UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

TRANS CONTINENTAL RECORDS, INC., BMG
ENTERTAINMENT, BMG ARIOLA MUENCHEN GmbH,
TRANS CONTINENTAL ENTERTAINMENT, INC.
and LOUIS J. PEARLMAN,

                         Plaintiffs,

vs.

ZOMBA RECORDING CORPORATION,
CLIVE CALDER, JAMES LANCE BASS,
JOSHUA SCOTT CHASEZ, JOSEPH
ANTHONY FATONE, JR.,
CHRISTOPHER ALAN KIRKPATRICK, and
JUSTIN RANDALL TIMBERLAKE,

                         Defendants.
_____/

CIVIL ACTION NO.
99-1282-Civ-Orl-22C

## COMPLAINT
## JURY TRIAL DEMANDED

Plaintiffs, Trans Continental Records, Inc. ("Trans Continental"), BMG
Entertainment ("BMG Entertainment"), BMG Ariola Muenchen GmbH, ("BMG Ariola"),
Trans Continental Entertainment, Inc. ("TCE") and Louis J. Pearlman ("Pearlman"), by
their undersigned attorneys, for their complaint against Defendants, James Lance Bass,
Joshua Scott Chasez, Joseph Anthony Fatone Jr., Christopher Alan Kirkpatrick, Justin
Randall Timberlake (hereinafter collectively the "Group Members" or "Group Member
Defendants"),  Zomba Recording Corporation ("Zomba") and Clive Calder ("Calder"),
allege as follows:

## **Nature of The Action**

1.      This action arises from Defendants' unlawful scheme to infringe Plaintiffs' valuable trademark rights in the mark 'N SYNC (the "'N SYNC Mark") and to breach contractual obligations owed to Plaintiffs by the popular musical recording group known as 'N SYNC (the "Group").  This action also has been made necessary by the egregious actions of Zomba in inducing the Group to breach its contractual obligations to Plaintiffs by, inter alia, entering into an unlawful recording agreement with Zomba, in violation of Plaintiffs' exclusive rights.    Defendants' wrongful actions are unconscionable because, as a result of the enormous time, effort and resources Plaintiffs have invested, the Group and 'N SYNC Mark have skyrocketed from virtual anonymity to one of the most popular and widely-recognized groups and marks in the world.

2.      The recording industry is highly competitive and fraught with considerable financial risk.  Record companies invest substantial sums of money in discovering new recording artists and financing the production of their recordings.  Many recording artists are signed to small, independently owned record companies and production companies which are an important part of the record industry.    These companies often sign artists of marked talent (like the Group Members) who are unknown to the large record companies, and provide an infusion of diversity and vitality of artistic expression that strengthens the record industry as a whole and redounds to the benefit of the public.  The actions of Pearlman and Trans Continental in forming, developing and grooming the Group and of BMG in providing creative input into,

promoting, advertising and distributing the Group's recordings have been essential to the Group's success.

3.     Trans Continental and Pearlman commenced using the 'N SYNC Mark in 1995 and have continuously used the 'N SYNC Mark at all times thereafter.   Trans Continental and Pearlman also hold rights under the exclusive license to the federal trademark registration in connection with the Group's music and music-related activities.

4.     Under an exclusive artist recording agreement between Trans Continental and the Group Members (the "Exclusive Recording Agreement"), to which BMG is a third-party beneficiary,  the Group Members are obligated to render exclusively to Trans Continental their services as musical recording artists.   Under the Exclusive Recording Agreement, the Group also acknowledged Trans Continental's ownership rights in and to the 'N SYNC Mark.   Under an exclusive license between Trans Continental and BMG (the "BMG License Agreement"), the Group's musical recordings and the 'N SYNC Mark are licensed exclusively to BMG for a specified term on a worldwide basis.   By this action, Plaintiffs seek injunctive relief and compensatory and punitive damages against Zomba, the Group Members and other defendants for trademark infringement, breach of contract, tortious interference with the relevant contracts, unfair competition and other claims.   This action also seeks damages and injunctive relief against the Group Members due to the Group Members' breach and repudiation of their Exclusive Recording Agreement.

5.     Despite its prior knowledge of the Exclusive Recording Agreement and BMG License Agreement, upon information and belief, Zomba and/or its label Jive

Records, have entered into a purported multi-record recording agreement with the Group Members (the "Zomba Recording Agreement") under which the Group Members would provide to Zomba their services as musical recording artists and the right to use the 'N SYNC Mark, in direct conflict with Plaintiffs' exclusive contractual rights.

6.      The unlawful scheme by Zomba to violate Plaintiffs' exclusive rights is part and parcel of a scheme by Zomba to steal the Group and the 'N SYNC Mark,  and deprive Plaintiffs of their exclusive rights to the services of the Group and the 'N SYNC Mark, despite the fact that the Group  and the 'N SYNC Mark were created, formed and developed by Pearlman and carried to the heights of success as a result of the considerable investment, commitment and energies of Pearlman, Trans Continental and BMG.

7.      The unlawful actions of the Defendants constitute an unconscionable and dangerous assault upon the record industry and the sanctity of contracts.  In order to prevent further irreparable harm to Plaintiffs, Defendants' illegal actions must immediately be enjoined.  In addition, in order to fully sanction Zomba and others, it is essential that Zomba be subject to a substantial punitive damages judgment.  In the absence of such relief, Plaintiffs will suffer grievous and irreversible harm and there will be a significant risk that Zomba will continue its unfair and unlawful activities, and that other record companies will similarly attempt to lure other recording artists away from companies to which they are signed.

8.      Specifically, Plaintiffs, who have no adequate remedy at law, seek, inter alia, an injunction barring Defendants and their respective agents and all those who act in

- 4 -

concert with them from: (i) using, displaying, or in any manner exploiting, the 'N SYNC Mark, or any variation or derivative of such Mark; (ii)  prosecuting any trademark application for registration of the 'N SYNC Mark  and from obtaining registration in any form of the 'N SYNC Mark and engaging in any acts which undermine, impair or otherwise create a cloud on Plaintiffs' rights in and to the 'N SYNC Mark; (iii) effectuating the Zomba Recording Agreement including, but not limited to using master recordings that the Group Members caused to be produced under the 'N SYNC Mark during the Summer of 1999 and continuing thereafter (the "New Master Recordings"); (iv)  manufacturing, causing to be manufactured, offering for sale, or selling recordings derived, in whole or in part, from the New Master Recordings, or any other recordings of the Group; (v) entering into any agreement with respect to merchandising or marketing of the Group, which would be inconsistent with or in violation of the terms of the Exclusive Recording Agreement or of the merchandising Agreement between Trans Continental and Winterland Productions, Inc. ("Winterland") dated as of or about November 30, 1998 (the "Winterland Agreement"); and (vi) communicating to any third party that the Exclusive Recording Agreement has been terminated.   Plaintiffs also seek compensatory damages in an amount to be proved at trial but, in a sum in excess of $100,000,000 together with punitive damages of $50,000,000.  Plaintiffs further seek delivery of the original of the New Master Recordings, and all copies, derivatives and compilations of the New Master Recordings and all works created or derived from the New Masters Recordings.  Plaintiffs also seek a declaration from this Court that, inter alia, the Group Members' purported termination of the Exclusive Recording Agreement and the

Exclusive Management Agreement is null and void and  that the Zomba Recording Agreement is null and void.   Plaintiffs also seek an order requiring Defendants to account for and pay to Plaintiffs all remuneration that Trans Continental would have received under the Exclusive Recording Agreement if that agreement had not been breached by the Group Members.   Finally, Plaintiffs seek indemnification of their damages, costs, expenses, and attorney's fees pursuant to the provisions of the governing agreements and/or under any applicable laws.

## The Parties

9.     Plaintiff Pearlman, an individual residing in Orlando, Florida, conceptualized, formed and developed the immensely popular and highly-acclaimed recording group known as 'N SYNC, as well as other successful and well-known popular recording groups such as the Backstreet Boys.

10.     Plaintiff Trans Continental is a Florida corporation with its principal place of business in Orlando, Florida and is engaged in the business of developing and promoting musical recording groups.  Headed by Pearlman, Trans Continental assisted in training, developing, recording and marketing the Group, through significant expenditures of money, skill, time, and resources.  Trans Continental and Pearlman have used the 'N SYNC Mark since 1995 and hold rights under the exclusive license for the United States federally registered trademark, registration No. 1,843,498, for all music and music-related activities in the United States.  In 1996, Trans Continental also entered into the Exclusive Recording Agreement with the Group Members pursuant to which, inter alia, the Group Members, by express provisions:  (i) agreed to provide their exclusive

- 6 -

services to Trans Continental as performers and members of the new group known as 'N SYNC, and to produce and deliver to Trans Continental up to eight albums or "LPS" embodying their recordings as 'N SYNC; (ii) warranted that they would not provide recordings to anyone other than Trans Continental or its designees; and (iii) acknowledged Trans Continental's rights to the 'N SYNC Mark and its rights to and control over the production of master recordings of the Group and the commercial use of the master recordings. Plaintiff TCE is the management company of the Group pursuant to an Exclusive Management Agreement.

11.    Plaintiff BMG Entertainment is a d/b/a of BMG Music, a New York general partnership with its principal place of business in New York City. Plaintiff BMG Ariola is a German corporation with its principal place of business in Munich, Germany and is an affiliate of BMG Entertainment and the international entertainment company Bertelsmann AG, one of the largest recording media and distribution companies in the world. The BMG entities manufacture, distribute and sell albums, compact discs, tapes and other audio and audiovisual recordings (hereinafter "records") in the United States and abroad through various affiliates, divisions and units including the well-known RCA Records Label ("RCA"). Sales of records by BMG entities account for a substantial percentage of all sales of recordings in the United States. BMG Entertainment, BMG Ariola and RCA sometimes will be referred to collectively herein as "BMG." The records of all BMG labels are distributed by BMG Distribution worldwide, including in the United States.

12.    In August 1996, Trans Continental entered into the BMG License Agreement with BMG for the recording and distribution of the Group's music.  At that time,  the Group had not yet released any recording or performed publicly before any large audiences.  The Group was still in development – unknown and untried.  In August 1996, the Group Members executed a Letter of Acknowledgment, in which they unconditionally endorsed the BMG License Agreement; BMG has distributed their records throughout the world since early 1997.  To date, more than 10,000,000 million copies of the Group's albums have been sold by BMG.

13.    Upon information and belief, Defendant Zomba is a New York corporation with its principal place of business in New York City, and is engaged in the manufacture, distribution and sale of records throughout the United States and elsewhere. Upon information and belief, Zomba operates through various wholly owned entities, including Jive Records ("Jive").  BMG owns a minority interest in Zomba, but defendant Calder, Zomba's Chairman of the Board and Chief Executive Officer, actively controls and directs the activities of Zomba and has authorized, approved, directed and participated in the unlawful conduct alleged herein. Defendant Calder is an individual residing in New York City and has been active in the recording industry for many years.

14.    Defendants James Lance Bass, Joshua Scott Chasez, Joseph Anthony Fatone, Jr., Christopher Alan Kirkpatrick and Justin Randall Timberlake comprise the Group.  Upon information and belief, all of these individual defendants reside in Orlando, Florida.

## Jurisdiction And Venue

15.     This Court has original jurisdiction over the subject matter of this action pursuant to 15 U.S.C. §1121 and pursuant to 28 U.S.C. §§ 1331 and 1338, in that this case arises under the Trademark Laws of the United States, 15 U.S.C. § 1051, and this Court has supplemental jurisdiction over all non-federal claims pursuant to 28 U.S.C. § 1367.

16.     This action, which also seeks a declaratory judgment, is also brought under 28 U.S.C. §§ 2201 and 2202.  Further, there is an actual controversy between the parties.

17.     Upon information and belief, certain of the unlawful acts took place in Florida including negotiations resulting in the Zomba Recording Agreement and meetings and telephone conversations for the purpose of infringing Plaintiffs' trademark rights and otherwise infringing and violating Plaintiffs' rights.  Defendants, including Defendant Calder, have committed tortious acts in the Middle District of Florida, or have committed acts outside the State which have caused damage to Plaintiffs in the Middle District of Florida.

18.     Venue in this district is proper pursuant to 28 U.S.C.§ 1391(b) because: (a) a substantial part of the events or omissions giving rise to the claims occurred in this district, (b) Defendants are found in this district and (c) the district is specified in a forum selection clause contained in one of the contracts that is the subject of this action.

## Factual Background

## The Creation of the Group by Pearlman

19.     Pearlman, directly or through Trans Continental or other affiliated entities, is engaged in the business of discovering, evaluating, training, financing, and equipping hopeful young singers, musicians and performers at the early stages of their careers. Once a group is created, Pearlman and/or Trans Continental will front living expenses for artists and sometimes their families while they are trained by vocal coaches, choreographers, stylists, producers and other professionals.   Pearlman and/or Trans Continental retain accomplished producers to create songs for the group while their singing, dancing and other talents are being developed by skilled professionals, also retained by plaintiffs Pearlman and/or Trans Continental.  Trans Continental is also the owner of a state-of-the art recording studio whose facilities and personnel are made available to its young artists.  Pearlman's and Trans Continental's business is dependent upon Pearlman's skill in identifying and commercializing the right artists and group concepts so that those which do succeed yield sufficient revenues to justify the enormous risks and substantial economic investments involved.    Pearlman's and Trans Continental's business is also dependent upon the maintenance of their credibility, high artistic standards, and important relationships with producers, managers and record companies.

20.     In 1995, each of the Group Members was trying to break into the music business, but had not achieved any commercial or artistic success, making only sporadic appearances for modest compensation.  Defendants Kirkpatrick and Fatone worked at Universal Studios to sustain themselves as they tried to get their first break in the music business.  Defendants Timberlake and Chasez had appeared on the television show, the

Mickey Mouse Club.  None were members of an established group, had a recording contract nor any other regular source of income derived from the music business.

21.    Through recommendations, references, auditions and showcases, in 1995 Pearlman ultimately assembled the Group Members to perform as the members of a unified ensemble in which he was prepared to invest time and money and to which he would give the benefit of his business expertise and rising stature in the music business, due to his success in conceiving and developing other popular music groups, including the Backstreet Boys and LFO.

22.    The members of the Group (and their families) recognized the unique opportunity offered by Pearlman and enthusiastically entered into a relationship with him. To further their common objectives, Pearlman, Trans Continental, TCE, and the Group Members entered into a series of agreements which would provide the members of the Group with all of the opportunities they sought and which contemplated a substantial investment by Pearlman, which he could recoup only if the Group achieved commercial success.

### The Exclusive Recording Agreement

23.    On or about April 29, 1996, Trans Continental and the Group Members entered into the Exclusive Recording Agreement, pursuant to which Trans Continental acquired the exclusive rights to the Group Members' services as musical recording artists, and which required the Group Members to record and deliver to Trans Continental sufficient master recordings embodying the Group Members' performances of musical compositions ("Masters") to constitute one album during the initial contract period and one album during each of the seven "option periods" granted to Trans Continental, as defined in the Exclusive Recording Agreement. (A true and correct copy of the Exclusive Recording Agreement is attached hereto as Exhibit A). Trans Continental agreed to

finance the recordings of the Master and to advance substantial expenses on behalf of the Group Members which included, but were not limited to, the Group Members' union wages, the union wages of back-up and supporting musicians, and other staff needed to produce the Masters, travel, lodging, rehearsal and equipment rental expenses, advances to producers, per diems, all studio and engineering charges and packaging costs. Trans Continental also agreed to finance appearances by the Group, the production of videos and other marketing, touring and promotion expenses. Trans Continental agreed to pay the Group Members advance royalties with respect to each such Master. Trans Continental also arranged and paid for the services of songwriters, vocal coaches, choreographers, stylists, publicists, private school tutors, accommodations for parents and guardians of group members and housing.

24.     The Exclusive Recording Agreement provides that these costs and expenses were, in large part, "non-returnable advances," which could be recouped from the proceeds, if any, of the distribution and sale of LPS made from the Masters, but which could not be recovered from the Group except in certain circumstances following a breach of the Exclusive Recording Agreement. Thus, Pearlman and Trans Continental, not the Group Members, bore the substantial financial risk of unsuccessful Masters or lack of public acceptance.

25.     Pursuant to Paragraphs 2.01 and 3.01 of the Exclusive Recording Agreement, the Group Members are obligated to:

> render [their] services as a performing artist [to Trans Continental] . . . for the purpose of [recording and delivering to Trans Continental] Master Recordings . . . . Such Masters shall embody the featured vocal performances of [the Group Members] . . . .

26.     Paragraph 13 of the Exclusive Recording Agreement requires the Group Members to provide their services as recording artists exclusively to Trans Continental and the Group Members  expressly and specifically represented and warranted that they would not enter into any other agreements which would interfere with their full and prompt performance of their obligations under the Exclusive Recording Agreement.

27.     Pursuant to Paragraph 13.04 of the Exclusive Recording Agreement, the Group Members acknowledge [that their] "services . . . are unique and extraordinary, and [that Trans Continental's] loss thereof cannot be adequately compensated in damages, and [Trans Continental] shall be entitled to seek injunctive relief to enforce the terms of this [Exclusive Recording Agreement]."

28.     During the Term of the Exclusive Recording Agreement, the Group Members are obligated to record and deliver exclusively to Trans Continental recordings embodying their performances.   The Term of the Recording Agreement has not yet expired.

29.     Pursuant to Paragraph 7 of the Exclusive Recording Agreement, Trans Continental is the owner of the Masters and has entire worldwide rights, title and interest, including the copyright, in and to all recordings embodying the Group Members' performances recorded during the Term.

30.     Pursuant to Paragraph 21.04(b) of the Exclusive Recording Agreement, the Group Members agreed that Trans Continental is the sole owner of the 'N SYNC Mark and the Group Members will not authorize anyone else to use such Mark.  This provision applies to any member who leaves the Group.

- 13 -

31.     Pursuant to Paragraphs 8 and 19 of the Exclusive Recording Agreement, the Group Members agreed that Trans Continental and its designees (including BMG) shall have the right to reproduce, print, publish and disseminate the names, portraits, pictures and likenesses of the Group Members in connection with all Masters.

32.     Pursuant to Paragraphs 2, 3, 4 and 21 of the Exclusive Recording Agreement, the Group Members agreed that Trans Continental had ultimate creative control over the recording process, including, inter alia, control over when, where and how albums would be recorded, the manner in which albums would be recorded, the material that would be included in the recordings, as well as the content and production of performances and products, including but not limited to, the selection of a producer, the selection of materials, including the number of compositions to be recorded and the specification of accompaniments, arrangements and copying services. The Group is obligated to promptly deliver to Trans Continental all Masters made and a listing of all the musical selections contained in the Masters. The aforementioned rights ensure that Trans Continental can maintain the quality and image of the Group and the products and services associated with the 'N SYNC Mark.

33.     Pursuant to Paragraphs 8 and 19 of the Exclusive Recording Agreement, the Group Members granted to Trans Continental all merchandising rights relating to the commercial activities of the Group, and the right to grant to others upon such terms as Trans Continental sees fit, the right to exercise and commercially exploit all such merchandising rights.

34.     Pursuant to paragraphs 9, 10 and 11 of the Exclusive Recording Agreement, Trans Continental and the Group Members agreed that the Group would receive fifty percent of net royalties and net receipts, as further defined and described in the Exclusive Recording Agreement. As is customary, Trans Continental had the express

right to deduct unrecouped advances and  agreed to account to the Group Members on a semi-annual basis.

35.     Pursuant to Paragraph 13 of the Exclusive Recording Agreement, Trans Continental may recover its costs and expenses, including reasonable attorney's fees, of any action arising out of the breach of any warranties and representations made by the Group Members in the Exclusive Recording Agreement.

36.     The Group Members have heretofore recorded and delivered, pursuant to the Exclusive Recording Agreement, sufficient Masters to constitute one album that the Group Members were obligated to deliver to Trans Continental during the initial contract period.   Pursuant to the Exclusive Recording Agreement, and the BMG Licensing Agreement, approximately 10,000,000 copies of  albums by the Group have been sold worldwide.

37.     BMG is a third party beneficiary of the Exclusive Recording Agreement.

### The Exclusive Management Agreement

38.     On or about April 28, 1996, TCE and the Group Members entered into an Exclusive Management Agreement ("the Exclusive Management Agreement"), pursuant to which the Group Members engaged the services of TCE as their sole and exclusive personal manager throughout the world for an initial term of two years with four consecutive one year options. (A true and correct copy of the Exclusive Management Agreement is attached hereto as Exhibit B). The management services to be provided to the Group by TCE pursuant to the Exclusive Management Agreement included, but were not limited to, advising and counseling the  Group on: (a) the selection of artistic and musical material; (b) public relations and advertising; (c) presentation of its talents and the determination of proper style, mood and setting; and (d) the general advancement of the Group's career.

39.     The Exclusive Management Agreement, like the Exclusive Recording Agreement, provides that the "services rendered by 'N SYNC are special, unique and irreplaceable, and any breach or threatened breach by 'N SYNC of any of 'N SYNC's obligations thereunder may be enjoined temporarily or permanently without regard to and without limiting any other remedy that may be available to [TCE]." (Exclusive Management Agreement ¶ 14).

40.     Plaintiff TCE has duly performed all its obligations under the Exclusive Management Agreement and the Group Members have enthusiastically accepted the benefits under that agreement.

### The BMG License Agreement

41.     Immediately after it entered into the Exclusive Recording Agreement and with the full knowledge and support of the Group Members, Trans Continental met with various prominent record companies in order to further promote and enhance the development and commercial success of the Group through the worldwide marketing and sale of its recordings.

42.     On or about August 1, 1996, Trans Continental entered into the BMG License Agreement pursuant to which BMG obtained the exclusive right to manufacture, distribute and sell the Group's records throughout the world as well as the right to use the 'N SYNC Mark in connection with such records. (A true and correct copy of the BMG License Agreement is attached hereto as Exhibit C).  BMG also has the right to approve any name change and to consult in the selection of all material to be recorded by the Group pursuant to the agreement.  The BMG License Agreement provides for the delivery of an initial album, plus options for four (4) additional albums and remains in effect even should the members of the Group change, although BMG has the right to approve any addition to the Group. The BMG License Agreement provides that both

Trans Continental and BMG have control over the nature, production and content of the Group's recordings.  The aforementioned rights ensure that BMG, together with Trans Continental,  can maintain the quality and image of the Group and its products and help the Group to create a distinct style and direction appropriate to its markets.  BMG, together with Trans Continental, agreed to devote substantial resources to the Group and expended substantial sums to produce and promote the Group's records and the Mark. Pursuant to a pre-existing  BMG intercompany agreement, RCA obtained the right exclusively to distribute the Group's records in the United States and to use the 'N SYNC Mark.

43.     By Letter of Acknowledgment dated August 1, 1996, each of the Group Members, as an inducement for the parties' entry into the BMG License Agreement, reaffirmed their obligations under the Exclusive Recording Agreement and expressly acknowledged that Trans Continental entered into the BMG License Agreement for the purposes of distributing, selling and exploiting the Group's records on a worldwide basis. (A true and correct copy of the Letter of Acknowledgment is attached hereto as Exhibit D).

44.     As a result of the efforts, time, money and resources expended by Plaintiffs,  in or about April 1997, the Group's self-titled first record was released by BMG in Europe and Southeast Asia.  The record has sold approximately 1,000,000 units in Europe and Southeast Asia and has achieved enormous success, including various gold, platinum and multi-platinum awards.  In March 1998, RCA, with the aid of Trans Continental, released the Group's self-titled first recording in the United States.   The album has achieved staggering success, selling approximately 7,000,000 units in the United States.  In addition, in November 1998, RCA, with the aid of Trans Continental, released in the United States the Group's Christmas album, which has sold approximately

1,700,000 units to date.  To put these numbers in context, to be certified gold, a record need sell only 500,000 copies.

45.     For the past three years, the Group Members have profited enormously, both financially and in the growth of their reputation and name recognition, from the efforts of Trans Continental and BMG in promoting, marketing and distributing the Group's records.  The Group is now one of the best known and most popular groups in the world, with a huge pre-teen and teen following in the United States, Europe, Asia and other markets, and the 'N SYNC Mark is one of the most widely-recognized in the world.

46.     The Group recently completed a successful United States tour, has engaged in various tours abroad, and has made numerous television appearances, including its own pay-per-view program and a featured performance in the 1999 MTV video award show.  The Group Members also have received, retained and enjoyed the benefits of lucrative sponsorship and  merchandising agreements and the Group has been the subject of dozens of news and magazine features highlighting its success.

## Plaintiffs' Rights in and to the 'N SYNC Mark

47.     In 1995, Pearlman and Trans Continental commenced using the 'N SYNC Mark in connection with the Group's music and music-related activities and have used the Mark on a continuous and ongoing basis at all times thereafter.  In 1996, Pearlman acquired the exclusive license to U.S.  Trademark Registration Number 1,843,498 for all music and music-related activities in the United States, including but not limited to, recording, publishing, merchandising, television, video, motion picture, live performance, promotions and advertising. The federal registration claims a first use date of January 2, 1992.  Pearlman sublicensed rights to the federal registration to Trans Continental.

48.     Pursuant to the BMG License Agreement, BMG obtained, for the term of the license, the exclusive right to use the 'N SYNC Mark in connection with the manufacture, distribution and sale of the Group's recordings throughout the world.

49.     Pearlman also obtained, at substantial expense, exclusive trademark rights for the 'N SYNC Mark in more than twenty (20) countries throughout the world including, but not limited to, Australia, Austria, Brazil, Canada, France, Germany, Mexico, Spain, Switzerland and the United Kingdom. At all relevant times, Pearlman and Trans Continental and their respective licensees have continuously used the 'N SYNC Mark in interstate commerce and throughout the world.

50.     Pearlman, Trans Continental and BMG are required by law to supervise and control the use of the 'N SYNC Mark in connection with services and products utilizing the 'N SYNC Mark. Plaintiffs, in accordance with legal requirements and cognizant that music, particularly pop music, has become so image-driven, have, at all pertinent times, exercised control over the quality of the goods and services under the 'N SYNC Mark in connection with the Group's recordings, videos, merchandising, live performances, promotions and advertising.

51.     The Group Members have no right or license to use the 'N SYNC Mark, except as authorized by Plaintiffs, and, as more fully described below, have expressly acknowledged Plaintiffs' rights in the Mark.

52.     As a result of the collective efforts and commitment of Pearlman, Trans Continental, BMG and RCA, including their creative input, financial support, record industry experience and extensive marketing capabilities in the United States and throughout the world, the Group has become among the world's most popular recording and live performance groups, has won numerous prestigious awards, and has experienced extraordinary success. Plaintiffs have, at all times, exercised exclusive care and control

over the quality of the goods and services under the 'N SYNC Mark. The public has come to expect and associate a certain quality and style, not just of sounds but how the sounds are produced on the Group's records and with respect to the style and image of the Group itself, with the 'N SYNC Mark.

