

FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

99 OCT 12 AM 8:31

TRANS CONTINENTAL RECORDS, INC., BMG
ENTERTAINMENT, BMG ARIOLA MUENCHEN GmbH,
TRANS CONTINENTAL ENTERTAINMENT, INC.
and LOUIS J. PEARLMAN,

                Plaintiffs,

v.

ZOMBA RECORDING CORPORATION,
CLIVE CALDER, JAMES LANCE BASS,
JOSHUA SCOTT CHASEZ, JOSEPH
ANTHONY FATONE, JR.,
CHRISTOPHER ALAN KIRKPATRICK,
and JUSTIN RANDALL TIMBERLAKE,

                Defendants.

_____/

CIVIL ACTION NO.
99-1282-Civ-Orl-22C

## MEMORANDUM OF LAW IN SUPPORT OF BMG'S
## MOTION FOR A PRELIMINARY INJUNCTION

Plaintiffs BMG Entertainment and BMG Ariola Muenchen GmbH (collectively "BMG")

submit this memorandum in support of Plaintiffs' motion pursuant to Rule 65(a) of the Federal

Rules of Civil Procedure for an Order preliminarily enjoining Defendants from, among other

things, violating Plaintiffs' rights under Section 43(a) of the Lanham Act by using the 'N SYNC

trademark other than pursuant to the Exclusive Artist Recording Agreement and certain related

agreements between Plaintiffs or their affiliates and Defendants.

5

## **Preliminary Statement**

BMG owns the exclusive, long-term right to manufacture, distribute and sell records by the musical group known as 'N SYNC (the "Group"), as well as the right to use the name 'N SYNC (the "Mark") in connection with such records, throughout the world. Prior to BMG's involvement, the Group had not released a single record and was almost completely unknown. BMG believed the Group had the potential to be successful, however, and committed enormous time, effort and resources to developing and promoting the Group, the Mark, and the Group's records. As a result of BMG's efforts – as well as the efforts of Plaintiffs Trans Continental Records, Inc. ("Trans Continental") and Louis Pearlman and the Group itself – the Group is currently one of the world's most popular and successful musical groups, and the Mark is one of the most widely-recognized musical group names in the world. As a result of BMG's role in the Group's tremendous success, the Group and Mark are inextricably linked with BMG (and its record label RCA) in the music industry and the general public.

Despite BMG's critical role, together with Trans Continental and Pearlman, in the Group's stunning rise from virtual anonymity to nearly unprecedented success, and despite BMG's exclusive right to manufacture, distribute and sell records by the Group, as well as the right to use the Mark, Defendant Zomba Recording Corporation ("Zomba") recently announced that it had entered into a purported recording agreement with the Group and would be releasing the Group's next record and using the Mark in connection with the new record. Zomba entered into that purported agreement in bad faith, fully aware of BMG's exclusive long-term contractual rights with respect to the Group and the Mark, as part and parcel of an illicit scheme to steal the Group and the Mark and capitalize on the success created by Plaintiffs. If the Defendants truly believed they had the right to enter into such an agreement, in violation of Plaintiffs' rights, they

2

would have sought a judicial declaration regarding the parties' respective rights from this Court. That they did not do so, and instead resorted to unilateral self-help, demonstrates that Defendants knew their wrongful actions were entirely without justification, and an unconscionable violation of Plaintiffs' contractual, statutory and other rights.

As a result of Zomba's announcement alone, BMG has suffered severe and irreparable harm to its reputation and business. Such harm will only increase if Zomba is permitted to manufacture and distribute records by the Group, and use the Mark, in contravention of BMG's exclusive rights. A preliminary injunction, therefore, is necessary to protect BMG from additional incalculable and irreparable harm.

## Facts[1]

### Plaintiff BMG

Plaintiff BMG Entertainment is one of the preeminent music companies in the world. It manufactures, distributes and sells albums, compact discs, tapes and other audiovisual recordings (hereinafter "records") in the United States and abroad through various affiliates, divisions and units, including the well-known RCA Records Label ("RCA"). Plaintiff BMG Ariola ("Ariola") is a German corporation and is an affiliate of the international entertainment company Bertelsmann AG.

