FILED

99 OCT 12 AM 8: 31

CLERK            COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF FLORIDA
ORLANDO DIVISION

TRANS CONTINENTAL RECORDS, INC.,
BMG ENTERTAINMENT, BMG ARIOLA
MUENCHEN GmbH, TRANS CONTINENTAL
ENTERTAINMENT, INC. and LOUIS J.
PEARLMAN,

                                Plaintiffs,

         v.

ZOMBA RECORDING CORPORATION,
CLIVE CALDER, JAMES LANCE BASS,
JOSHUA SCOTT CHASEZ, JOSEPH
ANTHONY FATONE, JR., CHRISTOPHER
ALAN KIRKPATRICK, and JUSTIN
RANDALL TIMBERLAKE,

                                Defendants.

CIVIL ACTION NO.
99-1282-Civ-Orl-22C

**DECLARATION OF LOUIS J.
PEARLMAN IN SUPPORT OF A
MOTION FOR A PRELIMINARY
INJUNCTION**

STATE OF FLORIDA     )
                     )ss.
COUNTY OF ORANGE     )

         LOUIS J. PEARLMAN, pursuant to 28 U.S.C. §1746, declares under the pains and

penalties of perjury, as follows:

         1.       I am a named plaintiff in this action and the Chairman and Chief Executive Officer

of the corporate plaintiffs Trans Continental Records, Inc. ("Trans Continental") and Trans

Continental Entertainment, Inc. ("TCE"). I am the creator and financier of the immensely popular

music group, 'N Sync (the "Group"). I have used the name 'N SYNC (the "Mark") continuously

since 1995 and I acquired the exclusive license for the United States federally registered

trademark, Registration No. 1,843,498 (the "Registration"), for all music and music related

10

activities in the United States.  I am also the owner of or applicant for the Mark in over twenty

(20) countries around the world.  Defendants are using and intend to continue to use that

trademark without my consent, involvement or supervision as a key element of the unlawful

scheme described below.  This application seeks to prevent that unlawful use and the

implementation of defendants' unlawful conspiracy.

2.      I submit this declaration in support of the application of plaintiffs for an Order

pursuant to Rule 65 of the Federal Rules of Civil Procedure, granting a preliminary injunction,

pending a trial of this action, prohibiting Defendants Zomba Recording Corporation ("Zomba"),

Clive Calder, its Chairman and Chief Executive Officer, and Defendants James Lance Bass,

Joshua Scott Chasez, Joseph Anthony Fatone, Jr., Christopher Alan Kirkpatrick, and Justin

Randall Timberlake, (the "Group Members"), their respective agents, those acting in concert with

them, and those receiving notice of the order emanating from this application, from: (A)  using,

advertising, offering for sale, selling, distributing, importing, exporting or otherwise disposing of,

any product bearing the servicemark or trade name 'N SYNC, or any confusingly similar imitation

thereof; (B) effectuating, any performing, recording, license, distribution or other agreements with

any person or entity, or making or participating in the making of any recordings or videos with

any person or entity, which would be inconsistent with or in violation of agreements that are the

subject of this action; and (C) related relief as more fully set forth in the accompanying Motion.

Unless otherwise stated, the facts contained herein are based upon my personal knowledge.

3.      This action arises out of the Group Members' unilateral and untenable repudiation

of valuable, long-term commercial agreements, including an exclusive recording agreement and an

exclusive management agreement, on patently frivolous grounds.  The bogus termination of the

-2-

recording agreement pertains to events almost three (3) years ago, about which defendants never complained until May 1999 when they demanded to renegotiate their contracts. Having accepted the benefits of these contracts, and having achieved celebrity status largely as a result of plaintiffs' efforts over the past three (3) years, the Group Members now seek to terminate all of their existing contractual commitments to obtain a multi-million dollar payment from defendant Zomba, a rival recording company. Defendant Zomba has unscrupulously conspired with the group member defendants to interfere with our contractual relations and to misappropriate the intellectual property that we spent millions of dollars to develop. Defendants are causing immediate, severe and irreparable harm, by among other things, entering into a new and conflicting exclusive recording contract based upon the unauthorized use of the 'N Sync trademark in callous disregard of existing agreements, which harm has been compounded by the calculated release of information regarding these events to the industry and the public to undermine Trans Continental and co-plaintiffs BMG Entertainment and BMG Ariola Muenchen GmbH (collectively, "BMG").

## I.   THE BUSINESS OF TRANS CONTINENTAL

4.     Since 1992, I have been engaged as an entrepreneur in the music business acting in my individual capacity and through Trans Continental, a recording company which I formed and as to which I serve as Chairman, Chief Executive Officer and President. Under my leadership, Trans Continental has created, developed and marketed some of the decade's most successful popular music groups, such as the Backstreet Boys, 'N Sync, and LFO. Various other groups and individual artists, such as C Note, Take-5, Phoenix Stone and Innosense, have recently had their careers launched or are currently being developed by Trans Continental. Trans Continental also

has exclusive international distribution rights to the world renown recording artist, Kenny Rogers. Trans Continental owns and operates a state-of-the-art recording facility in Orlando which it makes available to its own artists, other prominent recording artists and entertainment companies.

5.      Our success starts with my ability to identify young talent and trends in popular music, and my willingness to expend substantial effort and to risk great sums of money to finance previously unknown and untrained young performers.  Once a group concept is conceived and talent is selected, we advance all or substantially all expenses of the group and pursue all available opportunities in order to create a success.  Toward this end, we provide housing and advance expenses for our artists, and sometimes their families, while they are trained by vocal coaches, choreographers, stylists, and other professionals.  We retain accomplished producers to create songs for the group, while their singing, dancing and other talents are being developed by skilled professionals.  If a group or artist we create and support does not achieve commercial success, our entire investment will be lost.  Thus, our business is dependent upon my skill in identifying and commercializing the right artists and group concepts so that those which do succeed yield sufficient revenues to justify the enormous risks and substantial economic investments involved. It is also dependent on maintaining our credibility, high artist standards and important relationships with producers, managers and record companies.

6.      A fundamental element of the success of an emerging artist, and hence our success, is our relationships with recording and distribution companies, such as co-plaintiff BMG.  Once we sign and develop a new group or individual artist to the point that they are ready for commercialization, we will seek a partnership with a major record label to market the artist and

distribute their recordings.  The impairment of these relationships and the circumvention of our agreements will, as here, give rise to substantial, immediate and irreparable harm.

## II.    THE CREATION OF 'N SYNC AND ITS RISE TO SUPERSTARDOM

7.    In or about 1995, "pop" music was enormously popular in Europe, but had yet to emerge in the United States to the same degree.  Contrary to the conventional wisdom at the time held by most record industry executives, I believed that enormous opportunities existed in the U.S. and abroad in the teen and pre-teen markets with "up-tempo" singing groups comprised of young, talented artists with a clean-cut, all-American image.  'N Sync was a "concept" group born out of my recognition of these opportunities and my willingness to commit substantial sums to build a successful music group.

8.    Following my successful formation of the Backstreet Boys, I decided to assemble another R&B (rhythm and blues) influenced pop music group which, like the Backstreet Boys, was to be made up of five (5) male members with exceptional singing and dancing talents.  I began the process of auditioning and evaluating talent and, as more particularly described hereinbelow, ultimately selected defendants Bass, Chasez, Fatone, Jr., Kirkpatrick and Timberlake to comprise the group that later became known as 'N SYNC.  These individuals were never in a group until I brought them together and set their careers on a path for success.  In 1995, each of the Group Member Defendants was, in their own way, trying to break into the music business, but had not achieved any significant commercial or artistic success, making only sporadic appearances for modest compensation.  None had a recording contract or any other regular source of income in the music business.

9.      Through a former member of the Backstreet Boys, I met defendant Chris Kirkpatrick in mid-1995. Kirkpatrick had been working in Orlando as a part-time member of the singing group, Hollywood Hi-Tones, and as a waiter at the Outback Steakhouse. Kirkpatrick told me that he wanted to be part of a new singing group and asked for my help. I told Kirkpatrick that we would need a younger member and he recommended defendant Justin Timberlake who appeared on the television show, the Mickey Mouse Club. I paid for Justin and his parents, Lynn and Paul Harless, to fly to Orlando from Tennessee in order to audition him for the group. Timberlake recommended defendant Joshua Chasez who also performed on the Mickey Mouse Club show but was then working in Baltimore as a waiter at a Bob Evans Restaurant. I paid for Mr. Chasez to travel to Orlando to audition. After many other auditions, I auditioned defendant Joseph Fatone, Jr. who was then working part-time in the Wolfman Show for the Graveyard Review at Universal Studios. For a time, another young performer was intended to be part of the group but ultimately he was replaced by defendant Lance Bass. I also arranged to fly defendant Bass and his parents from Mississippi to Orlando to audition. By early fall of 1995 the auditions were completed and I had determined who members of the new group would be.

10.     In August of 1995, I arranged to lease a house in Orlando for the members of the group (other than defendant Fatone, Jr. -- who resided with his family in Orlando), in which they lived and were trained for more than 2 years. Trans Continental paid the rent, as well as virtually all other expenses for the defendants, including expenses for travel, housing, photography, dance and vocal instruction, hair, make-up, clothing, school tutoring, guardian expenses, etc. We even gave the Group Members an allowance each week for their groceries and personal expenses. We also made, and continued to make, substantial personal loans to the Group Members.

-6-

11.    By September 1995, we began taking steps for production of materials for the new group to record -- so-called "demos" -- and began plans to showcase the group.  I arranged, through Trans Continental, to develop the choreography, artistic direction and image of the group, and began preparations for marketing, promotion and publicity for the Group.  In October 1995, after weeks of rehearsals under my supervision, the Group's first public appearance and live performance took place at Pleasure Island in Downtown Disney, Orlando.  Trans Continental arranged for the event, provided publicity materials, T-shirts and other promotional merchandise depicting the new group, and arranged for a video crew to record the performance.  All expenses, as always, were paid by me or Trans Continental.  Thereafter and throughout 1996, we continued to supervise the artistic development of the Group, the style and sound of the Group and to arrange for public appearances, showcase events and other promotional activities to increase the Group's public exposure and commercial viability.  As more fully described below, the members of the Group were signed to an exclusive recording agreement with Trans Continental and an exclusive management agreement with TCE.

12.    We then undertook efforts on behalf of the Group to enter into a relationship with a "major" record company with a worldwide presence and strong distribution capabilities.  To this end, Trans Continental and/or its representatives solicited the interest of prominent record companies and delivered the "demo" tapes that we had made.  Most declined to enter into a recording commitment in respect of the Group and "passed" on the Group.  Defendant Zomba was among the many record companies that was unwilling to sign the Group or to make a financial commitment.

-7-

13.     In or about mid-1996, BMG was contacted and expressed great interest in the Group.  BMG is one of the largest record and distribution companies in the world with a pervasive presence in the United States on its own and through its affiliates, including the famed Arista and RCA labels.  Representatives of BMG came to Orlando to hear the Group perform and to meet with Trans Continental.  BMG was extremely impressed with the 'N Sync concept and, unlike defendant Zomba and so many other record companies, BMG was prepared to make a substantial commitment, both financially and otherwise, to join with Trans Continental to develop and promote the Group.  Each of the Group Members was thrilled at the prospect of working with a world class company such as BMG and enthusiastically embraced a transaction with them.

14.     Trans Continental negotiated a license agreement with BMG which provided for the delivery of their first album by December 31, 1996 and contained options in favor of BMG for four (4) additional studio recorded albums to be delivered by the Group and Trans Continental. In return, BMG agreed to make substantial expenditures for recording  costs, to apply its expertise and marketing for the benefit of the Group and to pay royalties on record and video sales.  Toward that end, each of the Group Members signed an acknowledgment letter to affirm their commitment to the BMG relationship.  Efforts began almost immediately between and among Trans Continental, BMG and the Group Members to produce an album for release in Europe.  Trans Continental was instrumental in doing the "A&R" work (i.e., artists and repertoire) for the album and, in conjunction with BMG, efforts were set in motion to launch the Group's initial recording.  As more fully described in April 1997, the Group, through BMG, released its initial album in Europe and Asia which is reported to have sold over 1,000,000 copies.

-8-

15.    As part of the combined marketing strategy of Trans Continental and BMG, the Group's European album release was preceded by the release of its first single, "I Want You Back" and its first concert tour.   The "I Want You Back" concert tour, which took place during February and March 1997 in various cities in Germany and Switzerland, was the Group's first tour.  Each of the members of the Group were thrilled about the progress their careers were taking and as an expression of their gratitude for all the support that I had given them, each group member presented me with a copy of the press photograph with a personal note of thanks.  Thus, defendant Kirkpatrick expressed that "[i]t all started with you ... and you know how much I appreciate all that you have done," defendant Chasez wrote that "I can't thank you enough," defendant Fatone, Jr. thanked me and told me that I "helped make [his] dreams come true," defendant Bass stated "Thanks <u>so</u> much for everything you have done," and defendant Timberlake wrote "... Thanx for all the love you have given us."  See collective <u>Exhibit "A"</u> annexed hereto.

16.    Under our guidance, the Group continued on its path to stardom throughout 1997 as the popularity of the Group's style of music began to rise in the United States.  The Group Members were ecstatic when they learned that RCA would be the Group's label in the United States.  RCA and Trans Continental began planning for 'N Sync's launch in the United States market, including their first album release in the United States.  Trans Continental worked in close association with RCA in the preparation of the new album, which included various new compositions, and in determining the artwork for, and the look and packaging of, the album.  An enormous marketing effort was put in motion, including photo shoots, public appearances, radio station marketing and the like, all designed to enhance the Group's image and visibility and to support the U.S. release.

17.     The Group's first U.S. album was released by RCA in March 1998 and is reported to have sold over 7,000,000 copies, mostly in late 1998 and 1999.  The Group also released a Christmas Album in November 1998, which almost immediately went platinum and is reported to have sold over 2,000,000 copies.  Due in large part to the success of their albums and the explosion of pop music in America, 'N Sync has become a leading concert attraction in the touring side of the business.  'N Sync has recently completed a successful United States tour, has engaged in various tours abroad, and has made numerous television appearances, including its own pay-per-view program and featured performance in the 1999 MTV video music award show and the 1999 County Music Awards.  The Group Members have also received, retained and enjoyed the benefits of lucrative sponsorship and  merchandising agreements and the Group has been subject of dozens of news and magazine features highlighting its success.

18.     Over the past three years the Group Members have profited enormously, both financially and in the growth of their reputation and name recognition, from the efforts of Trans Continental, BMG and RCA in promoting, marketing and distributing the Group's recordings.  'N Sync is now one of the best known and popular pop groups, with a large pre-teen and teen following in the United States, Europe, Asia and in other markets.

19.     The Group Members have already received more than $6,000,000 and substantial additional sums are in the "pipeline" and would be paid in ongoing accountings but for the Group Member Defendants' repudiation of the agreements.  As more fully described below, the Group Members have caused an additional amount, believed to be well in excess of $6,000,000, to be withheld by our merchandising licensee.  Pursuant to the Exclusive Recording Agreement, Trans Continental accounts to the Group Members semi-annually for record royalties (based upon our

-10-

receipt of the same from BMG) and merchandising payments, after deducting unrecouped advances made on behalf of the Group Members. Trans Continental has periodically rendered royalty statements to the Group Members and remains committed to honoring its contractual obligations under the Exclusive Recording Agreement.

## III.   PLAINTIFFS' RIGHTS TO THE 'N SYNC MARK

20.     In or about August 1995, I determined to name the new group 'N Sync, I created the group's logo, a copy of which is attached as Exhibit "B", and have continuously used the name 'N Sync in commerce since the time of the Group's first public performance in October 1995. In August 1995, I caused an application to be filed with the United States Patent and Trademark Office ("Trademark Office") for registration of the 'N Sync name and logo. I was informed by the Trademark Office that a prior registration existed for a mark similar to the mark for which I had applied. Accordingly, I contacted the registered owner and I acquired a comprehensive and exclusive perpetual license for rights to Registration No. 1,843,498 to insure that there would be no impediment to my rights to the name. Thus, I have acquired the exclusive right and license (the "Exclusive License") to use the 'N Sync trademark in connection with all activities of the Group, including "all recording, publishing, merchandising, television, video, motion picture, live performance, promotional, advertising and other activities related to the Group's career in the entertainment industry." A copy of the Exclusive License is annexed hereto as Exhibit "C."

21.     After I acquired the Exclusive License, I sublicensed the trademark to Trans Continental. Since that time, all commercial activities of the Group have been under my supervision and the 'N Sync Mark has been continuously and systematically used in interstate commerce. I also obtained, at substantial expense, exclusive trademark rights for the 'N Sync

Mark in more than twenty (20) countries throughout the world including, but not limited to, Australia, Austria, Brazil, Canada, France, Germany, Mexico, Spain, Switzerland, the United Kingdom and various countries in the Far East.

22.     Cognizant that music, particularly pop music, has become so image-driven, I personally, as well as Trans Continental, have exercised control over the quality of the goods and services under the 'N Sync Mark in connection with the Group's recordings, videos, merchandising, live performance, promotions and advertising.  The Group Members have no right or license to use the 'N Sync Mark and have expressly acknowledged our exclusive rights in the Mark.  Plainly, defendant Zomba has no right or license to use the Mark.

## IV.     THE EXCLUSIVE RECORDING AGREEMENT

### A.     General Provisions

23.     On or about April 29, 1996, Trans Continental and the Group Members entered into an Exclusive Artist Recording Agreement ("the Exclusive Recording Agreement"), a copy of which is annexed hereto as Exhibit "D."  Under the Exclusive Recording Agreement, Trans Continental agreed to finance the recording of Master Recordings by this unknown group of young singers and the Group agreed, in conjunction with Trans Continental, to record and deliver up to eight (8) "LPS", (albums).  (Thus far, the Group has delivered only one (1) LP in satisfaction of its overall recording commitment).  The costs and expenses that Trans Continental agreed to advance were substantial, and included, but were not limited to, the Group Members' union wages, the union wages of back-up and supporting musicians, and other staff needed to produce the Master Recordings, travel, lodging, rehearsal and equipment rental expenses, advances to producers, per diems, all studio and engineering charges and packaging costs.  Trans

Continental also agreed to finance appearances by the Group, the production of videos and other marketing, touring and promotion expenses.

B.   **The Group Member Defendants' Agreement to Render Services Exclusively to Trans Continental**

24.   The Group Members agreed that for the term of the Exclusive Recording Agreement (including the terms of the options granted to Trans Continental to extend the term of the Exclusive Recording Agreement), the Group Members would render services as performing artists, and perform for the recording of Master Recordings only for Trans Continental (Exclusive Recording Agreement, pars. 2,3). Trans Continental's exclusive rights entitled it to delivery of Master Recordings, satisfactory to Trans Continental in its reasonable business judgment, sufficient for eight (8) LPS.

25.   In the Exclusive Recording Agreement, the Group Members expressly and specifically represented and warranted, among other things, that during the term of the Exclusive Recording Agreement, they would not enter into any other agreements which would interfere with their full and prompt performance of their obligations under the Exclusive Recording Agreement and would not perform or render any services as a performing artist except as permitted under the Exclusive Recording Agreement (Exclusive Recording Agreement, par. 13.02). The Group Members also expressly and specifically agreed that "[t]he services of [the Group Members] are unique and extraordinary and the loss thereof cannot be adequately compensated by money damages and [Trans Continental] shall be entitled to seek injunctive relief to enforce the provisions of the Exclusive Recording Agreement" (Exclusive Recording Agreement, par. 13.04).

C.    **Trans Continental's Ownership of the Name 'N Sync**

26.    The Group Members expressly acknowledged plaintiffs' exclusive rights in the ownership and use of the name, 'N Sync, and agreed that they would not use or authorize any person to use the name in connection with the recording, production, manufacture, sale or advertising of records, or in connection with personal appearances, unless approved by Trans Continental (Exclusive Recording Agreement, par. 21.04(b)).

D.    **Recognition and Preservation of Trans Continental's Creative Control over the Recording Process**

27.    Various provisions in the Exclusive Recording Agreement also recognize and affirm Trans Continental's creative control over the recording process, including, among other things, control over the manner in which albums would be recorded, the material that would be included in the recordings, as well as the content and production of performances and products. (Exclusive Recording Agreement, pars. 2.02, 3.01, 4.01 and 21.01).

28.    Illustratively, paragraph 3.03 of the Exclusive Recording Agreement provides in pertinent part: "...[The Group] further agree[s] not to commence the recording of any Master hereunder without [Trans Continental's] prior approval." The Exclusive Recording Agreement details the procedures and protocols to be followed by the Group in connection with master recordings and emphasizes that, among other things, Trans Continental shall at all times have creative control over the selection of a producer, the selection of materials, including the number of compositions to be recorded, the specification of accompaniments, arrangements and copying services and the selection of the dates of recording and choice of recording studio.

E.   **Trans Continental's Ownership of All Master Recordings**

29.     The Group Members also granted to Trans Continental exclusive ownership of and all rights in the Master Recordings (Exclusive Recording Agreement, par. 7), including "the unlimited and exclusive rights to manufacture Phonograph Records by any method hereafter known, derived from the Master Recordings made under this Exclusive Recording Agreement or during its term, and to sell, transfer or otherwise deal in the same under any trademarks, trade names and labels, and to refrain from such manufacture, sale and dealing, throughout the world" (Exclusive Recording Agreement, par. 7.02). The Exclusive Recording Agreement also grants Trans Continental the right to use, disseminate and license the use of the Group Members' name and likenesses, and an irrevocable license under copyright to reproduce and distribute "controlled compositions" recorded under the Exclusive Recording Agreement (Exclusive Recording Agreement, pars. 12, 20, 21), as more fully described in the Exclusive Recording Agreement.

F.   **Grant of Merchandising Rights to Trans Continental**

30.     The Exclusive Recording Agreement further grants to Trans Continental all merchandising rights relating to the commercial activities of the Group, and the right to grant to others upon such terms as Trans Continental sees fit, the right to exercise and commercially exploit all such merchandising rights. (Exclusive Recording Agreement, pars. 8, 19.10).

