FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA -- ORLANDO DIVISION

99 NOV -2 FM 2:59

............................................................... x

TRANS CONTINENTAL RECORDS, INC., BMG
ENTERTAINMENT, BMG ARIOLA MUENCHEN
GmbH, TRANS CONTINENTAL ENTERTAINMENT,
INC., and LOUIS J. PEARLMAN,

                                 Plaintiffs,

                    v.

ZOMBA RECORDING CORPORATION, CLIVE
CALDER, JAMES LANCE BASS, JOSHUA SCOTT
CHASEZ, JOSEPH ANTHONY FATONE, JR.,
CHRISTOPHER ALAN KIRKPATRICK, and JUSTIN
RANDALL TIMBERLAKE,

                             Defendants.

............................................................... x

: Civil Action No.
: 99-1282-Civ-Orl-22C
:
: **DECLARATION OF CLIVE**
: **CALDER IN OPPOSITION**
: **TO PLAINTIFFS' MOTION**
: **FOR A PRELIMINARY**
: **INJUNCTION**
:
:
:
:
:
:
:
:
:
:
:
:

CLIVE CALDER, pursuant to 28 U.S.C. § 1746, declares under penalty

of perjury:

        1.     I am the co-founder and chief executive officer of the group of

companies called Zomba.  The U.S. record company of the Zomba Group is called

Zomba Recording Corporation ("Zomba"), which (with me) is a defendant in this

action.  Zomba recently entered into an exclusive recording contract ("the Zomba

Recording Agreement") with the musical group 'N SYNC -- defendants Lance Bass,

J.C. Chasez, Joey Fatone, Chris Kirkpatrick and Justin Timberlake -- through the

group's loan-out company, Zeeks, Inc.  This declaration opposes plaintiffs' motion for

a preliminary injunction, which asks this Court to restrain 'N SYNC from (among other

things) performing the Zomba Recording Agreement.

26

2.      After a brief recital of my background and Zomba's place in the music industry, I address below plaintiffs' claims against Zomba and me, as well as plaintiffs' assertions that they will suffer irreparable injury unless 'N SYNC is enjoined from pursuing its recording career with Zomba.  As I explain, Zomba did nothing to induce 'N SYNC to terminate its recording agreement with plaintiff Trans Continental Records, Inc. ("Transcon Records"); Zomba was unaware of 'N SYNC's decision to do so until almost two months after termination of that agreement.  In addition, it is not credible for plaintiffs, including BMG Entertainment ("BMG Music"), to argue that the absence of an injunction will result in irreparable injury to them.  By contrast, such an injunction would severely damage 'N SYNC and Zomba, and do great damage to fair competition in the music industry.

3.      Simply put, while asking this Court for equity, plaintiffs are seeking to enforce unreasonable contracts imposed on young artists, negate their exercise of an explicit termination right, and eliminate any competitive alternative allowing the artists to work.  Such a result would be unfair, send a terrible message to other artists who find themselves under similar unconscionable contracts and to the rest of the music industry, and threaten the viability of 'N SYNC's career.  I respectfully submit that this Court should deny plaintiff's request in its entirety.

*Background*

4.      I have been employed in the music industry since 1970, during which time I have been involved in all aspects of the business both in the United States and around the world.   I co-founded Zomba in the United Kingdom in 1976, and have served as its chief executive officer since then.  Zomba, which now has its headquarters

2

in New York, is engaged in the business of (among other things) producing and distributing records in the United States and elsewhere. Zomba does not manufacture records, nor does it physically package, sell or ship them in the U.S.; this is done for Zomba by others as I explain below.

       5.     Zomba is a large *independent* record company. In the music business, "independent" refers to record companies other than the five "majors." The five "majors" are huge, multi-billion-dollar international entertainment conglomerates engaged in the global manufacture, production and distribution of records. The five majors are:   BMG Music (including the Arista and RCA labels), a division of Bertelsman A.G., the world's third largest media organization; EMI (including Capitol and Virgin), the more than 100 year old publicly held U.K. corporation; Sony Music (including Columbia and Epic), a division of the Sony worldwide conglomerate; Universal (including Polygram, Interscope, Def Jam and MCA), the world's largest record company and a division of Seagram's; and Warner Music (including Warner, Elektra and Atlantic), a division of Time Warner, the world's largest media group.

       6.     These five fully integrated majors dominate the music industry, and have done so for many years.   Each has an extensive roster of established and upcoming recording stars.   Each has a huge catalog of recordings.   Each competes in every musical genre, from pop to rock to soul to classical.   Any one of them is able to exert pervasive influence on all aspects of the business, including with wholesalers, retailers, radio stations, video television outlets, and Internet music suppliers.   The economic clout of any one of the five majors dwarfs that of any independent record company, or indeed all independent record labels combined.

