FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION
-----------------------------------------------------------X

99 NOV -2 PM 4:00

U.S. DISTRICT COURT
MIDDLE DISTRICT FLORIDA

TRANS CONTINENTAL RECORDS, INC.,        :
BMG ENTERTAINMENT, BMG ARIOLA           :
MUENCHEN GmbH, TRANS CONTINENTAL        :        99-1282-Civ-Orl-22C
ENTERTAINMENT, INC. and LOUIS J.        :
PEARLMAN,                               :
                                        :
                        Plaintiffs,     :
                                        :
        -against-                       :        **DECLARATION OF**
                                        :        **JILL BERLINER IN**
ZOMBA RECORDING CORPORATION,            :        **OPPOSITION TO**
CLIVE CALDER, JAMES LANCE BASS,         :        **MOTION FOR**
JOSHUA SCOTT CHASEZ, JOSEPH             :        **PRELIMINARY**
ANTHONY FATONE, JR., CHRISTOPHER        :        **INJUNCTION**
ALAN KIRKPATRICK, and JUSTIN            :
RANDALL TIMBERLAKE,                     :
                                        :
                        Defendants.     :
                                        :
-----------------------------------------------------------X

I, JILL BERLINER, hereby declare under penalty of perjury:

1.      I am a member of King, Purtich, Holmes, Paterno & Berliner,

LLP and a member of the bar of the State of California.  Since 1985, I have

specialized in representing clients in the music industry.  Over the years I have

represented major and independent record companies and music publishing

companies, gold, platinum and multi-platinum recording artists, grammy winning

27

songwriters, managers, record producers, merchandising companies and so on.  I have taught classes about the music business at UCLA and have appeared as a guest speaker on numerous panels and at many seminars.  A copy of my resume is attached hereto as Exhibit "A."  I submit this affidavit as an expert witness in opposition to the motion for a preliminary injunction submitted by the plaintiffs.

2.      In connection with preparation of this declaration, I have reviewed the documents filed by plaintiffs in this action and in addition, the affidavits of Joshua Scott Chasez, Adam Ritholz and Howard Comart submitted herewith, and the exhibits annexed thereto.

Breach of the Manager's Fiduciary Duty

3.      Personal mangers in the record business (sometimes referred to simply as "managers") hold a position vis-a-vis the artists they represent of enormous trust, confidence and authority.  Typically, and certainly in the case of 'N SYNC, artists are young, impressionable, naive and inexperienced in business. They look almost exclusively to their managers for guidance, instruction and protection in a business historically known for its abuses of talent.

4.      Managers in the music business are unlicensed and unregulated.  There is not even a self-governing body of musicians' personal

managers.  There is no level of education or experience required, no citizenship requirement, not even a requirement that they have no felony convictions. ANYONE can be a musicians' manager.

      5.     The only protection for artists, even underage children such as 'N SYNC's members, is the courts.  One of the only laws available to deter onerous, fraudulent, or improper behavior on the part of these businessmen and women is the notion of fiduciary duty.

      6.     As 'N SYNC's manager, Louis Pearlman (referred to as "Pearlman" below) was entrusted with the authority and discretion to structure all business dealings for the act.  This is an enormous responsibility because decisions made at the beginning of an artist's career, particularly with regard to recording contracts requiring eight albums, endure for 10 to 15 years when most careers end in less than three.  In other words, these decisions will encompass the group's entire career.

      7.     An ethical, responsible manager would ensure that talent has other advisors to act as "checks and balances" to avoid even the appearance of impropriety or overreaching.  These advisors consist of experienced, objective and independent attorneys and accountants familiar with the music business and responsible only for the group's interests and not those of the manager.

8.     Pearlman did not instruct the group to seek independent advice. He discouraged the children and their parents from hiring any counsel at all, implying that "lawyers are how problems start." The group felt that if they sought representation their opportunity to work with Pearlman and their "foot in the door" of the music business would evaporate. This is sinister duress.

9.     The group signed every agreement Pearlman put in front of them. They never had <u>any</u> independent counsel to my knowledge before March of this year. The trust and confidence the group placed in Pearlman is evidence of the fiduciary role he held in the group's mind. He repaid this trust and confidence by charging outrageous commissions under the management agreement and causing the band to execute a number of onerous, self-dealing agreements with him and his affiliates (described below), under which he slyly took multiple, exceedingly high percentages of every conceivable type of earnings available to the group. The net effect of his multi-layered manipulation is that the group's income is reduced to 25% to 30% of industry norms and Pearlman's earnings as manager and "entrepreneur" are four to five times more than those paid to the most highly regarded professional personal managers in the music business.

10.     Clearly, Pearlman's advice to this group and his heavy-handed self-dealing constitute breach of his fiduciary duty to these artists.

4

## Pearlman Breached the Management Contract

11.     If the distasteful breach of fiduciary duty and fragrant abuse of naive trust and confidence were not sufficient, Pearlman also breached the terms of his own, unnegotiated management agreement with 'N SYNC.

12.     Paragraph 11 of the management agreement between Trans Continental Entertainment, Inc. and 'N SYNC, dated April 26, 1996 (the "Management Agreement") provides in part:

>"Manager shall not be entitled to Commissions from 'N SYNC in connection with any gross monies or other considerations derived by 'N SYNC from (i) any employment or agreement hereunder where 'N SYNC is employed or engaged by Manager or by any firm or corporation owned or controlled by Manager or any of Manager's partners, shareholders, officers, directors or employees in any capacity. (including without limitation, as the package agent for the entertainment program in which 'N SYNC is so employed or engaged, as 'N SYNC's music or literary publisher, or as 'N SYNC's record or promotion company)..."

