FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

99 NOV -2 PM 4:01

-----------------------------------------------------------------X

TRANS CONTINENTAL RECORDS, INC.,
BMG ENTERTAINMENT, BMG ARIOLA
MUENCHEN GmbH, TRANS
CONTINENTAL ENTERTAINMENT, INC.
and LOUIS J. PEARLMAN,

       Plaintiffs,

-against-

ZOMBA RECORDING CORPORATION,
CLIVE CALDER, JAMES LANCE BASS,
JOSHUA SCOTT CHASEZ, JOSEPH
ANTHONY FATONE, JR., CHRISTOPHER
ALAN KIRKPATRICK, and JUSTIN
RANDALL TIMBERLAKE,

       Defendants.

-----------------------------------------------------------------X

99-1282-Civ-Orl-22C

**DECLARATION OF
HOWARD COMART
IN OPPOSITION TO
MOTION FOR A
PRELIMINARY
INJUNCTION**

I, HOWARD COMART declare under penalty of perjury that:

1. I am a certified public accountant in the State of New York and a member of Comart & Koppel, CPA's, LLP. In February 1999, I was retained to examine the accounting records pertaining to the musical group 'N Sync maintained by Trans Continental Records, Inc. ("TCR") and 'N Sync Productions, Inc. I submit this declaration in opposition to plaintiffs' motion for a preliminary injunction.

2. This declaration is based upon the accounting statements furnished by TCR for the period from inception to December 31, 1998. As TCR has failed to

account to the members of 'N Sync for its receipts in 1999, notwithstanding that accounting statements are past due, a complete analysis of monies received by TCR in 1999 is not possible at this time.

3. This declaration is also based on the limited information made available by Louis Pearlman for the operation of 'N Sync Productions, Inc. Pearlman has never furnished the members of 'N Sync with financial statements or detailed accountings of the operation of this company, with the exception of a profit and loss statement for the 'N Sync tour in the three month period March 1999 through May 1999, and a draft for the year ending 1998.

4. I have supplemented the accounting records made available by TCR and Pearlman with information gleaned from contract documents and other documentation to the extent available.

5. According to the accounting records made available to me, the total investment made by Pearlman prior to the execution of the contract with BMG Ariola Muenchen GmbH ("BMG Germany") never exceeded $206,016. For most of the one year period prior to execution of the August 1, 1996 BMG Germany agreement, the investment was considerably less.

6. TCR's entire initial investment was fully recouped following the execution of the BMG Germany agreement. As of December 1997, the Trans Continental companies had a cash surplus in excess of all expenses incurred in the amount of

$1,281,147. As of that date, each member of the group had received advances on account of the agreement with TCR of only $12,000, a total of $60,000 for the group. Annexed hereto as Exhibit A is a cash flow chart reflecting the total sums received and expended by TCR over the course of the period from August 1995 through December 31, 1998.

       7.    The gross imbalance in the amount of money retained by the Trans Continental companies has persisted throughout the parties' relationship and continues to persist. Thus, at June 30, 1998, the group members had each received a total of $37,000 in payments under the recording agreement with TCR. The Trans Continental companies at that date, however, retained a surplus in excess of all expenses incurred of $805,156. At December 31, 1998, the Trans Continental companies held $2,401,078 in excess of all sums reported as expended, while the members of the group had received only $1,511,375 collectively from the inception of the relationship.

       8.    In the five months subsequent to December 31, 1998, TCR received additional sums in excess of $1.6 million on account of merchandise royalties and advances. The group has received no part of these royalties or advances, except for $134,381.79 for royalties net of a management commission from Winterland on retail sales.

       9.    The above analysis is premised on the receipts actually reported by TCR. In fact, the Trans Continental entities have received funds on account of 'N Sync which have <u>never</u> been reported on the accounting records of TCR. For example, TCR

3

reported receipt of total advances in the amount of $800,000 from Winterland on account of the execution of retail and tour merchandise agreements dated as of November 30, 1998. In fact, pursuant to paragraph 10.3 of the agreements, Winterland paid TCR an additional advance of $50,000 as a fee for the cost of artwork supplied by TCR, half of which is recoupable from royalties. A copy of paragraph 10.3 of the Winterland merchandising agreement is attached as Exhibit B. The receipt of the $50,000 payment was not reported by TCR to the group, notwithstanding that the expenses incurred for artwork appear to have been charged to the group.