## Defendants' Unlawful Conduct

### The Purported and Invalid Termination of the Exclusive Recording Agreement and the Exclusive Management Agreement

53.     Beginning in or about March, 1999, the Group Members, represented by a team of experienced and sophisticated New York attorneys and music industry advisors, attempted to re-negotiate the terms of their various agreements with Trans Continental. When the negotiations did not meet their expectations, the Group Members devised an unlawful scheme to breach their agreements with Plaintiffs and enter into a new recording agreement with a competitor label.

54.     In furtherance of this scheme, on May 26, 1999, more than three years after the date of the Exclusive Recording Agreement, after enormous commercial success in the United States and throughout the world, defendants, by their attorneys, claimed a right to terminate the Exclusive Recording Agreement and refused to record and deliver to Plaintiffs any further records, based on paragraph 19.12, which states:

> "Notwithstanding anything to the contrary contained herein, you [defendants] shall have the right to terminate this agreement in the event COMPANY has not secured a distribution agreement with a U.S. record company within eighteen months from the date hereof, pursuant to which recordings of your performances shall be released."

55.     This purported termination is a sham that has no legal force or effect because   Trans Continental   satisfied   its   obligations   under   the   Exclusive Recording Agreement. Trans Continental and BMG entered into the BMG License Agreement on or

about August 1, 1996, approximately three months after the Exclusive Recording Agreement between Trans Continental and the Group members – and well before the expiration of the eighteen month date set forth in Section 19.12. BMG Distribution is one of the largest record distribution companies in the world, including in the United States. Its market share of current albums released in the United States is approximately 18%, making it second in market share in the country. Moreover, BMG's intercompany agreement gave RCA the right to distribute the Group in the United States under the BMG License Agreement.

56.     As further evidence of the utter lack of merit in the purported termination, as of the date of the May 26, 1999 purported termination, the Group's United States debut album had sold approximately 6,600,000 copies and the Christmas album had sold approximately 1,700,000 copies. The Group had skyrocketed from almost complete anonymity in the United States to the absolute pinnacle of fame and popularity. The Group's purported termination therefore is utterly baseless.   The Group members enthusiastically embraced RCA and Trans Continental, and worked closely with it in preparing, recording and promoting the Untied States debut album and the Christmas album. The purported termination, coming after the Group already had received and accepted the overwhelming benefits their relationship with BMG and RCA has produced is absolutely unconscionable.

57.     Moreover, the Group Members accepted the benefits of the Exclusive Recording Agreement by, among other things, accepting  unparalleled financial and creative support from Plaintiffs, lucrative and substantial touring and merchandising contracts with third parties and substantial payments. The Group Members achieved international stardom from the collective efforts of Plaintiffs who expended millions of dollars in artistically developing and promoting the Group. The conduct of the Group

Members has, at all relevant times, reflected the unequivocal and enthusiastic acceptance of the benefits of the relationships.

58.    Similarly, after three years of accepting and enjoying the benefits of the Exclusive Management Agreement, the Group also purported to terminate the Exclusive Management Agreement. This purported termination is a sham that has no legal force or effect. Plaintiffs have rejected the Group Members' purported termination of the Exclusive Management Agreement.

59.    The Group Members also surreptitiously negotiated with various third parties, including Defendant Zomba, regarding the right to distribute records under the 'N SYNC Mark, to exploit merchandising rights, including the use of the 'N SYNC Mark, and have misappropriated master recordings and other intellectual property owned by Plaintiffs.

### The Unlawful Zomba Recording Agreement

60.    On or about September 7, 1999, Zomba, aware of the rights of Trans Continental and BMG, announced that it entered into the Zomba Recording Agreement with the Group Members for their services as recording artists using the 'N SYNC Mark, in direct conflict with Plaintiffs' exclusive rights. As alleged in more detail below, the Zomba Recording Agreement and the unlawful scheme were devised to steal the Group and the 'N SYNC Mark from the Plaintiffs, and were undertaken in direct violation of: (i) Plaintiffs' rights in the 'N SYNC Mark; (ii) the Exclusive Recording Agreement; and (iii) the rights of BMG. Calder also was aware of the rights of Trans Continental and BMG and directed and controlled the activities of Zomba with respect to the negotiations and execution of the Zomba Recording Agreement.

61.    At all relevant times Zomba knew or should have known that the purported termination of the Exclusive Recording Agreement by the Group Members was

a sham that has no legal force or effect.  Nonetheless, Zomba wrongfully induced the Group Members to further breach their contractual obligations to Plaintiffs by signing the Zomba Recording Agreement and asserting that the Group Members are legally bound under the Zomba Recording Agreement to furnish their exclusive services as recording artists to Zomba, and not to Plaintiffs.

62.    Upon information and belief, Zomba and the other Defendants intend to use the 'N SYNC Mark in connection with the marketing, promotion and sale of records embodying master recordings delivered to Zomba under the Zomba Recording Agreement which, in fact, the Group Members are obligated to record for and deliver to Plaintiffs.  In fact, Defendants, in announcing the Zomba Recording Agreement, already have unlawfully appropriated the 'N SYNC Mark.  These actions and threatened actions constitute a willful violation of the Lanham Act.

63.    Upon information and belief, Zomba and the other Defendants intend to use the names and likenesses of the Group Members in connection with the marketing and promotion of albums embodying master recordings delivered to Zomba under the Zomba Recording Agreement which, in fact, the Group Members are obligated to record for and deliver to Plaintiffs.

64.    Because the Exclusive Recording Agreement grants to Trans Continental and its designees (including BMG) the exclusive right to use the Group Members' names and likenesses for said purposes, any such uses of their names or likenesses by Zomba and the other Defendants would constitute, among other things, a violation of the Lanham Act and the trademark laws of states in which any such unlawful conduct by Zomba occurs.  Plaintiffs reserve the right to supplement this complaint as appropriate should Zomba and/or the other Defendants engage in such wrongful conduct in the future.

65.     The Group Members' refusal to record and deliver to Plaintiffs the additional recordings required by the Exclusive Recording Agreement, their repudiation of the Exclusive Recording Agreement, their negotiations with one or more record companies other than Plaintiffs, and their agreement with Zomba, constitute a willful and malicious breach and repudiation of the Group Members' obligations under the Exclusive Recording Agreement.

66.     Zomba's actions in inducing the Group Members to willfully breach and repudiate their contractual obligations to Plaintiffs also constitutes a willful and malicious interference with the contractual relations between and among the Group Members and Plaintiffs.

67.     Plaintiffs have demanded that the Group Members perform their obligations, but they have refused to withdraw their purported termination and have acted in callous disregard of Plaintiffs' trademark and contractual rights.  For a period of time prior to the date hereof, the parties were attempting to resolve this dispute.  The failure of those discussions to resolve the issues between the parties resulted in the commencement of this action.

### The New Master Recordings

68.     Upon information and belief, during the Summer of 1999 and continuing thereafter, the Group Members caused to be produced a number of master recordings under the 'N SYNC Mark ("the New Master Recordings").  Prior to the purported termination of the Exclusive Recording Agreement, the Group Members had worked with Plaintiffs in connection with   recording sessions and the creation and use of master

- 24 -

recordings.  In particular, the Group Members worked closely with Plaintiffs to record new musical recordings, which were scheduled  to be released by RCA in late 1999. Even after the purported termination, the Group continued to work closely with Plaintiffs to create the new master recordings, but recently refused to deliver the New Master Recordings to Trans Continental and/or BMG in violation of Plaintiffs' trademark, copyright and contractual rights.  Rather, as more fully alleged below, Defendants have now wrongfully retained and converted the New Master Recordings for their own illicit purposes.

69.     Upon information and belief, in furtherance of the agreement with Zomba, the Group recently delivered, sold, or otherwise transferred the New Master Recordings to Zomba and Calder, or their agents, or are about to do the same, and has or will imminently produce and distribute additional recordings utilizing the 'N SYNC Mark and derived from the New Master Recordings.  The Defendants have refused, despite due demand therefor, to deliver to Trans Continental and/or BMG the New Master Recordings.  Upon information and belief, the Group, acting in concert with Zomba, Calder and/or their agents, intend imminently to manufacture and distribute phonograph records from the New Master Recordings and other recordings.

70.     Because Plaintiffs own the copyright in and to all of the Group Members' recordings embodying their performance of musical compositions recorded during the Term, including all option periods, any exploitation by Zomba of any such recordings will constitute a willful violation by Zomba and others of Plaintiffs' rights under the Copyright Act of 1976.  Plaintiffs reserve the right to register the copyrights in all such

recordings when they receive a copy sufficient to constitute a deposit copy, and to thereafter supplement this complaint to seek all remedies available to them under the Copyright Act of 1976.

71.    If the Group and/or Zomba further effectuates the Zomba Recording Agreement by manufacturing, distributing and promoting recordings of the Group, including those derived from the New Master Recordings, or otherwise utilizes the 'N SYNC Mark, Plaintiffs will continue to suffer immediate, severe and irreparable harm. In this regard, the rights of Plaintiffs in the 'N SYNC Mark will be wrongfully infringed. Plaintiffs will lose the quality and image of the products and services offered under the 'N SYNC Mark, Plaintiffs will lose their ability to monitor the use of the 'N SYNC Mark and Plaintiffs will lose the benefits of the distinctive style and direction they brought to the Group.  Plaintiffs' reputation, image and good will in the music industry will be severely impaired, and their continued ability to secure recording contracts will be undermined.  In addition, the future ability of Plaintiffs to make an investment in and commitment to any group created, conceived or developed by them would be substantially and irrevocably impaired if, as here, the Group's trade name (including the good will associated therewith), its master recordings and other intellectual property could be diverted and misappropriated in such a manner.

72.    As a result of the foregoing, Plaintiffs have no adequate remedy at law and seek declaratory and injunctive relief establishing their exclusive rights to the 'N SYNC Mark, establishing the enforceability of the Exclusive Recording Agreement and preventing the Defendants from causing immediate, substantial and irreparable harm.

### Defendants' Wrongful Application
### to Obtain Federal Registration of
### of the Mark 'N SYNC

73.     On or about May 24, 1999, the Group Members, again assisted by their team of music industry lawyers and advisors, filed with the United States Patent and Trademark Office an intent-to-use trademark application No. TM 75/712737, for registration of the 'N SYNC Mark and are prosecuting such trademark application (the "Unauthorized Trademark Application"). Such conduct is in direct and blatant violation and contravention of Plaintiffs' exclusive rights to that Mark and Section 21.04(b) of the Exclusive Recording Agreement, in which the Group Members acknowledged Plaintiffs' exclusive rights in the ownership and use of the 'N SYNC Mark.

74.     The Unauthorized Trademark Application was an intent to use application and therefore, by its very nature, establishes that the Group Members did not use the 'N SYNC Mark prior to the date of the application, May 24, 1999. And indeed, the Unauthorized Trademark Application does not allege any such prior use.

### Defendants' Interference With
### Trans Continental's Merchandising Rights

75.     The Group Members also have interfered with a merchandising agreement between Trans Continental and Winterland Productions, Inc. ("Winterland"), dated as of November 30, 1998, whereby Trans Continental licensed to Winterland certain licensed property, including the name and likeness of the Group, in connection with the manufacture, advertisement, distribution and sale of such items as apparel, calendars, buttons and other novelty items ("Winterland Agreement").

75.     Pursuant to the Winterland Agreement, Winterland is required to pay Trans Continental royalties at various rates depending upon the nature of the distribution

or sales transaction.  Revenues received under the Winterland Agreement are distributed pursuant to and as expressly contemplated by the Exclusive Recording Agreement.  By acknowledgment on the last page of the Winterland Agreement, each of the Group Members expressly acknowledged that Winterland had no obligation to make any payments whatsoever to the Group Members in connection with the agreement or any services rendered by the Group Members in connection with the agreement.

77.     Notwithstanding the foregoing, upon information and belief, the Group Members, through their counsel, advised Winterland of the Group Members' purported termination of the Exclusive Recording Agreement and demanded that Winterland pay the monies due to Trans Continental under the Winterland Letter Agreement directly to the Group Members.  As a direct result of receiving the letter from Group Members, Winterland will not pay Trans Continental royalties as required under the Agreement.

## COUNT I

### (Trademark Infringement Claim under § 32 of the Lanham Act, 15 U.S.C. § 1114)

78.     Plaintiffs Trans Continental and Pearlman repeat and reallege paragraphs 1 through 77 of the Complaint as if fully set forth herein.

79.     Plaintiffs Trans Continental and Pearlman have used the 'N SYNC Mark since 1995 and also hold rights under the exclusive license for the United States federally registered trademark, registration No. 1,843,498, for all use in connection with a musical group and with all music and music related activities, recording, publishing, merchandising, television, video, motion picture, live performance, promotional, advertising and other activities related to the Group's career in the entertainment industry.

80. Defendants have no right or license to use the 'N SYNC Mark. The Group Members acknowledged in the Exclusive Recording Agreement that they have no right to the Mark.

81. By recording the New Master Recordings under the 'N SYNC Mark, the Defendants have infringed upon Plaintiffs Trans Continental's and Pearlman's rights in the 'N SYNC Mark, in violation of § 32 of the Lanham Act.

82. Defendants, by purporting to terminate the Exclusive Recording Agreement on invalid grounds, by entering into the Zomba Recording Agreement, by their unlawful possession, control and use of the New Master Recordings, and by filing the Unauthorized Trademark Application for the 'N SYNC Mark have threatened to infringe upon Trans Continental's and Pearlman's rights in and to the 'N SYNC Mark in violation of § 32 of the Lanham Act.

83. If Defendants are permitted to perform, record, or participate in or permit the manufacture or distribution of records in interstate commerce using the 'N SYNC Mark, other than through or under the Exclusive Recording Agreement and related agreements with Plaintiffs, or if Defendants are permitted to pursue a trademark registration for the mark on their own behalves, or otherwise hold themselves out as the owners of the Mark, Plaintiffs Trans Continental and Pearlman will suffer immediate and irreparable injury which is not compensable through an award of money damages, including but not limited to, the loss of good will; the loss of the right to use and to control the use of the 'N SYNC Mark; loss of artistic input as to the content, merchandising and marketing of a pop singing group known as 'N SYNC, its performances and its recordings; loss of control over the reputation of the 'N SYNC Mark; loss of the fruits of their efforts in discovering and developing the Group into a well known and successful, pop group known as 'N SYNC; and injury to Plaintiffs Trans

Continental's and Pearlman's reputation and name recognition as successful developers and promoters of unknown musical groups.

84.     Plaintiffs have no adequate remedy at law.

## COUNT II

### (Trademark Infringement and False Designation of Origin Claim under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a))

85.     Plaintiffs repeat and reallege each and every allegation of paragraphs 1 through 84 of the Complaint as if fully set forth herein.

86.     The 'N SYNC Mark is an inherently distinctive mark.  Alternatively, by reason of Plaintiffs' use of the Mark in connection with the services and products developed and financed by Plaintiffs, including the Group's tours, live performances, LPS, videos and related merchandise, the Mark has come to be associated by the public with the services and products developed, produced and marketed by Plaintiffs and has thereby acquired secondary meaning.

87.     Defendants' use of the 'N SYNC Mark is likely to cause confusion or to cause mistake or to deceive as to the affiliation, connection or association as to the origin, sponsorship or approval of Defendants' products by Plaintiffs, and otherwise conflicts with Plaintiffs' rights in and under the Mark.

88.     In addition, Defendants' release under a Zomba label of recordings to which Plaintiffs own the exclusive rights is likely to cause confusion or to cause mistake or to deceive as to the affiliation, connection or association as to the origin, sponsorship or approval of such recordings, and otherwise conflict with Plaintiffs' rights.

89.     By reason of the foregoing, Defendants have threatened to place such deceptive and infringing products and services in interstate commerce in violation of section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and unless restrained, such

conduct will result in irreparable injury to Plaintiffs for which they have no adequate remedy at law.

## COUNT III

**(Trademark Dilution under § 43(c) of the Lanham Act, 15 U.S.C. § 1125(c))**

90.  Plaintiffs Trans Continental and Pearlman repeat and reallege each and every allegation of paragraphs 1 through 89 of the Complaint as if fully set forth herein.

91.  Plaintiffs' 'N SYNC Mark is a famous trademark.

92.  By virtue of Defendants' conduct, including Defendants' use of the 'N SYNC Mark, Defendants have diluted, and intend to continue to dilute the distinction, quality, and reputation of Plaintiffs' 'N SYNC Mark, in violation of Lanham Act § 43(c), 15 U.S.C. § 1125(c).

93.  Defendants' conduct has been willful, malicious and wanton and they will continue their acts of willful dilution unless enjoined by this Court.

94.  The acts of Defendants have caused irreparable harm and damage to Plaintiffs and will continue to cause irreparable harm to Plaintiffs, and have caused Plaintiffs to suffer monetary damage in an amount thus far not determined.

95.  Plaintiffs have no adequate remedy at law.

## COUNT IV

**(Injunctive Relief Pursuant to §495.131 of the Florida Statutes – Trademark Infringement)**

96.  Plaintiffs Trans Continental and Pearlman repeat and reallege each and every allegation contained in paragraphs 1 through 95 of the Complaint as if fully set forth herein.

97.  Plaintiff Pearlman and his affiliated companies, including Trans Continental, have adopted and used the 'N SYNC Mark in the State of Florida in

connection with the Group and with all recording, publishing, merchandising, television, video, motion picture, live performance, promotional, advertising and other activities related to the Group's career in the entertainment industry.

98.     If Defendants use the 'N SYNC Mark as they have threatened to do, in violation of Defendants' obligations under the Exclusive Recording Agreement, and in violation of Plaintiffs Trans Continental's and Pearlman's rights to control the content and quality of the performances, recordings and merchandise marketed and sold with the 'N SYNC Mark, Plaintiffs will suffer injury which is not compensable through the award of money damages, including but not limited to injury to business reputation, loss of good will, loss of quality control, and dilution of the distinctive quality of the 'N SYNC Mark for which they have no adequate remedy at law.

<u>**COUNT V**</u>

**(Injunctive Relief Pursuant to §495.151 of the Florida Statutes - Trademark Dilution)**

99.     Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 98 of the Complaint as if fully set forth herein.

100.     By virtue of Defendants' conduct, including Defendants' use of the 'N SYNC Mark, Defendants have diluted, and intend to continue to dilute the distinction, quality, and reputation of Plaintiffs' 'N SYNC Mark, in violation of Lanham Act § 43(c), 15 U.S.C. § 1125(c) and Florida Statute § 495.151.

101.     Upon information and belief, Defendants' conduct has been willful, malicious and wanton and they will continue their acts of willful dilution unless enjoined by this Court.

102.   The acts of Defendants have caused irreparable harm and damage to Plaintiffs, will continue to cause irreparable harm to Plaintiffs, and have caused Plaintiffs to suffer monetary damage in an amount thus far not determined.

103.   Plaintiffs have no adequate remedy at law.

## COUNT VI

### (Injunctive Relief Pursuant to Florida's Deceptive and Unfair Practices Act)

104.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 103 of the Complaint as if fully set forth herein.

105.   By reason of the foregoing, Defendants have engaged and have threatened to continue to engage in unfair and deceptive trade practices in violation of the Florida Deceptive and Unfair Trade Practices Act, Florida Statute Section 501.201 et seq for which Plaintiffs have no adequate remedy at law.

## COUNT VII

### (Breach of Contract and Breach of Obligations of Good Faith and Fair Dealing - Injunctive Relief and Costs, Including Attorneys' Fees)

106.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 105 of the Complaint as if fully set forth herein.

107.   By: (i) purporting to terminate the Exclusive Recording Agreement on invalid grounds, (ii) advising third parties such as recording companies and Winterland to disregard the Exclusive Recording Agreement, (iii) providing services to Zomba and entering into a new recording agreement with Zomba, (iv) usurping creative control over the recording and phonograph manufacture, distribution and sale processes and/or granting same to Zomba; (v) retaining and using the New Master Recordings; (vi) seeking to divert to themselves the funds due and owing to Trans Continental pursuant to the Winterland Agreement and the Exclusive Recording Agreement; and (vii) filing and

prosecuting the Unauthorized Trademark Application, the Group Members have materially breached and repudiated the Exclusive Recording Agreement, to which BMG is a third-party beneficiary, including their obligations of good faith and fair dealing.

108.    The Group Members expressly acknowledged, represented and warranted in the Exclusive Recording Agreement that their performance of their obligations under the Exclusive Recording Agreement is unique and irreplaceable.

109.    Plaintiffs duly performed all their obligations under the Exclusive Recording Agreement and the Exclusive Management Agreement, respectively.

110.    If Defendants further effectuate the Zomba Recording Agreement, agree to perform, or make or distribute recordings other than with and through Plaintiffs, Trans Continental will suffer monetary loss, and severe, immediate and irreparable injury as to which money damages will be inadequate, including but not limited to the loss of goodwill; injury to reputation; loss of the fruits of its efforts in developing and marketing the Group; loss of name recognition arising from Defendants' association with the Group; loss of artistic input into the content, merchandising and marketing of the Group, its performances and its recordings; interference with its contractual relationship with BMG; damage to its ongoing and future business relationship with BMG; injury to Plaintiffs' rights in the 'N SYNC Mark; and other injuries not readily calculable or compensable by money damages.

111.    If the Group Members enter into a direct merchandising relationship with Winterland or any other third party, Plaintiffs will suffer severe, immediate and irreparable injury similar to that alleged in the immediately preceding paragraph.

112.    Plaintiffs have no adequate remedy at law

## COUNT VIII

### (Breach of Express Warranty - Injunctive Relief and Costs, Including Attorneys' Fees)

113.   Plaintiffs repeat and reallege each and every allegation contained in paragraphs 1 through 112 of the Complaint as if fully set forth herein.

114.   By virtue of the foregoing, the Group Members have breached their express warranties in the Exclusive Recording Agreement as set forth hereinabove.

## COUNT IX

### (Declaratory Judgment)

115.   Plaintiffs repeats and reallege each and every allegation contained in paragraphs 1 through 114 of the Complaint as if fully set forth herein.

116.   An actual, existing and bona fide controversy exists between Plaintiffs and Defendants as to whether the Group Members may terminate the Exclusive Recording Agreement pursuant to paragraph 19.12 thereof, and the parties' rights and obligations can only be determined by a declaratory judgment.

117.   An actual, existing and bona fide controversy exists between TCE and the Group Members as to whether the Group Members may terminate the Exclusive Management Agreement.

## COUNT X

### (Tortious Interference with Contract against Defendants Zomba and Calder)

118.   Plaintiffs Trans Continental and BMG repeat and reallege each and every allegation contained in paragraphs 1 through 117 of the Complaint as if fully set forth herein.

119.   It is common practice in the music industry for the creator, producer or promoter of an unknown and untried singing group to enter into an exclusive recording

- 35 -

agreement requiring the performers to provide a certain number of master recordings as consideration for financing and promoting the recordings and live performances of unknown groups of singers.

120.    Defendants Zomba and Calder knew that the Group Members had entered into an exclusive recording contract with Trans Continental, to which BMG was a third-party beneficiary, and also knew of the BMG License Agreement.

121.    Defendants Zomba and Calder intentionally and unjustifiably interfered with the Exclusive Recording Agreement and the BMG License Agreement in callous disregard of Plaintiffs' contractual rights and Defendants' contractual obligations to Plaintiffs, resulting in damage to Plaintiffs.

## COUNT XI

### (Conversion)

122.    Plaintiffs repeat and reallege paragraphs 1 through 121 of the Complaint as if fully set forth herein.

123.    The New Master Recordings constitute unique and valuable assets of Plaintiffs.

124.    The Group Members, acting in concert with or aided and abetted by Defendants, Zomba and Calder, are wrongfully in possession and/or control of the New Master Recordings and are wrongfully using same.

125.    The unauthorized possession, control and use of the New Master Recordings constitutes a conversion of Plaintiffs' property.

126.    By reason of the conversion of the New Master Recordings, the value of the Master Recordings to Plaintiffs has been eroded and damaged.

127. By reason of the tortious and wrongful conduct of the Group Members, Zomba and Calder, Plaintiffs have suffered and will suffer irreparable harm.

128. Plaintiffs have no adequate remedy at law.

## COUNT XII

### (Tortious Interference with The Winterland Agreement)

129. Plaintiff Trans Continental repeats and realleges each and every allegation contained in paragraphs 1 through 128 of the Complaint as if fully set forth herein.

130. The Group Members knew that Trans Continental entered into the Winterland Agreement, having expressly acknowledged same in writing.

131. As a direct result of the Group Member' notification to Winterland that they had purported to terminate the Exclusive Recording Agreement and their demand that Winterland pay directly to the Group Members monies due to Trans Continental under the Winterland Letter Agreement, Winterland has refused to pay Trans Continental the royalties due to it under the Winterland Agreement and the Group Members and intentionally and unjustifiably interfered with Trans Continental's relationship with Winterland.

132. If the Group Members are permitted to continue their intentional and unjustifiable interference with the Winterland Agreement, Plaintiff Trans Continental will suffer injury as to which an award of money damages will be inadequate, including but not limited to the loss of goodwill; injury to reputation; loss of the fruits of its efforts in developing and marketing the Group; loss of artistic input into the content, merchandising and marketing of the Group; damage to its ongoing and future business relationship with Winterland; injury to Plaintiffs' rights in the 'N SYNC Mark; and other injuries not readily calculable or compensable by money damages.

133. Plaintiff Trans Continental has no adequate remedy at law.

## COUNT XIII

### (Unfair Competition and Tortious Interference)

134.    Plaintiffs repeat and reallege paragraphs 1 through 133 of the Complaint as if fully set forth herein.

135.    The Group Members, with and without Defendants, Zomba and Calder, have used and threaten to continue to use illicit and unjustifiable means to unfairly compete with Plaintiffs.

136.    Such illicit and unjustifiable means include, but are not limited to, the tortious interference by Defendants, Zomba and Calder in the contractual relationship between Plaintiffs and the Group Members; the conversion of the New Master Recordings, the tortious interference by Defendants in the contractual relationship between Trans Continental and BMG as a result of Defendants' willful, malicious and intentional acts to frustrate and impair Trans Continental's ability to perform under the BMG License Agreement, the tortious interference by Defendants in the contractual relationship between Trans Continental and Winterland, the prosecution of the Unauthorized Trademark Application and the threatened misappropriation of the 'N SYNC Mark.

137.    As a direct, proximate and foreseeable result of the foregoing intentional, willful, malicious, and unjustifiable acts or threatened acts of Defendants, Plaintiffs will suffer significant injury with respect to which money damages will be inadequate, including but not limited to the loss of goodwill, injury to reputation; loss of the fruits of their efforts in developing and marketing the Group; loss of name-recognition arising from Defendants' association with the Group; loss of artistic input into the content, merchandising and marketing of the Group, its performances and its recordings; interference with its contractual relationships with BMG and Winterland; damage to its

ongoing and future business relationships with BMG and Winterland; injury to Plaintiffs' rights in the 'N SYNC Mark, and other injuries not readily calculable or compensable by money damages.