The records of all BMG labels are distributed by BMG Distribution worldwide, including in the United States. BMG Distribution's operations are at least as extensive and formidable as those of any record distribution company in the world, including, but not limited to Sony Music and Warner Music, and reach the same wholesalers and retailers as those companies. At the

---

[1] BMG adopts and incorporates herein the statement of facts contained in the memorandum of law and accompanying affidavits submitted by Plaintiffs Trans Continental and Pearlman in support of Plaintiffs' motion for a preliminary injunction.

present time, BMG Distribution's market share of current albums released in the United States is approximately 18%, making it second in market share in the country. BMG Distribution's sales of recordings for the current year will be in excess of one billion dollars. The artists that BMG Distribution distributes in the United States include some of the most popular and successful artists in the world, such as Whitney Houston, Kenny G, the Dave Matthews Band, and innumerable others. (Declaration of Robert Jamieson, dated October 7, 1999 ("Jamieson Dec.") ¶5).

### BMG's Acquisition of the Rights to the Group and the Mark

Pursuant to an agreement dated August 1, 1996 with Trans Continental (the "BMG License Agreement"), BMG obtained the exclusive right to manufacture, distribute and sell recordings by the Group, and to use the Mark and the Group members' names and likenesses, in connection with the exploitation of such recordings, throughout the world. (Complaint, Ex. C, ¶4.a.(viii)). The BMG License Agreement also provides that the Group's name cannot be changed without BMG's consent. (Id. ¶4.a.(vii)). The BMG License Agreement further states that all material to be recorded pursuant thereto will be selected in prior consultation with BMG. (Id. ¶4.a.(ix)). The term of the BMG License Agreement is, at BMG's option, five albums. (Id. ¶5). BMG retains such option regardless of the identity of the members of the Group. (Id. ¶4.a.(iv)). Pursuant to a BMG intercompany agreement, RCA has the exclusive right to distribute the Group's records in the United States and use the Mark and names and likenesses in connection therewith under the BMG License Agreement. (Jamieson Dec. at ¶¶18, 34)

In order to induce BMG to enter into the BMG License Agreement, each of the Group's members executed a Letter of Acknowledgment dated August 1, 1996 (the "Acknowledgment") unconditionally endorsing the BMG License Agreement. (Complaint, Ex. D)

At the time BMG entered into the BMG License Agreement, the Group had not sold a single record and was essentially unknown. Despite the substantial risks involved in taking on an unknown and untried group, BMG was willing to commit the substantial amounts of time, resources and energy necessary to develop, promote, and market the Group and Mark because BMG believed the Group had the potential to be successful and BMG had the exclusive long-term rights to the Group's recordings and the Mark. (Jamieson Dec. ¶10), (Declaration of Vincent Degiorgio dated October 6, 1999 ("Degiorgio Dec." ¶2)).

### BMG's Substantial Role in the Development and Success of the First Album

After the BMG License Agreement and Acknowledgment were executed, BMG worked closely with the Group and Trans Continental in the development, promotion and marketing of the Group's debut album. The album was released in Europe and Southeast Asia in April 1997. BMG expended enormous time, effort and resources in promoting and marketing the Group and the album. As a result of BMG's efforts, as well as the efforts of Trans Continental, Pearlman and the Group, the album became an enormous success, selling approximately 1 million copies in Europe and Southeast Asia. (Jamieson Dec. ¶ 13)

BMG subsequently began preparations to release the Group's first album in the United States, through its label RCA. Due to differences in the standards and tastes between the European/Southeast Asian market and the United States, RCA, together with Trans Continental and Pearlman, decided that five of the songs on the Group's European album should not be included on the United States album. RCA therefore attempted to find new songs to replace the ones which would not be included. After listening to numerous songs, RCA located several it believed would work well for the Group. After consultation with Trans Continental and Pearlman, two of the songs RCA discovered – "(God Must Have Spent) A Little More Time on

You" and "Everything I Own" – were ultimately included on the album, along with two other songs which had not been included on the European release. (Degiorgio Dec. ¶11)