V.   **THE EXCLUSIVE MANAGEMENT AGREEMENT**

31.     On or about April 28, 1996, the Group Members also entered into an Exclusive

Management Agreement ("the Exclusive Management Agreement") with TCE, pursuant to which

the Group Members engaged the services of TCE as their exclusive management company

throughout the world through April 27, 2002, unless TCE elected to terminate earlier.  A copy of

the Exclusive Management Agreement is annexed hereto as <u>Exhibit "E."</u>  The management

services to be provided to the Group by TCE pursuant to the Exclusive Management Agreement

included, but were not limited to, advising and counseling the  Group on: (a) the selection of

artistic and musical material; (b) public relations and advertising; (c) presentation of their talents

in the determination of proper style, mood and setting; and (d) the general advancement of the

Group's career.

32.     The Exclusive Management Agreement, like the Exclusive Recording Agreement,

at paragraph 14 provides that <u>the "services rendered by 'N Sync are special, unique and</u>

<u>irreplaceable and any breach or threatened breach by 'N Sync of any of 'N Sync's obligations</u>

<u>thereunder may be enjoined temporarily or permanently without regard to and without limiting</u>

<u>any other remedy that may be available  to [TCE]</u>."

## VI.    <u>THE BMG LICENSE AGREEMENT</u>

33.     The skills, prestige, resources, publicity department and distribution muscle of a

prestigious label with a worldwide distribution capability can significantly enhance a start-up

group's chances for success.  Because such a large amount of time and money is required to

develop and market a new group, and there is such a high rate of failure, it is customary in the

industry that recording agreements are exclusive and run for multiple album releases.

34.     With this in mind and with the full knowledge and support of the Group members, by separate agreement entered into on or about August 1, 1996, Trans Continental entered into an agreement with BMG and granted BMG the exclusive right to distribute the Group's recordings (the "BMG License Agreement").  When we negotiated our arrangement, BMG required distribution rights to five (5) albums, which albums we were to cause to be delivered.  If any of the members of the Group were to be changed, we agreed to consult with BMG and we agreed to coordinate our creative and other activities in respect of the Group with BMG.

35.     BMG is one of the largest recording media and distribution companies in the world.  It markets and sells recordings under approximately 200  labels worldwide, and accounts for a substantial percentage of all sales of recordings in the United States.  The media reports that BMG Entertainment generated $4.6 billion in revenues in its most recent fiscal year and that it enjoys the second largest market share for record sales in the United States. The BMG label is among the most desirable labels for a young recording artist and an affiliation with BMG can lead to artistic and commercial success.  On its part, BMG, in conjunction with Trans Continental, agreed to devote substantial resources to 'N Sync and expended substantial sums to produce and promote its recordings.  Among the companies under the BMG umbrella is the venerable and prestigious RCA label, which acted as the Group's label in the United States.

36.     By Letter of Acknowledgment dated August 1, 1996, on the joint letterhead of BMG and Trans Continental Records, Inc., a copy of which is annexed hereto as Exhibit "F," each of the Group Members and their parental guarantors, as an inducement for the parties' entry into the BMG License Agreement with Trans Continental, reaffirmed their obligations under the

Exclusive Recording Agreement and acknowledged that BMG would act as exclusive distributor with respect to the Group's recordings and videos.

## VII.   THE GROUP'S FRIVOLOUS ATTEMPT TO TERMINATE THE <u>EXCLUSIVE RECORDING AGREEMENT AND OTHER AGREEMENTS</u>

37.     Commencing in March 1999, the Group Members through their counsel, demanded to renegotiate the economic terms of their agreements and threatened to withhold their services and repudiate their many obligations to Trans Continental. During the initial stages of this process, all sides approached business discussions which arose out of these threats in good faith. We had several face to face meetings and numerous telephone conferences were held by and between counsel for the parties. However, notwithstanding our efforts, the demands of the Group continuously increased and, ultimately, in May, the discussions stalled. We certainly had an earnest desire to attempt to make reasonable accommodations, although our rights under the operative agreements were (and remain)  clear.

38.     On May 26, 1999, more than three years after the date of the Exclusive Recording Agreement and almost three years after the date of the Letter of Acknowledgment, after enormous commercial success in the United States and throughout the world, defendants, by their attorneys, claimed a right to terminate the Exclusive Recording Agreement based on paragraph 19.12, which states:

> "Notwithstanding anything to the contrary contained herein, you [defendants ] shall have the right to terminate this agreement in the event COMPANY has not secured a distribution agreement with a U.S. record company within eighteen months from the date hereof, pursuant to which recordings of your performances shall be released."

Copies of the letter dated May 26, 1999 from the Group's attorneys, Leibowitz Roberts &

Ritholz, L.P., and the letter dated June 7, 1999 from Dorsey & Whitney, LLP, other attorneys on

behalf of the Group, pursuant to which the Group purported to terminate the Exclusive Recording

Agreement, are collectively annexed hereto as Exhibit "G."

39.     I regarded the grounds for termination to be preposterous.  Trans Continental's

agreement with BMG, one of the largest record and distribution companies in the world with

incredible resources in the United States, was entered into within 3 months of the date of the

Exclusive Recording Agreement.  Each Group Member expressly acknowledged and

enthusiastically embraced that relationship.  The claimed termination was almost two years since

the Group, Trans Continental and RCA began working together, virtually on a daily basis, to

create, record and promote their music.  The success we achieved speaks for itself and RCA put

its enormous financial, creative and marketing resources behind the Group.   Based upon the

combined creative input of Trans Continental and BMG, and our unparalleled financial and

promotional support, the Group became an international sensation and has experienced album

sales that are the envy of the industry.

40.     Thus, the predicate for the Group's claim of termination three (3) years after the

fact was absurd and I authorized my attorneys to respond by stating that Group Members'

purported termination of the Exclusive Recording Agreement was null and void and predicated

upon completely meritless grounds, that Trans Continental satisfied paragraph 19.12 in all

respects, and, in any event, the Group Members, acknowledged, from its inception, the BMG

License Agreement, and clearly ratified that agreement by unequivocally and enthusiastically

accepting of all of its lucrative benefits.  Copies of letters dated June 4, 1999, June 17, 1999 and June 23, 1999 are collectively annexed as Exhibit "H."

41.    The Group Members have, however, refused to withdraw their termination and have acted in callous disregard of plaintiffs' trademark and contractual rights, including, without limitation, their entry into new and conflicting agreements, their production of new master recordings, their refusal to deliver such master recordings to plaintiffs and their interference with numerous other business arrangements.

42.    Similarly, after three years of accepting and enjoying the benefits of the Exclusive Management Agreement, by letters from the Group's attorneys dated July 14, 1999, the Group also purported to terminate the Exclusive Management Agreement and other agreements on various other grounds -- all of which are disputed and none of which could predicate a termination.  Plaintiffs have similarly rejected the Group Member Defendants' purported termination of the Exclusive Management Agreement and other agreements.

43.    Notwithstanding defendants' outrageous conduct in claiming that all of our agreements had been terminated, through the summer, we continued our efforts to attempt to reach a mutually satisfactory arrangement.  We now know that such discussions were a sham and were calculated to divert Trans Continental and me from the fact that the Group was secretly negotiating a new record deal with defendant Zomba.

44.    At no time did any of the defendants seek a judicial determination of their rights to terminate any of our agreements.  Rather, they unilaterally declared our rights to be terminated and contended that they could abandon our agreements, ignore all contractual obligations and that we were without rights or remedies.

## VIII.  THE GROUP'S SURREPTITIOUS RECORDING AGREEMENT WITH ZOMBA AND OTHER WRONGFUL CONDUCT

45.     On September 7, 1999, we heard the shocking rumor that Zomba had signed the Group to a competing recording agreement and intended to release 'N Sync's recordings on a going forward basis.  Defendant Calder, Chairman and Chief Executive Officer of Zomba, subsequently confirmed these facts directly to our counsel, and there have since been various news stories and other accounts, such as a highly publicized segment on MTV News, about these matters.  See, e.g., collective Exhibit "I" attached hereto.  We have made inquiry of the defendants, through their counsel, to advise us of the details of the new recording agreement, their plans to release new recordings, and their intention to use master recordings developed and owned by plaintiffs.  As of this date, we have received no response.  I have recently seen the Group interviewed on MTV and they stated that their new album was planned for release in January, 2000 and that their new single is planned for release in November.  Neither the album nor the single have been autohorized for release by me or any of the plaintiffs.

46.     Based upon our dealings with Zomba and general knowledge in the record industry, particularly given the enormous popularity of a group such as 'N Sync, there can be no doubt that defendant Calder and Zomba knew that there were numerous albums remaining to be fulfilled as part of the Group's recording commitment under our Exclusive Recording Agreement, and that they were brazenly interfering with our contracts and business relationships.

47.     I have just learned that the Group Members Defendants secretly filed an intent-to-use trademark application No. TM 75/712737, dated May 24, 1999, with the Trademark Office for registration of the 'N Sync Mark, on their own behalves, and are attempting to prosecute such

trademark application, a copy of which is annexed hereto as <u>Exhibit "J."</u>  Once again, their conduct is in direct contravention of our exclusive rights to the trademark and a violation of section 21.04 of the Exclusive Recording Agreement in which the Group Members acknowledged our exclusive rights in the name, 'N Sync.  The application, which, is alleged under penalties of fine or imprisonment, is an "intent to use" application which, by its very terms, negates any prior use by the Group Members of the 'N Sync Mark prior to May 24, 1999.  This admission further confirms my exclusive rights.

48.     I have also learned that, as part of their scheme to circumvent our agreements, the Group, acting in concert with the other named defendants, has, at various times, been secretly producing new master recordings without the knowledge, input, consent and participation of Trans Continental.  The production of these new recordings, obviously intended to be released under the name 'N Sync, constitutes a clear and direct infringement of our trademark rights and exclusive contract rights.  We have asked defendants to identify and deliver these recordings to us but they have refused and have wrongfully retained and converted the recordings for their own illicit devises, uses and unauthorized purposes.  A copy of our letter dated September 14, 1999 to each of the defendants is annexed hereto as <u>Exhibit "K."</u>

49.     I have also learned that the Group Members, by their attorneys, without our knowledge, sent a notice to Winterland Productions, the well known merchandise company with which Trans Continental has an exclusive merchandising agreement with respect to 'N Sync, demanding that all merchandising revenues earned be paid directly to the Group rather than to Trans Continental as expressly required by our agreement.  This outrageous action has resulted in Winterland's refusal to pay more than $6 million dollars owed to Trans Continental, which

amounts would thereafter be shared with the Group Members in accordance with the terms of the Exclusive Recording Agreement, and has seriously impaired our business relationship with Winterland.

## IX.    DEFENDANTS' CONDUCT HAS CAUSED SEVERE, IMMEDIATE AND IRREPARABLE HARM

50.    The defendants' calculated actions have, in so many ways, interfered with our contractual and intellectual property rights and have severely damaged our business and business relationships.  The Zomba Recording Agreement directly contravenes our exclusive rights under the Exclusive Recording Agreement and the BMG License Agreement and contravenes our exclusive rights in and to the 'N Sync Mark.  If the Group Members and/or Zomba further effectuate the Zomba Recording Agreement, by manufacturing, distributing and promoting recordings of the Group, including those derived from any new recordings, or otherwise use the name 'N Sync in an unauthorized manner, plaintiffs will be immediately, severely and irreparably harmed.  Among the many ways our irreparable harm will be manifested, I will lose my ability to monitor the use of the 'N Sync Mark  as defendants infringe my rights and the rights of my licensees.  The infringement of the Mark will have an immediate adverse impact on our exclusive rights.  Trans Continental and I will lose control of the quality and image of the Group, and the creative control which was so clearly agreed to, and be in jeopardy of irreparably damaging the value and distinctiveness of the Group and image that I created.  Trans Continental will also fail to receive credit on all recordings to insure recognition in the industry and with the public as to its pivotal role in developing the Group.  In addition, my reputation and image in the music industry will be severely impaired and my continued ability to secure financial commitments from

-23-

significant record companies will be jeopardized and my ability to secure recording and

distribution contracts for my other groups will be undermined.  The future ability of Trans

Continental to induce prominent recording companies, such as BMG or RCA, to make a future

investment and commitment to any group created, conceived or developed by us would also be

substantially  and irrevocably impaired if, as here, the Group's name (including the good will we

created), its master recordings and other intellectual property could be diverted and

misappropriated in such a manner.  Further irreparable harm caused by defendants' outrageous

conduct must be stopped.

51.      The Group Member's wrongful claim of termination has recently caused the

licensor under the Exclusive License to engage in an attempt to obstruct my exclusive rights in

and to the 'N Sync Mark.  I have obtained from the United States District Court, District of New

Jersey, a temporary restraining order which restrains and enjoins the licensor from interfering with

my exclusive rights.  As more particularly stated herein, Defendants' conduct, if allowed to stand,

will cause severe, immediate and direct harm to me and all of the plaintiffs, and will have far

reaching impact as to the enforceability of artist agreements in the music industry.

52.      As a result of the foregoing, plaintiffs have no adequate remedy at law and seek

declaratory and injunctive relief establishing their exclusive rights to the name 'N Sync,

establishing the continued validity and enforceability of the Exclusive Recording Agreement and

the Exclusive Management Agreement, and preventing the defendants from further causing

substantial and irreparable harm.

53.      No prior application for relief has been made with respect to this matter.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 11, 1999

LOUIS J. PEARLMAN



Papa Bear!

What can I say.
It all started with one
little phone call and you
know how much I appreciate
all that you have done!

Love
Yo

'N SYNC

Christopher "Chris" Alan Kirkpatrick



















## LICENSE AGREEMENT

AGREEMENT made as of the 31st day of July_____, 1996, by and between ___Richard E. Ford_____ as President of -N- Sync Inc., a New Jersey corporation, having an address at Post Office Box 263, Scotch Plains, New Jersey 07076 (hereinafter called "PROPRIETOR") and LOUIS J. PEARLMAN, having an address at 7380 Sand Lake Road, Suite 350, Orlando, Florida 32819 (hereinafter called "LICENSEE").

### W I T N E S S E T H :

WHEREAS, PROPRIETOR is the owner of U.S. Service Mark Registration No. 1,843,498 and the service mark -N- Sync, Inc. registered thereby (hereinafter called "the Licensed Mark"); and

WHEREAS, LICENSEE desires to use the Licensed Mark in the composite mark 'N SYNC in connection with the musical group currently known as "'N Sync" (the "Group") including all recording, publishing, merchandising, television, video, motion picture, live performance, promotional, advertising and other activities related to the Group's career in the entertainment industry;

NOW, THEREFORE, in consideration of the premises and of the mutual covenants hereinafter set forth, the parties hereto, intending to be legally bound, hereby agree as follows:

1. **GRANT**

PROPRIETOR hereby grants to LICENSEE the exclusive right and license to use the Licensed Mark in the composite mark 'N SYNC in connection with the musical group currently known as "'N Sync" (the "Group") including all recording, publishing, merchandising, television, video, motion picture, live performance, promotional,

advertising and other activities related to the Group's career in the entertainment industry, but not in connection with any other kind of services or merchandise, upon the terms and conditions of this Agreement.

### 2.  SUBLICENSES

PROPRIETOR grants to LICENSEE the non-exclusive right to sublicense others to use the Licensed Mark in conjunction only with the composite mark 'N SYNC for the purposes set forth in paragraph "1" above.  All other licensed uses shall be subject to the written approval of PROPRIETOR.

### 3.  TITLE AND VALIDITY

LICENSEE agrees that it will not, during the term of this Agreement or thereafter, attach the title of PROPRIETOR in and to the Licensed Mark or attack the validity of this license.

### 4.  QUALITY OF SERVICES

The quality of all services performed by LICENSEE hereunder and the quality of all goods made by LICENSEE hereunder and the quality of all related advertising, promotional or other related uses of the Licensed Mark by LICENSEE shall be of a standard equally high as that currently maintained by PROPRIETOR and shall conform to the standards set by and be under the control of PROPRIETOR provided LICENSEE shall be advised in writing of any changes in such standards or practices.  LICENSEE agrees to cooperate with PROPRIETOR in facilitating PROPRIETOR's control of such quality, to permit reasonable inspection of LICENSEE's operation, including live performances, and to supply PROPRIETOR

2

with specimens of all uses of the Licensed Mark upon request. LICENSEE shall comply with all applicable laws and regulations and obtain all appropriate government approvals pertaining to the sale, distribution and advertising of goods and services covered by this License.

### 5.   FORM OF MARK

LICENSEE agrees to use the marks only in the form and manner with appropriate legends as prescribed from time to time by PROPRIETOR, and not to use any other trademark or service mark in combination with the Licensed Mark without prior written approval of PROPRIETOR.

### 6.   ROYALTY

In full consideration for the rights granted LICENSEE herein, LICENSEE agrees to pay to PROPRIETOR a royalty of $10.00 and other good and valuable consideration.

### 7.   HOLD HARMLESS

LICENSEE hereby indemnifies and agrees to hold PROPRIETOR harmless from and against any claim or suit arising out of alleged defects in the services and/or products of LICENSEE hereunder. PROPRIETOR shall give to LICENSEE immediate notice of any such claim or suit and afford LICENSEE the opportunity to defend the same, at LICENSEE's own expense, through counsel of LICENSEE's choice. Likewise, PROPRIETOR hereby indemnifies and agrees to hold LICENSEE harmless from and against any claim or suit arising out of alleged defects in the services and/or products of PROPRIETOR hereunder. LICENSEE shall give to PROPRIETOR immediate notice of

3

any such claim or suit and afford PROPRIETOR the opportunity to defend the same, at PROPRIETOR's own expense, through counsel of PROPRIETOR's choice.

8.   **USE INURES TO PROPRIETOR**

All use of the Licensed Mark by LICENSEE on or in connection with the services performed hereunder and any goods sold hereunder shall inure to the benefit of PROPRIETOR.   LICENSEE agrees to cooperate with PROPRIETOR in the prosecution of any service mark or trademark applications that PROPRIETOR may desire to file and for that purpose LICENSEE shall supply to PROPRIETOR from time to time such articles, brochures, advertising and similar material as may reasonably be required in connection with any such application. The rights of LICENSEE pursuant to paragraph "1" hereof shall include, to the extent necessary, the right to use any registered service marks or trademarks relating to the Licensed Mark secured by PROPRIETOR hereunder at no additional fee.

9.   **BREACH**

If LICENSEE shall violate or fail to perform any of its obligations hereunder, PROPRIETOR shall have the right to terminate this Agreement upon thirty (30) days written notice, and such notice of termination shall become effective unless LICENSEE shall completely remedy the default within such thirty-day period. Termination of the Agreement under the provisions of this paragraph shall be without prejudice to any other rights which PROPRIETOR may have against LICENSEE.

4

10. **SEVERABILITY**

If any term, condition, or provision of this License Agreement is or should be found to be void or unenforceable because of a law of the United States or of any state thereof, the validity or enforceability of the remaining provisions of this Agreement shall not be affected thereby but shall remain in full force and effect as though such void or unenforceable term, conditions or provision had never been included in this Agreement.

11. **ASSIGNMENT**

This Agreement is personal to LICENSEE and may not be assigned without the prior written consent of PROPRIETOR.  With respect to any corporation that is affiliated with the LICENSEE and that is related to the Group, PROPRIETOR agrees not to withhold consent to an assignment of this Agreement.

12. **PROPRIETOR'S RIGHTS**

All rights in the Licensed Marks other than those specifically granted herein are reserved by PROPRIETOR for its own use and benefit.  Upon the expiration or termination of this Agreement for any reason whatsoever, all rights in the Licensed Mark and any service mark registrations or trademark registrations pertaining thereto shall automatically revert to PROPRIETOR.  LICENSEE shall at any time, whether during or after the term of this Agreement, execute any documents reasonably required by PROPRIETOR to confirm PROPRIETOR's ownership of all such rights.

5

### 13.  **TERM**

This Agreement shall continue in force and effect so long as the Licensed Mark is being used by LICENSEE or the assignee of LICENSEE if this agreement is assigned under the terms and conditions of this agreement, unless sooner terminated as provided for herein.

14.  This Agreement and the rights and benefits conveyed hereunder shall inure to the heirs, successors, and assigns of PROPRIETOR and LICENSEE subject to the terms contained herein.

### 15.  **APPLICABLE LAW**

This Agreement shall be construed in accordance with the laws of the State of Florida.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed as of the day and year first above written.

ATTEST:                                         "PROPRIETOR"


_____          By: _____
Witness Signature

___Teresa D. Ford, Esq.___
Witness Name Printed


ATTEST:                                         "LICENSEE"


_____          By: _____
Witness Signature                                Louis J. Pearlman


_____
Witness Name Printed


(docs\tc\nsync\license.agr)
Rev. July 23, 1996

6

STATE OF _New Jersey_

               : SS

COUNTY OF _Union_ :

      The foregoing License Agreement was acknowledged before me this _31st_ day of _July_, 1996, by _Richard E. Ford_ as _President_ (title) of 'N SYNC, INC., a _New Jersey_ corporation, on behalf of the corporation, who is personally known to me or who produced _____ as identification.

_(signature)_
Teresa D. Ford, Esq.
An Attorney At Law of New
Jersey

Notary Public
Name Printed: _____
Commission No.: _____


STATE OF _____ :

             : SS

COUNTY OF _____ :

      The foregoing License Agreement was acknowledged before me this ____ day of _____, 1996, by LOUIS J. PEARLMAN, an individual, who is personally known to me or who produced _____ as identification.

Notary Public
Name Printed:_____
Commission No.:_____

7



## EXCLUSIVE ARTIST RECORDING AGREEMENT

AGREEMENT made this 29th day of _April_, 1996, by and between TRANS CONTINENTAL RECORDS, INC. with a principal place of business at 7380 Sand Lake Road, Suite 350, Orlando, Florida 32819 (hereinafter "COMPANY") and CHRISTOPHER ALAN KIRKPATRICK, residing at 1610 Overdale Street, Orlando, Florida 32825, and JUSTIN RANDALL TIMBERLAKE, a minor, residing at 303 Fawn Lake Drive, Millington, Tennessee 38053, and JOSHUA SCOTT CHASEZ, residing at 6511 Homestake Drive South, Bowie, Maryland 20720, and JOSEPH ANTHONY FATONE, JR., residing at 2746 Woodruff Drive, Orlando, Florida 32837, and JAMES LANCE BASS, a minor, residing at 111 Newport Circle, Clinton, Mississippi 39056, (hereinafter individually and collectively referred to as "you" or "Artist."