3

7.     These facts provide important context that refutes plaintiffs' arguments. Zomba is uniquely positioned to know. Zomba has had extensive business dealings with BMG Music for the past twelve years: BMG Music is a 20% stockholder of Zomba's parent company, and Zomba has existing agreements whereby affiliates of BMG Music act as exclusive manufacturers and distributors of Zomba's releases in the United States and Canada. In addition, Zomba has also had experience with Louis Pearlman and his Transcon group of companies, and the manner in which he and his companies exploit young performers eager to enter the music industry.

**_The Zomba Recording Agreement_**

8.     By an agreement dated September 7, 1999, Zomba entered into an exclusive recording agreement with Zeeks, Inc., a Delaware corporation, which we understand to be a loan-out company wholly owned and controlled by the members of 'N SYNC for the services of the group. This Zomba Recording Agreement is a typical U.S. record contract for the recording services of a group of the stature of 'N SYNC.

9.     It is common for artists to have contracts with corporate entities, often "loan out companies" owned or controlled by the artists, which in turn enter into recording agreements with a record label for the recording services of the artists. To assure that the recording artists (and not merely the corporation) are committed to perform under the recording contract, it is the invariable practice in the music business, in my experience, for a record label to obtain what is referred to as an "inducement letter" or an artists' "assent and guaranty." These documents are the means by which a record label establishes a contractual relationship directly with the artist, and the documents are attached to and made a part of the recording agreement. In an

4

inducement letter or assent and guaranty, the artist expressly acknowledges having read the recording agreement and promises the record label to perform the relevant terms of the recording agreement.  As I note below, Mr. Pearlman is fully aware of this industry practice, and the form, content and significance of the commitment.

        10.    So is BMG Music.  I attach as Exhibit A an example of an Artist's Assent and Guaranty used by RCA, a wholly owned BMG Music label, in 1998.  This document, attached to the recording agreement between RCA and the corporation furnishing the artist's services, is substantially similar to the inducement letters used throughout the music business.  The Assent and Guaranty provides that, to induce RCA to enter into the recording agreement with the corporation providing the artist's services (whether a loan-out company owned by the artist or an independent company), the artist:

    •    "represents to RCA that she has read the [Recording] Agreement and has consulted with or has had the opportunity to consult with a lawyer chosen for her for the purpose of having the legal effect of each of the provisions contained in the [Recording] Agreement explained to her";

    •    "assents to the execution of the [Recording] Agreement and agrees to be bound by all grants, restrictions and other provisions of the [Recording] Agreement relating to the Artist"; and

    •    "guarantees, absolutely and unconditionally, the full performance by [the loan-out company] ("the Furnishing Party") of all of the Furnishing Party's obligations under the [Recording] Agreement."

RCA's Assent and Guaranty also provides that "[t]he Artist's liability under this guaranty is direct and immediate, and is not conditioned upon the pursuit by RCA of any remedy RCA may have against the Furnishing Party. This guaranty shall not be revocable at any time or for any reason."

11.    In the Zomba Recording Agreement, in keeping with this industry convention, the individual members of 'N SYNC executed an Artist's Assent and Guaranty for Zomba.  Under this Assent and Guaranty, each member of 'N SYNC expressly and personally agrees with Zomba to perform the Zomba Recording Agreement and to fulfill the relevant obligations of 'N SYNC's loan-out company, Zeeks, Inc., under the Zomba Recording Agreement.

**The Injury Threatened by Plaintiffs' Motion**

12.    The principal victims of any injunctive relief in this action would be 'N SYNC -- Chris, J.C., Joey, Justin and Lance.  These young talented individuals have enjoyed success in the music business, but that success and their careers would quickly evaporate if 'N SYNC is not permitted to make records.  I address later plaintiffs' misguided claims, made as if an artist's career is merely a product line like toothpaste, that their "market" power will diminish and the "quality and image" of their alleged "mark" will be injured if an injunction does not issue.  It is unfortunate that nowhere do plaintiffs address the effect of the relief they demand on these performers.

13.    The effect would be severely damaging -- and no amount of money can remedy it.  'N SYNC's appeal today is predominately concentrated in the pre-teen and teen audience for pop music.  This audience is notoriously fickle; no

segment of the music business is subject to more rapidly changing trends. New artists and musical styles emerge quickly, often supplanting previously popular and successful artists and styles. This effect is particularly noticeable with the pre-teen and teen audience. There is great competition among artists for the ever-changing loyalty of these fans. To preserve fan loyalty and prolong a career, it is essential that these new artists remain in the public eye, and the best way to achieve this is through the regular release of new records.