13.     Notwithstanding the terms of paragraph 11, Pearlman routinely caused both Trans Continental Records (hereinafter referred to as "TCR") and 'N SYNC Productions, Inc. (referred to below as the "Touring

5

Corp.") to withhold "management commissions" from sums payable to the artist. For example, sums withheld from payments under the Recording Agreement alone totaled in excess of $625,000. Close to $2,000,000 of proceeds from the group's tour in only the three month period from March 1999 through May 1999 were allocated to Pearlman's management company as commissions.

14.    The group notified both TCR and Trans Continental Entertainment, Inc. (referred to below as "TCE") of its breach of both the Recording Agreement and Management Agreement in connection with this "double-dipping." Notwithstanding due notice, both companies failed to restore the money to the group. Counsel for the Pearlman entities took the position that TCE was entitled to these commissions, wholly ignoring the express terms of paragraph 11 of the Management Agreement.

15.    It is my opinion that Pearlman's conduct in advising the group, as their manager, to enter into both the Stockholders Agreement with the Touring Corp. and the Recording Agreement with TCR, which granted TCR merchandise and publishing rights, among other things, allowing him to charge commissions while at the same time profiting through other affiliates and therefor "double dipping" and sometimes even "triple dipping" constitutes a flagrant, oppressive breach of fiduciary duty as well as unconscionable overreaching.

6

The Agreements between TCR,
Pearlman and the Group are Unconscionable

16.     As their manager, Pearlman advised the group to enter into

the following agreements:  (1) an "Exclusive Artist Recording Agreement" with

TCR, dated April 29, 1996 (referred to herein as the "Recording Agreement"), for

the group's exclusive recording services for a term of up eight albums; (2) a

component of the Recording Agreement transferring to TCR all interests in the

group's musical compositions, including 100% of the copyright therein; (3) a

component of the Recording Agreement whereby the group transferred to TCR

control of its merchandising rights and one-half of all net monies received by the

group in connection with the exercise of those merchandising rights; (4) a Letter of

Acknowledgment to TCR's agreement with BMG Ariola Muenchen GmbH

(referred to below as "BMG Germany"); and (5) a Stockholders Agreement

between the Touring Corp. and TCE (referred to herein as the "Stockholders

Agreement"), pursuant to which Pearlman was appointed Chairman of the group's

touring corporation and was given a proxy to vote the interests of all members of

the group in respect of all corporate business without even a requirement of

consultation.  The unconscionability of each of these agreements will be further discussed below.

17.     It is my opinion that the contractual agreements between the Trans Continental plaintiffs and the group members taken in the aggregate are unconscionable in part because the Trans Continental plaintiffs and/or Pearlman controlled and radically diminished every potential source of income of the artists in their entertainment career.  Nowhere does the Trans Continental plaintiffs assure the artists a living wage for their services.  The artists were effectively indentured servants of the Trans Continental companies and Pearlman.  I reach this conclusion based upon the factors set forth below.

18.     Musical performing groups such as 'N SYNC have five principal sources of income: (1) live performance; (2) recording advances and royalties; (3) music publishing royalties and advances; (4) merchandise advances and royalties; and (5) celebrity endorsements.  Under the series of agreements described above, Pearlman and his companies owned and/or controlled all of these revenue sources.  The members of 'N SYNC were, thus, wholly dependent upon the Pearlman entities to receive any income whatsoever from their services. Pearlman overreached in every one of these areas appropriating to himself a absurdly disproportionate amount of both income and control, in gross departure

8

from the current standards in the industry.  The agreements are throwbacks to the

dark ages of the music business and reflect the kind of arrangements which the

industry has repudiated as archaic, offensive and casting an unfavorable light on

the industry as a whole.  Each of the five revenue streams will be addressed.

<u>Live Performance</u>

19.    Live performances for a band of 'N SYNC's stature represent

their greatest source of income by a large margin.  Because live performance is

also an important tool to promote the sale of records and expand the artists'

market, both independent record producers and major record companies have

recognized that it is in their interests to encourage the artist to tour and to perform

before live audiences.  They <u>never</u> seek to participate in the revenue generated by

live performances.  No matter how imbalanced the contract negotiations between

the artist and record company or record producers, there is universal agreement

that this income source is reserved to the performers.

20.    Pearlman usurped all control over 'N SYNC's ability to tour

and the proceeds of the group's touring activities.  He created a corporation

through which he organized all of the group's touring activities, the Touring Corp.

Under the Stockholders Agreement, he allocated 3/8 of the stock in this

corporation to himself and to his affiliates, TCR and TCE.  Not satisfied with

appropriating a substantial part of the profits of this corporation to himself, through an irrevocable proxy to vote all of the stock, he controls all of the corporation's affairs.  He abused his control of the Touring Corp. to fix the salary the group would make while touring, taking for himself a salary in an equal amount.  The declaration of dividends is, likewise, in his sole control, as is the use of the money generated.

21.     Pearlman instituted a "consulting agreement" between the Touring Corp. and TCR without informing the group, which agreement provided that 25% of "net revenues" from the Touring Corp. were paid to yet another Pearlman controlled entity for "consulting services."  This represents an astonishing breach of fiduciary duty to the other stockholders, an unprecedented diversion of their biggest income stream, and an unconscionable abuse of trust and confidence.