10. It also should be noted that not all of the underlying documents supporting the expenses reported as incurred by TCR have been made available for inspection to date. All of the expenses reported by TCR as chargeable to 'N Sync may not in fact be properly charged to the group.

11. For example, on December 31, 1998, TCR made a journal entry charging the 'N Sync account with the sum of $17,395.54 to "allocate 50% YE trademark exp." Since all of the 'N Sync trademarks worldwide have been procured by Louis Pearlman personally, charging trademark expenses as sums to be recouped from the 'N Sync accounts with TCR is clearly improper. It is likely that similar "trademark expenses" were charged to the 'N Sync account in prior periods, but available records do not permit those charges to be identified at this time.

12. In addition, TCR deducted $180,000 from the group as "tour support" even though this is an expense which should be reimbursed by 'N Sync Productions, Inc.

13. Further, a substantial portion of the expenses charged to the 'N Sync account reflect payments to Trans Continental Studios for recording time or services in connection with "The Christmas Album" and other records. Trans Continental Studios is another corporation owned or controlled by Louis Pearlman. At this time, it is not possible to determine whether like services were obtainable elsewhere at a lower cost and the amount of profit, if any, obtained as a result of steering this work to a Pearlman owned entity.

14. Each of the royalty statements reflect deductions from gross receipts for "management commissions" payable to TCR's affiliate Trans Continental Entertainment ("TCE"), in the amount of 25% for recording advances and royalties and 30% for merchandise advances and royalties. Over the course of the period from August 1995 to December 31, 1998 total deductions for "management commissions" equal $1,251,435. As a result of these deductions from receipts, the group has been credited with only 37.5% of earnings on records and 35% of earnings on merchandise.

15. During 1998, management commissions to TCE from 'N Sync Productions, Inc. were approximately $750,000.[1/]

16. In the period from March 3, 1999 to May 16, 1999, 'N Sync Productions, Inc. received revenue in the amount of $11,605,997.00 and generated a profit in excess of $6 million, before management commissions. A management commission in excess of $1.9 million was paid to TCE according to the tour accounting provided by TCE for this period.

17. No accounting has been received from 'N Sync Productions, Inc. for the tour dates from May 29, 1999 through September 4, 1999. Based upon accountings received from the tour booking agent, it is estimated that a gross income of approximately $14,000,000 was received by 'N Sync Productions, Inc. for these tour dates. I estimate that an additional $2.3 million in management commissions was paid to TCE on account of revenue from performances in this period.

18. The members of 'N Sync have performed in concert as employees of "N Sync Productions, Inc. Since 1997, Louis Pearlman has drawn a salary from 'N Sync Productions, Inc. equal to that earned by the individual members of 'N Sync for their concert performances. This is in addition to all the money paid to Mr. Pearlman and his

---

[1/] In the accounting records, total receipts are reported net of commissions so that the actual gross receipts are understated and the management commission paid is not disclosed.

companies under the recording, management and consulting agreements. Annexed hereto as Exhibit C is a chart prepared by 'N Sync Productions, Inc. reflecting all salaries paid from January 1, 1997 through March 20, 1999. Salary paid to Louis Pearlman for this period equaled $92,402.10

19. Pearlman has insisted on receiving a salary during the 1999 tour. Based upon the information presently available to me, I believe that Pearlman has caused himself to be paid in excess of $1,000,000 in salary and bonus from 'N Sync Productions, Inc. through September 4, 1999.

20. Based upon the foregoing, I estimate that TCE has collected management commissions in excess of $6,500,000 on the known income received by TCR and 'N Sync Productions, Inc. and that Louis Pearlman has collected personally in excess of $1,000,000 in salary bonuses and fees.