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.    Granting a preliminary and permanent injunction enjoining Zomba, the Group Members and Calder,  their respective agents, and all those who act in concert with them, from using, displaying, or in any manner exploiting, the 'N SYNC Mark, or any variation or derivative of such Mark, in connection with a musical group and with all recording, publishing, merchandising, television, video, motion picture, live performance, promotional, advertising and other activities related to the Group's activities in the entertainment industry, other than pursuant to the Exclusive Recording Agreement and certain related agreements among and between Plaintiffs or their affiliates and Defendants;

B.    Granting a preliminary and permanent injunction enjoining Defendants and each of them, their agents and representatives, and all those acting in concert with them, from:  (i) prosecuting any trademark application, including the Unauthorized Trademark Application, to obtain registration, in any forum, of the 'N SYNC Mark, or any variation or derivative of such Mark; and (ii) engaging in any acts which undermine, impair or otherwise create a cloud on Plaintiffs' rights in and to the 'N SYNC Mark and to commercially exploit the Mark;

C.    Granting a preliminary and permanent injunction enjoining Zomba, its employees, Calder, their respective  agents and representatives, and all those acting in concert with it, from effectuating the Zomba Recording Agreement,  including but not limited to using the New Master Recordings and manufacturing, causing to be

manufactured, offering for sale, or selling recordings derived, in whole or in part, from the New Master Recordings, or any other recordings of the Group, and from entering into or effectuating any other performing, recording, license, distribution or other agreements with any of the Group Members, and soliciting, inducing or otherwise taking any actions to cause the Group Members to make any appearances, make or participate in any live performances, or audio or video recordings, or participate in the manufacture, distribution or sale of any recordings, videos or other merchandise other than with or through Trans Continental in accordance with the terms of the Exclusive Recording Agreement;

D.      Granting a preliminary and permanent injunction enjoining and restraining the Group Members and each of them, their agents and representatives, and all those acting in concert with them, from: (i) effectuating, directly or indirectly, in any manner whatsoever, the Zomba Recording Agreement, including but not limited to using the New Master Recordings and manufacturing, causing to be manufactured, offering for sale, or selling recordings derived, in whole or in part, from the New Master Recordings, or any other recordings of the Group; (ii) entering into, or effectuating, any performing, recording, license, distribution or other agreements with any person or entity, or making or participating in the making of any recordings or videos with any person or entity, which would be inconsistent with or in violation of the terms of the Exclusive Recording Agreement and Trans Continental's rights thereunder, including but not limited to the Zomba Recording Agreement; (iii) entering into any agreement with any person or entity, including but not limited to Winterland, with respect to merchandising or marketing of the Group, which would be inconsistent with or in violation of the terms of the Exclusive Recording Agreement or the Winterland Agreement and Trans Continental's rights thereunder;   (iv) communicating to any third party that the Exclusive Recording Agreement has been terminated or otherwise impairing or interfering with Trans

Continental's rights under the Exclusive Recording Agreement; and (v) entering into any agreement which would subvert or interfere with validly existing rights under the BMG License Agreement and the Exclusive Recording Agreement;

  E.  Granting an order requiring the Defendants to deliver to Plaintiffs the original of the New Master Recordings, all copies, derivatives and compilations of the New Master Recordings and all works, in any and all mediums, created or derived from the New Master Recordings;

  F.  Declaring that: (i) the Group Members' purported termination of the Exclusive Recording Agreement and the Exclusive Management Agreement are null and void and without any force and effect; (ii) the Zomba Recording Agreement is null and void and without any force and effect; (iii) the Exclusive Recording Agreement is in full force and effect with respect to all of its provisions including, but not limited to, all of Trans Continental's rights flowing therefrom, such as its right to have the Group render services exclusively to Trans Continental, its rights to exclusive ownership and control over all master recordings, its exclusive merchandising rights with respect to the Group, and all of the Defendants' recording and performance obligations; (iv) Plaintiffs are entitled to immediate delivery of all New Master Recordings and that Defendants are without authority to commercially exploit or to otherwise use said New Master Recordings; (v) Trans Continental, and not the Group Members, is entitled to payment from Winterland of all monies required to be paid to Trans Continental pursuant to the Winterland Agreement; (vi) Defendants disgorge any monies received from the use of the New Master Recordings; (vii) Defendants disgorge any monies received in connection with the Zomba Recording Agreement; and (viii) Group Members disgorge any monies received from Winterland in connection with the Winterland Agreement;

G. Imposing a constructive trust upon any and all remuneration earned or received by the Group Members and Defendants, Zomba and Calder from or in connection with the making, distribution or sale of performances, recordings, videos or musical compositions, by Defendants, for the term of the Exclusive Recording Agreement (as extended by all options granted thereunder), and requiring Defendants to account for and pay over to Plaintiffs all profits, royalties and other remuneration that Trans Continental would have received under the Exclusive Recording Agreement if Group Members had not breached the Exclusive Recording Agreement;

H. Awarding Plaintiffs their costs and reasonable attorney's fees incurred in prosecuting this action;

I. Awarding Plaintiffs damages in an amount to be determined at trial, but in a sum in excess of One Hundred Million Dollars ($100,000,000) dollars, together with punitive damages in the sum of Fifty Million Dollars ($50,000,000) dollars;

J. Awarding Plaintiffs treble damages as provided by 15 U.S.C. §§1114(1)(a) and 1117(a); and

K. Awarding Plaintiffs such other and further relief as to this Court seems just and proper.

## JURY DEMAND

Plaintiffs demand trial by jury of all issues so triable.

Dated:        Orlando, Florida, October *12*, 1999.

- 42 -

Respectfully submitted,

J/ Cheney Mason, Esquire
NationsBank Center, Ste. 2100
390 North Orange Avenue
Orlando, FL 32801
(407) 843-5785
Fl. Bar 131982

William B. Wilson, Esquire
Florida Bar No. 153167
Holland & Knight LLP
200 S. Orange Avenue, Ste. 2600
Orlando, FL 32801
(407) 425-8500

William B. Pringle, II, Esquire
NationsBank Center, Ste. 2100
390 North Orange Avenue
Orlando, FL 32801
(407) 843-3701
FL. Bar 0777986

Steven M. Hayes, Esquire
Orin Snyder, Esquire
Parcher, Hayes & Snyder, P.C.
38th Floor
500 Fifth Avenue
New York, NY 10110
(212) 382-0200

Michael D. Friedman, Esquire
Sharon H. Stern, Esquire
Parker Chapin Flattau &
 Klimpl, LLP
1211 Avenue of the Americas
New York, NY 10036

Attorneys for Plaintiffs, BMG
Entertainment and BMG Ariola
Muenchen GmbH

Attorneys for Plaintiffs, Trans
Continental Records, Inc., Trans
Continental Entertainment, Inc.
and Louis J. Pearlman



## EXCLUSIVE ARTIST RECORDING AGREEMENT

AGREEMENT made this 29th day of April, 1998, by and between TRANS CONTINENTAL RECORDS, INC. with a principal place of business at 7380 Sand Lake Road, Suite 350, Orlando, Florida 32819 (hereinafter "COMPANY") and CHRISTOPHER ALAN KIRKPATRICK, residing at 1610 Overdale Street, Orlando, Florida 32825, and JUSTIN RANDALL TIMBERLAKE, a minor, residing at 303 Fawn Lake Drive, Millington, Tennessee 38053, and JOSHUA SCOTT CHASEZ, residing at 6511 Homestake Drive South, Bowie, Maryland 20720, and JOSEPH ANTHONY FATONE, JR., residing at 2746 Woodruff Drive, Orlando, Florida 32837, and JAMES LANCE BASS, a minor, residing at 111 Newport Circle, Clinton, Mississippi 39056, (hereinafter individually and collectively referred to as "you" or "Artist."

1.  **TERM**

1.01.  The term of this Agreement will commence on the date hereof and shall continue pursuant to the conditions herein until the later of (1) the date nine (9) months after the date of the delivery to COMPANY of all Masters required in fulfillment of your Recording Commitment herein or (2) six (6) months after COMPANY's initial U.S. retail street date for the record delivered by you in fulfillment of your Recording Commitment herein.

1.02.  Additionally, you hereby grant COMPANY seven (7) separate options to extend the term of this Agreement for additional Contract Periods ("Option Periods") on the same terms and conditions applicable to the initial Contract Period except as otherwise provided herein.  Each option shall be exercised automatically unless written notice is sent by COMPANY prior to the expiration date of the Contract Period which is then in effect (the "current Contract Period").  If COMPANY so advises you in its exercise notice, such Period will begin on the date of such exercise notice.  Each of the Option Periods will end the later of (1) nine (9) months after the date of the Delivery to COMPANY of all Masters required in fulfillment of your Recording Commitment for each such Option Period or (2) six (6) months after Company's initial U.S. retail street date for the last record delivered by you in fulfillment of your Recording Commitment for such Period.  Notwithstanding the foregoing, in no event will any Option Period end earlier than twelve (12) months after the date of the commencement of such Period.

2.  **SERVICES**

2.01.  During the term of this Agreement you will render your services as a performing artist for the purpose of making Master Recordings for COMPANY.  (You are sometimes called "the Artist" below; all references in this Agreement to "you and the Artist" and the like, will be understood to refer to you alone).

# EXHIBIT A

2.02.  Artist will render services at recording sessions scheduled at times and places designated by COMPANY. COMPANY shall select in consultation with the Artist, the musical compositions, arrangements and works to be performed by Artist, Company shall also determine the number and identity of the musicians, vocalists and other performers (if any) to be recorded at such sessions.

2.03.  Upon COMPANY'S request you shall re-record any performance recorded hereunder for the purpose of obtaining a commercially satisfactory master recording.

3.  <u>RECORDING COMMITMENT</u>

3.01.  During the Contract Period you will perform for the recording of Master Recordings, commercially satisfactory in COMPANY'S reasonable business judgment. Such Masters shall embody the featured vocal performances of Artist. (Any Masters accepted hereunder by COMPANY that were partially or completely recorded prior to the term of this agreement shall be deemed to have been recorded during the Contract Period). Neither Multiple Record LPs nor Joint Recordings shall not be recorded as part of your Recording Commitment hereunder without your and COMPANY's prior written consent (your delivery of a Multiple LP or a Joint Recording shall be deemed your consent).  Without limiting the foregoing, COMPANY shall have the right to reject any master which, in the reasonable opinion of COMPANY's legal counsel, is offensive to reasonable standards of public taste or which infringes on the rights of others.

3.02.  During each Contract Period Artist shall perform for the recording of Masters for Delivery to COMPANY those Masters (the "Recording Commitment") necessary to satisfy the following schedule:

| <u>CONTRACT PERIOD</u> | <u>RECORDING COMMITMENT</u> |
|---|---|
| Initial Contract Period | 1 LP |
| First Option Period | 1 LP |
| Second Option Period | 1 LP |
| Third Option Period | 1 LP |
| Fourth Option Period | 1 LP |
| Fifth Option Period | 1 LP |
| Sixth Option Period | 1 LP |
| Seventh Option Period | 1 LP |

3.03.  You shall not deviate from the performance and Delivery schedule specified in Paragraph "3.02" above without COMPANY's written consent; timely Delivery as provided therein shall be deemed a material obligation hereunder.  You further agree not to commence the recording of any Master hereunder without COMPANY's prior approval.  The LP's will consist entirely of Masters made in the course of the then current single or LP recording project unless agreed to by COMPANY.

2

4.    RECORDING PROCEDURE

4.01.    You will follow the procedure set forth below in connection with Master Records made hereunder:

(a) Except as expressly noted otherwise in this Agreement, prior to the commencement of recording in each instance the following, in order, shall apply:

(1) Selection of producer.  You shall have mutual approval with respect to any producer other than a producer signed exclusively to COMPANY, provided in the event of a dispute, COMPANY's decision shall be final.

(2) Selection of material, including the number of compositions to be recorded shall be made by COMPANY.  COMPANY shall not be deemed to be unreasonable in rejecting any request to record an Album consisting of more than ten masters. Notwithstanding the foregoing, COMPANY shall consult with you with respect to the selection of material to be recorded hereunder.

(3) Specification of accompaniment, arrangement and copying services shall be made by COMPANY.

(4) Selection of dates of recording and studios where recording is to take place, including the cost of recording there and scheduling and booking of all studio time will be done by COMPANY.

(b)  COMPANY shall notify the appropriate Local of the American Federation of Musicians in advance of each recording session.

(c)  To the extent that any of the information described below is within your control, you shall timely supply COMPANY with all of the information it needs in order: (1) to make payments due in connection with such Recordings; (2) to comply with any other obligations COMPANY may have in connection with the making of such Master Recordings; and (3) to prepare to release Phonograph Records derived from such Master Recordings.  Without limiting the generality of clause (2) of the preceding sentence, to the extent that such information is within your knowledge or control, you shall furnish COMPANY with all information it requires to comply with its obligations under its union agreements including, without limitation, the following:

(1)  If a session is held to record new tracks intended to be mixed with existing tracks (and if such information is requested by the American Federation of Musicians), the dates and places of the prior sessions at which such existing tracks were

3

made, and the AFM Phonograph Recording Contract (Form "B") numbers covering such sessions.

(2)  Each change of title of any composition listed in an AFM Phonograph Recording Contract (Form "B").

(3)  A listing of all the musical selections contained in Recordings Delivered to COMPANY hereunder.

4.02.  No "live" Recording or Recordings not made in full compliance with the provisions of this Agreement will apply in fulfillment of your Recording Commitment, nor will COMPANY be required to make any payment in connection with any such Recording, unless COMPANY so agrees in writing or releases the recording.  No Joint Recording will apply in fulfillment of your Recording Commitment, nor will COMPANY be required to make any payments in connection with any such Joint Recording other than royalties due you hereunder, even if such Joint Recording is released by COMPANY. Notwithstanding the foregoing, COMPANY will not require you to jointly record any masters without your prior written approval. No Recordings shall be made by unauthorized dubbing of another party's masters, excluding sampled or computerized dubbing without COMPANY's express written consent.

4.03.  Nothing in this Agreement shall obligate COMPANY to continue or permit the continuation of any recording session or project, even if previously approved hereunder, if COMPANY reasonably anticipates that the Recording Costs will exceed those specified in the approved budget or that the Recordings being produced will not be commercially satisfactory.

4.04.  The Artist will not be required to perform together with any other royalty artist without the Artist's consent. COMPANY shall not be deemed to be unreasonable in rejecting any request for the Artist to record with another royalty artist.

5.  RECORDING COSTS; SPECIAL PACKAGING

5.01.  COMPANY will pay all minimum union scale payments required to be made to Artist in connection with Recordings made hereunder, all costs of instrumental, vocal and other personnel specifically approved by COMPANY for the recording of such Master Recordings, and all other amounts required to be paid by COMPANY pursuant to any applicable law or any collective bargaining agreement with any union representing persons who render services in connection with such Master Recordings.  Notwithstanding the foregoing, Artist agrees that the Advances hereunder include the prepayment of session union scale to Artist as provided in the applicable union codes, and Artist agrees to complete any documentation required by the applicable union to implement this sentence.  (Union contracts will be paid on Artist's behalf by COMPANY, which payments shall be an Advance).  In the event COMPANY

4

should be required to make any such payments directly to a union with which Artist is affiliated, COMPANY may - in its sole discretion - reduce the Advances otherwise payable directly to Artist by the exact amount of any such payment made to such union. If, after the Delivery of Masters constituting the Singles or LP in fulfillment of your Recording Commitment, there are monies remaining in the applicable Recording Budget, then COMPANY will at your prompt written request pay you minimum union scale payment otherwise waived hereunder up to an amount which, when added to all other amounts paid by COMPANY in connection with such Masters, does not exceed the applicable Recording Fund.

5.02.    Except as otherwise provided for pursuant to Sub-Paragraph "15.01(c)" below all amounts described in Paragraph "5.01" above plus all other amounts representing direct expenses paid by COMPANY, or incurred in connection with the recording of Master Recordings hereunder (including, without limitation, travel, rehearsal, and equipment rental expenses, advances to producers, mastering, re-mixing, per diems, hotel, transportation, lodging and all studio and engineering charges, in connection with COMPANY's facilities and personnel or otherwise) are herein sometimes called "Recording Costs" and shall constitute non-returnable advances. All Special Packaging Costs will constitute Advances also.  All costs incurred by COMPANY in connection with the production or exploitation of Videos made for use in promoting sales of Records made under this Agreement will constitute non-returnable Advances. Notwithstanding the foregoing, only fifty (50%) percent of such costs incurred by COMPANY in connection with the production of Videos shall be recoupable from Record royalties due you.  The costs of copper and other masters equivalent to lacquer masters will be chargeable as Recording Costs, but the costs of other metal parts, and payments to the AFM Special Payments Fund and the Music Performance Trust Fund based upon record sales (so-called "pre-record royalties"), shall not constitute Advances.  Any Recording Costs in excess of the budget initially established, and all Special Packaging Costs, will be your sole responsibility and will be paid by you promptly (or reimbursed by you if paid by COMPANY.)

5.03.    In determining the portion of the Recording Costs (other than payments to the Artist) applicable to any Joint Recording which shall be charged against your royalties, such portion shall be computed by multiplying the aggregate amount of such Recording Costs by the same fraction used in determining the royalties payable to you in respect of such Joint Recording.

6.    ADDITIONAL ADVANCES

6.01.    All monies paid to on behalf of Artist (including but not limited to advances and expenditures for tour support and promotion) during the term of this Agreement, other than royalties paid pursuant to Paragraphs "9" and "12" below, shall constitute

5

non-returnable Advances unless otherwise expressly agreed in writing by an authorized officer of COMPANY.

6.02.   Subject to your full and timely performance of your material obligations hereunder, COMPANY shall pay to you the following advances which shall be deemed to be non-returnable but recoupable from royalties payable to you hereunder:

A.   For Albums recorded during the Initial Option Contract Periods:

| | |
|---|---|
| Initial Period: | $10,000 |
| 1st Option: | 15,000 |
| 2nd Option: | 20,000 |
| 3rd Option: | 25,000 |
| 4th Option: | 30,000 |
| 5th Option: | 35,000 |
| 6th Option: | 40,000 |
| 7th Option: | 45,000 |

B.   Each advance above shall be paid to you one-half (1/2) upon the commencement of your recording services for the applicable Master Recording and the balance within fifteen (15) days after the completion of recording and the acceptance of the Masters by COMPANY and its distributor.

C.   Each advance designated above shall be an aggregate advance for the entire group and shall be distributed equally amongst the members of the group.

## 7.   RIGHTS IN RECORDING

7.01.   Each Master Recording made under this Agreement or during its term, from the Inception of Recording, will be considered a "work made for hire" for COMPANY; if any such Master Recording is determined not to be a "work made for hire" it will be deemed transferred to COMPANY by this Agreement, together with all rights in it. All Master Recordings made under this Agreement or during its term, from the Inception of Recording, and all Matrices and Phonograph Records manufactured from them, together with the performances embodied on them, shall be the sole property of COMPANY, free from any claims by you or any other person; and COMPANY shall have the exclusive right to copyright those Master Recordings in its name as the author and owner of them and to secure any and all renewals and extensions of such copyright throughout the world. You will execute and deliver to COMPANY such instruments of transfer and other documents regarding the rights of COMPANY in the Master Recordings subject to this Agreement as COMPANY may reasonably request to carry out the purposes of this Agreement, and COMPANY may sign such documents in your name and make appropriate disposition of them.

6

7.02.   Without limiting the generality of the foregoing, COMPANY and any person authorized by COMPANY shall have the unlimited and exclusive rights to manufacture Phonograph Records by any method nor or hereafter known, derived from the Master Recordings made under this Agreement or during its term, and to sell, transfer or otherwise deal in the same under any trademarks, tradenames and labels, or to refrain from such manufacture, sale and dealing, throughout the world.

8.   NAMES AND LIKENESSES; PUBLICITY

8.01.   COMPANY and any Licensee of COMPANY each shall have the right and may grant to others the right to reproduce, print, publish, or disseminate in any medium your name, the names, portraits, pictures and likenesses of the Artist in connection with Master Recordings made under this Agreement (including, without limitation, all professional, group, and other assumed or fictitious names used by them), and biographical material concerning them, as news or information, or the purposes of trade, or for advertising purposes in connection with the Masters made hereunder.  The uses authorized by the preceding sentence include, without limitation, the use of those names, portraits, pictures, and likenesses in the marketing of Phonograph Records.  During the term of this Agreement neither you nor Artist shall authorize any Party other than COMPANY to use the name or likeness of Artist (or any professional, group, or other assumed or fictitious name used by Artist), in connection with the advertising or sale of:

        (a)   Phonograph Records; or
        (b)   Blank Audio Tape

8.02.   You will cooperate with COMPANY, as it reasonably requests, in making photographs and preparing other materials for use in promoting and publicizing the Artist and the Recordings made under this Agreement.  You shall also have the right to approve any publicity and album cover photographs of you, and any biographies provided, should you fail to notify us of any disapproval within five (5) business days after your receipt of such material, your approval shall be deemed automatic.  You agree not to unreasonably withhold your approval herein.

9.   ROYALTIES

9.01.   In consideration of (i) the copyright ownership provided below; (ii) COMPANY's rights to use Artist's name and likeness as provided herein; and (iii) the representations and warranties contained herein, COMPANY agrees to pay you in connection with the Net Sale of Phonograph Records (other than audio-visual records) consisting entirely of Masters hereunder the following net royalty receipts computed at the applicable percentage indicated below, of the applicable Royalty Base Price with respect to the Record concerned, it being agreed that such

7

JUL-29-1999  10:33

royalties will be computed and paid in accordance with Paragraph "9" & "11" and Paragraph "10" & "11" below, and the other provisions set forth herein.

9.02.  COMPANY shall pay to you a royalty equivalent to fifty percent (50%) of all net royalties received by company in connection with the sales of recordings derived from the Masters hereunder. Said royalties shall be calculated and determined in the same manner in which COMPANY's licensees and distributor account to company.

9.03.  (a)  If COMPANY licenses Videos (i.e., sight and sound records designed to reproduce the audio performances of recording artists together with a visual image) or make commercial use of such Videos embodying Artist's performances (other than as provided below), the royalty payable by COMPANY to you shall be one-half (1/2) of COMPANY's net receipts derived therefrom after deducting (i) any and all direct costs and/or third party payments in connection with the creation, manufacture, exploitation or use of said videos; (ii) any royalty paid to the producer(s) of the Masters recorded hereunder which are embodied in any such Videos; and (iii) any distribution fees that COMPANY may be required to pay. It is specifically agreed that COMPANY shall have the right to license Videos to third parties (e.g., club services) without any payment to you as long as COMPANY does not receive any such payment.  To the extent COMPANY receives any payment for such promotional uses, COMPANY will credit your account with one-half (1/2) of the net receipts paid to COMPANY as provided in this Paragraph "9.04".

9.04.  The terms "net receipts", "net sums", or "net amount received" and similar terms in this Paragraph "9" shall mean amount received by COMPANY in connection with the subject matter thereof which are solely attributable to the Masters hereunder less any costs or expenses which COMPANY is required to pay or credit to third parties.

10.  MISCELLANEOUS ROYALTY PROVISIONS

Notwithstanding  anything  to  the  contrary  contained  in Paragraph "9" above:

10.01.  In respect of Joint Recordings, the royalty rate to be used in determining the royalties payable to you shall be computed by multiplying the royalty rate otherwise applicable thereto by a fraction, the numerator of which shall be one and the denominator of which shall be the total number of royalty artists whose performances are embodied on a Joint Recording.

10.02.  With respect to Phonograph Records embodying Master Recordings made hereunder together with other Master Recordings, the royalty rate payable to you shall be computed by multiplying

8

JUL-29-1999  10:33

the royalty rate otherwise applicable by a fraction, the numerator of which is the number of sides contained thereon embodying Master Recordings made hereunder and the denominator of which is the total number of sides contained on such Record. Further, Company shall not embody more than two Masters recorded hereunder on any LP that includes masters not recorded hereunder without Artist's consent which consent shall not be unreasonably withheld.

10.03. No royalties shall be payable to you in respect of Phonograph Records sold or distributed by COMPANY or its Licensees for promotional purposes, as cutouts after the listing of such Records has been deleted from the catalog of COMPANY or the particular Licensee, as "free", "no charge" or "bonus" Records (whether or not intended for resale), or to radio stations. No royalties will be payable to you on "sampler" Records in tape form intended for free distribution to automobile purchasers and containing not more than two Recordings made under this Agreement.

10.04. With respect to so-called home video devices embodying Artist's performances (e.g., video cassettes or discs intended primarily for home use), you will be entitled to a royalty computed as provided in Paragraph "9" above.

11. ROYALTY ACCOUNTINGS

11.01. COMPANY will compute your royalties as of each June 30th and December 31st for the prior six months, in respect of each such six-month period in which there are sales or returns of Records covered by this Agreement. On the next September 30th or March 31st, respectively, COMPANY will send you a statement covering those royalties which are due after deducting unrecouped Advances. COMPANY shall maintain royalty reserves against anticipated returns exchanges, refunds and credits. Reserves will be maintained in accordance with Company's standard policy and such reserves shall be fully liquidated over four (4) consecutive semi-annual accounting periods commencing upon the rendition of the third accounting statement rendered following the statement with respect to which such reserve was originally maintained. If COMPANY makes any overpayment to you, you will reimburse COMPANY for it; COMPANY may also deduct it from any payments due or becoming due to you. If COMPANY pays you any royalties on Records which are returned later, those royalties will be considered overpayments.

11.02. Sale of Records for distribution outside the United States are called "foreign sales" below. COMPANY will compute your royalties for any foreign sale in the same national currency in which COMPANY's Licensee pays COMPANY for that sale, and COMPANY will credit those royalties to your account at the same rate of exchange at which the Licensee pays COMPANY for that purpose of accounting to you, COMPANY will treat any foreign sale as a sale made during the same six (6) month period in which COMPANY receives

9

JUL-25-1999  10:34

its Licensee's accounting and payment for that sale.   If any COMPANY Licensee deducts any taxes from its payments to COMPANY, COMPANY may deduct a proportionate amount of those taxes from your royalties.    If any law, any government ruling, or any other restriction affects the amount of the payments which a COMPANY Licensee can remit to COMPANY, COMPANY may deduct from your royalties an amount proportionate to the reduction in the Licensee's remittances to COMPANY.   If COMPANY cannot collect payment for a foreign sale in the United States in U.S. Dollars it will not be required to account to you for that sale.

11.03.  COMPANY will maintain books and records which report the sales of the Phonograph Records for which royalties are payable to you.  You may, at your own expense, examine those books and records, as provided in this paragraph only.  You may make those examinations only for the purpose of verifying the accuracy of the statements sent to you under Paragraph "11.01" above.  You may make such an examination for a particular statement only once, and only within one (1) year from the date said statement is rendered by COMPANY under Paragraph "11.01" above.   You may make those examinations only during COMPANY's usual business hours, and at the place where it keeps the books and records to be examined.  If you wish to make an examination you will be required to notify COMPANY at least thirty (30) days before the date when you plan to begin it.   If your examination has not been completed within one (1) month from the time you begin it, COMPANY may require you to terminate it on seven days' notice to you at any time; COMPANY will not be required or permit you to continue the examination after the end of that seven (7) day period.   You will not be entitled to examine any manufacturing records or any other records that do not specifically report sales of Phonograph Records, or gratis distributions of Phonograph Records, on which royalties are payable to you.  You may appoint a certified public accountant to make such an examination of you, but not if he or his firm has begun an examination of COMPANY's books and records for any Person except you unless the examination has been concluded.