RCA, Trans Continental and Pearlman undertook extraordinary efforts to prepare for the album's release in the United States. RCA began to promote to radio stations the song it hoped would be the Group's first single, "I Want You Back."  RCA also coordinated photo shoots and the filming of the Group's first United States video. RCA began to heighten the Group's profile and public awareness of the name 'N SYNC by arranging television appearances, magazine interviews and other public appearances across the country.  In addition, RCA arranged for the Group to visit radio stations across the country to meet disc jockeys, give interviews and publicize their act and the album.  These efforts were designed to create a "buzz" about the Group in anticipation of its first United States album. (Jamieson Dec. ¶20)

On March 24, 1998, RCA released the Group's United States debut album, titled 'N SYNC. The album initially was not as successful as RCA believed it deserved to be.  It was only after RCA arranged for the Group to appear on a television special on the Disney Channel in July 1998 that sales took off.  As a result in no small part of RCA's enormous marketing and promotional efforts, the album has become a remarkable success, selling approximately 7 million copies in the United States.  In addition, the single "(God Must Have Spent) A Little More Time On You" – which was discovered and secured for the Group by RCA – has gone gold, selling more than 500,000 copies. (Jamieson Dec. ¶ 21; Degiorgio Dec. ¶13)

### BMG's Role Regarding the Christmas Album

After the Group's United States debut album was released, RCA suggested that the Group record a Christmas album.  After consultation with the relevant parties, including Trans Continental and Pearlman, it was agreed that the Group would do so.  RCA believed the album

should consist primarily of original material, rather than re-recordings of standards.   RCA subsequently expended substantial time and effort to find original songs that would be appropriate for the Christmas album.   With the exception of two songs, all of the songs that ultimately were included on the Christmas album were those which had been selected by RCA, in consultation with Trans Continental and Pearlman.   One of those other two songs – "Merry Christmas, Happy Holidays" – was co-written by RCA's Director of International A&R, Vincent Degiorgio.   Degiorgio had initially suggested the song because he believed the album needed an up-tempo track that could be released as a single.   And indeed, that song subsequently became the single from the album.   In addition to finding the material that would be recorded on the album, RCA, together with Trans Continental and Pearlman, also participated in the selection and hiring of the producers for the songs.   (Degiorgio Dec. ¶¶15-16)

The Christmas album was titled "Home for Christmas" and was released on November 10, 1998.   The album has been tremendously successful and has sold approximately 1.7 million copies.   In addition, the video single "Merry Christmas, Happy Holidays" has been played repeatedly on MTV.   (Jamieson Dec. ¶22; Degiorgio Dec. ¶17)

### The Identification of BMG With the Group and the Mark

As a result in no small part of BMG's efforts, together with the efforts of Trans Continental and Pearlman, the Mark has come to be associated with a distinctive quality and image.   In addition, the Group and the Mark are now firmly linked with BMG in the music industry and the general public.   RCA's name appears prominently at the beginning and end of the Group's music videos whenever they are played on music video outlets such as MTV or VH1.   RCA's name and logo also appear on every one of the more than 10 million 'N SYNC records and videos which have been sold to date.   Magazines and other publications frequently

identify 'N SYNC as "RCA Recording Artists" or as "distributed by RCA." The connection between RCA and 'N SYNC is further reinforced by the record charts, which are the most watched and recognized indicator in the music industry of a record label's success and status. (Jamieson Dec. ¶¶24-26)

### 'N SYNC's Immeasurable Value to BMG

BMG's relationship with the Group and the Mark is of enormous and incalculable value to BMG. Because the Group has been on the United States charts almost continuously since 1998, it has become closely identified as a key asset of BMG. In the music industry, success begets success. A label's relationship with a successful artist benefits the label in almost every aspect of its business. It provides the label with greater credibility and power in every facet of the music industry. The label acquires increased influence with radio stations, video television outlets and retail outlets. The label also gains the ability to leverage new and/or less successful titles into airplay and retail space. In addition, the label's demonstrated ability to take a previously unknown group and help make it one of the most successful acts in the world makes it easier for the label to compete for and attract promising new artists. (Jamieson Dec. ¶¶ 29-31)

### The Group Members' Sham Termination

Beginning in or about February 1999, the Group members, represented by a team of experienced and sophisticated New York attorneys and music industry advisors, attempted to renegotiate the terms of their agreements with Trans Continental. When those negotiations did not produce the results they desired, the Group members, in violation of their contractual obligations, unilaterally purported to terminate their agreements and refused to record and deliver to Plaintiffs any further records. (Jamieson Dec. ¶¶32-33)