1.   TERM

1.01. The term of this Agreement will commence on the date hereof and shall continue pursuant to the conditions herein until the later of (1) the date nine (9) months after the date of the delivery to COMPANY of all Masters required in fulfillment of your Recording Commitment herein or (2) six (6) months after COMPANY's initial U.S. retail street date for the record delivered by you in fulfillment of your Recording Commitment herein.

1.02. Additionally, you hereby grant COMPANY seven (7) separate options to extend the term of this Agreement for additional Contract Periods ("Option Periods") on the same terms and conditions applicable to the initial Contract Period except as otherwise provided herein. Each option shall be exercised automatically unless written notice is sent by COMPANY prior to the expiration date of the Contract Period which is then in effect (the "current Contract Period"). If COMPANY so advises you in its exercise notice, such Period will begin on the date of such exercise notice. Each of the Option Periods will end the later of (1) nine (9) months after the date of the Delivery to COMPANY of all Masters required in fulfillment of your Recording Commitment for each such Option Period or (2) six (6) months after Company's initial U.S. retail street date for the last record delivered by you in fulfillment of your Recording Commitment for such Period. Notwithstanding the foregoing, in no event will any Option Period end earlier than twelve (12) months after the date of the commencement of such Period.

2.   SERVICES

2.01. During the term of this Agreement you will render your services as a performing artist for the purpose of making Master Recordings for COMPANY. (You are sometimes called "the Artist" below; all references in this Agreement to "you and the Artist" and the like, will be understood to refer to you alone).

2.02.   Artist will render services at recording sessions scheduled at times and places designated by COMPANY.  COMPANY shall select in consultation with the Artist, the musical compositions, arrangements and works to be performed by Artist, Company shall also determine the number and identity of the musicians, vocalists and other performers (if any) to be recorded at such sessions.

2.03.   Upon COMPANY'S request you shall re-record any performance recorded hereunder for the purpose of obtaining a commercially satisfactory master recording.

## 3.   RECORDING COMMITMENT

3.01.   During the Contract Period you will perform for the recording of Master Recordings, commercially satisfactory in COMPANY'S reasonable business judgment.  Such Masters shall embody the featured vocal performances of Artist.  (Any Masters accepted hereunder by COMPANY that were partially or completely recorded prior to the term of this agreement shall be deemed to have been recorded during the Contract Period).  Neither Multiple Record LPs nor Joint Recordings shall not be recorded as part of your Recording Commitment hereunder without your and COMPANY's prior written consent (your delivery of a Multiple LP or a Joint Recording shall be deemed your consent).  Without limiting the foregoing, COMPANY shall have the right to reject any master which, in the reasonable opinion of COMPANY's legal counsel, is offensive to reasonable standards of public taste or which infringes on the rights of others.

3.02.   During each Contract Period Artist shall perform for the recording of Masters for Delivery to COMPANY those Masters (the "Recording Commitment") necessary to satisfy the following schedule:

| CONTRACT PERIOD | RECORDING COMMITMENT |
|---|---|
| Initial Contract Period | 1 LP |
| First Option Period | 1 LP |
| Second Option Period | 1 LP |
| Third Option Period | 1 LP |
| Fourth Option Period | 1 LP |
| Fifth Option Period | 1 LP |
| Sixth Option Period | 1 LP |
| Seventh Option Period | 1 LP |

3.03.   You shall not deviate from the performance and Delivery schedule specified in Paragraph "3.02" above without COMPANY's written consent; timely Delivery as provided therein shall be deemed a material obligation hereunder.  You further agree not to commence the recording of any Master hereunder without COMPANY's prior approval.  The LP's will consist entirely of Masters made in the course of the then current single or LP recording project unless agreed to by COMPANY.

2

## 4.   RECORDING PROCEDURE

4.01.   You will follow the procedure set forth below in connection with Master Records made hereunder:

(a)   Except as expressly noted otherwise in this Agreement, prior to the commencement of recording in each instance the following, in order, shall apply:

(1)   Selection of producer.   You shall have mutual approval with respect to any producer other than a producer signed exclusively to COMPANY, provided in the event of a dispute, COMPANY's decision shall be final.

(2)   Selection of material, including the number of compositions to be recorded shall be made by COMPANY.   COMPANY shall not be deemed to be unreasonable in rejecting any request to record an Album consisting of more than ten masters.   Notwithstanding the foregoing, COMPANY shall consult with you with respect to the selection of material to be recorded hereunder.

(3)   Specification of accompaniment, arrangement and copying services shall be made by COMPANY.

(4)   Selection of dates of recording and studios where recording is to take place, including the cost of recording there and scheduling and booking of all studio time will be done by COMPANY.

(b)   COMPANY shall notify the appropriate Local of the American Federation of Musicians in advance of each recording session.

(c)   To the extent that any of the information described below is within your control, you shall timely supply COMPANY with all of the information it needs in order:  (1) to make payments due in connection with such Recordings; (2) to comply with any other obligations COMPANY may have in connection with the making of such Master Recordings; and (3) to prepare to release Phonograph Records derived from such Master Recordings.   Without limiting the generality of clause (2) of the preceding sentence, to the extent that such information is within your knowledge or control, you shall furnish COMPANY with all information it requires to comply with its obligations under its union agreements including, without limitation, the following:

(1)   If a session is held to record new tracks intended to be mixed with existing tracks (and if such information is requested by the American Federation of Musicians), the dates and places of the prior sessions at which such existing tracks were

3

made, and the AFM Phonograph Recording Contract (Form "B") numbers covering such sessions.

(2)   Each change of title of any composition listed in an AFM Phonograph Recording Contract (Form "B").

(3)   A listing of all the musical selections contained in Recordings Delivered to COMPANY hereunder.

4.02.   No "live" Recording or Recordings not made in full compliance with the provisions of this Agreement will apply in fulfillment of your Recording Commitment, nor will COMPANY be required to make any payment in connection with any such Recording, unless COMPANY so agrees in writing or releases the recording.   No Joint Recording will apply in fulfillment of your Recording Commitment, nor will COMPANY be required to make any payments in connection with any such Joint Recording other than royalties due you hereunder, even if such Joint Recording is released by COMPANY. Notwithstanding the foregoing, COMPANY will not require you to jointly record any masters without your prior written approval. No Recordings shall be made by unauthorized dubbing of another party's masters, excluding sampled or computerized dubbing without COMPANY's express written consent.

4.03.   Nothing in this Agreement shall obligate COMPANY to continue or permit the continuation of any recording session or project, even if previously approved hereunder, if COMPANY reasonably anticipates that the Recording Costs will exceed those specified in the approved budget or that the Recordings being produced will not be commercially satisfactory.

4.04.   The Artist will not be required to perform together with any other royalty artist without the Artist's consent. COMPANY shall not be deemed to be unreasonable in rejecting any request for the Artist to record with another royalty artist.

5.   RECORDING COSTS; SPECIAL PACKAGING

5.01.   COMPANY will pay all minimum union scale payments required to be made to Artist in connection with Recordings made hereunder, all costs of instrumental, vocal and other personnel specifically approved by COMPANY for the recording of such Master Recordings, and all other amounts required to be paid by COMPANY pursuant to any applicable law or any collective bargaining agreement with any union representing persons who render services in connection with such Master Recordings.   Notwithstanding the foregoing, Artist agrees that the Advances hereunder include the prepayment of session union scale to Artist as provided in the applicable union codes, and Artist agrees to complete any documentation required by the applicable union to implement this sentence.   (Union contracts will be paid on Artist's behalf by COMPANY, which payments shall be an Advance).   In the event COMPANY

4

should be required to make any such payments directly to a union with which Artist is affiliated, COMPANY may - in its sole discretion - reduce the Advances otherwise payable directly to Artist by the exact amount of any such payment made to such union. If, after the Delivery of Masters constituting the Singles or LP in fulfillment of your Recording Commitment, there are monies remaining in the applicable Recording Budget, then COMPANY will at your prompt written request pay you minimum union scale payment otherwise waived hereunder up to an amount which, when added to all other amounts paid by COMPANY in connection with such Masters, does not exceed the applicable Recording Fund.

5.02.   Except as otherwise provided for pursuant to Sub-Paragraph "15.01(c)" below all amounts described in Paragraph "5.01" above plus all other amounts representing direct expenses paid by COMPANY, or incurred in connection with the recording of Master Recordings hereunder (including, without limitation, travel, rehearsal, and equipment rental expenses, advances to producers, mastering, re-mixing, per diems, hotel, transportation, lodging and all studio and engineering charges, in connection with COMPANY's facilities and personnel or otherwise) are herein sometimes called "Recording Costs" and shall constitute non-returnable advances. All Special Packaging Costs will constitute Advances also.  All costs incurred by COMPANY in connection with the production or exploitation of Videos made for use in promoting sales of Records made under this Agreement will constitute non-returnable Advances. Notwithstanding the foregoing, only fifty (50%) percent of such costs incurred by COMPANY in connection with the production of Videos shall be recoupable from Record royalties due you.  The costs of copper and other masters equivalent to lacquer masters will be chargeable as Recording Costs, but the costs of other metal parts, and payments to the AFM Special Payments Fund and the Music Performance Trust Fund based upon record sales (so-called "pre-record royalties"), shall not constitute Advances.  Any Recording Costs in excess of the budget initially established, and all Special Packaging Costs, will be your sole responsibility and will be paid by you promptly (or reimbursed by you if paid by COMPANY.)

5.03.   In determining the portion of the Recording Costs (other than payments to the Artist) applicable to any Joint Recording which shall be charged against your royalties, such portion shall be computed by multiplying the aggregate amount of such Recording Costs by the same fraction used in determining the royalties payable to you in respect of such Joint Recording.

6.   ADDITIONAL ADVANCES

6.01.   All monies paid to on behalf of Artist (including but not limited to advances and expenditures for tour support and promotion) during the term of this Agreement, other than royalties paid pursuant to Paragraphs "9" and "12" below, shall constitute

5

non-returnable Advances unless otherwise expressly agreed in writing by an authorized officer of COMPANY.

6.02.   Subject to your full and timely performance of your material obligations hereunder, COMPANY shall pay to you the following advances which shall be deemed to be non-returnable but recoupable from royalties payable to you hereunder:

> A.   For Albums recorded during the Initial Option Contract Periods:
>
> | | |
> |---|---|
> | Initial Period: | $10,000 |
> | 1st Option: | 15,000 |
> | 2nd Option: | 20,000 |
> | 3rd Option: | 25,000 |
> | 4th Option: | 30,000 |
> | 5th Option: | 35,000 |
> | 6th Option: | 40,000 |
> | 7th Option: | 45,000 |

B.   Each advance above shall be paid to you one-half (1/2) upon the commencement of your recording services for the applicable Master Recording and the balance within fifteen (15) days after the completion of recording and the acceptance of the Masters by COMPANY and its distributor.

C.   Each advance designated above shall be an aggregate advance for the entire group and shall be distributed equally amongst the members of the group.

7.   <u>RIGHTS IN RECORDING</u>

7.01.   Each Master Recording made under this Agreement or during its term, from the Inception of Recording, will be considered a "work made for hire" for COMPANY; if any such Master Recording is determined not to be a "work made for hire" it will be deemed transferred to COMPANY by this Agreement, together with all rights in it. All Master Recordings made under this Agreement or during its term, from the Inception of Recording, and all Matrices and Phonograph Records manufactured from them, together with the performances embodied on them, shall be the sole property of COMPANY, free from any claims by you or any other person; and COMPANY shall have the exclusive right to copyright those Master Recordings in its name as the author and owner of them and to secure any and all renewals and extensions of such copyright throughout the world. You will execute and deliver to COMPANY such instruments of transfer and other documents regarding the rights of COMPANY in the Master Recordings subject to this Agreement as COMPANY may reasonably request to carry out the purposes of this Agreement, and COMPANY may sign such documents in your name and make appropriate disposition of them.

6

7.02.   Without limiting the generality of the foregoing, COMPANY and any person authorized by COMPANY shall have the unlimited and exclusive rights to manufacture Phonograph Records by any method nor or hereafter known, derived from the Master Recordings made under this Agreement or during its term, and to sell, transfer or otherwise deal in the same under any trademarks, tradenames and labels, or to refrain from such manufacture, sale and dealing, throughout the world.

8.   NAMES AND LIKENESSES; PUBLICITY

8.01.   COMPANY and any Licensee of COMPANY each shall have the right and may grant to others the right to reproduce, print, publish, or disseminate in any medium your name, the names, portraits, pictures and likenesses of the Artist in connection with Master Recordings made under this Agreement (including, without limitation, all professional, group, and other assumed or fictitious names used by them), and biographical material concerning them, as news or information, or the purposes of trade, or for advertising purposes in connection with the Masters made hereunder.   The uses authorized by the preceding sentence include, without limitation, the use of those names, portraits, pictures, and likenesses in the marketing of Phonograph Records.   During the term of this Agreement neither you nor Artist shall authorize any Party other than COMPANY to use the name or likeness of Artist (or any professional, group, or other assumed or fictitious name used by Artist), in connection with the advertising or sale of:

        (a)   Phonograph Records; or
        (b)   Blank Audio Tape

8.02.   You will cooperate with COMPANY, as it reasonably requests, in making photographs and preparing other materials for use in promoting and publicizing the Artist and the Recordings made under this Agreement.   You shall also have the right to approve any publicity and album cover photographs of you, and any biographies provided, should you fail to notify us of any disapproval within five (5) business days after your receipt of such material, your approval shall be deemed automatic.   You agree not to unreasonably withhold your approval herein.

9.   ROYALTIES

9.01.   In consideration of (i) the copyright ownership provided below; (ii) COMPANY's rights to use Artist's name and likeness as provided herein; and (iii) the representations and warranties contained herein, COMPANY agrees to pay you in connection with the Net Sale of Phonograph Records (other than audio-visual records) consisting entirely of Masters hereunder the following net royalty receipts computed at the applicable percentage indicated below, of the applicable Royalty Base Price with respect to the Record concerned, it being agreed that such

7

royalties will be computed and paid in accordance with Paragraph "9" & "11" and Paragraph "10" & "11" below and the other provisions set forth herein.

9.02.   COMPANY shall pay to you a royalty equivalent to fifty percent (50%) of all net royalties received by company in connection with the sales of recordings derived from the Masters hereunder.   Said royalties shall be calculated and determined in the same manner in which COMPANY's licensees and distributor account to company.

9.03.   (a)  If COMPANY licenses Videos (i.e., sight and sound records designed to reproduce the audio performances of recording artists together with a visual image) or make commercial use of such Videos embodying Artist's performances (other than as provided below), the royalty payable by COMPANY to you shall be one-half (1/2) of COMPANY's net receipts derived therefrom after deducting (i) any and all direct costs and/or third party payments in connection with the creation, manufacture, exploitation or use of said videos; (ii) any royalty paid to the producer(s) of the Masters recorded hereunder which are embodied in any such Videos; and (iii) any distribution fees that COMPANY may be required to pay.   It is specifically agreed that COMPANY shall have the right to license Videos to third parties (e.g., club services) without any payment to you as long as COMPANY does not receive any such payment.   To the extent COMPANY receives any payment for such promotional uses, COMPANY will credit your account with one-half (1/2) of the net receipts paid to COMPANY as provided in this Paragraph "9.04".

9.04.   The terms "net receipts", "net sums", or "net amount received" and similar terms in this Paragraph "9" shall mean amount received by COMPANY in connection with the subject matter thereof which are solely attributable to the Masters hereunder less any costs or expenses which COMPANY is required to pay or credit to third parties.

10.   <u>MISCELLANEOUS ROYALTY PROVISIONS</u>

Notwithstanding   anything   to   the   contrary   contained   in Paragraph "9" above:

10.01.   In respect of Joint Recordings, the royalty rate to be used in determining the royalties payable to you shall be computed by multiplying the royalty rate otherwise applicable thereto by a fraction, the numerator of which shall be one and the denominator of which shall be the total number of royalty artists whose performances are embodied on a Joint Recording.

10.02.   With respect to Phonograph Records embodying Master Recordings made hereunder together with other Master Recordings, the royalty rate payable to you shall be computed by multiplying

8

the royalty rate otherwise applicable by a fraction, the numerator of which is the number of sides contained thereon embodying Master Recordings made hereunder and the denominator of which is the total number of sides contained on such Record. Further, Company shall not embody more than two Masters recorded hereunder on any LP that includes masters not recorded hereunder without Artist's consent which consent shall not be unreasonably withheld.

10.03.   No royalties shall be payable to you in respect of Phonograph Records sold or distributed by COMPANY or its Licensees for promotional purposes, as cutouts after the listing of such Records has been deleted from the catalog of COMPANY or the particular Licensee, as "free", "no charge" or "bonus" Records (whether or not intended for resale), or to radio stations. No royalties will be payable to you on "sampler" Records in tape form intended for free distribution to automobile purchasers and containing not more than two Recordings made under this Agreement.

10.04.  With respect to so-called home video devices embodying Artist's performances (e.g., video cassettes or discs intended primarily for home use), you will be entitled to a royalty computed as provided in Paragraph "9" above.

11.  <u>ROYALTY ACCOUNTINGS</u>

11.01.   COMPANY will compute your royalties as of each June 30th and December 31st for the prior six months, in respect of each such six-month period in which there are sales or returns of Records covered by this Agreement. On the next September 30th or March 31st, respectively, COMPANY will send you a statement covering those royalties which are due after deducting unrecouped Advances.    COMPANY   shall   maintain   royalty   reserves   against anticipated returns exchanges, refunds and credits. Reserves will be maintained in accordance with Company's standard policy and such reserves shall be fully liquidated over four (4) consecutive semi-annual accounting periods commencing upon the rendition of the third accounting statement rendered following the statement with respect   to   which   such   reserve   was   originally   maintained.    If COMPANY makes any overpayment to you, you will reimburse COMPANY for it;  COMPANY may also deduct it from any payments due or becoming due to you. If COMPANY pays you any royalties on Records which are returned later, those royalties will be considered overpayments.

11.02.   Sale of Records for distribution outside the United States are called "foreign sales" below. COMPANY will compute your royalties for any foreign sale in the same national currency in which COMPANY's Licensee pays COMPANY for that sale, and COMPANY will credit those royalties to your account at the same rate of exchange at which the Licensee pays COMPANY for that purpose of accounting to you, COMPANY will treat any foreign sale as a sale made during the same six (6) month period in which COMPANY receives

9

its Licensee's accounting and payment for that sale. If any COMPANY Licensee deducts any taxes from its payments to COMPANY, COMPANY may deduct a proportionate amount of those taxes from your royalties. If any law, any government ruling, or any other restriction affects the amount of the payments which a COMPANY Licensee can remit to COMPANY, COMPANY may deduct from your royalties an amount proportionate to the reduction in the Licensee's remittances to COMPANY. If COMPANY cannot collect payment for a foreign sale in the United States in U.S. Dollars it will not be required to account to you for that sale.

11.03. COMPANY will maintain books and records which report the sales of the Phonograph Records for which royalties are payable to you. You may, at your own expense, examine those books and records, as provided in this paragraph only. You may make those examinations only for the purpose of verifying the accuracy of the statements sent to you under Paragraph "11.01" above. You may make such an examination for a particular statement only once, and only within one (1) year from the date said statement is rendered by COMPANY under Paragraph "11.01" above. You may make those examinations only during COMPANY's usual business hours, and at the place where it keeps the books and records to be examined. If you wish to make an examination you will be required to notify COMPANY at least thirty (30) days before the date when you plan to begin it. If your examination has not been completed within one (1) month from the time you begin it, COMPANY may require you to terminate it on seven days' notice to you at any time; COMPANY will not be required or permit you to continue the examination after the end of that seven (7) day period. You will not be entitled to examine any manufacturing records or any other records that do not specifically report sales of Phonograph Records, or gratis distributions of Phonograph Records, on which royalties are payable to you. You may appoint a certified public accountant to make such an examination of you, but not if he or his firm has begun an examination of COMPANY's books and records for any Person except you unless the examination has been concluded.

11.04. If a certified public accountant performs the examination for you, he will review his tentative findings with those members of the COMPANY Finance staff who COMPANY designates before he renders a report to you in order to remedy any factual errors and clarify any issues which may have resulted from misunderstanding. Your accountant's report will be completed and a copy of it will be delivered to COMPANY within sixty (60) days from date his examination ends.

11.05. If you have any objections to a royalty statement, you will give COMPANY specific notice of that objection and your reasons for it within one (1) year after the date when COMPANY sends you that statement under Paragraph "11.01" above. Each royalty statement will become conclusively binding on you at the end of that twelve (12) month period, and you will no longer have

any right to make any other objections to it.  You will not have the right to sue COMPANY in connection with any royalty accounting, or to sue COMPANY for royalties on Records sold during the period a royalty accounting covers, unless you commence the suit within that one (1) year period after a statement is rendered which is the subject of your claim.  If you commence suit on any controversy or claim concerning royalty accountings rendered to you under this Agreement, the scope of the proceeding will be limited to determination of the amount of the royalties due for the accounting periods concerned, and the court will have no authority to consider any other issues or award any relief except recovery of any royalties found owing.  Your recovery of any such royalties will be the sole remedy available to you or the Artist by reason of any claim related to COMPANY's royalty accountings.  Without limiting the generality of the preceding sentence, neither you nor the Artist will have any right to seek termination of this Agreement or avoid the performance of your obligations under it by reason of any such claim except if such claim is based upon fraud.

11.06.  Neither party hereto shall be deemed to be in material breach of any of our respective obligations hereunder unless and until the aggrieved party shall have given the defaulting party specific written notice of the nature of such breach and the defaulting party shall have failed to cure such breach within sixty (60) days after receipt of such written notice.  Nothing herein contained shall constitute or be deemed or construed to constitute a partnership or other fiduciary relationship between, or a joint venture by, you and me.

12.  <u>LICENSES FOR MUSICAL COMPOSITIONS</u>

12.01.    (a)  (1)  You grant to us an irrevocable license, under copyright, to reproduce each controlled composition on Phonograph Records and distribute them in the United States and Canada.