14.    'N SYNC's last album of pop music was released in March 1998. To maintain the momentum of 'N SYNC's career, a new album ideally should have been released prior to the end of this year. To postpone such release by anything more than a few months would undoubtedly be very harmful to 'N SYNC. A new release by Zomba requires many months of advance work. Zomba has already devoted substantial funds to securing 'N SYNC's recording services and is currently devoting time and resources in planning for 'N SYNC's next release, including production and recording costs, plans for release of a single from the album before or soon after year's end, and development of marketing and promotion efforts. A delay in implementing this schedule would cost 'N SYNC a critical opportunity to solidify and enhance the group's following. That opportunity cannot be recaptured. There is no reason, in this case, to delay it.

*Negotiation of the Zomba Recording Agreement*

15.    In paragraph 13 of the Zomba Recording Agreement, 'N SYNC represented to Zomba that they were free to enter into the Zomba Recording Agreement. Paragraph 13.02 of the Zomba Recording Agreement provides:

Without limitation of the warranties and representations set forth in paragraph 13.01, you warrant and represent that: (a) the "Exclusive Recording Agreement between Trans Continental Records, Inc. ("Transcon") and the members of the Artist [defined to mean 'N SYNC] dated April 29, 1996 ("the Transcon Agreement") has been properly terminated; (b) neither Transcon nor any other Person other than you is entitled to the recording services of the Artist or any member of the Artist, (c) the Artist and you have no obligations, commitments, or encumbrances to Transcon or any other Person that may restrict in any way the performance of the Artist's and your obligations under this agreement; and (d) Justin Timberlake has repudiated and disaffirmed the Transcon Agreement to the full extent permitted by law, by reason of attaining the age of majority.

16.     The circumstances leading to execution of the Zomba Recording Agreement are these: In mid-July of this year, while I was in the Zomba U.K. office, I was told that Adam Ritholz, a respected U.S. lawyer in the music business, had informed the representatives of certain freelance music producers for 'N SYNC that 'N SYNC was no longer under contract to Transcon Records and would not be recording or releasing future records for Transcon Records or BMG Ariola.

17.     I subsequently called Mr. Ritholz and asked him whether, as I had heard, 'N SYNC was no longer under contract to Transcon Records. Mr. Ritholz told me that 'N SYNC had terminated its recording agreement with Transcon Records in May; that 'N SYNC never had a contract with RCA; and that, as part of his legal representation of 'N SYNC, he was currently looking for a recording agreement with

another record company.  Mr. Ritholz explained that Transcon Records had granted a license for 'N SYNC's recordings to BMG Ariola Muenchen GmbH ("BMG Ariola"), BMG Music's German subsidiary, and that BMG Ariola had no inducement letter from 'N SYNC.  When I asked Mr. Ritholz whether he was in negotiations with any other record company, he told me, as I recall, that he was "well down the line" with some other labels.  I asked him whether Zomba could "throw its hat in the ring" and Mr. Ritholz invited me to do so.

18.    Mr. Ritholz and I met on July 26, a week after my return to New York.  At this meeting, he gave me a copy of 'N SYNC's letter of May 26, 1999 terminating the Transcon Recording Agreement.  He also reiterated to me that 'N SYNC had no contractual relationship with BMG Ariola.  He told me that he was in active discussions with several other record companies to sign 'N SYNC, and that Zomba would need to move quickly if Zomba were interested in also bidding for 'N SYNC's services.

19.    A little less than three weeks later, Zomba made an offer to sign 'N SYNC to an exclusive recording agreement.  As far as Zomba was aware, 'N SYNC was then still engaged in discussions with other record labels.  I did not hear from Mr. Ritholz until the very end of August that 'N SYNC was interested in moving forward with Zomba.  Final negotiations of the Zomba Recording Agreement ensued.

20.    In short, it is simply untrue that Zomba or I induced 'N SYNC to terminate the Transcon Recording Agreement or any other contract.  To my knowledge, no one at Zomba had any communications of any kind with any representative of 'N SYNC prior to 'N SYNC's termination of the Transcon Recording

9

Agreement in May 1999.  Zomba had no communications with any representative of 'N SYNC until almost two months later, at a time when 'N SYNC was already engaged in negotiations with other record labels for its services.  Zomba was not (and is not) aware of any existing contractual relationship between 'N SYNC and any affiliate of BMG Music; to the contrary, Zomba was informed and confirmed that no such contractual relationship exists.