22.     In short what, if anything, the members of 'N SYNC received on account of their live performances was a matter in Pearlman's sole and unfettered discretion.  This is beyond the bounds of what is reasonable, appropriate or customary in any industry and reflects extraordinary, shameless overreaching and self-dealing.

10

## Recording Advances and Royalties

23.      Artists' earnings from their recording services include both direct advances and royalties payable under a recording contract. Direct advances are typically payable upon the execution of a recording agreement, the commencement of recording, the completion of recording or the delivery of a record, and the exercise of an option. Direct advances also may take the form of a recording fund for payment for the costs incurred in recording. To the extent that the actual costs incurred in making a record are less than the fund specified, the balance becomes the artist's to keep as a direct advance. Royalties are typically payable semi-annually, within 90 days after the end of each semi-annual calendar period only after advances are recouped. Royalties take the form of a percentage of the selling price subject to a formula set out in the recording agreement for each record reported as sold during a particular accounting period.

24.      Many artists fail to earn royalties in excess of the direct advances. Royalties are also applied by record companies to recoup other company expenses charged to artist's account. These chargeable expenses include promotion costs, video production, recording costs and tour support. Therefore, the direct advances received by the artist on signing, delivery or option exercise may be the only monies ever paid to the artist by the company.

11

25.     Paragraph 9.02 of the Recording Agreement provides that TCR shall pay to the artist a royalty equivalent to 50% of "all net royalties received by the company in connection with the sales of recordings derived from Masters." TCR apparently interpreted paragraph 9.02 of the agreement as not extending to advances received by it from BMG Germany for delivery of 'N SYNC's records. TCR took substantial advances from BMG Germany. Therefore, due to the unrecouped status of TCR's accounts, no royalties were payable to 'N SYNC. TCR's failure to share advances with the artist in accordance with paragraph 9.02 deprived the artist of the ability to pay their personal living expenses in this approximately two year period. As a result, the artists were forced to request "loans" from TCR to pay their personal living expenses, putting them in the position of continuous debt to TCR. In the interim, TCR was free to finance its business with the artists' share of the direct advances received from BMG Germany.

26.     In record production deals of this sort it is standard practice to distribute to the artist, at a <u>minimum</u>, 50% of net receipts (defined as all sums received by the furnishing entity less its expenses for recording costs). The plaintiffs' interpretation of the Recording Agreement departed from that standard because it did not provide for a share of advances and because it charged the artist

12

for expenses far beyond recording costs.  It is also common in these types of agreements for the artist's share of net receipts to increase over time, based on performance and the number of albums delivered, so that an artist signing a typical production deal might reasonably expect to receive 85% or 90% of net receipts by the time they became as successful as 'N SYNC has become.

### Music Publishing

27.   Music publishing is revenue for an artist who is a songwriter. The primary types of music publishing income are:  (1) mechanical royalties; (2) synchronization income; and (3) public performance income.

28.   The record company pays mechanical royalties to songwriters for the right to reproduce musical compositions on records.  The mechanical royalty rate is determined by lawmakers under the Copyright Act and is readjusted bi-annually.  This legal rate is referred to in the music business as the "statutory rate."  Currently the statutory rate is 7.1¢ per song on each record sold.  Typically, record companies require that recording artists license the compositions they write at 3/4 of the statutory rate.  This provision of a record contract is referred to in the music industry as the "controlled compositions clause."  Section 12 of the Recording Agreement contains a fairly typical controlled compositions clause.

13

29.     A synchronization license is required when music is to be incorporated in a film, television program or commercial incorporating music with visual images.  Consideration for these licenses is not fixed by statute.  Each license is individually negotiated and for a group of 'N SYNC's stature, the fee should be very high.

30.     A songwriter is also entitled to royalties for the public performance of his music, such as in television or radio broadcasts. Public performance royalties are collected by local performing rights societies such as ASCAP and BMI throughout the world and then paid to copyright holders.  By convention, these societies generally divide the royalties earned by a song equally between the writer and the publisher and they will pay the writer's share only to the songwriter.

31.     Mechanical, synchronization, public performances and other publishing royalties are sometimes collected by a music publisher who has acquired an interest, usually half, in the copyrights, and who handles the administrative tasks of registering the music copyrights, negotiating and issuing licenses and collecting royalties.  There are a number of large music publishers who compete for the right to acquire copyright interests and publish the music of songwriters.  A new songwriter with a recording contract with a major record

14

company can secure a generous advance from a music publisher in return for giving up half of the copyright and 25% of the future royalties his songs will generate.

32.     Paragraph 20 of the Recording Agreement required the members of 'N SYNC to assign to TCR 100% of their interests, including their copyrights, in their songwriting.  The Recording Agreement makes <u>no</u> provision for any royalty to the songwriters.  TCR took all income, ownership and control from them, leaving the songwriters with only the writer's share of public performance royalties which ASCAP and BMI will pay only to the writer.

33.     Paragraph 20 of the Recording Agreement is obscene when compared to the prevailing standard in the industry.  Decades ago it was common practice for music publishers and others to acquire music copyrights for little or no real consideration.  The practice left some of the writers who wrote compositions, which earned millions for others over the years, penniless.  It has now been uniformly condemned in the industry.  Major record companies do not require artists to give up their music publishing for the honor of entering into a record contract.

34.     Independent record producers sometimes demand the right to share in music publishing.  When this occurs, however, the common practice is for

15

the producers to obtain 50% of the copyright, or less.  This equates to payment to the writer of at least 75% of all sums received on account of licenses issued for the music.

35.     In taking for itself an assignment of 100% of the interests in the group's songwriting, TCR grossly overreached and transcended the bounds of what is acceptable in the industry today.  TCR deprived the artists of an important source of revenue and the right to own and control their own creative works.