21. In addition, Winterland has advised that it is placing approximately $5,250,000 in merchandise royalties payable to TCR in escrow pending the outcome of this action. Pearlman would have caused TCE to be paid $1,575,000 as a management commission had this sum been paid to TCR.

22. To date, the Pearlman companies have not accounted for or paid 'N Sync for merchandise sales or advertising revenues received by Transcontinental Media, Inc, another entity owned or controlled by Pearlman, which hosts the official 'N Sync website. Nor have they accounted for or paid the group for either advances or royalties

paid by Bantam Doubleday for the best selling *NSync The Official Book released last year or for receipts from the Fan Club.  Nor have they accounted to or paid the group for the full proceeds of a pay-per-view concert and the group's performance for the Disney animated motion picture "Tarzan" soundtrack and its sound track album.

      23.    I estimate that the members of 'N Sync have received a small percentage of the known profits generated by their personal services.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 1st day of November, 1999 at New York, New York.

HOWARD COMART



N SYNC
TCR PAYMENTS (RECEIPTS)
1995-12/31/98

### TCR DISBURSEMENTS

| | PRODUCTION AND OTHER COSTS | ADVANCES TO GROUP | N SYNC MEMBERS' PERSONAL LOANS | TOTAL | TCR RECEIVED | TCR SURPLUS (DEFICIT) PER PERIOD | CUMULATIVE TCR SURPLUS (DEFICIT) |
|---|---|---|---|---|---|---|---|
| 1995 | 86,702 | | 14,479 | 101,181 | 0 | (101,181) | (101,181) |
| 1/1/96 - 7/31/96 | 67,701 | | 37,135 | 104,835 | 0 | (104,835) | (206,016) |
| 8/1/96 - 12/31/96 | 24,849 | 10,000 | 28,045 | 62,894 | 281,161 | 218,267 | 12,250 |
| 6/97 | 113,938 | | 60,168 | 174,106 | 89,586 | (84,520) | (72,270) |
| 12/97 | 259,350 | 50,000 | 50,141 | 359,491 | 1,712,908 | 1,353,417 | 1,281,147 |
| 6/98 | 249,081 | 125,000 | 101,910 | 475,991 | 0 | (475,991) | 805,156 |
| 12/98 | 504,179 | 1,326,375 | 24,724 | 1,855,278 | 3,451,200 | 1,595,922 | 2,401,078 |
| | 1,305,800 | 1,511,375 | 316,602 | 3,133,777 | 5,534,855 | 2,401,078 | |

* EXCLUDES MANAGEMENT COMMISSIONS.
INCLUDES 100% OF 1998 PRODUCTION COSTS, REPORTED BY TCR.



WINTERLAND
100 Harrison Street
San Francisco, CA 94105-1605

**FINAL EXECUTED COPY**

Dated: as of November 30, 1998

Trans Continental Records,
   Inc.
7380 Sand Lake Road
Suite 350
Orlando, FL 32819

    Re:  Merchandising Agreement
          (retail/licensing-agency)

Ladies and Gentlemen:

1.   **Understanding.** Effective upon execution of this agreement, the following will confirm the understanding between TRANS CONTINENTAL RECORDS, INC. (hereinafter "Licensor") and WINTERLAND (hereinafter "Licensee") relative to the musical group 'N SYNC and the individual members thereof (hereinafter "Artist"):

2.   **Grant of Rights.** Licensor hereby grants Licensee for the term hereof the exclusive right to utilize the names, symbols, emblems, designs, likenesses, service marks, trademarks, copyrights in graphic designs and/or visual representations of Artist (hereinafter "Licensed Property") in the United States and Canada (hereinafter "Licensed Area") in connection with:

   2.1.   the manufacture, advertisement, distribution and/or sale of:

       2.1.1.   wearing apparel of all types for adults and children, including, but not limited to, children's wear, hats, night shirts, outerwear, sleepwear, socks, sweatshirts and T-shirts; and