11.04.   If a certified public accountant performs the examination for you, he will review his tentative findings with those members of the COMPANY Finance staff who COMPANY designates before he renders a report to you in order to remedy any factual errors and clarify any issues which may have resulted from misunderstanding.  Your accountant's report will be completed and a copy of it will be delivered to COMPANY within sixty (60) days from date his examination ends.

11.05.  If you have any objections to a royalty statement, you will give COMPANY specific notice of that objection and your reasons for it within one (1) year after the date when COMPANY sends you that statement under Paragraph "11.01" above.   Each royalty statement will become conclusively binding on you at the end of that twelve (12) month period, and you will no longer have

any right to make any other objections to it. You will not have the right to sue COMPANY in connection with any royalty accounting, or to sue COMPANY for royalties on Records sold during the period a royalty accounting covers, unless you commence the suit within that one (1) year period after a statement is rendered which is the subject of your claim. If you commence suit on any controversy or claim concerning royalty accountings rendered to you under this Agreement, the scope of the proceeding will be limited to determination of the amount of the royalties due for the accounting periods concerned, and the court will have no authority to consider any other issues or award any relief except recovery of any royalties found owing. Your recovery of any such royalties will be the sole remedy available to you or the Artist by reason of any claim related to COMPANY's royalty accountings. Without limiting the generality of the preceding sentence, neither you nor the Artist will have any right to seek termination of this Agreement or avoid the performance of your obligations under it by reason of any such claim except if such claim is based upon fraud.

11.06. Neither party hereto shall be deemed to be in material breach of any of our respective obligations hereunder unless and until the aggrieved party shall have given the defaulting party specific written notice of the nature of such breach and the defaulting party shall have failed to cure such breach within sixty (60) days after receipt of such written notice. Nothing herein contained shall constitute or be deemed or construed to constitute a partnership or other fiduciary relationship between, or a joint venture by, you and me.

## 12. LICENSES FOR MUSICAL COMPOSITIONS

12.01. (a) (1) You grant to us an irrevocable license, under copyright, to reproduce each controlled composition on Phonograph Records and distribute them in the United States and Canada.

(2) For that License, COMPANY will pay Mechanical Royalties at three-fourths (3/4) of the minimum compulsory license rate per Composition at the time of the commencement of the recording of the Master concerned but in no event later than the last date for timely Delivery of such Master for Records manufactured for distribution in the United States and at three-fourths (3/4) of the minimum compulsory rate per Composition for Records manufactured for distribution in Canada, on the basis of Net Sales. The Mechanical Royalty on any Record described in Paragraph "9.02" above or sold through a Club Operation will be three-fourths (3/4) of the amount fixed in the preceding sentence. If the Composition is an arranged version of a public domain work, the Mechanical Royalty on it will be half of the amount fixed in the first sentence. No Mechanical Royalties will be payable for any Records described in Paragraph "10.03" above or for any other records for which COMPANY does not receive

11

payment for sale as a full price, mid line, budget or premium record.

(b)  The total Mechanical Royalty for all Controlled Compositions, will be limited to ten (10) times the amount which would be payable on it under Paragraph "12.01 (a)(2)" if it contained only one Controlled Composition.  The total Mechanical Royalty on any Single will be limited to twice that amount.

(c)  COMPANY will compute Mechanical Royalties on Controlled Compositions as of the end of each calendar semi-annual period in which there are sales or returns of Records on which Mechanical Royalties are earned hereunder.  On the next September 30th, or March 31st, COMPANY will send a statement covering those royalties and will pay any net royalties which are due.  Mechanical Royalty reserves maintained by COMPANY against anticipated returns and credits will not be held for any unreasonable period in any case.  If COMPANY makes any overpayment of Mechanical Royalties to Artist for Controlled Compositions only, you will reimburse COMPANY for it; COMPANY may also recoup it from any payments due or becoming due to you.  If COMPANY pays any Mechanical Royalties on Controlled Compositions on Records which are returned later, those royalties be considered overpayments.  If the total amount of the Mechanical Royalties which COMPANY pays on any Record consisting of Master Recording made under this Agreement (including Mechanical Royalties for compositions which are not Controlled Compositions) is higher than the limit fixed for that Record under Subparagraph "12.01(b)" above, that excess amount will be considered an overpayment also.

(d)  Any assignment made of the ownership on copyrights in or the rights to license or administer the use of any Controlled Compositions shall be subject to the terms set forth above and Artist will make any modifications, if necessary to conform these terms to the terms and provision of any such assignment.

12.02.  You also grant to COMPANY, for promotional purposes only, an irrevocable license under copyright to reproduce each Controlled Composition in motion pictures and other audio-visual works ("pictures") and to distribute and to perform those pictures throughout the world,and to authorize others to do so.  COMPANY will not be required to make any payment in connection with those uses unless COMPANY received any payment in connection with those pictures.

12.03.  If the copyright in any Controlled Composition is owned or controlled by anyone else, you will use your good faith efforts to cause that Person to grant COMPANY the same rights described in Paragraphs "12.01" and "12.02", above on the same terms.  If the copyright in any Controlled Composition is transferred, the transfer will be made subject to this Agreement.

12

12.04.  With respect to each Controlled Composition herein, you will cause the issuance of effective licenses, under copyright and otherwise,to reproduce each Controlled Composition on Phonograph Records and distribute those Records outside the United States and Canada, on terms not less favorable to COMPANY or its Licensees that the terms most favorable to Phonograph Manufacturers prevailing on a general basis in the country concerned.

13.  WARRANTIES; REPRESENTATIONS; RESTRICTIONS; INDEMNITIES

13.01.  You warrant and represent:

(a)  You have the right and power to enter into and fully perform this Agreement.

(b)  COMPANY shall not be required to make any payments of any nature for, or in connection with, the acquisition, exercise or exploitation of rights by COMPANY pursuant to this Agreement except as specifically provided in this Agreement.

(c)  Artist is or will become and will remain to the extent necessary to enable the performance of this Agreement, a member in good standing of all labor unions or guilds, membership in which may be lawfully required from the performance of Artist's services hereunder.

(d)  No materials, as hereinafter defined, or any use thereof, will violate any law or infringe upon or violate the rights (including copyrights and/or right of privacy) of any Person. "Materials" as used in this Paragraph, means:  (1) a Controlled Composition, (2) each name used by the Artist, individually or as a group, in connection with Recordings made hereunder, and (3) all other musical, dramatic, artistic and literary materials, ideas, and other intellectual properties, furnished or selected by you, the Artist and contained in or used in connection with any Recordings made hereunder or the packaging, sale, distribution, advertising, publicizing or other exploitation thereof.

13.02.  During the term of this Agreement, you will not enter into any Agreement which would interfere with the full and prompt performance of your obligations hereunder, and the Artist will not perform, or render any services as a performing artist, for the purpose of making Master Recordings or Phonograph Records for any Person except COMPANY.  The Artist will not perform any "restricted Composition" (defined below) for any person except COMPANY for the purpose of making Master Recordings or Phonograph Records, at any time before the later of the following dates:  (a) the date five (5) years after the Recording of the Composition for COMPANY, or (b) the date two (2) years after the expiration of the term of this Agreement.  A "restricted Composition", for the purposes of this

13

JUL-09-1999  10:35

Paragraph, is a Composition which shall have been recorded by the Artist for a Master Recording made or delivered to COMPANY under this Agreement.   Neither you nor the Artist shall authorize or knowingly permit the Artist's performances to be recorded for any purpose without an express written Agreement prohibiting the use of such recording on Phonograph Records in violation of the foregoing restrictions.

13.03.   If you become aware of any unauthorized recording, manufacture, distribution or sale by any third party contrary to the foregoing re-recording restrictions you will notify COMPANY thereof and shall cooperate with COMPANY in the event that COMPANY commences any action or proceeding against such third party.

13.04.   The services of the Artist are unique and extraordinary, and the loss thereof cannot be adequately compensated in damages, and COMPANY shall be entitled to seek injunctive relief to enforce the provisions of this Agreement.

13.05.   You will at all times indemnify and hold harmless COMPANY and any Licensee of COMPANY from and against any and all claims, damages, liabilities, costs and expenses, including legal expenses and reasonable counsel fees, arising out of any breach by you of any warranty or representation made by you in this Agreement which is reduced to a final judgment or mutually approved settlement.   Pending the resolution of any claim in respect of which COMPANY is entitled to be indemnified, COMPANY may withhold monies which would otherwise be payable to you under this Agreement in an amount not to exceed your potential liability to COMPANY under this paragraph.   You shall have the right to post a bond in form, amount and duration and with a bonding company satisfactory to COMPANY, and the event you shall post such a bond, COMPANY shall no longer withhold monies due hereunder in respect of which such bond shall be posted.   Company agrees to give Artist notice of any claim, demand or action to which the foregoing indemnity applies, and Artist may participate in the defense of same at Artist's expense, through counsel of Artist's choice; provided, that the final control and disposition of same (by settlement, compromise or otherwise) shall remain with Company.

14.   DEFINITIONS

14.01.   "Record" or "Phonograph Record" means all forms of reproductions, now or hereafter known, manufactured or distributed primarily for use, school use, juke box use or use in means of transportation, including records of sound alone and audio-visual recordings.

14.02.   "Master", "Master Recording" or "Recording" means any recording of sound, whether or not coupled with a visual image, by any method and on any substance or material, whether now or

14

JUL-09-1999  12:35

hereafter known, which is intended for use in the recording, production and/or manufacture of Phonograph Records.

14.03. "Performance" means singing, speaking, conducting or playing an instrument, along or with others.

14.04. The words "Single Records" or "Single" means a Record containing not more than three (3) sides.

14.05. "Long Play Single" means a 12-inch 33-1/3 rpm disc Phonograph Record embodying not more than three (3) Sides.

14.06. "Mini LP" or "EP" means any Record, other than an LP, containing more than three (3) Sides.

14.07. The term "Multiple Record LP" means an LP containing two or more 12-inch 33-1/3 rpm records packaged as a single unit or equivalent. For purposes of the Recording Commitment hereunder and for computing the applicable Recording Fund or Advance, a Multiple Record LP is accepted by COMPANY shall be deemed only one (1) LP.

14.08. "Person" means any individual, corporation, partnership, association or other organized group of persons or legal successors or representatives of the foregoing.

14.09. "Side" means a Recording of sufficient playing time to constitute one side of a 45 rpm record, but not less than three (3) minutes of continuous sound embodying performances by Artist.

14.10. (a) "Royalty Base Price" means (i) with respect to Records sold for distribution in the United States, the retail selling price of one hundred (100%) percent of net sales through normal retail channels of phonograph records embodying masters computed on such records, except as otherwise provided herein. Notwithstanding the foregoing, in the event any of COMPANY's distributor should account to COMPANY for sales of records hereunder on a basis less than one hundred (100%) percent, or should calculate royalties on the basis of the wholesale selling price, then with respect to those sales only the royalty basis shall be adjusted to equal that computed by such distributor. Royalties as aforesaid shall be calculated for sales during the applicable accounting period for the computation of royalties to be made hereunder, it being understood that a separate calculation of the price shall be made for each price configuration of Phonograph Records manufactured and sold by COMPANY; and (ii) with respect to Records sold hereunder for distribution outside the United States. The Royalty Base Price shall be the dealer price utilized by COMPANY's distributor or its licensee in computing monies to be paid to COMPANY for the Record concerned, unless COMPANY distributes its own records in a particular country, in which event the Royalty Base Price shall be the suggested or

15

applicable retail price in the country of manufacture or sale, as COMPANY is paid, or, in the absence in a particular country of such suggested retail list price, the price as may be established by COMPANY distributors in conformity with the general practice of the recording industry in such country, provided that COMPANY shall not be obligated to utilize the price adopted by the local mechanical copyright collection agency for collection of Mechanical Royalties. The Royalty Base Price shall be less all excise, sales and similar taxes and less the applicable container charge.

(b)   COMPANY may at some time change the method by which it computes royalties in the United States from a basis to some other basis (the "New Basis"), such as, without limitation, a retail basis. The New Basis will replace the then-current Royalty Base Price and the royalty rate shall be adjusted to the appropriate royalty which would be applied to the New Basis so that the dollars and cents royalty amounts payable with respect to the top-line product would be the same as that which was payable immediately prior to such New Basis; for sales other than top-line product, for which there is a New Basis, the adjusted royalty rate for such sales of top-line product. If there are other adjustments made by COMPANY that would otherwise make the New Basis more favorable (a particular example of which might be the distribution of smaller quantities of free goods than theretofore distributed) then the benefits of such other adjustments will be taken into consideration in adjusting the royalty rate.

(c)   Notwithstanding anything to the contrary contained herein, the Wholesale Price with respect to so-called home video devices manufactured and distributed by COMPANY shall be COMPANY's published wholesale price as of the commencement of the accounting period concerned.

14.11.   "Container Charge" shall mean ten (10%) percent of the Retail Selling Price for a single-fold disc Record in a standard sleeve with no inserts or for any other Record other than as hereinafter provided; fifteen (15%) percent of the Suggested List Price for an LP in a double-fold or gatefold, or nonstandard sleeve or jacket or with inserts; and twenty (20%) percent of such Price for Records, cassette tape configuration and twenty-five (25%) percent of such price for records in non-disc form, i.e.: audio-visual Records, or compact discs, audiophile records, DAT and New Record Configurations. There shall be no Container Charge with respect to seven (7) inch Single Records shipped in a plain stock sleeve.

14.12.   "Video Base Price" means with respect to Videos sold for distribution, COMPANY's distributor's Wholesale Price during the applicable accounting period.

14.13.   "LP" or "Album" means a sufficient number of Masters embodying Artist's performances to comprise one (1) or more 12-

16

inch, 33-1/3 long-playing Phonograph Record album, or the equivalent, of not less than thirty-eight (38) minutes of playing time. COMPANY may request that up to ten (10) Masters be recorded for the LP delivered hereunder.

14.14.    The words "term of this Agreement" or "period of this Agreement" or "term hereof" or "so long as this Agreement remains in force" or words of similar connotation shall include the initial period of this Agreement.

14.15.    "United States" means the United States of America, its territories, possessions and military exchanges.

14.16.    "Contract Period" means the initial period and/or an option period as the case may be.

14.17.    "Composition" means - a single musical composition, irrespective of length, including all spoken words and bridging passages and including a medley.

14.18.    "Controlled Composition" means a Composition wholly or partly written, owned or controlled by you, the Artist, or any person in which you, the Artist, has a direct or indirect interest.

14.19.    "Budget Record" means a Record bearing a Gross Royalty Base Price less than or equal to sixty-seven (67%) percent for the Retail Selling Price in the country concerned of top-line single disc LPs.

14.20.    "Net Sales" means one-hundred (100%) percent of gross sales of singles, LPs and EPs, and eighty-five (85%) compact discs, DAT and other audiophile recordings paid for returns and credits, after deduction of reserves against anticipated returns and credits. "Net Sales" for foreign sales pursuant to license agreements shall be calculated and then payable in the same manner as the applicable agreement. In the event COMPANY should enter into a Distribution Agreement that accounts to COMPANY on a basis of less than one hundred (100%) percent, COMPANY shall conform the definition of "Net Sales" to such definition as provided in the Distribution Agreement.

14.21.    "Advance" means a prepayment of royalties or any other payments or on behalf of Artist and shall be chargeable against and recoupable from any royalties otherwise payable hereunder.

14.22.    "Territory" shall mean the Universe.

14.23.    "Sales Through Normal Retail Channels" means sales other than as described in Paragraph "9.02" and "9.03" above.

17

JUL-29-1999  10:37

14.24.   "Mechanical Royalties" means royalties payable to
any Person for the right to reproduce and distribute copyrighted
musical compositions on Phonograph Records.

14.25.   "Joint Recordings" means Masters embodying the
Artist's performance and any performance by another artist with
respect to whom COMPANY is obligated to pay royalties.

14.26.   "Mid-line" record means a record bearing a Gross
Royalty Base that is less than or equal to eighty (80%) percent of
the Gross Royalty Base in the country concerned of top-line records
in the configuration concerned.  (See Paragraph "9.02" above).

## 15.   REMEDIES

15.01.   Without limiting any other rights and remedies of
COMPANY hereunder, if you fail to Deliver any Masters hereunder
within the time prescribed in Paragraph "1" above, COMPANY will
have the following options:

(a)   to suspend COMPANY's obligations to make payments
to you under this Agreement until you have cured the default;

(b)   to terminate the term of this Agreement at any time,
whether or not you have commenced curing the default before such
termination occurs; and

(c)   to require you to repay to COMPANY the amount, not
then recouped, of any Advance previously paid to you by COMPANY and
not specifically attributable under Paragraph "6" above to an Album
which has actually been fully Delivered.  COMPANY may exercise each
of those options by sending you the appropriate notice.  If COMPANY
terminates the term under Paragraph "15.01 (b)" above all parties
will be deemed to have fulfilled all of their obligations under
this Agreement except those obligations which survive the end of
the term (such as indemnification obligations, re-recording
restrictions, accounting and your obligations under Paragraph
"15.01 (c)".)  No exercise of any option under this paragraph will
limit COMPANY's rights to recover damages by reason of your
default, its rights to exercise any other option under this
paragraph, or any of its other rights.

15.02.   If Artist's voice should be or become materially and
permanently impaired or if Artist should otherwise become
physically unable to perform recording and/or for a period of six
(6) months or more personal appearances and/or if Artist should
cease to pursue a career as an entertainer, COMPANY may elect to
terminate this Agreement, by notice to you at any time during the
period in which such contingency arose or continues and thereby be
relieved of any liability for the executory provisions of this
Agreement.

18

JUL-29-1999  10:37

15.03.    If because of:  act of God; inevitable accident; fire, lockout; strike or other labor dispute; riot or civil commotion; act of public enemy; enactment, rule, order or act of any government or governmental instrumentality (whether federal, state, local or foreign); failure of technical facilities; failure or delay of transportation facilities; illness or incapacity of any performer or producer; or other cause of similar or difference in nature not reasonably within COMPANY's control; COMPANY is materially hampered in the recording, manufacture, distribution or sale of records, then, without limiting COMPANY's rights, COMPANY shall have the option by giving you notice to suspend the running of the then current Contract Period for the duration of any such contingency plus such additional time as is necessary so that COMPANY shall have no less than thirty (30) days after the cessation of such contingency in which to exercise its options, if any, for the next following Option Period.  Notwithstanding the foregoing in the event any such suspension continues for a period in excess of six (6) months, you shall have the right to terminate this Agreement upon written notice to COMPANY following such six (6) month period.

16.    AGREEMENTS, APPROVAL & CONSENT

16.01.    As to all matters treated herein to be determined by mutual Agreement, or as to which any approval or consent is required, such Agreement, approval or consent will not be unreasonably withheld.

16.02.    Your Agreement, approval or consent, whenever required, shall be deemed to have been given unless you notify COMPANY otherwise within five (5) business days following the date of COMPANY's written request to you therefor.

17.    NOTICES

17.01.    Except as otherwise specifically provided herein, all notices hereunder shall be in writing and shall be given by personal delivery, registered or certified mail or telegraph (prepaid), at the addresses shown above, or such other address or addresses as may be designated by either Party.  Notices shall be deemed given when mailed or when transmitted by telegraph, except that notice of change of address shall be effective only from the date of its receipt.  Each notice sent to COMPANY shall be directed to COMPANY:  Trans Continental Records, Inc., 7380 Sand Lake Road, Suite 350, Orlando, Florida 32819; Attention: Louis J. Pearlman, President;  and a copy of each such notice shall be sent simultaneously to William B. Pringle, III, Esquire, Post Office Box 691222, Orlando, Florida  32869-1222.

19

## 18.  EVENTS OF DEFAULT

18.01.   In the event of your or our dissolution or the liquidation of your or our assets, or the filing by or against you of a petition for liquidation or reorganization under Title 11 of the United States Code as now or hereafter in effect or under any similar statute relating to insolvency, bankruptcy, liquidation or reorganization, or in the event of the appointment of a trustee, receiver or custodian for you or for any of your property, or in the event that you shall make an assignment for the benefit of creditors or commit any act for, or in, bankruptcy or become insolvent, or in the event you shall fail to fulfill any of your material obligations under this Agreement for any other reason, then at any time after the occurrence of any such event and subject to the provisions as set forth in paragraph "11.06" above and "15.01" above, COMPANY shall have the option by notice to terminate this Agreement.   You shall have the right to terminate this Agreement upon written notice to COMPANY in the event COMPANY declares bankruptcy and files a petition for protection from their creditors.

### 18.02.   COMPLIANCE WITH LAWS/MORALS

During the term of this agreement, you shall observe and comply with all federal, state and local laws, ordinances, rules and regulations, including but not limited to, those laws prohibiting use/sale of controlled substances.  Additionally, you agree not to commit any act which shall subject COMPANY, its officers, employees, assigns or yourself to public ridicule, humiliation or disrepute.   Failure by you to comply with the provisions of this paragraph shall give COMPANY the right to immediately terminate this agreement.

## 19.  MISCELLANEOUS

19.01.   The Artist will, prior to the release of the LP hereunder, prepare an act of professional quality and will during the term of this Agreement, actively pursue his career as an entertainer in the live engagement field.

19.02.   (a) This  Agreement  contains  the  entire understanding of the Parties relating to its subject matter.  No change or termination of this Agreement will be binding upon COMPANY unless it is made by an instrument signed by an officer of COMPANY.   A waiver by either Party of any provision of this Agreement in any instance shall not be deemed to waive it for the future.   All remedies, rights, undertakings, and obligations contained in this Agreement shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking,or obligation of either Party.

JUL-09-1999  10:33

(b)  No change of a budget prescribed in this Agreement or established under it will be effective unless the change is approved in writing by COMPANY.

19.03.    Those provisions of any applicable collective bargaining Agreement between COMPANY and any labor organization which are required, by the terms of such Agreement; to be included in this Agreement shall be deemed incorporated herein.

19.04.    Each option and election granted to COMPANY in this Agreement, including, without limitation, to suspend the running of one (1) or more period of time, to terminate the term, to acquire the direct and individual services of a leaving member (if a group artist is involved), or otherwise, is separate and distinct, and the exercise of any such option or election shall not operate as a waiver of any other option or election unless specifically so stated by COMPANY in its notice of exercise of such option or election.

19.05.    You shall not be entitled to recover damages or to terminate the term of this Agreement by reason of any breach by COMPANY of its material obligations hereunder, unless COMPANY has failed to remedy such breach within sixty (60) days following receipt of your notice thereof.

19.06.    This Agreement has been entered into in the State of Florida, and the validity, interpretation and legal effect of this Agreement shall be governed by the laws of the State of Florida applicable to contracts entered into and performed entirely within the State of Flora. The courts (state and federal), only will have jurisdiction of any controversies regarding this Agreement; any action or other proceeding which involves such a controversy will be brought in those courts, in Florida and not elsewhere. Any process in any such action or proceeding may, among other methods, be served upon you by delivering it or mailing it, by registered or certified mail, directed to the address first above written or such other address as you may designate pursuant to Paragraph "17" above.  Any such process may, among other methods, be served upon the Artist or any other Person who approves, ratifies, or assents to this Agreement to induce COMPANY to enter into it, by delivering the process or mailing it by registered or certified mail, directed to the address first above written or such other address as the Artist or the other Person concerned may designate in the manner prescribed in Paragraph "17" above.  Any such delivery or mail service shall be deemed to have the same force and effect as personal service within the State of Florida.

19.07.    In entering into this Agreement, and in providing services pursuant hereto, you shall have the status of an independent contractor and nothing herein contained shall contemplate or constitute you as COMPANY's agent(s) or employee(s).

21

19.08.    This Agreement shall not become effective until executed by all proposed Parties hereto.

19.09.    Any and all riders annexed hereto together with this basis document shall be taken together to constitute the Agreement between you and COMPANY.

19.10.    You hereby grant to us, or our affiliate 'N Sync Productions, Inc. or our designee all merchandising rights and the sole and exclusive right to use your name (both legal and professional), likeness, picture and portrait in any manner whatsoever in connection with the exercise of the merchandising rights herein granted.  COMPANY or its designee shall have the right to grant to the others (including companies affiliated with us) upon such terms as we shall see fit, the right to exercise or cause to be exercised such merchandising rights.  COMPANY shall pay to you, in addition to any and all monies provided for in this Agreement, one-half (1/2) of all net monies received by us in connection with the exercise of said merchandising rights.

19.11.    COMPANY shall retain tutors and a parent or parent-appointed guardian to oversee and supervise the education and maintenance of such members of the group that are under the age of eighteen years during periods of recording and touring.  The costs and expenses related to such personnel shall be paid by COMPANY and shall be deemed to be an additional recoupable advance hereunder.

19.12.    Notwithstanding anything to the contrary contained herein, you shall have the right to terminate this agreement in the event COMPANY has not secured a distribution agreement with a U.S. record company within eighteen months from the date hereof, pursuant to which recordings of your performances shall be released.

20.   PUBLISHING AGREEMENT

You hereby assign to COMPANY, or a publishing company designated by COMPANY, One Hundred (100%) percent of all the right, title and interest in and to the Controlled Compositions, including without limitation, the rights in and to the copyrights therein and the renewal rights thereto.  You shall simultaneously herewith enter into the attached Exhibit A copyright transfer and assignment, pursuant to which COMPANY or such publishing company shall acquire said rights, title and interest, together with the exclusive right to Administer the copyrights for the term of the copyright in each such Controlled Composition.  Artist shall receive their public performance royalties for the United States directly from the performing rights society to which they are affiliated.  "IT IS SPECIFICALLY UNDERSTOOD AND AGREED THAT THIS PARAGRAPH (AND PROVISIONS CONTAINED IN THIS AGREEMENT RELATED THERETO) APPLIES ONLY TO THOSE CONTROLLED COMPOSITIONS RECORDED BY

22.

ARTIST HEREUNDER AND COMPANY SHALL HAVE NO CLAIM TO, OR ANY RIGHT, TITLE OR INTEREST IN, ANY COMPOSITIONS WHOLLY OR PARTLY WRITTEN, OWNED, OR CONTROLLED BY YOU AND/OR ARTIST WHICH ARE NOT RECORDED HEREUNDER."

21.  VIDEO AND SIDEPERSON PROVISIONS

21.01.    If COMPANY shall decide to produce one (1) or more Videos during the term hereof (which COMPANY is under no obligation whatsoever to do), the following shall be applicable:

(a)  The selection(s) to be embodied in each Video shall be designated by COMPANY and Artist.

(b)  Each Video shall be shot on a date or dates and at a location or locations to be designated by COMPANY and subject to your reasonable availability.