By letter dated May 26, 1999, the Group Members alleged that they were terminating the April 29, 1996 Exclusive Recording Agreement with Trans Continental pursuant to Section 19.12 of that agreement, which provided that the Group members "shall have the right to terminate this agreement in the event [Trans Continental] has not secured a distribution agreement with a U.S. record company within eighteen months from the date hereof . . . ." (Jamieson Dec. ¶33)

The Group members' purported termination is a sham and has no legal effect.  Trans Continental and BMG entered into the BMG License Agreement on or about August 1, 1996, approximately four months after the Exclusive Recording Agreement between Trans Continental and the Group members – well before the expiration of the eighteen month date set forth in Section 19.12.  BMG's intercompany agreement gave RCA – one of the preeminent record companies in the United States – the right to distribute the Group in the United States under the BMG License Agreement.   In addition, BMG Distribution is one of the largest record distribution companies in the  United States. (Jamieson Dec. ¶5).  Indeed, the Group's members clearly recognized that there would be distribution by BMG in the United States as well as the rest of the world, when they signed the Letter of Acknowledgment dated August 1, 1996, acknowledging that Trans Continental had "entered into a Licensing Agreement for the purposes of selling and exploiting the artist group 'N SYNC audio and video products with BMG for worldwide distribution."   (See Letter of Acknowledgment, attached to the Complaint as Exhibit D)  (emphasis added).

Indeed, as of the date of the Group's May 26, 1999 purported termination, the Group's United States debut album had sold approximately 6,600,000 copies in the United States and the Christmas album had sold approximately 1,700,000 copies.  (Jamieson Dec. ¶35)  The Group

had skyrocketed from almost complete anonymity in the United States to unparalleled success. The Group's purported termination therefore is entirely baseless.   The Group members enthusiastically embraced RCA, and worked closely with it in preparing, recording and promoting the United States debut album and the Christmas album.  The purported termination, coming after the Group already had received and accepted the overwhelming benefits its relationship with BMG and RCA has produced is unconscionable.

### The Unlawful Zomba Recording Agreement

In early September, 1999, Defendant Zomba, aware of Plaintiffs' rights with respect to the Group and the Mark, announced that it and its label, Jive Records,  had entered into a purported recording agreement with the Group members for their services as recording artists using the Mark 'N SYNC, in direct contravention of Plaintiffs' exclusive rights (the "Zomba Recording Agreement").  Press reports state that Zomba will be releasing an album by the Group members using the Mark sometime in the year 2000, although such a release could occur earlier. (Jamieson Dec. ¶36)

Defendants' actions are entirely without support or justification.  If Defendants truly believed they had the right to enter into the Zomba Recording Agreement, in direct contravention of Plaintiffs' exclusive rights, they would have sought a declaration to that effect from this Court.  Their failure to do so, and their resort instead to unilateral self-help, demonstrates that their actions are a complete and utter sham, and a knowing and willful violation of Plaintiffs' rights.

### BMG Will Suffer Irreparable
### Harm Absent an Injunction

If Zomba is permitted to steal the Group from BMG and misappropriate the Mark, the injury to BMG in terms of prestige, goodwill and reputation will be irreparable, unquantifiable

and potentially devastating.  As an initial matter, BMG, Trans Continental and Pearlman would lose all control over the quality and character of the products and services offered under the Mark, as well as the distinctive style and image which have come to be associated with the Mark. Moreover, just as BMG's association with the Group and Mark has benefited BMG in virtually every aspect of its business, their loss would have a proportionately negative effect.  BMG and its label RCA would be perceived as having lost the Group to a rival company and would suffer grievous harm to its reputation.  Moreover, BMG's ability to promote and distribute its existing artists, as well as attract new talent, would suffer substantially.  Such damage would be severe and unquantifiable.  Accordingly, a preliminary injunction is necessary to protect BMG from substantial and irreparable harm.  (Jamieson Dec. ¶¶39-46)

**Argument**

**I.**

**THE STANDARD FOR A PRELIMINARY INJUNCTION**

It is well-established in this Circuit that an application for a preliminary injunction should be granted where the plaintiff establishes:  "(1) substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest."  McDonald's Corp. v. Robertson, 147 F.3d 1301, 1306 (11th Cir. 1998).  As demonstrated below, BMG easily satisfies each of these elements.