(2)  For that License, COMPANY will pay Mechanical Royalties at three-fourths (3/4) of the minimum compulsory license rate per Composition at the time of the commencement of the recording of the Master concerned but in no event later than the last date for timely Delivery of such Master for Records manufactured for distribution in the United States and at three-fourths (3/4) of the minimum compulsory rate per Composition for Records manufactured for distribution in Canada, on the basis of Net Sales.  The Mechanical Royalty on any Record described in Paragraph "9.02" above or sold through a Club Operation will be three-fourths (3/4) of the amount fixed in the preceding sentence.  If the Composition is an arranged version of a public domain work, the Mechanical Royalty on it will be half of the amount fixed in the first sentence.  No Mechanical Royalties will be payable for any Records described in Paragraph "10.03" above or for any other records for which COMPANY does not receive

11

payment for sale as a full price, mid line, budget or premium record.

(b)  The total Mechanical Royalty for all Controlled Compositions, will be limited to ten (10) times the amount which would be payable on it under Paragraph "12.01 (a)(2)" if it contained only one Controlled Composition.  The total Mechanical Royalty on any Single will be limited to twice that amount.

(c)  COMPANY will compute Mechanical Royalties on Controlled Compositions as of the end of each calendar semi-annual period in which there are sales or returns of Records on which Mechanical Royalties are earned hereunder.  On the next September 30th, or March 31st, COMPANY will send a statement covering those royalties and will pay any net royalties which are due.  Mechanical Royalty reserves maintained by COMPANY against anticipated returns and credits will not be held for any unreasonable period in any case.  If COMPANY makes any overpayment of Mechanical Royalties to Artist for Controlled Compositions only, you will reimburse COMPANY for it;  COMPANY may also recoup it from any payments due or becoming due to you.  If COMPANY pays any Mechanical Royalties on Controlled Compositions on Records which are returned later, those royalties be considered overpayments.  If the total amount of the Mechanical Royalties which COMPANY pays on any Record consisting of Master Recording made under this Agreement (including Mechanical Royalties for compositions which are not Controlled Compositions) is higher than the limit fixed for that Record under Subparagraph "12.01(b)" above, that excess amount will be considered an overpayment also.

(d)  Any assignment made of the ownership on copyrights in or the rights to license or administer the use of any Controlled Compositions shall be subject to the terms set forth above and Artist will make any modifications, if necessary to conform these terms to the terms and provision of any such assignment.

12.02.  You also grant to COMPANY, for promotional purposes only, an irrevocable license under copyright to reproduce each Controlled Composition in motion pictures and other audio-visual works ("pictures") and to distribute and to perform those pictures throughout the world,and to authorize others to do so.  COMPANY will not be required to make any payment in connection with those uses unless COMPANY received any payment in connection with those pictures.

12.03.  If the copyright in any Controlled Composition is owned or controlled by anyone else, you will use your good faith efforts to cause that Person to grant COMPANY the same rights described in Paragraphs "12.01" and "12.02", above on the same terms.  If the copyright in any Controlled Composition is transferred, the transfer will be made subject to this Agreement.

12

12.04.   With respect to each Controlled Composition herein, you will cause the issuance of effective licenses, under copyright and otherwise, to reproduce each Controlled Composition on Phonograph Records and distribute those Records outside the United States and Canada, on terms not less favorable to COMPANY or its Licensees that the terms most favorable to Phonograph Manufacturers prevailing on a general basis in the country concerned.

13.   <u>WARRANTIES; REPRESENTATIONS; RESTRICTIONS; INDEMNITIES</u>

13.01.   You warrant and represent:

(a)   You have the right and power to enter into and fully perform this Agreement.

(b)   COMPANY shall not be required to make any payments of any nature for, or in connection with, the acquisition, exercise or exploitation of rights by COMPANY pursuant to this Agreement except as specifically provided in this Agreement.

(c)   Artist is or will become and will remain to the extent necessary to enable the performance of this Agreement, a member in good standing of all labor unions or guilds, membership in which may be lawfully required from the performance of Artist's services hereunder.

(d)   No materials, as hereinafter defined, or any use thereof, will violate any law or infringe upon or violate the rights (including copyrights and/or right of privacy) of any Person. "Materials" as used in this Paragraph, means:   (1) a Controlled Composition, (2) each name used by the Artist, individually or as a group, in connection with Recordings made hereunder, and (3) all other musical, dramatic, artistic and literary materials, ideas, and other intellectual properties, furnished or selected by you, the Artist and contained in or used in connection with any Recordings made hereunder or the packaging, sale, distribution, advertising, publicizing or other exploitation thereof.

13.02.   During the term of this Agreement, you will not enter into any Agreement which would interfere with the full and prompt performance of your obligations hereunder, and the Artist will not perform, or render any services as a performing artist, for the purpose of making Master Recordings or Phonograph Records for any Person except COMPANY.  The Artist will not perform any "restricted Composition" (defined below) for any person except COMPANY for the purpose of making Master Recordings or Phonograph Records, at any time before the later of the following dates:   (a) the date five (5) years after the Recording of the Composition for COMPANY, or (b) the date two (2) years after the expiration of the term of this Agreement.  A "restricted Composition", for the purposes of this

13

Paragraph, is a Composition which shall have been recorded by the Artist for a Master Recording made or delivered to COMPANY under this Agreement. Neither you nor the Artist shall authorize or knowingly permit the Artist's performances to be recorded for any purpose without an express written Agreement prohibiting the use of such recording on Phonograph Records in violation of the foregoing restrictions.

13.03.   If you become aware of any unauthorized recording, manufacture, distribution or sale by any third party contrary to the foregoing re-recording restrictions you will notify COMPANY thereof and shall cooperate with COMPANY in the event that COMPANY commences any action or proceeding against such third party.

13.04.   The services of the Artist are unique and extraordinary, and the loss thereof cannot be adequately compensated in damages, and COMPANY shall be entitled to seek injunctive relief to enforce the provisions of this Agreement.

13.05.   You will at all times indemnify and hold harmless COMPANY and any Licensee of COMPANY from and against any and all claims, damages, liabilities, costs and expenses, including legal expenses and reasonable counsel fees, arising out of any breach by you of any warranty or representation made by you in this Agreement which is reduced to a final judgment r mutually approved settlement. Pending the resolution of any claim in respect of which COMPANY is entitled to be indemnified, COMPANY may withhold monies which would otherwise be payable to you under this Agreement in an amount not to exceed your potential liability to COMPANY under this paragraph. You shall have the right to post a bond in form, amount and duration and with a bonding company satisfactory to COMPANY, and the event you shall post such a bond, COMPANY shall no longer withhold monies due hereunder in respect of which such bond shall be posted. Company agrees to give Artist notice of any claim, demand or action to which the foregoing indemnity applies, and Artist may participate in the defense of same at Artist's expense, through counsel of Artist's choice; provided, that the final control and disposition of same (by settlement, compromise or otherwise) shall remain with Company.

14.  DEFINITIONS

14.01.   "Record" or "Phonograph Record" means all forms of reproductions, now or hereafter known, manufactured or distributed primarily for use, school use, juke box use or use in means of transportation, including records of sound alone and audio-visual recordings.

14.02.   "Master", "Master Recording" or "Recording" means any recording of sound, whether or not coupled with a visual image, by any method and on any substance or material, whether now or

14


hereafter known, which is intended for use in the recording, production and/or manufacture of Phonograph Records.

14.03. "Performance" means singing, speaking, conducting or playing an instrument, along or with others.

14.04. The words "Single Records" or "Single" means a Record containing not more than three (3) sides.

14.05. "Long Play Single" means a 12-inch 33-1/3 rpm disc Phonograph Record embodying not more than three (3) Sides.

14.06. "Mini LP" or "EP" means any Record, other than an LP, containing more than three (3) Sides.

14.07. The term "Multiple Record LP" means an LP containing two or more 12-inch 33-1/3 rpm records packaged as a single unit or equivalent. For purposes of the Recording Commitment hereunder and for computing the applicable Recording Fund or Advance, a Multiple Record LP is accepted by COMPANY shall be deemed only one (1) LP.

14.08. "Person" means any individual, corporation, partnership, association or other organized group of persons or legal successors or representatives of the foregoing.

14.09. "Side" means a Recording of sufficient playing time to constitute one side of a 45 rpm record, but not less than three (3) minutes of continuous sound embodying performances by Artist.

14.10. (a) "Royalty Base Price" means (i) with respect to Records sold for distribution in the United States, the retail selling price of one hundred (100%) percent of net sales through normal retail channels of phonograph records embodying masters computed on such records, except as otherwise provided herein. Notwithstanding the foregoing, in the event any of COMPANY's distributor should account to COMPANY for sales of records hereunder on a basis less than one hundred (100%) percent, or should calculate royalties on the basis of the wholesale selling price, then with respect to those sales only the royalty basis shall be adjusted to equal that computed by such distributor. Royalties as aforesaid shall be calculated for sales during the applicable accounting period for the computation of royalties to be made hereunder, it being understood that a separate calculation of the price shall be made for each price configuration of Phonograph Records manufactured and sold by COMPANY; and (ii) with respect to Records sold hereunder for distribution outside the United States. The Royalty Base Price shall be the dealer price utilized by COMPANY's distributor or its licensee in computing monies to be paid to COMPANY for the Record concerned, unless COMPANY distributes its own records in a particular country, in which event the Royalty Base Price shall be the suggested or

15

applicable retail price in the country of manufacture or sale, as COMPANY is paid, or, in the absence in a particular country of such suggested retail list price, the price as may be established by COMPANY distributors in conformity with the general practice of the recording industry in such country, provided that COMPANY shall not be obligated to utilize the price adopted by the local mechanical copyright collection agency for collection of Mechanical Royalties. The Royalty Base Price shall be less all excise, sales and similar taxes and less the applicable container charge.

(b)   COMPANY may at some time change the method by which it computes royalties in the United States from a basis to some other basis (the "New Basis"), such as, without limitation, a retail basis.  The New Basis will replace the then-current Royalty Base Price and the royalty rate shall be adjusted to the appropriate royalty which would be applied to the New Basis so that the dollars and cents royalty amounts payable with respect to the top-line product would be the same as that which was payable immediately prior to such New Basis; for sales other than top-line product, for which there is a New Basis, the adjusted royalty rate for such sales of top-line product.  If there are other adjustments made by COMPANY that would otherwise make the New Basis more favorable (a particular example of which might be the distribution of smaller quantities of free goods than theretofore distributed) then the benefits of such other adjustments will be taken into consideration in adjusting the royalty rate.

(c)   Notwithstanding anything to the contrary contained herein, the Wholesale Price with respect to so-called home video devices manufactured and distributed by COMPANY shall be COMPANY's published wholesale price as of the commencement of the accounting period concerned.

14.11.   "Container Charge" shall mean ten (10%) percent of the Retail Selling Price for a single-fold disc Record in a standard sleeve with no inserts or for any other Record other than as hereinafter provided; fifteen (15%) percent of the Suggested List Price for an LP in a double-fold or gatefold, or nonstandard sleeve or jacket or with inserts; and twenty (20%) percent of such Price for Records, cassette tape configuration and twenty-five (25%) percent of such price for records in non-disc form, i.e.: audio-visual Records, or compact discs, audiophile records, DAT and New Record Configurations.  There shall be no Container Charge with respect to seven (7) inch Single Records shipped in a plain stock sleeve.

14.12.   "Video Base Price" means with respect to Videos sold for distribution, COMPANY's distributor's Wholesale Price during the applicable accounting period.

14.13.   "LP" or "Album" means a sufficient number of Masters embodying Artist's performances to comprise one (1) or more 12-

16

inch, 33-1/3 long-playing Phonograph Record album, or the equivalent, of not less than thirty-eight (38) minutes of playing time. COMPANY may request that up to ten (10) Masters be recorded for the LP delivered hereunder.

14.14.   The words "term of this Agreement" or "period of this Agreement" or "term hereof" or "so long as this Agreement remains in force" or words of similar connotation shall include the initial period of this Agreement.

14.15.   "United States" means the United States of America, its territories, possessions and military exchanges.

14.16.   "Contract Period" means the initial period and/or an option period as the case may be.

14.17.   "Composition" means - a single musical composition, irrespective of length, including all spoken words and bridging passages and including a medley.

14.18.   "Controlled Composition" means a Composition wholly or partly written, owned or controlled by you, the Artist, or any person in which you, the Artist, has a direct or indirect interest.

14.19.   "Budget Record" means a Record bearing a Gross Royalty Base Price less than or equal to sixty-seven (67%) percent for the Retail Selling Price in the country concerned of top-line single disc LPs.

14.20.   "Net Sales" means one-hundred (100%) percent of gross sales of singles, LPs and EPs, and eighty-five (85%) compact discs, DAT and other audiophile recordings paid for returns and credits, after deduction of reserves against anticipated returns and credits. "Net Sales" for foreign sales pursuant to license agreements shall be calculated and then payable in the same manner as the applicable agreement. In the event COMPANY should enter into a Distribution Agreement that accounts to COMPANY on a basis of less than one hundred (100%) percent, COMPANY shall conform the definition of "Net Sales" to such definition as provided in the Distribution Agreement.

14.21.   "Advance" means a prepayment of royalties or any other payments or on behalf of Artist and shall be chargeable against and recoupable from any royalties otherwise payable hereunder.

14.22.   "Territory" shall mean the Universe.

14.23.   "Sales Through Normal Retail Channels" means sales other than as described in Paragraph "9.02" and "9.03" above.

17

14.24.   "Mechanical Royalties" means royalties payable to any Person for the right to reproduce and distribute copyrighted musical compositions on Phonograph Records.

14.25.   "Joint Recordings" means Masters embodying the Artist's performance and any performance by another artist with respect to whom COMPANY is obligated to pay royalties.

14.26.   "Mid-line" record means a record bearing a Gross Royalty Base that is less than or equal to eighty (80%) percent of the Gross Royalty Base in the country concerned of top-line records in the configuration concerned.  (See Paragraph "9.02" above).

## 15.   REMEDIES

15.01.   Without limiting any other rights and remedies of COMPANY hereunder, if you fail to Deliver any Masters hereunder within the time prescribed in Paragraph "1" above, COMPANY will have the following options:

(a)   to suspend COMPANY's obligations to make payments to you under this Agreement until you have cured the default;

(b)   to terminate the term of this Agreement at any time, whether or not you have commenced curing the default before such termination occurs; and

(c)   to require you to repay to COMPANY the amount, not then recouped, of any Advance previously paid to you by COMPANY and not specifically attributable under Paragraph "6" above to an Album which has actually been fully Delivered.  COMPANY may exercise each of those options by sending you the appropriate notice.  If COMPANY terminates the term under Paragraph "15.01 (b)" above all parties will be deemed to have fulfilled all of their obligations under this Agreement except those obligations which survive the end of the term (such as indemnification obligations, re-recording restrictions, accounting and your obligations under Paragraph "15.01 (c)".)  No exercise of any option under this paragraph will limit COMPANY's rights to recover damages by reason of your default, its rights to exercise any other option under this paragraph, or any of its other rights.

15.02.   If Artist's voice should be or become materially and permanently impaired or if Artist should otherwise become physically unable to perform recording and/or for a period of six (6) months or more personal appearances and/or if Artist should cease to pursue a career as an entertainer, COMPANY may elect to terminate this Agreement, by notice to you at any time during the period in which such contingency arose or continues and thereby be relieved of any liability for the executory provisions of this Agreement.

18

15.03.   If because of:  act of God; inevitable accident; fire, lockout; strike or other labor dispute; riot or civil commotion; act of public enemy; enactment, rule, order or act of any government or governmental instrumentality (whether federal, state, local or foreign); failure of technical facilities; failure or delay of transportation facilities; illness or incapacity of any performer or producer; or other cause of similar or difference in nature not reasonably within COMPANY's control; COMPANY is materially hampered in the recording, manufacture, distribution or sale of records, then, without limiting COMPANY's rights, COMPANY shall have the option by giving you notice to suspend the running of the then current Contract Period for the duration of any such contingency plus such additional time as is necessary so that COMPANY shall have no less than thirty (30) days after the cessation of such contingency in which to exercise its options, if any, for the next following Option Period.   Notwithstanding the foregoing in the event any such suspension continues for a period in excess of six (6) months, you shall have the right to terminate this Agreement upon written notice to COMPANY following such six (6) month period.

16.   AGREEMENTS, APPROVAL & CONSENT

16.01.   As to all matters treated herein to be determined by mutual Agreement, or as to which any approval or consent is required, such Agreement, approval or consent will not be unreasonably withheld.

16.02.   Your Agreement, approval or consent, whenever required, shall be deemed to have been given unless you notify COMPANY otherwise within five (5) business days following the date of COMPANY's written request to you therefor.

17.   NOTICES

17.01.   Except as otherwise specifically provided herein, all notices hereunder shall be in writing and shall be given by personal delivery, registered or certified mail or telegraph (prepaid), at the addresses shown above, or such other address or addresses as may be designated by either Party.  Notices shall be deemed given when mailed or when transmitted by telegraph, except that notice of change of address shall be effective only from the date of its receipt. Each notice sent to COMPANY shall be directed to COMPANY:  Trans Continental Records, Inc., 7380 Sand Lake Road, Suite 350, Orlando, Florida 32819; Attention: Louis J. Pearlman, President;  and  a  copy  of  each  such  notice  shall  be  sent simultaneously to William B. Pringle, III, Esquire, Post Office Box 691222, Orlando, Florida  32869-1222.

19

## 18.   EVENTS OF DEFAULT

18.01.    In the event of your or our dissolution or the liquidation of your or our assets, or the filing by or against you of a petition for liquidation or reorganization under Title 11 of the United States Code as now or hereafter in effect or under any similar statute relating to insolvency, bankruptcy, liquidation or reorganization, or in the event of the appointment of a trustee, receiver or custodian for you or for any of your property, or in the event that you shall make an assignment for the benefit of creditors or commit any act for, or in, bankruptcy or become insolvent, or in the event you shall fail to fulfill any of your material obligations under this Agreement for any other reason, then at any time after the occurrence of any such event and subject to the provisions as set forth in paragraph "11.06" above and "15.01" above, COMPANY shall have the option by notice to terminate this Agreement.   You shall have the right to terminate this Agreement upon written notice to COMPANY in the event COMPANY declares bankruptcy and files a petition for protection from their creditors.

### 18.02.   COMPLIANCE WITH LAWS/MORALS

During the term of this agreement, you shall observe and comply with all federal, state and local laws, ordinances, rules and regulations, including but not limited to, those laws prohibiting use/sale of controlled substances. Additionally, you agree not to commit any act which shall subject COMPANY, its officers, employees, assigns or yourself to public ridicule, humiliation or disrepute.   Failure by you to comply with the provisions of this paragraph shall give COMPANY the right to immediately terminate this agreement.

## 19.   MISCELLANEOUS

19.01.    The Artist will, prior to the release of the LP hereunder, prepare an act of professional quality and will during the term of this Agreement, actively pursue his career as an entertainer in the live engagement field.

19.02.    (a) This Agreement contains the entire understanding of the Parties relating to its subject matter.   No change or termination of this Agreement will be binding upon COMPANY unless it is made by an instrument signed by an officer of COMPANY.   A waiver by either Party of any provision of this Agreement in any instance shall not be deemed to waive it for the future.    All remedies, rights, undertakings, and obligations contained in this Agreement shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking, or obligation of either Party.

20

(b) No change of a budget prescribed in this Agreement or established under it will be effective unless the change is approved in writing by COMPANY.

19.03.   Those provisions of any applicable collective bargaining Agreement between COMPANY and any labor organization which are required, by the terms of such Agreement, to be included in this Agreement shall be deemed incorporated herein.

19.04.   Each option and election granted to COMPANY in this Agreement, including, without limitation, to suspend the running of one (1) or more period of time, to terminate the term, to acquire the direct and individual services of a leaving member (if a group artist is involved), or otherwise, is separate and distinct, and the exercise of any such option or election shall not operate as a waiver of any other option or election unless specifically so stated by COMPANY in its notice of exercise of such option or election.

19.05.   You shall not be entitled to recover damages or to terminate the term of this Agreement by reason of any breach by COMPANY of its material obligations hereunder, unless COMPANY has failed to remedy such breach within sixty (60) days following receipt of your notice thereof.

19.06.   This Agreement has been entered into in the State of Florida, and the validity, interpretation and legal effect of this Agreement shall be governed by the laws of the State of Florida applicable to contracts entered into and performed entirely within the State of Flora. The courts (state and federal), only will have jurisdiction of any controversies regarding this Agreement; any action or other proceeding which involves such a controversy will be brought in those courts, in Florida and not elsewhere. Any process in any such action or proceeding may, among other methods, be served upon you by delivering it or mailing it, by registered or certified mail, directed to the address first above written or such other address as you may designate pursuant to Paragraph "17" above.   Any such process may, among other methods, be served upon the Artist or any other Person who approves, ratifies, or assents to this Agreement to induce COMPANY to enter into it, by delivering the process or mailing it by registered or certified mail, directed to the address first above written or such other address as the Artist or the other Person concerned may designate in the manner prescribed in Paragraph "17" above.   Any such delivery or mail service shall be deemed to have the same force and effect as personal service within the State of Florida.

19.07.   In entering into this Agreement, and in providing services pursuant hereto, you shall have the status of an independent contractor and nothing herein contained shall contemplate or constitute you as COMPANY's agent(s) or employee(s).

21

19.08.    This Agreement shall not become effective until executed by all proposed Parties hereto.

19.09.    Any and all riders annexed hereto together with this basis document shall be taken together to constitute the Agreement between you and COMPANY.

19.10.    You hereby grant to us, or our affiliate 'N Sync Productions, Inc. or our designee all merchandising rights and the sole and exclusive right to use your name (both legal and professional), likeness, picture and portrait in any manner whatsoever in connection with the exercise of the merchandising rights herein granted.   COMPANY or its designee shall have the right to grant to the others (including companies affiliated with us) upon such terms as we shall see fit, the right to exercise or cause to be exercised such merchandising rights.  COMPANY shall pay to you, in addition to any and all monies provided for in this Agreement, one-half (1/2) of all net monies received by us in connection with the exercise of said merchandising rights.

19.11.    COMPANY shall retain tutors and a parent or parent-appointed guardian to oversee and supervise the education and maintenance of such members of the group that are under the age of eighteen years during periods of recording and touring.  The costs and expenses related to such personnel shall be paid by COMPANY and shall be deemed to be an additional recoupable advance hereunder.

19.12.    Notwithstanding anything to the contrary contained herein, you shall have the right to terminate this agreement in the event COMPANY has not secured a distribution agreement with a U.S. record company within eighteen months from the date hereof, pursuant to which recordings of your performances shall be released.