      21.    BMG Music knows it.  Prior to the public announcement of the Zomba Recording Agreement, I spoke with Strauss Zelnick, the chief executive officer of BMG Music.  Mr. Zelnick acknowledged to me that BMG Ariola had no inducement letter from 'N SYNC.  In this same conversation, contrary to the claims now made by BMG Music in plaintiffs' motion papers, Mr. Zelnick belittled the long-term prospects of 'N SYNC, but argued that I was wrong to "betray" BMG Music by signing the group.

      22.    Therein lies the explanation for plaintiff's complaint against Zomba and me.  Plaintiffs' objective in suing Zomba (and me personally) for $150 million -- including $50 million in alleged punitive damages -- is meant as a threat to the music industry, and especially independent labels such as Zomba, *not to dare* compete for the talent of artists who independently exercise their contractual right to terminate.  By throwing its massive resources against Zomba, and naming me personally as a defendant in a $150 million suit, BMG Music seeks to intimidate others from competing and thereby assure that artists who stand on their contract rights have no choice but to forfeit those rights or leave the business.

10

*The Pearlman Agreements*

23.    Such a tactic is improper in any marketplace, but this is an especially unsuitable circumstance in which to try it.  BMG Music is attempting to force  young artists to choose between recording under unfair and unconscionable agreements or not recording at all.  Zomba has experience with Mr. Pearlman and his contracts, because Zomba is the record label of another of the musical groups for which Mr. Pearlman claims credit, the Backstreet Boys.  The assorted contractual and self-dealing arrangements to which Mr. Pearlman apparently tried to bind 'N SYNC parallel those he executed with the Backstreet Boys, who were also, at the time of the contracts, young men.  In that situation, as with 'N SYNC, Mr. Pearlman procured irrevocable proxies to control the relevant corporations, signed the group to an array of self-dealing contracts ostensibly entitling Mr. Pearlman or his companies to substantial royalties and commissions, and attempted to control the artists' own name, by claiming the name as his own trademark.

24.    Although Transcon Records entered into the recording agreement with 'N SYNC in 1996,  Mr. Pearlman's Transcon Records was not then, and is not now, a record company in any meaningful sense of the word.  As far as I am aware, Transcon Records does not manufacture, produce, market, distribute or sell recordings, or engage in any other activity characteristic of a record company.  As best I know, and in the perception of the music industry at large, Transcon Records and Mr. Pearlman operate instead to locate musical acts and then arrange to have others produce, market and distribute the acts' records and promote the acts' careers.

25.     Thus, by way of example, Mr. Pearlman's claim to have "created, developed and marketed" the Backstreet Boys is, to put it mildly, overstated. When the Backstreet Boys signed with Zomba in March 1994, they were largely unknown, undeveloped and unmarketed. While I do not have personal knowledge concerning the initial formation of the Backstreet Boys, once the Backstreet Boys signed with Zomba in 1994, Mr. Pearlman's and Transcon Records' role in the development and marketing of Backstreet Boys was minimal.

26.     There is, however, one highly significant difference between the Backstreet Boys experience and this one. Originally, the Backstreet Boys had a recording contract with Transcon Records, which I understand was much like the one into which 'N SYNC entered here. When in 1994 Zomba was approached concerning the Backstreet Boys, Zomba refused to enter into any contract with Transcon Records for the services of the Backstreet Boys and instead insisted that Zomba enter into a direct U.S. record contract with the Backstreet Boys. This was done: Zomba signed a recording contract directly with Backstreet Boys, Inc., which Zomba understood to be the Backstreet Boys' loan out company; Zomba obtained a standard inducement letter from the individual members of the group. Mr. Pearlman, who was directly involved in the negotiation and execution of this recording contract, was familiar with the content of the inducement letter and knew that it was a condition to the contract. (I should note that Zomba did not learn until much later that Mr. Pearlman had earlier obtained irrevocable control over the company called Backstreet Boys, Inc. Mr. Pearlman no longer controls that company.)

12

*The Significance of a U.S. Record Deal*

       27.    The contract between Transcon Records and BMG Ariola is not a U.S. record deal. This is so regardless of any "intercompany licensing arrangements" internal to BMG Music. Some background is necessary to understand why I say this.

       28.    I am familiar with the business of BMG Ariola, because BMG Music's international arm distributed Zomba's releases overseas until September 1996. BMG Ariola is a record company operating in what is known as the GSA region -- Germany, Switzerland and Austria. As I understand it, BMG Ariola is engaged in the business of producing, manufacturing and distributing records in that region.