Merchandising

36.     The sale of apparel, posters and other goods containing the artist's name and likeness can be a very lucrative aspect of a performers career.  T-shirts, sweatshirts, jackets, caps, stickers, posters, photos and all manner of merchandise are sold at concert venues and in retail outlets.  Large merchandise companies would be willing to pay advances of millions of dollars for the right to sell merchandise bearing the name and likeness of a recording group as popular with young people as 'N SYNC.  With t-shirts selling at concert venues for $25 and royalty rates equal to or in excess of 78% paid on gross sales, the proceeds to the artist can be considerable.  The Winterland contracts with TCR for concert and retail merchandise referenced in the Pearlman affidavit are examples.  They provided for advances totaling $800,000 plus a $50,000 artwork reimbursement.

16

According to the Pearlman affidavit, royalties due for retail and tour sales over the past six months equal approximately $6,000,000.

37.    Paragraph 19.10 of the Recording Agreement provides:

> You hereby grant to us, or our affiliate 'N SYNC Productions, Inc. or our designee all merchandising rights and the sole and exclusive right to use your name (both legal and professional) likeness, picture and portrait <u>in any manner whatsoever</u> in connection with the exercise of the merchandising rights herein granted. <u>Company or its designee shall have the right to grant to others (including companies affiliated with us) upon such terms as we shall see fit</u>, the right to exercise or cause to be exercised such merchandising rights. Company shall pay to you, in addition to any and all monies provided for in this Agreement one-half (½) of all net monies received by us in connection with the exercise of said merchandising rights." (emphasis added.)

The Recording Agreement contains no provision for accounting for or remitting any sums to the artist in respect of merchandising income.

38.    The merchandising provision is both vague and potentially illusory. Whether the Touring Corp. or TCR hold the merchandising rights is not specified and affects the amount received by the artist. If no profits are made by the Touring Corp. or no profits are distributed by the Touring Corp., the group

17

would receive nothing if the merchandising rights were granted to the Touring Corp.

      39.    Further, TCR has the right to grant to anyone, including an affiliated company, the right to exercise merchandising rights on terms determined in its sole discretion.  Thus, TCR could grant yet another Pearlman entity the right to exercise the artists' merchandising rights for little or no compensation, thereby diverting all or substantially all of the revenue away from the artists.

      40.    Paragraph 23 of the Recording Agreement is contrary to prevailing standards in the industry, both in the control granted TCR and the revenue share awarded to TCR.  Major record companies do <u>not</u> require ownership or economic interests in artist's merchandising rights.

      41.    Control of the exercise of merchandising rights is important because artists need to control the use of their own names and likenesses.  Shoddy goods, poor artwork or an association with distasteful products or services can impair the artist's image or offend the artist's sensibilities.  Merchandising decisions must balance the artists' long term interests against short term profit. The Recording Agreement wholly deprives the artist of the necessary control.

      42.    A share of merchandise revenue is not often sought by the independent record producer.  Further, on the rare occasion where a share of the

revenue generated by merchandising is granted to the independent record producer, 25-30% of net income, including advances, represents the outer boundary of the acceptable share. The bulk of merchandise revenue is generated by touring. Touring involves grueling work. The independent record producer does not participate in the work. Thus, it is patently unfair to allocate to him any share of merchandise revenue.

### Celebrity Endorsements

43.     Celebrities such as 'N SYNC have the opportunity to earn significant revenue from their endorsements of commercial products and services. Endorsement arrangements vary widely. They can consist of the artist wearing clothing of a sponsoring clothing company in their photographs, or of contests by a manufacturer allowing participants the opportunity to meet the artist or attend a concert. They may involve pre or post show appearances at which the artist meets and greets the sponsor's guests. These arrangements involve work by the artist beyond that entailed in live performance. They also associate the artist's name, likeness and image with a commercial product or service.

44.     Sums paid for celebrity endorsements are considerable. I am informed that Oxy, Clairol and Kelloggs entered into endorsement contracts for 'N SYNC with fees in excess of $1,250,000. These contracts were entered into by the

Touring Corp.  I understand that less than 10% of the revenue generated by these endorsement contracts was paid to the group, notwithstanding that their personal services were required to perform the agreements.

### Ownership of the 'N SYNC Trademark

45.     Pearlman claims that he and his companies own the 'N SYNC trademark.  Through the trademark ownership claim, Pearlman asserts the right to prevent the group from performing in any capacity, except under his auspices.

46.     To the fans who purchased the ten million 'N SYNC recordings sold throughout the world and who purchased close to two million concert tickets for their personal appearances this past year, the name 'N SYNC is associated with five individual performers, their individual names, their individual likenesses, even their horoscopes.  The public doesn't care who manufactures their records.  It is the group's faces on the cover of the fanzines, the records and the T-shirts sold at concerts, not Pearlman's.

47.     There is no agreement between Pearlman and the group which authorizes him to own or use the group name.  If there is goodwill in the name, it is goodwill earned by the group from their personal services and tremendous efforts and it belongs to the group.

20

48.     Pearlman's effort to claim the name for his sole use and benefit apart from the group, without in an anyway compensating the group is outrageous and should be soundly condemned.  This Pearlman argument surpasses even the draconian arrangements reflected in the various contract documents, because his claim is for <u>perpetual</u> rights with no obligation ever to share proceeds with the group.