       2.1.2.   bags, bandanas, bed linens, bumper stickers, buttons, calendars (and other paper products), clocks, comic books, games, head bands, jewelry, key fobs, luggage, magnets, mugs, novelty items, party goods, patches, pillows, postcards, posters of all sizes, prints, programs, puzzles, school products, sleeping bags, stick-on stickers, towels, trading cards wallets, watches and other mutually approved products embodying the Licensed Property; and

   2.2.   subject to the terms hereof, the licensing of others to manufacture, advertise, distribute and/or sell any and all merchandise of every kind and nature utilizing or relating to the Licensed Property in any manner;

1

        10.2.2.2. to grant Licensee the right to utilize artwork contained on Artist's subsequent records and music videos released during the Licensed Term no later than thirty (30) days after any such release.

    The artwork referred to in sub-paragraphs 10.2.1 and 10.2.1.2 above must be supplied to Licensee no later than the date of execution of this agreement by Licensor and Artist. In the event Licensor fails to provide such artwork by such date, Licensee may purchase such artwork from a third party or hire a third party to create same (subject to Licensor's right to approve such artwork and the expense therefor). If Licensee is required to expend monies to purchase, create, or otherwise acquire the right to use such artwork, such expenditure shall be treated as an additional advance to Licensor paid hereunder. Following the expiration or termination of the Licensed Term, Licensee shall not have any right whatsoever to utilize any artwork or photographs supplied or created hereunder, provided that Licensee may retain any such materials consisting of screens or films.

10.3.    Licensee shall pay Licensor the sum of $50,000 as a contribution to artwork origination costs hereunder and under the Tour Agreement; Licensor shall bear all artwork origination costs in excess of such amount. Fifty percent (50%) of such amount shall be treated as an additional advance paid hereunder and under the Tour Agreement and shall be recoupable from monies payable to Licensor hereunder.

10.4.    All artwork, photographs and negatives utilized in connection with Licensed Products shall be delivered to Licensor promptly following the expiration or termination of the Licensed Term, provided that Licensee may retain any such materials consisting of screens or films. Notwithstanding the foregoing, Licensee shall destroy all screens or films at Licensor's discretion, and a statement of destruction sworn to by an officer of Licensee shall be submitted to Licensor within thirty (30) days following such destruction.

11.    <u>No Prejudice.</u> Nothing contained herein shall be construed to be prejudicial to or operate in derogation of any rights, licenses, privileges, or property which Licensee may enjoy or to which Licensee may be entitled as a member of the public, and this agreement shall not restrict, diminish, or impair Licensee's rights to utilize freely in any work or production any story, idea, plot, theme, sequence, scene, episode, incident, name, characterization, or dialog derived from whatever source which may be in the public domain.

12.    <u>Artist's Name: Copyright: Trademark.</u>

12.1.    As used in this agreement, the term "Licensed Property" means each of the elements specified on page 1 of this agreement and all the elements collectively. Licensee recognizes the value of the goodwill associated with the Licensed Property and that it has a secondary meaning in the mind of the public. Licensee acknowledges as between Licensor and Licensee that the Licensed Property shall be and remain Licensor's exclusive and complete property. Licensee may take all steps necessary to secure worldwide copyright and/or trademark protection for each Licensed Product in Licensor's name, and

8



NSYNC Salaries to Date

| | BASS, L | CHASEZ, JC | FATONE, J | KIRKPATRICK, C | PEARLMAN, L | TIMBERLAKE, J |
|---|---|---|---|---|---|---|
| 1997 | 19,905.90 | 19,905.90 | 19,905.90 | 19,905.90 | 19,861.55 | 19,905.90 |
| 1998 | 38,484.74 | 38,484.74 | 38,484.74 | 38,484.74 | 38,484.74 | 38,484.74 |
| as of 3/20/99 | 34,055.81 | 34,055.81 | 34,055.81 | 34,055.81 | 34,055.81 | 34,055.81 |
| Total | 92,446.45 | 92,446.45 | 92,446.45 | 92,446.45 | 92,402.10 | 92,446.45 |