(c)  The producer and director of each Video, and the concept or script for each Video, shall be mutually approved by COMPANY and Artist.  COMPANY shall engage the producer, director and other production personnel for each Video, and shall be responsible for and shall pay the production costs of each Video in an amount not in excess of a budget to be established in advance by COMPANY in consultation with you (the "Production Budget").  You shall be responsible for and shall pay the production costs for each Video which are in excess of the production costs caused by your delay and/or circumstances that are within your control for which you are responsible pursuant to the foregoing (which COMPANY is in no way obligated to do), you shall promptly reimburse COMPANY for such excess costs upon demand and, without limiting COMPANY's other rights and remedies, if you fail to so reimburse COMPANY, then COMPANY may deduct an amount equal to such excess from any monies otherwise payable to you hereunder.  Your compensation for performing in such Videos shall be limited to any minimum amounts required to be paid for such performances pursuant to any collective bargaining Agreement pertaining thereto, provided, however, that you hereby waive any right to receive such compensation to the extent such right may be waived.

(d)  COMPANY shall be the sole owner of all worldwide rights in and to each Video (including the worldwide copyrights therein and thereto.).

(e)  You shall issue (or shall cause the music publishing companies having the right to do so to issue) (i) worldwide, perpetual synchronization licenses, and (ii) perpetual licenses for public performance in the United States (to the extent that ASCAP or BMI are unable to issue same), to COMPANY at no costs for the use of all Controlled Compositions in any such Videos effective as of the commencement of production of the applicable Video (and your execution of this Agreement shall constitute the issuance of such

23

JUL-09-1999  10:39

licenses by any music publishing company which is owned or controlled by you, or by any Person owned or Controlled by you). In the event that you shall fail to cause any such music publishing company to issue any such license to COMPANY, and if COMPANY shall be required to pay any fee to such music publishing company in order to obtain any such license, then COMPANY shall have the right to deduct the amount of such license fee from any and all sums otherwise payable to you hereunder.

(f)  COMPANY shall have the right to use and allow others to use each Video for advertising and promotional purposes with no payment to you except as otherwise provided herein.  As used herein, "advertising and promotional purposes" shall mean all uses for which COMPANY receives no monetary consideration from licensees in excess of its costs and expenses in connection with the creation or exploitation of the Video, an incidental fee and a reasonable reimbursement for its administrative costs.  Compensation derived from such promotional uses due you hereunder shall be credited to your account as provided in Paragraph "9.05" above.

(g)  COMPANY shall also have the right to use and allow others to use the Videos for commercial purposes.  As used in this subparagraph, "commercial purposes" shall mean any use which is not for "advertising and promotional" purposes (as defined above) for which COMPANY received monetary consideration in excess of its Compensation derived from such commercial exploitation and due you hereunder shall be credited to your account as provided in Paragraph "9.05" above.

(h)  Each Video shall be deemed a Material as provided herein and COMPANY shall have the rights otherwise applicable hereto with respect to Masters hereunder including, without limitation, the right to use and publish, and permit others to use and publish, your name and likeness in each Video and for advertising and purposes of trade in connecting therewith.

21.02.   Notwithstanding anything to the contrary contained herein, Artist shall have the right, during the term hereof, to perform as a background vocalist or background instrumentalist for the purpose of making audio Phonograph Records for other subject to the following:

(a)  You have then fulfilled all of your then current obligations hereunder, and the engagement does not interfere with the continuing prompt performances of your obligations to COMPANY or with any professional engagements to which you are committed and which are intended to aid in the promotion of Records hereunder;

(b)  Artist will not after the commencement of this Agreement, render a solo or "step-out performance" and the musical style of the recording will not be such as to be confused with

24

Recordings made by Artist for COMPANY, without the consent of
COMPANY, such consent shall not be unreasonably withheld;

(c)  Artist will not record any material embodied on a
Master theretofore or thereafter delivered by you hereunder, and
you shall be restricted from recording the same material for
COMPANY (which you shall not do without COMPANY'S written consent);

(d)  Artist's name may be used in a courtesy credit to
COMPANY or its designee on the LP liners used for such Records, in
the same position as the credits accorded to other sidepersons and
in type identical in size, prominence and all other respects.
Except as provided in this subparagraph (d), neither the Artist's
name, nor likeness nor biographical material may be used in any
manner in connection with such Recordings.  Without limiting the
foregoing, Artist's name and/or likeness shall not be used on the
front cover of LPs, on sleeves or labels used for single records,
or advertising, publicity or other forms of exploitation, without
COMPANY's express written consent which COMPANY may withhold in its
absolute discretion.

21.03.    Within sixty (60) days following the execution
hereof, you may supply COMPANY with six (6) Approved pictures of
Artist to be used by COMPANY.  Such submission shall be made to
COMPANY.  In the event that COMPANY disapproves of the pictures
supplied by you, COMPANY will make available to you for your
approval pictures to be used by COMPANY.  Your approval will not
be unreasonably withheld, and will be deemed given unless your
notice of disapproval (including the reason) has been received by
COMPANY within five (5) days after the material has been made
available to you.  In the event that you timely disapprove of any
pictures, you will, within seven (7) days of the date of your
disapproval notice, supply to COMPANY approved pictures.  In the
event that the pictures supplied by you, pursuant to the preceding
sentence, are not satisfactory to COMPANY, pursuant to this
paragraph, COMPANY shall thereafter have the right to select and
use such pictures as it shall determine, in its sole discretion,
and you shall have no approval rights in respect thereof.  No
inadvertent failure to COMPANY to comply with this paragraph will
constitute a breach of this Agreement.

21.04.    (a) As used herein, the term "You" includes all
members of the group presently professionally known as 'N SYNC.
The obligations, liabilities, prohibitions and restrictions imposed
upon you hereunder shall be deemed to apply individually and
collectively to each of the members of 'N SYNC, whether performing
alone, with others or as a member of 'N SYNC, regardless of the
name by which you or any of your members may then be identified.
A failure by any member of 'N SYNC to satisfy any of your
obligations hereunder shall, as COMPANY's election, be deemed a
breach of this Agreement by you.  In the event of any such breach,
COMPANY may, by notice to you, and without limiting any of

25

JUL-29-1999  12:42

COMPANY's other rights or remedies hereunder, terminate the term of this Agreement or, alternatively, may terminate the term of this Agreement only as it applies to the member or members who have failed to satisfy their individual obligations.

(b)   You hereby acknowledge that TRANS CONTINENTAL RECORDS, INC. is the sole owner of the name 'N SYNC and will be the sole owner of such name during the term hereof; that you will not use or authorize any other person to use such name or other name adopted by you in connection with the recording, production, manufacture, sale or advertising of records in the territory, or in connection with personal appearances by any person other than you unless approved by TRANS CONTINENTAL RECORDS, INC.   If any member becomes a "leaving member" of the group, or if COMPANY terminates the term of this Agreement as to some but not all members then the leaving member as to whom the term of this Agreement is terminated shall not thereafter use or authorize or permit any other person to use in any manner or for any purpose whatsoever the name 'N SYNC or such other name as you may hereafter adopt.   As used herein, a "leaving member" means any member of Artist who during the term hereof ceases to be an actively performing member of the group for any reason whatsoever, and in the event you disband or COMPANY decides to terminate this Agreement because there being a leaving member, each member of the group.

(c)   No additional member may be added without COMPANY's prior written consent.   If any member of Artist becomes a leaving member, then you shall promptly give COMPANY written notice thereof and COMPANY shall thereafter have the right to terminate this Agreement as to such leaving member or to require such leaving member to render his services directly to COMPANY as a solo artist or as a member of any new group comprised of the leaving members under the same terms and conditions as set forth in this Agreement with respect to you.

21.05.   At COMPANY's request, you shall submit to a drug test with a physician designated by COMPANY at COMPANY's expense.

TRANS CONTINENTAL RECORDS, INC.

By: _____

LOUIS J. PEARLMAN      President

ACCEPTED TO AND AGREED:

_____
"Artist"
CHRISTOPHER ALAN KIRKPATRICK
Soc. Sec. #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

26

JUL-09-1999  10:48

"Artist"
JUSTIN RANDALL TIMERBLAKE
Soc. Sec. #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

"Artist"
JOSHUA SCOTT CHASEZ
Soc. Sec. #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

"Artist"
JOSEPH ANTHONY FATONE, JR.
Soc. Sec. #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

"Artist"
JAMES LANCE BASS
Soc. Sec. #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

27

JUL-29-1999  10:41

## EXHIBIT "A"

## TRANSFER OF COPYRIGHT

For good and valuable consideration, receipt whereof is hereby acknowledged, the undersigned hereby transfer to TRANS CONTINENTAL RECORDS, INC., PUBLISHER DESIGNEE, One Hundred (100%) percent of all the right, title and interest in and to the copyright and One Hundred (100%) percent of the rights comprised in the copyright, without limitation, in the controlled musical composition recorded hereunder.  The above pertains only to Publisher's interest.  The writers retain their interest.

CHRISTOPHER ALAN KIRKPATRICK
Artist

JUSTIN RANDALL TIMBERLAKE
Artist

JOSHUA SCOTT CHASEZ
Artist

JOSEPH ANTHONY FATONE, JR.
Artist

JAMES LANCE BASS
Artist

28

JUL-09-1999  10:41

## PARENTAL\GUARDIAN CONSENT

I, ___LYNN HARLESS___, hereby represent and acknowledge that I am the natural parent and/or legal guardian of the minor ___JUSTIN RANDALL TIMBERLAKE___ and that I have read and am familiar with the Exclusive Artist Recording Agreement attached hereto.

I hereby guarantee my child's performance of his obligations under said Recording Agreement and agree to be secondarily liable in the event he should breach or improperly terminate same.

_Lynn Harless_
Parent/Guardian Signature

_LYNN HARLESS_
Parent/Guardian's Name Printed

Dated: ___4/29/96___

29

JUL-29-1999  10:41

## PARENTAL\GUARDIAN CONSENT

I,   DIANE P. BASS   , hereby represent and acknowledge that
I am the natural parent and/or legal guardian of the minor   JAMES
LANCE BASS   and that I have read and am familiar with the
Exclusive Artist Recording Agreement attached hereto.

I hereby guarantee my child's performance of his obligations
under said Recording Agreement and agree to be secondarily liable
in the event he should breach or improperly terminate same.

*Diane P. Bass*
**Parent/Guardian Signature**

*Diane P. Bass*
**Parent/Guardian's Name Printed**

Dated:   4-29-96

30



CONFIDENTIAL

# EXCLUSIVE MANAGEMENT AGREEMENT

# EXHIBIT B

CONFIDENTIAL

## EXCLUSIVE MANAGEMENT AGREEMENT

AGREEMENT made as of the 28 day of April , 1996, by and between TRANS CONTINENTAL ENTERTAINMENT, INC., with a place of business at 7380 Sand Lake Road, Suite 350, Orlando, Florida 32819 (hereinafter "MANAGER") and CHRISTOPHER ALAN KIRKPATRICK, residing at ~~1610 Overdale Street~~, Orlando, Florida 32839, and JUSTIN RANDALL TIMBERLAKE, a minor, residing at 303 Fawn Lake Drive, Millington, Tennessee 38053, and JOSHUA SCOTT CHASEZ, residing at 6511 ~~Lakestake~~ Drive South, Bowie, Maryland 20720, and JOSEPH ANTHONY FATONE, JR., residing at 2746 Woodruff Drive, Orlando, Florida 32637, and JAMES LANCE BASS, a minor, residing at ~~111 Newport Circle, Clinton, Mississippi 39056~~, professionally known as 'N SYNC, (each being hereinafter individually and collectively referred to as "'N SYNC").

WHEREAS, 'N SYNC is desirous of engaging the services of Manager to act as 'N SYNC's professional advisor and counselor and to attend to certain business details in connection with 'N SYNC's professional career in the entertainment industry; and

WHEREAS, Manager is willing to become associated with 'N SYNC and act as the manager for 'N SYNC upon the terms and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the foregoing and the mutual promises and covenants hereinafter contained, it is agreed as follows:

1.     'N SYNC hereby engages Manager as 'N SYNC's sole and exclusive personal manager for 'N SYNC throughout the world during the term of this Agreement, and Manager hereby accepts such engagement subject to the terms and conditions set forth herein. The term of this Agreement shall commence as of the date hereof and shall continue for an Initial Period of two (2) years. 'N SYNC grants Manager four (4) separate and irrevocable options each to extend the term of this Agreement for a period of one (1) year ("Option Periods"), said Option Periods to run consecutively beginning at the expiration of the Initial Period hereof upon the same terms and conditions as set forth herein. Each option shall be deemed to be automatically exercised unless Manager shall give 'N SYNC written notice to the contrary at least ten (10) days prior to the commencement of the immediately following Option Period. The Initial Period and each Option Period for which Manager has exercised its option are sometimes referred to together herein as the "Term."

2.     Manager agrees, subject to 'N SYNC's availability and cooperation, to perform the following personal management services, at the request of 'N SYNC, in connection with 'N SYNC's activities in the entertainment industry;

(a) advise and counsel in the selection of any literary, artistic and musical material;

(b) advise and counsel in any and all matters pertaining to any public relations and advertising for 'N SYNC;

(c) advise and counsel with relation to the adoption of the proper format for presentation of 'N SYNC's talents and in the determination of proper style, mood and setting therefor;

(d) advise, counsel and direct in the selection of any artistic talent to work with 'N SYNC;

(e) advise and counsel with regard to general practices in the entertainment and amusement industries, and with respect to compensation and terms and contract in such industries;

(f) advise and counsel concerning the selection of theatrical agencies and persons, firms and corporations to procure employment and engagements for 'N SYNC;

(g) negotiate any and all agreement(s) pertaining to 'N SYNC's services, but only to the extent permitted by law ('N SYNC agreeing in any event to obtain Manager's prior written approval of each of same); and

(h) use Manager's reasonable efforts to endeavor to advance promising aspects of 'N SYNC's career, in good faith and in accordance with the business policies and practices of Manager in the entertainment industry generally.

3. 'N SYNC agrees that Manager is not expected to, nor shall Manager procure or secure employment for 'N SYNC. Manager is not to perform any services which, standing alone, shall constitute Manager a talent agent, and Manager has not agreed or promised to perform such services except to the extent permitted by any applicable laws. 'N SYNC agrees to utilize proper talent or other employment agencies mutually approved by Manager and 'N SYNC to obtain engagements and employment for 'N SYNC. 'N SYNC further agrees to submit all offers of employment (and all leads or other communications related thereto) and all contracts of any kind to Manager for Manager's advice and counsel and, if and to the extent permitted by applicable laws, approval.

4. (a) If 'N SYNC or 'N SYNC's representative is, in the sole discretion of Manager, not reasonably available to execute any employment agreement (or related or similar written instrument) nor requiring 'N SYNC's exclusive services for in excess of seven (7) full days, Manager may, at Manager's sole election, execute such agreement (or instruments) as 'N SYNC's attorney-in-fact pursuant to the provisions of subparagraph 4(c) hereof. Manager shall also be authorized in Manager's discretion and on 'N SYNC's behalf, to

2



approve and permit any and all publicity and advertising for 'N SYNC and to approve and permit the use of 'N SYNC's name, photograph, likeness caricatures, voice and/or sound effects for the purposes of advertising and publicity and/or in the promotion of any and all products and services, provided that manager shall obtain 'N SYNC's approval (which 'N SYNC shall not have the right to unreasonably withhold) as to the photographs, likenesses and caricatures to be utilized by Manager for such advertising, publicity and promotional purposes, it being agreed, however, that any inadvertent failure by Manager to utilize such elements so approved by 'N SYNC shall not constitute a breach of this Agreement.   'N SYNC shall not approve or permit any of the foregoing without Manager's approval thereof.

(b) (i) 'N SYNC shall have the right, subject to written notice to Manager, to engage a business manager, who shall be authorized to receive and make payments on behalf of 'N SYNC, - and to collect and receive all gross compensation earned by 'N SYNC with respect to 'N SYNC's activities hereunder (a "Business Manager"). In the event 'N SYNC does engage a Business Manager, 'N SYNC shall authorize and direct that, except as otherwise provided herein, all gross compensation earned by 'N SYNC as to which Manager's right to compensation shall attach hereunder, shall be paid to and shall be collected by Business Manager. Manager shall use reasonable efforts to provide that third party payors compensate 'N SYNC individually when possible. 'N SYNC hereby agrees that all such gross compensation received by Business Manager on 'N SYNC's behalf, which is subject to the terms hereof, shall be segregated into two (2) shares (i.e. Manager's "Commission", as hereinafter defined, and "'N SYNC's Share"). Manager's Commissions shall be received by Business Manager on Manager's behalf pending only the monthly payment thereof to Manager as hereinafter provided, and Manager's Commissions shall not at any time be commingled with any other monies being held by 'N SYNC or Business Manager.

(ii) It is agreed that Business Manager shall render written accounting statements to Manager setting forth the amount of gross compensation received directly or indirectly by 'N SYNC or on 'N SYNC's behalf, if any, or Business Manager, and at the same time remit to Manager its Commissions hereunder as reflected by such statement, as well as repay Manager for any and all monies owing to Manager. Said statements shall be rendered and said Commissions shall be remitted within a reasonable time after receipt thereof by Business Manager in connection with gross compensation subject to the terms hereof. If Business Manager is unable for any reason to comply with the above provisions of this subparagraph 4(b)(iii), Business Manager will immediately give Manager written notice by pre-paid certified mail, return receipt requested, of such inability. Business Manager shall simultaneously furnish Manager with copies of all statements rendered by third parties to 'N SYNC and/or Business Manager with respect to 'N SYNC

3

activities hereunder.    Notwithstanding the foregoing, if at any time during such monthly period, the amount of Manager's Commissions in such monthly period equals or exceeds One Thousand Five Hundred Dollars ($1,500.00), 'N SYNC or Business Manager shall promptly notify Manager to such effect, and remit such monies due to Manager simultaneously with the furnishing to Manager of the above described accounting statement. In the event that 'N SYNC recovers any gross compensation pursuant to an audit conducted by or on behalf of 'N SYNC of a third party pursuant to any agreement entered into by 'N SYNC or substantially negotiated on 'N SYNC's behalf during the Term hereof, and upon any extensions, renewals and substitutions thereof entered into or substantially negotiated on 'N SYNC's behalf during the term hereof, such gross compensation shall be commissionable by Manager at the applicable rate as if said gross compensation were received at the time it was properly due.

(c)  'N SYNC hereby retains the right to sign, on 'N SYNC's own behalf, any recording, publishing, film, television or endorsement contracts or any other agreements whose terms exceeds one (1) year. Notwithstanding the foregoing sentence, Manager and 'N SYNC mutually acknowledge the need for a limited Power of Attorney from 'N SYNC to Manager so that Manager can reasonably attend to 'N SYNC's affairs in 'N SYNC's absence, such as in those instances where Manager has insufficient time to reach 'N SYNC or 'N SYNC's representatives to secure the requisite authority to enter into such an agreement. Accordingly, in such instances (i.e., for the acceptance of engagements being offered by promoters and/or booking agents), or if a good faith, unsuccessful effort has been made by Manager, during the term of this Agreement, as 'N SYNC appoints Manager, during the term of this Agreement, as 'N SYNC's true and lawful attorney-in-fact to sign all necessary documents including, but not limited to, bills of exchange, checks, notes or other negotiable instruments. For this provision to apply, Manager must obtain the prior written consent from 'N SYNC, or in the case 'N SYNC is a minor from 'N SYNC's guardian, prior to exercising this power of attorney. The foregoing appointment is to be deemed a power coupled with an interest, and is, therefore, irrevocable. Manager's exercise of this limited Power of Attorney shall be limited to matters reasonably related to 'N SYNC's career in the entertainment field. Manager hereby agrees to indemnify 'N SYNC for all losses and other damages, including court costs and reasonable attorney's fees, occasioned by Manager's exercise of the limited Power of Attorney in a manner that is inconsistent with the terms contained herein.

(d)  In the event any gross compensation (as hereinafter defined) which should have been paid to Manager pursuant to the terms of this Agreement is nonetheless received at any time by 'N SYNC or by any other person, firm or corporation or other entity(ies) of any kind or nature on 'N SYNC's behalf, including, without limitation, any agent and/or business manager, same shall

4

be deemed to be held in trust for Manager, and 'N SYNC shall immediately require the source of such gross compensation to thereafter conform to the provisions of this Paragraph 4 and shall, within forty-eight (48) hours of receipt of such gross compensation, remit or cause the remittance of all such gross compensation to Manager from the first monies so received and prior to the payment of any other monies, and a photocopy of this Agreement shall (and hereby does) serve as an irrevocable letter of direction, authorizing and directing any and all other persons, firms and corporations or other entity(ies) to at all times so remit such gross compensation as provided above.

(e) (i) 'N SYNC hereby warrants and agrees that any and all agreements entered into by, for or concerning 'N SYNC during the Term hereof (including any extensions and renewals thereof) shall provide for payment in accordance with the provisions of this Paragraph 4, and that 'N SYNC shall promptly execute and deliver to each other party to any such agreements already entered into an irrevocable letter of direction (in form acceptable to such party) effectuating the provisions of this Paragraph 4, and 'N SYNC further warrants and agrees that in the event any existing agreement is hereinafter amended, 'N SYNC shall cause such amendment, to include a provision for payment in the manner hereinabove set forth.

(ii) Until such time as 'N SYNC engages a Business Manager as provided for in subparagraph 4(b)(ii) hereof, Manager agrees to use its good faith endeavors to render accounting statements to 'N SYNC at 'N SYNC's written request within a reasonable time after the end of each calendar month during the Term of this Agreement, setting forth gross income and costs for the prior month and the year to date. Each statement shall be accompanied by Manager's check payable to 'N SYNC for the amount of proceeds (if any) due to 'N SYNC. In addition, Manager shall simultaneously furnish 'N SYNC at 'N SYNC's written request with copies of all statements rendered by third parties to 'N SYNC and/or Manager with respect to 'N SYNC's activities hereunder. Manager agrees to keep a comprehensive set of books and records of accounting for all transactions relative to Manager's causing monies to be paid to or on behalf of 'N SYNC, and such accounts shall be open to inspection by 'N SYNC or 'N SYNC's nominee at all reasonable times provided 'N SYNC sends Manager ten (10) days prior written notice. In addition 'N SYNC or 'N SYNC's representatives shall have the right, at 'N SYNC's expense, to conduct an audit of Manager's records to determine the accuracy of such payments.

(f) 'N SYNC acknowledges that Manager is not required to make any loans or advances to 'N SYNC, but in the event Manager is hereby irrevocably authorized to deduct the amount of such loans or advances from any sums which Manager may receive for 'N SYNC's account.

5

5.    'N SYNC understands that Manager may also represent other persons and performers and that Manager's services hereunder are not exclusive. 'N SYNC agrees that Manager shall not be required to devote Manager's entire time and attention to fulfilling Manager's obligation under this Agreement, and that Manager shall have the right to render services to other persons, firms and corporations either in the capacity which Manager is employed hereunder or otherwise. 'N SYNC warrants that 'N SYNC will actively pursue 'N SYNC's career in the entertainment industry and will give due consideration to all advice and counsel preferred by Manager hereunder. 'N SYNC agrees at all times to be devoted to 'N SYNC's career and to do all things reasonably necessary to promote same.

6.    (a)  In full compensation for Manager's services hereunder, 'N SYNC shall pay to Manager, as and when received by 'N SYNC, or by Manager as provided herein, and prior to payment of any other party, twenty-five (25%) percent of the "gross compensation" received in connection with recordings generated under the Exclusive Artist Recording Agreement dated _____, 1996, and thirty (30%) percent of the "gross compensation" received in connection with merchandise and/or performances ("Commission") of 'N SYNC, as hereinafter defined, received at any time on account of any and all activities in the entertainment and publishing industries except as specifically excluded from this Agreement. "Gross compensation", as used herein, shall mean the gross sums of money or other consideration (including, but not limited, to, fees, salaries, earnings, royalties, residuals, advances, report and/or union fees, bonuses, proceeds of sales, leases or licenses, gifts, shares of stock, partnership interests and amounts paid for packaged television, motion pictures and radio programs) directly or indirectly earned or received by 'N SYNC or 'N SYNC's heirs, successors and assigns, or earned, received or expended by anyone on 'N SYNC's behalf, from any professional activities of 'N SYNC (and/or derived from the use of 'N SYNC's experiences or talents and/or the results or proceeds thereof), whether as an actor, writer, composer, author, lyricist, singer, musician, performer, artist, designer, cameraman, technician, director, producer, supervisor, executive, consultant or as owner in whole or in part of any properties, or as proprietary interest in a production, publishing or other firm or entity of any kind, and whether for the rendition of the 'N SYNC's services or from the sale or other disposition of literary, dramatic or musical property or package radio or television program, or any rights therein or thereto, or any use of 'N SYNC's name(s), likeness or talents for advertising purposes or otherwise, without any exclusion or deduction whatsoever, including all sums earned by 'N SYNC during the Term of this Agreement, and thereafter, under (i) any employment or contract now in existence or entered into or negotiated for during the Term hereof, (ii) any extension, modification, addition of renewal of such contract or employment, regardless of when entered into, (iii) any substitutes, directly or indirectly, for such contract or employment, including, without limiting the foregoing,

6

*i.e. Commission is based on net to 'N Sync and not sales price of any goods or records sold. (If price to public is sales f- then Manager's Commission is only to amount paid to 'N Sync from record distributor or merchandiser/manufacturer).

a contract or employment with an employer or contracting party entered into within six (6) months of the termination of a previous contract or employment if such previous contract or employment is commissionable hereunder, and (iv) any and all judgments, awards, settlements, payments, damages and proceeds (whenever received) relating to any suits, claims, actions, proceedings or arbitration proceedings arising out of any alleged breach or non-performance by others of any portion of any contracts, engagements, commitments or other agreements refereed to in this Paragraph 6, all of which regardless of when entered into, when performed and when effective. Any Commissions or other sums due Manager resulting from any and all such judgments, awards, settlements, payments, damages and/or proceeds relating to any such suits, claims, actions, proceedings or arbitration proceedings shall be computed after first deducting counsel fees and disbursements, and any counsel fees and disbursements therefrom shall be paid by 'N SYNC. Notwithstanding anything to the contrary contained in this Agreement, as to any motion picture, phonograph record, film, tape, wire, transcription, recording or other reproduction of any of 'N SYNC's activities in the entertainment industries or resulting therefrom which is created in whole or in part during the Term hereof (or thereafter pursuant to an engagement, contract or agreement subject to Commission hereunder), expiration of the Term hereof (or thereafter pursuant to an engagement, contract or agreement subject to Commission hereunder), expiration of the Term of this Agreement shall not affect Manager's right to receive Manager's Commission as provided herein and Manager shall continue to be entitled to such Commission in perpetuity with respect to any gross compensation accruing to or received by 'N SYNC after the expiration or termination of the Term of this Agreement on account of any activities and interests connected to the entertainment industry created by 'N SYNC and initially exploited during Term hereof. Manager's commissions shall, at Manager's option hereunder, apply to any monies paid to 'N SYNC by any employer of 'N SYNC as travel or living expenses in connection with any engagements, employment or agreement performed, secured or entered into by 'N SYNC. Notwithstanding any other provisions of this subparagraph 6(a), Manager's Commission shall not apply to any monies paid to 'N SYNC for (A) recording costs (excluding advances paid directly to 'N SYNC, (B) video production costs, (C) recoupable tour support or (D) tour production (i.e., "sound and lights") costs. Notwithstanding the foregoing, Commissions hereunder shall not apply to union "scale" income received by 'N SYNC in connection with services as a non-featured side musician appearing on recordings or personal appearances of other (featured) artists unless 'N SYNC served in royalty-earning and/or proprietary, controlling, ownership or partnership capacity in connection with such services, appearance of recording.