**II.**

**THERE IS A SUBSTANTIAL LIKELIHOOD THAT BMG WILL
SUCCEED ON THE MERITS OF ITS LANHAM ACT CLAIM**

There is a substantial likelihood that BMG will succeed on the merits of its Lanham Act claim.[2]  In order to prevail on a claim under Section 43(a), a plaintiff must establish that (1) it has rights in the mark at issue and (2) the defendant has adopted a mark that is the same as, or confusingly similar to the plaintiff's mark, thereby causing a likelihood of confusion.  E.g., Conagra, Inc. v. Singleton, 743 F.2d 1508, 1512 (11th Cir. 1984); Ocean Bio-Chem, Inc. v. Turner Network Television, Inc., 741 F. Supp. 1546, 1553 (S.D. Fla. 1990).

BMG clearly satisfies both of these requirements.  First, Defendants cannot dispute that BMG has valid rights in the Mark.[3]  As discussed more fully in Trans Continental's papers, Trans Continental and Pearlman – and not the Group members – are the owners of the Mark 'N SYNC.  Indeed, the Group members explicitly acknowledged in the April 29, 1996 Exclusive Recording Agreement that Trans Continental is the sole owner of the Mark.  BMG acquired the exclusive right to use the Mark from Trans Continental pursuant to the BMG License

---

[2]   Section 43(a) of the Lanham Act provides in pertinent part:

(1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which--

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1).

[3]   There also can be no dispute that the mark 'N SYNC is entitled to federal protection.  On or about May 24, 1999, the Group members filed with the United States Patent and Trademark Office

Agreement.  In addition, BMG's right to use the Mark exists, at its option, regardless of the identity of the Group's members.  BMG, therefore, is a valid licensee and has protectable rights in the Mark.[4]

Second, there can be no dispute that the mark Defendants wish to use in connection with recordings released by Zomba is confusingly similar to the Mark in which BMG has rights because the marks, in fact, are identical.  Indeed, if Defendants are allowed to use the Mark in connection with Zomba recordings, confusion is not merely likely, but an absolute certainty, because such use will create the false impression that Zomba – and not BMG – has the right to use the Mark 'N SYNC in connection with the manufacture and distribution of recordings and other related activities.   The Group members can only use the Mark in connection with recordings which have been authorized by Plaintiffs; accordingly, their use of the Mark in connection with Zomba recordings violates the Lanham Act.  See, e.g., Burger King Corp. v. Mason, 710 F.2d 1480, 1492-93 (11th Cir. 1983) (continued use by franchisee of franchisor's trademark after franchise has been terminated is likely to cause confusion); Burger King Corp. v. Agad, 911 F. Supp. 1499, 1504 (S.D. Fla. 1995) (same); Gorenstein Enters., Inc. v. Quality Care-USA, Inc., 874 F.2d 431, 435 (7th Cir. 1989) (franchisee cannot seek to rescind franchise agreement and continue to use franchisor's trademark); Costandi v. AAMCO Automatic Transmissions, Inc., 456 F.2d 941, 942-43 (9th Cir. 1972) (same).  Similarly, Zomba's use of the Mark in connection with recordings is unlawful because the Group members do not have the power to authorize Zomba to make such use.  See, e.g., Firma Melodiya v. ZYX Music GmbH, 882 F. Supp. 1306, 1313-14 (S.D.N.Y. 1995) (defendants' sale of plaintiffs' recordings using

---

an intent-to-use application to register 'N SYNC as a Service Mark.  Accordingly, Defendants themselves have acknowledged that the Mark constitutes a valid mark.

plaintiffs' trademarks together with defendants' name and logo likely to cause confusion where defendants' purported license to use plaintiffs' recordings and marks was invalid because defendants' licensor lacked authority to issue license).

It therefore is irrefutable that (1) BMG has rights in the Mark and (2) Defendants' unauthorized use of the Mark in connection with recordings by the Group on a Zomba label is likely to cause confusion. Accordingly, BMG has demonstrated a likelihood of success on the merits of its Lanham Act claim.