20.  PUBLISHING AGREEMENT

You hereby assign to COMPANY, or a publishing company designated by COMPANY, One Hundred (100%) percent of all the right, title and interest in and to the Controlled Compositions, including without limitation, the rights in and to the copyrights therein and the renewal rights thereto.   You shall simultaneously herewith enter into the attached Exhibit A copyright transfer and assignment, pursuant to which COMPANY or such publishing company shall acquire said rights, title and interest, together with the exclusive right to Administer the copyrights for the term of the copyright in each such Controlled Composition.   Artist shall receive their public performance royalties for the United States directly from the performing rights society to which they are affiliated.   "IT IS SPECIFICALLY UNDERSTOOD AND AGREED THAT THIS PARAGRAPH (AND PROVISIONS CONTAINED IN THIS AGREEMENT RELATED THERETO) APPLIES ONLY TO THOSE CONTROLLED COMPOSITIONS RECORDED BY

22

ARTIST HEREUNDER AND COMPANY SHALL HAVE NO CLAIM TO, OR ANY RIGHT, TITLE OR INTEREST IN, ANY COMPOSITIONS WHOLLY OR PARTLY WRITTEN, OWNED, OR CONTROLLED BY YOU AND/OR ARTIST WHICH ARE NOT RECORDED HEREUNDER."

## 21.   VIDEO AND SIDEPERSON PROVISIONS

21.01.   If COMPANY shall decide to produce one (1) or more Videos during the term hereof (which COMPANY is under no obligation whatsoever to do), the following shall be applicable:

(a)   The selection(s) to be embodied in each Video shall be designated by COMPANY and Artist.

(b)   Each Video shall be shot on a date or dates and at a location or locations to be designated by COMPANY and subject to your reasonable availability.

(c)   The producer and director of each Video, and the concept or script for each Video, shall be mutually approved by COMPANY and Artist.  COMPANY shall engage the producer, director and other production personnel for each Video, and shall be responsible for and shall pay the production costs of each Video in an amount not in excess of a budget to be established in advance by COMPANY in consultation with you (the "Production Budget").  You shall be responsible for and shall pay the production costs for each Video which are in excess of the production costs caused by your delay and/or circumstances that are within your control for which you are responsible pursuant to the foregoing (which COMPANY is in no way obligated to do), you shall promptly reimburse COMPANY for such excess costs upon demand and, without limiting COMPANY's other rights and remedies, if you fail to so reimburse COMPANY, then COMPANY may deduct an amount equal to such excess from any monies otherwise payable to you hereunder.  Your compensation for performing in such Videos shall be limited to any minimum amounts required to be paid for such performances pursuant to any collective bargaining Agreement pertaining thereto, provided, however, that you hereby waive any right to receive such compensation to the extent such right may be waived.

(d)   COMPANY shall be the sole owner of all worldwide rights in and to each Video (including the worldwide copyrights therein and thereto.).

(e)   You shall issue (or shall cause the music publishing companies having the right to do so to issue) (i) worldwide, perpetual synchronization licenses, and (ii) perpetual licenses for public performance in the United States (to the extent that ASCAP or BMI are unable to issue same), to COMPANY at no costs for the use of all Controlled Compositions in any such Videos effective as of the commencement of production of the applicable Video (and your execution of this Agreement shall constitute the issuance of such

23

licenses by any music publishing company which is owned or controlled by you, or by any Person owned or Controlled by you). In the event that you shall fail to cause any such music publishing company to issue any such license to COMPANY, and if COMPANY shall be required to pay any fee to such music publishing company in order to obtain any such license, then COMPANY shall have the right to deduct the amount of such license fee from any and all sums otherwise payable to you hereunder.

(f)   COMPANY shall have the right to use and allow others to use each Video for advertising and promotional purposes with no payment to you except as otherwise provided herein.   As used herein, "advertising and promotional purposes" shall mean all uses for which COMPANY receives no monetary consideration from licensees in excess of its costs and expenses in connection with the creation or exploitation of the Video, an incidental fee and a reasonable reimbursement for its administrative costs.   Compensation derived from such promotional uses due you hereunder shall be credited to your account as provided in Paragraph "9.05" above.

(g)   COMPANY shall also have the right to use and allow others to use the Videos for commercial purposes.   As used in this subparagraph, "commercial purposes" shall mean any use which is not for "advertising and promotional" purposes (as defined above) for which COMPANY received monetary consideration in excess of its Compensation derived from such commercial exploitation and due you hereunder shall be credited to your account as provided in Paragraph "9.05" above.

(h)   Each Video shall be deemed a Material as provided herein and COMPANY shall have the rights otherwise applicable hereto with respect to Masters hereunder including, without limitation, the right to use and publish, and permit others to use and publish, your name and likeness in each Video and for advertising and purposes of trade in connecting therewith.

21.02.   Notwithstanding anything to the contrary contained herein, Artist shall have the right, during the term hereof, to perform as a background vocalist or background instrumentalist for the purpose of making audio Phonograph Records for other subject to the following:

(a)   You have then fulfilled all of your then current obligations hereunder, and the engagement does not interfere with the continuing prompt performances of your obligations to COMPANY or with any professional engagements to which you are committed and which are intended to aid in the promotion of Records hereunder;

(b)   Artist will not after the commencement of this Agreement, render a solo or "step-out performance" and the musical style of the recording will not be such as to be confused with

24

Recordings made by Artist for COMPANY; without the consent of COMPANY, such consent shall not be unreasonably withheld;

(c)  Artist will not record any material embodied on a Master theretofore or thereafter delivered by you hereunder, and you shall be restricted from recording the same material for COMPANY (which you shall not do without COMPANY'S written consent);

(d)  Artist's name may be used in a courtesy credit to COMPANY or its designee on the LP liners used for such Records, in the same position as the credits accorded to other sidepersons and in type identical in size, prominence and all other respects. Except as provided in this subparagraph (d), neither the Artist's name, nor likeness nor biographical material may be used in any manner in connection with such Recordings. Without limiting the foregoing, Artist's name and/or likeness shall not be used on the front cover of LPs, on sleeves or labels used for single records, or advertising, publicity or other forms of exploitation, without COMPANY's express written consent which COMPANY may withhold in its absolute discretion.

21.03.    Within sixty (60) days following the execution hereof, you may supply COMPANY with six (6) approved pictures of Artist to be used by COMPANY. Such submission shall be made to COMPANY. In the event that COMPANY disapproves of the pictures supplied by you, COMPANY will make available to you for your approval pictures to be used by COMPANY. Your approval will not be unreasonably withheld, and will be deemed given unless your notice of disapproval (including the reason) has been received by COMPANY within five (5) days after the material has been made available to you. In the event that you timely disapprove of any pictures, you will, within seven (7) days of the date of your disapproval notice, supply to COMPANY approved pictures. In the event that the pictures supplied by you, pursuant to the preceding sentence, are not satisfactory to COMPANY pursuant to this paragraph, COMPANY shall thereafter have the right to select and use such pictures as it shall determine, in its sole discretion, and you shall have no approval rights in respect thereof. No inadvertent failure to COMPANY to comply with this paragraph will constitute a breach of this Agreement.

21.04.    (a)  As used herein, the term "You" includes all members of the group presently professionally known as 'N SYNC. The obligations, liabilities, prohibitions and restrictions imposed upon you hereunder shall be deemed to apply individually and collectively to each of the members of 'N SYNC, whether performing alone, with others or as a member of 'N SYNC, regardless of the name by which you or any of your members may then be identified. A failure by any member of 'N SYNC to satisfy any of your obligations hereunder shall, as COMPANY's election, be deemed a breach of this Agreement by you. In the event of any such breach, COMPANY may, by notice to you, and without limiting any of

25

COMPANY's other rights or remedies hereunder, terminate the term of this Agreement or, alternatively, may terminate the term of this Agreement only as it applies to the member or members who have failed to satisfy their individual obligations.

(b)  You hereby acknowledge that TRANS CONTINENTAL RECORDS, INC. is the sole owner of the name 'N SYNC and will be the sole owner of such name during the term hereof; that you will not use or authorize any other person to use such name or other name adopted by you in connection with the recording, production, manufacture, sale or advertising of records in the territory, or in connection with personal appearances by any person other than you unless approved by TRANS CONTINENTAL RECORDS, INC.  If any member becomes a "leaving member" of the group, or if COMPANY terminates the term of this Agreement as to some but not all members then the leaving member as to whom the term of this Agreement is terminated shall not thereafter use or authorize or permit any other person to use in any manner or for any purpose whatsoever the name 'N SYNC or such other name as you may hereafter adopt.  As used herein, a "leaving member" means any member of Artist who during the term hereof ceases to be an actively performing member of the group for any reason whatsoever, and in the event you disband or COMPANY decides to terminate this Agreement because there being a leaving member, each member of the group.

(c)  No additional member may be added without COMPANY's prior written consent.  If any member of Artist becomes a leaving member, then you shall promptly give COMPANY written notice thereof and COMPANY shall thereafter have the right to terminate this Agreement as to such leaving member or to require such leaving member to render his services directly to COMPANY as a solo artist or as a member of any new group comprised of the leaving members under the same terms and conditions as set forth in this Agreement with respect to you.

21.05.   At COMPANY's request, you shall submit to a drug test with a physician designated by COMPANY at COMPANY's expense.

TRANS CONTINENTAL RECORDS, INC.

By: _____
     LOUIS J. PEARLMAN     President

ACCEPTED TO AND AGREED:

_____
"Artist"
CHRISTOPHER ALAN KIRKPATRICK
Soc. Sec. #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

26

"Artist"
JUSTIN RANDALL TIMERBLAKE
Soc. Sec. #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

"Artist"
JOSHUA SCOTT CHASEZ
Soc. Sec. #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

"Artist"
JOSEPH ANTHONY FATONE, JR.
Soc. Sec. #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

"Artist"
JAMES LANCE BASS
Soc. Sec. #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

27

## EXHIBIT "A"

## TRANSFER OF COPYRIGHT

For good and valuable consideration, receipt whereof is hereby acknowledged, the undersigned hereby transfer to TRANS CONTINENTAL RECORDS, INC., PUBLISHER DESIGNEE, One Hundred (100%) percent of all the right, title and interest in and to the copyright and One Hundred (100%) percent of the rights comprised in the copyright, without limitation, in the controlled musical composition recorded hereunder.  The above pertains only to Publisher's interest.  The writers retain their interest.

CHRISTOPHER ALAN KIRKPATRICK
Artist

JUSTIN RANDALL TIMBERLAKE
Artist

JOSHUA SCOTT CHASEZ
Artist

JOSEPH ANTHONY FATONE, JR.
Artist

JAMES LANCE BASS
Artist

28

## PARENTAL\GUARDIAN CONSENT

I, _____LYNN HARLESS_____, hereby represent and acknowledge that I am the natural parent and/or legal guardian of the minor _JUSTIN RANDALL TIMBERLAKE_ and that I have read and am familiar with the Exclusive Artist Recording Agreement attached hereto.

I hereby guarantee my child's performance of his obligations under said Recording Agreement and agree to be secondarily liable in the event he should breach or improperly terminate same.

_____
Parent/Guardian Signature

_____
Parent/Guardian's Name Printed

Dated: _____4/29/96_____

29

## PARENTAL\GUARDIAN CONSENT

      I, ___DIANE P. BASS___, hereby represent and acknowledge that I am the natural parent and/or legal guardian of the minor __JAMES LANCE BASS__ and that I have read and am familiar with the Exclusive Artist Recording Agreement attached hereto.

      I hereby guarantee my child's performance of his obligations under said Recording Agreement and agree to be secondarily liable in the event he should breach or improperly terminate same.

_Diane P. Bass_
Parent/Guardian Signature

_Diane P. Bass_
Parent/Guardian's Name Printed

Dated: ___4-29-96___

30



## EXCLUSIVE MANAGEMENT AGREEMENT

AGREEMENT made as of the _28_ day of _April_, 1996, by and between TRANS CONTINENTAL ENTERTAINMENT, INC., with a place of business at 7380 Sand Lake Road, Suite 350, Orlando, Florida 32819 (hereinafter "MANAGER") and CHRISTOPHER ALAN KIRKPATRICK, residing at ~~1610 Overdale Street~~, Orlando, Florida 32819, and JUSTIN RANDALL TIMBERLAKE, a minor, residing at 303 Fawn Lake Drive, Millington, Tennessee 38053, and JOSHUA SCOTT CHASEZ, residing at 6511 Tinnestake Drive South, Bowie, Maryland 20720, and JOSEPH ANTHONY FATONE, JR., residing at 2746 Woodruff Drive, Orlando, Florida 32037, and JAMES LANCE BASS, a minor, residing at ~~111 Newport Circle, Clinton, Mississippi 39056~~, professionally known as 'N SYNC, (each being hereinafter individually and collectively referred to as "'N SYNC").

*8000 Palm Lake Dr*

*7826 SUGAR BEND DRIVE ORLANDO FL. 32819*

WHEREAS, 'N SYNC is desirous of engaging the services of Manager to act as 'N SYNC's professional advisor and counselor and to attend to certain business details in connection with 'N SYNC's professional career in the entertainment industry; and

WHEREAS, Manager is willing to become associated with 'N SYNC and act as the manager for 'N SYNC upon the terms and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the foregoing and the mutual promises and covenants hereinafter contained, it is agreed as follows:

1.    'N SYNC hereby engages Manager as 'N SYNC's sole and exclusive personal manager for 'N SYNC throughout the world during the term of this Agreement, and Manager hereby accepts such engagement subject to the terms and conditions set forth herein. The term of this Agreement shall commence as of the date hereof and shall continue for an Initial Period of two (2) years. 'N SYNC grants Manager four (4) separate and irrevocable options each to extend the term of this Agreement for a period of one (1) year ("Option Periods"), said Option Periods to run consecutively beginning at the expiration of the Initial Period hereof upon the same terms and conditions as set forth herein. Each option shall be deemed to be automatically exercised unless Manager shall give 'N SYNC written notice to the contrary at least ten (10) days prior to the commencement of the immediately following Option Period. The Initial Period and each Option Period for which Manager has exercised its option are sometimes referred to together herein as the "Term".

2.    Manager agrees, subject to 'N SYNC's availability and cooperation, to perform the following personal management services, at the request of 'N SYNC, in connection with 'N SYNC's activities in the entertainment industry;

(a) advise and counsel in the selection of any literary, artistic and musical material;

(b) advise and counsel in any and all matters pertaining to any public relations and advertising for 'N SYNC;

(c) advise and counsel with relation to the adoption of the proper format for presentation of 'N SYNC's talents and in the determination of proper style, mood and setting therefor;

(d) advise, counsel and direct in the selection of any artistic talent to work with 'N SYNC;

(e) advise and counsel with regard to general practices in the entertainment and amusement industries, and with respect to compensation and terms and contract in such industries;

(f) advise and counsel concerning the selection of theatrical agencies and persons, firms and corporations to procure employment and engagements for 'N SYNC;

(g) negotiate any and all agreement(s) pertaining to 'N SYNC's services, but only to the extent permitted by law ('N SYNC agreeing in any event to obtain Manager's prior written approval of each of same); and

(h) use Manager's reasonable efforts to endeavor to advance promising aspects of 'N SYNC's career, in good faith and in accordance with the business policies and practices of Manager in the entertainment industry generally.

3.    'N SYNC agrees that Manager is not expected to, nor shall Manager procure or secure employment for 'N SYNC. Manager is not to perform any services which, standing alone, shall constitute Manager a talent agent, and Manager has not agreed or promised to perform such services except to the extent permitted by any applicable laws. 'N SYNC agrees to utilize proper talent or other employment agencies mutually approved by Manager and 'N SYNC to obtain engagements and employment for 'N SYNC.   'N SYNC further agrees to submit all offers of employment (and all leads or other communications related thereto) and all contracts of any kind to Manager for Manager's advice and counsel and, if and to the extent permitted by applicable laws, approval.

4.    (a)  If 'N SYNC or 'N SYNC's representative is, in the sole discretion of Manager, not reasonably available to execute any employment agreement (or related or similar written instrument) nor requiring 'N SYNC's exclusive services for in excess of seven (7) full days, Manager may, at Manager's sole election, execute such agreement (or instruments) as 'N SYNC's attorney-in-fact pursuant to the provisions of subparagraph 4(c) hereof. Manager shall also be authorized in Manager's discretion and on 'N SYNC's behalf, to

2

approve and permit any and all publicity and advertising for 'N SYNC and to approve and permit the use of 'N SYNC's name, photograph, likeness caricatures, voice and/or sound effects for the purposes of advertising and publicity and/or in the promotion of any and all products and services, provided that manager shall obtain 'N SYNC's approval (which 'N SYNC shall not have the right to unreasonably withhold) as to the photographs, likenesses and caricatures to be utilized by Manager for such advertising, publicity and promotional purposes, it being agreed, however, that any inadvertent failure by Manager to utilize such elements so approved by 'N SYNC shall not constitute a breach of this Agreement. 'N SYNC shall not approve or permit any of the foregoing without Manager's approval thereof.

(b) (i) 'N SYNC shall have the right, subject to written notice to Manager, to engage a business manager, who shall be authorized to receive and make payments on behalf of 'N SYNC, and to collect and receive all gross compensation earned by 'N SYNC with respect to 'N SYNC's activities hereunder (a "Business Manager"). In the event 'N SYNC does engage a Business Manager, 'N SYNC shall authorize and direct that, except as otherwise provided herein, all gross compensation earned by 'N SYNC as to which Manager's right to compensation shall attach hereunder, shall be paid to and shall be collected by Business Manager. Manager shall use reasonable efforts to provide that third party payors compensate 'N SYNC individually when possible. 'N SYNC hereby agrees that all such gross compensation received by Business Manager on 'N SYNC's behalf, which is subject to the terms hereof, shall be segregated into two (2) shares (i.e. Manager's "Commission", as hereinafter defined, and "'N SYNC's Share"). Manager's Commissions shall be received by Business Manager on Manager's behalf pending only the monthly payment thereof to Manager as hereinafter provided, and Manager's Commissions shall not at any time be commingled with any other monies being held by 'N SYNC or Business Manager.

(ii) It is agreed that Business Manager shall render written accounting statements to Manager setting forth the amount of gross compensation received directly or indirectly by 'N SYNC or on 'N SYNC's behalf, if any, or Business Manager, and at the same time remit to Manager its Commissions hereunder as reflected by such statement, as well as repay Manager for any and all monies owing to Manager. Said statements shall be rendered and said Commissions shall be remitted within a reasonable time after receipt thereof by Business Manager in connection with gross compensation subject to the terms hereof. If Business Manager is unable for any reason to comply with the above provisions of this subparagraph 4(b)(iii), Business Manager will immediately give Manager written notice by pre-paid certified mail, return receipt requested, of such inability. Business Manager shall simultaneously furnish Manager with copies of all statements rendered by third parties to 'N SYNC and/or Business Manager with respect to 'N SYNC

3

activities hereunder.  Notwithstanding the foregoing, if at any time during such monthly period, the amount of Manager's Commissions in such monthly period equals or exceeds One Thousand Five Hundred Dollars ($1,500.00), 'N SYNC or Business Manager shall promptly notify Manager to such effect, and remit such monies due to Manager simultaneously with the furnishing to Manager of the above described accounting statement. In the event that 'N SYNC recovers any gross compensation pursuant to an audit conducted by or on behalf of 'N SYNC of a third party pursuant to any agreement entered into by 'N SYNC or substantially negotiated on 'N SYNC's behalf during the Term hereof, and upon any extensions, renewals and substitutions thereof entered into or substantially negotiated on 'N SYNC's behalf during the term hereof, such gross compensation shall be commissionable by Manager at the applicable rate as if said gross compensation were received at the time it was properly due.

(c) 'N SYNC hereby retains the right to sign, on 'N SYNC's own behalf, any recording, publishing, film, television or endorsement contracts or any other agreements whose terms exceeds one (1) year. Notwithstanding the foregoing sentence, Manager and 'N SYNC mutually acknowledge the need for a limited Power of Attorney from 'N SYNC to Manager so that Manager can reasonably attend to 'N SYNC's affairs in 'N SYNC's absence, such as in those instances where Manager has insufficient time to reach 'N SYNC or 'N SYNC's representatives to secure the requisite authority to enter into such an agreement. Accordingly, in such instances (i.e., for the acceptance of engagements being offered by promoters and/or booking agents), or if a good faith, unsuccessful effort has been made by Manager, during the term of this Agreement, as 'N SYNC appoints Manager, during the term of this Agreement, as 'N SYNC's true and lawful attorney-in-fact to sign all necessary documents including, but not limited to, bills of exchange, checks, notes or other negotiable instruments. For this provision to apply, Manager must obtain the prior written consent from 'N SYNC, or in the case 'N SYNC is a minor from 'N SYNC's guardian, prior to exercising this power of attorney. The foregoing appointment is to be deemed a power coupled with an interest, and is, therefore, irrevocable. Manager's exercise of this limited Power of Attorney shall be limited to matters reasonably related to 'N SYNC's career in the entertainment field. Manager hereby agrees to indemnify 'N SYNC for all losses and other damages, including court costs and reasonable attorney's fees, occasioned by Manager's exercise of the limited Power of Attorney in a manner that is inconsistent with the terms contained herein.

(d) In the event any gross compensation (as hereinafter defined) which should have been paid to Manager pursuant to the terms of this Agreement is nonetheless received at any time by 'N SYNC or by any other person, firm or corporation or other entity(ies) of any kind or nature on 'N SYNC's behalf, including, without limitation, any agent and/or business manager, same shall

4

be deemed to be held in trust for Manager, and 'N SYNC shall immediately require the source of such gross compensation to thereafter conform to the provisions of this Paragraph 4 and shall, within forty-eight (48) hours of receipt of such gross compensation, remit or cause the remittance of all such gross compensation to Manager from the first monies so received and prior to the payment of any other monies, and a photocopy of this Agreement shall (and hereby does) serve as an irrevocable letter of direction, authorizing and directing any and all other persons, firms and corporations or other entity(ies) to at all times so remit such gross compensation as provided above.