       29.    Each of the five majors, as well as some independents such as Zomba, have subsidiaries or affiliates in countries and regions throughout the world operating as local record companies. These local record companies produce and distribute releases by locally generated artists, and also commonly have the right to distribute releases of sister companies located elsewhere. Thus, for example, a German subsidiary of a major would typically have many artists licensed to or signed directly to recording contracts with that subsidiary, which would release those artists' records in Germany. These licenses and recording contracts would also often provide that the German subsidiary has the worldwide distribution rights to those artists' records. In my experience, however, only in a small percentage of cases do these contracts *obligate* the German subsidiary to release those artists' records outside Germany. It is even more rare for these contracts to obligate the German subsidiary to release those records in the United States. Rather, through intercompany arrangements providing blanket licenses (*i.e.*, not specific to any artist), the various territorial subsidiaries (including

13

the U.S. label subsidiary) have the right, but not the obligation, to elect to release records produced by the German subsidiary in their respective territories. It is highly unusual for U.S. record labels to exercise this right and release albums in the U.S. by artists under contract to local foreign labels, especially those located outside North America and the U.K. The U.S. is principally an exporter, not an importer, of recording artists.

30.   There are various significant differences for a recording artist between being under contract to a foreign subsidiary label and being under contract to a U.S. record company. These include:

(a)   First and foremost, a standard recording contract with a U.S. record company requires the U.S. record company to release the artists' recordings in the U.S. If the U.S. record company fails to do so, the artist may terminate the contract and thereby seek to acquire certain rights in the recordings to make them available to other U.S. record companies. This commitment is of major consequence for the artist. The U.S. market is by far the largest and most economically important record market in the world, particularly for a U.S. artist. To have a deal with a U.S. record company means that the artist has a commitment for a release of the recording in the world's largest market. This commitment does not exist if the artist is signed to a foreign label. To the contrary, under such a foreign deal, the foreign label may continue to bind the artist as long as the foreign label releases recordings in its territory, and regardless of whether the artist's recordings are ever released in the U.S. or anywhere outside the local territory. Thus, for instance, under the recording contract between Transcon Records and BMG Ariola, neither BMG

14

Ariola nor any affiliate had any obligation to release 'N SYNC's recordings in the U.S. Nevertheless, BMG Ariola could have continued to bind 'N SYNC for the full term of that contract even if BMG Ariola or its affiliates never released another 'N SYNC album in the U.S.

(b)     Second, the absence of a contractual commitment to release an album in the U.S. is not a mere technicality.  I see in the declarations submitted in support of plaintiffs' motion that BMG Music's U.S. label RCA did not learn of 'N SYNC until 1997, well after Transcon Records had entered into its contract with BMG Ariola.  Even then, U.S.-based employees of RCA were required "to pitch the Group as a potential RCA act."  (See RCA's Mr. DeGiorgio's declaration at paragraph 6.)  In other words, the fact that 'N SYNC was signed to BMG Ariola did not mean that 'N SYNC was anything more than a "potential" recording artist to be "pitched" to BMG Ariola's sister company in the U.S.  RCA was free (and remained free) to pass on 'N SYNC.  In all but the rarest situations, artists signed to the foreign label such as BMG Ariola are not "pitched" or even brought to the attention of the U.S. label.

(c)     Third, a group such as 'N SYNC is especially vulnerable in these circumstances.  As I have explained, 'N SYNC's appeal is predominately concentrated in the fickle pre-teen and teen audience for pop music.  This audience is somewhat different in the U.S. from the comparable European audience, which historically has found appeal in artists in the pop music genre who do not become popular in the U.S.  To be signed to a German-based record company, with no commitment from a U.S. record company for a U.S. release, means that a U.S.-based

15

group could be tied to a recording contract, to the exclusion of any U.S. record label, as long as the German company continues to release albums in Germany. This is true regardless of whether a U.S. affiliate had previously released an album in the U.S. Thus, the fact that BMG Ariola's U.S. affiliate released two 'N SYNC albums in the U.S. does not mean that 'N SYNC had any commitment for any future release in the U.S.

(d)     Fourth, for an artist, the economics of a U.S. record contract are materially different from a foreign contract. Just as a standard U.S. record contract pays a lower royalty for foreign sales, so, too, does a foreign contract pay a lower royalty for sales outside that foreign territory. This, of course, is of significance when the world's largest market, the U.S., is treated as a foreign territory for purposes of the artist's royalty rate. In addition, a foreign contract also typically provides for the artist to be paid royalties in the currency of the foreign country regardless of where the sales occurred, thus exposing the artist to currency fluctuation risks. Finally, foreign contracts produce delays in accounting and payment of royalties from sales outside the foreign territory, including U.S. sales. Thus, for example, in the case of BMG Ariola, a record sold by RCA in the U.S. in January 1999 will be accounted to BMG Ariola in August or September 1999; BMG Ariola will then account to Transcon Records for that sale in March 2000; and Transcon Records will not account to 'N SYNC for that sale until the end of September 2000.