49.     Record companies no longer seek ownership of groups' trademarks.  This practice has long been considered oppressive and offensive to the industry and has been forsaken.  Currently companies seek merely a license permitting the use of trademarks in connection with the records they sell. Independent record producers, whose contribution is limited to financing and overseeing the production of the recordings made by the group, do not demand ownership of the group name.  A demand for sole ownership of the group name on the part of an entrepreneur who is not a working member of the group is the hallmark of an overreaching agreement, for it leaves the group forever bound.

50.     The particular paragraph of the agreement upon which plaintiffs rely -- paragraph 21.04(b) is also vague.  The full text of the provision appears to be directed solely to preventing "leaving members"; <u>i.e.</u>, members who are fired or who quit the group, from using the name in competition with the

21

remaining members. The provision does not expressly convey ownership of the name from the group to TCR, being phrased merely in terms of an acknowledgment. Finally, the language is limited to the term of the agreement and TCR's ownership rights, if any, would therefore terminate with the termination of the Recording Agreement.

51.     In short, read in context, TCR's ownership rights under paragraph 21.04(b) do nothing more than assure that the name 'N SYNC is used only by the five individuals constituting the group.

**TCR did not secure
a Distribution Agreement with a
United States Record Company Within Eighteen
Months of the April 29, 1996 Agreement.**

52.     Paragraph 19.12 of the Recording Agreement provides:

"Notwithstanding anything to the contrary contained

herein, you shall have the right to terminate this

agreement in the event Company [TCR] has not

secured a distribution agreement with a United States

record company within eighteen months from the date

22

hereof, pursuant to which recordings of your

performances shall be released. [emphasis added.]"

53.    On May 26, 1999, 'N SYNC exercised its right to terminate

the Recording Agreement pursuant to paragraph 19.12 thereof.

54.    Although plaintiffs dispute the propriety of that termination,

neither Pearlman, on behalf of himself and the Trans Continental plaintiffs, nor

Jamieson and DiGiorgio, on behalf of the two BMG plaintiffs, have elected to

attach the distribution agreement with a United States record company they argue

was secured by TCR.  The sole distribution agreement which TCR secured is

annexed to the complaint as Exhibit C.  The record company with which TCR

contracted is BMG Germany.

55.    Paragraph 11 of the complaint recites that BMG Germany is a

German corporation with its principal place of business in Munich, Germany.

Plainly, then, TCR did not secure a distribution agreement with a United States

record company.  It procured an agreement with a German company with no

provision for distribution in any territory, including the United States, by any other

company.

56.    Plaintiffs, however, contend that the agreement was with

"BMG" and point to the fact that a recording made by the group was ultimately

released on the RCA Records label in the United States in March 1998, twenty-three months after the execution of the April 29, 1996 Agreement, and seventeen months after the group's first single was released in Germany. Disregarded by plaintiffs is the fact that RCA Records, is a separate and independent company from BMG Germany, the German company with which TCR contracted. Obscured by plaintiffs is the fact that the contract pursuant to which the record was ultimately released in the United States was one to which BMG Germany, not TCR, was a party -- what Robert Jamieson in his affidavit refers to as the "ICLA" or inter-company license agreement. (Jamieson Affid. at para. 18). Although the source of RCA's indirect rights is the inter-company license agreement, that agreement, if it indeed exists, is not included within any of the moving papers.

57.     Notwithstanding the plaintiffs' attempts to obfuscate the true facts, the only distribution agreement which TCR secured is with a German company. BMG Entertainment and its RCA Record label have no contractual obligations to TCR and TCR has no contract with them. The distinction between being signed to a German company and to a United States record company is very consequential. It has had and continues to have substantial disadvantages for the group.

24

58.     "BMG" is not a record company.  It is shorthand for a German parent company with many holdings, including record companies located in various countries and including music publishing companies, record clubs, etc. There are numerous separate and independent companies, some of them record companies, throughout the world who are authorized to use the "BMG" trademark in their own assigned territories.  They share the fact that they are subsidiaries of the same ultimate parent corporation, but they operate independently and in various businesses.

59.     In the United States, BMG has at least two "pop" record labels:  RCA Records and Arista Records.  These two labels sign recording contracts with artists and have their own entirely independent staffs for developing and promoting the artists they sign.  Each separately undertakes contractual obligations to pay for recordings of the artists signed to them and to release, promote and distribute those records in the United States.

60.     'N SYNC is not signed to either RCA Records or Arista Records.  Neither RCA Records nor Arista Records has any contractual obligation to or legal relationship with TCR or 'N SYNC.

61.     To the contrary, TCR signed a contract with BMG Germany. BMG Germany is a German record company, which signs its own artists, produces

25

its own recorded music and develops its own marketing strategies.  To my knowledge, it makes and markets records <u>only in Germany, Austria and Switzerland</u>.  It maintains its own staff of employees, which it hires and fires, its own books and financial accounts and its own officers.  It operates completely independently of the RCA and Arista labels.

62.    Like any record company which acquires the right to distribute a record outside of its home territory, BMG Germany must license its recordings for distribution in other countries.  Similarly, to exploit the recordings of RCA and Arista recording artists outside the United States, RCA and Arista must license their product for distribution outside of the United States to foreign companies.

63.    Major record companies, like the BMG family of labels, generally address the territorial licenses through what is referred to as the inter company licensing agreement.  This agreement gives each BMG affiliated record company the right, <u>but not the obligation</u>, to elect to distribute in its home territory the recordings of artists signed to another BMG company.

64.    Whether the BMG company for any particular territory actually releases and markets a record from an artist signed to another BMG company is completely a matter of its own discretion.