7.   All expenses, other than normal minimum office overhead expenses, incurred by Manager on behalf of 'N SYNC (including, without limitation, long distance telephone calls, messenger fees,

transportation and expenses while travelling, and promotion and publicity expenses) shall be promptly paid or reimbursed to Manager by 'N SYNC. Unless made reasonably necessary due to circumstances substantially outside of Manager's control, Manager shall not incur (a) any single such expense in excess of Two Thousand Five Hundred (U.S. $2,500) United States Dollars or (b) cumulative expenses in any one (1) calendar month totalling Twenty-Five Thousand (U.S. $25,000) United States Dollars, without 'N SYNC's prior approval. Neither Manager nor any individual affiliated with Manager shall be required to travel to meet with 'N SYNC at any particular time or places, provided, however, that if Manager or any such individual employee of Manager does travel on behalf of 'N SYNC, then the cost of such travel and any and all expenses relating thereto shall be promptly paid or reimbursed by 'N SYNC. Notwithstanding anything to the contrary contained in this Paragraph 7, if the presence of Manager or any such individual is required outside METROPOLITAN ORLANDO, FLORIDA, 'N SYNC agrees that 'N SYNC will pay for the expenses incurred, such expenses to consist of first class living accommodations and requirements (including any and all tips and incidentals) and travelling expenses. All such expenses incurred on 'N SYNC's behalf are to be paid in advance from 'N SYNC's accounts and expense statements are to be turned in by Manager after each trip. In the event Manager has to entertain any individual or group of individuals anywhere in the world on 'N SYNC's behalf, and provided that such expense is related to the furtherance of 'N SYNC's career, Manager shall have the right to deduct such expenses as manager incurs from 'N SYNC's accounts. In the event the accounts Manager holds for 'N SYNC are not sufficient to repay or advance the needed money to Manager, 'N SYNC shall promptly reimburse Manager or advance such money to Manager from the accounts of 'N SYNC that Manager holds upon Manager's request to 'N SYNC for such monies. In no event, without prior written approval, shall expenses exceed five (5%) percent of "gross compensation" of 'N SYNC as defined in paragraph 6(a).

8.    This Agreement shall not constitute a joint venture by or partnership between Manager and 'N SYNC, it being understood that Manager is acting hereunder as an independent contractor and that, subject to the prior written consent of 'N SYNC, manager may appoint or engage other persons or entities to perform any of the administrative services required hereunder, and any of the non-administrative services required hereunder pursuant to Manager's direction.

9.    It is understood and agreed that Manager shall not be held in any way liable or responsible for any breach of contract or act or omission on the part of any person, firm or corporation not owned or controlled by Manager with whom any engagement or contract of any kind is entered into by or for 'N SYNC for any reason.

8

10.   'N SYNC acknowledges that it is difficult to determine the amount and exact nature of services Manager must render hereunder at 'N SYNC's request; and correspondingly, Manager acknowledges that it is difficult for 'N SYNC to determine the exact scope and timing of the services Manager will render to 'N SYNC hereunder, and in some cases the rate at which such services rendered will be so commissionable. Accordingly, but without limitation of the foregoing, it is agreed that a party hereto (the "First Party") shall not be deemed in breach of any of its obligations hereunder unless and until the other party (the "Second Party") shall give the First Party written notice, by pre-paid certified mail, return receipt requested, of the precise breach alleged and the First Party fails, within thirty (30) days after receipt of such notice, to cure the breach specified by the Second Party.

11.   From time to time during the Term of this Agreement, Manager or other persons or entities owned and/or controlled directly or indirectly by Manager, or Manager's partners, shareholders, officers, directors and employees, whether acting alone or in association with others, may package an entertainment program in which 'N SYNC is employed as an artist, or may act as the entrepreneur or promoter of an entertainment program in which 'N SYNC is employed as an artist, or may employ 'N SYNC in connection with the production of phonograph records, or as a songwriter, composer, arranger or otherwise in connection with the creation of literary or musical works. Such activity on Manager's or of Manager's fiduciary obligations and duties to 'N SYNC, and such activity shall not in any way affect Manager's rights to Commissions hereunder in all instances except as hereinafter specifically provided. Manager shall not be entitled to Commissions from 'N SYNC in connection with any gross monies or other considerations derived by 'N SYNC from (i) any employment or agreement hereunder where 'N SYNC is employed or engaged by Manager or by any person, firm or corporation owned or controlled by Manager or by any of Manager's partners, shareholders, officers, directors or employees, in any capacity (including, without limitation, as the package agent for the entertainment program in which 'N SYNC is so employed or engaged, as 'N SYNC's music or literary publisher, or as 'N SYNC's record or promotion company); (ii) the sale, license or grant of any literary or musical rights to Manager or any person, firm or corporation owned or controlled by Manager.

12.   This Agreement shall be deemed to have been made in FLORIDA and its validity, construction, performance and breach shall be governed by the laws of the State of FLORIDA applicable to agreements made and to be wholly performed therein.

13.   (a)   'N SYNC hereby represents and warrants that 'N SYNC has not entered into any agreements or contracts which shall or do in any way interfere or conflict with 'N SYNC's obligations,

9.

promises and/or warranties hereunder and that 'N SYNC is free to enter into this Agreement, and 'N SYNC agrees to indemnify and hold Manager harmless from any loss, cost or liability (including reasonable attorneys' fees) as a result of any breach by 'N SYNC of any of 'N SYNC's representations, warranties or covenants contained herein, including, without limitation, the provisions of Paragraph 9 hereof.

(b)  Manager hereby represents and warrants that Manager has not entered into any agreements or contracts which shall or do in any way interfere or conflict with Manager's obligations, promises and/or warranties hereunder and that Manager is free to enter into this Agreement, and Manager agrees to indemnify and hold 'N SYNC harmless from any loss, cost or liability (including reasonable attorney's fees) as a result of any breach by Manager of any of Manager's representations, warranties or covenants contained herein.

14.  The services rendered by 'N SYNC are special, unique and irreplaceable, and any breach or threatened breach by 'N SYNC of any of 'N SYNC's obligations hereunder may be enjoined temporarily or permanently without regard to and without limiting any other remedy that may be available to Manager.

15.  In the event Manager (or Manager's successors and/or assigns, if any) shall assign or otherwise transfer this Agreement or any of Manager's (or their) rights hereunder or delegate any of Manager's (or their) obligations hereunder, in whole or in part, to any part(ies) at any time comprising Manager or any corporation or partnership owned by Manager (or them) or any of such parties in whole or in part, such assignment shall be (and hereby is) approved and accepted and deemed to be a novation of this Agreement, subject to PEARLMAN's and 'N SYNC'S prior written consent.   'N SYNC shall not have the right to assign any of 'N SYNC's rights or delegate any of 'N SYNC's obligations hereunder. Without in any way derogating from the preceding sentence, this Agreement shall inure to the benefit of and be binding upon each of the parties hereto and their respective successors, assigns, heirs, executors, administrators and legal and personal representatives.

16.  Any notice given hereunder shall be sufficient only if mailed via certified mail, return receipt requested, postage prepaid, and if to Manager, addressed to Manager at the address hereinabove specified with a copy to WILLIAM B. PRINGLE, III, ESQUIRE, Post Office Box 691222, Orlando, Florida 32869-1222; and other address(es) of which 'N SYNC has been given notice as provided herein, and if to 'N SYNC, at 'N SYNC's above address. Any notice shall be effective as of the date three (3) days after mailing aforesaid in the continental United States except for notices of changes in address (which shall only be effective on receipt.)

10

17.  Nothing in this Agreement shall be construed so as to require the commission of any act contrary to law. Wherever there is any conflict between the provisions of this Agreement and any present or future statute, law, ordinance or regulation the latter shall prevail, but in such event the provision(s) of this Agreement affected shall be curtailed or limited only to the minimum extent necessary to bring it within the requirements of the latter. (The parties hereto do not intend by the foregoing sentence to imply the illegality, voidness or unenforceability of any term, provision or paragraph of this Agreement).

18.  This Agreement sets forth the entire agreement between the parties hereto, and replaces and supersedes all other agreements relating to the subject matter hereof. This Agreement cannot be modified, altered, terminated or otherwise changed except by an agreement in writing signed by the parties hereto. In the event that any party hereto initiates litigation to enforce this Agreement, the party prevailing to the greater extent shall be entitled to recover reasonable attorneys' fees and costs reasonably incurred in connection with such litigation. No waiver of any provision of this contract or of any default hereunder shall effect Manager's rights thereafter to enforce such provision or to exercise any right or remedy in the event of any other default, whether or not similar.

19.  If necessary in Manager's good faith opinion to ensure Manager of payments for Manager's services as provided herein, 'N SYNC agrees to deliver to Manager a written assignment of so much of 'N SYNC's compensation earned as a result of 'N SYNC's professional career in the entertainment industry from any source therein, as hereinabove agreed upon to be Manager's compensation, and if not so delivered to Manager, Manager is authorized to draw an assignment to Manager for such salary, execute the same in the name of 'N SYNC and collect therefrom with the same force and effect as though signed by 'N SYNC in person, or to require any party paying such compensation directly or indirectly to 'N SYNC to pay the same over to Manager, in which event this instrument or a copy thereof shall be authority for such employer to make such deductions and payment. All the terms and conditions of this Agreement shall be irrevocable, this Agreement constituting a contract and a power of attorney and creating an agency coupled with an interest.

20.  'N SYNC hereby expressly agrees that 'N SYNC will not at any time, without Manager's express written consent, exert or permit any third party to exert any of the powers herein granted to Manager so as to create any confusion or conflict of authority in the mind of any third person. 'N SYNC understands and agrees that Manager's interest and compensation under this Agreement shall be a continuing interest and shall not be revocable in any event or for any reason whatsoever for the term of this Agreement and any

11

extension(s), renewals(s), replacement(s), or substitution(s), thereof, except only as specified in this Agreement.

21. Manager shall have the right to advertise and publicize Manager as 'N SYNC's exclusive personal manager and representative and 'N SYNC shall cooperate and assist Manager in securing written (and, if applicable, logo) credit as such wherever reasonably possible.

22. 'N SYNC acknowledges that no promises, representations or inducements have been made by Manager or on Manager's behalf, except as specifically set forth herein, and 'N SYNC further acknowledges that Manager's acceptance and execution hereof is in reliance on this fact.

23. 'N SYNC hereby represents, warrants and agrees that 'N SYNC shall cooperate fully with Manager in any and all of Manager's efforts to comply with any laws as same may apply to the manner in which Manager conducts Manager's management business generally and/or as it specifically pertains to 'N SYNC and/or the rendition of Manager's services hereunder. Manager has advised 'N SYNC and 'N SYNC hereby agrees that they have the right to obtain independent legal counsel to negotiate with WILLIAM B. PRINGLE, III, Esq. and to represent 'N SYNC regarding 'N SYNC's activities with Manager.

24. Manager shall be entitled (but in no event shall be obligated) to secure, in Managers own name or otherwise and at Manager's expense, life, accident, health and/or other insurance covering 'N SYNC, in an amount which does not exceed the sum of One Million Dollars ($1,000,000.00) per member, either independently or together with Manager or any party Manager designates being the sole beneficiary thereof and neither 'N SYNC nor 'N SYNC's estate shall have any right, title or interest in and to such insurance or any proceeds therefrom. 'N SYNC shall cooperate fully with Manager in connection with the obtaining of such insurance, if any, including, without limitation, by timely submitting to medical examinations and by completing any and all documents necessary or desirable in respect thereof.

25. 'N SYNC specifically acknowledges that this Agreement is executed as an arm's length transaction, separate and apart from any fiduciary or other duty or obligation of any kind or nature which may be owed by Manager or any affiliate of Manager to 'N SYNC, and that Manager is under no such duty or obligation to 'N SYNC in connection with this Agreement, whether or not Manager or any affiliate or Manager now has or at any time had any fiduciary or other relationship of any kind or nature with 'N SYNC. It is specifically understood and agreed that 'N SYNC is free to utilize separate, independent legal counsel to advise 'N SYNC with respect to the respective rights and obligations of each party under this Agreement, any failure by 'N SYNC to seek or obtain such legal

12



counsel to be 'N SYNC's sole choice (and contrary to Manager's wishes).

In the event TRANS CONTINENTAL ENTERTAINMENT, INC. does not obtain a record contract for 'N SYNC or, at the very least, a written bona fide offer to enter into a record contract from a major record distributor within 180 days immediately following the effective date of this Agreement, then this Agreement shall be null and void and all parties shall be absolved of and from all liability hereunder.  Manager shall also keep 'N SYNC apprised of all facts concerning the status of negotiations with prospective record distributor(s).✱

IN WITNESS WHEREOF, the parties hereunder set their hands and seals on the day and year first above written.

COMPANY:

By: _____

JOHNNY WRIGHT          President

ACCEPTED TO AND AGREED:

"'N SYNC"
CHRISTOPHER ALAN KIRKPATRICK
Soc. Sec. #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

"'N SYNC"
Joseph Anthony Fatone Jr.
Soc. Sec. # 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

"'N SYNC"
JUSTIN RANDALL TIMBERLAKE
Soc. Sec. #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

"'N SYNC"
JOSHUA SCOTT CHASEZ
Soc. Sec. #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

✱ Upon ninety days (90) after signing this agreement. 'N Sync shall have the right to terminate this agreement if N Sync hasn't recorded new products and has engaged in four (4) promotional performances arranged by Manager.

13

CK  JF
JT

"'N SYNC"
JAMES LANCE BASS
Soc. Sec. #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

(doc\tc\nsync\manage.agr)

14

JUL-29-1999  10:47

## PARENTAL/GUARDIAN CONSENT

I, _JAMES I._ _DIANE T. BASS_, hereby represent and acknowledge that I am the natural parent and/or legal guardian of the minor _JAMES LANCE BASS_ and that I have read and am familiar with the Exclusive Management Agreement attached hereto. I hereby guarantee my child's performance of his obligations under said Management Agreement and agree to be secondarily liable in the event he should breach or improperly terminate same.

_____
Parent/Guardian Signature
Dated: _4/28/96_

16

CK



(a:ik 010896)

**SUBJECT TO CONTRACT**

An / To:         **Louis J. Pearlman**
                 **TRANS CONTINENTAL RECORDS, INC**

Fax -Nr:

Von / From:      **BMG Ariola Muenchen GmbH**

                 **Proposed License Agreement**
                 **Trans Continental Records Inc. ("Licensor") -w-**
                 **BMG Ariola Muenchen GmbH  ("Licensee" or "BMG")**
                 **for the services of N-Sync ("Artist Group" or "Artists")**

EINGEGANGEN

6. AUG. 1996

Erled. ..........................

| **If you did not receive all pages please call the telephone number above.** |
| --- |

Datum /Date:  August 1,      Zeit /Time:    16:12      Seiten / Pages:
              1996

Dear Mr. Pearlman:

We hereby should like to summarize our mutual understanding and agreement as follows:

Within no later than four (4) weeks from the date hereof, Transcontinental Records Inc. shall deliver to BMG demo recordings ("the Specified Demos") of such sufficient master recordings featuring the recorded performances of the Artists as shall be required to make two (2) singles, and BMG shall have thirty (30) days from BMG's receipt of the Specified Demos ("BMG's Decision Period") to determine (at BMG's sole discretion) whether or not BMG wishes to enter into the exclusive licensing arrangement with Transcontinental Records, Inc. for the services of the Artists on the basis of the terms and conditions set forth below, PROVIDED THAT BMG's decision on the immediately aforesaid shall be notified to Transcontinental Records in writing within BMG's Decision Period and other subject to the *otherwise (B)* following: **(A)** If BMG decides not to enter into such licensing arrangement with Trans Continental Records, then BMG shall have no rights in and to the master recordings comprised in the Specified Demos and Trans Continental Records shall be free to contract with any other party for the services of the Artists, it being hereby expressly clarified and agreed that Trans Continental Records shall have no claims against BMG as a result of BMG's decision as immediately aforesaid or **(B)** If BMG decides to enter into such licensing arrangement with Trans Continental Records, then the master recordings comprised in the Specified Demos shall be deemed to fall within the terms and conditions of such licensing arrangement between BMG and Trans Continental Records (and shall thus fall within the definition of "Additional Master Recordings" (as defined for purposes thereof), in which case the licensing arrangement shall automatically come into effect on the basis of the following terms and conditions:

1.      **Licensor:**
Trans Continental Records Inc.

2.      **Licensee:**
BMG Ariola Muenchen GmbH

3.      **Exclusive Licensed Territory ("Territory"):**
The world and the universe;

**EXHIBIT** C





-2- (a:k010896) Basic Terms: Proposed License Agreement re. N-Sync

### 4.    Type of Contract:

Exclusive License Agreement ("the Agreement") for the services of the artist group ("Artists" or "Artist Group" which is currently p/k/a "N-Sync" ("Group Name", subject as further specified in 4.b. below). For the purpose of the Agreement,

a.    Licensor warrants, represents and agrees all of the following:

(i)    On the basis of one or more binding agreement(s) Licensor has at present and shall continue to have at least during the entire "Term" of the Agreement the sole and exclusive right throughout the Territory to call upon the Artist Group to render services in connection with the making of recordings (whether audio-only and/or audio-visual) of all descriptions and by any and all methods now or hereafter known.

(ii)    Licensor is authorized to legally bind the Artists on an exclusive basis for purposes of performing the Agreement and it is the Artists' wish that Licensor does so, it being hereby agreed that, in verification of the immediately aforesaid, Licensor shall cause each of the Artists to sign a so-called "Letter of Inducement", such signed Letters of Inducement to be returned to Licensee no later than concurrently with the execution by Licensor of the Agreement.

(iii)    Licensor and/or Artists shall not cause or procure any changes and will use their best endeavours to prevent any changes during the Term of the Agreement in the Artist Group as now comprised, provided always that (aa) the Artist Group featured in any and all master recordings to be delivered pursuant to the Agreement shall consist of at least the key members specified below which currently comprise the Artist Group ("Key Members") and such additional artist(s), if any, as may be required from time to time to maintain or improve the artistic quality of the Artist Group; (bb) during the Term of the Agreement, the Key Members may not be replaced unless Licensor and Licensee shall mutually agree that any artist(s) of similar calibre are acceptable in replacement of any of the following Key Members:

.............................................................................................................................................

.............................................................................................................................................

(iv)    If, during the Term, any "Leaving Member" (which immediately aforesaid expression means any Key Member or any person accepted in replacement of a Key Member) becomes permanently incapacitated by illness or separates from or otherwise ceases to perform with the remaining Key Members ("Remaining Members") of the Artist Group, then Licensor shall promptly give Licensee written notice of such occurrence and Licensee, in its sole discretion, by written notice to Licensor, may elect to (aa) terminate the Term of the Agreement or (bb) require Licensor and the Remaining Members to continue to be bound by the Agreement and either promptly furnish an acceptable substitute for the Leaving Member or perform as a reconstituted Artist Group without the replacement of the Leaving Member;

(v)    If during the Term of the Agreement a Key Member (or any person accepted in replacement of a Key Member) decides to record individually whilst still a member of the Artist Group ("Solo Member"), then Licensor shall promptly notify the Licensee in writing to that effect, provided that Licensor shall procure that (unless Licensor specifically agrees to the contrary in writing) no Key Member shall become a Solo Member







during the Term until such time as Licensee shall have released under the Agreement the so-called "First Commitment Album", the "Second Commitment Album" and (if applicable) any further "Commitment Album" (as such expressions are defined) in respect of which Licensee shall have exercised its first option under the Agreement prior to Licensee's receipt of Licensor's written notification as immediately aforesaid.

(vi)    Licensee shall have irrevocable options (subject as shall be specified in more detail in the Agreement) to acquire exclusively the individual recording services of each Leaving Member and/or Solo Member.

(vii)   During the entire Term of the Agreement, Licensor and/or Artists will neither without Licensee's prior written consent change the "Group Name" nor will any Leaving Member or Solo Member have the right to use the Group Name at any time during the Term of the Agreement without Licensee's prior written consent;

(viii)  Licensor is authorized to grant and shall grant to Licensee (for as long as Licensee shall have the exploitation rights pursuant to the Agreement) the right to use and/or to authorize any of Licensee's affiliates, subsidiaries, licensees and their respective parents, sub-licensees and assigns to use (without liability to any party) the Group Name as well as the individual name and/or professional name, facsimile signature, voice, biographical material, photographs and/or other likenesses of each person comprising the Artist Group in connection with the exploition of rights granted to Licensee pursuant to the Agreement.

(ix)    All Master Recordings to be produced under the Agreement shall be so produced solely by such established top producer(s) as has/have proven to be successful in the past (such as but not limited to Denniz Pop) and as shall be mutually agreed from time to time between Licensor and Licensee, and all material to be recorded under the Agreement shall be selected in prior consultation with the Licensee.

(x)     At least DM 350.000,-- (three hundred and fifty thousand Deutsche Mark) shall be expended by way of recording costs in respect of each "Commitment Album" to be delivered by Licensor to Licensee under the Agreement.

(xi)    During the "Re-recording Restriction Period" (as hereinafter defined), . each of the Artists and applicable Producer(s) shall be subject to a re-recording restriction in respect of the material included in each applicable "Accepted Master Recording" (as defined), which Re-recording Restriciton Period shall in each instance mean a period of five (5) years from Licensee's initial release of the respective Accepted Master Recording.

b.    "Group Name" means "N-Synch" and any new Group Name as may be adopted for use in connection with the exploitation of the Artist Group's recorded performances, subject to the following:

(i)     Prior to the initial Record release under the Agreement, the parties hereto and Artists shall liaise in good faith and decide by mutual agreement as to whether or not the Artist Group shall adopt another professional Group Name for use in the Territory or any part(s) thereof; and

(ii)    if at any time any third party challenges the Artists' right to use the Group Name and/or new Group Name (as applicable), the parties hereto and Artists shall liaise




-4- (a:jk010896) Basic Terms: Proposed License Agreement re. N-Sy.

in good faith and decide by mutual agreement as to whether or not Artists shall adopt another professional name selected by mutual agreement without awaiting the determination of the validity of any such challenge.

## 5.    Licensor's Delivery Commitment, Term of Agreement and Duration of Licensee's Exploitation Rights:

    **a.**    The Agreement shall contain a firm commitment for the production by or on behalf of Licensor and the delivery to Licensee of the "First Commitment Album" (as hereinafter defined) and (subject to Licensor's compliance with Licensor's applicable contractual obligations in repect of the production and delivery of same), Licensee shall be deemed to have been accepted the First Commitment Album for release under the Agreement. For purposes of the Agreement, "First Commitment Album" means the Artist Group's newly produced studio album (whether or not same is a multiple album) to be next released after the Commencement Date of the Term of the Agreement, such completed First Commitment Album to be delivered to Licensee prior to December 31st, 1996.

    **b.**    In addition to Licensee's rights in and to the First Commitment Album, Licensor grants to Licensee separate and consecutive first options to secure for release in the Territory under the terms and conditions of the Agreement all new master recordings embodying the performances of the Artist which shall be produced at any time during the "Term" of the Agreement ("Option Masters"). Licensor shall offer all Option Masters in the form of the respective record formats envisaged by Licensor for initial release of same ("Option Records") and otherwise subject to the following:

        **(i)**    Licensor shall deliver two samples ("Samples") containing either demo or completed recordings (as Licensor may elect at its sole discretion) of at least 50% of the Option Masters to be included in each Option Record, and Licensee shall in each instance have a period of 30 (thirty) calendar days from Licensee's receipt of Samples of the respective Option Record ("Option Period") to exercise Licensee's first option in relation to same by written notice to Licensor. The exercise from time to time by Licensee of Licensee's first option right in accordance with the immediately aforesaid shall be deemed to constitute Licensee's acceptance of the applicable Option Record, provided that Licensee's failure from time to time to validly exercise its first option right in respect of the applicable Option Record shall be deemed to constitue non-acceptance (rejection) of same.

        **(ii)**    Subject to the provisions contained in sub-clauses 5.c. and 5.d. hereof, the Option Records available to Licensee under the Agreement shall include at least the "Second Commitment Album", "Third Commitment Album", the "Fourth Commitment Album" and the "Fifth Commitment Album" (as such expressions are defined and subject as hereinafter specified in more detail), PROVIDED THAT

        **(aa)**  "Second Commitment Album" means the Artist Group's newly produced studio album (whether or not same is a multiple album) to be next released after the release of the First Commitment Album (whereby Licensor shall procure that Samples of the Second Commitment Album shall be supplied to Licensee no later than nine (9) months after the release of the First Commitment Album and, if Licensee shall have validly exercised its first option in relation to the Second Commitment Album, then the completed Second Commitment Album shall be delivered to Licensee not earlier than twelve (12) months but in

-5- (ajik010896) Basic Terms: Proposed License Agreement re. N-S

any event no later than eighteen (18) months after Licensee's initial release of the First Commitment Album;

(bb)  "Third Commitment Album"  means the Artist Group's newly produced studio album (whether or not same is a multiple album) to be next released after the release of the Second Commitment Album (whereby Licensor shall procure that Samples of the Third Commitment Album shall be supplied to Licensee no later than nine (9) months after the release of the Second Commitment Album and, if Licensee shall have validly exercised its first option in relation to the Third Commitment Album, then the completed Third Commitment Album shall be delivered to Licensee not earlier than twelve (12) months but in any event no later than eighteen (18) months after Licensee's initial release of the Second Commitment Album;

(cc)  "Fourth Commitment Album"  means the Artist Group's newly produced studio album (whether or not same is a multiple album) to be next released after the release of the Third Commitment Album (whereby Licensor shall procure that Samples of the Fourth Commitment Album shall be supplied to Licensee no later than nine (9) months after the release of the Third Commitment Album and, if Licensee shall have validly exercised its first option in relation to the Fourth Commitment Album, then the completed Fourth Commitment Album shall be delivered to Licensee not earlier than twelve (12) months but in any event no later than eighteen (18) months after Licensee's initial release of the Third Commitment Album;

(dd)   "Fifth Commitment Album"  means the Artist Group's newly produced studio album (whether or not same is a multiple album) to be next released after the release of the Fourth Commitment Album (whereby Licensor shall procure that samples of the Fifth Commitment Album shall be supplied to Licensee no later than nine (9) months after the release of the Fourth Commitment Album and, if Licensee shall have validly exercised its first option in relation to the Fifth Commitment Album, then the completed Fifth Commitment Album shall be delivered to Licensee not earlier than twelve (12) months but in any event no later than eighteen (18) months after Licensee's initial release of the Fourth Commitment Album.

c.      The "Term" of the Agreement shall commence as of August 1, 1996 ("Commencement Date") and shall thereafter continue up to the expiration of ten (10) months after the initial release in the Territory of the Fifth Commitment Album , PROVIDED THAT, notwithstanding anything to the contrary herein contained,

(i)      if Licensee rejects or fails to validly exercise its first option in relation to the Second Commitment Album, then the Term shall expire prematurely as of the latest of (aa) the expiration of the Option Period relating thereto or (bb) the date of the actual rejection by Licensee of the Second Commitment Album or (cc) the expiration of ten (10) months after the initial release in the Territory of the First Commitment Album (as the case may be, whichever shall be the latest), provided further that, upon the premature expiration of the Term of the Agreement pursuant to the foregoing provisions of this sub-paragraph (i), Licensor shall have the right to license the Second Commitment Album to any other party and Licensee's first options in relation to the Third Commitment Album, the Fourth Commitment Album and the Fifth Commitment Album shall be deemed to be null and void; or





-6- (a:ik010896) Basic Terms: Proposed License Agreement re. N-Sy...