## III.

## BMG WILL BE IRREPARABLY HARMED
## ABSENT A PRELIMINARY INJUNCTION

BMG unquestionably satisfies the requirement of irreparable harm because it is well-established in this Circuit that where, as here, likelihood of confusion is demonstrated, irreparable harm is presumed. See, e.g., McDonald's Corp., 147 F.3d at 1310; Callaway Golf Co. v. Golf Clean, Inc., 915 F. Supp. 1206, 1215 (M.D. Fla. 1995); Caterpillar, Inc. v. Nationwide Equip., 877 F. Supp. 611, 617 (M.D. Fla. 1994); Bellsouth Adver. & Publ'g Corp. v. Real Color Pages, Inc., 792 F. Supp. 775, 784 (M.D. Fla. 1991); Sundor Brands, Inc. v. Borden, Inc., 653 F. Supp. 86, 93 (M.D. Fla. 1986). As demonstrated above, confusion here is not merely likely – it is an absolute certainty. Thus, the irreparable harm requirement is satisfied in this case, not due to the application of a legal presumption, but because confusion is certain to exist if Defendants are permitted to improperly use the 'N SYNC Mark in violation of Plaintiffs' pre-existing rights in and to the Mark.

---

[4]   BMG's status as a licensee of the Mark gives it standing to assert a cause of action under Section 43(a). See, e.g., Norman M. Morris Corp. v. Weinstein, 466 F.2d 137, 142 (5th Cir. 1972).

Even absent the legal presumption and the demonstration of actual confusion, it is indisputable that BMG and its label RCA will be irreparably harmed if a preliminary injunction is not issued. BMG and RCA have invested enormous amounts of time, energy and resources to develop and promote the Group and Mark from complete anonymity to one of the most successful and widely-recognized musical acts and Marks in the world. Among other things, BMG and its label RCA helped locate and secure the best possible songs for the Group to record, procured the best possible producers for those songs, devoted substantial resources to marketing and promoting the Group and Mark, and originated the concept of the Christmas album. As a result of BMG's and RCA's massive efforts, the Group and the Mark are universally recognized and are firmly linked with BMG and its label RCA in the minds of the music industry and the general public. (Jamieson Dec. ¶¶ 23-26; Degiorgio Dec. ¶13)

If a preliminary injunction is not issued, BMG will suffer severe, incalculable and irreparable harm. BMG and its label RCA will be perceived as having lost one of the world's most popular and widely-recognized musical groups and Marks to one of its competitors, thereby causing substantial and immeasurable harm to the reputation of BMG and RCA. In addition, BMG and RCA would be damaged in almost every aspect of their business. The loss of its relationship with such a successful group and Mark would decrease BMG's influence with radio stations, video television outlets and retail outlets, thereby making it more difficult for BMG to promote and distribute its other artists. Similarly, the loss of the Group and the Mark would make it more difficult for BMG to compete with other labels for promising new talent. In addition, BMG, Trans Continental and Pearlman would lose all control over the quality and image of the products and services offered under the Mark, as well as the distinctive style and image associated with the Mark, all of which BMG, along with Trans Continental and Pearlman,

helped to create.  (Jamieson Dec. ¶¶ 39-44)  In sum, the damage BMG would suffer absent a preliminary injunction would be severe and unquantifiable, and therefore constitutes irreparable injury.

**IV.**

**THE THREATENED INJURY TO BMG
OUTWEIGHS ANY DAMAGE TO DEFENDANTS**

The injury BMG will suffer absent a preliminary injunction substantially outweighs any conceivable damage Defendants might incur.  BMG, Trans Continental and Pearlman have invested enormous time, effort and resources into making the Group and Mark one of the most popular and recognized musical groups and Marks in the world.  Indeed, as demonstrated above, see supra §III, if a preliminary injunction is not granted, BMG will suffer massive, unquantifiable and irreparable harm.

In contrast, Defendants will not suffer any comparable legally cognizable harm.  As an initial matter, unlike BMG, defendant Zomba has not yet released any albums by the Group, and has not invested anywhere near the time and resources that BMG has expended in developing and promoting the Group and Mark.  See, e.g., Popular Bank of Florida v. Banco Popular de Puerto Rico, 9 F. Supp.2d 1347, 1364 (S.D. Fla. 1998) (defendant bank would not suffer hardship from preliminary injunction prohibiting it from using name in South Florida because its financial investment in that area was limited).