(e) (i) 'N SYNC hereby warrants and agrees that any and all agreements entered into by, for or concerning 'N SYNC during the Term hereof (including any extensions and renewals thereof) shall provide for payment in accordance with the provisions of this Paragraph 4, and that 'N SYNC shall promptly execute and deliver to each other party to any such agreements already entered into an irrevocable letter of direction (in form acceptable to such party) effectuating the provisions of this Paragraph 4, and 'N SYNC further warrants and agrees that in the event any existing agreement is hereinafter amended, 'N SYNC shall cause such amendment, to include a provision for payment in the manner hereinabove set forth.

(ii) Until such time as 'N SYNC engages a Business Manager as provided for in subparagraph 4(b)(ii) hereof, Manager agrees to use its good faith endeavors to render accounting statements to 'N SYNC at 'N SYNC's written request within a reasonable time after the end of each calendar month during the Term of this Agreement, setting forth gross income and costs for the prior month and the year to date. Each statement shall be accompanied by Manager's check payable to 'N SYNC for the amount of proceeds (if any) due to 'N SYNC. In addition, Manager shall simultaneously furnish 'N SYNC at 'N SYNC's written request with copies of all statements rendered by third parties to 'N SYNC and/or Manager with respect to 'N SYNC's activities hereunder. Manager agrees to keep a comprehensive set of books and records of accounting for all transactions relative to Manager's causing monies to be paid to or on behalf of 'N SYNC, and such accounts shall be open to inspection by 'N SYNC or 'N SYNC's nominee at all reasonable times provided 'N SYNC sends Manager ten (10) days prior written notice. In addition 'N SYNC or 'N SYNC's representatives shall have the right, at 'N SYNC's expense, to conduct an audit of Manager's records to determine the accuracy of such payments.

(f) 'N SYNC acknowledges that Manager is not required to make any loans or advances to 'N SYNC, but in the event Manager is hereby irrevocably authorized to deduct the amount of such loans or advances from any sums which Manager may receive for 'N SYNC's account.

5

5.   'N SYNC understands that Manager may also represent other persons and performers and that Manager's services hereunder are not exclusive. 'N SYNC agrees that Manager shall not be required to devote Manager's entire time and attention to fulfilling Manager's obligation under this Agreement, and that Manager shall have the right to render services to other persons, firms and corporations either in the capacity which Manager is employed hereunder or otherwise. 'N SYNC warrants that 'N SYNC will actively pursue 'N SYNC's career in the entertainment industry and will give due consideration to all advice and counsel preferred by Manager hereunder. 'N SYNC agrees at all times to be devoted to 'N SYNC's career and to do all things reasonably necessary to promote same.

6.   (a)   In full compensation for Manager's services hereunder, 'N SYNC shall pay to Manager, as and when received by 'N SYNC, or by Manager as provided herein, and prior to payment of any other party, twenty-five (25%) percent of the "gross compensation" received in connection with recordings generated under the Exclusive Artist Recording Agreement dated _____, 1996, and thirty (30%) percent of the "gross compensation" received in connection with merchandise and/or performances ("Commission") of 'N SYNC, as hereinafter defined, received at any time on account of any and all activities in the entertainment and publishing industries except as specifically excluded from this Agreement. "Gross compensation", as used herein, shall mean the gross sums of money or other consideration (including, but not limited, to, fees, salaries, earnings, royalties, residuals, advances, report and/or union fees, bonuses, proceeds of sales, leases or licenses, gifts, shares of stock, partnership interests and amounts paid for packaged television, motion pictures and radio programs) directly or indirectly earned or received by 'N SYNC or 'N SYNC's heirs, successors and assigns, or earned, received or expended by anyone on 'N SYNC's behalf, from any professional activities of 'N SYNC (and/or derived from the use of 'N SYNC's experiences or talents and/or the results or proceeds thereof), whether as an actor, writer, composer, author, lyricist, singer, musician, performer, artist, designer, cameraman, technician, director, producer, supervisor, executive, consultant or as owner in whole or in part of any properties, or as proprietary interest in a production, publishing or other firm or entity of any kind, and whether for the rendition of the 'N SYNC's services or from the sale or other disposition of literary, dramatic or musical property or package radio or television program, or any rights therein or thereto, or any use of 'N SYNC's name(s), likeness or talents for advertising purposes or otherwise, without any exclusion or deduction whatsoever, including all sums earned by 'N SYNC during the Term of this Agreement, and thereafter, under (i) any employment or contract now in existence or entered into or negotiated for during the Term hereof, (ii) any extension, modification, addition of renewal of such contract or employment, regardless of when entered into, (iii) any substitutes, directly or indirectly, for such contract or employment, including, without limiting the foregoing,

6

* ie. Commission is based on net to 'N Sync and not sales price of any goods or records sold. (If price to public is sales price then Manager's commission only to amount paid to 'N Sync from record distributor or merchandiser/manufacturer).

a contract or employment with an employer or contracting party entered into within six (6) months of the termination of a previous contract or employment if such previous contract or employment is commissionable hereunder, and (iv) any and all judgments, awards, settlements, payments, damages and proceeds (whenever received) relating to any suits, claims, actions, proceedings or arbitration proceedings arising out of any alleged breach or non-performance by others of any portion of any contracts, engagements, commitments or other agreements refereed to in this Paragraph 6, all of which regardless of when entered into, when performed and when effective. Any Commissions or other sums due Manager resulting from any and all such judgments, awards, settlements, payments, damages and/or proceeds relating to any such suits, claims, actions, proceedings or arbitration proceedings shall be computed after first deducting counsel fees and disbursements, and any counsel fees and disbursements therefrom shall be paid by 'N SYNC. Notwithstanding anything to the contrary contained in this Agreement, as to any motion picture, phonograph record, film, tape, wire, transcription, recording or other reproduction of any of 'N SYNC's activities in the entertainment industries or resulting therefrom which is created in whole or in part during the Term hereof (or thereafter pursuant to an engagement, contract or agreement subject to Commission hereunder), expiration of the Term hereof (or thereafter pursuant to an engagement, contract or agreement subject to Commission hereunder), expiration of the Term of this Agreement shall not affect Manager's right to receive Manager's Commission as provided herein and Manager shall continue to be entitled to such Commission in perpetuity with respect to any gross compensation accruing to or received by 'N SYNC after the expiration or termination of the Term of this Agreement on account of any activities and interests connected to the entertainment industry created by 'N SYNC and initially exploited during Term hereof.   Manager's commissions shall, at Manager's option hereunder, apply to any monies paid to 'N SYNC by any employer of 'N SYNC as travel or living expenses in connection with any engagements, employment or agreement performed, secured or entered into by 'N SYNC. Notwithstanding any other provisions of this subparagraph 6(a), Manager's Commission shall not apply to any monies paid to 'N SYNC for (A) recording costs (excluding advances paid directly to 'N SYNC, (B) video production costs, (C) recoupable tour support or (D) tour production (i.e., "sound and lights") costs.   Notwithstanding the foregoing, Commissions hereunder shall not apply to union "scale" income received by 'N SYNC in connection with services as a non-featured side musician appearing on recordings or personal appearances of other (featured) artists unless 'N SYNC served in royalty-earning and/or proprietary, controlling, ownership or partnership capacity in connection with such services, appearance of recording.

    7.   All expenses, other than normal minimum office overhead expenses, incurred by Manager on behalf of 'N SYNC (including, without limitation, long distance telephone calls, messenger fees,

7

transportation and expenses while travelling, and promotion and publicity expenses) shall be promptly paid or reimbursed to Manager by 'N SYNC. Unless made reasonably necessary due to circumstances substantially outside of Manager's control, Manager shall not incur (a) any single such expense in excess of Two Thousand Five Hundred (U.S. $2,500) United States Dollars or (b) cumulative expenses in any one (1) calendar month totalling Twenty-Five Thousand (U.S. $25,000) United States Dollars, without 'N SYNC's prior approval. Neither Manager nor any individual affiliated with Manager shall be required to travel to meet with 'N SYNC at any particular time or places, provided, however, that if Manager or any such individual employee of Manager does travel on behalf of 'N SYNC, then the cost of such travel and any and all expenses relating thereto shall be promptly paid or reimbursed by 'N SYNC. Notwithstanding anything to the contrary contained in this Paragraph 7, if the presence of Manager or any such individual is required outside METROPOLITAN ORLANDO, FLORIDA, 'N SYNC agrees that 'N SYNC will pay for the expenses incurred, such expenses to consist of first class living accommodations and requirements (including any and all tips and incidentals) and travelling expenses. All such expenses incurred on 'N SYNC's behalf are to be paid in advance from 'N SYNC's accounts and expense statements are to be turned in by Manager after each trip.  In the event Manager has to entertain any individual or group of individuals anywhere in the world on 'N SYNC's behalf, and provided that such expense is related to the furtherance of 'N SYNC's career, Manager shall have the right to deduct such expenses as manager incurs from 'N SYNC's accounts. In the event the accounts Manager holds for 'N SYNC are not sufficient to repay or advance the needed money to Manager, 'N SYNC shall promptly reimburse Manager or advance such money to Manager from the accounts of 'N SYNC that Manager holds upon Manager's request to 'N SYNC for such monies.  In no event, without prior written approval, shall expenses exceed five (5%) percent of "gross compensation" of 'N SYNC as defined in paragraph 6(a).

8.   This Agreement shall not constitute a joint venture by or partnership between Manager and 'N SYNC, it being understood that Manager is acting hereunder as an independent contractor and that, subject to the prior written consent of 'N SYNC, manager may appoint or engage other persons or entities to perform any of the administrative services required hereunder, and any of the non-administrative services required hereunder pursuant to Manager's direction.

9.   It is understood and agreed that Manager shall not be held in any way liable or responsible for any breach of contract or act or omission on the part of any person, firm or corporation not owned or controlled by Manager with whom any engagement or contract of any kind is entered into by or for 'N SYNC for any reason.

8

10. 'N SYNC acknowledges that it is difficult to determine the amount and exact nature of services Manager must render hereunder at 'N SYNC's request; and correspondingly, Manager acknowledges that it is difficult for 'N SYNC to determine the exact scope and timing of the services Manager will render to 'N SYNC hereunder, and in some cases the rate at which such services rendered will be so commissionable. Accordingly, but without limitation of the foregoing, it is agreed that a party hereto (the "First Party") shall not be deemed in breach of any of its obligations hereunder unless and until the other party (the "Second Party") shall give the First Party written notice, by pre-paid certified mail, return receipt requested, of the precise breach alleged and the First Party fails, within thirty (30) days after receipt of such notice, to cure the breach specified by the Second Party.

11. From time to time during the Term of this Agreement, Manager or other persons or entities owned and/or controlled directly or indirectly by Manager, or Manager's partners, shareholders, officers, directors and employees, whether acting alone or in association with others, may package an entertainment program in which 'N SYNC is employed as an artist, or may act as the entrepreneur or promoter of an entertainment program in which 'N SYNC is employed as an artist, or may employ 'N SYNC in connection with the production of phonograph records, or as a songwriter, composer, arranger or otherwise in connection with the creation of literary or musical works. Such activity on Manager's or of Manager's fiduciary obligations and duties to 'N SYNC, and such activity shall not in any way affect Manager's rights to Commissions hereunder in all instances except as hereinafter specifically provided. Manager shall not be entitled to Commissions from 'N SYNC in connection with any gross monies or other considerations derived by 'N SYNC from (i) any employment or agreement hereunder where 'N SYNC is employed or engaged by Manager or by any person, firm or corporation owned or controlled by Manager or by any of Manager's partners, shareholders, officers, directors or employees, in any capacity (including, without limitation, as the package agent for the entertainment program in which 'N SYNC is so employed or engaged, as 'N SYNC's music or literary publisher, or as 'N SYNC's record or promotion company); (ii) the sale, license or grant of any literary or musical rights to Manager or any person, firm or corporation owned or controlled by Manager.

12. This Agreement shall be deemed to have been made in FLORIDA and its validity, construction, performance and breach shall be governed by the laws of the State of FLORIDA applicable to agreements made and to be wholly performed therein.

13. (a) 'N SYNC hereby represents and warrants that 'N SYNC has not entered into any agreements or contracts which shall or do in any way interfere or conflict with 'N SYNC's obligations,

9

promises and/or warranties hereunder and that 'N SYNC is free to enter into this Agreement, and 'N SYNC agrees to indemnify and hold Manager harmless from any loss, cost or liability (including reasonable attorneys' fees) as a result of any breach by 'N SYNC of any of 'N SYNC's representations, warranties or covenants contained herein, including, without limitation, the provisions of Paragraph 9 hereof.

(b)   Manager hereby represents and warrants that Manager has not entered into any agreements or contracts which shall or do in any way interfere or conflict with Manager's obligations, promises and/or warranties hereunder and that Manager is free to enter into this Agreement, and Manager agrees to indemnify and hold 'N SYNC harmless from any loss, cost or liability (including reasonable attorney's fees) as a result of any breach by Manager of any of Manager's representations, warranties or covenants contained herein.

14.   The services rendered by 'N SYNC are special, unique and irreplaceable, and any breach or threatened breach by 'N SYNC of any of 'N SYNC's obligations hereunder may be enjoined temporarily or permanently without regard to and without limiting any other remedy that may be available to Manager.

15.   In the event Manager (or Manager's successors and/or assigns, if any) shall assign or otherwise transfer this Agreement or any of Manager's (or their) rights hereunder or delegate any of Manager's (or their) obligations hereunder, in whole or in part, to any part(ies) at any time comprising Manager or any corporation or partnership owned by Manager (or them) or any of such parties in whole or in part, such assignment shall be (and hereby is) approved and accepted and deemed to be a novation of this Agreement, subject to PEARLMAN's and 'N SYNC'S prior written consent.   'N SYNC shall not have the right to assign any of 'N SYNC's rights or delegate any of 'N SYNC's obligations hereunder. Without in any way derogating from the preceding sentence, this Agreement shall inure to the benefit of and be binding upon each of the parties hereto and their respective successors, assigns, heirs, executors, administrators and legal and personal representatives.

16.   Any notice given hereunder shall be sufficient only if mailed via certified mail, return receipt requested, postage prepaid, and if to Manager, addressed to Manager at the address hereinabove specified with a copy to WILLIAM B. PRINGLE, III, ESQUIRE, Post Office Box 691222, Orlando, Florida 32869-1222; and other address(es) of which 'N SYNC has been given notice as provided herein, and if to 'N SYNC, at 'N SYNC's above address. Any notice shall be effective as of the date three (3) days after mailing aforesaid in the continental United States except for notices of changes in address (which shall only be effective on receipt.)

10

17. Nothing in this Agreement shall be construed so as to require the commission of any act contrary to law. Wherever there is any conflict between the provisions of this Agreement and any present or future statute, law, ordinance or regulation the latter shall prevail, but in such event the provision(s) of this Agreement affected shall be curtailed or limited only to the minimum extent necessary to bring it within the requirements of the latter. (The parties hereto do not intend by the foregoing sentence to imply the illegality, voidness or unenforceability of any term, provision or paragraph of this Agreement).

18. This Agreement sets forth the entire agreement between the parties hereto, and replaces and supersedes all other agreements relating to the subject matter hereof. This Agreement cannot be modified, altered, terminated or otherwise changed except by an agreement in writing signed by the parties hereto. In the event that any party hereto initiates litigation to enforce this Agreement, the party prevailing to the greater extent shall be entitled to recover reasonable attorneys' fees and costs reasonably incurred in connection with such litigation. No waiver of any provision of this contract or of any default hereunder shall effect Manager's rights thereafter to enforce such provision or to exercise any right or remedy in the event of any other default, whether or not similar.

19. If necessary in Manager's good faith opinion to ensure Manager of payments for Manager's services as provided herein, 'N SYNC agrees to deliver to Manager a written assignment of so much of 'N SYNC's compensation earned as a result of 'N SYNC's professional career in the entertainment industry from any source therein, as hereinabove agreed upon to be Manager's compensation, and if not so delivered to Manager, Manager is authorized to draw an assignment to Manager for such salary, execute the same in the name of 'N SYNC and collect therefrom with the same force and effect as though signed by 'N SYNC in person, or to require any party paying such compensation directly or indirectly to 'N SYNC to pay the same over to Manager, in which event this instrument or a copy thereof shall be authority for such employer to make such deductions and payment. All the terms and conditions of this Agreement shall be irrevocable, this Agreement constituting a contract and a power of attorney and creating an agency coupled with an interest.

20. 'N SYNC hereby expressly agrees that 'N SYNC will not at any time, without Manager's express written consent, exert or permit any third party to exert any of the powers herein granted to Manager so as to create any confusion or conflict of authority in the mind of any third person. 'N SYNC understands and agrees that Manager's interest and compensation under this Agreement shall be a continuing interest and shall not be revocable in any event or for any reason whatsoever for the term of this Agreement and any

11

extension(s), renewals(s), replacement(s), or substitution(s), thereof, except only as specified in this Agreement.

21. Manager shall have the right to advertise and publicize Manager as 'N SYNC's exclusive personal manager and representative and 'N SYNC shall cooperate and assist Manager in securing written (and, if applicable, logo) credit as such wherever reasonably possible.

22. 'N SYNC acknowledges that no promises, representations or inducements have been made by Manager or on Manager's behalf, except as specifically set forth herein, and 'N SYNC further acknowledges that Manager's acceptance and execution hereof is in reliance on this fact.

23. 'N SYNC hereby represents, warrants and agrees that 'N SYNC shall cooperate fully with Manager in any and all of Manager's efforts to comply with any laws as same may apply to the manner in which Manager conducts Manager's management business generally and/or as it specifically pertains to 'N SYNC and/or the rendition of Manager's services hereunder. Manager has advised 'N SYNC and 'N SYNC hereby agrees that they have the right to obtain independent legal counsel to negotiate with WILLIAM B. PRINGLE, III, Esq. and to represent 'N SYNC regarding 'N SYNC's activities with Manager.

24. Manager shall be entitled (but in no event shall be obligated) to secure, in Managers own name or otherwise and at Manager's expense, life, accident, health and/or other insurance covering 'N SYNC, in an amount which does not exceed the sum of One Million Dollars ($1,000,000.00) per member, either independently or together with Manager or any party Manager designates being the sole beneficiary thereof and neither 'N SYNC nor 'N SYNC's estate shall have any right, title or interest in and to such insurance or any proceeds therefrom. 'N SYNC shall cooperate fully with Manager in connection with the obtaining of such insurance, if any, including, without limitation, by timely submitting to medical examinations and by completing any and all documents necessary or desirable in respect thereof.

25. 'N SYNC specifically acknowledges that this Agreement is executed as an arm's length transaction, separate and apart from any fiduciary or other duty or obligation of any kind or nature which may be owed by Manager or any affiliate of Manager to 'N SYNC, and that Manager is under no such duty or obligation to 'N SYNC in connection with this Agreement, whether or not Manager or any affiliate or Manager now has or at any time had any fiduciary or other relationship of any kind or nature with 'N SYNC. It is specifically understood and agreed that 'N SYNC is free to utilize separate, independent legal counsel to advise 'N SYNC with respect to the respective rights and obligations of each party under this Agreement, any failure by 'N SYNC to seek or obtain such legal



counsel to be 'N SYNC's sole choice (and contrary to Manager's wishes).

In the event TRANS CONTINENTAL ENTERTAINMENT, INC. does not obtain a record contract for 'N SYNC or, at the very least, a written bona fide offer to enter into a record contract from a major record distributor within 180 days immediately following the effective date of this Agreement, then this Agreement shall be null and void and all parties shall be absolved of and from all liability hereunder.  Manager shall also keep 'N SYNC apprised of all facts concerning the status of negotiations with prospective record distributor(s).✶

IN WITNESS WHEREOF, the parties hereunder set their hands and seals on the day and year first above written.

COMPANY:

By: _____
     JOHNNY WRIGHT          President

ACCEPTED TO AND AGREED:

_____
"'N SYNC"
CHRISTOPHER ALAN KIRKPATRICK
Soc. Sec. #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

_____
"'N SYNC"
Joseph Anthony Fatone Jr.
Soc. Sec. #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

_____
"'N SYNC"
JUSTIN RANDALL TIMERBLAKE
Soc. Sec. #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

_____
"'N SYNC"
JOSHUA SCOTT CHASEZ
Soc. Sec. #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

✶ Upon ninety days (90) after signing this agreement,
'N Sync shall have the right to terminate this
agreement if 'N Sync hasnt recorded new products
and has engaged in four (4) promotional performances
arranged by Manager.

13

"'N SYNC"
JAMES LANCE BASS
Soc. Sec. #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

(doc\tc\nsync\manage.age)

14

## PARENTAL/GUARDIAN CONSENT

I, __*JAMES I.* DIANE T. BASS__, hereby represent and acknowledge that I am the natural parent and/or legal guardian of the minor __JAMES LANCE BASS__ and that I have read and am familiar with the Exclusive Management Agreement attached hereto. I hereby guarantee my child's performance of his obligations under said Management Agreement and agree to be secondarily liable in the event he should breach or improperly terminate same.

Parent/Guardian Signature
Dated: __4/28/96__

16

## PARENTAL/GUARDIAN CONSENT

I, __LYNN HARLESS__, hereby represent and acknowledge that I am the natural parent and/or legal guardian of the minor __JUSTIN RANDALL TIMBERLAKE__ and that I have read and am familiar with the Exclusive Management Agreement attached hereto. I hereby guarantee my child's performance of his obligations under said Management Agreement and agree to be secondarily liable in the event he should breach or improperly terminate same.

Parent/Guardian Signature

Dated: 4-28-96

15



 

**BMG ARIOLA
MUENCHEN GMBH**

**TRANS CONTINENTAL RECORDS, INC.**

7380 Sand Lake Road, Suite 350
Orlando, Florida 32819

(407) 345-0004
Telefax (407) 345-0088

## LETTER OF ACKNOWLEDGEMENT

The parties signed below acknowledge that Trans Continental Records, Inc. has entered into a Licensing Agreement for the purposes of selling and exploiting the artist group 'N SYNC audio and video products with BMG for worldwide distribution. Nothing herein shall change the terms of the Exclusive Artist Agreement previously executed.