31.     In short, it matters to an artist to have a contract with a U.S. record company entitling the artist to release of an album in the U.S. Plaintiffs assert in their motion papers that Zomba and I are liable here because we "knew or should

16

have known" that 'N SYNC's termination of the Transcon Recording Agreement was a "sham." As someone who has spent almost thirty years in the music industry, however, I can say that plaintiffs knew or should have known that 'N SYNC had no recording contract with a U.S. record company, and had no inducement letter with BMG Ariola. Thus, while Zomba and I had nothing to do with 'N SYNC's termination of the Transcon Recording Agreement, which occurred prior to the first contacts between any representative of Zomba and any representative of 'N SYNC, that termination should not have come as a surprise to plaintiffs.

### Plaintiffs' Claims of Injury

32.    I have reviewed the declarations of Messrs. Jamieson, DeGiorgio and Pearlman concerning the alleged injury they claim BMG Music and Transcon Records will suffer in the event that 'N SYNC and Zomba are not restrained from performing the Zomba Recording Agreement.    I respectfully suggest that these claims amount to nothing more than a statement that they find themselves embarrassed by these circumstances.

### The BMG Music Claims

33.    The claims of BMG Music are particularly hollow.  BMG Music alleges that 'N SYNC is "firmly associated" with its RCA label in the minds of "the public and the music industry." According to BMG Music, RCA will suffer "potentially devastating" injury to its ability to compete in the "lifeline" of retailers, radio and video television outlets.  With all respect, these claims are preposterous.

34.    To begin with, as surely BMG Music knows, the "public" associates 'N SYNC not with RCA but only with five talented young men: Chris, J.C.,

Joey, Justin and Lance.  Nobody buys a record because of a label.  Few consumers have any idea what label issues the recordings of even their favorite recording artist. To say that the record-buying public "associates" an artist with a label is akin to claiming that someone goes to a movie because of the studio that produced it.  People buy records because of the artists who perform on them, and rarely can identify the name of the label that released the album.  And record companies know it, because their promotional and marketing dollars are spent promoting artists, not labels.

35.    Contrary to plaintiffs' view, Chris, J.C., Joey, Justin and Lance are not fungible commodities briefly using a name that others will inherit.  'N SYNC is not a product, as plaintiffs depict the group, but five individuals with their own style and personality and talent.  'N SYNC is inextricably associated in the public mind only with those five performers.  Such is apparent from all the promotional and media attention directed at this group.  The face and sound and identity of 'N SYNC -- on records, in videos, on television, in books and magazines and countless news stories and Web sites -- are the faces and sounds and identities of these five young singers and dancers, and only them.  It would be a fraud on the public -- especially the young fans who are devoted to the group -- to use the name 'N SYNC to describe anyone other than these five stars.  To the public and the music industry, the name 'N SYNC means Chris, J.C., Joey, Justin and Lance.

36.    Thus, 'N SYNC is not a so-called "concept" group by any stretch of the imagination.  I understand a "concept" group to be a musical group in which the predominant public image consists of the idea of the group, rather than of its individual members.  Such a group is known and promoted as an indistinguishable whole, and its

18

membership is constantly changing. There have been a few such "concept" groups in the music business (e.g., Menudo and the Village People), in which the public appeal is less dependent on the individuals making up the group. But 'N SYNC cannot be compared to such a group: its members have been constant and the sole source of 'N SYNC's popularity. Chris, J.C., Joey, Justin and Lance personify 'N SYNC. Their names are intertwined with the public image of 'N SYNC. Plaintiffs' effort to dissociate the two -- their references to "the Group" and, separately, "the 'N SYNC name" as if the two were distinct and only coincidentally related -- may be convenient for their legal argument, but has no basis in reality.

37.   BMG Music's claim that the loss of 'N SYNC would be "potentially devastating" to BMG Music or its label RCA in the marketplace is similarly divorced from reality. BMG Music's extraordinary market power belies its dependence on any one artist. A major record company such as BMG Music has so many established artists under contract, and so much leverage in the marketplace as a result, that *it* is the lifeline for retailers, wholesalers, and media outlets eager for content to market, not the other way around. I know of no instance, nor do I see one cited in plaintiffs' papers, when the loss of a recording artist affected the ability of a major record company to continue fully to exploit its position in the marketplace.