26

65.     There are more records sold in the United States then in any other country of the world.  American popular music, like American movies, has a great deal of caché around the world, and significant success of a United States artist signed to RCA or Arista in the United States virtually assures that the independent BMG companies in each foreign territory will elect to release the record, giving the artist worldwide exposure.

66.     The same is not true of artists signed to the myriad of foreign BMG companies.  Very few artists signed to a foreign BMG company achieve a release in the United States, a fact alluded to by Bob Jamieson in his affidavit (para. 19), and other foreign territories are much less receptive to releasing artists signed to the foreign companies than they are to artists signed to the United States company.

67.     Thus, Vince DiGiorgio and Robert Jamieson describe a tortuous year-long process in which the group was "pitched" to RCA by its International Division in an effort to persuade RCA to exercise its discretion and release the group in the United States.

68.     A very high royalty from RCA's sales of BMG Germany's 'N SYNC records in the United States is sent to BMG Germany, as dictated by the inter company licensing agreement.  RCA keeps its profits above and beyond that

27

royalty.  RCA does not pay TCR for sales of 'N SYNC records in the United States.  Rather, the duty of accounting and paying for sales is imposed on BMG Germany.  All of the contractual obligations to TCR under the BMG Germany agreement remain with BMG Germany.  The group, though consisting of American performers who achieved their greatest success in the United States, are, to RCA in the United States, "foreign" artists.  BMG Germany controls their advances, option exercises and initial releases through its license agreement with TCR.  RCA is a remote licensee and agent of BMG Germany, which is the principal.

69.    The impact on 'N SYNC of being signed through BMG Germany, rather than a United States company, has been substantial and continues to disadvantage them.

70.    First and most obviously, the German signing affects when the group receives royalties on sales occurring in the United States.  Since RCA accounts to BMG Germany pursuant to a schedule fixed by the inter company licensing agreement and not to TCR, royalty payments to 'N SYNC are delayed by at least one additional six-month accounting period.  The result is that TCR does not receive an accounting for the sale of a particular record in the United States until at least fifteen months and possibly as much as twenty-one months after that

28

record is sold in the United States and the Recording Agreement's accounting provisions further delay the accounting by at least one six month period.

71.    Second, the royalty rate at which TCR is paid, and therefore the ultimate royalties to the group, for United States sales will be lower.  Under paragraph 6(d)(i)(aa) of the agreement between TCR and BMG Germany, TCR's royalty was fixed at 18% of the "royalty base selling price", which is defined as the "published price to dealer" ("PPD") similar to a wholesale price.  The royalty increases to 20% for sales in Germany, Austria and Switzerland only based on sales achieved in those countries alone.  Thus, although the group has sold more than 7,000,000 copies of its first release in the United States, TCR's royalty remains at 18% of the PPD, and TCR will not be paid the increased royalty provided under the agreement on United States sales.

72.    While a royalty of 18% of wholesale may be typical for a German record deal, the royalty rate as compared to a typical royalty rate under a United States recording agreement, is significantly lower.  Typical new artist recording agreements in the United States provide a royalty equivalent to a minimum of 28% of wholesale or PPD.

73.    Next, the length of the group's contract is extended by virtue of being signed to a German company, which releases records first in Europe.

29

Under the group's recording agreement with TCR, the initial term of the agreement is defined as "the <u>latter</u> of (1) the date nine (9) months after the date of delivery to Company of all masters required in the fulfillment of your Recording Commitment herein, or (2) six (6) months after Company's initial United States retail street date for the record delivered by you in fulfillment of your recording Commitment."  Here, the group delivered a complete LP in early 1997, which was released in Germany in April 1997.  Its United States release was at least a full year later.  Thus, the initial term of the agreement was extended by a full year simply because the United States release was delayed a year.

74.     The burden, cost and expense of obtaining an American release is increased dramatically by virtue of the foreign signing.  As Vince DiGiorgio's affidavit notes, European tastes are different from those of the American popular music market.  RCA declined to release the 'N SYNC album released in Germany and required the group to record four new songs and remix others.  This increases the costs incurred in issuing a record in the United States and required the group to take the considerable time required to go into a recording studio and record additional material.  These extra recording costs are charged to the group's account pursuant to paragraph 5 of the Recording Agreement, thereby decreasing the amount the group receives.  Thus, the group must work harder for

less money.  In effect, they were required to record one and one-half albums, bore a greater expense and received a lesser royalty.

75.     The German contract contains onerous provisions no longer found in United States record contracts.  Here the business has evolved to be more "artist friendly," or less abusive.  For example, the German agreement contains options for BMG Germany to acquire an interest in 'N SYNC's publishing rights and merchandising rights.  These provisions would not be found in a current RCA Records recording agreement.

76.     Finally and most importantly, 'N SYNC has no guarantee that future records will be released in the United States.  While RCA is anxious to have the group's next album, there is nothing to say it will want other future albums.  BMG Germany may enjoy continued sales success in Germany, and the economics of the GSA market may make it worthwhile for BMG Germany to continue to exercise its options for the group's records.  Another group may capture the attention of American youngsters, and RCA's priorities may change.  Thus, the group could remain bound to BMG Germany with no opportunity to sell records in the United States.  Since the term of the TCR agreement is linked to a "United States company's retail street date," the contract periods would then have no contractual terminus.

<u>There Is No Artist Inducement Letter</u>

77.    Plaintiffs contend that the "Letter of Acknowledgment" signed by the group constitutes an artist's inducement letter and entitles BMG Germany and BMG Entertainment to the exclusive recording services of the group. The "Letter of Acknowledgment" contains none of the essential features of an artist's inducement letter and creates no rights in BMG Germany or BMG Entertainment.