(ii)    if Licensee shall have accepted the Second Commitment Album for release under the Agreement but if Licensee rejects or fails to validly exercise its first option in relation to the Third Commitment Album, then the Term shall expire prematurely as of the latest of (aa) the expiration of the Option Period relating thereto or (bb) the date of the actual rejection by Licensee of the Third Commitment Album or (cc) the expiration of ten (10) months after the initial release in the Territory of the Second Commitment Album (as the case may be, whichever shall be the latest), provided further that, upon the premature expiration of the Term of the Agreement pursuant to the foregoing provisions of this sub-paragraph (i), Licensor shall have the right to license the Third Commitment Album to any other party and Licensee's first options in relation to the Fourth Commitment Album and the Fifth Commitment Album shall be deemed to be null and void; or

(iii)   if Licensee shall have accepted the Third Commitment Album for release under the Agreement but if Licensee rejects or fails to validly exercise its first option in relation to the Fourth Commitment Album, then the Term shall expire prematurely as of the latest of (aa) the expiration of the Option Period relating thereto or (bb) the date of the actual rejection by Licensee of the Fourth Commitment Album or (cc) the expiration of ten (10) months after the initial release in the Territory of the Third Commitment Album (as the case may be, whichever shall be the latest), provided further that, upon the premature expiration of the Term of the Agreement pursuant to the foregoing provisions of this sub-paragraph (ii), Licensor shall have the right to license the Fourth Commitment Album to any other party and Licensee's first option in relation to the Fifth Commitment Album shall be deemed to be null and void; or

(iv)    if Licensee shall have accepted the Fourth Commitment Album for release under the Agreement but if Licensee rejects or fails to validly exercise its first option in relation to the Fifth Commitment Album, then the Term shall expire as of the latest of (aa) the expiration of the Option Period relating thereto or (bb) the date of the actual rejection by Licensee of the Fifth Commitment Album or (cc) the expiration of ten (10) months after the initial release in the Territory of the Fourth Commitment Album (as the case may be, whichever shall be the latest), provided further that, upon the expiration of the Term of the Agreement pursuant to the foregoing provisions of this sub-paragraph (iii), Licensor shall have the right to license the Fifth Commitment Album to any other party.

d.      The First Commitment Album to be delivered by Licensor to Licensee pursuant to sub-paragraph 5.a. and (to the extent applicable) any subsequent Commitment Album(s) to be delivered by Licensor to Licensee pursuant to sub-paragraph 5.b. above are sometimes collectively referred to as "Licensor's Minimum Deliver Commitment", it being expressly clarified and agreed that each Multiple Album which otherwise qualifies as a "Commitment Album" shall count as only one (1) Commitment Album delivered by Licensor towards the fulfilment of Licensor's Minimum Delivery Commitment. It is hereby further agreed that neither any master recordings from the Artist Group's back catalogue nor any Master Recordings embodying the performances of the Artist Group recorded at any time during the Term hereof which consist substantially of only spoken word or which are so-called "live" or specialized "theme" recordings (such as but not limited to any Christmas songs) or "Soundtrack Recordings" or "Videos" (as the case may be) nor any recordings or records by any Solo Member or Leaving Member (as the case may be) shall be applicable towards the fulfilment of Licensor's Minimum Delivery Commitment nor shall any Option Records which are Singles or EPs or Mini Albums or "Greatest Hits" Albums or "Live" Albums or "Limited Edition" Albums (as the case may be) be applied towards the fulfilment




Case 6:99-cv-01282-ACC    Document 1    Filed 10/12/99    Page 99 of 115 PageID 99

-7- (atik010896) Basic Terms: Proposed License Agreement re. N-St

of Licensor's Minimum Delivery Commitment, provided, however, that if at any time during the Term hereof any Master Recordings or Records embodying the performances of the Artist Group shall be recorded or compiled by or on behalf of Licensor (as the case may be) which are in excess of Licensor's Minimum Delivery Commitment ("Excess Master Recordings") and/or which shall not qualify as Master Recordings or Records applicable towards the fulfilment of Licensor's Minimum Delivery Commitment ("Non-Qualifying Master Recordings"), as the case may be (any and all such Non-Qualifying Master Recordings and/or Excess Master Recordings being for the purposes of the Agreement collectively referred to as "Additional Master Recordings", which immediately aforesaid expression shall be deemed to exclude, however, any recordings or records subject to any separate agreement(s)(if any) respecting the services of any Leaving Member or Solo Member), then such Additional Master Recordings (if any) shall equally be deemed to be Option Masters available to Licensor for release in the Territory under the terms and conditions hereof, PROVIDED THAT the non-acceptance or rejection of any Additional Master Recording(s) shall not result in any premature expiration of the Term hereof. Upon the expiration or premature expiration or other termination of the Term of the Agreement, all rights for the Territory in and to any Additional Master Recording(s) rejected or not accepted by Licensee hereunder (collectively "Rejected Additional Master Recordings") shall revert to Licensor and Licensor shall thereafter have the right to exploit and/or authorize any third party to exploit all or any of such Rejected Additional Master Recordings in the Territory or any parts thereof, provided always that any Records, Videograms and/or Multimedia configurations which Licensor and/or any third party may be entitled to release, distribute, sell and/or otherwise exploit at any time after the expiration or premature expiration or other termination of the Agreement shall neither contain any "Accepted Master Recordings" nor any "Specified Videos" (as defined and subject as hereinafter specified in more detail).

e.    Under the Agreement, Licensee shall acquire and retain perpetual exclusive and unrestricted exploitation rights for the Territory in and to all Master Recordings accepted by Licensee for release under the Agreement ("Accepted Master Recordings", which immediately aforesaid expressions shall be deemed to include any and all mixes and/or remixes of same) as well as in and to all "Specified Videos" (which immediately aforesaid expression shall be deemed to mean any and all videos and/or video-clips which embody or are made of or based upon any of the Accepted Master Recordings). Licensee's exclusive exploitation rights as aforesaid include all rights for the promotional and/or commercial exploitation (including exclusive compilation rights) of each Accepted Master Recording and each Specified Video, including without limitation the right to manufacture, release, transmit, market, distribute, sell, use, exhibit and/or otherwise exploit for promotional, commercial and/or any other purposes, publicly perform, broadcast, advertise, publicise and promote the Accepted Master Recordings and/or Specified Videos or any parts thereof separately or in combination with any other material or recordings, in any manner, through any trade channels (including without limitation regular trade channels, club, mail order and direct mail operation) under any label(s), trademark(s) or other identification, in any form and/or by any means and/or media and/or methods now or hereafter known, used or invented, including without limitation in the form and any formats of audio-only "Records" and/or "Videograms" and/or so-called "Multimedia" configurations and/or systems (as such terms shall be defined in the Agreement or as same are commonly understood in the entertainment industry) as same may be so released, re-released, transmitted, marketed, distributed, sold, exhibited and/or otherwise exploited, packaged and/or repackaged hereunder at the discretion from time to time of Licensee and/or any of Licensee's affiliates, subsidiaries, licensees and their respective parents, sub-licensees and assigns, . Without limiting the generality of the foregoing, "Accepted Master Recordings" includes all Master Recordings included or to be included in



Case 6:99-cv-01282-ACC   Document 1   Filed 10/12/99   Page 100 of 115 PageID 100

-8- (a:jk010896) Basic Terms: Proposed License Agreement re. N-S)

• the First Commitment Album, the Second Commitment Album and/or in any Option Record in respect of which Licensee shall have validly exercised its first option right pursuant hereto, provided that if as of the "Latest Delivery Date" (which immediately aforesaid expression means the applicable latest delivery date pursuant to the Agreement for each applicable completed Commitment Album or completed Option Record or completed Specified Video to be delivered by Licensor under the Agreement) Licensor shall have failed to deliver all completed Master Recordings or completed video(s) (as applicable) to be included in same, then (notwithstanding anything to the contrary herein contained) Licensee shall have the right to reject (such rejection right being exerciseable at Licensee's absolute discretion at any time after the Latest Delivery Date and up to the expiration of thirty calendar days after the actual delivery) of any such completed Commitment Album or Option Record or Specified Video (as applicable) which was so delivered after the Latest Delivery Date, provided that Licensee shall have no financial obligations in respect of any Rejected Commitment Album or Rejected Option Record or Rejected Specified Video. Without limiting the generality of the immediately aforesaid proviso or other applicable provisions herein contained, if any part of the applicable Advance or "Licensee's Video Contribution" (as defined and subject as hereinafter specified) shall have been paid to Licensor prior to the delivery of any Commitment Album or Option Record or Specified Video (as applicable) which Licensee shall have validly rejected in accordance with the immediately aforesaid, then Licensee shall have the "Offset Right" (i.e. Licensee's right to request reimbursement from Licensor and/or Licensee's right to charge monies against and/or deduct same from Licensor's account).

### 6.   Advances, Recoupment Provisions, Royalties and Royalty-related Provisions

    a.   In full and final consideration of Licensor's services and the rights licensed to Licensee pursuant to the Agreement, Licensee shall pay to Licensor (subject to other applicable terms and conditions relating to the payment and/or recoupment of) the sums therein specified by way of applicable advances ("Advances), royalties and royalty-like sums such as flat fees, if any (collectively "Royalties"), provided always that the applicable Advances, Royalties and other sums due Licensor pursuant to the Agreement shall be deemed to be "all-in", meaning that the applicable amounts fully cover and include (and Licensor shall be solely responsible and liable for the payment of) any and all sums which may be due to the Artists and/or any other parties as may have participated in or contributed to the making of the Master Recordings, Videos and/or Video Clips by virtue of their services and/or performances and/or as a result of the exploitation of any rights granted pursuant to the Agreement (it being expressly clarified and agreed that, without limiting the generality of the immediately aforesaid proviso, the sums payable to Licensor further include without limitation all studio and other recording costs as well as fees, royalties and/or other sums due to any musician(s) and/or union(s) such as the AFofM), excepting only that Licensee and Licensee's affiliates, subsidiaries, licensees and their respective sub-licensees shall be solely responsible for the payment of "Mechanical Copyright Royalties" (which immediately aforesaid expression means any "per unit" mechanical copyright royalties payable pursuant to applicable laws in respect of any Accepted Master Recordings, Specified Videos, Records and/or Videograms distributed, sold and/or otherwise exploited under the Agreement which embody copyrighted musical or other material.

    b.   Subject always to the provisions contained in sub-clause 6.h., Licensee shall pay to Licensor the following sum(s) by way of Advances hereunder:

        (i)   In respect of the First Commitment Album:




Case 6:99-cv-01282-ACC   Document 1   Filed 10/12/99   Page 101 of 115 PageID 101

-9- (a:ik010896) Basic Terms: Proposed License Agreement re. N-S\

DM 350,000,— (three hundred and fifty thousand Deutsche Mark, payable by two equal instalments (the first instalment being due upon the execution of the formal long-form version of the Agreement, and the second instalment being due upon the delivery to Licensee and Licensee's acceptance (or deemed acceptance) of all of the completed Master Recordings to be included in the First Commitment Album).

      (ii)   If (but only if) the **Second Commitment Album** shall be accepted by Licensee for release under the Agreement and subject to the minimum and maximum provisions set forth in sub-paragraph 6.b.(ii)(cc) hereof, the Advance payable by Licensee to Licensor in connection therewith shall amount to a sum equal to seventy-five per cent (75%) of aggregate Royalties which have been earned by Licensor under the Agreement up to the "Specified Date" and which resulted solely from net sales in the Territory of the First Commitment Album through the BMG Companies' regular trade channels, PROVIDED THAT (aa) for the purpose of the immediately aforesaid, "Specified Date" means the date of the expiration of twelve (12) months after the initial release in Germany of the First Commitment Album; (bb) for purposes of the Agreement, "BMG Company" means any wholly owned company of BMG Entertainment; (cc) notwithstanding the foregoing provisions of sub-paragraph 6.b.(ii) hereof, the advance in respect of the Second Commitment Album shall be not less than DM 200,000,— (two hundred thousand Deutsche Mark) and not in excess of DM 500,000,— (five hundred thousand Deutsche Mark) and (dd) the applicable Advance in respect of the Second Commitment Album shall be payable by two instalments (first instalment in the amount of DM 100,000,— (one hundred thousand) being due upon the commencement of the recording of the Second Commitment Album and second instalment in the amount of the applicable balance being due upon the delivery to Licensee and Licensee's acceptance (or deemed acceptance) of all of the completed Master Recordings to be included in the Second Commitment Album).

      (iii)   If (but only if) the **Third Commitment Album** shall be accepted by Licensee for release under the Agreement and subject to the minimum and maximum provisions set forth in sub-paragraph 6.b.(iii)(bb) hereof, the Advance payable by Licensee to Licensor in connection therewith shall amount to a sum equal to seventy-five per cent (75%) of aggregate Royalties which have been earned by Licensor under the Agreement up to the "Specified Date" and which resulted solely from net sales in the Territory of the Second Commitment Album through the BMG Companies' regular trade channels, PROVIDED THAT (aa) for the purpose of the immediately aforesaid, "Specified Date" means the date of the expiration of twelve (12) months after the initial release in Germany of the Second Commitment Album; (bb) notwithstanding the foregoing provisions of sub-paragraph 6.b.(iii) hereof, the advance in respect of the Third Commitment Album (if accepted by Licensee for release under the Agreement) shall be not less than DM 200,000,— (two hundred thousand Deutsche Mark) and not in excess of DM 500,000,— (five hundred thousand Deutsche Mark) and (cc) the applicable Advance in respect of the Third Commitment Album shall be payable by two instalments (first instalment in the amount of DM 100,000,— (one hundred thousand) being due upon the exercise of Licensee's first option in relation to the Third Commitment Album and second instalment in the amount of the applicable balance being due upon the delivery to Licensee and Licensee's acceptance (or deemed acceptance) of all of the completed Master Recordings to be included in the Third Commitment Album).

      (iv)   If (but only if) the **Fourth Commitment Album** shall be accepted by Licensee for release under the Agreement and subject to the minimum and maximum provisions set forth in sub-paragraph 6.b.(iv)(bb) hereof, the Advance payable by Licensee to Licensor in connection therewith shall amount to a sum equal to seventy-five per cent (75%)



Case 6:99-cv-01282-ACC   Document 1   Filed 10/12/99   Page 102 of 115 PageID 102

-10- (ajk010896) Basic Terms: Proposed License Agreement re. N-S    :

of aggregate Royalties which have been earned by Licensor under the Agreement up to the "Specified Date" and which resulted solely from net sales in the Territory of the Third Commitment Album through the BMG Companies' regular trade channels, PROVIDED THAT (aa) for the purpose of the immediately aforesaid, "Specified Date" means the date of the expiration of twelve (12) months after the initial release in Germany of the Third Commitment Album; (bb) notwithstanding the foregoing provisions of sub-paragraph 6.b.(iv) hereof, the advance in respect of the Fourth Commitment Album (if accepted by Licensee for release under the Agreement) shall be not less than DM 200.000,-- (two hundred thousand Deutsche Mark) and not in excess of DM 500.000,-- (five hundred thousand Deutsche Mark) and (cc) the applicable Advance in respect of the Fourth Commitment Album shall be payable by two instalments (first instalment in the amount of DM 100.000,-- (one hundred thousand) being due upon the exercise of Licensee's first option in relation to the Fourth Commitment Album and second instalment in the amount of the applicable balance being due upon the delivery to Licensee and Licensee's acceptance (or deemed acceptance) of all of the completed Master Recordings to be included in the Fourth Commitment Album).

(v)     If (but only if) the **Fifth Commitment Album** shall be accepted by Licensee for release under the Agreement and subject to the minimum and maximum provisions set forth in sub-paragraph 6.b.(v)(bb) hereof, the Advance payable by Licensee to Licensor in connection therewith shall amount to a sum equal to seventy-five per cent (75%) of aggregate Royalties which have been earned by Licensor under the Agreement up to the "Specified Date" and which resulted solely from net sales in the Territory of the Fourth Commitment Album through the BMG Companies' regular trade channels, PROVIDED THAT (aa) for the purpose of the immediately aforesaid, "Specified Date" means the date of the expiration of twelve (12) months after the initial release in Germany of the Fourth Commitment Album; (bb) notwithstanding the foregoing provisions of sub-paragraph 6.b.(v) hereof, the advance in respect of the Fifth Commitment Album (if accepted by Licensee for release under the Agreement) shall be not less than DM 200.000,-- (two hundred thousand Deutsche Mark) and not in excess of DM 500.000,-- (five hundred thousand Deutsche Mark) and (cc) the applicable Advance in respect of the Fifth Commitment Album shall be payable by two instalments (first instalment in the amount of DM 100.000,-- (one hundred thousand) being due upon the exercise of Licensee's first option in relation to the Fifth Commitment Album and second instalment in the amount of the applicable balance being due upon the delivery to Licensee and Licensee's acceptance (or deemed acceptance) of all of the completed Master Recordings to be included in the Fifth Commitment Album).

c.     No advance payments other than those expressly required to be made in accordance with applicable provisions herein contained shall be due to Licensor hereunder. Without limiting the generality of the immediately aforesaid and notwithstanding anything to the contrary herein contained, Licensee shall in any event not be required to make any advance payment(s) in respect of any of the following:

(i)     Any Commitment Album in respect of which Licensee fails to exercise its first option right or which Licensee shall have actually rejected (as the case may be);

(ii)     any Accepted Option Record (whether Single or Album or Multiple Album or other) which falls within the definition of "Additional Master Recordings" (including without limitation any Option Record which comprises master recordings from the Artist' back catalogue or which consists substantially of only spoken word or so-called



Case 6:99-cv-01282-ACC    Document 1    Filed 10/12/99    Page 103 of 115 PageID 103

-11- (a:jk010896) Basic Terms: Proposed License Agreement re. N-... c

"soundtrack recordings" or "Live" recordings or which is a "Greatest Hits" or "Limited Edition" (as the case may be);

(iii) any "Specified Videos" or Videograms to be used and/or distributed, sold and/or otherwise exploited hereunder, PROVIDED THAT the parties shall by good faith negotiations and mutual agreement from time to time determine Licensee's financial contribution towards the video recording costs ("Video Production Costs") of each Specified Video available to Licensee hereunder, it being agreed, however, that (subject to the provisions contained in sub-paragraph 6.c.(iii)(aa) hereof) Licensee shall not be required to make any financial contribution as immediately aforesaid if the respective Specified Video cannot or will not be used and/or exploited by or on behalf of Licensee in the Licensed Territory. With further respect to the foregoing provisions of this sub-paragraph (iii), the parties hereby agree that (aa) each mutually agreed financial contribution payable by or on behalf of Licensee towards the video recording budget of any Specified Video shall be confirmed by Licensee in writing from time to time (and if so confirmed shall be deemed to constitute "Licensee's Video Contribution" respecting same), provided in any event that (notwithstanding anything to the contrary herein contained) the parties hereby agree that at least two (2) Specified Videos shall be produced in connection with each Commitment Album which Licensee has accepted for release under the Agreement (regardless whether same has been so accepted under the provisions of sub-clause 5.a. or 5.b. hereof) and Licensee shall contribute at least DM 80.000,-- (eighty thousand Deutsche Mark) by way of Licensee's Video Contribution in respect of each of such two (2) Specified Videos to be so produced in connection with each Commitment Album which Licensee has so accepted for release under the Agreement; (bb) 100% (one hundred per cent) of any and all sums actually paid by or on behalf of Licensee under the Agreement by way of Licensee's Video Contributions shall be deemed to be "Other Recoupable Sums" and shall thus be fully recoupable from any and all Royalties due to Licensor under the Agreement; (cc) except for sums payable by Licensee to Licensor by way of Licensee's Video Contributions (as same may from time to time be agreed and subject to the provisions of sub-paragraph 6.c.(iii)(aa) above, Licensee shall not be responsible and liable for the payment of (but Licensor shall in each instance bear ) all Video Production Costs for any Specified Video; (dd) without limiting the generality of the immediately aforesaid, the definition of "Video Production Costs" shall include without limitation all studio and recording costs, all sums due to the producer and director of each Specified Video as well as all required "first time" synchronization licenses and fees (if any) for the Territory (as distinct from per unit "Mechanical Copyright Royalties" which shall be payable by Licensee and/or any of Licensee's affiliates, subsidiaries, licensees and their respective parents, sub-licensees and assigns in accordance with applicable provisions herein contained) and (ee) the applicable sum payable by way of Licensee's Video Contribution shall in each instance be payable to Licensor within eight (8) German business days from the delivery to Licensee of the complete and final Specified Video in relation to which Licensee's Confirmed Video Contribution applies.

d.    Subject to applicable recoupment provisions and other applicable provisions relating to the computation of Royalties due to Licensor pursuant to the Agreement, the following Royalties shall be due to Licensor in respect of all "net sales" (as herein defined) of Records (whether audio-only Records or Videograms, unless expressly otherwise specified) which contain one or more Master Recording(s) subject to the Agreement:

(i)    Subject always to the provisions of sub-paragraphs 6.d.(ii), 6.d.(iii), 6.d.(iv), 6.d.(v) and 6.d.(vi) hereof,



Case 6:99-cv-01282-ACC   Document 1   Filed 10/12/99   Page 104 of 115 PageID 104

-12- (a:ik010896) Basic Te...: ...posed License Agreement re. N-S

(aa)   in respect of any audio-only Records or Videograms (as the case may be, including without limitation any Multiple Albums) sold by any of the BMG companies through their regular trade channels in full price category, the Royalty due to Licensor shall equal 18% (eighteen per cent) of the applicable "Royalty Base Selling Price" or "RBSP" (as such expressions are herein defined), SAVE THAT

*20%*

(1)   the Royalty in respect of Singles shall be 13,5% (thirteen and one half per cent) of applicable RBSP;

(2)   If any particular audio-only Record which is an Album comprised solely of Master Recordings subject to the Agreement ("Specified 100% Album") shall have sold in "GSA" (= Germany, Austria and Switzerland) in excess of 250.000 (two hundred and fifty thousand)full-priced units through the BMG companies' regular trade channels, then the Royalty due to Licensor in respect of further full-price category sales in GSA through the BMG companies' regular trade channels of such same particular Specified 100% Album shall be 19% (nineteen *21%* per cent) of the applicable RBSP, it being expressly clarified and agreed that the immediately aforesaid royalty increase shall not apply retroactively but only in respect of such further sales as immediately aforesaid which are over and above the escalation point specified in this sub-paragraph (2).;

(3)   If any particular audio-only Record which is an Album comprised solely of Master Recordings subject to the Agreement ("Specified 100% Album") shall have sold in "GSA" (= Germany, Austria and Switzerland) in excess of 500.000 (five hundred thousand)full-priced units through the BMG companies' regular trade channels, then the Royalty due to Licensor in respect of further full-price category sales in GSA through the BMG companies' regular trade channels of such *22%* same particular Specified 100% Album shall be 20% (twenty per cent) of the applicable RBSP, it being expressly clarified and agreed that the immediately aforesaid royalty increase shall not apply retroactively but only in respect of such further sales as immediately aforesaid which are over and above the escalation point specified in this sub-paragraph (3).;

(bb)   in respect of any audio-only Records or Videograms (as the case may be, including without limitation any Multiple Albums) sold by any of the BMG companies through their regular trade channels in medium (or mid) price category, the Royalty due to Licensor shall equal 13,5% (thirteen and one half per cent) of the applicable RBSP;

(cc)   in respect of any audio-only Records or Videograms (as the case may be, including without limitation any Multiple Albums) sold by any of the BMG companies through their regular trade channels in low (or budget) price category, the Royalty due to Licensor shall equal 9% (nine per cent) of the applicable RBSP, SAVE THAT 7% (seven per cent) of the applicable RBSP if so sold at a so-called "super-budget price"

Case 6:99-cv-01282-ACC Document 1 Filed 10/12/99 Page 105 of 115 PageID 105

-13- (a:ik010896) Basic Terms: Proposed License Agreement re. N-S...c

(which immediately aforesaid expression means the price line of the Ariola Express label or a price line or list category which is below the applicable regular low or budget price category and similar to the price line of the Ariola Express label);

(dd)   in respect of any audio-only Records or Videograms (as the case may be, including without limitation any Multiple Albums) sold by any of the BMG companies in any price category to or through any "non-regular trade channels" (which immediately aforesaid expression includes without limitation club or mail order or direct mail or similar type operations or direct-to-consumer outlets or door-to-door sales or sales to or through any government or educational institutions or libraries or by way of so-called "Premiums" or to any commercial purchaser for re-sale through army sales channels such as but not limited to PXes or European Exchange System or for use or re-sale as "Premiums" (as the case may be), the Royalty due to Licensor shall in each instance equal the lesser of (1) two thirds (2/3) of Licensee's net royalty receipts (exclusive of taxes, duties and Mechanical Copyright Royalties, if any) which are attributable to any Accepted Master Recordings and/or Specified Videos hereunder contained in audio-only Records or Videograms so sold under the provisions of this sub-paragraph 6.d.(i)(dd) or (2) the applicable Royalty amount arrived at by computing Licensor's Royalty on the basis of 9% (nine per cent) of the applicable RBSP (or 7% (seven per cent) of the applicable RBSP where so sold at a so-called "super-budget price")

(ii)   Notwithstanding anything to the contrary herein contained, in the event that any audio-only Records or Videograms sold by any of the BMG companies under any of the provisions contained in sub-paragraph 6.d.(i) hereof are so-called "Media-promoted Records" (as herein defined), then the following shall apply:

(aa)   If such "Media-promoted Records" are promoted by any "Substantial TV- and/or Radio-Advertising Campaign(s)" (which immediately aforesaid expression shall for the purposes hereof be deemed to mean any "Media Campaign(s)" the aggregate costs of which total at least DM 100.000,— (one hundred thousand Deutsche Mark) or the equivalent thereof in any other currency) or more, then a reduced Royalty shall be due to Licensor in respect only of such Media-promoted Records which are so promoted by any Substantial TV- and/or Radio-Advertising Campaign(s), such reduced Royalty to be computed in each instance on the basis of 75% (seventy-five per cent) of the Royalty rates otherwise applicable pursuant to sub-paragraphs 6.d.(i)(aa) or 6.d.(I)(bb) or 6.d.(i)(cc) or 6.d.(i)(dd) (as applicable) of this sub-clause V.D. and otherwise subject to the provisions contained in sub-paragraph 6.d.(ii)(cc) hereof.