In addition, Defendants would suffer no legitimate injury because they would merely be restrained from engaging in activities which are unlawful.  If Defendants truly believed they had the right to enter into the Zomba Recording Agreement, in contravention of Plaintiffs' rights, Defendants should have sought a judicial declaration from this Court regarding the parties' rights and obligations.  Instead of seeking this Court's guidance, however, Defendants chose to resort

16

to self-help in order to effectuate their illicit scheme. Their failure to obtain a declaratory judgment demonstrates that Defendants knew their actions were entirely without justification. Having resorted to unlawful, unilateral actions in a willful and blatant violation of Plaintiffs' clear contractual, statutory and other rights, Defendants cannot now complain about any harm they might suffer from a preliminary injunction. See, e.g., Nailtiques Cosmetic Corp. v. Salon Sciences Corp., 41 U.S.P.Q.2d (BNA) 1995, *1999 (S.D. Fla. 1997) ("Defendants should not be heard to complain about hardship when their actions, undertaken with apparent prior knowledge of plaintiff's trademarks and trade dress imply bad faith."); Callaway, 915 F. Supp. at 1215 ("A preliminary injunction will not cause defendants' to suffer any legitimate harm, because they are simply being prevented from selling a product that they are not legally entitled to sell."); Caterpillar, Inc., 877 F. Supp. at 617 ("Defendants will suffer no harm from being restrained from doing that which is illegal."); Burger King Corp. v. Hall, 770 F. Supp. 633, 640 (S.D. Fla. 1991) ("[o]ne who adopts the mark of another for similar goods acts at his own peril, since he has no claim to the profits or advantages thereby derived") (internal quotation marks and citation omitted).

Accordingly, the balance of hardships weighs overwhelmingly in favor of BMG.

## V.

## A PRELIMINARY INJUNCTION WOULD NOT BE ADVERSE TO THE PUBLIC INTEREST

Finally, a preliminary injunction would not be adverse to the public interest. "The purpose of the Lanham Act is protect the public and encourage business activity by preventing confusion as to the origin of goods and services. The public has an interest in being able to properly identify the source of products." Caterpillar, Inc., 877 F. Supp. at 617; see also Burger King Corp., 770 F. Supp. at 640 ("[W]hen a trademark is said to have been infringed, what is

actually infringed is the right of the public to be free of confusion and the synonymous right of the trademark owner to control his product's reputation."). As demonstrated above, see supra §II, public confusion is inevitable absent an injunction, for the distribution by Zomba of recordings using the Mark would create the false impression that Zomba, and not BMG, has the exclusive right to manufacture and distribute recordings under Mark.

In addition, a preliminary injunction would serve the public interest because it would preserve the sanctity of contracts against the type of unlawful and unconscionable conduct Defendants have engaged in here. See, e.g., Burger King Corp. v. Lee, 766 F. Supp. 1149, 1157 (S.D. Fla. 1991) ("It is not in the public interest to condone [defendants'] material breach of the Agreement or to allow [defendants] to continue to operate the franchise with the unauthorized use of [plaintiff's] marks for an extended period of time"). Accordingly, the public interest compels the entry of a preliminary injunction.

## Conclusion

For the reasons set forth above, in the accompanying Declarations, and in the papers submitted by the other Plaintiffs herein, BMG respectfully requests that the Court grant Plaintiffs' motion for a preliminary injunction.

Dated: October _12_ , 1999

Respectfully submitted,

William B. Wilson, Esquire
Florida Bar No.: 153167
Holland & Knight LLP
200 S. Orange Street, Suite 2600
Post Office Box 1526
Orlando, Florida 32802-1526
(407) 425-8500

Steven M. Hayes, Esquire (SH 2926)
Orin Snyder, Esquire (OS 3122)
Parcher, Hayes & Snyder, P.C.
500 Fifth Avenue, 38th Floor
New York, New York 10110
(212) 382-0200

Attorneys for Plaintiffs BMG Entertainment
and BMG Ariola Muenchen GmbH

ORL1 #503842 v1