Above acknowledged by:                     Date: August 1, 1996

_____     _____
Christopher Alan Kirkpatrick              Joseph Anthony Fatone Jr.


_____
Joshua Scott Chasez


_____     _____
Justin R. Timberlake, minor               Guardian, Lynn Harless


_____     _____
James Lance Bass, minor                   Guardian, James Bass


_____
Louis J. Pearlman, President
Trans Continental Records, Inc.



# LEIBOWITZ ROBERTS & RITHOLZ LLP

### ATTORNEYS AT LAW

ADAM E. RITHOLZ
JAIMISON M. ROBERTS
WILLIAM R. LEIBOWITZ

SHARON COLCHAMIRO*
BARRY M. PERLMAN
DANIEL R. GETZ

OF COUNSEL
DIANE F. KRAUSZ

*ALSO ADMITTED IN NJ

183 MADISON AVENUE
PENTHOUSE
NEW YORK, NY 10016

TELEPHONE: (212) 448-1800
FACSIMILE: (212) 448-0024

May 26, 1999

<u>**BY FAX AND CERTIFIED MAIL, Return Receipt Requested**</u>

Trans Continental Records, Inc.
7380 Sand Lake Road
Suite 350
Orlando, FL 32819
Attention: Louis J. Pearlman

Re:  Trans Continental Records, Inc. -w- Christopher Kirkpatrick, Justin Timberlake, Joshua
Chasez, Joseph Fatone, Jr. and James Lance Bass pka 'N SYNC

Gentlemen:

Reference is made to the agreement between you and the members of 'N SYNC, dated April 29,
1996 ("Agreement"). Further reference is made to paragraph 19.12 of the agreement, pursuant
to which 'N SYNC hereby terminates the Agreement, on the basis that Trans Continental
Records, Inc. did not secure a distribution agreement with a U.S. record company within 18
months following the date of the Agreement.

The foregoing is not intended as a complete statement of the facts or law in this matter, and all
of my clients' rights and remedies are hereby expressly reserved.

Sincerely,
LEIBOWITZ ROBERTS & RITHOLZ LLP

By: _____
       Adam E. Ritholz

AER/dh

Cc:   Willliam B. Pringle, III, Lawrence Rudolph, Esq., Helene Freeman, Esq.,
        Philip Bakershenk, Esq., Howard Comart, 'N SYNC

N Sync.Trans Cont.Pearlman.ltr 5.26.99.doc

# DORSEY & WHITNEY LLP

MINNEAPOLIS
WASHINGTON, D.C.
LONDON
BRUSSELS
HONG KONG
DES MOINES
ROCHESTER
COSTA MESA

250 PARK AVENUE
NEW YORK, NEW YORK 10177
TELEPHONE: (212) 415-9200
FAX: (212) 953-7201

HELENE M. FREEMAN
freeman.helene@dorseylaw.com
(212) 415-9239

NEW YORK
DENVER
SEATTLE
FARGO
BILLINGS
MISSOULA
GREAT FALLS

June 7, 1999

<u>VIA FACSIMILE AND MAIL</u>

Steven Beer, Esq.
Rudolph & Beer LLP
432 Park Avenue South, Second Floor
New York, NY 10016

Re:   <u>Trans Continental Records Inc. -w- 'N Sync</u>

Dear Steve:

Adam has forwarded your letter dated June 4, 1999 to me for reply.  You appear to have overlooked the terms of paragraph 19.12 of the Agreement dated April 29, 1996 which provides:

"Notwithstanding anything to the contrary contained herein, you shall have the right to terminate this agreement in the event COMPANY has not secured a <u>distribution agreement with a U.S. record company within 18 months from the date hereof, pursuant to which recordings of your performance shall be released</u>."  (Emphasis supplied.)

The only distribution agreement secured by your client is with BMG Ariola Muenchen GmbH, which is a German company located in Munich, Germany.  All recordings of 'N Sync to date have been distributed pursuant to a distribution agreement, dated August 1, 1996, governed by the laws of Germany, with the aforesaid German record company.

## DORSEY & WHITNEY LLP

Steven Beer, Esq.
June 7, 1999
Page 2

That 'N Sync recordings may have been distributed in the United States by BMG and/or RCA is irrelevant. Under the plain language of paragraph 19.12 'N Sync recordings must be distributed pursuant to a distribution agreement with a U.S. record company. BMG Ariola Muenchen, GmbH is plainly not a U.S. record company. It is a German corporation which operates independently from the BMG and RCA labels in the United States.

The members of 'N Sync were not provided with a copy of the distribution agreement between TransContinental Records and BMG Ariola Muenchen, GmbH. They had no knowledge of the contractual arrangements made by TransContinental nor were they aware that their recordings first released in the United States in March 1998 were being distributed pursuant to the recording agreement dated August 1, 1996.

Indeed, no one was aware that 'N Sync recordings were being distributed in the United States pursuant to the August 1, 1996 agreement with BMG Ariola Muenchen GmbH until Larry Rudolph provided a copy of the agreement to Adam Ritholz in February 1999.

Your client drafted the recording agreement and it is hornbook law that a contract is interpreted strictly against the draftsman. Indeed, the members of 'N Sync did not have the benefit of legal counsel in connection with the contracts entered into with the various TransContinental entities. We believe that those contracts are unconscionable under Florida law and in all of the circumstances, that a court would enforce paragraph 19.12 in accordance with its plain meaning and conclude that 'N Sync was well within its rights in terminating the April 29, 1996 agreement.

Accordingly, we unequivocally reject your demand that 'N Sync withdraw its letter of termination dated May 26, 1999. The agreement dated April 29, 1996 has terminated. Your client has no rights thereunder and its rights including inter alia to the recording and songwriting services of 'N Sync or merchandising of the group and its name have terminated.

# DORSEY & WHITNEY LLP

Steven Beer, Esq.
June 7, 1999
Page 3

The foregoing is not intended as an exhaustive statement of the facts or of our client's rights, remedies and legal position in this matter, all of which are expressly reserved.

Very truly yours,

Helene M. Freeman

HMF/JW

cc:    Adam Ritholz, Esq.
        Straus Zelnick
        Bob Jamieson
        Jeff Walker, Esq.



NEW AVENUE SOUTH
SECOND FLOOR
NEW YORK, NEW YORK 10016
(212) 684-1001 FAX (212) 684-0920

## RUDOLPH & BEER, LLP

ATTORNEYS AT LAW

Steven C. Beer
Laurence H. Rudolph

Nicole S. Berlin
Emerson E. Bruns
Alison K. Finley △
Kristi Gamble △
Vivien Rachles
Mark Severson*
*admitted in California only
△awaiting admission

Of Counsel
Mark S. Frey
Kendall A. Minter

June 4, 1999

**VIA FACSIMILE (212) 448-0020**
Adam E. Ritholz, Esq.
Leibowitz Roberts & Ritholz LLP
183 Madison Avenue
Penthouse
New York, NY 10016

Re: Trans Continental Records, Inc. -w- N' SYNC

Dear Adam:

This responds to your May 26, 1999 letter seeking to terminate the Recording Agreement by and between Trans Continental Records, Inc. ("Trans Continental") and the members of N' SYNC dated April 29, 1996 (the "Agreement"). We must emphatically reject any attempt by you or your clients to terminate the Agreement. With the express consent and approval of your clients, Trans Continental engaged BMG and RCA to distribute N'SYNC's recordings on a worldwide basis well within eighteen (18) months of April 29, 1996, the date set forth in Paragraph 19.12 of the Agreement. Pursuant to that arrangement, N'Sync's recordings have been marketed in the United States and throughout the world, enabling your clients to achieve unparalleled success and recognition.

The members of N'SYNC have endorsed and affirmed this worldwide distribution arrangement both explicitly and by their course of conduct over the past three (3) years during which time N'SYNC has worked closely with BMG and RCA without complaint or objection. Your belated effort to avoid obligations under the Agreement is nothing more than a transparent attempt to extort concessions in a renegotiation. This is totally unacceptable to Trans Continental and absent an unequivocal withdrawal of the purported Agreement termination, we cannot respond to your renegotiation counter-proposal dated May 26, 1999.

**RUDOLPH & BEER, LLP**

Adam E. Ritholz, Esq.
June 4, 1999
Page 2

Needless to say, any attempt by you, your clients, or their manager, Johnny Wright, to engage other record labels in pointless discussions about a new recording deal at this time shall constitute a tortious interference, for which we shall seek immediate and exhaustive remedies at law and equity to address the actual and potential injury.

Be advised that your clients will each be held jointly and severally accountable to Trans Continental for all costs and expenses, including its attorneys fees, arising out of your clients' frivolous termination notice and anticipatory breaches of contract. The foregoing is not intended as an exhaustive statement of our client's rights, remedies and legal position in this matter, all of which are expressly reserved.

Yours very truly,

Steven C. Beer

SCB/ew
cc:   Louis J. Pearlman
      Laurence H. Rudolph, Esq.
      Straus Zelnick, President BMG Entertainment
      Bob Jameison, President RCA
      Jeff Walker, Esq., RCA
      Michael D. Friedman, Esq.

PARKER CHAPIN FLATTAU & KLIMPL, LLP

COUNSELLORS AT LAW

1211 AVENUE OF THE AMERICAS

NEW YORK, NY 10036-8735

(212) 704-6000

CABLE LAWPARK

FAX (212) 704-6288

TELEX 640347

175 GREAT NECK ROAD
GREAT NECK, NY 11021
(516) 482-4422
FAX (516) 482-4469

MICHAEL D. FRIEDMAN
(212) 704-6309

June 17, 1999

**VIA FACSIMILE AND FIRST CLASS MAIL**

Helene M. Freeman, Esq.
Dorsey & Whitney LLP
250 Park Avenue
New York, New York 10177

Re:   **'N Sync Productions, Inc.**

Dear Ms. Freeman:

This firm is special counsel to Trans Continental Records, Inc. ("Trans Continental"). Your letter dated June 7, 1999 directed to Steven Beer, Esq., and the related prior correspondence, has been directed to us for review.  The stated grounds which predicate your purported termination of the Exclusive Artist Recording Agreement dated April 29, 1996 by and between your clients and Trans Continental (the "Recording Agreement") are devoid of merit. Plainly, your clients remain fully obligated under the Recording Agreement.

Your actions in asserting a termination of the Recording Agreement and related hostile acts appear to be calculated to instigate a public conflict of existing business disputes.  While Trans Continental does not regard this to be prudent or in the best interest of the members of 'N Sync, be assured that it will take all necessary actions to fully enforce its rights under the Recording Agreement and to otherwise pursue its remedies against your clients and third parties acting in concert with them.

Very truly yours,

Michael D. Friedman

cc:   Louis J. Pearlman
      Laurence H. Rudolph, Esq.
      Steven C. Beer, Esq.
      Barry J. Brett, Esq.
      Straus Zelnick, President BMG Entertainment
      Bob Jameison, President RCA
      Jeff Walker, Esq., RCA

460933-1

PARKER CHAPIN FLATTAU & KLIMPL, LLP

COUNSELLORS AT LAW

1211 AVENUE OF THE AMERICAS
NEW YORK, N.Y. 10036-8735
(212) 704-6000

CABLE LAWPARK

FAX (212) 704-6288

TELEX 640347

MICHAEL D. FRIEDMAN
(212) 704-6309

178 GREAT NECK ROAD
GREAT NECK, NY 11021
(516) 482-4422
FAX (516) 482-4469

June 23, 1999

**BY FACSIMILE AND FIRST CLASS MAIL**

Helene M. Freeman, Esq.
Dorsey & Whitney
250 Park Avenue
New York, NY  10177

Re:  'N SYNC

Dear Ms. Freeman:

We write to you, once again, on behalf of Trans Continental Records, Inc. ("Trans Continental").  Your letter of June 21 continues the unfortunate pattern of provocation between your clients and Trans Continental as exhibited in prior correspondence.  If you are able to persuade your clients to put their professional interests at risk by acting in contravention of agreements which they entered into voluntarily and through which they have enjoyed great benefits, we will vigorously defend and enforce those agreements, and hold your clients, and those acting with them, responsible for all consequences which may result.

To avoid any suggestion of acquiescence in your assertions, I will address some of the conclusory statements set out your letter of June 21.  Most particularly, it is regrettable that you continue to encourage your clients to abandon the people who most believed in their talents and assiduously pursued all available means toward making them a success.  In reliance upon commitments from your clients and their families, Lou Pearlman and Trans Continental invested enormous sums in the highly risky business of training, developing, recording and marketing the group and your overzealous attacks on the relationship are unseemly.  What is "unconscionable" is an effort to convince these young men that they can walk away from their obligations and try to persuade some other recording company to join with them in breaching the agreement.  We urge that your clients evaluate the wisdom and risks of making deals with new "friends" and trusting people who are quite prepared to urge them to breach the obligations which they undertook so enthusiastically when their careers were in the early stages of development.  Nor should you and

461904-2

PARKER CHAPIN FLATTAU & KLIMPL, LLP

Helene M. Freeman, Esq.                    - 2 -                    June 23, 1999

your clients lose sight of the fact that 'N Sync is a name in which they own no rights and are not free to exploit in an unauthorized manner.

As for your "view" that the group has terminated the April 26, 1996 exclusive recording agreement based on a right granted under paragraph 19.12, we find your position to be flimsy and, at best, a technical argument that holds little weight when the facts and circumstances are examined in their entirety. Based upon the recording deal with BMG, one of the world's largest and most influential record companies, which has a pervasive presence in the United States, including distribution under the venerable RCA label, 'N Sync received unparalleled financial and creative support. The combined efforts of Trans Continental, BMG and RCA are responsible for the enormous success of 'N Sync on a global scale. We would welcome the opportunity to demonstrate to a court that Trans Continental satisfied paragraph 19.12 in all respects, that your clients' expressly acknowledged Trans Continental's arrangement with BMG from its inception, that their conduct reflected the unequivocal and enthusiastic acceptance of the benefits of the relationship and that your clients long ago waived any possible objection under the provision upon which you rely. Suffice it to say that the conduct of the parties and the language of the agreement are far more persuasive as to what paragraph 19.12 contemplated than your belated effort to find a way to break an agreement as part of a business deal renegotiation.

Your clients should understand that Mr. Pearlman and Trans Continental continue to be prepared to work with them in a manner that will serve to further advance their careers and to address their financial needs but they will not stand idle if you take any further steps to abandon existing contractual obligations. Any time your clients wish to renew discussions with Mr. Pearlman and Trans Continental and discuss any grievances or talk about how best to arrange their artistic or financial relationships, they should abandon their posturing and request a meeting for that purpose.

Very truly yours,

Michael D. Friedman

cc:    Louis J. Pearlman
       Johnny Wright
       Steven C. Beer, Esq.
       Laurence H. Rudolph, Esq.
       Barry J. Brett, Esq.
       Straus Zelnick, President BMG Entertainment
       Laverne Evans, Esq., BMG
       Steve Gawley, Esq. BMG
       Bob Jameison, President RCA
       Jeff Walker, Esq , RCA

461904-2

# THE WALL STREET JOURNAL

© 1994 Dow Jones & Company, Inc. All Rights Reserved.

THURSDAY, OCTOBER

# Behind the Crooning, Noisy Discord

### Backstreet Boys and 'N Sync Draw Record Companies Into Dizzying Dispute

By Martin Peers
*Staff Reporter of* THE WALL STREET JOURNAL





IT'S THE BATTLE of the boy bands.

A simmering rivalry between 'N Sync and Backstreet Boys, two hot-selling teen groups, has erupted into one of the music industry's biggest and most complex brawls. It involves two record companies and a pop-music impresario. And beneath the din of screaming teens, control of the two bands and millions of dollars in profits from their red-hot albums are up for grabs.

Battling over rights to 'N Sync are Bertelsmann AG's BMG Entertainment, the world's second-biggest record company, and Zomba Recording Corp., the biggest independent music company. Until now, the two have been tight. Bertelsmann owns 20% of Zomba, distributes its records in North America and counts on Zomba for nearly a third of BMG's market share of current albums.

In the middle of it all is Louis J. Pearlman, chairman and chief executive of Trans Continental Records Inc., the man who founded 'N Sync and Backstreet Boys. At various times 'over the past 18 months, he has been locked in struggles with both bands over money issues.

The battle started to heat up this past summer, when 'N Sync and Mr. Pearlman were arguing over his take of the band's revenue. In 1996, Mr. Pearlman had signed the band to a recording deal, and his company, Trans Continental, then signed a world-wide distribution contract with a Bertelsmann subsidiary in Germany to deliver five albums.

With Mr. Pearlman quarreling with the band, BMG worried about that record deal, and the band's possible defection from its RCA label. So on a steamy weekday in mid-July, Strauss Zelnick, BMG's chief executive, spent several hours in a Times Square hotel room with the five young members of 'N Sync and Mr. Pearlman, trying to smooth over their financial differences. But a few weeks later, the band ended up signing a new recording deal with Jive, a Zomba Records label.

That presented BMG's Mr. Zelnick with a new problem: A knockdown fight with Zomba to keep 'N Sync could end up damaging another important relationship the two companies had. Specifically, BMG has been Zomba's North American distributor for years, but Zomba can terminate the distribution deal next year. Angering Zomba over 'N Sync could thus cause BMG to also lose lucrative distribution rights to the rest of Zomba's lineup, which includes stars like Britney Spears.

On top of that, the move of 'N Sync to Jive has prompted the Backstreet Boys to try to terminate their own deal with the label, music industry executives say. The Backstreet Boys, who are known to regard 'N Sync as a knockoff band, worry that Jive simply won't be able to provide the same attention and promotion it

## Mad About the Boys

A fight between two boy bands – Backstreet Boys, left, and 'N Sync – has spilled over into major music companies.

| | OWNER | MAJOR LABELS |
|---|---|---|
| **BMG Entertainment** | Bertelsmann AG | RCA, which has Dave Matthews Band, 'N Sync and Christina Aguilera |
| | | Arista, which has Whitney Houston, Kenny G, Sarah McLachlan and Carlos Santana |
| **Zomba Recording Corp.** | Closely held company, 20% owned by Bertelsmann | Jive, which has Backstreet Boys, Britney Spears and R. Kelly |
| **Trans Continental Records Inc.** | Trans Continental Companies Inc. | Acts it has developed include the Backstreet Boys, 'N Sync, Take 5, LFO and CNote |

did before it added 'N Sync, the executives add.

Both quintets croon the same type of syrupy tunes that light up wide-eyed girls and CD sales. The Backstreet Boys' eponymous debut album has sold 8.6 million copies, and its second album, Millennium, has sold 6.2 million copies since May. 'N Sync has sold nearly seven million copies of its first album, released last year, Soundscan estimates.

As the fight escalates, the record companies both claim to have 'N Sync currently signed. A spokeswoman for Zomba wouldn't comment on the dispute but said that 'N Sync has indeed joined the Jive label, which will provide "priority treatment" for both groups. Jeff Kwatinetz, a co-manager of the Backstreet Boys, declined to comment.

Bertelsmann declined to comment, other than to say that 'N Sync "is a BMG act and we protect our rights vigorously." BMG and Zomba are currently in negotiations to head off litigation, say several people with knowledge of the situation.

Zomba has quietly become a major power in the music industry since its founding 20 years ago by South African-born Clive Calder. The Zomba chairman and chief executive built up

Jive by acquiring low-profile labels and signing hit artists.

While its growth has benefited Bertelsmann, Zomba has gradually been taking back more control of its business. Until 1996, for instance, Bertelsmann had handled much of Zomba's international distribution, a business Zomba has since regained.

How these multiple conflicts will be resolved isn't clear. For BMG, one potential solution is to let Zomba keep 'N Sync in exchange for extending Zomba's distribution deal with BMG. But distributing another company's music would garner BMG much less money than releasing an album through a fully-owned label.

Though Zomba won't comment, some in the industry believe Mr. Calder may hope to use the dispute to find some way to buy back Bertelsmann's 20% stake in Zomba. Or he may simply have his eyes on the profits expected from the next 'N Sync album, now being recorded. The band's eponymous first album, with 6.9 million copies sold, made it one of the biggest acts on Bertelsmann's RCA label. And the next album is expected to be an-

# The Big Battle of the Boy Bands

*Continued From Page B1*

other huge hit, though its release date is unclear.

Meanwhile, Mr. Pearlman himself has issues to work out with 'N Sync, much as he did with the BackStreet Boys. Last October, Mr. Pearlman's Trans Continental settled a lawsuit filed by the Backstreet Boys that claimed the company took too big a share of its revenue. As part of the settlement, however, Mr. Pearlman's company continues to earn a percentage of the band's revenue.

The deal signed by Trans Continental with 'N Sync gave the company a share of the band's recording, merchandising and music publishing revenues, as well as management commissions—totaling about two-thirds of the band's revenue, according to a person familiar with the situation.

Trans Continental paid for the group's dance lessons and housing and even "gave them grocery money to live on," said Michael Friedman, Trans Continental's attorney, acknowledging that the company gets "reimbursement on their extraordinary expenses" in developing the group.

Three months after the Backstreet Boys settled their lawsuit against Trans Continental, 'N Sync's members, who range in age from the late teens to the early 20s, hired a lawyer to look over their agreements with Trans Continental. Several months of negotiations followed without resolution.

In May, 'N Sync's lawyer, Adam Ritholtz, told Trans Continental that he was terminating the agreements, according to people familiar with the discussions. Mr. Ritholtz claimed the company hadn't fulfilled its obligation to get the group a U.S. record deal, and argued that the deal with a Bertelsmann subsidiary of Germany didn't qualify as a U.S. record deal. People familiar with the discussions say Mr. Ritholtz argued that because Trans

*Both of the teen quintets croon the same type of syrupy tunes that light up wide-eyed girls—and CD sales.*

Continental hadn't fulfilled its obligations, the band had the right to sign a new deal with Zomba's Jive label.

"Its absolutely absurd," counters Mr. Friedman, the Trans Continental attorney. "You are talking about a group that became one of the best and most successful groups in the world through the efforts of Trans Continental, BMG and RCA." He adds, "You can't get rich and famous and then say, 'I'm finished with it' and say, 'I'm walking away.' "

# 'N Sync Jibes With Jive In New Deal;
# Freddy DeMann Back In The Saddle?

IN SYNC WITH 'N SYNC: What's behind 'N Sync's move to Jive worldwide from BMG (and RCA in the U.S.)? All we can tell you is that it's a bit of a tangled web. 'N Sync's original deal was with Florida-based Trancontinental Records, which, in turn, signed a deal with BMG Germany for the group worldwide. However, sources say that BMG Germany never got a signed inducement letter from 'N Sync, which would have served as the band's acknowledgment and intent to honor the Trancontinental/BMG licensing agreement. Therefore, sources say, 'N Sync felt free to pursue other label deals. After talking with a number of major labels, according to sources, the group inked directly with Jive, which is distributed in the U.S., Canada, and New Zealand by BMG. As most people know, 'N Sync's self-titled label debut for RCA has been one of the year's top sellers. According to Sound-Scan, the release has sold 6.8 million units in the U.S. International figures were unavailable.