38.   Plaintiffs' effort to portray 'N SYNC as in a "league of its own" with the Backstreet Boys for a particular audience is baseless. There is no meaningful "segment" of the music business comprised solely of groups of five young men who sing and dance. Instead, both groups compete in the broad genre of pop music with numerous other artists, including many under contract to BMG Music labels. These

19

artists include, among many others, Ricky Martin (Columbia/Sony); Christina Aguilera (RCA/BMG Music); 98 Degrees (Motown/Universal); TLC (Arista/BMG Music); Monica (Arista/BMG Music); LFO (Arista/BMG Music); Britney Spears (Jive/Zomba); Hanson (Mercury/Universal); Limp Bizkit (Interscope/Universal); and Jennifer Lopez (Epic/Sony).

        39.    There is another reason why the Zomba Recording Agreement will have no "irreparable" effect on BMG Music. As I noted, Zomba has a contract with BMG Music's distribution subsidiary pursuant to which BMG Music sells and physically distributes all Zomba releases in the United States and Canada, including those of the Backstreet Boys and, now, 'N SYNC. This means that BMG Music's own sales and distribution force is responsible for selling and shipping Zomba records to wholesalers and retailers throughout the country. The only way that such customers may have access to Zomba releases is through BMG Music. Zomba generally accounts for close to 30 percent of BMG Music's market share, and, as Zomba's distributor, BMG Music regularly takes credit for sales of Zomba records. Thus, BMG Music says in this case that its market share is approximately 18% of all record sales, but its sales of Zomba releases account for over 5% of that total. In addition, when publicly speaking of BMG Music's recent successes in the pop music segment, BMG Music's Mr. Zelnick has referred not just to 'N SYNC but to the Backstreet Boys (a Zomba release distributed by BMG Music) and Britney Spears (also a Zomba release distributed by BMG Music). In short, because BMG Music has the exclusive right to sell Zomba releases, including 'N SYNC, it makes no sense to say that the Zomba Recording Agreement threatens "irreparable" injury to BMG Music's relationships with

retailers and wholesalers since BMG Music will, in fact, distribute the next 'N SYNC album to those same retailers and wholesalers.

40.     Not only will the Zomba Recording Agreement have no effect on who sells 'N SYNC albums, but it will also have no effect on the physical manufacturing of 'N SYNC albums.   Zomba has a contract with BMG Music's manufacturing subsidiary whereby BMG Music manufactures and packages all Zomba releases in the United States.

41.     BMG Music's attempt to enjoin 'N SYNC is all about money. BMG would rather release 'N SYNC's next album through its wholly-owned U.S. label RCA, and thereby secure 100% of the label profits, rather than through Zomba, the parent company of which BMG Music owns only 20%, despite the fact that, as noted above, BMG Music takes credit for its sales of Zomba artists' records as one of BMG Music's "labels."

42.     In addition, I note that 'N SYNC has already recorded songs that have been released by record labels other than RCA.   For example, 'N SYNC currently has a single on the *Billboard* charts, a recording made with Gloria Estefan called "Music of My Heart."   The single was released by Epic, a Sony label, and distributed by Sony Music.   In addition, 'N SYNC recorded a song for the soundtrack of the movie *Tarzan*, and that album was released by a Disney label.   Presumably, these arrangements were made with the knowledge and consent of BMG Music.

### The Pearlman Claims

43.     Mr. Pearlman's arguments that he and his companies will suffer irreparable injury are equally unconvincing.   Mr. Pearlman cites two injuries that he

argues cannot be addressed in a damages claim: that the loss of 'N SYNC will damage his ability to attract other recording artists, and that he will be unable to exert "control of the quality and image" of 'N SYNC. I note the following:

44. First, Mr. Pearlman does not explain anything that he has done to control the "quality and image" of 'N SYNC since Mr. Pearlman obtained a recording agreement with BMG Ariola. As I noted, Mr. Pearlman and Transcon Records had minimal (if any) involvement or control over the "quality and image" of the Backstreet Boys once the Backstreet Boys signed a recording contract with Zomba in 1994, long before the group became famous.

45. Second, Mr. Pearlman has previously "lost" his first successful recording group -- the Backstreet Boys, which he no longer manages or controls. Mr. Pearlman's disputes and loss of control of the Backstreet Boys were widely publicized in the music industry and beyond. Nonetheless, Mr. Pearlman and his companies continue to thrive in obtaining contracts both from performers and from record labels interested in signing these performers. Indeed, Mr. Pearlman boasts of other musical acts and record labels with which he has contracted notwithstanding his loss of the Backstreet Boys. Thus, Mr. Pearlman's own history demonstrates that his claims of irreparable injury are not credible.