78.    An artist inducement letter is a common document in the music business.  It is typically required by a major record company whenever an artist's services are furnished by any third party entity, including the artist's own loan-out company.  The essence of the document is that the individual artist confirms that the furnishing entity entering into the contract is entitled to the artist's services, that the artist will look solely to that entity for any compensation to which he or she is entitled, and that in the event of any default by the furnishing entity, the artist will render his or her services directly to the record company.  It often also provides that the artist "guarantees" the performance of his or her services to the record company.  It constitutes the artist's express consent to the execution by the furnishing entity of the particular contract at issue, warrants that

the artist has read and understood the third party agreement and had the effect of it explained to him by an attorney experienced in the entertainment industry, and provides for the artist's express agreement to be bound personally by all the restrictions and other provisions contained in the agreement. (See <u>Entertainment Industry Contracts</u> at 159-142 (Matthew Bender 1998)).  Annexed hereto as Exhibit "B" is a sample artist's inducement letter.  The artist's inducement letter is typically executed simultaneously with the agreement between the furnishing entity and the major record company and indeed is typically an exhibit attached to that agreement, drafted by the major record company.  It usually expressly provides that it is being signed to induce the major record company to enter into the agreement.  It is, in fact, a contract between the major record company and the artist, separate and apart from the contract between the major record company and the entity furnishing the artist's services.

79.    The Letter of Acknowledgment executed by the group and annexed to the Pearlman affidavit does not contain any of the salient features found in an artist inducement letter.  In it the group does not expressly assent to the execution by TCR of the agreement with any BMG company nor does it contain the artist's commitment and contractual undertaking to be bound by that agreement.

33

80.   In the absence of an artist's inducement letter,  BMG Entertainment and BMG Germany have no direct right to the artist's services. There is no contract between either of the BMG companies and the group.  The rights of the BMG companies are wholly dependent upon the enforceability of the Recording Agreement between TCR and the individual members of 'N SYNC.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 1st day of November, 1999 at Los Angeles, California.

JILL BERLINER



EXHIBIT "A"

<u>Jill Berliner's Resume</u>

Jill H. Berliner has been a partner in the Music Department of King, Purtich, Holmes, Paterno & Berliner, LLP for 5 years. Ms. Berliner represents clients involved in various aspects of the music business. Ms. Berliner works closely with various recording artists and songwriters who have achieved varying degrees of success from multi-platinum artists to "baby" bands. Some of the other clients Ms. Berliner works with are major record companies and publishing companies. Ms. Berliner also works with managers, producers, production companies and other music industry-related individuals and entities.

Ms. Berliner also represents film companies and individuals in the motion picture business.

Ms. Berliner was previously a partner at the firm of Mitchell, Silberberg & Knupp where she worked for 11 years.

Ms. Berliner has been a professor at UCLA in the Extension Program for the Recording Arts and created a course entitled "Negotiating Strategies For The Music Industry." She also sat as a member of the advisory committee to the UCLA Extension Program for the Recording Arts.

Ms. Berliner received her Juris Doctor degree from USC in 1984 where she was elected as an editor of the USC Law Review. She also designed and taught first-year legal writing courses for the law school. Prior to law school, Ms. Berliner was a teacher in the public school system in Watsonville, California where she taught high school history and math. Ms. Berliner received her Bachelor of Arts degree from University of California, Santa Cruz, together with her teaching credential. Her degree was in United States history with an emphasis on urban, ethnic history. She graduated with honors.



EXHIBIT "B"

Sample Inducement Letter

Dated: As of _____

_____ Records, Inc.

_____

_____

Gentlemen:

Pursuant to an exclusive recording contract ("Recording Contract") between _____ ("Company") and me, Company is entitled exclusively to my services and the results of my services as a recording artist, including, without limitation, master recordings embodying my performances and phonograph records derived therefrom. I have been advised that Company is entering into a written agreement with you ("the Contract"), pursuant to which Company is agreeing to furnish to you exclusively my services and the results of my services as a recording artist and pursuant to which you shall be the sole owner of the entire worldwide right, title and interest in and to the results of my services as a recording artist.

In consideration of your entering into the Contract, and as a further inducement for you to do so, it being to my benefit as a recording artist that you enter into the Contract, I hereby represent and agree as follows:

1.    (a)    I understand the terms of the Contract insofar as those terms relate to me;

(b)    Company has the right, insofar as I am concerned, to enter into the Contract and to assume all of the obligations, warranties and undertakings to you on the part of Company contained therein, and Company shall continue to have those rights during the term of the Contract and thereafter until all of those obligations, warranties and undertakings shall have been fully performed and discharged;

(c)    All of the obligations, warranties, undertakings, covenants and agreements on the part of Company contained in the Contract which concern me are true and correct;

(d)    I shall fully and to the best of my ability perform and discharge all of the obligations, warranties and undertakings contained in the Contract insofar as the same are required of me and to the extent Company has undertaken to cause the performance and discharge by me of those obligations, warranties and undertakings; and

(e)    I hereby guarantee the performance by Company of all of its obligations under the Contract.  My liability under this guarantee is direct and is not conditioned upon your exercising any remedy against Company.