(bb)   Licensor hereby expressly agrees to give good faith consideration to any requests from time to time for reasonable reduced Royalty rates in respect of any Media-promoted Records hereunder which will be promoted by any Media Campaign(s) other than "Substantial TV- and/or Radio-Advertising Campaign(s)" (such as but not limited to any Media-promoted Records hereunder which will be promoted by any TV-and/or radio-advertising campaign(s) the total costs of which are below the minimum sum specified in sub-paragraph 6.d.(ii)(aa) above or which will be promoted by any magazine-and/or cinema-advertising campaign(s), as the case may be), PROVIDED THAT any reduced reduced Royalty rate(s) so requested from time to time under the provisions of this sub-paragraph 6.d.(ii)(bb) shall in each instance be subject to Licensor's final discretion and written approval, provided further that any reduced Royalty rate(s) so approved by Licensor from time to time shall in each instance be computed on the applicable Royalty Base Selling Price and otherwise subject to the provisions contained in sub-paragraph 6.d.(ii)(cc) hereof.

Case 6:99-cv-01282-ACC   Document 1   Filed 10/12/99   Page 106 of 115 PageID 106

-14- (a:ik010896) Basic Terms: Proposed License Agreement re. N-S...e

(cc)    Where reduced Royalty rates apply in respect of any Media-promoted Records hereunder (whether pursuant to sub-paragraph 6.d.(ii)(aa) or as may from time to time be approved by Licensor under the provisions of sub-paragraph 6.d.(ii)(bb), as the case may be), the applicable reduced Royalty rate(s) shall so apply only in respect of sales of the respective Media-promoted Records which are sold in the country or countries where the respective Media Campaign(s) is/are effective and (subject to the immediately aforesaid) which are sold during the period commencing as of the first day of the month which immediately precedes the month during which the respective Media Campaign(s) begin(s) up to and including the date of the expiration of nine (9) months after the end of the month during which the respective Media Campaign(s) has/have ended.

(dd)    Subject to differential provisions expressly provided for in the Agreement, "Media-promoted Records" means any audio-only Records and/or Videograms (including any Multimedia configurations) subject to the Agreement which shall be promoted, whether alone or together with any other record(s), videograms and/or multimedia configuration(s), by one or more Media Campaigns.

(iii)    Notwithstanding anything to the contrary herein contained,

(aa)    in the event that any audio-only Records or Videograms hereunder are sold under the terms and conditions of any licensing arrangement(s) made between any BMG Company and any sub-licensee which is not a BMG Company (collectively "**Third Party Licensing Arrangements**"), whether so sold in any part(s) of the Territory through regular trade channels and/or non-regular trade channels (including without limitation club, mail order, direct mail operations, and direct-to-consumer outlets), Licensee shall procure that the applicable royalty terms (including without limitation royalty rates, container deductions, royalty base prices, royalty-bearing units and reserves provisions) respecting any such Third Party Licensing Arrangements shall be negotiated and agreed in good faith between the applicable BMG Company and the respective sub-licensee from time to time, PROVIDED THAT, subject to the foregoing provisions of this sub-paragraph 6.d.(iii)(aa), the Royalty due to Licensor in respect of any audio-only Records and/or Videograms hereunder which are sold pursuant to any Third Party Licensing Arrangements shall in each instance equal two thirds (2/3) of Licensee's net royalty receipts (exclusive of taxes, duties and Mechanical Copyrights Royalties, if any) which are attributable to any Accepted Master Recording(s) and/or Specified Video(s) hereunder and arising out of audio-only Records and/or Videograms so sold under the provisions of any such Third Party Licensing Arrangements; or

(bb)    in the event that any Accepted Master Recording(s) and/or Specified Video(s) hereunder is/are proposed to be licensed or used hereunder in whole or in part for commercial exploitation on a **flat fee basis** (as opposed to any percentage rate royalty computed on the applicable royalty base price), whether for film synchronisation or for use in any commercial advertising or Premiums or for any other commercial exploitation (as the case may be), then any such license or use on a flat fee basis and the amount of the applicable flat fee due to Licensee in respect of any such license or use shall be subject to Licensor's approval from time to time, PROVIDED THAT

(1)    Licensor's share of any flat fee which shall be paid or credited to Licensee in respect of any such license or use on a flat fee basis and which is attributable to any Master Recording(s) and/or Specified Video(s) hereunder shall in any

Case 6:99-cv-01282-ACC   Document 1   Filed 10/12/99   Page 107 of 115 PageID 107

-15- (a:ik010896) Basic Terms: Proposed License Agreement re. N-S..ic

event not exceed two thirds (2/3) of the applicable "net amount" so paid or credited to Licensee from time to time (whereby, for the purposes of the immediately aforesaid, "net amount" shall mean the (pro rated) gross amount paid or credited to Licensee (exclusive of taxes, duties and Mechanical Copyright Royalties) which is attributable to any Accepted Master Recording(s) and/or Specified Video(s) so licensed or used on a flat fee basis; or

        (2)    if Licensee itself wishes to use or exploit any Accepted Master Recording(s) or Specified Video(s) in whole or in part on a flat fee basis, then the applicable amount due to Licensor in respect thereof shall be subject to good faith negotiation and mutual agreement from time to time between Licensor and Licensee.

        (cc)    any monies due to Licensor under the provisions of sub-paragraphs 6.d.(iii)(aa) and/or 6.d.(iii)(bb) shall be deemed to be additional Royalties earned hereunder which are equally subject to recoupment provisions otherwise applicable pursuant hereto.

        (iv)    For the purpose of royalty computation hereunder, it is further agreed as follows:

        (aa)    If any Multiple Album or other Record hereunder (including without limitation any Audiophile Record or Videogram) contains any Accepted Master Recording(s) and/or Specified Video(s) subject to this Agreement together with any other recording(s) and/or material which is/are not subject to this Agreement, then the applicable Royalty due to Licensor pursuant hereto shall be computed on a pro rata numeris basis, excepting only if and when royalties received by Licensee in relation to any Master Recording(s) and/or Specified Video(s) hereunder were computed on a pro rata temporis basis, corresponding Royalties due to Licensor hereunder may also be computed on a pro rata temporis basis.

        (bb)    If and when, in respect of any so-called "Benefit Record" (being a Record or Multiple Album sold at any price which includes any donation(s) payable to any charity or welfare or other relief organization(s) herein defined) containing any Master Recording(s) and/or Specified Video(s) hereunder, provided that Licensee shall not without Licensor's prior approval release or sell any Benefit Record which is solely comprised of Accepted Master Recordings and/or Specified Videos) Licensor shall have approved from time to time a royalty reduction or shall have waived Licensor's entitlement to receive payment or credit of the otherwise applicable Royalty due to Licensor pursuant hereto, then and in any of such events such royalty reduction or waiver as immediately aforesaid shall apply only in respect of sales in such country or countries where the respective Record or Multiple Album is so sold as a "Benefit Record".

        (cc)    If, as of any date(s), the recorded performances comprised in any Accepted Master Recording(s) and/or Specified Video(s) hereunder become(s) property of the public domaine in any part(s) of the Territory so that any party may reproduce and/or otherwise exploit the respective Accepted Master Recording(s) and/or Specified Video(s) in such part(s) of the Territory without license from Licensee, then, notwithstanding anything to the contrary herein contained, no Royalties or other monies whatsoever shall accrue hereunder in connection with record sales and/or other exploitation hereunder of such respective Accepted Master Recording(s) and/or Specified Video(s) which are/is made in such respective part(s) of the Territory from and after the applicable date(s) as of which same has/have become property of the public domaine.

Case 6:99-cv-01282-ACC   Document 1   Filed 10/12/99   Page 108 of 115 PageID 108

-16- (arik010896) Basic Terms: Proposed License Agreement re. N-Sync

(28)

(v)      For the purpose of computing Royalties due to Licensor in respect of any audio-only Records and/or Videograms and/or Multimedia configurations sold by any BMG Company hereunder,

(aa)     the "Royalty Base Selling Price" or "RBSP" means the applicable "Net Selling Price" (as herein defined) less the applicable "Container Deduction" permitted to be made hereunder for the purpose of contructing the applicable RBSP;

(bb)     the "Net Selling Price" means the applicable "Selling Price" (as herein defined and subject as hereinafter specified in more detail) after deduction (if and to the extent applicable) of (1) any taxes actually included in the applicable Selling Price, (2) any packing and/or shipping expenses actually included in the applicable Selling Price and (3) in the case only of any so-called "Benefit Records" (as herein defined), any donation(s) payable to any charity or welfare or other relief organization(s);

(cc)     the "Selling Price" means the the applicable "PPD" (which immediately aforesaid expression means the published price to dealers in respect of the applicable Record configuration in the respective price category as so published from time to time by the respective distributor in the country of sale), PROVIDED THAT, notwithstanding the immediately aforesaid,

(1)      where any Records hereunder have been sold by any BMG Company in the form of finished product to any dealer or other purchaser for use or (re)sale as "Premiums" or to any governmental or educational institution or library or other commercial purchaser for distribution and/or (re)sale through army sales channels (such as European Exchange System or PXes) or to or through club or direct mail or mail order or similar type operation or direct-to-consumer outlets or other non-regular trade channels or non-regular distribution methods and/or for exportation to any other part(s) of the Territory (as the case may be), then and in any of such events the "Selling Price" means the per unit purchase price or the per unit export price (as applicable) paid by the applicable purchaser in respect of the applicable Record configuration so sold, or

(2)      where any Accepted Master Recording(s) and/or Specified Video(s) hereunder have been licensed (as opposed to the sale of Records in the form of finished product) to any other BMG Company for use on Records to be sold through club channels or direct mail or mail order or similar type operation or direct-to-consumer outlets or other non-regular trade channels (as the case may be) or for use on Records to be distributed and/or sold by way of Premiums, the "Selling Price" means the same price as has been used for the purpose of constructing the royalty base price on which royalties are paid or credited to Licensee in respect of such sales.

(dd)     the Container Deduction permitted to be made for the purpose of constructing the applicable "Royalty Base Selling Price" shall be 25% (twenty-five per cent) of the applicable Net Selling Price for any Records hereunder which fall within the definitions of "Videograms" or "Multimedia" configurations or "New Technology Configurations" or "Audiophile Records" (as the case may be), PROVIDED THAT in respect only of audio-only Records which are not included in the definition of any of the aforesaid expressions ("conventional-type Records", which immediately aforesaid expression includes without limitation vinyl records and conventional-type MCs) the container deduction permitted to be made hereunder shall equal 15% (fifteen per cent) of the applicable Net






Selling Price, except that (i) the Container Deduction in respect of vinyl 7" singles shall be 10% (ten per cent) of the applicable Net Selling Price and (ii) the Container Deduction in respect of conventional-type Multiple Albums shall be 20% (twenty per cent) of the applicable Net Selling Price and (iii) there shall be no Container Deduction in respect of Records sold in so-called "white bags".

(ee)   Where any "Multiple Album" (which immediately aforesaid expression means two or more Record configurations (whether any audio-only Record(s) and/or Videogram(s) and/or Multimedia configurations, as the case may be) which are sold in a package as one unit) have been sold by any BMG Company through regular trade channels, the proportionate selling price of each configuration contained in the applicable Multiple Album shall be the criterion to determine the applicable price category in which such particular Multiple Album shall be deemed to have been sold.

(vi)   In respect of any Records  (including without limitation Audiophile Records, Videograms and Multimedia configurations) hereunder, "sales" or "net sales" or "sold" means 100% (one hundred per cent) of all configurations of Records hereunder which have been sold and paid for, less returns and credits for any reason and otherwise subject to the following, notwithstanding anything to the contrary herein contained:

(aa)   If Records hereunder are sold subject to a discount or merchandising plan, the number of Records hereunder deemed to have been sold shall be determined by reducing the number of Records sold by the percentage of discount granted, and if a discount is granted in the form of "free" records (including without limitation free goods to dealers and other customers, free club records or so-called "dividend" or "bonus" records),  then such "free" records which are Records subject to this Agreement shall be excluded from the number of sales hereunder, PROVIDED THAT in respect of any and all Records (including without limitation "Audiophile Records", "Videograms" and Multimedia configurations) subject to this Agreement, Licensee shall procure that the quantities of "free" records thereof and other discounts relating to same shall be in accordance with industry practice in the various parts of the Territory and the respective discount policies generally applied or approved from time to time by the BMG Companies.

(bb)   In computing the quantities of Records (including without limitation "Audiophile Records", "Videograms" and Multimedia configurations) sold hereunder,  reasonable portions of Licensor's Royalties may be withheld from time to time as reserves for subsequent returns and/or credits, PROVIDED THAT such reserves shall be established from time to time in accordance with industry practice and accepted royalty accounting practices in the various parts of the Territory and otherwise in accordance with the applicable reserves policies generally applied or approved from time to time by the BMG Companies, provided further that each reserve shall be liquidated on the basis of actual credits, returns and exchanges but in any event within a maximum of the two accounting periods which immediately succeed the accounting period when the applicable reserve was first established.

(cc)   It is hereby expressly clarified and agreed that Licensor shall not be entitled to receive any Royalty or other payment in respect of (1) any promotional uses of any Accepted Master Recording(s) and/or Specified Video(s) subject to this Agreement; (2) Records subject to the Agreement (including without limitation Audiophile Records, Videograms and Multimedia configurations) which are distributed, used or otherwise exploited by way of so-called "Exhibition Copies" (as defined) and/or "free" records




-18- (a:ik010896) Basic Terms: Proposed License Agreement re. N-S ...

(including without limitation free goods to dealers and/or other customers, free club records, so-called "dividend" and/or "bonus" records); (3) Records subject to the Agreement sold as "scrap" or "overstock" or "surplus", which terms mean excess inventory of a particular Record hereunder which may still be listed in the respective catalogue(s) and which is sold at one third or less of the otherwise applicable selling price; (4) Records hereunder deleted from the respective catalogue(s) and sold off as discontinued merchandise at so-called "cut-out prices"; (6) Records hereunder destroyed for any reason.

h.      There shall be cross-collateralisation overall between any and all Advances and other recoupable sums due to Licensor pursuant to the Agreement and any and all Royalties due to Licensor pursuant to the Agreement, i.e. any and all Advances and other recoupable sums paid under the Agreement shall be fully recoupable from any and all Royalties due to Licensor hereunder, PROVIDED THAT (i) Mechanical Copyright Royalties shall never be used in recoupment of Advances and/or other recoupable sums paid hereunder, (ii) if as of the end of any accounting period Royalties due to Licensor hereunder shall have been earned which are in excess of the total of Advances and/or other recoupable sums theretofore paid hereunder ("Excess Earnings"), then such Excess Earnings shall be payable to Licensor as and when so earned and due pursuant hereto, it being hereby expressly agreed that Licensee shall have the right to deduct Excess Earnings so paid to Licensor from time to time from any subsequent Advance(s), if any, as may thereafter be payable to Licensor pursuant to the Agreement; (iii) if as of the end of any accounting Advances and/or other recoupable sums theretofore paid hereunder shall not have been fully recouped ("Unrecouped Balances"), then such Unrecouped Balances shall thereafter continue to be fully recoupable from any further Royalties due to Licensor under the Agreement (iv) Advances and other recoupable sums shall be deemed to be non-returnable save as expressly specified to the contrary pursuant to applicable provisions contained in the Agreement.

7.    Merchandising Rights:

For the purposes of the Agreement, "Non-Record Merchandising Rights" means the right (whether as a result of any rights granted pursuant to sub-paragraph 7.a. or as may from time to time apply or be agreed under the provisions of sub-clause 7.b. or 7.c. below, as the case may be) to use and/or authorize the use of any "Biographical Material" (whereby, for the purposes of this Clause 7, "Biographical Material" means and includes the Group Name (including any trademark and/or logo of the Artist Group) and/or name(s), professional name(s), (facsimile) signature(s), voice(s), photograph(s), other likeness(es) and/or other biographical material and/or of all or any of the individual Artists as same shall have been made known or furnished or approved by or on behalf of Licensor and/or Artists from time to time) in the creation, manufacture, distribution, sale and/or other exploitation of any goods other than Records, such as but not limited to T-shirts, toys, etc. (any goods other than Records being for the purposes of the Agreement sometimes collectively referred to as "Non-Record Products") and the right to use and/or otherwise exploit (or authorize others to use and/or otherwise exploit) any Non-Record Products containing Biographical Material for promotional and/or commercial purposes in the Territory or in any parts of the Territory (as the case may be), subject to the following:

a.      Any Non-Record Merchandising Rights solely for promotional purposes in connection with the exploitation of any Accepted Master Recordings, Specified Videos, audio-only Records and/or Videograms subject to the Agreement shall be exerciseable at the



Case 6:99-cv-01282-ACC    Document 1    Filed 10/12/99    Page 111 of 115 PageID 111

-19- (a:ik010896) Basic Terms: Proposed License Agreement re. N-...

sole discretion from time to time of Licensee and/or any of Licensee's affiliates, subsidiaries, licensees and their respective parents, sub-licensees and assigns (and shall be so exerciseable any time during the continuance of Licensee's exploitation rights pursuant to the Agreement), and no Royalty shall be due to Licensor and/or Artists as a result of such exercise of Non-Record Merchandising Rights for promotional purposes as aforesaid.

      b.     Except in cases where any BMG Company or any merchandiser(s) affiliated with any BMG Company (collectively "BMG Merchandiser") shall match any so-called "Third Party Merchandising Offer" (as defined in and subject as further specified in sub-paragraph 7.c.. hereof), if at any time during the continuance of the Term hereof any BMG Company or BMG Merchandiser (as the case may be) proposes the commercial exploitation (whether worldwide or in any parts of the Territory) of any Non-Record Merchandising Rights in respect of any Non-Record Product (collectively "BMG Merchandising Offer"), Licensee shall furnish to Licensor complete details respecting such BMG Merchandising Offer, PROVIDED THAT (i) no commercial Non-Record Merchandising Rights shall be exercised without Licensor's prior written approval on a case by case basis, (ii) the applicable terms and conditions in respect of the commercial exploitation by any BMG Company and/or BMG Merchandiser (as the case may be) of any Non-Record Merchandising Rights for any Non-Record Product shall be subject to good faith negotiation and separate agreement(s) from time to time and (iii) any monies due to Licensor as a result of the commercial exploitation of any Non-Record Merchandising Rights shall not be subject to recoupment provisions otherwise applicable pursuant to the Agreement but shall be payable in addition to and separate from any monies due to Licensor pursuant to the Agreement.

      c.     If at any time during the continuance of the Term of the Agreement Licensor and/or Artist shall receive any offer(s) from any third party (excluding any BMG Company or BMG Merchandiser) in respect of the commercial exploitation (whether worldwide or in any parts of the Territory) of any Non-Record Merchandising Rights (collectively "Third Party Merchandising Offer"), then and in any of such events the following shall apply:

      (i)     Licensor shall promptly furnish to Licensee complete copies of all documents constituting such Third Party Merchandising Offer, it being hereby agreed that any BMG Company or BMG Merchandiser shall in each instance have the right and preference on a matching offer basis ("Matching Offer Right") to enter into an agreement with Licensor in respect of the commercial exploitation of any Non-Record Merchandising Rights on the same material terms as are contained in the respective Third Party Merchandising Offer, PROVIDED THAT nothing herein contained shall be deemed to (aa) be an obligation on the part of any BMG Company or BMG Merchandiser to exercise its Matching Offer Right hereunder in respect of any Third Party Merchandising Offer so received from time to time, or (bb) require Licensee to waive any of its rights pursuant to the Agreement in respect of the exploitation in the Territory of any Master Recordings, Records and/or Videograms subject to this Agreement or (cc) permit Licensor to accept (and Licensor hereby agrees to procure that Licensor and Artists shall refrain from accepting) any Third Party Merchandising Offer relating to or competing with any particular Non-Record Product already exploited or scheduled for exploitation by any BMG Company or BMG Merchandiser (as the case may be) on the basis of respective arrangements approved by Licensor and/or Artist prior to Licensee's receipt of the documents constituting such Third Party Merchandising Offer or (ee) permit Licensor to accept (and Licensor hereby agrees to procure that Licensor and Artists shall refrain from accepting) any Third Party Merchandising Offer the acceptance of which would adversely affect or be inconsistent with any rights granted to Licensee under the Agreement in



-20- (a:ik010896) Basic Terms: Proposed License Agreement re. N- ...

respect of the exploitation of any Master Recordings, audio-only Records and/or Videograms subject to this Agreement;

     (ii)   if within thirty (30) calendar days from Licensee's receipt of the documents constituting any particular Third Party Merchandising Offer ("Matching Offer Option Period") the Matching Offer Right hereunder shall not have been exercised by corresponding written notification to Licensor and if within said Matching Offer Option Period Licensor and/or Artists have not accepted any Non-Record Product merchandising arrangement (if any) alternatively proposed by any BMG Company or BMG Merchandiser (as the case may be) in substitution for the applicable Third Party Merchandising Offer for any Non-Record Product, then (subject to applicable restrictions pursuant to the provisions contained in sub-paragraph 7.c.(i).hereof) Licensor and/or Artists shall have the right to accept such particular Third Party Merchandising Offer which was not so matched or substituted, provided that the formal binding merchandising agreement respecting such Third Party Merchandising Offer shall be consummated on terms and conditions no less favourable to Licensor and/or Artists than those set forth in the documents which constituted such particular Third Party Merchandising Offer not matched hereunder.

8.    Miscellaneous:

     a.    The Agreement shall provide for semi-annual accounting within ninety (90) days from the end of June 30 and December 31st.

     b.    In connection with the release and/or marketing of any Records hereunder comprised solely of Accepted Master Recordings subject to this Agreement, Licensee and/or any of Licensee's affiliates, subsidiaries, licensees and their respective parents, sub-licensees and assigns may (at their sole discretion from time to time) request the personal appearance of Artist in connection with photo sessions, interviews and/or other publicity and/or promotional activities (collectively "Promotional Activities", provided always that for the purposes hereof the definition of the immediately aforesaid expression shall be deemed to exclude any live concerts and tours of the Artist). Without limiting the generality of the immediately aforesaid, if and when so requested from time to time during the Term, Licensor agrees to cause Artists to cooperate with the requesting party/parties in connection with any such Promotinal Activities as aforesaid and to appear at such time(s) and place(s) and during such reasonably continuous period(s) as may be reasonably requested and as shall be coordinated and mutually agreed between Licensor and the requesting party from time to time and otherwise subject to other prior professional commitments of the Artist, provided always that the Artists' services and/or performances in connection with Promotional Activities hereunder shall be made available free of charge except for payment or reimbursement of "Travelling Expenses" (as defined and subject as shall be specified in more detail in the Agreement), provided that if and to the extent that the Artists shall be requested to travel in connection with the any Promotional Activities, then and in any of such events (unless expressly otherwise pre-approved by Licensee in writing in each particular instance), "Travelling Expenses" means in each instance business class travelling expenses, reasonable expenses for hotel accommodation and reasonable per diems for the Artists incurred in direct relation to such Promotional Activities if and for as long as the Artists' services and/or performances by way of Promotional Activities shall be requested and actually rendered under the Agreement. Licensor or Artists shall obtain, retain and submit to Licensee receipts of all costs actually incurred by way of Travelling Expenses in connection with Promotional Activities, provided that reimbursement of per diems intended to cover subsistence costs shall in any event not exceed the lower of (i) DM 80,-- (eighty Deutsche Mark) per person and per day (or the

Case 6:99-cv-01282-ACC   Document 1   Filed 10/12/99   Page 113 of 115 PageID 113

-21- (a:ik010896) Basic Terms: Proposed License Agreement re. N-Sy...

equivalent of the immediately aforesaid amount in any other currency) or (ii) the total of subsistence costs per person and per day actually incurred at such times as the Artist shall render services and/or performances by way of Promotional Activities.

c.  BMG or any publisher(s) affiliated with any BMG Company ("BMG Publisher") shall have separate options (exerciseable from time to time with respect to each "Controlled Composition" (to be defined) which is included in any Accepted Master Recording) to acquire the publishing rights for such particular Controlled Composition(s), PROVIDED THAT if BMG or any BMG Publisher shall exercise its option in respect of one or more Controlled Composition(s), then the publishing rights for same shall be assigned to BMG or the respective BMG Publisher under the terms and conditions of separate publishing agreement(s) to be made between BMG or the applicable BMG Publisher(s) of the one part and Licensor and/or respective composer(s)/author(s) of the other part, provided in any event, however, that in respect of each Controlled Composition for which publishing rights shall have been so assigned to BMG or the applicable BMG Publisher, the respective composer/author shall receive an advance of DM 3.000,-- (three thousand Deutsche Mark) which shall be fully recoupable from composer's/author's shares of monies resulting from the applicable publishing agreement.

d.  For the purpose of the Agreement, the noun "record" or "Record" means any mechnical reproduction, in any form now known or hereafter developed from which sounds (whether or not coupled with visual images) can be perceived, reproduced or otherwise communicated, either directly or with the aid of a machine, device or process, and which is manufactured or exploited primarily for home use, provided further that "Records" includes without limitation (but subject to differential provisions expressly contained in the Agreement) conventional-type records and tape configurations as well as so-called "Audiophile Records" (which immediately aforesaid expression means and includes any audio-only Record or Multiple Album now or hereafter known which is made for digital playback and includes without limitation compact discs, digital audio tapes, digital compact cassettes and mini discs), Videograms and Multimedia configurations, regardless of whether or not same are so-called New Technology Configurations ("NTC").

e.  The validity, construction and effect hereof and of the Agreement shall be governed by the laws of Germany, provided that (in the event of any dispute or controversy between the parties) the parties shall submit to the court of competent jurisdiction in Munich Germany.

f.  All final contractual language and further particulars to be included in and subject as shall be specified in the formal long-form version of the Agreement.

If the above is acceptable, please return fix a countersigned copy hereof to the undersigned. We are looking forward to a successful cooperation!

Yours sincerely,
For and on behalf of Licensee,
BMG Ariola Muenchen GmbH

Jan Bolz

1. Aug. 1996

ACCEPTED AND AGREED
for and on behalf of Licensor,
Trans Continental Records Inc.

Louis J. Pearlman
President



 

**TRANS CONTINENTAL RECORDS, INC.**

7380 Sand Lake Road, Suite 350    (407) 345-0004
Orlando, Florida 32819    Telefax: (407) 345-0006

## LETTER OF ACKNOWLEDGEMENT

The parties signed below acknowledge that Trans Continental Records, Inc. has entered into a Licensing Agreement for the purposes of sell-ing and exploiting the artist group 'N SYNC audio and video products with BMG for worldwide distribution. Nothing herein shall change the terms of the Exclusive Artist Agreement previously executed.

Above acknowledged by:               Date: August 1, 1996

_____       _____
Christopher Alan Kirkpatrick     Joseph Anthony Fatone Jr.


_____
Joshua Scott Chasez


_____       _____
Justin R. Timberlake, minor      Guardian, Lynn Harless


_____       _____
James Lance Bass, minor          Guardian, James Bass


_____
Louis J. Pearlman, President
Trans Continental Records, Inc.

# EXHIBIT D