All Jive will confirm is that the band is now on the label worldwide and that an album originally slated for release in November on RCA has now been pushed to 2000. Calls to RCA were referred to parent BMG's VP of corporate communications, **Dennis Petroskey**, who says, " 'N Sync is a BMG act, and we protect and enforce our rights vigorously." He would not comment on whether BMG planned to pursue legal action over the group's move. Neither 'N Sync's manager nor Transcontinental, both located in Florida, returned calls by press time. One act that can't be too happy about the switch is **Backstreet Boys**, who reportedly left their management company last year in part because their managers represented 'N Sync as well.

Current Backstreet Boys manager **Jeff Kwatinetz** declined to comment on 'N Sync's move. However, this much we know: Backstreet Boys, who are signed to Jive worldwide, have announced a press conference on Sept. 27 to discuss something management is keeping very hush-hush until then.

READY FREDDY? Look for former Maverick Records partner/Madonna manager **Freddy DeMann** to re-emerge soon with a number of new activities. While DeMann declined to comment, sources say he's in discussions with **Michael Jackson**, whom he managed in the early '80s, about a possible management deal.

STUFF: Still no replacement for **Smashing Pumpkins** bassist **D'Arcy Wretzky**, who left the band at the beginning of September. The band still plans to release its next album on Virgin on Feb. 15, 2000 ... Pearl Jam, Brian Wilson, Green Day, Sheryl Crow, and Lucin-da Williams are among the acts expected to perform at the 13th annual Bridge School Concert to be held Oct. 30-31 at Shoreline Amphitheater in Mountain View, Calif. The benefit, organized by Neil Young, raises funds for the San Francisco-based Bridge School, a learning facility for physically challenged and severely speech-impaired children. The show is also supposed to feature Crosby, Stills & Nash, but there's no word on whether Graham Nash will be performance-ready following the Sept. 13 boating accident that broke both his legs.

Reprise will release "Clapton Chronicles: The Best Of Eric Clapton" on Oct. 12. In addition to covering the past 15 years of Eric Clapton's career, the set features "Blue Eyes Blue" from the "Runaway Bride" soundtrack and "(I) Get Lost," which will appear in the upcoming movie "The Story Of Us" ... "Reverb," HBO's live music show, debuts Tuesday (21) with performances from **Alanis Morissette** and **Everlast**. Other acts slated to appear during the 13-episode season are **Hole**, **Marvelous 3**, Wilson, Moby, Beck, Fountains Of Wayne, Sugar Ray, Vic Chesnutt, Collective Soul, and Kid Rock.

SHOW AND TELL: Beverly Hills, Calif., police officer **Marcelo Rodriguez** has filed a multimillion-dollar suit against **George Michael**, accusing the singer of committing slander in his song and video "Outside," as well as in numerous television interviews. In the suit, filed Sept. 13 in Los Angeles' California Superior Court, Rodriguez, who arrested Michael on charges of lewd behavior in a public park in April 1998, says Michael has accused the officer of entrapment and exposing his genitals to Michael. Such comments, according to the lawsuit, were intentional infliction of emotional distress. Michael's management did not respond by press time.

YOU GO GIRL: The Los Angeles chapter of Women in Music has released its first compilation CD of some of the City of Angels' best unsigned female artists. The 19-track set, on Indie Nation Records, includes tracks from Almost Ugly, Kanary, Atticus, DeeDee O'Malley, Rubydiver, and Kitty Kat Stew.

The $10 album is available through the organization's Web site (www.lawim.org), as well as through a number of other sites. Executive producer **Nancy Matter** says the organization is trying to secure distribution into brick-and-mortar stores. The artists will also sell the albums at their concerts.

Matter says the collection is the first in a series: the next album, which will come out next summer, will feature both male and female artists.

11TH STORY of Level 1 printed in FULL format.

Copyright 1999 Daily News, L.P.
Daily News (New York)

September 13, 1999, Monday

SECTION: Business; Pg. 28

LENGTH: 352 words

HEADLINE: FIERY FIGHT FOR HOT ACT   RIVAL LABEL WOOS 'N SYNC

BYLINE: By PHYLLIS FURMAN

BODY:
   Red-hot independent record label Jive is close to snaring teen pop phenomenon 'N Sync away from music giant BMG Entertainment.

   According to music sources, Jive is poised to add the band to its already highly lucrative stable of teeny bopper favorites, including the Backstreet Boys and Britney Spears.

   Lou Pearlman, who manages 'N Sync and runs Trans Continental Records, the Orlando-based company that produces their albums, acknowledged the negotiations with Jive.

   Pearlman, credited with discovering both 'N Sync and the Backstreet Boys, said "nothing has been determined yet," and that talks also are underway about 'N Sync's future with BMG execs.

   At stake is one of the music industry's hottest acts.

   Capitalizing on the swelling ranks of swooning teen music fans, 'N Sync's self-titled first album, released in March 1998, has sold 7 million copies domestically and remains a fixture on the pop charts.

   "This is an enormous asset," said one music industry insider.

   BMG chief executive Strauss Zelnick and Jive founder and chief Clive Calder declined to comment. A spokesman for BMG said that 'N Sync "is a BMG act, and we intend to enforce our rights vigorously."

   BMG has much to lose if the five-man band whose hit singles include "Tearing Up My Heart" flees.

   'N Sync now records for BMG label RCA, which has relied on the group to help pull it out of a major slump.

   While RCA's other leading acts include another sudden teen sensation, Christina Aguilera, and popular rock act the Dave Matthews Band, the loss of 'N Sync would be a heavy blow.

   Complicating matters is the relationship between BMG and Jive. BMG, a division of German media giant Bertelsmann, owns a minority stake in Jive and distributes its CDs in North America.

Daily News (New York) September 13, 1999, Monday

The battle over 'N Sync could mark the end of an already shaky relationship. Calder, a reclusive and shrewd music entrepreneur, has in the past looked to break his ties to BMG.

"N Sync's self-titled debut album has sold 7 million copies in the U.S. since its March 1998 release.

Source: Recording Industry Association of America


GRAPHIC: 'N Sync

LOAD-DATE: September 13, 1999

16TH STORY of Level 1 printed in FULL format.

Copyright 1999 BPI Communications, Inc.
The Hollywood Reporter

September 09, 1999

LENGTH: 297 words

HEADLINE: Jive, BMG wrangle over 'N Sync

BYLINE: Marc Pollack

DATELINE: NEW YORK

BODY:

   Jive Records, home to pop kingpins Backstreet Boys and Britney Spears, has
signed multiplatinum teen favorites 'N Sync, sources said, and that might cause
a rift with distributor BMG.

   BMG, which distributes Jive artists in the United States, claims that 'N
Sync is signed to Transcontinental, the group's previous label.

   " 'N Sync is signed to Transcontinental, which has a licensing agreement with
BMG," BMG Entertainment spokesman Dennis Petroskey said. "We take that contract
seriously and will enforce it vigorously."

   The addition of 'N Sync to the Jive roster is seen as a major move by label
chief Clive Calder, giving his independent imprint a leg up in the lucrative pop
market.

   Sources said Interscope and Sony also approached the group, but Jive, based
on its success with Spears and Backstreet Boys, were the label of choice.
Representatives of 'N Sync have been in negotiations with labels the past
several months.

   'N Sync's self-titled debut and a follow-up Christmas release were two of the
biggest-selling albums last year.

   For the week ending Sept. 5, 'N Sync has sold 6.8 million units, according to
SoundScan figures. The group's next album is due in January.

   Sources said the BMG-Jive distribution deal, which includes Canada and the
United States, was a big leverage point in the negotiations.

   Jive has been on a roll recently. The label's Backstreet Boys is the
best-selling act this year. The group's "Millennium," No. 3 on the charts, has
passed the 5.6 million mark, while the group's self-titled debut has sold more
than 8.5 million units, according to SoundScan. Spears' " Baby One More Time"
has passed the 5 million mark, R. Kelly's "R." has sold more than 2 million
units, and rapper Too Short is approaching gold.  n

LANGUAGE: ENGLISH



TRADEMARK APPLICATION SERIAL NO.  **75712737**

SER000

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE
FEE RECORD SHEET

06/16/1999 FMKE1   00000E1 75712737
01 FC:351               1225.00 OP

**PTO-1555**
(5/87)

To:   Assistant Commissioner for Trademarks

From:   Dorsey & Whitney, LLP
1330 Connecticut Avenue NW; Suite 200
Washington, D.C.  20036
Tel. 202-452-6971

**91151**

Dorsey & Whitney Filing Number

Atty. Docket No. 449126-0001

Application/Registration No. : NEW APPLICATION

Opposition/Cancellation No.:

May 24, 1999
Filing Date

Trademark: 'N SYNC

The following items/fees are submitted herewith to the U.S. Patent & Trademark Office:

ITEMS

U.S. PTO FEES ENCLOSED

| | | |
|---|---|---|
| _X_ | Transmittal Sheet | |
| _x_ | New U.S. TM Application incl.  0 specimens per cl. | |
| __ | Declaration. Power of Attorney, Drawing Page and return postcard | |
| __ | Priority Document - Cert. copy of Application | |
| __ | Request for Reinstatement of Application | |
| __ | Response or Amendment | |
| __ | Request to Divide Application | |
| __ | Request for Extension of Time | |
| __ | Statement of Use with 3 specimens per class | |
| __ | Declaration under §§ 8 & 15 incl. One specimen | |
| __ | TM renewal Application incl. specimens (1 per cl) | |
| __ | Assignment  with Cover Sheet | |
| __ | Amendment to Allege Use with 6 specimens | |
| __ | Power of Attorney | |
| __ | Request to Divide Application | |
| __ | Change of Attorney Address | |

| | |
|---|---|
| _____ | Filing Fee |
| __X__ | New Application Fee |
| _____ | Recordation |
| _____ | Extension Fee |
| _____ | Notice of Opposition Fee |
| _____ | Petition to Cancel Fee |
| _____ | TM Statement of Use Fee |
| _____ | § 8 Affidavit Fee |
| _____ | §§ 8 and 15 Affidavit Fee |
| _____ | TM Renewal Application Fee |
| _____ | Expedited Processing Fee |
| _____ | Amendment to Allege Use Fee |
| _____ | Fee to Amend Mark |
| _____ | Request to Divide Application |
| _____ | Additional Class Fee |
| _____ | No Fee |

$1225.00     Total Fees Enclosed

Check Number  _1801_

DEPOSIT ACCOUNT AUTHORIZATION

_x_  Please debit any other charges or credit any overpayment to Deposit Acct No. 04-1425 and cite our Ref. No.  449126-1



COMBINED

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE
### Joint Application for Combined Trademark and Service Mark Registration
### Based On Intent To Use

Mark       :       'N SYNC

Int. Classes.:    9, 14, 16, 25, and 41

Assistant Commissioner for Trademarks
2900 Crystal Drive
Arlington, VA 22202-3513

INT CLASS  9  16
                 25
           14  41

James Lance Bass
104 West Easthaven Circle
Brandon, MS 39042

A  Citizen of the United States;

Joshua Scott Chasez
2746 Woodruff Dr.
Orlando, FL 32837

A  Citizen of the United States;

Justin Randall Timberlake
303 Fawn Lake Drive
Millington, TN 38053

A  Citizen of the United States;

Joseph Anthony Fatone, Jr.
2746 Woodruff Dr.
Orlando, FL 32837

A  Citizen of the United States; and

Christopher Alan Kirkpatrick
7300 West Point Blvd.
Apt. 723
Orlando, FL 32835

A  Citizen of the United States

The above-identified joint applicants have a bona fide intention to use the combined trademark and

WYNDHAM BELAGE HOTEL    Fax:3108540926        May 24 '99   13:22    P.02

service mark shown in the accompanying drawing in commerce on or in connection with

MUSICAL SOUND RECORDINGS; PRERECORDED RECORDS, AUDIO CASSETTES,

COMPACT DISCS AND CD-ROMS FEATURING MUSIC AND LYRICS; PRERECORDED

VIDEO TAPES FEATURING MUSICAL ENTERTAINMENT; LASER DISCS FEATURING

MUSICAL ENTERTAINMENT; VIDEO DISCS FEATURING MUSICAL ENTERTAINMENT;

MULTIMEDIA SOFTWARE RECORDED ON CD-ROM FEATURING MUSICAL

ENTERTAINMENT in International Class 9;

JEWELRY; EARRINGS AND EAR CLIPS; CLOCKS AND WATCHES; ORNAMENTAL

PINS; CHAINS; BRACELETS; MEDALS; RINGS; NECKLACES; CIGARETTE LIGHTERS

AND CIGARETTE CASES; CUFF LINKS; PENDANTS; BELT BUCKLES; CHARMS in

International Class 14;

BOOKS, NEWSLETTERS, PAMPHLETS, MAGAZINES, MAGAZINE SUPPLEMENTS ALL

IN THE FIELD OF ENTERTAINMENT AND MUSIC; SHEET MUSIC; POSTERS;

STICKERS; DECALS; NOTE CARDS, STATIONERY, CALENDARS; TRADING CARDS;

MOUNTED AND UNMOUNTED PHOTOGRAPHS; TEMPORARY TATTOOS in International

Class 16;

CLOTHING NAMELY, NAMELY, HATS, CAPS, VISORS, HEADBANDS, HOODS,

SCARVES, NECKTIES, MUFFLERS, SHIRTS, T-SHIRTS, BLOUSES, PULLOVERS, TOPS,

JACKETS, PARKAS, COATS, SWEATERS, VESTS, SWEAT SHIRTS, PANTS, SWEAT

-2-

PANTS, SHORTS, BOTTOMS, SKIRTS, DRESSES; UNDERWEAR, NAMELY, BOXER

SHORTS, UNDERSHORTS, UNDERPANTS, BRAS; SOCKS, HOSIERY; FOOTWEAR,

NAMELY, SHOES AND BOOTS; GLOVES, MITTENS; SWIMWEAR, BEACHWEAR;

LEOTARDS, LEGGINGS, TIGHTS; PAJAMAS, ROBES, LOUNGEWEAR; BELTS in

International Class 25; and

ENTERTAINMENT IN THE NATURE OF LIVE PERFORMANCES BY A MUSICAL GROUP

in International Class 41; and request that said mark be registered in the United States Patent and

Trademark Office on the Principal Register established by the Act of July 5, 1946, under § 1(b), 15

U.S.C.§ 1051(b).

The mark will be used on containers and packaging for goods, on labels affixed to the goods, or on

the goods themselves; the mark will be used on advertisements for the services; and the required filing

fee is submitted herewith.  In the event that this fee is deficient in any respect, please charge any

additional required amount to Deposit Account 04-1425 and refer to our reference 449126-1.

## POWER OF ATTORNEY

The joint applicants hereby appoint STEPHEN G. JANOSKI, ALDO NOTO, and PHILIP BAKER-

SHENK of DORSEY & WHITNEY LLP, 1330 Connecticut Avenue, N.W., Suite 200, Washington,

D.C. 20036 (Tel: 202-452-6933; Fax: 202-857-0569), with full power of substitution and revocation, to

prosecute this application to register, to transact all business in the U.S. Patent and Trademark Office in

connection therewith, and to receive the Certificate of Registration.

-3-

## DECLARATION

The undersigned being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U.S.C. 1001, and that such willful false statements may jeopardize the validity of the application or any resulting registration, each declares that he believes he and each other joint applicant is the owner of the mark sought to be registered, or, if the application is being filed under 15 U.S.C. 1051(b), he believes he and each other joint applicant are entitled to use such mark in commerce; to the best of his knowledge and belief no other person, firm, corporation, or association has the right to use the above identified mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods of such other person, to cause confusion, or to cause mistake, or to deceive; and all statements made of his own knowledge are true and all statements made on information and belief are believed to be true.

Dated: May 24, 1999     By: _____
                             James Lance Bass

Dated: May 24, 1999     By: _____
                             Joshua Scott Chasez

Dated: May 24, 1999     By: _____
                             Justin Randall Timberlake

Dated: May 14, 1999     By: _____
                             Joseph Anthony Fatone, Jr.

Dated: May 24, 1999     By: _____
                             Christopher Alan Kirkpatrick

-4-

May 24 '99  13:23        Fax:3108540926        LYNDHAM BELFAGE HOTEL        P.05

05-24-1999

U.S. Patent & TMOfc/TM Mail Rcpt Dt. #00

# COMBINED

Joint Applicants:  James Lance Bass
104 West Easthaven Circle
Brandon, MS  39042

Joshua Scott Chasez
2746 Woodruff Dr.
Orlando, FL  32837

Justin Randall Timberlake
303 Fawn Lake Drive
Millington, TN  38053

Joseph Anthony Fatone, Jr.
2746 Woodruff Dr.
Orlando, FL  32837

Christopher Alan Kirkpatrick
7300 West Point Blvd.
Apt. 723
Orlando, FL  32835

| INT CLASS | |
|---|---|
| 9 | 14 |
| 16 | 25 | 41 |

Goods and Services:  Musical sound recordings; prerecorded records, radio tapes, compact discs and CD-ROMS featuring music and lyrics; prerecorded video tapes featuring musical entertainment; laser discs featuring musical entertainment...in International Class 9;

Jewelry; earrings and ear clips; clocks and watches; ornamental pins; chains; bracelets; medals; rings; necklaces; cigarette lights and cigarette cases; cuff links; pendants; belt buckles; charms in International Class 14;

Books, newsletters, pamphlets, magazines, magazine supplements all in the field of entertainment and music; sheet music; posters; stickers; decals... in International Class 16;

Clothing namely, hats, caps, visors, headbands, hoods, scarves, neckties, mufflers, shirts, t-shirts, blouses, pullovers, tops, jackets, parkas, coats,...in International Class 25; and

Entertainment in the nature of live performances by a musical group in International Class 41

'N SYNC

STEPHEN G. JANOSKI
ALDO NOTO
PHILIP BAKER-SHENK
DORSEY & WHITNEY LLP
1330 Connecticut Avenue, N.W.
Suite 200
Washington, D.C.  20036
Tel: 202-452-6933; Fax: 202-857-0569



TRADEMARK
76712737



PARKER CHAPIN FLATTAU & KLIMPL, LLP

COUNSELLORS AT LAW

1211 AVENUE OF THE AMERICAS

NEW YORK, N.Y. 10036-8735

(212) 704-6000

CABLE LAWPARK

FAX (212) 704-6288

TELEX 640347

MICHAEL D. FRIEDMAN
(212) 704-6309

175 GREAT NECK ROAD
GREAT NECK, NY 11021
(516) 482-4422
FAX (516) 482-4469

September 14, 1999

**BY FACSIMILE AND**
**FIRST CLASS MAIL**

Helene M. Freeman, Esq.
Dorsey & Whitney
250 Park Avenue
New York, NY  10177

Re:   'N Sync -w- Trans Continental Records, Inc.
Exclusive Recording Agreement

Dear Ms. Freeman:

We have received and responded to a series of letters from you and others which sought to establish a basis for your clients to avoid the agreements which they made with Louis J. Pearlman, Trans Continental Records, Inc. ("Trans Continental") and others when your clients were offered the extraordinary opportunity to become members of the musical group known as 'N Sync. The grounds upon which they claimed to be released from those agreements were less than flimsy and totally lacking in legal merit. More significantly, their actions reflected an astounding failure to acknowledge that they had achieved whatever fame and fortune they enjoyed as a result of the vision, creativity and investment made by Lou Pearlman who risked substantial sums to make these five aspiring performers into a successful group.

Our clients have now heard reports that your clients have compounded the insult they have already imposed on Mr. Pearlman and Trans Continental by entering into an agreement with Zomba Recording Corporation ("Zomba") for the distribution of recordings on that label without regard to the rights of and obligations to Mr. Pearlman and Trans Continental. We assume that you have advised your clients and those who guaranteed their performance under the operative agreements of the injuries their actions have caused and will continue to cause, and the risks they are taking as a consequence of those steps. We also assume that you have advised Zomba, which was fully aware of Trans Continental's exclusive and long-term recording agreement with your clients, of our numerous written communications detailing the utterly frivolous nature of your purported terminations.

This letter serves as a formal notice that the trademark, copyright and contract rights of Mr Pearlman, Trans Continental and others with whom they have dealt preclude the release of any album by Zomba or anyone else without the prior written approval of Trans Continental and

484107-1

PARKER CHAPIN FLATTAU & KLIMPL LLP

Helene Freeman, Esq.                    - 2 -                    September 14, 1999

that all master recordings, which are the property of Trans Continental, may not be used without its prior written consent.  We request that you immediately inform us of the accuracy of the reports to which we refer, provide us with all details of any such arrangements with Zomba, and disclose to us immediately whether there is in fact an intent to release one or more recordings by Zomba without our clients' supervision and consent. In addition, the existence and location of all master recordings should be disclosed to us and Trans Continental without further delay.

In addition to the foregoing, your clients have expressly acknowledged our clients' exclusive rights in the ownership and use of the name 'N Sync and agreed that they would not use, or permit any third party to use, the name in connection with the recording, production, manufacture, sale or promotion of recordings, in connection with personal appearances, merchandising and otherwise.  Be advised that any use by your clients or their designees of the tradename and service mark 'N Sync without our clients' prior written authorization shall constitute violation of the exclusive rights of Mr. Pearlman and Trans Continental.  We demand your immediate written confirmation that your clients shall immediately cease all use and reference to the name 'N Sync in connection with any and all of their commercial activities.

As always, Mr. Pearlman is prepared to speak directly with the young men whom he made into a successful group and discuss any real concerns with them on a face to face basis.  Apparently, the current "advisors" who have persuaded these young men to take another course prefer to prevent that and to plunge everyone into a costly and public litigation.  Our clients will not sit idly by and allow their reputations and intellectual property rights to be misused, converted or destroyed.

All of our clients' rights, claims, remedies and legal positions are expressly reserved.

Very truly yours,

Michael D. Friedman

cc: Louis J. Pearlman
    Johnny Wright
    Steven C. Beer Esq.
    Laurence H. Rudolph, Esq.
    Barry J. Brett, Esq.
    Paul Katz, Esq. (Zomba)
    Steven Hays, Esq.

484107-1