46. Third, as far as I am aware, Mr. Pearlman knows nothing about producing a record, nor does he claim to know anything about producing a record. To my knowledge, he did not produce 'N SYNC's prior releases. Rather, through BMG Ariola, 'N SYNC obtained the services of leading record producers and songwriters, among them Denniz Pop and Max Martin, principals in Cheiron Productions. Zomba

has a relationship with Cheiron Productions, including Mr. Martin (Mr. Pop has died), and 'N SYNC continues to record with these producers/songwriters. In addition, the executive producer of 'N SYNC's prior releases was Johnny Wright, who was and remains 'N SYNC's manager and executive producer. Also, of course, 'N SYNC itself remains unchanged: Chris, J.C., Joey, Justin and Lance are the performers whose "quality and image" will count.

47.    Finally, Zomba's history of success in the music business, especially in pop music segment in recent years, shows that plaintiffs have no irreparable injury to fear from the Zomba Recording Agreement. Two of the leading artists in the pop music segment -- the Backstreet Boys and Britney Spears -- release their records with Zomba. Mr. Pearlman entrusted his first group, the Backstreet Boys, to Zomba. In light of this, and Zomba's established track record of success in the record business in general and pop music in particular, the Zomba Recording Agreement poses no threat to the "quality and image" of 'N SYNC.

*Conclusion*

48.    In summary, I respectfully submit that plaintiffs' claims of irreparable injury have no merit. When Zomba releases an 'N SYNC album, as we plan to do by early next year, the album will be recorded by the same persons who have always personified 'N SYNC, produced by many of the same producers who worked on 'N SYNC's prior releases, with the same executive producer as in the prior releases, manufactured and distributed in the U.S. and Canada by the same company that manufactured and distributed the prior releases, BMG Music, and released on a label, Zomba, that features some of the leading artists in the pop music segment today. There

is no risk that release of this album will injure plaintiffs' alleged interest in the "quality" or "image" of 'N SYNC.  On the other hand, any delay in the release of that album would seriously injure the career of 'N SYNC in a way that can never be recaptured.  For this reason, among many others, plaintiffs' motion should be denied.

Executed this 2nd day of November 1999.

Clive Calder



## ARTIST'S ASSENT AND GUARANTY

To induce The RCA Records Label, A Unit of BMG Entertainment ("RCA") to enter into the foregoing agreement with Signature Productions, L.L.C. (the "Agreement"):

1.      The Artist:

        (a)     represents to RCA that she has read the Agreement and has consulted with or has had the opportunity to consult with a lawyer chosen by her for the purpose of having the legal effect of each of the provisions contained in the Agreement explained to her;

        (b)     assents to the execution of the Agreement and agrees to be bound by all grants, restrictions, and other provisions of the Agreement relating to the Artist;

        (c)     acknowledges that RCA shall have no obligation to make any payments to the Artist in connection with the services rendered by the Artist or the fulfillment of the Artist's other obligations under the Agreement, except for the payments specified in subparagraphs 5.01(a), 13.05(b) and Article 18; and

        (d)     agrees that if during the Term of the Agreement the "Furnishing Party" (as defined below) shall cease to be entitled to Artist's recording services, the Artist shall, at RCA's request, take all such steps and actions as shall give to RCA the same rights, privileges and benefits as RCA would have had under the Agreement and such rights, privileges and benefits shall be enforceable on RCA's behalf against Artist and all the terms and conditions contained in the Agreement shall be effective, except as provided in paragraph 18 of the Agreement.

2.      (a)     The Artist:

        (1)     guarantees, absolutely and unconditionally, the full performance by Signature Productions, L.L.C. (the "Furnishing Party") of all of the Furnishing Party's obligations under the Agreement

        (2)     agrees to indemnify and hold RCA harmless from any loss, damage, liability or expense (including but not limited to attorneys' fees and legal expenses) which arise from any failure by the Furnishing Party to fulfill the Furnishing Party's obligations under the Agreement, or which are incurred by RCA in the enforcement of RCA's rights under this guaranty; and

        (3)     agrees that if the Artist has not received compensation of at least Nine Thousand Dollars ($9,000) from the Furnishing Party for her services under the Agreement during the first Fiscal Year (as that term is defined in paragraph 13.05 of the Agreement), Twelve Thousand Dollars ($12,000) during the second such Fiscal Year; and Fifteen Thousand Dollars ($15,000) during the third through the seventh Fiscal Years, the Artist shall so notify RCA at least forty (40) days before the end of the applicable Fiscal Year.

        (4)       shall notify RCA promptly in writing if the Furnishing Party shall cease to be entitled to Artist's recording services.

        (b)       The Artist's liability under this guaranty is direct and immediate, and is not conditioned upon the pursuit by RCA of any remedy RCA may have against the Furnishing Party. This guaranty shall not be revocable at any time or for any reason, including, without limitation, any modification of the Agreement with or without notice to the Artist. No failure by RCA to exercise any of RCA's rights shall operate as a waiver of those rights or any other rights or remedies.