2.    If during the term of the Contract or any extensions or renewals thereof, Company shall, for any reason, cease to be entitled to my services or the results of my services as a recording artist in accordance with all of the terms of the Contract, or Company shall, for any reason, fail or refuse to furnish to you my services or the results of my services as a recording artist in accordance with all of the terms of the Contract, I shall, at your request, render such services and perform such acts as shall give to you the same rights, privileges and benefits you would have received under the Contract had Company continued to be entitled to my services and the results of my services as a recording artist in accordance with all of the terms of the Contract and had Company continued to furnish to you my services and the results of my services as a recording artist in accordance with all of the terms of the Contract and such rights, privileges and benefits shall be enforceable in your behalf against me.  I hereby represent that I understand the terms and conditions set forth in subparagraph 15(f) of the Contract and I agree to be bound by those terms and conditions insofar as they concern me.

3.    You and any person, firm or corporation designated by you shall have the perpetual, worldwide right to use and to permit others to use my name (both legal and professional, and whether presently or hereafter used by me), likeness, other identification and biographical material concerning me, for purposes of trade and advertising all in accordance with the terms and conditions set forth in the Contract.  You shall have the further right to refer to me during the term of the Contract as your exclusive recording artist, and I shall in my activities in the entertainment field use reasonable efforts to be billed and advertised during the term of the Contract as your exclusive recording artist.  The rights granted to you pursuant to this paragraph with respect to my name, likeness, other identification and biographical material concerning me shall be exclusive during the term of the Contract and nonexclusive thereafter.  Accordingly, but without limiting the generality of the foregoing, I shall not authorize or permit any person, firm or corporation other than you to use during the term of the Contract my legal or professional name or my likeness in connection with the advertising or sale of phonograph records other than as provided in the Contract.

4.      During the term of the Contract, I shall not enter into any agreement or make any commitment which would interfere with the performance of my or Company's obligations under the Contract, and I shall not perform or render services in connection with the recording of phonograph records or master recordings for any person, firm or corporation other than you, except as permitted under the Contract.  After the term of the Contract, I shall not prior to the later of the following dates perform for any person, firm or corporation other than you, for the purpose of making phonograph records or master recordings, any selection which was recorded under the Contract or under any other agreement between Company or its affiliates or me and you or your affiliates:  (a) the date five (5) years subsequent to the last date on which a master recording embodying that selection was delivered to you under the Contract and (b) the date two (2) years subsequent to the date on which the term of the Contract ended, all in accordance with the provisions of subparagraph 14(a) of the Contract.

5.      No termination of the Contract shall diminish my liabilities or obligations hereunder without your written consent.

6.      You may, in your name, institute any action or proceeding against me, at your election, to enforce your rights under the Contract, under the Recording Contract and under this document.

7.      I expressly acknowledge that my and Company's services hereunder and under the Contract are of a special, unique, intellectual and extraordinary character which gives them peculiar value, and that if I or Company breach any term hereof or of the Contract, you will be caused irreparable injury which cannot adequately be compensated by money damages.  Accordingly, you shall be entitled to seek injunctive relief, in addition to any other rights or remedies which you may have, to enforce the terms hereof or of the Contract.

8.      Except as otherwise provided in paragraph 15 of the Contract and paragraphs 2 above and 9 below, I shall look solely to Company for all royalties and other compensation which may be payable to me by reason of the recording, manufacture, distribution, or sale of phonograph records under the Recording Contract or the Contract or by reason of any other exploitation of the recordings embodied therein.

9.      Under the Recording Contract I am guaranteed to receive from Company during each consecutive twelve (12) month period of the term of the Contract ("Term Calendar Year") compensation of no less than _____ Dollars ($_____) in respect solely of my services as a recording artist under the Recording Contract.  If for any reason Company shall fail to pay to me at least _____ Dollars ($_____) during any Term Calendar Year, you may pay to me an amount which, when added to the amounts, if any, so paid by Company to me during that Term Calendar Year, shall equal

_____ Dollars ($_____).  You may demand that Company pay to you an amount equal to any amounts so paid by you pursuant to this paragraph, and you may, without limiting your other rights and remedies, deduct that amount from any monies payable by you under the Contract or under any other agreement between the Company or its affiliates or me and you or your affiliates.  No later than thirty (30) days prior to the end of each Term Calendar Year I shall advise you in writing of whether or not Company shall have paid to me at least _____ Dollars ($_____) during that Term Calendar Year.

        10.    In the event of any action, suit or proceeding arising from or based upon the Contract or this document brought by either party against the other, the prevailing party shall be entitled to recover from the other its attorneys' fees in connection therewith in addition to the cost of such action, suit or proceeding.

        11.    This document has been entered into in the State of _____, and its validity, construction, interpretation and legal effect shall be governed by the laws of the State of _____ applicable to contracts entered into and performed entirely within the State of _____.  The venue for any action, suit or proceeding arising from or based upon this document shall be the appropriate state and federal courts located in the State of _____.  Accordingly, you and I agree that any action, suit or proceeding arising from or based upon this document shall be commenced in and determined by those appropriate state and federal courts located in the State of _____.  In connection with the foregoing, you and I each agree to submit to and be bound by the jurisdiction of the appropriate state and federal courts located in the State of _____.  Finally, you and I agree that service of process may be effected by mail and agree that same shall be as binding as if personally served.

        12.    I acknowledge and agree that I have been represented by independent counsel or have had the unrestricted opportunity to be represented by independent legal counsel of my own choice for purposes of advising me in connection with the execution of this document.

Very truly yours,

_____

**AGREED AND ACCEPTED:**

_____ RECORDS, INC.        By:_____

*WE CONSENT TO THE FOREGOING*
*INSOFAR AS IT CONCERNS US:*

_____

By:_____
   An Authorized Signatory