UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA -- ORLANDO DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

TRANS CONTINENTAL RECORDS, INC., BMG
ENTERTAINMENT, BMG ARIOLA MUENCHEN
GmbH, TRANS CONTINENTAL ENTERTAINMENT,
INC., and LOUIS J. PEARLMAN,

                             Plaintiffs,

                 v.

ZOMBA RECORDING CORPORATION, CLIVE
CALDER, JAMES LANCE BASS, JOSHUA SCOTT
CHASEZ, JOSEPH ANTHONY FATONE, JR.,
CHRISTOPHER ALAN KIRKPATRICK, and JUSTIN
RANDALL TIMBERLAKE,

                         Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Civil Action No.
99-1282-Civ-Orl-22C

**DECLARATION OF
ADAM E. RITHOLZ IN
OPPOSITION TO
PLAINTIFFS' MOTION
FOR A PRELIMINARY
INJUNCTION**

    ADAM E. RITHOLZ, pursuant to 28 U.S.C. § 1746, declares under

penalty of perjury:

    1.    I am an attorney admitted to the practice of law in the State of New

York and a member of the law firm of Leibowitz Roberts & Ritholz LLP.  Since in or

about January 1999, I have acted as counsel for defendants James Lance Bass, Joshua

Scott Chasez, Joseph Anthony Fatone, Christopher Alan Kirkpatrick and Justin Randall

Timberlake, who are known as 'N SYNC.  This declaration opposes plaintiffs' motion

for a preliminary injunction, which asks this Court to restrain my young clients from

pursuing their career.



2.     Plaintiffs' motion is part of their self-described "scorched-earth policy," the object of which is to see that "'N SYNC will cease to exist." Such are the words of counsel of record for plaintiff Trans Continental Records, Inc. ("Transcon Records") as reported in *The Orlando Sentinel*, a copy of which I annex as Exhibit 1. In that same article, counsel indicates that, in the event plaintiffs achieve this objective, Transcon Records will simply replace 'N SYNC with a different group called Take Five.

3.     My purpose here is twofold: First, I describe the contracts by which Transcon Records, its affiliates and their principal Louis J. Pearlman purportedly bound 'N SYNC, and my efforts to relieve 'N SYNC of these unfair arrangements ("the Pearlman Agreements"). Curiously, plaintiffs' voluminous papers fail to supply this Court with the full record of the Pearlman Agreements, and the many different ways in which Mr. Pearlman and his companies attempted unreasonably to exploit 'N SYNC. Second, I describe the circumstances of my negotiations with Zomba Recording Corporation ("Zomba") following termination of 'N SYNC's recording contract with Transcon Records. Plaintiffs' allegations that Zomba "tortiously interfered" with or otherwise procured the breach of any contract with plaintiffs is without basis. To my knowledge, as more fully described below, the only party in this action that has attempted to procure a breach of any existing agreement is RCA Records, a division of plaintiff BMG Entertainment ("BMG Music").

### My Contacts with RCA

4.     I have been engaged in the practice of entertainment law, primarily in the music industry, for approximately eighteen years. After a period of private

2

practice prior to entering the music industry, I worked as a legal and business affairs officer at various record companies from 1981 to 1992, with the exception of one year spent in private practice with a major entertainment law firm.  During this period, I held senior positions dealing with legal and business affairs at Arista (now owned by BMG Music); CBS, Inc.; CBS Records International (now part of Sony Music); Chrysalis Records and Chrysalis Music Publishing (which was acquired by EMI); and EMI Records Group.  In 1992, I returned to private practice, and have since concentrated my practice in the music industry.

5.      Shortly after 'N SYNC retained me in or about January 1999, I contacted Robert Jamieson, president of RCA Records.  I have known Mr. Jamieson for some years, and I wanted to notify him that 'N SYNC had retained me to review the Pearlman Agreements, including the putative agreement between 'N SYNC and Transcon Records ("the Transcon Recording Agreement").

6.      In his declaration in support of plaintiffs' motion for a preliminary injunction in this action, Mr. Jamieson declares that "RCA is the home of 'N SYNC" and that the "RCA name is now closely identified in the record industry with the 'N SYNC name."  (See Jamieson Decl. ¶ 2.)   In fact, however, in my first conversation with Mr. Jamieson in early 1999, when I told him I represented 'N SYNC, Mr. Jamieson told me that 'N SYNC was "not my problem but Jan Bolz's problem" and that 'N SYNC was not under contract to RCA but had a contract "with Germany."  This was a reference to Transcon's contract with BMG Ariola Muenchen GmbH ("BMG

Ariola"), and to one of BMG Ariola's executives, Mr. Bolz.  Mr. Jamieson told me that he and RCA could do nothing concerning this "German" contract.

7.      This remained RCA's position for many months.  Indeed, until September 1999 -- after 'N SYNC's recording agreement with Zomba was publicly announced -- Mr. Jamieson and RCA consistently declined to participate in any negotiations with me or any other representative of 'N SYNC.   In my various conversations with him in the first half of 1999, Mr. Jamieson told me, time and again: that there was nothing RCA could do for 'N SYNC, that his "hands were tied" because 'N SYNC was not signed to RCA, and that BMG Ariola alone had the agreement with Transcon Records.

8.      RCA's position changed only after 'N SYNC signed its exclusive recording agreement with Zomba.   With knowledge of that Zomba Recording Agreement, which was fully in force and effect at the time, RCA proposed that 'N SYNC enter into an entirely new exclusive recording contract directly with RCA, in disregard of the Zomba Recording Agreement, not to mention plaintiffs' current theory that the Transcon Recording Agreement remained in effect.  Otherwise put, for the first time, RCA proposed to do what Transcon Records had promised (but failed) to do in the Transcon Recording Agreement:  provide 'N SYNC with a recording contract with a U.S. record company.   RCA's proposal did not involve any "renegotiation" or "modification" of the Transcon Recording Agreement; it called for a whole new deal. RCA also offered to provide a full indemnity against any claim by Zomba for breach of the Zomba Recording Agreement.

9.     RCA's proposal came too late, because 'N SYNC had already signed the Zomba Recording Agreement.

**The Pearlman Agreements**

10.     After my initial conversation with Mr. Jamieson in early 1999, I directed my efforts to gathering the various different contracts by which Mr. Pearlman and his companies had purportedly bound 'N SYNC. This was no easy undertaking, because neither the members of the group nor their parents had a complete set of the Pearlman Agreements.

11.     In their motion papers, plaintiffs do not disclose all the Pearlman Agreements to this Court. To the contrary, by providing the Court with copies of only certain contracts, plaintiffs greatly understate the manner in which Mr. Pearlman attempted to bind and exploit young and unsophisticated individuals. It is important to set forth the chronology and detail of these Pearlman Agreements:

•      The first of the Pearlman Agreements is an agreement purportedly executed on or about October 6, 1995 entitled "Stockholders Agreement" involving an entity called 'N SYNC, Inc. (Ex. 2)  'N SYNC, Inc. is identified as a Delaware corporation with its principal place of business in what I believe to be Mr. Pearlman's home. Six stockholders are named in this agreement -- the five members of 'N SYNC and Louis J. Pearlman. Each supposedly holds an equal interest in the entity. The Agreement, however, grants Mr. Pearlman an irrevocable proxy to vote the shares of all stockholders on all matters on which the stockholders are entitled to vote, including the election of officers and directors. The Agreement names Mr. Pearlman plus one of

Transcon Records' employees, Robert Fischetti, as the only officers. The certificate of incorporation says that 'N SYNC, Inc. was established as a management company for 'N SYNC. (Ex. 3)

- Also executed on or about October 6, 1995, is a second "Stockholders Agreement," substantially similar to the first one, involving an entity called 'N SYNC Productions, Inc. (Ex. 4)  This company, too, is identified as a Delaware corporation with its place of business in what I believe to be Mr. Pearlman's home. Eight stockholders are named in this agreement -- the five members of 'N SYNC, plus Mr. Pearlman and two of his companies, Transcon Records and an entity called Trans Continental, Inc. Thus, in this company, the members of 'N SYNC each hold only a one-eighth interest, with Mr. Pearlman controlling three-eighths. The Agreement says that each shareholder is entitled to choose one director. Nevertheless, Mr. Pearlman again purported to obtain an irrevocable proxy to vote the shares of all stockholders on all matters on which the stockholders are entitled to vote, including the election of officers and directors. Mr. Pearlman and Mr. Fischetti are appointed the only officers. 'N SYNC Productions, Inc.'s stated corporate purposes, as set forth in its Certification of Incorporation, are the same as 'N SYNC Inc.'s.

- Also among the Pearlman Agreements is a putative record of an alleged "Special Meeting of Stockholders" of 'N SYNC Productions, Inc. said to have occurred on October 6, 1995. The alleged minutes of this "Special Meeting" (Ex. 5) state that present were four of the five members of 'N SYNC, "some" unidentified "parents in person or by teleconference," and Messrs. Pearlman and Fischetti and a Mr.

Siegel from Trans Continental, Inc.  The minutes state that the purpose of the "Special Meeting" was to agree on a shareholders agreement for 'N SYNC Productions, Inc., which was being set up to "receive all revenue and income derived from 'N Sync touring, fan club and other non-recording (non-merchandising) related revenues and act exclusively on behalf of 'N Sync with regard to any of the above."  These minutes are signed by Messrs. Pearlman and Fischetti as, respectively, president and secretary of 'N SYNC Productions, Inc.

- Also on or about October 6, 1995, Mr. Pearlman executed the first of two recording agreements with 'N SYNC.  (Ex. 6)  In this "Initial Transcon Recording Agreement," Transcon Records purported to obtain the right to fifty percent of all royalties received under the contract, and one hundred percent of all publishing and copyright interests in compositions written by any member of 'N SYNC and recorded under the contract.  In addition, by a provision buried in the back of the contract, under the heading of "Video and Sideperson Provisions," Mr. Pearlman purported to have 'N SYNC "acknowledge" that Transcon Records was the sole owner of the name 'N SYNC.

- The next agreement is dated January 15, 1996 between Transcon Records and 'N SYNC Productions, Inc.  (Ex. 7)  This so-called "Consulting Agreement" is signed by Mr. Fischetti on behalf of Transcon Records (which Mr. Pearlman controls) and by Mr. Pearlman on behalf of 'N SYNC Productions, Inc. (which he also controls).  In this Consulting Agreement, 'N SYNC Productions agreed to pay Transcon Records twenty-five percent of all net revenues earned by 'N SYNC

Productions during the term of the Consulting Agreement; the term of the contract is perpetual unless both parties (both controlled by Mr. Pearlman) agree to terminate. In consideration of this twenty-five percent interest in all profits, Transcon Records is to perform unidentified consulting services "on such matters relating to the music business, particularly touring," as 'N SYNC Productions may require. Transcon Records has no other obligations under the contract with one limited exception. Transcon Records commits to "provide funding to" 'N SYNC Productions:

> to cover the cost of protecting, in the United States, the name 'N SYNC including, but not limited to, advancing the costs of trademark or other counsel and all filing fees in connection with filings made with the US Patent and Trademark Office . . . .

Transcon Records is to receive reimbursement of all expenses incurred under the Consulting Agreement, including the costs of protecting the mark 'N SYNC, out of the gross revenues and before any stockholder of 'N SYNC Productions is entitled to any funds. To secure these costs, Transcon Records received a security interest in all revenues of 'N SYNC Productions.

• The next agreement is a so-called Exclusive Management Agreement dated April 28, 1996 between Trans Continental Entertainment, Inc. and the members of 'N SYNC. (Ex. 8) My understanding is Mr. Pearlman is the controlling shareholder of this company, too. (Interestingly, the Management Agreement expressly identifies and refers to my five individual clients as 'N SYNC.) Under this Management Agreement, Mr. Pearlman's company is to receive twenty-five percent of all compensation received by 'N SYNC under any recording agreement, and thirty percent of all compensation received by 'N SYNC for merchandising and/or live performances

of 'N SYNC "received at any time on account of any and all activities in the entertainment or publishing industries," including 'N SYNC's use of the 'N SYNC name.

- On or about April 29, 1996, Mr. Pearlman had 'N SYNC re-execute the Transcon Recording Agreement, which in substance is identical to the Initial Transcon Recording Agreement. (Ex. 9)  As in its predecessor, the Transcon Recording Agreement purported to give Transcon Records the right to fifty percent of all royalties received under the contract, and one hundred percent of all publishing and copyright income, leaving the group only songwriter performance royalties.  Transcon Records obtained the right to an initial album plus seven options for additional albums. In addition, as before, buried in the back of the contract, Mr. Pearlman procured 'N SYNC's "acknowledgment" that Transcon Records was the sole owner of the name 'N SYNC, and, by cleverly limiting the group's income to 50% of "net royalties" as opposed to "net receipts" as would be normal, he took 100% of all advances to be paid by third parties for 'N SYNC's services.  Thus, under this Transcon Recording Agreement, if and when Mr. Pearlman obtained a contract with and received an advance from a record company, Mr. Pearlman would keep the advance.

- Despite the putative "acknowledgment" that Transcon Records "is the sole owner" of the 'N SYNC name, it appears that Transcon Records did not then own, and has never owned, that mark.  Public records indicate that, even before 'N SYNC signed any contracts with Mr. Pearlman, and though the name was not his idea, Mr. Pearlman's Trans Continental, Inc. filed a federal intent-to-use application for the name in August 1995.  (Ex. 10)  Sometime before then, however, I am advised that a

New Jersey company called N-Sync Inc. had filed a federal registration for the mark N-SYNC.  In June 1996, Mr. Pearlman, *in his personal name*, obtained a limited use license with that company for the use of that service mark.  (Ex. 11)  Under this limited-use license, which the New Jersey company has since terminated, Mr. Pearlman's use of the mark is restricted to use in connection "with the musical group then known as 'N SYNC" -- in other words, even under the license, Mr. Pearlman may use the name only to refer to my five clients.  Although Mr. Pearlman claims in his declaration that he has sublicensed the mark to Transcon Records, I have never seen such a sublicense, and Mr. Pearlman does not attach the sublicense to his papers.  Also worth noting is that, in a sworn statement recently filed in the United States District Court of New Jersey, Richard E. Ford, the President of -N- Sync, Inc. and the individual with whom Mr. Pearlman negotiated the 1996 license agreement, states that Mr. Pearlman, in seeking to secure the license to the mark, indicated that he was acting as 'N SYNC's legal representative.  (Ex. 12)  I should also mention that the trademark registration which underlies the 1996 license agreement is filed in category 9, the category which covers goods such as CDS and tapes, and not in category 41, entertainment services, which covers performers such as 'N SYNC.

- Mr. Pearlman's act of securing the N.J. license in his own name was not an isolated incident of misappropriation.  Trademark searches conducted abroad indicate that in the majority, if not all, of the jurisdictions in which Mr. Pearlman sought to register the 'N SYNC mark, he sought registration in his own name.  (Ex. 13)

12.     In summary, by the middle of 1996, at a time when two of my five clients were under 18, two were 19, and one was in his 20's, Mr. Pearlman had seized irrevocable control of all 'N SYNC entities, had procured a personal license in the 'N SYNC name, and had purported to bind my clients to a web of confused and confusing contracts fraught with self-dealing.  In this web of contracts, Mr. Pearlman purported to obtain for himself and his companies the following percentages of the following sources of income: 50% of all recording royalties and 100% of all advances, plus a further 25% of recording income as management commission; 100% of all publishing income; 50% of all merchandising income, plus a further 30% of gross merchandising income as management commission; 30% of gross touring income as management commission, plus a further 25% of net touring revenues as consulting fees. This was all in addition to the 37.5% of profits Mr. Pearlman and his companies received as stockholders of 'N Sync Productions, Inc., one of the many companies controlled by Mr Pearlman.

13.     To my knowledge, no court ever saw, let alone approved, this entire web of contracts as applied to minors.  Rather, it is my understanding from court filings that Mr. Pearlman arranged for some of the contracts to be submitted to the Circuit Court of the Ninth Judicial Circuit for Orange County, Florida, for approval. The court file indicates that the court appointed a guardian *ad litem* to review the contracts on behalf of Justin Timberlake, that this guardian raised objections to the contracts, finding certain provisions had the "combined effect [of] remov[ing] [the] artist-shareholders (including the Minor Artist) from input to and information from the Board

of Directors of the Corporation" and that others had been drafted "to disenfranchise the minor and the court."   According to the file, and as far as I know, nothing was done to address these issues, and the application for judicial approval of the contracts was not pursued.

14.   As noted, the 'N SYNC Productions Shareholders Agreement entitled each shareholder to nominate himself to be a director, but then provided that Mr. Pearlman had an irrevocable proxy to vote all the shares.   In June 1999, my clients called a special meeting of the board of directors of 'N SYNC Productions, Inc. (Ex. 14)   In response, Mr. Pearlman's counsel sent a letter stating that my clients are "neither officers nor directors" of 'N SYNC Productions, and that their call for a meeting was therefore a "nullity." (Ex. 15)

15.   One thing that Mr. Pearlman was supposed to do in all the web of contracts he had my clients sign:  get 'N SYNC a deal with a U.S. record company. Specifically, paragraph 19.12 of the Transcon Recording Agreement provides, that, notwithstanding anything to the contrary in the Transcon Recording Agreement, 'N SYNC "shall have the right to terminate this agreement" in the event that Transcon Records "has not secured a distribution agreement with a U.S. record company within eighteen months from the date hereof, pursuant to which recordings of your performances shall be released."   As far as I am aware, Mr. Pearlman and Transcon Records never secured such a distribution agreement.

### The BMG Ariola Agreement

16.     The BMG Ariola Agreement, dated August 1, 1996, is not a deal with a U.S. record company.   That Agreement is between Transcon Records and BMG Ariola.   (Ex. 16)   Although it purports to obtain the exclusive recording rights to 'N SYNC around the world, the BMG Ariola Agreement does not obligate BMG Ariola to release *any* 'N SYNC record in the United States, nor does it allow 'N SYNC to release a record in the United States if BMG Ariola chooses not to do so.

17.     The BMG Ariola Agreement provided for BMG Ariola to have the right to release an initial album and options for four more.   The royalty provisions of the BMG Ariola Agreement provide for increased royalties based on, and payable only on, sales in Germany, Switzerland and Austria.   The BMG Ariola Agreement states that Transcon Records is to receive an advance of DM350,000, half on signing and half upon delivery and acceptance of the initial album.   As best as I am able to determine, my clients never received any part of this advance.

18.     The BMG Ariola Agreement also required Transcon Records to obtain and deliver a "Letter of Inducement" to BMG Ariola.   In the music industry, a "Letter of Inducement" is a letter by which 'N SYNC would undertake certain obligations directly to BMG Ariola.   The form and content of such a Letter of Inducement, well known and established in the music business, is to create a contractual relationship between the artists (here, 'N SYNC) and the record label (BMG Ariola).   As far as I am aware, neither Transcon Records nor BMG Ariola ever obtained a Letter of Inducement from 'N SYNC to perform the BMG Ariola Agreement.   To my

knowledge, there is not, nor has there ever been, any agreement of any kind obligating 'N SYNC to do anything for BMG Ariola (or any other BMG company for that matter).

***Termination of the Pearlman Agreements***

19.     In their declarations submitted in support of plaintiffs' motion for a preliminary injunction, plaintiffs assert that, beginning in February or March 1999, 'N SYNC "attempted to renegotiate" the Pearlman Agreements.  Plaintiffs' depiction of my efforts as an attempt to "renegotiate the economic terms" of the Pearlman Agreements is, at best, incomplete.  In light of plaintiffs' reference to those discussions, which struggle to characterize 'N SYNC's later actions as a "sham," it is necessary to elaborate.

20.     It took most of the month of February for me to gather what I understood to be all the Pearlman Agreements.  Thereafter, beginning in March, I attempted to negotiate in good faith with Transcon Records to unburden my clients of these onerous and unconscionable contracts.  I did so for the obvious reason that I welcomed a negotiated resolution if Transcon Records and Mr. Pearlman were prepared to respect my clients' legal rights.  Unfortunately, they were not.

21.     Plaintiffs pepper their papers with references to the "sham" and "frivolous" basis for one of the grounds on which 'N SYNC decided to terminate -- namely, that Transcon Records had failed to secure a deal with a U.S. record company. In fact, however, from the very first of my discussions with Transcon Records, I made it plain that there would be no negotiated resolution in the absence of a new agreement in which a U.S. record company directly contracted with 'N SYNC assuring U.S. release

of 'N SYNC albums and compensating 'N SYNC consistent with U.S. record deals.  In addition, I made it plain that there would be no negotiated resolution in the absence of a complete overhaul of the Pearlman Agreements.  From the first, I made it plain, in writing and otherwise, that 'N SYNC did not intend to perform the Pearlman Agreements without a negotiated resolution achieving these objectives.  Hence, plaintiffs' attempt to characterize the bases for 'N SYNC's termination as pretextual is untrue.

22.    In May 1999, 'N SYNC (with its counsel) agreed to meet directly with Mr. Pearlman (with his) in an attempt to resolve this matter.  Upon listening to Mr. Pearlman's position, 'N SYNC, on their own, decided to leave, and did so.

23.    On or about May 26, 1999, I gave notice on behalf of 'N SYNC terminating the Transcon Recording Agreement for violation of paragraph 19.12. (Ex. 17)  I should note that between the date of this Termination Letter and the Zomba Recording Agreement -- that is, for over three months -- neither Transcon Records nor BMG Ariola ever attempted, as far as I am aware, either to seek a judicial declaration challenging the termination or to offer to arrange for the "German" contract to be replaced with a U.S. record contract with a U.S. company.

24.    Certainly Transcon Records and BMG Ariola had no reason to doubt that 'N SYNC regarded the Transcon Recording Agreement to be at an end.  The Termination Letter explicitly so stated.  Mr. Pearlman's counsel responded to the Termination Letter with an express threat to sue.  Repeated letters to Mr. Pearlman's counsel reiterated that the agreement had terminated, and expressly refused to withdraw the termination notice.  (Ex. 18)  In addition, 'N SYNC itself began to record on its

own, without use of the facilities or funds of Transcon Records.   And, in the communications that I had with representatives of Transcon Records following the termination, I reiterated that 'N SYNC was no longer acting under the Transcon Recording Agreement.

          25.     During this period no one affiliated with BMG Ariola purported to assert any rights as against 'N SYNC.  While no one from BMG Music contacted me, I did try to reach out to BMG Music.  Specifically, I called both Bob Jamieson, President of RCA, and Strauss Zelnick, the chief executive officer of BMG Music, RCA's parent company.  Again, Mr. Jamieson indicated that he was powerless to intervene. Following my discussions with Mr. Zelnick, he attempted to "mediate" directly between 'N SYNC and Mr. Pearlman, to no avail.  He made clear to me that he intended to stand behind Mr. Pearlman.  He further indicated that he did not believe that 'N SYNC had a long-term future as a recording group, a belief both Mr. Zelnick and other representatives of BMG Music communicated to 'N SYNC directly.

          26.     Following the Termination Letter, 'N SYNC gave additional notice of default under the Transcon Recording Agreement (Ex. 19), which default Transcon never attempted to cure.   'N SYNC also terminated the Management Agreement. (Ex. 20)   In addition, Justin Timberlake, who was fourteen years old when the agreements were signed, exercised his rights to disaffirm the Pearlman Agreements after attaining his majority.  (Ex. 21)

### *Negotiation of the Zomba Recording Agreement*

27.   Neither I nor, to my knowledge, anyone else acting on behalf of 'N SYNC had any contact with any representative of Zomba concerning 'N SYNC prior to 'N SYNC's termination of the Transcon Recording Agreement on May 26, 1999. The first contact of which I am aware did not occur until almost two months later.

28.   Beginning some time after May 25, 1999, I contacted various record companies to solicit their interest in recording 'N SYNC. Zomba was not among the companies that I contacted. I told every company I contacted about 'N SYNC's termination of the Transcon Recording Agreement. Various of these companies expressed interest in recording 'N SYNC, and I had ongoing discussions with certain of these companies in the period June through August 1999. Of the various companies I contacted, no record label declined to speak to me, save for two that told me that they would not do so only because they had existing (but unrelated) contractual arrangements with Mr. Pearlman.

29.   Meanwhile, as noted, 'N SYNC began to record on its own, without using the funds or other resources of Transcon Records or any BMG company, including RCA. Sometime in mid-July 1999, I received a telephone call from Clive Calder, who told me that he had heard that I was negotiating directly with record producers in connection with 'N SYNC's recordings. I confirmed to Mr. Calder that I was doing so. I also told him that 'N SYNC had terminated the Transcon Recording Agreement, that 'N SYNC did not intend to perform any recording agreement with Transcon (including release of any record through BMG Ariola), that BMG Ariola did

not have a Letter of Inducement from 'N SYNC, and that I was in discussions with other record labels looking toward a new recording agreement for 'N SYNC.  Upon hearing this, Mr. Calder asked to meet with me, and I agreed.

30.    Mr. Calder and I met on July 26, 1999 -- two months after the Termination Letter ending the Transcon Recording Agreement.  The meeting was preliminary in nature.  As I had done with other record labels, I gave Mr. Calder a copy of the Termination Letter of May 26, 1999.  I also reiterated to Mr. Calder that I was in discussions with other record labels about signing 'N SYNC.  Mr. Calder told me that Zomba might be interested in pursuing discussion for a recording contract with 'N SYNC.  I invited Zomba to make a proposal.

31.    I was on holiday during the first part of August.  While I was away, and despite the knowledge that I represented 'N SYNC, a lawyer for Transcon Records engaged in negotiations with a non-lawyer representative of 'N SYNC.  When I returned and learned of these negotiations, I contacted the lawyer to determine whether anything new and constructive had been proffered by Mr. Pearlman.  When I informed my clients of Mr. Pearlman's "final position," they rejected it.  To my knowledge, apart from these inappropriate discussions, no one from 'N SYNC participated in any negotiations with Transcon Records in this period.

32.    During August 1999, while continuing discussions with other record labels, I pursued negotiations for a recording agreement with Zomba.  'N SYNC did not choose to go forward with Zomba until the very end of August.  These negotiations ultimately resulted in the Zomba Recording Agreement dated September 4, 1999.

33.     The Zomba Recording Agreement is between Zomba and an entity called Zeeks, Inc., a Delaware corporation which was formed by Howard Comart, on behalf of 'N SYNC, on April 21, 1999, one month before 'N SYNC terminated its agreements with Transcon in May 1999.  The members of 'N SYNC are the sole owners of Zeeks, Inc., and they alone are empowered to control the corporation.  The members of 'N SYNC have designated me the Secretary of the corporation. As is standard in the music industry, in connection with the Zomba Recording Agreement, Zomba requested and received a Letter of Inducement pursuant to which each of the members of 'N SYNC personally agreed to perform the relevant provisions of the Zomba Recording Agreement.

***Conclusion***

34.     In short, I respectfully submit that 'N SYNC properly terminated the Transcon Recording Agreement; that 'N SYNC owes no continuing legal duty of any kind to Transcon Records, BMG Ariola or RCA; and that Zomba did nothing to procure 'N SYNC's termination of the Transcon Recording Agreement.  This Court should deny plaintiffs' application for a preliminary injunction in all respects.

35.     I also respectfully submit that plaintiffs have not come close to meeting the standards for issuance of the extraordinary remedy of a preliminary injunction.  If, however, the Court were to consider an injunction here, then the Court should require a bond in an amount sufficient to compensate Zomba and 'N SYNC for the lost sales, lost investment, increased costs and the potentially severe adverse impact on 'N SYNC's career which would result from a delay in the release of 'N SYNC's next album.  The complaint against my clients alleges compensatory damages of $100 million

solely from loss of 'N SYNC.   Other declarations submitted in opposition to the preliminary injunction motion make clear that an injunction here, by delaying my clients' pursuit of their career at a key stage in that career, could potentially eliminate 'N SYNC as pop music artists.   Accordingly, I respectfully submit that plaintiffs' own damages figure establishes the amount of the bond that should be required.

Executed in New York City, New York this 15 day of November, 1999.

_____
Adam E. Ritholz

1

Citation                    Search Result          Rank 1 of 8        Database
10/13/99 KRTBNWS (No Page)                                            ALLNEWS
10/13/99 Knight-Ridder Trib. Bus. News - KRTBN (Pg. Unavail. Online)
1999 WL 28698118
**(Publication page references are not available for this document.)**

KRTBN Knight-Ridder Tribune Business News: The Orlando Sentinel - Florida
Copyright (C) 1999 KRTBN Knight Ridder Tribune Business News; Source: World
Reporter (TM)

Wednesday, October 13, 1999

Lawsuit Could Put Orlando, Fla., Pop-Music Group Out of Business
Leslie Doolittle

War has been declared in Orlando's billion-dollar bubble-gum pop world.

Trans Continental Records, its founder Louis J. Pearlman and worldwide record distributor BMG filed a lawsuit in federal court in Orlando on Tuesday that could bring 'N Sync -- the musical money machine they helped create -- to a screeching halt.

Trans Con, Pearlman and BMG are seeking $150 million in damages from all five members of the multiplatinum-selling group and Zomba Records, accusing them of breach of contract because 'N Sync recently signed with Zomba subsidiary Jive Records.

The plaintiffs also want to stop the group from any use of the name 'N Sync, claiming it would infringe on Trans Con's exclusive rights to that trademark.

"This is a scorched-earth policy," said J. Cheney Mason, Trans Con's co-lead trial counsel. "We're going to shut them down. We believe there will be no tours, no performances, no rehearsal or recordings" other than those benefitting Trans Con until contract disputes are resolved.

"It is not Trans Continental's intent to cut the throats of those boys," said Mason, referring to Justin Timberlake, Joey Fatone, Chris Kirkpatrick, J.C. Chasez and Lance Bass, whom he said have received more than $1 million each from the group's debut album sales. "But we're going to decapitate the advisers who have been giving them bad advice."

At stake: about $300 million in initial record sales and merchandise and a contract for several more albums with expected revenue Trans Con says easily exceeds $1 billion.

Johnny Wright, the group's Orlando-based manager, could not be reached for comment Tuesday. But in an earlier interview, Wright said he expects the business-minded folks on both sides of the table to resolve the

Copr. © West 1999 No Claim to Orig. U.S. Govt. Works

10/13/99 KRTBNWS (No Page)
**(Publication page references are not available for this document.)**

dispute without disruption to the group, as they did when the Backstreet
Boys faced off with Trans Con a year and a half ago.

A spokesperson for Zomba and Jive would not comment except to say
neither record company had been served with papers in the case.

Trans Con's lawyers said 'N Sync has justified signing with Jive by
saying Trans Con failed in its contractual responsibility to obtain a
U.S. record company with national distribution within 18 months.

"That's the most legally incompetent and absolutely stupid position
I've ever seen in my career, and I've seen some lulus," Mason said.

William Pringle, co-counsel for Trans Con, said within four months his
client had 'N Sync signed with BMG, an international distributor that
owns RCA Records.

"We're done having people take advantage of Lou Pearlman," Pringle
said, noting the recording executive had invested millions grooming the
Orlando-based group for stardom since 1996.

Trans Con attorneys insist the company is willing to put 'N Sync out
of business.

"If this means 'N Sync will cease to exist, there's another group
right behind them," said Mason, referring to Take 5, the next boy band
in the Trans Con pipeline.

In an earlier interview, Wright said even if 'N Sync lost its right to
use that name, the group would go on.

'N Sync isn't the first band to end up in a battle over rights to a
famous name. Others include Creedence Clearwater Revival, Jefferson
Airplane/Starship, Toto and the Buffalo Springfield.

Both sides in the current dispute said they hope problems are resolved
before brakes are applied to 'N Sync's business, which could come in the
form of a preliminary injunction in about 30 days.

How quickly could this be resolved?

"That depends on how smart they get and how quick they get smart,"
Mason said.



## STOCKHOLDERS AGREEMENT

STOCKHOLDERS AGREEMENT (the "Agreement") made as of the ____ day of _____, 1995 among 'N SYNC, INC., (the "Corporation"), a Delaware corporation having an address at 9235 Ridge Pine Trail, Orlando, Florida 32819, and LOUIS J. PEARLMAN, residing at 9235 Ridge Pine Trail, Orlando, Florida 32819, CHRISTOPHER ALAN KIRKPATRICK, residing at 1610 Overdale Street, Orlando, Florida 32825, and JUSTIN RANDALL TIMBERLAKE, a minor, residing at 303 Fawn Lake Drive, Millington, Tennessee 38053, and JOSHUA SCOTT CHASEZ, residing at 6511 Homestake Drive South, Bowie, Maryland 20720, and JOSEPH ANTHONY FATONE, JR., residing at 2746 Woodruff Drive, Orlando, Florida 32837, and JAMES LANCE BASS, residing at 111 Newport Circle, Clinton, Mississippi 39056, (each being hereinafter individually and collectively referred to as "Stockholder" and collectively, as the "Stockholders").

### W I T N E S S E T H:

WHEREAS, the Corporation has authorized six hundred (600) shares of common stock, par value $.01 per share, ("Common Stock") of which six hundred (600) have been issued are outstanding;

WHEREAS, as of the date hereof, each Stockholder owns 100 shares of Common Stock (the shares of Common Stock owned by each Stockholder respectively are referred as such Stockholder's "Shares"); and

WHEREAS, the Stockholders desire to regulate the transfer of their Shares and to define certain of their rights and obligations with respect to the operation of the Corporation;

NOW THEREFORE, in consideration of the premises hereof and the covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **DIRECTORS AND OFFICERS**

   (a)  The Corporation's Board of Directors shall consist of six (6) individuals. Each Stockholder, for so long as he shall own at least 5% of the outstanding Common Stock, shall have the right to nominate himself to be a director. Each Stockholder, for so long as he remains a stockholder of the Corporation, agrees to vote the shares of Common Stock owned by such Stockholder to elect the nominees of the other Stockholders.

   (b)  The directors of the Corporation shall use their best efforts to elect and re-elect the following individuals as officers of the Corporation, for so long as said individuals are stockholders of the Corporation:

Louis J. Pearlman    -    Chairman, President and Treasurer
Robert Fischetti     -    Secretary

(c)   Notwithstanding anything herein to the contrary, if, at any time, any Stockholder shall cease to own any Shares, such Stockholder shall be deemed to have resigned as an officer and director of the Corporation.

(d)   Each Stockholder hereby grants an irrevocable proxy, coupled with an interest, to Pearlman to vote the Shares of such Stockholder on all matters on which holders of Common Stock are entitled to vote.

2.   PROFITS OF CORPORATION

(a)   If the Corporation's status as an "S" corporation is in effect for a taxable year, the Stockholders and the directors agree that they shall authorize and direct the Corporation to make pro rata distributions of an amount equal to the state and federal tax liability of each Stockholder as a result of being a Stockholder of the Corporation of operating profits for such taxable year, as determined by the Corporation's regular certified public accountants.  Such share of the operating profits shall be distributed to the Stockholders, at least annually and not later than ninety (90) days after the end of each taxable year in accordance with the proportionate ownership of Shares of each Stockholder.

(b)   If there is an addition, reduction or any other change (other than a complete termination of interest in the Corporation) in the number of Shares of any Stockholder during a taxable year, any allocation and distribution of profits for such taxable year shall be prorated among the Stockholders and any other stockholders of the Corporation based on the number of days in the period their ownership of Shares was outstanding.

(c)   In the event that any Stockholder shall transfer all of his Shares in accordance with the provisions of this Agreement prior to the end of any taxable year, the Corporation shall make a distribution to the transferor Stockholder equal to the portion of the Corporation's operating profits for the taxable year (and any distributions owing from to the Stockholder for any previous taxable year) that will be (or should have been) allocated to such Stockholder, but only to the extent such profits have not been previously distributed.

3.   RESTRICTION ON TRANSFER OF SHARES

(a)   Each of the Stockholders undertakes with each other during the continuance of this Agreement that he shall not pledge or otherwise encumber all or any portion of his Shares, nor shall he dispose of all or any portion of his Shares by gift, sale,

2

inheritance or otherwise, except with the prior written unanimous consent of both the Corporation's Board of Directors and all the Stockholders or as otherwise specifically permitted by this Agreement.  Any purported pledge, encumbrance or disposition in violation of the terms of this Agreement shall be void ab initio. Upon issuance, the certificates representing the Shares shall have inscribed thereon the following endorsement:

> "THE PLEDGE, TRANSFER, SALE OR ENCUMBRANCE OF THE SHARES REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE TERMS OF A STOCKHOLDERS AGREEMENT DATED AS OF _____, 1995, A COPY OF WHICH IS ON FILE AT THE OFFICE OF THE CORPORATION."

(b)  Notwithstanding the foregoing, a Stockholder shall be permitted to transfer any or all of his Shares pursuant to his will or by the laws of intestacy, provided that any Shares so transferred shall remain subject to the rights of the Corporation and the other Stockholders to acquire the same as provided herein, and, provided further, that the transferee executes and delivers an agreement to be bound by the terms and conditions of this agreement.

4.   <u>RIGHT OF FIRST REFUSAL</u>

(a)  In the event a Stockholder (herein, the "Selling Stockholder") desires, at any time, to transfer all (but not less than all) of his Shares or to otherwise withdraw as a Stockholder of the Corporation, and/or if a Stockholder during his lifetime obtains a bona fide written offer (an "offer") from a third party (the "Offeror") to acquire all but not less than all of Shares which Offer he desires to accept, the Selling Stockholder shall give written notice to the Corporation ("Notice of Intention") and such Notice of Intention shall disclose the identity of the Offeror and the terms of the Offer.  If the Corporation shall not have responded to the Notice of Intention within twenty (20) days after receipt that the Corporation desires to purchase the Shares of the Selling Stockholder on the same terms as the Offer ("Notice of Acceptance") or if the Corporation does not actually purchase such Shares within the time period set forth below, then the Selling Stockholder may accept the Offer.  In no event shall any Stockholder offer or agree to sell all, but not less than all, of the Shares to anyone at a price less than the Book Value (as defined in Paragraph 7 below) thereof as of the last day of the month immediately preceding the month during which such Offer occurs (the "Purchase Price").

(b)  If the Corporation shall accept the offer to purchase all of the Shares provided for in this paragraph, a Closing shall take place as provided in Paragraph 8 hereof.

(c)  If the Corporation fails to exercise its right to purchase the shares of the Selling Stockholder pursuant to subparagraph (a) of this Paragraph, the Selling Stockholder shall be free for a period not exceeding two (2) months to sell the Shares to the Offeror upon the terms and conditions contained in the Offer, provided that there shall be delivered to the Corporation an agreement executed by the Offeror acknowledging that the Shares are and remain subject to the terms and provisions of this Agreement and agreeing to be bound hereby.

(d)  All exercises of options hereunder are binding upon all parties with any direct or indirect interest in any Shares unless options are not exercised with respect to all of the Shares held by the Selling Stockholder within the time limits provided. If options are not exercised with respect to all of said Shares, all exercises of options shall be null and void.

5.   <u>EVENTS OF SEPARATION</u>

(a)  <u>Event of Separation-Defined</u>.  In the event that: (i) any Stockholder dies, (ii) any Stockholder is deemed to have a permanent disability (which "permanent disability" shall be deemed to exist when, by reason of a physical or mental condition or both, person is incapable of properly performing his or her usual and customary duties and responsibilities for the Corporation or otherwise for a consecutive six (6) month period, or for any nine (9) months out of a twelve (12) month period, and if requested by another Stockholder, such person or his legal representative has provided the Corporation with a written opinion from a qualified physician that such permanent disability exists), or (iii) any Stockholder shall be adjudicated a bankrupt, file a voluntary bankruptcy petition or a petition for an arrangement with creditors, make an assignment for the benefit of creditors, or seek to avail himself of any provision of law for the relief of debtors; or a receiver or trustee is appointed for his property and such appointment is not vacated or withdrawn prior to the sale of his property thereunder; or any of his Shares shall pass or devolve upon any other person in any involuntary manner, including, but not limited to, judicial order, legal process, execution or attachment (the events set forth in this subparagraph (iii) are hereinafter collectively referred to as "Bankruptcy"), then, in each of those cases, an "Event of Separation" shall be deemed to have occurred with respect to such person.  The Stockholder with respect to whom an Event of Separation shall occur (or the legal representative of his estate) or any transferee from the Stockholder and persons to whom Shares of such Stockholder may pass or upon whom they may devolve, hereinafter shall be referred to as a "Selling Stockholder."

(b)  <u>Death or Permanent Disability</u>.  In the event of a Stockholder's death or permanent disability, the Selling Stockholder shall be required to sell all of the Stockholder's

4

Shares to the Corporation and the Corporation shall be required to purchase said Shares from the Selling Stockholder. The purchase price for the Shares (the "Purchase Price"), payable at the Closing shall be equal to the Book Value (as defined in Paragraph 7 below) of the Shares plus any accumulated operating profits owing to such Selling Stockholder pursuant to Paragraph 2(c) hereof.

(c) **Other Events of Separation**. In the event that a Stockholder desires to voluntarily terminate his relationship with the Corporation or is the subject of a Bankruptcy, then the Corporation shall have option to buy all of such Shares from the Selling Stockholder and said event shall be treated as if the Selling Stockholder had tendered a Notice of Intention pursuant to Paragraph 4 of this Agreement for the purpose of determining the Purchase Price and how the option to purchase shall devolve upon and shall be exercisable by the Corporation.

6. **Take-Along Right**.

(a) **Take-Along**. If a Selling Stockholder proposes to sell Shares to a third party, each of the other Stockholders (each, a "Potential Take-Along Participant") shall have the right to require the third party purchase from him the number of Shares derived by multiplying the total number of Shares to be purchased by the third party by a fraction, the numerator of which is the number of Shares owned by such Potential Take-Along Participant and the denominator of which is the total number of Shares owned by all Potential Take-Along Participants electing to participate and the Selling Stockholder. The number of Shares to be sold to a third party by the Selling Stockholder shall be reduced by the number of Shares subject to the Take-Along Right and included in such sale by the Potential Take-Along Participants; unless the third party agrees to purchase all the Shares offered by the Selling Stockholder and the Potential Take-Along Participants.

(b) **Take-Along Notice**. The Take-Along Right may be exercised by a Potential Take-Along Participant by delivery of a notice (a "Take-Along Notice") to the Selling Stockholder and the Corporation (which in turn will promptly notify the Potential Take-Along Participants) within ten days following receipt by the Corporation of a Notice of Intention. The Take-Along Notice shall state the maximum number of Shares that such Potential Take-Along Participant wishes to include in such sale to the third party purchaser. Any Shares purchased from a Potential Take-Along Participant pursuant to this Paragraph 6 shall be at a price and upon terms no less favorable to such Potential Take-Along Participant than that contained in the Notice of Intention, and shall be purchased only by the third party specified in such Notice of Intention. After expiration of the applicable periods referred to in Paragraph 4, the Selling Stockholder, together with any electing Potential Take-Along Participant, shall have the right for thirty days to transfer the Shares upon the terms and conditions

5

contained in the Notice of Intention, provided that, in each case, that such transfer shall be made to the third party specified in the Notice of Intention on the terms set forth therein.

(c) <u>Notification of Take-Along Rights</u>. The Corporation hereby acknowledges its obligations to deliver a copy of the Notice of Intention and the Take-Along Notice to each of the Potential Take-Along Participants promptly upon its receipt thereof, unless such Notice of Intention or Take-Along Notice, as the case may be, appears on its face to have been delivered directly to such Potential Take-Along Participants.

7. <u>DEFINITION OF BOOK VALUE</u>.

(a) The "Book Value" of the shares shall be equal to the product of the net worth per share of the Corporation as computed by the Corporation's certified public accountant's in accordance with generally accepted accounting principles, applied consistently with past practice, times the number of shares to be purchased, subject to the following:

(i) Adjustments shall be made for mathematical errors, omissions and for any other allowances necessary to correctly reflect assets and liabilities in accordance with generally accepted principles of accounting.

(ii) Trade fixtures, equipment, furniture and furnishings shall be valued at cost less straight-line depreciation.

(iii) All merchandise, inventory, works in process and raw materials shall be valued at cost or fair market value, whichever is lower.

(iv) Accounts receivable shall be valued at the face amount thereof, less customary trade discounts, and less a reserve of bad debts, determined in accordance with the Corporation's customary practice.

(v) Life insurance policies owned by the Corporation shall be valued at the cash surrender value thereof, and in the event that the valuation relates to the shares of any Stockholder upon his death, then only the cash surrender value of such life insurance policy on the day immediately preceding the date of death shall be included in the valuation of Book Value and not the proceeds thereof.

(vi) Corporate income taxes and other taxes allocable to the period up to the date for which Book Value is to be determined, if any, shall, if not otherwise provided for on the books of the Corporation, be estimated in accordance with generally accepted accounting principles consistently applied.

(vii) No consideration shall be given to any tax carry-forward which may result in a refund for any period after the date for which Net Book Value is to be determined.

(viii) All assets and liabilities of the Corporation shall be valued according to their current fair market value.

The aforesaid determination of Book Value shall be binding upon and conclusive against all persons, firms and corporations (including the Stockholders, the Selling Stockholder, the Corporation and their representatives) subject to this Agreement, unless written notice of any objection is delivered to the Corporation within ten (10) days after receipt by such persons of the accountants' written determination in which event such determination shall be subject to arbitration pursuant to this Agreement.

(b) Promptly after the occurrence of an Event of Separation or the acceptance by the Corporation or the other Stockholders of an offer to purchase the Shares pursuant to Paragraph 4, the Corporation shall cause the Corporation's accountants to compute the Book Value of the Selling Stockholder's Shares in accordance herewith and to deliver written copies of such computation to the Corporation, the remaining Stockholder and the Selling Stockholder as promptly as possible.

8. <u>PAYMENT AND CLOSING</u>.  With respect to the sale and purchase of Shares hereunder pursuant to Paragraph 4, 5 or 6 hereof, a closing (the "Closing") will take place at the principal office of the Corporation, its attorneys or a lending institution, on the business day and at the time set forth by the purchaser in a notice delivered at least ten (10) days prior to the Closing. In no event shall the Closing occur more than thirty (30) days after the receipt of the accountant's report provided for in paragraph 7(b), except that if the Event of Separation is the death of a Stockholder, the Closing may occur up to the later of ninety (90) days after the receipt of the accountant's report or fifteen (15) days after a personal representative has been appointed and qualified.  If the Corporation is not permitted to purchase or redeem any Shares that it is entitled to purchase or redeem pursuant to this Agreement, by either state corporation law or any debt instrument, Pearlman shall have the personal right to purchase such Shares on the same terms and conditions as the Corporation.

9. <u>LIFE INSURANCE</u>

(a) During the term of this Agreement, the Corporation shall have the right to maintain life insurance on the life of each Stockholder with a death benefit payable to the Corporation in such amount as the Corporation shall determine.

7

(b)   If any Stockholder shall cease to be a Stockholder for any reason other than his death, the Corporation shall, upon receipt from such Stockholder of an amount equal to the cash value of the life insurance maintained on his life, less any loan balance plus an adjustment to reflect any pre-paid premiums, transfer all of its right, title and interest in such policy to such Stockholder.

## 10.   RESTRICTIVE COVENANTS

(a)   Upon the occurrence of an Event of Separation or upon a sale of Shares subsequent to delivery of a Notice of Intention pursuant to Paragraph 4 above, each of the Stockholders hereby agrees that he will not, without the written consent of the Corporation, directly or indirectly, solicit or accept, on behalf of another record label or distributor, the services of any recording artist, composer or other artist under contract with the Corporation at the time of the Event of Separation (including any services that may be provided by the Stockholder), and will not, directly or indirectly, assist or be employed by any other party in soliciting or accepting the services of any recording artist, composer or other artist under contract with the Corporation at the time of the Event of Separation.

(b)   Each Stockholder hereby acknowledges that should he breach the restrictive covenant contained herein, the Corporation's remedy at law will be inadequate.   Therefore, in addition to any remedy otherwise available to the Corporation, and notwithstanding the provisions herein for arbitration, each Stockholder agrees that the Corporation shall be entitled to an injunction restraining it from any such violation.   Moreover, if it shall be determined by any arbitration panel or court, that any covenant herein is not enforceable due to its geographic area or duration, then it is the intention of the parties that such covenant shall be enforceable to the greatest extent possible, and will be deemed amended so as to reduce the geographic area or duration, as the case may be, to the extent necessary to secure enforceability.

## 11.   INJUNCTIVE RELIEF

Due to the fact that the Shares cannot be readily purchased or sold in the open market, and for other reasons, the parties hereto recognize and acknowledge that irreparable damage will result in the event this Agreement shall not be specifically enforced.   If any dispute arises concerning disposition of any Shares hereunder, the parties hereto agree that the other parties hereto shall be entitled, without showing any actual damage, to a temporary or permanent injunction restraining such disposition pending determination of such controversy, and that no bond or other security may be required in connection therewith.   If any dispute arises concerning the rights or obligations of any party hereto to purchase or sell any of the Shares, such right or

obligation shall be enforceable by a decree of specific performance. Such remedies shall, however, not be exclusive and shall be in addition to any other remedies which the parties may have.

12. **DURATION**

This Agreement shall continue in full force and effect until terminated by the occurrence of any of the following events:

(i) Discontinuance of the Corporation's business or its liquidation;

(ii) A petition in bankruptcy is filed by the Corporation or an adjudication of bankruptcy is made against the Corporation;

(iii) A receiver is appointed for the Corporation and such appointment is not vacated within sixty (60) days;

(iv) An unconditional assignment is made for the benefit of creditors by the Corporation;

(v) There is only one stockholder of the Corporation except that any payout provisions, if any, would survive; or

(vi) The expiration of a ten-year period commencing of the date hereof except that this Agreement shall be automatically renewed for successive ten-year periods unless the parties hereto agree otherwise in writing.

13. **ARBITRATION**

All questions concerning this Agreement, including but not limited to, its execution, interpretation and performance shall be governed by the laws of the State of Florida without regard to any law which would result in the selection or application of the law of any other jurisdiction. Any dispute or controversy arising out of or in connection with this Agreement shall be submitted to arbitration before a panel of three arbitrators in Orlando, Florida in accordance with the Commercial Arbitration Rules then obtaining of the American Arbitration Association provided, however, that at least one of such arbitrators shall be a practicing attorney licensed in the State of Florida and at least one of such arbitrators shall be a certified public accountant licensed in the State of Florida. The arbitrators' powers shall include the power to award specific performance, injunctive relief and reasonable attorneys' fees and expenses to any party in any such arbitration. The arbitrators shall not, however, have the power to change, modify, alter, set aside or ignore any express condition, item or provision hereof, and to that extent the scope of their authority

9

is limited.  The arbitration award shall be final and binding upon
the parties and judgment may be entered thereon in the Supreme
Court of the State of Florida or in any other court of competent
jurisdiction.   This  agreement  to  arbitrate  all  disputes  and
controversies shall not prevent either party from seeking judicial
injunctive relief in aid of any such arbitration.   The service of
any notice, process, motion or other document in connection with
any dispute may be effected in the manner in which notices are to
be given to a party pursuant to Paragraph 15 below.

      14.   COMPLETE AGREEMENT; GOVERNING LAW;
            ORAL MODIFICATION

        This   Agreement   contains   the   full   and   complete
understanding and agreement of the parties with respect to the
subject matter hereof and supersedes all prior agreements, either
oral or written, between the parties with respect to the subject
matter hereof.

      15.   NOTICES

        All notices, requests, demands or other communication
required or permitted to be given hereunder shall be in writing,
and shall be deemed duly given, upon receipt, if personally
delivered or, three days after deposit in a facility of the United
States mails, if mailed by registered or certified mail, return
receipt requested, to the address of the intended recipient set
forth above, or to such other addresses as may be designated by
notice given to the other Stockholder in accordance with this
Paragraph, with, in the case of the Corporation, a copy to:

            William B. Pringle, III, Esquire
            Post Office Box 691222
            Orlando, Florida  32869-1222

      16.   SEVERABILITY

        If any provision of this Agreement is determined to be
legally invalid, inoperative or unenforceable, only that particular
provision shall be affected, and the determination shall have no
effect whatsoever on any other provision of this Agreement, and all
other provisions shall remain in full force and effect and fully
enforceable.

      17.   NON WAIVER

        No delay or failure to exercise any remedy or right
occurring upon any default shall be construed as a waiver of such
remedy or right or acquiescence in such default, nor shall it
affect any subsequent default of the same or a different nature.
All rights and remedies herein conferred shall be in addition to

10

and not exclusive of any and all other rights or remedies now or hereafter existing at law or in equity.

18.   **SUCCESSORS AND ASSIGNS**

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and permitted assigns.  If ownership of the shares of any of the Stockholders shall be transferred to a third party in accordance with the terms hereof, the Corporation shall not be obligated to recognize such individual as a stockholder unless and until such individual shall have executed and delivered an agreement wherein such individual agrees to be bound by the terms hereof.  Further, upon delivery of such an instrument of assumption, such individual shall be entitled to all of the benefits hereof.

19.   **HEADINGS**

The heading and captions contained in this Agreement are for the convenience of reference only and shall have no bearing on the interpretation or enforcement of this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first written above.

'N SYNC, INC.

By: _____
    LOUIS J. PEARLMAN      President

_____
LOUIS J. PEARLMAN

_____
CHRISTOPHER ALAN KIRKPATRICK

_____
JUSTIN RANDALL TIMBERLAKE

11

JOSHUA SCOTT CHASEZ

JOSEPH ANTHONY FATONE, JR.

JAMES LANCE BASS

**12**

### PARENTAL\GUARDIAN CONSENT


I, _____ LYNN HARLESS _____, hereby represent and acknowledge that I am the natural parent and/or legal guardian of the minor __JUSTIN RANDALL TIMBERLAKE__ and that I have read and am familiar with the Shareholder's Agreement attached hereto.

I hereby guarantee my child's performance of his obligations under said Recording Agreement and agree to be secondarily liable in the event he should breach or improperly terminate same.

_Lynn Harless_____
Parent/Guardian Signature

_LYNN HARLESS_____
Parent/Guardian's Name Printed

Dated: ____10/2/95_____

13

## PARENTAL\GUARDIAN CONSENT

I, _____DIANE P. BASS_____, hereby represent and acknowledge that I am the natural parent and/or legal guardian of the minor __JAMES LANCE BASS__ and that I have read and am familiar with the Shareholder's Agreement attached hereto.

I hereby guarantee my child's performance of his obligations under said Recording Agreement and agree to be secondarily liable in the event he should breach or improperly terminate same.

_Diane P. Bass_____
Parent/Guardian Signature

_Diane P. Bass_____
Parent/Guardian's Name Printed

Dated: _10-6-95_____

14



STATE OF DELAWARE
SECRETARY OF STATE
DIVISION OF CORPORATIONS
FILED 09:00 AM 11/14/1995
950263726 - 2564255

# CERTIFICATE OF INCORPORATION

## OF

### 'N SYNC PRODUCTIONS, INC.

I, the undersigned, in order to form a corporation for the purposes hereinafter stated, under and pursuant to the provisions of the General Corporation Law of the State of Delaware, do hereby certify as follows:

FIRST:    The name of the corporation is 'N SYNC PRODUCTIONS, INC. (the "Corporation").

SECOND:   The address of the corporation's registered office in the State of Delaware is 15 East North Street, City of Dover, County of Kent, State of Delaware.  The name of the Corporation's registered agent at such address is United Corporate Services, Inc.

THIRD:    The purposes for which the corporation is formed are as follows:

1.    To conduct business as managers, representatives of entertainers, performing artists, actors and actresses, and other creative talent; To carry on the business of producing and presenting public entertainment, theatrical and otherwise, and also of theatrical proprietors, music hall proprietors, caterers, for public entertainments, concerts, and public exhibitions, ballets, conjuring, juggling, moving pictures and other entertainment; to provide, engage and employ actors dancers, singers, variety performers, athletes, and theatrical and musical artists; to produce and present to the public all manner of shows, exhibitions, and amusements which are or may be produced at a theater, music hall, or elsewhere within enclosures or in the open; to own, acquire, erect, lease, use, operate, manage, or control and sell, let, mortgage, transfer, or otherwise dispose of theaters, hall, gardens, entertainment halls, or other places for public entertainment or amusement.

2.    To engage generally in any and all branches of the general theatrical business, including but not limited to radio, television, stage, and motion pictures; to own, lease, or otherwise acquire and to manage, operate, and control theatres and other places of amusement and entertainment; to own, lease, or otherwise acquire, and to manage, operate and control radio, telegraph, telephone, radio broadcasting, and telecasting systems or stations and any other means of communication, whether now known or hereafter discovered or invented; to carry on a general theatrical and amusement business and every branch thereof or every business connected therewith; and to carry on any other business of a similar or related nature or capable of being conveniently carried on in connection with the foregoing or calculated directly or

indirectly to enhance the value of the property or rights of the corporation.

3.   To engage in all phases of the business of music and literary publishers, including making arrangements with authors, companies, and others for the writing and composition of musical works, and including acting as a jobber, wholesaler, retailer, licensor and forms in which musical works may be embodied.

4.   To hire, employ, contract with and negotiate for the musical production or artistic services or, and to use in any manner, orchestras, bands, singers, musicians, actors, entertainers and others.

5.   To manufacture, produce, acquire, purchase, own, maintain, export, import, sell, lease, license, distribute, exhibit, and generally deal in motion pictures of every kind, nature and description, of any size and dimension, colored or otherwise, with or without sound synchronization, talking sequences or musical accompaniment; to purchase, acquire, sell, lease, distribute, and generally deal in plays, scenarios, works of literature, dramas, dramatic compositions, musical composition, operas, operettas, and to apply for, obtain, purchase or otherwise dispose of, any and all copyrights, whether secured under the copyright law of the United States or of any foreign country; to produce, purchase, sell, lease, license, and otherwise deal in motion picture plays; with or without sound synchronization, talking sequences or musical accompaniment, dramas, musical compositions, operas, operettas, stories, scientific, travel, and educational subjects, and all other subjects generally adaptable to production in motion picture forms, and for that purpose to engage and employ the services of actors, actresses, singers, musicians, directors, playwrights, scenario writers, cameramen, electricians, stage staff, wardrobe staff, scenic artists, and all other persons necessary and proper for the production of such motion picture.

6.   To buy, sell and otherwise deal in notes, stocks, bonds or other investments, including the right to hold, buy, sell, lease, mortgage, or otherwise encumber, sell and dispose of real and personal property of all kinds and descriptions.

7.   To make and enter into contracts of all kinds with, and to act as agent or representative for, or manager of investments for, any individual, firm, association, or other corporation; to compile statistics and analyze reports and statements of corporations and associations; to do all such things and perform or supply all such services are as commonly done, performed, or supplied by fiscal agents, and to aid any lawful enterprise.

8.   To purchase, hold, sell, and reissue the shares of its own capital stock.  To endorse, guarantee and secure the payment and satisfaction of bonds, coupons, mortgages, deeds of trust, debentures, securities, obligations and evidences of indebtedness,

and also to guarantee and secure the payment or satisfaction of interest on obligations.

9.   To acquire, purchase, own, hold, operate, develop, lease, mortgage, pledge, exchange, sell, transfer or otherwise dispose of and to invest, trade or deal in real and personal property of every kind and description or any interest therein.

10.   To acquire all or any part of the securities, goodwill rights, property or assets of any kind and to undertake or assume the whole or any part of the obligations or liabilities of any corporation, association, partnership, syndicate, entity, person, or governmental, municipal or public authority, domestic or foreign, and to pay for the same in cash, stocks, bonds, debentures or other securities of this or any other corporation, or otherwise in any manner permitted by law; and to conduct in any lawful manner the whole or any part of any business so acquired.

11.   To engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware.   Corporation's registered agent at such address is United Corporate Services.

FOURTH:   The total number of shares of stock which the Corporation shall have the authority to issue is 800 shares of Common Stock, no par value.

FIFTH:    The names and mailing addresses of the incorporators are:

    Louis J. Pearlman
    9235 Ridge Pine Trail
    Orlando, Florida 32819

The powers of the incorporator shall terminate on the filing of the Certificate of Incorporation.   The names and mailing addresses of the persons who shall serve as director until the first annual meeting of stockholders or until its successor is elected are:

    Louis J. Pearlman
    9235 Ridge Pine Trail
    Orlando, Florida 32819

SIXTH:    The following provisions are inserted for the management of the business and for the conduct of the affairs of the Corporation, and for further definition, limitation and regulation of the powers of the Corporation and of its directors and stockholders:

    (1) Election of directors need not be by ballot unless the by-laws so provided.

(2)  The Board of Directors shall have the power without the assent or vote of the stockholders:

(a)  To make, alter, amend, change, add to or repeal the by-laws of the Corporation; to fix and vary the amount to be reserved for any proper purpose; to authorize and cause to be executed mortgages and liens upon all or any part of the property of the Corporation; and to determine the use and disposition of any surplus or net profits; and to fix the times for the declaration and payment of dividends.

(b)  To determine from time to time whether, and to what extent, and at what times and places, and under what conditions and regulations, the accounts and books of the Corporation (other than the stock ledger) or any of them, shall be open to the inspection of the stockholders.

(3)  In  addition  to  the  powers  and  authorities hereinbefore or by statute expressly conferred upon them, the directors are hereby empowered to exercise all such powers and do all such acts and things as may be exercised or done by the Corporation; subject, nevertheless, to the provisions of the statutes of the State of Delaware, of this Certificate, and to any by-laws so made shall invalidate any prior act of the directors which would have been valid if such by-law had not been made.

SEVENTH:  No contract or transaction between the Corporation and any other corporation in which one or more of its directors or officers is a director or officer, or has a financial interest, shall be void or voidable solely for this reason, or solely because the director or officer is present at or participates in the meeting of the board or committee thereof which authorizes the contract or transaction, or solely because his or their votes are counted for such purpose if:  (1) the material facts as to his interest and as to the contract or transaction are disclosed or are known to the Board of Directors or the committee, and the Board or the committee in good faith authorized the contract or transaction by vote sufficient for such purpose without counting the vote of the interested director or directors; or (2) the material facts as to his interest and as to the contract or transaction are disclosed or are known to the shareholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by a vote of the stockholders; or (3) the contract or transaction is fair as to the Corporation as of the time it is authorized, approved or ratified by the Board of Directors, a committee thereof, or the stockholders.

Interested directors may be counted in determining whether a quorum is present.

EIGHTH:   The Corporation shall, to the full extent permitted by Section 145 of the Delaware General Corporation Law, as amended, from time to time, indemnify all persons whom it may indemnify pursuant thereto.

NINTH:   Whenever a compromise or arrangement is proposed between this Corporation and its creditors or any class of them and/or between this Corporation and its stockholders or any class of them, any court of equitable jurisdiction within the State of Delaware, may, on the application in a summary way of this Corporation or of any creditor or stockholder thereof or on the application of any receiver or receivers appointed for this Corporation under the provisions of Section 291 Title 8 of the Delaware Code or on the application of trustees in dissolution or of any receiver or receivers appointed for this Corporation under the provisions of Section 279 Title 8 of the Delaware Code order a meeting of the creditors or class of creditors, and/or of the stockholders or class of stockholders of this Corporation, as the case may be, to be summoned in such manner as the said court directs.  If a majority in number representing three-fourths (3/4) in value of the creditors or class of creditors, and/or of the stockholders or class of stockholders of this Corporation, as the case may be, agree to any compromise or arrangement and to any reorganization of this Corporation as consequence of such compromise or arrangement and the said reorganization shall, if sanctioned by the court to which the said application has been made, be binding on all the creditors or class of creditors, and/or on all the stockholders or class of stockholders, of this corporation, as the case may be, and also on this Corporation.

TENTH:   The Corporation reserves the right to amend, alter, change or repeal any provision in this Certificate of Incorporation in the manner now or hereafter prescribed by law, and all rights and powers conferred herein on stockholders, directors and officers are subject to this reserved power.

IN WITNESS WHEREOF, I have hereunto signed my name and affirm that the statements made herein are true under the penalties of perjury, this _24th_ day of _September_ , 1995.

Incorporator
Louis J. Pearlman
9235 Ridge Pine Trail
Orlando, Florida 32819



## STOCKHOLDERS AGREEMENT

STOCKHOLDERS AGREEMENT (the "Agreement") made as of the 6th day of ___October___, 1995 among 'N SYNC PRODUCTIONS, INC., (the "Corporation"), a Delaware corporation having an address at 9235 Ridge Pine Trail, Orlando, Florida 32819, and TRANS-CONTINENTAL, INC., a corporation having an address at 7380 Sand Lake Road, Suite 350, Orlando, Florida 32819, TRANS CONTINENTAL RECORDS, INC., a Florida corporaiton having an address at 7380 Sand Lake Road, Suite 350, Orlando, Florida 32819, LOUIS J. PEARLMAN, residing at 9235 Ridge Pine Trail, Orlando, Florida 32819, CHRISTOPHER ALAN KIRKPATRICK, residing at 1610 Overdale Street, Orlando, Florida 32825, and JUSTIN RANDALL TIMBERLAKE, a minor, residing at 303 Fawn Lake Drive, Millington, Tennessee 38053, and JOSHUA SCOTT CHASEZ, residing at 6511 Homestake Drive South, Bowie, Maryland 20720, and JOSEPH ANTHONY FATONE, JR., residing at 2746 Woodruff Drive, Orlando, Florida 32837, and JAMES LANCE BASS, residing at 111 Newport Circle, Clinton, Mississippi 39056, (each being hereinafter individually and collectively referred to as "Stockholder" and collectively, as the "Stockholders").

## W I T N E S S E T H:

WHEREAS, the Corporation has authorized eight hundred (800) shares of common stock, par value $.01 per share, ("Common Stock") of which eight hundred (800) have been issued are outstanding;

WHEREAS, as of the date hereof, each Stockholder owns 100 shares of Common Stock (the shares of Common Stock owned by each Stockholder respectively are referred as such Stockholder's "Shares"); and

WHEREAS, the Stockholders desire to regulate the transfer of their Shares and to define certain of their rights and obligations with respect to the operation of the Corporation;

NOW THEREFORE, in consideration of the premises hereof and the covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    DIRECTORS AND OFFICERS

(a)  The Corporation's Board of Directors shall consist of eight (8) individuals.  Each Stockholder, for so long as he shall own at least 5% of the outstanding Common Stock, shall have the right to nominate himself to be a director.  Each Stockholder, for so long as he remains a stockholder of the Corporation, agrees to vote the shares of Common Stock owned by such Stockholder to elect the nominees of the other Stockholders.

(b)  The directors of the Corporation shall use their best efforts to elect and re-elect the following individuals as

officers of the Corporation, for so long as said individuals are stockholders of the Corporation:

     Louis J. Pearlman    -    Chairman, President and Treasurer
     Robert Fischetti    -    Secretary

     (c)  Notwithstanding anything herein to the contrary, if, at any time, any Stockholder shall cease to own any Shares, such Stockholder shall be deemed to have resigned as an officer and director of the Corporation.

     (d)  Each Stockholder hereby grants an irrevocable proxy, coupled with an interest, to Pearlman to vote the Shares of such Stockholder on all matters on which holders of Common Stock are entitled to vote.

    2.    **PROFITS OF CORPORATION**

     (a)  If the Corporation's status as an "S" corporation is in effect for a taxable year, the Stockholders and the directors agree that they shall authorize and direct the Corporation to make pro rata distributions of an amount equal to the state and federal tax liability of each Stockholder as a result of being a Stockholder of the Corporation of operating profits for such taxable year, as determined by the Corporation's regular certified public accountants. Such share of the operating profits shall be distributed to the Stockholders, at least annually and not later than ninety (90) days after the end of each taxable year in accordance with the proportionate ownership of Shares of each Stockholder.

     (b)  If there is an addition, reduction or any other change (other than a complete termination of interest in the Corporation) in the number of Shares of any Stockholder during a taxable year, any allocation and distribution of profits for such taxable year shall be prorated among the Stockholders and any other stockholders of the Corporation based on the number of days in the period their ownership of Shares was outstanding.

     (c)  In the event that any Stockholder shall transfer all of his Shares in accordance with the provisions of this Agreement prior to the end of any taxable year, the Corporation shall make a distribution to the transferor Stockholder equal to the portion of the Corporation's operating profits for the taxable year (and any distributions owing from to the Stockholder for any previous taxable year) that will be (or should have been) allocated to such Stockholder, but only to the extent such profits have not been previously distributed.

3.   RESTRICTION ON TRANSFER OF SHARES

(a)   Each of the Stockholders undertakes with each other during the continuance of this Agreement that he shall not pledge or otherwise encumber all or any portion of his Shares, nor shall he dispose of all or any portion of his Shares by gift, sale, inheritance or otherwise, except with the prior written unanimous consent of both the Corporation's Board of Directors and all the Stockholders or as otherwise specifically permitted by this Agreement.   Any purported pledge, encumbrance or disposition in violation of the terms of this Agreement shall be void ab initio. Upon issuance, the certificates representing the Shares shall have inscribed thereon the following endorsement:

"THE PLEDGE, TRANSFER, SALE OR ENCUMBRANCE OF THE SHARES REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE TERMS OF A STOCKHOLDERS AGREEMENT DATED AS OF _____, 1995, A COPY OF WHICH IS ON FILE AT THE OFFICE OF THE CORPORATION."

(b)   Notwithstanding the foregoing, a Stockholder shall be permitted to transfer any or all of his Shares pursuant to his will or by the laws of intestacy, provided that any Shares so transferred shall remain subject to the rights of the Corporation and the other Stockholders to acquire the same as provided herein, and, provided further, that the transferee executes and delivers an agreement to be bound by the terms and conditions of this agreement.

4.   RIGHT OF FIRST REFUSAL

(a)   In the event a Stockholder (herein, the "Selling Stockholder") desires, at any time, to transfer all (but not less than all) of his Shares or to otherwise withdraw as a Stockholder of the Corporation, and/or if a Stockholder during his lifetime obtains a bona fide written offer (an "offer") from a third party (the "Offeror") to acquire all but not less than all of Shares which Offer he desires to accept, the Selling Stockholder shall give written notice to the Corporation ("Notice of Intention") and such Notice of Intention shall disclose the identity of the Offeror and the terms of the Offer.   If the Corporation shall not have responded to the Notice of Intention within twenty (20) days after receipt that the Corporation desires to purchase the Shares of the Selling Stockholder on the same terms as the Offer ("Notice of Acceptance") or if the Corporation does not actually purchase such Shares within the time period set forth below, then the Selling Stockholder may accept the Offer.   In no event shall any Stockholder offer or agree to sell all, but not less than all, of the Shares to anyone at a price less than the Book Value (as defined in Paragraph 7 below) thereof as of the last day of the

3

month immediately preceding the month during which such Offer occurs (the "Purchase Price").

(b) If the Corporation shall accept the offer to purchase all of the Shares provided for in this paragraph, a Closing shall take place as provided in Paragraph 8 hereof.

(c) If the Corporation fails to exercise its right to purchase the shares of the Selling Stockholder pursuant to subparagraph (a) of this Paragraph, the Selling Stockholder shall be free for a period not exceeding two (2) months to sell the Shares to the Offeror upon the terms and conditions contained in the Offer, provided that there shall be delivered to the Corporation an agreement executed by the Offeror acknowledging that the Shares are and remain subject to the terms and provisions of this Agreement and agreeing to be bound hereby.

(d) All exercises of options hereunder are binding upon all parties with any direct or indirect interest in any Shares unless options are not exercised with respect to all of the Shares held by the Selling Stockholder within the time limits provided. If options are not exercised with respect to all of said Shares, all exercises of options shall be null and void.

5.   EVENTS OF SEPARATION

(a) Event of Separation-Defined.  In the event that: (i) any Stockholder dies, (ii) any Stockholder is deemed to have a permanent disability (which "permanent disability" shall be deemed to exist when, by reason of a physical or mental condition or both, person is incapable of properly performing his or her usual and customary duties and responsibilities for the Corporation or otherwise for a consecutive six (6) month period, or for any nine (9) months out of a twelve (12) month period, and if requested by another Stockholder, such person or his legal representative has provided the Corporation with a written opinion from a qualified physician that such permanent disability exists), or (iii) any Stockholder shall be adjudicated a bankrupt, file a voluntary bankruptcy petition or a petition for an arrangement with creditors, make an assignment for the benefit of creditors, or seek to avail himself of any provision of law for the relief of debtors; or a receiver or trustee is appointed for his property and such appointment is not vacated or withdrawn prior to the sale of his property thereunder; or any of his Shares shall pass or devolve upon any other person in any involuntary manner, including, but not limited to, judicial order, legal process, execution or attachment (the events set forth in this subparagraph (iii) are hereinafter collectively referred to as "Bankruptcy"), then, in each of those cases, an "Event of Separation" shall be deemed to have occurred with respect to such person. The Stockholder with respect to whom an Event of Separation shall occur (or the legal representative of his estate) or any transferee from the Stockholder and persons to

4

whom Shares of such Stockholder may pass or upon whom they may devolve, hereinafter shall be referred to as a "Selling Stockholder."

(b) <u>Death or Permanent Disability</u>. In the event of a Stockholder's death or permanent disability, the Selling Stockholder shall be required to sell all of the Stockholder's Shares to the Corporation and the Corporation shall be required to purchase said Shares from the Selling Stockholder. The purchase price for the Shares (the "Purchase Price"), payable at the Closing shall be equal to the Book Value (as defined in Paragraph 7 below) of the Shares plus any accumulated operating profits owing to such Selling Stockholder pursuant to Paragraph 2(c) hereof.

(c) <u>Other Events of Separation</u>. In the event that a Stockholder desires to voluntarily terminate his relationship with the Corporation or is the subject of a Bankruptcy, then the Corporation shall have option to buy all of such Shares from the Selling Stockholder and said event shall be treated as if the Selling Stockholder had tendered a Notice of Intention pursuant to Paragraph 4 of this Agreement for the purpose of determining the Purchase Price and how the option to purchase shall devolve upon and shall be exercisable by the Corporation.

6. <u>Take-Along Right</u>.

(a) <u>Take-Along</u>. If a Selling Stockholder proposes to sell Shares to a third party, each of the other Stockholders (each, a "Potential Take-Along Participant") shall have the right to require the third party purchase from him the number of Shares derived by multiplying the total number of Shares to be purchased by the third party by a fraction, the numerator of which is the number of Shares owned by such Potential Take-Along Participant and the denominator of which is the total number of Shares owned by all Potential Take-Along Participants electing to participate and the Selling Stockholder. The number of Shares to be sold to a third party by the Selling Stockholder shall be reduced by the number of Shares subject to the Take-Along Right and included in such sale by the Potential Take-Along Participants; unless the third party agrees to purchase all the Shares offered by the Selling Stockholder and the Potential Take-Along Participants.

(b) <u>Take-Along Notice</u>. The Take-Along Right may be exercised by a Potential Take-Along Participant by delivery of a notice (a "Take-Along Notice") to the Selling Stockholder and the Corporation (which in turn will promptly notify the Potential Take-Along Participants) within ten days following receipt by the Corporation of a Notice of Intention. The Take-Along Notice shall state the maximum number of Shares that such Potential Take-Along Participant wishes to include in such sale to the third party purchaser. Any Shares purchased from a Potential Take-Along Participant pursuant to this Paragraph 6 shall be at a price and

5

upon terms no less favorable to such Potential Take-Along Participant than that contained in the Notice of Intention, and shall be purchased only by the third party specified in such Notice of Intention. After expiration of the applicable periods referred to in Paragraph 4, the Selling Stockholder, together with any electing Potential Take-Along Participant, shall have the right for thirty days to transfer the Shares upon the terms and conditions contained in the Notice of Intention, provided that, in each case, that such transfer shall be made to the third party specified in the Notice of Intention on the terms set forth therein.

(c) <u>Notification of Take-Along Rights</u>. The Corporation hereby acknowledges its obligations to deliver a copy of the Notice of Intention and the Take-Along Notice to each of the Potential Take-Along Participants promptly upon its receipt thereof, unless such Notice of Intention or Take-Along Notice, as the case may be, appears on its face to have been delivered directly to such Potential Take-Along Participants.

7. <u>DEFINITION OF BOOK VALUE</u>.

(a) The "Book Value" of the shares shall be equal to the product of the net worth per share of the Corporation as computed by the Corporation's certified public accountant's in accordance with generally accepted accounting principles, applied consistently with past practice, times the number of shares to be purchased, subject to the following:

(i) Adjustments shall be made for mathematical errors, omissions and for any other allowances necessary to correctly reflect assets and liabilities in accordance with generally accepted principles of accounting.

(ii) Trade fixtures, equipment, furniture and furnishings shall be valued at cost less straight-line depreciation.

(iii) All merchandise, inventory, works in process and raw materials shall be valued at cost or fair market value, whichever is lower.

(iv) Accounts receivable shall be valued at the face amount thereof, less customary trade discounts, and less a reserve of bad debts, determined in accordance with the Corporation's customary practice.

(v) Life insurance policies owned by the Corporation shall be valued at the cash surrender value thereof, and in the event that the valuation relates to the shares of any Stockholder upon his death, then only the cash surrender value of such life insurance policy on the day immediately preceding the

date of death shall be included in the valuation of Book Value and not the proceeds thereof.

(vi) Corporate income taxes and other taxes allocable to the period up to the date for which Book Value is to be determined, if any, shall, if not otherwise provided for on the books of the Corporation, be estimated in accordance with generally accepted accounting principles consistently applied.

(vii) No consideration shall be given to any tax carry-forward which may result in a refund for any period after the date for which Net Book Value is to be determined.

(viii) All assets and liabilities of the Corporation shall be valued according to their current fair market value.

The aforesaid determination of Book Value shall be binding upon and conclusive against all persons, firms and corporations (including the Stockholders, the Selling Stockholder, the Corporation and their representatives) subject to this Agreement, unless written notice of any objection is delivered to the Corporation within ten (10) days after receipt by such persons of the accountants' written determination in which event such determination shall be subject to arbitration pursuant to this Agreement.

(b) Promptly after the occurrence of an Event of Separation or the acceptance by the Corporation or the other Stockholders of an offer to purchase the Shares pursuant to Paragraph 4, the Corporation shall cause the Corporation's accountants to compute the Book Value of the Selling Stockholder's Shares in accordance herewith and to deliver written copies of such computation to the Corporation, the remaining Stockholder and the Selling Stockholder as promptly as possible.

8. PAYMENT AND CLOSING. With respect to the sale and purchase of Shares hereunder pursuant to Paragraph 4, 5 or 6 hereof, a closing (the "Closing") will take place at the principal office of the Corporation, its attorneys or a lending institution, on the business day and at the time set forth by the purchaser in a notice delivered at least ten (10) days prior to the Closing. In no event shall the Closing occur more than thirty (30) days after the receipt of the accountant's report provided for in paragraph 7(b), except that if the Event of Separation is the death of a Stockholder, the Closing may occur up to the later of ninety (90) days after the receipt of the accountant's report or fifteen (15) days after a personal representative has been appointed and qualified. If the Corporation is not permitted to purchase or redeem any Shares that it is entitled to purchase or redeem pursuant to this Agreement, by either state corporation law or any debt instrument, Pearlman shall have the personal right to purchase such Shares on the same terms and conditions as the Corporation.

7

9.  **LIFE INSURANCE**

(a)  During the term of this Agreement, the Corporation shall have the right to maintain life insurance on the life of each Stockholder with a death benefit payable to the Corporation in such amount as the Corporation shall determine.

(b)  If any Stockholder shall cease to be a Stockholder for any reason other than his death, the Corporation shall, upon receipt from such Stockholder of an amount equal to the cash value of the life insurance maintained on his life, less any loan balance plus an adjustment to reflect any pre-paid premiums, transfer all of its right, title and interest in such policy to such Stockholder.

10.  **RESTRICTIVE COVENANTS**

(a)  Upon the occurrence of an Event of Separation or upon a sale of Shares subsequent to delivery of a Notice of Intention pursuant to Paragraph 4 above, each of the Stockholders hereby agrees that he will not, without the written consent of the Corporation, directly or indirectly, solicit or accept, on behalf of another record label or distributor, the services of any recording artist, composer or other artist under contract with the Corporation at the time of the Event of Separation (including any services that may be provided by the Stockholder), and will not, directly or indirectly, assist or be employed by any other party in soliciting or accepting the services of any recording artist, composer or other artist under contract with the Corporation at the time of the Event of Separation.

(b)  Each Stockholder hereby acknowledges that should he breach the restrictive covenant contained herein, the Corporation's remedy at law will be inadequate.  Therefore, in addition to any remedy otherwise available to the Corporation, and notwithstanding the provisions herein for arbitration, each Stockholder agrees that the Corporation shall be entitled to an injunction restraining it from any such violation.  Moreover, if it shall be determined by any arbitration panel or court, that any covenant herein is not enforceable due to its geographic area or duration, then it is the intention of the parties that such covenant shall be enforceable to the greatest extent possible, and will be deemed amended so as to reduce the geographic area or duration, as the case may be, to the extent necessary to secure enforceability.

11.  **INJUNCTIVE RELIEF**

Due to the fact that the Shares cannot be readily purchased or sold in the open market, and for other reasons, the parties hereto recognize and acknowledge that irreparable damage will result in the event this Agreement shall not be specifically

8

enforced.   If any dispute arises concerning disposition of any Shares hereunder, the parties hereto agree that the other parties hereto shall be entitled, without showing any actual damage, to a temporary or permanent injunction restraining such disposition pending determination of such controversy, and that no bond or other security may be required in connection therewith.   If any dispute arises concerning the rights or obligations of any party hereto to purchase or sell any of the Shares, such right or obligation shall be enforceable by a decree of specific performance.   Such remedies shall, however, not be exclusive and shall be in addition to any other remedies which the parties may have.

12.   DURATION

This Agreement shall continue in full force and effect until terminated by the occurrence of any of the following events:

(i)   Discontinuance of the Corporation's business or its liquidation;

(ii) A petition in bankruptcy is filed by the Corporation or an adjudication of bankruptcy is made against the Corporation;

(iii) A receiver is appointed for the Corporation and such appointment is not vacated within sixty (60) days;

(iv) An unconditional assignment is made for the benefit of creditors by the Corporation;

(v)   There is only one stockholder of the Corporation except that any payout provisions, if any, would survive; or

(vi) The expiration of a ten-year period commencing of the date hereof except that this Agreement shall be automatically renewed for successive ten-year periods unless the parties hereto agree otherwise in writing.

13.   ARBITRATION

All questions concerning this Agreement, including but not limited to, its execution, interpretation and performance shall be governed by the laws of the State of Florida without regard to any law which would result in the selection or application of the law of any other jurisdiction.   Any dispute or controversy arising out of or in connection with this Agreement shall be submitted to arbitration before a panel of three arbitrators in Orlando, Florida in accordance with the Commercial Arbitration Rules then obtaining of the American Arbitration Association provided, however, that at least one of such arbitrators shall be a practicing attorney

9

licensed in the State of Florida and at least one of such
arbitrators shall be a certified public accountant licensed in the
State of Florida. The arbitrators' powers shall include the power
to award specific performance, injunctive relief and reasonable
attorneys' fees and expenses to any party in any such arbitration.
The arbitrators shall not, however, have the power to change,
modify, alter, set aside or ignore any express condition, item or
provision hereof, and to that extent the scope of their authority
is limited. The arbitration award shall be final and binding upon
the parties and judgment may be entered thereon in the Supreme
Court of the State of Florida or in any other court of competent
jurisdiction. This agreement to arbitrate all disputes and
controversies shall not prevent either party from seeking judicial
injunctive relief in aid of any such arbitration. The service of
any notice, process, motion or other document in connection with
any dispute may be effected in the manner in which notices are to
be given to a party pursuant to Paragraph 15 below.

14.  COMPLETE AGREEMENT; GOVERNING LAW;
     ORAL MODIFICATION

     This Agreement contains the full and complete
understanding and agreement of the parties with respect to the
subject matter hereof and supersedes all prior agreements, either
oral or written, between the parties with respect to the subject
matter hereof.

15.  NOTICES

     All notices, requests, demands or other communication
required or permitted to be given hereunder shall be in writing,
and shall be deemed duly given, upon receipt, if personally
delivered or, three days after deposit in a facility of the United
States mails, if mailed by registered or certified mail, return
receipt requested, to the address of the intended recipient set
forth above, or to such other addresses as may be designated by
notice given to the other Stockholder in accordance with this
Paragraph, with, in the case of the Corporation, a copy to:

          William B. Pringle, III, Esquire
          Post Office Box 691222
          Orlando, Florida 32869-1222

16.  SEVERABILITY

     If any provision of this Agreement is determined to be
legally invalid, inoperative or unenforceable, only that particular
provision shall be affected, and the determination shall have no
effect whatsoever on any other provision of this Agreement, and all
other provisions shall remain in full force and effect and fully
enforceable.

10

17. NON WAIVER

No delay or failure to exercise any remedy or right occurring upon any default shall be construed as a waiver of such remedy or right or acquiescence in such default, nor shall it affect any subsequent default of the same or a different nature. All rights and remedies herein conferred shall be in addition to and not exclusive of any and all other rights or remedies now or hereafter existing at law or in equity.

18. SUCCESSORS AND ASSIGNS

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and permitted assigns. If ownership of the shares of any of the Stockholders shall be transferred to a third party in accordance with the terms hereof, the Corporation shall not be obligated to recognize such individual as a stockholder unless and until such individual shall have executed and delivered an agreement wherein such individual agrees to be bound by the terms hereof. Further, upon delivery of such an instrument of assumption, such individual shall be entitled to all of the benefits hereof.

19. HEADINGS

The heading and captions contained in this Agreement are for the convenience of reference only and shall have no bearing on the interpretation or enforcement of this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first written above.

'N SYNC PRODUCTIONS, INC.

By: _____

LOUIS J. PEARLMAN      President

TRANS CONTINENTAL, INC.

By: _____

ALAN A. SIEGEL   Vice-President

TRANS CONTINENTAL RECORDS, INC.

By: _____

LOUIS J. PEARLMAN      President

11

LOUIS J. PEARLMAN

CHRISTOPHER ALAN KIRKPATRICK

JUSTIN RANDALL TIMBERLAKE

JOSHUA SCOTT CHASEZ

JOSEPH ANTHONY FATONE, JR.

JAMES LANCE BASS

12



'N Sync Productions, Inc.

Minutes of A Special Meeting of Stockholders

A special meeting of stockholders of 'N Sync Productions, Inc. was held at the home of Louis J. Pearlman on the 6th of October 1995.

The following people were present at the meeting:

Louis J. Pearlman

Robert Fischetti

Alan Siegel

Christopher Alan Kirkpatrick

Justin Randall Timberlake

Joshua Scott Chasez

James Lance Bass

And some parents in person or by teleconference

The purpose of this meeting was to discuss and ratify the following items of business:

(A)   To agree to sign the Shareholder agreement for 'N Sync Productions, Inc. which Company is being set up to negotiate all transactions and receive all revenue and income derived from 'N Sync touring, fan club and other non-recording, (non-merchandising) related revenues, and act exclusively on behalf of 'N Sync with regard to any of the above.

(B)   To agree to elect the officers and directors of the Corporation.

(C)   To agree that Louis J. Pearlman is elected Director, Chairman, and President of the Corporation by contract with irrevocable proxies as per the Stockholders Agreement.   It was also agreed that Robert Fischetti is elected Secretary of the Corporation.

(D)   Trans Continental shall contribute, at its discretion, start up working capital for the corporation.

Further agreed, that all actions of the officers, directors, and stockholders of the corporation hereby are ratified and confirmed.

There being no further business before the meeting; it was, upon motion duly made, seconded and carried, duly adjourned.

_____
Secretary

_____
Chairman



## EXCLUSIVE ARTIST RECORDING AGREEMENT

AGREEMENT made this _____ day of _____, 1995, by and between TRANS CONTINENTAL RECORDS, INC. with a principal place of business at 7380 Sand Lake Road, Suite 350, Orlando, Florida 32819 (hereinafter "COMPANY") and CHRISTOPHER ALAN KIRKPATRICK, residing at 1610 Overdale Street, Orlando, Florida 32825, and JUSTIN RANDALL TIMBERLAKE, a minor, residing at 303 Fawn Lake Drive, Millington, Tennessee 38053, and JOSHUA SCOTT CHASEZ, residing at 6511 Homestake Drive South, Bowie, Maryland 20720, and JOSEPH ANTHONY FATONE, JR., residing at 2746 Woodruff Drive, Orlando, Florida 32837, and JAMES LANCE BASS, a minor, residing at 111 Newport Circle, Clinton, Mississippi 39056, (hereinafter individually and collectively referred to as "you" or "Artist."

1.   **TERM**

1.01. The term of this Agreement will commence on the date hereof and shall continue pursuant to the conditions herein until the later of (1) the date nine (9) months after the date of the delivery to COMPANY of all Masters required in fulfillment of your Recording Commitment herein or (2) six (6) months after COMPANY's initial U.S. retail street date for the record delivered by you in fulfillment of your Recording Commitment herein.

1.02. Additionally, you hereby grant COMPANY seven (7) separate options to extend the term of this Agreement for additional Contract Periods ("Option Periods") on the same terms and conditions applicable to the initial Contract Period except as otherwise provided herein.   Each option shall be exercised automatically unless written notice is sent by COMPANY prior to the expiration date of the Contract Period which is then in effect (the "current Contract Period").   If COMPANY so advises you in its exercise notice, such Period will begin on the date of such exercise notice.   Each of the Option Periods will end the later of (1) nine (9) months after the date of the Delivery to COMPANY of all Masters required in fulfillment of your Recording Commitment for each such Option Period or (2) six (6) months after Company's initial U.S. retail street date for the last record delivered by you in fulfillment of your Recording Commitment for such Period. Notwithstanding the foregoing, in no event will any Option Period end earlier than twelve (12) months after the date of the commencement of such Period.

2.   **SERVICES**

2.01.  During the term of this Agreement you will render your services as a performing artist for the purpose of making Master Recordings for COMPANY.   (You are sometimes called "the Artist" below; all references in this Agreement to "you and the Artist" and the like, will be understood to refer to you alone).

2.02.   Artist will render services at recording sessions scheduled at times and places designated by COMPANY. COMPANY shall select in consultation with the Artist, the musical compositions, arrangements and works to be performed by Artist, Company shall also determine the number and identity of the musicians, vocalists and other performers (if any) to be recorded at such sessions.

2.03.   Upon COMPANY'S request you shall re-record any performance recorded hereunder for the purpose of obtaining a commercially satisfactory master recording.

3.   <u>RECORDING COMMITMENT</u>

3.01.   During the Contract Period you will perform for the recording of Master Recordings, commercially satisfactory in COMPANY'S reasonable business judgment. Such Masters shall embody the featured vocal performances of Artist. (Any Masters accepted hereunder by COMPANY that were partially or completely recorded prior to the term of this agreement shall be deemed to have been recorded during the Contract Period). Neither Multiple Record LPs nor Joint Recordings shall not be recorded as part of your Recording Commitment hereunder without your and COMPANY's prior written consent (your delivery of a Multiple LP or a Joint Recording shall be deemed your consent). Without limiting the foregoing, COMPANY shall have the right to reject any master which, in the reasonable opinion of COMPANY's legal counsel, is offensive to reasonable standards of public taste or which infringes on the rights of others.

3.02.   During each Contract Period Artist shall perform for the recording of Masters for Delivery to COMPANY those Masters (the "Recording Commitment") necessary to satisfy the following schedule:

| CONTRACT PERIOD | RECORDING COMMITMENT |
|---|---|
| Initial Contract Period | 1 LP |
| First Option Period | 1 LP |
| Second Option Period | 1 LP |
| Third Option Period | 1 LP |
| Fourth Option Period | 1 LP |
| Fifth Option Period | 1 LP |
| Sixth Option Period | 1 LP |
| Seventh Option Period | 1 LP |

3.03. You shall not deviate from the performance and Delivery schedule specified in Paragraph "3.02" above without COMPANY's written consent; timely Delivery as provided therein shall be deemed a material obligation hereunder. You further agree not to commence the recording of any Master hereunder without COMPANY's prior approval. The LP's will consist entirely of Masters made in the course of the then current single or LP recording project unless agreed to by COMPANY.

2

## 4.   RECORDING PROCEDURE

4.01.   You will follow the procedure set forth below in connection with Master Records made hereunder:

(a)   Except as expressly noted otherwise in this Agreement, prior to the commencement of recording in each instance the following, in order, shall apply:

(1)   Selection of producer.   You shall have mutual approval with respect to any producer other than a producer signed exclusively to COMPANY, provided in the event of a dispute, COMPANY's decision shall be final.

(2)   Selection of material, including the number of compositions to be recorded shall be made by COMPANY.   COMPANY shall not be deemed to be unreasonable in rejecting any request to record an Album consisting of more than ten masters. Notwithstanding the foregoing, COMPANY shall consult with you with respect to the selection of material to be recorded hereunder.

(3)   Specification of accompaniment, arrangement and copying services shall be made by COMPANY.

(4)   Selection of dates of recording and studios where recording is to take place, including the cost of recording there and scheduling and booking of all studio time will be done by COMPANY.

(b)   COMPANY shall notify the appropriate Local of the American Federation of Musicians in advance of each recording session.

(c)   To the extent that any of the information described below is within your control, you shall timely supply COMPANY with all of the information it needs in order:  (1) to make payments due in connection with such Recordings; (2) to comply with any other obligations COMPANY may have in connection with the making of such Master Recordings; and (3) to prepare to release Phonograph Records derived from such Master Recordings.   Without limiting the generality of clause (2) of the preceding sentence, to the extent that such information is within your knowledge or control, you shall furnish COMPANY with all information it requires to comply with its obligations under its union agreements including, without limitation, the following:

(1)   If a session is held to record new tracks intended to be mixed with existing tracks (and if such information is requested by the American Federation of Musicians), the dates and places of the prior sessions at which such existing tracks were

3

made, and the AFM Phonograph Recording Contract (Form "B") numbers covering such sessions.

(2) Each change of title of any composition listed in an AFM Phonograph Recording Contract (Form "B").

(3) A listing of all the musical selections contained in Recordings Delivered to COMPANY hereunder.

4.02. No "live" Recording or Recordings not made in full compliance with the provisions of this Agreement will apply in fulfillment of your Recording Commitment, nor will COMPANY be required to make any payment in connection with any such Recording, unless COMPANY so agrees in writing or releases the recording. No Joint Recording will apply in fulfillment of your Recording Commitment, nor will COMPANY be required to make any payments in connection with any such Joint Recording other than royalties due you hereunder, even if such Joint Recording is released by COMPANY. Notwithstanding the foregoing, COMPANY will not require you to jointly record any masters without your prior written approval. No Recordings shall be made by unauthorized dubbing of another party's masters, excluding sampled or computerized dubbing without COMPANY's express written consent.

4.03. Nothing in this Agreement shall obligate COMPANY to continue or permit the continuation of any recording session or project, even if previously approved hereunder, if COMPANY reasonably anticipates that the Recording Costs will exceed those specified in the approved budget or that the Recordings being produced will not be commercially satisfactory.

4.04. The Artist will not be required to perform together with any other royalty artist without the Artist's consent. COMPANY shall not be deemed to be unreasonable in rejecting any request for the Artist to record with another royalty artist.

5. <u>RECORDING COSTS; SPECIAL PACKAGING</u>

5.01. COMPANY will pay all minimum union scale payments required to be made to Artist in connection with Recordings made hereunder, all costs of instrumental, vocal and other personnel specifically approved by COMPANY for the recording of such Master Recordings, and all other amounts required to be paid by COMPANY pursuant to any applicable law or any collective bargaining agreement with any union representing persons who render services in connection with such Master Recordings. Notwithstanding the foregoing, Artist agrees that the Advances hereunder include the prepayment of session union scale to Artist as provided in the applicable union codes, and Artist agrees to complete any documentation required by the applicable union to implement this sentence. (Union contracts will be paid on Artist's behalf by COMPANY, which payments shall be an Advance). In the event COMPANY

4

should be required to make any such payments directly to a union with which Artist is affiliated, COMPANY may - in its sole discretion - reduce the Advances otherwise payable directly to Artist by the exact amount of any such payment made to such union. If, after the Delivery of Masters constituting the Singles or LP in fulfillment of your Recording Commitment, there are monies remaining in the applicable Recording Budget, then COMPANY will at your prompt written request pay you minimum union scale payment otherwise waived hereunder up to an amount which, when added to all other amounts paid by COMPANY in connection with such Masters, does not exceed the applicable Recording Fund.

5.02.   Except as otherwise provided for pursuant to Sub-Paragraph "15.01(c)" below all amounts described in Paragraph "5.01" above plus all other amounts representing direct expenses paid by COMPANY, or incurred in connection with the recording of Master Recordings hereunder (including, without limitation, travel, rehearsal, and equipment rental expenses, advances to producers, mastering, re-mixing, per diems, hotel, transportation, lodging and all studio and engineering charges, in connection with COMPANY's facilities and personnel or otherwise) are herein sometimes called "Recording Costs" and shall constitute non-returnable advances. All Special Packaging Costs will constitute Advances also.   All costs incurred by COMPANY in connection with the production or exploitation of Videos made for use in promoting sales of Records made under this Agreement will constitute non-returnable Advances. Notwithstanding the foregoing, only fifty (50%) percent of such costs incurred by COMPANY in connection with the production of Videos shall be recoupable from Record royalties due you.   The costs of copper and other masters equivalent to lacquer masters will be chargeable as Recording Costs, but the costs of other metal parts, and payments to the AFM Special Payments Fund and the Music Performance Trust Fund based upon record sales (so-called "pre-record royalties"), shall not constitute Advances.   Any Recording Costs in excess of the budget initially established, and all Special Packaging Costs, will be your sole responsibility and will be paid by you promptly (or reimbursed by you if paid by COMPANY.)

5.03.   In determining the portion of the Recording Costs (other than payments to the Artist) applicable to any Joint Recording which shall be charged against your royalties, such portion shall be computed by multiplying the aggregate amount of such Recording Costs by the same fraction used in determining the royalties payable to you in respect of such Joint Recording.

6.   <u>ADDITIONAL ADVANCES</u>

6.01.   All monies paid to on behalf of Artist (including but not limited to advances and expenditures for tour support and promotion) during the term of this Agreement, other than royalties paid pursuant to Paragraphs "9" and "12" below, shall constitute

5

non-returnable Advances unless otherwise expressly agreed in
writing by an authorized officer of COMPANY.

6.02.   Subject to your full and timely performance of your
material obligations hereunder, COMPANY shall pay to you the
following advances which shall be deemed to be non-returnable but
recoupable from royalties payable to you hereunder:

> A.   For Albums recorded during the Initial Option
> Contract Periods:
>
> | Initial Period: | $10,000 |
> |---|---|
> | 1st Option: | 15,000 |
> | 2nd Option: | 20,000 |
> | 3rd Option: | 25,000 |
> | 4th Option: | 30,000 |
> | 5th Option: | 35,000 |
> | 6th Option: | 40,000 |
> | 7th Option: | 45,000 |

> B.   Each advance above shall be paid to you one-half
> (1/2) upon the commencement of your recording services for the
> applicable Master Recording and the balance within fifteen (15)
> days after the completion of recording and the acceptance of the
> Masters by COMPANY and its distributor.

> C.   Each advance designated above shall be an aggregate
> advance for the entire group and shall be distributed equally
> amongst the members of the group.

## 7.   RIGHTS IN RECORDING

7.01.   Each Master Recording made under this Agreement or
during its term, from the Inception of Recording, will be
considered a "work made for hire" for COMPANY; if any such Master
Recording is determined not to be a "work made for hire" it will
be deemed transferred to COMPANY by this Agreement, together with
all rights in it.  All Master Recordings made under this Agreement
or during its term, from the Inception of Recording, and all
Matrices and Phonograph Records manufactured from them, together
with the performances embodied on them, shall be the sole property
of COMPANY, free from any claims by you or any other person; and
COMPANY shall have the exclusive right to copyright those Master
Recordings in its name as the author and owner of them and to
secure any and all renewals and extensions of such copyright
throughout the world.  You will execute and deliver to COMPANY such
instruments of transfer and other documents regarding the rights
of COMPANY in the Master Recordings subject to this Agreement as
COMPANY may reasonably request to carry out the purposes of this
Agreement, and COMPANY may sign such documents in your name and
make appropriate disposition of them.

6

7.02.   Without limiting the generality of the foregoing, COMPANY and any person authorized by COMPANY shall have the unlimited and exclusive rights to manufacture Phonograph Records by any method nor or hereafter known, derived from the Master Recordings made under this Agreement or during its term, and to sell, transfer or otherwise deal in the same under any trademarks, tradenames and labels, or to refrain from such manufacture, sale and dealing, throughout the world.

8.   <u>NAMES AND LIKENESSES; PUBLICITY</u>

8.01.   COMPANY and any Licensee of COMPANY each shall have the right and may grant to others the right to reproduce, print, publish, or disseminate in any medium your name, the names, portraits, pictures and likenesses of the Artist in connection with Master Recordings made under this Agreement (including, without limitation, all professional, group, and other assumed or fictitious names used by them), and biographical material concerning them, as news or information, or the purposes of trade, or for advertising purposes in connection with the Masters made hereunder.   The uses authorized by the preceding sentence include, without limitation, the use of those names, portraits, pictures, and likenesses in the marketing of Phonograph Records.   During the term of this Agreement neither you nor Artist shall authorize any Party other than COMPANY to use the name or likeness of Artist (or any professional, group, or other assumed or fictitious name used by Artist), in connection with the advertising or sale of:

> (a)   Phonograph Records; or
> (b)   Blank Audio Tape

8.02.   You will cooperate with COMPANY, as it reasonably requests, in making photographs and preparing other materials for use in promoting and publicizing the Artist and the Recordings made under this Agreement.   You shall also have the right to approve any publicity and album cover photographs of you, and any biographies provided, should you fail to notify us of any disapproval within five (5) business days after your receipt of such material, your approval shall be deemed automatic.   You agree not to unreasonably withhold your approval herein.

9.   <u>ROYALTIES</u>

9.01.   In consideration of (i) the copyright ownership provided below; (ii) COMPANY's rights to use Artist's name and likeness as provided herein; and (iii) the representations and warranties contained herein, COMPANY agrees to pay you in connection with the Net Sale of Phonograph Records (other than audio-visual records) consisting entirely of Masters hereunder the following net royalty receipts computed at the applicable percentage indicated below, of the applicable Royalty Base Price with respect to the Record concerned, it being agreed that such

7

royalties will be computed and paid in accordance with Paragraph "9" & "11" and Paragraph "10" & "11" below and the other provisions set forth herein.

9.02. COMPANY shall pay to you a royalty equivalent to fifty percent (50%) of all net receipts received by company in connection with the sales of recordings derived from the Masters hereunder. Said royalties shall be calculated and determined in the same manner in which COMPANY's licensees and distributor account to company.

9.03. (a) If COMPANY licenses Videos (i.e., sight and sound records designed to reproduce the audio performances of recording artists together with a visual image) or make commercial use of such Videos embodying Artist's performances (other than as provided below), the royalty payable by COMPANY to you shall be one-half (1/2) of COMPANY's net receipts derived therefrom after deducting (i) any and all direct costs and/or third party payments in connection with the creation, manufacture, exploitation or use of said videos; (ii) any royalty paid to the producer(s) of the Masters recorded hereunder which are embodied in any such Videos; and (iii) any distribution fees that COMPANY may be required to pay. It is specifically agreed that COMPANY shall have the right to license Videos to third parties (e.g., club services) without any payment to you as long as COMPANY does not receive any such payment. To the extent COMPANY receives any payment for such promotional uses, COMPANY will credit your account with one-half (1/2) of the net receipts paid to COMPANY as provided in this Paragraph "9.04".

9.04. The terms "net receipts", "net sums", or "net amount received" and similar terms in this Paragraph "9" shall mean amount received by COMPANY in connection with the subject matter thereof which are solely attributable to the Masters hereunder less any costs or expenses which COMPANY is required to pay or credit to third parties.

## 10. MISCELLANEOUS ROYALTY PROVISIONS

Notwithstanding anything to the contrary contained in Paragraph "9" above:

10.01. In respect of Joint Recordings, the royalty rate to be used in determining the royalties payable to you shall be computed by multiplying the royalty rate otherwise applicable thereto by a fraction, the numerator of which shall be one and the denominator of which shall be the total number of royalty artists whose performances are embodied on a Joint Recording.

10.02. With respect to Phonograph Records embodying Master Recordings made hereunder together with other Master Recordings, the royalty rate payable to you shall be computed by multiplying

8

the royalty rate otherwise applicable by a fraction, the numerator of which is the number of sides contained thereon embodying Master Recordings made hereunder and the denominator of which is the total number of sides contained on such Record.  Further, Company shall not embody more than two Masters recorded hereunder on any LP that includes masters not recorded hereunder without Artist's consent which consent shall not be unreasonably withheld.

10.03.  No royalties shall be payable to you in respect of Phonograph Records sold or distributed by COMPANY or its Licensees for promotional purposes, as cutouts after the listing of such Records has been deleted from the catalog of COMPANY or the particular Licensee, as "free", "no charge" or "bonus" Records (whether or not intended for resale), or to radio stations.  No royalties will be payable to you on "sampler" Records in tape form intended for free distribution to automobile purchasers and containing not more than two Recordings made under this Agreement.

10.04.  With respect to so-called home video devices embodying Artist's performances (e.g., video cassettes or discs intended primarily for home use), you will be entitled to a royalty computed as provided in Paragraph "9" above.

## 11.  ROYALTY ACCOUNTINGS

11.01.  COMPANY will compute your royalties as of each June 30th and December 31st for the prior six months, in respect of each such six-month period in which there are sales or returns of Records covered by this Agreement.  On the next September 30th or March 31st, respectively, COMPANY will send you a statement covering those royalties which are due after deducting unrecouped Advances.  COMPANY shall maintain royalty reserves against anticipated returns exchanges, refunds and credits.  Reserves will be maintained in accordance with Company's standard policy and such reserves shall be fully liquidated over four (4) consecutive semi-annual accounting periods commencing upon the rendition of the third accounting statement rendered following the statement with respect to which such reserve was originally maintained.  If COMPANY makes any overpayment to you, you will reimburse COMPANY for it; COMPANY may also deduct it from any payments due or becoming due to you.  If COMPANY pays you any royalties on Records which are returned later, those royalties will be considered overpayments.

11.02.  Sale of Records for distribution outside the United States are called "foreign sales" below.  COMPANY will compute your royalties for any foreign sale in the same national currency in which COMPANY's Licensee pays COMPANY for that sale, and COMPANY will credit those royalties to your account at the same rate of exchange at which the Licensee pays COMPANY for that purpose of accounting to you, COMPANY will treat any foreign sale as a sale made during the same six (6) month period in which COMPANY receives

its Licensee's accounting and payment for that sale.   If any COMPANY Licensee deducts any taxes from its payments to COMPANY, COMPANY may deduct a proportionate amount of those taxes from your royalties.   If any law, any government ruling, or any other restriction affects the amount of the payments which a COMPANY Licensee can remit to COMPANY, COMPANY may deduct from your royalties an amount proportionate to the reduction in the Licensee's remittances to COMPANY.   If COMPANY cannot collect payment for a foreign sale in the United States in U.S. Dollars it will not be required to account to you for that sale.

   11.03.   COMPANY will maintain books and records which report the sales of the Phonograph Records for which royalties are payable to you.   You may, at your own expense, examine those books and records, as provided in this paragraph only.   You may make those examinations only for the purpose of verifying the accuracy of the statements sent to you under Paragraph "11.01" above.   You may make such an examination for a particular statement only once, and only within one (1) year from the date said statement is rendered by COMPANY under Paragraph "11.01" above.   You may make those examinations only during COMPANY's usual business hours, and at the place where it keeps the books and records to be examined.   If you wish to make an examination you will be required to notify COMPANY at least thirty (30) days before the date when you plan to begin it.   If your examination has not been completed within one (1) month from the time you begin it, COMPANY may require you to terminate it on seven days' notice to you at any time; COMPANY will not be required or permit you to continue the examination after the end of that seven (7) day period.   You will not be entitled to examine any manufacturing records or any other records that do not specifically report sales of Phonograph Records, or gratis distributions of Phonograph Records, on which royalties are payable to you.   You may appoint a certified public accountant to make such an examination of you, but not if he or his firm has begun an examination of COMPANY's books and records for any Person except you unless the examination has been concluded.

   11.04.   If a certified public accountant performs the examination for you, he will review his tentative findings with those members of the COMPANY Finance staff who COMPANY designates before he renders a report to you in order to remedy any factual errors and clarify any issues which may have resulted from misunderstanding.   Your accountant's report will be completed and a copy of it will be delivered to COMPANY within sixty (60) days from date his examination ends.

   11.05.   If you have any objections to a royalty statement, you will give COMPANY specific notice of that objection and your reasons for it within one (1) year after the date when COMPANY sends you that statement under Paragraph "11.01" above.   Each royalty statement will become conclusively binding on you at the end of that twelve (12) month period, and you will no longer have

any right to make any other objections to it.  You will not have the right to sue COMPANY in connection with any royalty accounting, or to sue COMPANY for royalties on Records sold during the period a royalty accounting covers, unless you commence the suit within that one (1) year period after a statement is rendered which is the subject of your claim.  If you commence suit on any controversy or claim concerning royalty accountings rendered to you under this Agreement, the scope of the proceeding will be limited to determination of the amount of the royalties due for the accounting periods concerned, and the court will have no authority to consider any other issues or award any relief except recovery of any royalties found owing.  Your recovery of any such royalties will be the sole remedy available to you or the Artist by reason of any claim related to COMPANY's royalty accountings.  Without limiting the generality of the preceding sentence, neither you nor the Artist will have any right to seek termination of this Agreement or avoid the performance of your obligations under it by reason of any such claim except if such claim is based upon fraud.

11.06.  Neither party hereto shall be deemed to be in material breach of any of our respective obligations hereunder unless and until the aggrieved party shall have given the defaulting party specific written notice of the nature of such breach and the defaulting party shall have failed to cure such breach within sixty (60) days after receipt of such written notice.  Nothing herein contained shall constitute or be deemed or construed to constitute a partnership or other fiduciary relationship between, or a joint venture by, you and me.

12.  <u>LICENSES FOR MUSICAL COMPOSITIONS</u>

12.01.    (a)  (1)  You grant to us an irrevocable license, under copyright, to reproduce each controlled composition on Phonograph Records and distribute them in the United States and Canada.

(2)  For that License, COMPANY will pay Mechanical Royalties at three-fourths (3/4) of the minimum compulsory license rate per Composition at the time of the commencement of the recording of the Master concerned but in no event later than the last date for timely Delivery of such Master for Records manufactured for distribution in the United States and at three-fourths (3/4) of the minimum compulsory rate per Composition for Records manufactured for distribution in Canada, on the basis of Net Sales.  The Mechanical Royalty on any Record described in Paragraph "9.02" above or sold through a Club Operation will be three-fourths (3/4) of the amount fixed in the preceding sentence.  If the Composition is an arranged version of a public domain work, the Mechanical Royalty on it will be half of the amount fixed in the first sentence.  No Mechanical Royalties will be payable for any Records described in Paragraph "10.03" above or for any other records for which COMPANY does not receive

11

payment for sale as a full price, mid line, budget or premium record.

(b)  The total Mechanical Royalty for all Controlled Compositions, will be limited to ten (10) times the amount which would be payable on it under Paragraph "12.01 (a)(2)" if it contained only one Controlled Composition.  The total Mechanical Royalty on any Single will be limited to twice that amount.

(c)  COMPANY will compute Mechanical Royalties on Controlled Compositions as of the end of each calendar semi-annual period in which there are sales or returns of Records on which Mechanical Royalties are earned hereunder.  On the next September 30th, or March 31st, COMPANY will send a statement covering those royalties and will pay any net royalties which are due.  Mechanical Royalty reserves maintained by COMPANY against anticipated returns and credits will not be held for any unreasonable period in any case.  If COMPANY makes any overpayment of Mechanical Royalties to Artist for Controlled Compositions only, you will reimburse COMPANY for it; COMPANY may also recoup it from any payments due or becoming due to you.  If COMPANY pays any Mechanical Royalties on Controlled Compositions on Records which are returned later, those royalties are considered overpayments.  If the total amount of the Mechanical Royalties which COMPANY pays on any Record consisting of Master Recording made under this Agreement (including Mechanical Royalties for compositions which are not Controlled Compositions) is higher than the limit fixed for that Record under Subparagraph "12.01(b)" above, that excess amount will be considered an overpayment also.

(d)  Any assignment made of the ownership on copyrights in or the rights to license or administer the use of any Controlled Compositions shall be subject to the terms set forth above and Artist will make any modifications, if necessary to conform these terms to the terms and provision of any such assignment.

12.02.  You also grant to COMPANY, for promotional purposes only, an irrevocable license under copyright to reproduce each Controlled Composition in motion pictures and other audio-visual works ("pictures") and to distribute and to perform those pictures throughout the world, and to authorize others to do so.  COMPANY will not be required to make any payment in connection with those uses unless COMPANY received any payment in connection with those pictures.

12.03.  If the copyright in any Controlled Composition is owned or controlled by anyone else, you will use your good faith efforts to cause that Person to grant COMPANY the same rights described in Paragraphs "12.01" and "12.02", above on the same terms.  If the copyright in any Controlled Composition is transferred, the transfer will be made subject to this Agreement.

12

12.04. With respect to each Controlled Composition herein, you will cause the issuance of effective licenses, under copyright and otherwise, to reproduce each Controlled Composition on Phonograph Records and distribute those Records outside the United States and Canada, on terms not less favorable to COMPANY or its Licensees that the terms most favorable to Phonograph Manufacturers prevailing on a general basis in the country concerned.

13. <u>WARRANTIES; REPRESENTATIONS; RESTRICTIONS; INDEMNITIES</u>

13.01. You warrant and represent:

(a) You have the right and power to enter into and fully perform this Agreement.

(b) COMPANY shall not be required to make any payments of any nature for, or in connection with, the acquisition, exercise or exploitation of rights by COMPANY pursuant to this Agreement except as specifically provided in this Agreement.

(c) Artist is or will become and will remain to the extent necessary to enable the performance of this Agreement, a member in good standing of all labor unions or guilds, membership in which may be lawfully required from the performance of Artist's services hereunder.

(d) No materials, as hereinafter defined, or any use thereof, will violate any law or infringe upon or violate the rights (including copyrights and/or right of privacy) of any Person. "Materials" as used in this Paragraph, means: (1) a Controlled Composition, (2) each name used by the Artist, individually or as a group, in connection with Recordings made hereunder, and (3) all other musical, dramatic, artistic and literary materials, ideas, and other intellectual properties, furnished or selected by you, the Artist and contained in or used in connection with any Recordings made hereunder or the packaging, sale, distribution, advertising, publicizing or other exploitation thereof.

13.02. During the term of this Agreement, you will not enter into any Agreement which would interfere with the full and prompt performance of your obligations hereunder, and the Artist will not perform, or render any services as a performing artist, for the purpose of making Master Recordings or Phonograph Records for any Person except COMPANY. The Artist will not perform any "restricted Composition" (defined below) for any person except COMPANY for the purpose of making Master Recordings or Phonograph Records, at any time before the later of the following dates: (a) the date five (5) years after the Recording of the Composition for COMPANY, or (b) the date two (2) years after the expiration of the term of this Agreement. A "restricted Composition", for the purposes of this

Paragraph, is a Composition which shall have been recorded by the Artist for a Master Recording made or delivered to COMPANY under this Agreement.  Neither you nor the Artist shall authorize or knowingly permit the Artist's performances to be recorded for any purpose without an express written Agreement prohibiting the use of such recording on Phonograph Records in . violation of the foregoing restrictions.

13.03.   If you become aware of any unauthorized recording, manufacture, distribution or sale by any third party contrary to the foregoing re-recording restrictions you will notify COMPANY thereof and shall cooperate with COMPANY in the event that COMPANY commences any action or proceeding against such third party.

13.04.   The services of the Artist are unique and extraordinary, and the loss thereof cannot be adequately compensated in damages, and COMPANY shall be entitled to seek injunctive relief to enforce the provisions of this Agreement.

13.05.   You will at all times indemnify and hold harmless COMPANY and any Licensee of COMPANY from and against any and all claims, damages, liabilities, costs and expenses, including legal expenses and reasonable counsel fees, arising out of any breach by you of any warranty or representation made by you in this Agreement which is reduced to a final judgment r mutually approved settlement.  Pending the resolution of any claim in respect of which COMPANY is entitled to be indemnified, COMPANY may withhold monies which would otherwise be payable to you under this Agreement in an amount not to exceed your potential liability to COMPANY under this paragraph.  You shall have the right to post a bond in form, amount and duration and with a bonding company satisfactory to COMPANY, and the event you shall post such a bond, COMPANY shall no longer withhold monies due hereunder in respect of which such bond shall be posted.  Company agrees to give Artist notice of any claim, demand or action to which the foregoing indemnity applies, and Artist may participate in the defense of same at Artist's expense, through counsel of Artist's choice; provided, that the final control and disposition of same (by settlement, compromise or otherwise) shall remain with Company.

14.  <u>DEFINITIONS</u>

14.01.   "Record" or "Phonograph Record" means all forms of reproductions, now or hereafter known, manufactured or distributed primarily for use, school use, juke box use or use in means of transportation, including records of sound alone and audio-visual recordings.

14.02.   "Master", "Master Recording" or "Recording" means any recording of sound, whether or not coupled with a visual image, by any method and on any substance or material, whether now or

14

hereafter known, which is intended for use in the recording, production and/or manufacture of Phonograph Records.

14.03.   "Performance" means singing, speaking, conducting or playing an instrument, along or with others.

14.04.   The words "Single Records" or "Single" means a Record containing not more than three (3)sides.

14.05.   "Long Play Single" means a 12-inch 33-1/3 rpm disc Phonograph Record embodying not more than three (3) Sides.

14.06.   "Mini LP" or "EP" means any Record, other than an LP, containing more than three (3) Sides.

14.07.   The term "Multiple Record LP" means an LP containing two or more 12-inch 33-1/3 rpm records packaged as a single unit or equivalent.  For purposes of the Recording Commitment hereunder and for computing the applicable Recording Fund or Advance, a Multiple Record LP is accepted by COMPANY shall be deemed only one (1) LP.

14.08.       "Person" means   any   individual,   corporation, partnership, association or other organized group of persons or legal successors or representatives of the foregoing.

14.09.   "Side" means a Recording of sufficient playing time to constitute one side of a 45 rpm record, but not less than three (3) minutes of continuous sound embodying performances by Artist.

14.10.   (a)       "Royalty Base Price" means (i) with respect to Records sold for distribution in the United States, the retail selling price of one hundred (100%) percent of net sales through normal retail channels of phonograph records embodying masters computed on such records, except as otherwise provided herein. Notwithstanding the foregoing, in the event any of COMPANY's distributor should account to COMPANY for sales of records hereunder on a basis less than one hundred (100%) percent, or should calculate royalties on the basis of the wholesale selling price, then with respect to those sales only the royalty basis shall be adjusted to equal that computed by such distributor. Royalties as aforesaid shall be calculated for sales during the applicable accounting period for the computation of royalties to be made hereunder, it being understood that a separate calculation of the price shall be made for each price configuration of Phonograph Records manufactured and sold by COMPANY; and (ii) with respect to Records sold hereunder for distribution outside the United States.  The Royalty Base Price shall be the dealer price utilized by COMPANY's distributor or its licensee in computing monies to be paid to COMPANY for the Record concerned, unless COMPANY distributes its own records in a particular country, in which event the Royalty Base Price shall be the suggested or

15

applicable retail price in the country of manufacture or sale, as COMPANY is paid, or, in the absence in a particular country of such suggested retail list price, the price as may be established by COMPANY distributors in conformity with the general practice of the recording industry in such country, provided that COMPANY shall not be obligated to utilize the price adopted by the local mechanical copyright collection agency for collection of Mechanical Royalties. The Royalty Base Price shall be less all excise, sales and similar taxes and less the applicable container charge.

(b)    COMPANY may at some time change the method by which it computes royalties in the United States from a basis to some other basis (the "New Basis"), such as, without limitation, a retail basis.    The New Basis will replace the then-current Royalty Base Price and the royalty rate shall be adjusted to the appropriate royalty which would be applied to the New Basis so that the dollars and cents royalty amounts payable with respect to the top-line product would be the same as that which was payable immediately prior to such New Basis; for sales other than top-line product, for which there is a New Basis, the adjusted royalty rate for such sales of top-line product.    If there are other adjustments made by COMPANY that would otherwise make the New Basis more favorable (a particular example of which might be the distribution of smaller quantities of free goods than theretofore distributed) then the benefits of such other adjustments will be taken into consideration in adjusting the royalty rate.

(c)    Notwithstanding anything to the contrary contained herein, the Wholesale Price with respect to so-called home video devices manufactured and distributed by COMPANY shall be COMPANY's published wholesale price as of the commencement of the accounting period concerned.

14.11.    "Container Charge" shall mean ten (10%) percent of the Retail Selling Price for a single-fold disc Record in a standard sleeve with no inserts or for any other Record other than as hereinafter provided; fifteen (15%) percent of the Suggested List Price for an LP in a double-fold or gatefold, or nonstandard sleeve or jacket or with inserts; and twenty (20%) percent of such Price for Records, cassette tape configuration and twenty-five (25%) percent of such price for records in non-disc form, i.e.: audio-visual Records, or compact discs, audiophile records, DAT and New Record Configurations.    There shall be no Container Charge with respect to seven (7) inch Single Records shipped in a plain stock sleeve.

14.12.    "Video Base Price" means with respect to Videos sold for distribution, COMPANY's distributor's Wholesale Price during the applicable accounting period.

14.13.    "LP" or "Album" means a sufficient number of Masters embodying Artist's performances to comprise one (1) or more 12-

16

inch, 33-1/3 long-playing Phonograph Record album, or the equivalent, of not less than thirty-eight (38) minutes of playing time. COMPANY may request that up to ten (10) Masters be recorded for the LP delivered hereunder.

14.14. The words "term of this Agreement" or "period of this Agreement" or "term hereof" or "so long as this Agreement remains in force" or words of similar connotation shall include the initial period of this Agreement.

14.15. "United States" means the United States of America, its territories, possessions and military exchanges.

14.16. "Contract Period" means the initial period and/or an option period as the case may be.

14.17. "Composition" means - a single musical composition, irrespective of length, including all spoken words and bridging passages and including a medley.

14.18. "Controlled Composition" means a Composition wholly or partly written, owned or controlled by you, the Artist, or any person in which you, the Artist, has a direct or indirect interest.

14.19. "Budget Record" means a Record bearing a Gross Royalty Base Price less than or equal to sixty-seven (67%) percent for the Retail Selling Price in the country concerned of top-line single disc LPs.

14.20. "Net Sales" means one-hundred (100%) percent of gross sales of singles, LPs and EPs, and eighty-five (85%) compact discs, DAT and other audiophile recordings paid for returns and credits, after deduction of reserves against anticipated returns and credits. "Net Sales" for foreign sales pursuant to license agreements shall be calculated and then payable in the same manner as the applicable agreement. In the event COMPANY should enter into a Distribution Agreement that accounts to COMPANY on a basis of less than one hundred (100%) percent, COMPANY shall conform the definition of "Net Sales" to such definition as provided in the Distribution Agreement.

14.21. "Advance" means a prepayment of royalties or any other payments or on behalf of Artist and shall be chargeable against and recoupable from any royalties otherwise payable hereunder.

14.22. "Territory" shall mean the Universe.

14.23. "Sales Through Normal Retail Channels" means sales other than as described in Paragraph "9.02" and "9.03" above.

17

14.24.    "Mechanical Royalties" means royalties payable to any Person for the right to reproduce and distribute copyrighted musical compositions on Phonograph Records.

14.25.    "Joint Recordings" means Masters embodying the Artist's performance and any performance by another artist with respect to whom COMPANY is obligated to pay royalties.

14.26.    "Mid-line" record means a record bearing a Gross Royalty Base that is less than or equal to eighty (80%) percent of the Gross Royalty Base in the country concerned of top-line records in the configuration concerned.  (See Paragraph "9.02" above).

## 15.   REMEDIES

15.01.    Without limiting any other rights and remedies of COMPANY hereunder, if you fail to Deliver any Masters hereunder within the time prescribed in Paragraph "1" above, COMPANY will have the following options:

(a)   to suspend COMPANY's obligations to make payments to you under this Agreement until you have cured the default;

(b)   to terminate the term of this Agreement at any time, whether or not you have commenced curing the default before such termination occurs; and

(c)   to require you to repay to COMPANY the amount, not then recouped, of any Advance previously paid to you by COMPANY and not specifically attributable under Paragraph "6" above to an Album which has actually been fully Delivered.  COMPANY may exercise each of those options by sending you the appropriate notice.  If COMPANY terminates the term under Paragraph "15.01 (b)" above all parties will be deemed to have fulfilled all of their obligations under this Agreement except those obligations which survive the end of the term (such as indemnification obligations, re-recording restrictions, accounting and your obligations under Paragraph "15.01 (c)".)  No exercise of any option under this paragraph will limit COMPANY's rights to recover damages by reason of your default, its rights to exercise any other option under this paragraph, or any of its other rights.

15.02.    If Artist's voice should be or become materially and permanently impaired or if Artist should otherwise become physically unable to perform recording and/or for a period of six (6) months or more personal appearances and/or if Artist should cease to pursue a career as an entertainer, COMPANY may elect to terminate this Agreement, by notice to you at any time during the period in which such contingency arose or continues and thereby be relieved of any liability for the executory provisions of this Agreement.

18

15.03.   If because of:   act of God; inevitable accident; fire, lockout; strike or other labor dispute; riot or civil commotion; act of public enemy; enactment, rule, order or act of any government or governmental instrumentality (whether federal, state, local or foreign); failure of technical facilities; failure or delay of transportation facilities; illness or incapacity of any performer or producer; or other cause of similar or difference in nature not reasonably within COMPANY's control; COMPANY is materially hampered in the recording, manufacture, distribution or sale of records, then, without limiting COMPANY's rights, COMPANY shall have the option by giving you notice to suspend the running of the then current Contract Period for the duration of any such contingency plus such additional time as is necessary so that COMPANY shall have no less than thirty (30) days after the cessation of such contingency in which to exercise its options, if any, for the next following Option Period.   Notwithstanding the foregoing in the event any such suspension continues for a period in excess of six (6) months, you shall have the right to terminate this Agreement upon written notice to COMPANY following such six (6) month period.

16.   AGREEMENTS, APPROVAL & CONSENT

16.01.   As to all matters treated herein to be determined by mutual Agreement, or as to which any approval or consent is required, such Agreement, approval or consent will not be unreasonably withheld.

16.02.   Your Agreement, approval or consent, whenever required, shall be deemed to have been given unless you notify COMPANY otherwise within five (5) business days following the date of COMPANY's written request to you therefor.

17.   NOTICES

17.01.   Except as otherwise specifically provided herein, all notices hereunder shall be in writing and shall be given by personal delivery, registered or certified mail or telegraph (prepaid), at the addresses shown above, or such other address or addresses as may be designated by either Party.   Notices shall be deemed given when mailed or when transmitted by telegraph, except that notice of change of address shall be effective only from the date of its receipt.   Each notice sent to COMPANY shall be directed to COMPANY:   Trans Continental Records, Inc., 7380 Sand Lake Road, Suite 350, Orlando, Florida   32819; Attention: Louis J. Pearlman, President;   and   a   copy   of   each   such   notice   shall   be   sent simultaneously to William B. Pringle, III, Esquire, Post Office Box 691222, Orlando, Florida   32869-1222.

19

## 18.  EVENTS OF DEFAULT

18.01.    In the event of your or our dissolution or the liquidation of your or our assets, or the filing by or against you of a petition for liquidation or reorganization under Title 11 of the United States Code as now or hereafter in effect or under any similar statute relating to insolvency, bankruptcy, liquidation or reorganization, or in the event of the appointment of a trustee, receiver or custodian for you or for any of your property, or in the event that you shall make an assignment for the benefit of creditors or commit any act for, or in, bankruptcy or become insolvent, or in the event you shall fail to fulfill any of your material obligations under this Agreement for any other reason, then at any time after the occurrence of any such event and subject to the provisions as set forth in paragraph "11.06" above and "15.01" above, COMPANY shall have the option by notice to terminate this Agreement.    You shall have the right to terminate this Agreement upon written notice to COMPANY in the event COMPANY declares bankruptcy and files a petition for protection from their creditors.

18.02.    COMPLIANCE WITH LAWS/MORALS

During the term of this agreement, you shall observe and comply with all federal, state and local laws, ordinances, rules and regulations, including but not limited to, those laws prohibiting use/sale of controlled substances.    Additionally, you agree not to commit any act which shall subject COMPANY, its officers, employees, assigns or yourself to public ridicule, humiliation or disrepute.    Failure by you to comply with the provisions of this paragraph shall give COMPANY the right to immediately terminate this agreement.

## 19.  MISCELLANEOUS

19.01.    The Artist will, prior to the release of the LP hereunder, prepare an act of professional quality and will during the term of this Agreement, actively pursue his career as an entertainer in the live engagement field.

19.02.    (a) This Agreement contains the entire understanding of the Parties relating to its subject matter.    No change or termination of this Agreement will be binding upon COMPANY unless it is made by an instrument signed by an officer of COMPANY.    A waiver by either Party of any provision of this Agreement in any instance shall not be deemed to waive it for the future.    All remedies, rights, undertakings, and obligations contained in this Agreement shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking, or obligation of either Party.

20

(b)  No change of a budget prescribed in this Agreement or established under it will be effective unless the change is approved in writing by COMPANY.

19.03.    Those provisions of any applicable collective bargaining Agreement between COMPANY and any labor organization which are required, by the terms of such Agreement, to be included in this Agreement shall be deemed incorporated herein.

19.04.    Each option and election granted to COMPANY in this Agreement, including, without limitation, to suspend the running of one (1) or more period of time, to terminate the term, to acquire the direct and individual services of a leaving member (if a group artist is involved), or otherwise, is separate and distinct, and the exercise of any such option or election shall not operate as a waiver of any other option or election unless specifically so stated by COMPANY in its notice of exercise of such option or election.

19.05.    You shall not be entitled to recover damages or to terminate the term of this Agreement by reason of any breach by COMPANY of its material obligations hereunder, unless COMPANY has failed to remedy such breach within sixty (60) days following receipt of your notice thereof.

19.06.    This Agreement has been entered into in the State of Florida, and the validity, interpretation and legal effect of this Agreement shall be governed by the laws of the State of Florida applicable to contracts entered into and performed entirely within the State of Flora.  The courts (state and federal), only will have jurisdiction of any controversies regarding this Agreement; any action or other proceeding which involves such a controversy will be brought in those courts, in Florida and not elsewhere.  Any process in any such action or proceeding may, among other methods, be served upon you by delivering it or mailing it, by registered or certified mail, directed to the address first above written or such other address as you may designate pursuant to Paragraph "17" above.   Any such process may, among other methods, be served upon the Artist or any other Person who approves, ratifies, or assents to this Agreement to induce COMPANY to enter into it, by delivering the process or mailing it by registered or certified mail, directed to the address first above written or such other address as the Artist or the other Person concerned may designate in the manner prescribed in Paragraph "17" above.  Any such delivery or mail service shall be deemed to have the same force and effect as personal service within the State of Florida.

19.07.    In entering into this Agreement, and in providing services pursuant hereto, you shall have the status of an independent contractor and nothing herein contained shall contemplate or constitute you as COMPANY's agent(s) or employee(s).

21

19.08.    This Agreement shall not become effective until executed by all proposed Parties hereto.

19.09.    Any and all riders annexed hereto together with this basis document shall be taken together to constitute the Agreement between you and COMPANY.

19.10.    You hereby grant to us, or our affiliate 'N Sync Productions, Inc. or our designee all merchandising rights and the sole and exclusive right to use your name (both legal and professional), likeness, picture and portrait in any manner whatsoever in connection with the exercise of the merchandising rights herein granted.    COMPANY or its designee shall have the right to grant to the others (including companies affiliated with us) upon such terms as we shall see fit, the right to exercise or cause to be exercised such merchandising rights.    COMPANY shall pay to you, in addition to any and all monies provided for in this Agreement, one-half (1/2) of all net monies received by us in connection with the exercise of said merchandising rights.

19.11.    COMPANY shall retain tutors and a parent or parent-appointed guardian to oversee and supervise the education and maintenance of such members of the group that are under the age of eighteen years during periods of recording and touring.    The costs and expenses related to such personnel shall be paid by COMPANY and shall be deemed to be an additional recoupable advance hereunder.

19.12.    Notwithstanding anything to the contrary contained herein, you shall have the right to terminate this agreement in the event COMPANY has not secured a distribution agreement with a U.S. record company within eighteen months from the date hereof, pursuant to which recordings of your performances shall be released.

## 20.   <u>PUBLISHING AGREEMENT</u>

You hereby assign to COMPANY, or a publishing company, designated by COMPANY, One Hundred (100%) percent of all the right, title and interest in and to the Controlled Compositions, including without limitation, the rights in and to the copyrights therein and the renewal rights thereto.    You shall simultaneously herewith enter into the attached Exhibit A copyright transfer and assignment, pursuant to which COMPANY or such publishing company shall acquire said rights, title and interest, together with the exclusive right to Administer the copyrights for the term of the copyright in each such Controlled Composition.    Artist shall receive their public performance royalties for the United States directly from the performing rights society to which they are affiliated.   "IT IS SPECIFICALLY UNDERSTOOD AND AGREED THAT THIS PARAGRAPH (AND PROVISIONS CONTAINED IN THIS AGREEMENT RELATED THERETO) APPLIES ONLY TO THOSE CONTROLLED COMPOSITIONS RECORDED BY

22

ARTIST HEREUNDER AND COMPANY SHALL HAVE NO CLAIM TO, OR ANY RIGHT, TITLE OR INTEREST IN, ANY COMPOSITIONS WHOLLY OR PARTLY WRITTEN, OWNED, OR CONTROLLED BY YOU AND/OR ARTIST WHICH ARE NOT RECORDED HEREUNDER."

21.   <u>VIDEO AND SIDEPERSON PROVISIONS</u>

21.01.   If COMPANY shall decide to produce one (1) or more Videos during the term hereof (which COMPANY is under no obligation whatsoever to do), the following shall be applicable:

(a)   The selection(s) to be embodied in each Video shall be designated by COMPANY and Artist.

(b)   Each Video shall be shot on a date or dates and at a location or locations to be designated by COMPANY and subject to your reasonable availability.

(c)   The producer and director of each Video, and the concept or script for each Video, shall be mutually approved by COMPANY and Artist.   COMPANY shall engage the producer, director and other production personnel for each Video, and shall be responsible for and shall pay the production costs of each Video in an amount not in excess of a budget to be established in advance by COMPANY in consultation with you (the "Production Budget").   You shall be responsible for and shall pay the production costs for each Video which are in excess of the production costs caused by your delay and/or circumstances that are within your control for which you are responsible pursuant to the foregoing (which COMPANY is in no way obligated to do), you shall promptly reimburse COMPANY for such excess costs upon demand and, without limiting COMPANY's other rights and remedies, if you fail to so reimburse COMPANY, then COMPANY may deduct an amount equal to such excess from any monies otherwise payable to you hereunder.   Your compensation for performing in such Videos shall be limited to any minimum amounts required to be paid for such performances pursuant to any collective bargaining Agreement pertaining thereto, provided, however, that you hereby waive any right to receive such compensation to the extent such right may be waived.

(d)   COMPANY shall be the sole owner of all worldwide rights in and to each Video (including the worldwide copyrights therein and thereto.).

(e)   You shall issue (or shall cause the music publishing companies having the right to do so to issue) (i) worldwide, perpetual synchronization licenses, and (ii) perpetual licenses for public performance in the United States (to the extent that ASCAP or BMI are unable to issue same), to COMPANY at no costs for the use of all Controlled Compositions in any such Videos effective as of the commencement of production of the applicable Video (and your execution of this Agreement shall constitute the issuance of such

23

licenses by any music publishing company which is owned or controlled by you, or by any Person owned or Controlled by you). In the event that you shall fail to cause any such music publishing company to issue any such license to COMPANY, and if COMPANY shall be required to pay any fee to such music publishing company in order to obtain any such license, then COMPANY shall have the right to deduct the amount of such license fee from any and all sums otherwise payable to you hereunder.

(f)    COMPANY shall have the right to use and allow others to use each Video for advertising and promotional purposes with no payment to you except as otherwise provided herein.    As used herein, "advertising and promotional purposes" shall mean all uses for which COMPANY receives no monetary consideration from licensees in excess of its costs and expenses in connection with the creation or exploitation of the Video, an incidental fee and a reasonable reimbursement for its administrative costs.    Compensation derived from such promotional uses due you hereunder shall be credited to your account as provided in Paragraph "9.05" above.

(g)    COMPANY shall also have the right to use and allow others to use the Videos for commercial purposes.    As used in this subparagraph, "commercial purposes" shall mean any use which is not for "advertising and promotional" purposes (as defined above) for which COMPANY received monetary consideration in excess of its Compensation derived from such commercial exploitation and due you hereunder shall be credited to your account as provided in Paragraph "9.05" above.

(h)    Each Video shall be deemed a Material as provided herein and COMPANY shall have the rights otherwise applicable hereto with respect to Masters hereunder including, without limitation, the right to use and publish, and permit others to use and publish, your name and likeness in each Video and for advertising and purposes of trade in connecting therewith.

21.02.    Notwithstanding anything to the contrary contained herein, Artist shall have the right, during the term hereof, perform as a background vocalist or background instrumentalist for the purpose of making audio Phonograph Records for other subject to the following:

(a)    You have then fulfilled all of your then current obligations hereunder, and the engagement does not interfere with the continuing prompt performances of your obligations to COMPANY or with any professional engagements to which you are committed and which are intended to aid in the promotion of Records hereunder;

(b)    Artist will not after the commencement of this Agreement, render a solo or "step-out performance" and the musical style of the recording will not be such as to be confused with

24

Recordings made by Artist for COMPANY; without the consent of COMPANY, such consent shall not be unreasonably withheld;

(c)   Artist will not record any material embodied on a Master theretofore or thereafter delivered by you hereunder, and you shall be restricted from recording the same material for COMPANY (which you shall not do without COMPANY's written consent);

(d)   Artist's name may be used in a courtesy credit to COMPANY or its designee on the LP liners used for such Records, in the same position as the credits accorded to other sidepersons and in type identical in size, prominence and all other respects. Except as provided in this subparagraph (d), neither the Artist's name, nor likeness nor biographical material may be used in any manner in connection with such Recordings. Without limiting the foregoing, Artist's name and/or likeness shall not be used on the front cover of LPs, on sleeves or labels used for single records, or advertising, publicity or other forms of exploitation, without COMPANY's express written consent which COMPANY may withhold in its absolute discretion.

21.03.   Within sixty (60) days following the execution hereof, you may supply COMPANY with six (6) approved pictures of Artist to be used by COMPANY.   Such submission shall be made to COMPANY.   In the event that COMPANY disapproves of the pictures supplied by you, COMPANY will make available to you for your approval pictures to be used by COMPANY.   Your approval will not be unreasonably withheld, and will be deemed given unless your notice of disapproval (including the reason) has been received by COMPANY within five (5) days after the material has been made available to you.   In the event that you timely disapprove of any pictures, you will, within seven (7) days of the date of your disapproval notice, supply to COMPANY approved pictures.   In the event that the pictures supplied by you, pursuant to the preceding sentence, are not satisfactory to COMPANY pursuant to this paragraph, COMPANY shall thereafter have the right to select and use such pictures as it shall determine, in its sole discretion, and you shall have no approval rights in respect thereof.   No inadvertent failure to COMPANY to comply with this paragraph will constitute a breach of this Agreement.

21.04.   (a)   As used herein, the term "You" includes all members of the group presently professionally known as 'N SYNC. The obligations, liabilities, prohibitions and restrictions imposed upon you hereunder shall be deemed to apply individually and collectively to each of the members of 'N SYNC, whether performing alone, with others or as a member of 'N SYNC, regardless of the name by which you or any of your members may then be identified. A failure by any member of 'N SYNC to satisfy any of your obligations hereunder shall, as COMPANY's election, be deemed a breach of this Agreement by you.   In the event of any such breach, COMPANY may, by notice to you, and without limiting any of

25

COMPANY's other rights or remedies hereunder, terminate the term of this Agreement or, alternatively, may terminate the term of this Agreement only as it applies to the member or members who have failed to satisfy their individual obligations.

(b)   You hereby acknowledge that TRANS CONTINENTAL RECORDS, INC. is the sole owner of the name 'N SYNC and will be the sole owner of such name during the term hereof; that you will not use or authorize any other person to use such name or other name adopted by you in connection with the recording, production, manufacture, sale or advertising of records in the territory, or in connection with personal appearances by any person other than you unless approved by TRANS CONTINENTAL RECORDS, INC.   If any member becomes a "leaving member" of the group, or if COMPANY terminates the term of this Agreement as to some but not all members then the leaving member as to whom the term of this Agreement is terminated shall not thereafter use or authorize or permit any other person to use in any manner or for any purpose whatsoever the name 'N SYNC or such other name as you may hereafter adopt.   As used herein, a "leaving member" means any member of Artist who during the term hereof ceases to be an actively performing member of the group for any reason whatsoever, and in the event you disband or COMPANY decides to terminate this Agreement because there being a leaving member, each member of the group.

(c)   No additional member may be added without COMPANY's prior written consent.   If any member of Artist becomes a leaving member, then you shall promptly give COMPANY written notice thereof and COMPANY shall thereafter have the right to terminate this Agreement as to such leaving member or to require such leaving member to render his services directly to COMPANY as a solo artist or as a member of any new group comprised of the leaving members under the same terms and conditions as set forth in this Agreement with respect to you.

21.05.   At COMPANY's request, you shall submit to a drug test with a physician designated by COMPANY at COMPANY's expense.

TRANS CONTINENTAL RECORDS, INC.

By: _____
LOUIS J. PEARLMAN          President

ACCEPTED TO AND AGREED:

_____
"Artist"
CHRISTOPHER ALAN KIRKPATRICK
Soc. Sec. #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

26

"Artist"
JUSTIN RANDALL TIMERBLAKE
Soc. Sec. #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

"Artist"
JOSHUA SCOTT CHASEZ
Soc. Sec. #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

"Artist"
JOSEPH ANTHONY FATONE, JR.
Soc. Sec. #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

"Artist"
JAMES LANCE BASS
Soc. Sec. #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

27

## EXHIBIT "A"

## TRANSFER OF COPYRIGHT

For good and valuable consideration, receipt whereof is hereby acknowledged, the undersigned hereby transfer to TRANS CONTINENTAL RECORDS, INC., PUBLISHER DESIGNEE, One Hundred (100%) percent of all the right, title and interest in and to the copyright and One Hundred (100%) percent of the rights comprised in the copyright, without limitation, in the controlled musical composition recorded hereunder.   The above pertains only to Publisher's interest.   The writers retain their interest.

CHRISTOPHER ALAN KIRKPATRICK
Artist

JUSTIN RANDALL TIMBERLAKE
Artist

JOSHUA SCOTT CHASEZ
Artist

JOSEPH ANTHONY FATONE, JR.
Artist

JAMES LANCE BASS
Artist

28

## PARENTAL\GUARDIAN CONSENT

I, ___LYNN HARLESS___, hereby represent and acknowledge that I am the natural parent and/or legal guardian of the minor __JUSTIN RANDALL TIMBERLAKE__ and that I have read and am familiar with the Exclusive Artist Recording Agreement attached hereto.

I hereby guarantee my child's performance of his obligations under said Recording Agreement and agree to be secondarily liable in the event he should breach or improperly terminate same.

_Lynn Harless_
Parent/Guardian Signature

_LYNN HARLESS_
Parent/Guardian's Name Printed

Dated: ___10/2/95___

29

## PARENTAL\GUARDIAN CONSENT

I, ___DIANE P. BASS___, hereby represent and acknowledge that I am the natural parent and/or legal guardian of the minor __JAMES LANCE BASS__ and that I have read and am familiar with the Exclusive Artist Recording Agreement attached hereto.

I hereby guarantee my child's performance of his obligations under said Recording Agreement and agree to be secondarily liable in the event he should breach or improperly terminate same.

*Diane P. Bass*
Parent/Guardian Signature

*Diane P. Bass*
Parent/Guardian's Name Printed

Dated: __10-6-95__

30

## STOCKHOLDERS AGREEMENT

STOCKHOLDERS AGREEMENT (the "Agreement") made as of the ____ day of _____, 1995 among 'N SYNC, INC., (the "Corporation"), a Delaware corporation having an address at 9235 Ridge Pine Trail, Orlando, Florida 32819, and LOUIS J. PEARLMAN, residing at 9235 Ridge Pine Trail, Orlando, Florida 32819, CHRISTOPHER ALAN KIRKPATRICK, residing at 1610 Overdale Street, Orlando, Florida 32825, and JUSTIN RANDALL TIMBERLAKE, a minor, residing at 303 Fawn Lake Drive, Millington, Tennessee 38053, and JOSHUA SCOTT CHASEZ, residing at 6511 Homestake Drive South, Bowie, Maryland 20720, and JOSEPH ANTHONY FATONE, JR., residing at 2746 Woodruff Drive, Orlando, Florida 32837, and JAMES LANCE BASS, residing at 111 Newport Circle, Clinton, Mississippi 39056, (each being hereinafter individually and collectively referred to as "Stockholder" and collectively, as the "Stockholders").

### W I T N E S S E T H:

WHEREAS, the Corporation has authorized six hundred (600) shares of common stock, par value $.01 per share, ("Common Stock") of which six hundred (600) have been issued are outstanding;

WHEREAS, as of the date hereof, each Stockholder owns 100 shares of Common Stock (the shares of Common Stock owned by each Stockholder respectively are referred as such Stockholder's "Shares"); and

WHEREAS, the Stockholders desire to regulate the transfer of their Shares and to define certain of their rights and obligations with respect to the operation of the Corporation;

NOW THEREFORE, in consideration of the premises hereof and the covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **DIRECTORS AND OFFICERS**

   (a)   The Corporation's Board of Directors shall consist of six (6) individuals. Each Stockholder, for so long as he shall own at least 5% of the outstanding Common Stock, shall have the right to nominate himself to be a director. Each Stockholder, for so long as he remains a stockholder of the Corporation, agrees to vote the shares of Common Stock owned by such Stockholder to elect the nominees of the other Stockholders.

   (b)   The directors of the Corporation shall use their best efforts to elect and re-elect the following individuals as officers of the Corporation, for so long as said individuals are stockholders of the Corporation:

Louis J. Pearlman      -    Chairman, President and Treasurer
Robert Fischetti       -    Secretary

(c)  Notwithstanding anything herein to the contrary, if, at any time, any Stockholder shall cease to own any Shares, such Stockholder shall be deemed to have resigned as an officer and director of the Corporation.

(d)  Each Stockholder hereby grants an irrevocable proxy, coupled with an interest, to Pearlman to vote the Shares of such Stockholder on all matters on which holders of Common Stock are entitled to vote.

2.  <u>PROFITS OF CORPORATION</u>

(a)  If the Corporation's status as an "S" corporation is in effect for a taxable year, the Stockholders and the directors agree that they shall authorize and direct the Corporation to make <u>pro rata</u> distributions of an amount equal to the state and federal tax liability of each Stockholder as a result of being a Stockholder of the Corporation of operating profits for such taxable year, as determined by the Corporation's regular certified public accountants. Such share of the operating profits shall be distributed to the Stockholders, at least annually and not later than ninety (90) days after the end of each taxable year in accordance with the proportionate ownership of Shares of each Stockholder.

(b)  If there is an addition, reduction or any other change (other than a complete termination of interest in the Corporation) in the number of Shares of any Stockholder during a taxable year, any allocation and distribution of profits for such taxable year shall be prorated among the Stockholders and any other stockholders of the Corporation based on the number of days in the period their ownership of Shares was outstanding.

(c)  In the event that any Stockholder shall transfer all of his Shares in accordance with the provisions of this Agreement prior to the end of any taxable year, the Corporation shall make a distribution to the transferor Stockholder equal to the portion of the Corporation's operating profits for the taxable year (and any distributions owing from to the Stockholder for any previous taxable year) that will be (or should have been) allocated to such Stockholder, but only to the extent such profits have not been previously distributed.

3.  <u>RESTRICTION ON TRANSFER OF SHARES</u>

(a)  Each of the Stockholders undertakes with each other during the continuance of this Agreement that he shall not pledge or otherwise encumber all or any portion of his Shares, nor shall he dispose of all or any portion of his Shares by gift, sale,

inheritance or otherwise, except with the prior written unanimous consent of both the Corporation's Board of Directors and all the Stockholders or as otherwise specifically permitted by this Agreement. Any purported pledge, encumbrance or disposition in violation of the terms of this Agreement shall be void ab initio. Upon issuance, the certificates representing the Shares shall have inscribed thereon the following endorsement:

> "THE PLEDGE, TRANSFER, SALE OR ENCUMBRANCE OF THE SHARES REPRESENTED BY THIS CERTIFICATE IS SUBJECT TO THE TERMS OF A STOCKHOLDERS AGREEMENT DATED AS OF _____, 1995, A COPY OF WHICH IS ON FILE AT THE OFFICE OF THE CORPORATION."

(b)  Notwithstanding the foregoing, a Stockholder shall be permitted to transfer any or all of his Shares pursuant to his will or by the laws of intestacy, provided that any Shares so transferred shall remain subject to the rights of the Corporation and the other Stockholders to acquire the same as provided herein, and, provided further, that the transferee executes and delivers an agreement to be bound by the terms and conditions of this agreement.

4.  **RIGHT OF FIRST REFUSAL**

(a)  In the event a Stockholder (herein, the "Selling Stockholder") desires, at any time, to transfer all (but not less than all) of his Shares or to otherwise withdraw as a Stockholder of the Corporation, and/or if a Stockholder during his lifetime obtains a bona fide written offer (an "offer") from a third party (the "Offeror") to acquire all but not less than all of Shares which Offer he desires to accept, the Selling Stockholder shall give written notice to the Corporation ("Notice of Intention") and such Notice of Intention shall disclose the identity of the Offeror and the terms of the Offer.  If the Corporation shall not have responded to the Notice of Intention within twenty (20) days after receipt that the Corporation desires to purchase the Shares of the Selling Stockholder on the same terms as the Offer ("Notice of Acceptance") or if the Corporation does not actually purchase such Shares within the time period set forth below, then the Selling Stockholder may accept the Offer.  In no event shall any Stockholder offer or agree to sell all, but not less than all, of the Shares to anyone at a price less than the Book Value (as defined in Paragraph 7 below) thereof as of the last day of the month immediately preceding the month during which such Offer occurs (the "Purchase Price").

(b)  If the Corporation shall accept the offer to purchase all of the Shares provided for in this paragraph, a Closing shall take place as provided in Paragraph 8 hereof.

3

(c)  If the Corporation fails to exercise its right to purchase the shares of the Selling Stockholder pursuant to subparagraph (a) of this Paragraph, the Selling Stockholder shall be free for a period not exceeding two (2) months to sell the Shares to the Offeror upon the terms and conditions contained in the Offer, provided that there shall be delivered to the Corporation an agreement executed by the Offeror acknowledging that the Shares are and remain subject to the terms and provisions of this Agreement and agreeing to be bound hereby.

(d)  All exercises of options hereunder are binding upon all parties with any direct or indirect interest in any Shares unless options are not exercised with respect to all of the Shares held by the Selling Stockholder within the time limits provided. If options are not exercised with respect to all of said Shares, all exercises of options shall be null and void.

5.    **EVENTS OF SEPARATION**

(a)  **Event of Separation-Defined**.  In the event that: (i) any Stockholder dies, (ii) any Stockholder is deemed to have a permanent disability (which "permanent disability" shall be deemed to exist when, by reason of a physical or mental condition or both, person is incapable of properly performing his or her usual and customary duties and responsibilities for the Corporation or otherwise for a consecutive six (6) month period, or for any nine (9) months out of a twelve (12) month period, and if requested by another Stockholder, such person or his legal representative has provided the Corporation with a written opinion from a qualified physician that such permanent disability exists), or (iii) any Stockholder shall be adjudicated a bankrupt, file a voluntary bankruptcy petition or a petition for an arrangement with creditors, make an assignment for the benefit of creditors, or seek to avail himself of any provision of law for the relief of debtors; or a receiver or trustee is appointed for his property and such appointment is not vacated or withdrawn prior to the sale of the property thereunder; or any of his Shares shall pass or devolve upon any other person in any involuntary manner, including, but not limited to, judicial order, legal process, execution or attachment (the events set forth in this subparagraph (iii) are hereinafter collectively referred to as "Bankruptcy"), then, in each of those cases, an "Event of Separation" shall be deemed to have occurred with respect to such person.  The Stockholder with respect to whom an Event of Separation shall occur (or the legal representative of his estate) or any transferee from the Stockholder and persons to whom Shares of such Stockholder may pass or upon whom they may devolve, hereinafter shall be referred to as a "Selling Stockholder."

(b)  **Death or Permanent Disability**.  In the event of a Stockholder's death or permanent disability, the Selling Stockholder shall be required to sell all of the Stockholder's

4

Shares to the Corporation and the Corporation shall be required to purchase said Shares from the Selling Stockholder. The purchase price for the Shares (the "Purchase Price"), payable at the Closing shall be equal to the Book Value (as defined in Paragraph 7 below) of the Shares plus any accumulated operating profits owing to such Selling Stockholder pursuant to Paragraph 2(c) hereof.

(c) _Other Events of Separation_. In the event that a Stockholder desires to voluntarily terminate his relationship with the Corporation or is the subject of a Bankruptcy, then the Corporation shall have option to buy all of such Shares from the Selling Stockholder and said event shall be treated as if the Selling Stockholder had tendered a Notice of Intention pursuant to Paragraph 4 of this Agreement for the purpose of determining the Purchase Price and how the option to purchase shall devolve upon and shall be exercisable by the Corporation.

6. _Take-Along Right_.

(a) _Take-Along_. If a Selling Stockholder proposes to sell Shares to a third party, each of the other Stockholders (each, a "Potential Take-Along Participant") shall have the right to require the third party purchase from him the number of Shares derived by multiplying the total number of Shares to be purchased by the third party by a fraction, the numerator of which is the number of Shares owned by such Potential Take-Along Participant and the denominator of which is the total number of Shares owned by all Potential Take-Along Participants electing to participate and the Selling Stockholder. The number of Shares to be sold to a third party by the Selling Stockholder shall be reduced by the number of Shares subject to the Take-Along Right and included in such sale by the Potential Take-Along Participants; unless the third party agrees to purchase all the Shares offered by the Selling Stockholder and the Potential Take-Along Participants.

(b) _Take-Along Notice_. The Take-Along Right may be exercised by a Potential Take-Along Participant by delivery of a notice (a "Take-Along Notice") to the Selling Stockholder and the Corporation (which in turn will promptly notify the Potential Take-Along Participants) within ten days following receipt by the Corporation of a Notice of Intention. The Take-Along Notice shall state the maximum number of Shares that such Potential Take-Along Participant wishes to include in such sale to the third party purchaser. Any Shares purchased from a Potential Take-Along Participant pursuant to this Paragraph 6 shall be at a price and upon terms no less favorable to such Potential Take-Along Participant than that contained in the Notice of Intention, and shall be purchased only by the third party specified in such Notice of Intention. After expiration of the applicable periods referred to in Paragraph 4, the Selling Stockholder, together with any electing Potential Take-Along Participant, shall have the right for thirty days to transfer the Shares upon the terms and conditions

5

contained in the Notice of Intention, provided that, in each case, that such transfer shall be made to the third party specified in the Notice of Intention on the terms set forth therein.

(c) <u>Notification of Take-Along Rights</u>. The Corporation hereby acknowledges its obligations to deliver a copy of the Notice of Intention and the Take-Along Notice to each of the Potential Take-Along Participants promptly upon its receipt thereof, unless such Notice of Intention or Take-Along Notice, as the case may be, appears on its face to have been delivered directly to such Potential Take-Along Participants.

7.   <u>DEFINITION OF BOOK VALUE</u>.

(a) The "Book Value" of the shares shall be equal to the product of the net worth per share of the Corporation as computed by the Corporation's certified public accountant's in accordance with generally accepted accounting principles, applied consistently with past practice, times the number of shares to be purchased, subject to the following:

(i) Adjustments shall be made for mathematical errors, omissions and for any other allowances necessary to correctly reflect assets and liabilities in accordance with generally accepted principles of accounting.

(ii) Trade fixtures, equipment, furniture and furnishings shall be valued at cost less straight-line depreciation.

(iii) All merchandise, inventory, works in process and raw materials shall be valued at cost or fair market value, whichever is lower.

(iv) Accounts receivable shall be valued at the face amount thereof, less customary trade discounts, and less a reserve of bad debts, determined in accordance with the Corporation's customary practice.

(v) Life insurance policies owned by the Corporation shall be valued at the cash surrender value thereof, and in the event that the valuation relates to the shares of any Stockholder upon his death, then only the cash surrender value of such life insurance policy on the day immediately preceding the date of death shall be included in the valuation of Book Value and not the proceeds thereof.

(vi) Corporate income taxes and other taxes allocable to the period up to the date for which Book Value is to be determined, if any, shall, if not otherwise provided for on the books of the Corporation, be estimated in accordance with generally accepted accounting principles consistently applied.

6

(vii) No consideration shall be given to any tax carry-forward which may result in a refund for any period after the date for which Net Book Value is to be determined.

(viii) All assets and liabilities of the Corporation shall be valued according to their current fair market value.

The aforesaid determination of Book Value shall be binding upon and conclusive against all persons, firms and corporations (including the Stockholders, the Selling Stockholder, the Corporation and their representatives) subject to this Agreement, unless written notice of any objection is delivered to the Corporation within ten (10) days after receipt by such persons of the accountants' written determination in which event such determination shall be subject to arbitration pursuant to this Agreement.

(b) Promptly after the occurrence of an Event of Separation or the acceptance by the Corporation or the other Stockholders of an offer to purchase the Shares pursuant to Paragraph 4, the Corporation shall cause the Corporation's accountants to compute the Book Value of the Selling Stockholder's Shares in accordance herewith and to deliver written copies of such computation to the Corporation, the remaining Stockholder and the Selling Stockholder as promptly as possible.

8.   PAYMENT AND CLOSING.   With respect to the sale and purchase of Shares hereunder pursuant to Paragraph 4, 5 or 6 hereof, a closing (the "Closing") will take place at the principal office of the Corporation, its attorneys or a lending institution, on the business day and at the time set forth by the purchaser in a notice delivered at least ten (10) days prior to the Closing. In no event shall the Closing occur more than thirty (30) days after the receipt of the accountant's report provided for in paragraph 7(b), except that if the Event of Separation is the death of a Stockholder, the Closing may occur up to the later of ninety (90) days after the receipt of the accountant's report or fifteen (15) days after a personal representative has been appointed and qualified.   If the Corporation is not permitted to purchase or redeem any Shares that it is entitled to purchase or redeem pursuant to this Agreement, by either state corporation law or any debt instrument, Pearlman shall have the personal right to purchase such Shares on the same terms and conditions as the Corporation.

9.   LIFE INSURANCE

(a)  During the term of this Agreement, the Corporation shall have the right to maintain life insurance on the life of each Stockholder with a death benefit payable to the Corporation in such amount as the Corporation shall determine.

7

(b)  If any Stockholder shall cease to be a Stockholder for any reason other than his death, the Corporation shall, upon receipt from such Stockholder of an amount equal to the cash value of the life insurance maintained on his life, less any loan balance plus an adjustment to reflect any pre-paid premiums, transfer all of its right, title and interest in such policy to such Stockholder.

## 10.  RESTRICTIVE COVENANTS

(a)  Upon the occurrence of an Event of Separation or upon a sale of Shares subsequent to delivery of a Notice of Intention pursuant to Paragraph 4 above, each of the Stockholders hereby agrees that he will not, without the written consent of the Corporation, directly or indirectly, solicit or accept, on behalf of another record label or distributor, the services of any recording artist, composer or other artist under contract with the Corporation at the time of the Event of Separation (including any services that may be provided by the Stockholder), and will not, directly or indirectly, assist or be employed by any other party in soliciting or accepting the services of any recording artist, composer or other artist under contract with the Corporation at the time of the Event of Separation.

(b)  Each Stockholder hereby acknowledges that should he breach the restrictive covenant contained herein, the Corporation's remedy at law will be inadequate.  Therefore, in addition to any remedy otherwise available to the Corporation, and notwithstanding the provisions herein for arbitration, each Stockholder agrees that the Corporation shall be entitled to an injunction restraining it from any such violation.  Moreover, if it shall be determined by any arbitration panel or court, that any covenant herein is not enforceable due to its geographic area or duration, then it is the intention of the parties that such covenant shall be enforceable to the greatest extent possible, and will be deemed amended so as to reduce the geographic area or duration, as the case may be, to the extent necessary to secure enforceability.

## 11.  INJUNCTIVE RELIEF

Due to the fact that the Shares cannot be readily purchased or sold in the open market, and for other reasons, the parties hereto recognize and acknowledge that irreparable damage will result in the event this Agreement shall not be specifically enforced.  If any dispute arises concerning disposition of any Shares hereunder, the parties hereto agree that the other parties hereto shall be entitled, without showing any actual damage, to a temporary or permanent injunction restraining such disposition pending determination of such controversy, and that no bond or other security may be required in connection therewith.  If any dispute arises concerning the rights or obligations of any party hereto to purchase or sell any of the Shares, such right or

8

obligation shall be enforceable by a decree of specific performance. Such remedies shall, however, not be exclusive and shall be in addition to any other remedies which the parties may have.

12. **DURATION**

This Agreement shall continue in full force and effect until terminated by the occurrence of any of the following events:

(i) Discontinuance of the Corporation's business or its liquidation;

(ii) A petition in bankruptcy is filed by the Corporation or an adjudication of bankruptcy is made against the Corporation;

(iii) A receiver is appointed for the Corporation and such appointment is not vacated within sixty (60) days;

(iv) An unconditional assignment is made for the benefit of creditors by the Corporation;

(v) There is only one stockholder of the Corporation except that any payout provisions, if any, would survive; or

(vi) The expiration of a ten-year period commencing of the date hereof except that this Agreement shall be automatically renewed for successive ten-year periods unless the parties hereto agree otherwise in writing.

13. **ARBITRATION**

All questions concerning this Agreement, including but not limited to, its execution, interpretation and performance shall be governed by the laws of the State of Florida without regard to any law which would result in the selection or application of the law of any other jurisdiction. Any dispute or controversy arising out of or in connection with this Agreement shall be submitted to arbitration before a panel of three arbitrators in Orlando, Florida in accordance with the Commercial Arbitration Rules then obtaining of the American Arbitration Association provided, however, that at least one of such arbitrators shall be a practicing attorney licensed in the State of Florida and at least one of such arbitrators shall be a certified public accountant licensed in the State of Florida. The arbitrators' powers shall include the power to award specific performance, injunctive relief and reasonable attorneys' fees and expenses to any party in any such arbitration. The arbitrators shall not, however, have the power to change, modify, alter, set aside or ignore any express condition, item or provision hereof, and to that extent the scope of their authority

9

is limited.  The arbitration award shall be final and binding upon the parties and judgment may be entered thereon in the Supreme Court of the State of Florida or in any other court of competent jurisdiction.  This agreement to arbitrate all disputes and controversies shall not prevent either party from seeking judicial injunctive relief in aid of any such arbitration.  The service of any notice, process, motion or other document in connection with any dispute may be effected in the manner in which notices are to be given to a party pursuant to Paragraph 15 below.

14.  COMPLETE AGREEMENT; GOVERNING LAW;
     ORAL MODIFICATION

     This Agreement contains the full and complete understanding and agreement of the parties with respect to the subject matter hereof and supersedes all prior agreements, either oral or written, between the parties with respect to the subject matter hereof.

15.  NOTICES

     All notices, requests, demands or other communication required or permitted to be given hereunder shall be in writing, and shall be deemed duly given, upon receipt, if personally delivered or, three days after deposit in a facility of the United States mails, if mailed by registered or certified mail, return receipt requested, to the address of the intended recipient set forth above, or to such other addresses as may be designated by notice given to the other Stockholder in accordance with this Paragraph, with, in the case of the Corporation, a copy to:

          William B. Pringle, III, Esquire
          Post Office Box 691222
          Orlando, Florida  32869-1222

16.  SEVERABILITY

     If any provision of this Agreement is determined to be legally invalid, inoperative or unenforceable, only that particular provision shall be affected, and the determination shall have no effect whatsoever on any other provision of this Agreement, and all other provisions shall remain in full force and effect and fully enforceable.

17.  NON WAIVER

     No delay or failure to exercise any remedy or right occurring upon any default shall be construed as a waiver of such remedy or right or acquiescence in such default, nor shall it affect any subsequent default of the same or a different nature. All rights and remedies herein conferred shall be in addition to

10

and not exclusive of any and all other rights or remedies now or hereafter existing at law or in equity.

18.   **SUCCESSORS AND ASSIGNS**

This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and permitted assigns.  If ownership of the shares of any of the Stockholders shall be transferred to a third party in accordance with the terms hereof, the Corporation shall not be obligated to recognize such individual as a stockholder unless and until such individual shall have executed and delivered an agreement wherein such individual agrees to be bound by the terms hereof.  Further, upon delivery of such an instrument of assumption, such individual shall be entitled to all of the benefits hereof.

19.   **HEADINGS**

The heading and captions contained in this Agreement are for the convenience of reference only and shall have no bearing on the interpretation or enforcement of this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and year first written above.

'N SYNC, INC.

By: _____
LOUIS J. PEARLMAN        President

_____
LOUIS J. PEARLMAN

_____
CHRISTOPHER ALAN KIRKPATRICK

_____
JUSTIN RANDALL TIMBERLAKE

11

JOSHUA SCOTT CHASEZ

JOSEPH ANTHONY FATONE, JR.

JAMES LANCE BASS

12

## PARENTAL\GUARDIAN CONSENT

I, _____ LYNN HARLESS _____, hereby represent and acknowledge that I am the natural parent and/or legal guardian of the minor __JUSTIN RANDALL TIMBERLAKE__ and that I have read and am familiar with the Shareholder's Agreement attached hereto.

I hereby guarantee my child's performance of his obligations under said Recording Agreement and agree to be secondarily liable in the event he should breach or improperly terminate same.

_____
Parent/Guardian Signature

_____
Parent/Guardian's Name Printed

Dated: ___10/2/95___

13

## PARENTAL\GUARDIAN CONSENT

I, _____DIANE P. BASS_____ , hereby represent and acknowledge that I am the natural parent and/or legal guardian of the minor ___JAMES LANCE BASS___ and that I have read and am familiar with the Shareholder's Agreement attached hereto.

I hereby guarantee my child's performance of his obligations under said Recording Agreement and agree to be secondarily liable in the event he should breach or improperly terminate same.


_Diane P. Bass_
**Parent/Guardian Signature**

_Diane P. Bass_
**Parent/Guardian's Name Printed**

Dated: __10-6-95__


14



 **TRANS CONTINENTAL RECORDS, INC.**
7380 Sand Lake Road • Suite 350 • Orlando, Florida 32819
Telephone: (407) 345-0004 • Telefax: (407) 345-0688

## AGREEMENT

AGREEMENT made as of the 15th day of January, 1996 by and between 'N SYNC PRODUCTIONS, INC., a Delaware corporation ("NSP") and TRANSCONTINENTAL RECORDS, INC., a Florida corporation ("Transcontinental")

WHEREAS, NSP has been formed for the purpose of operating the touring activities of the musical group known as "N SYNC" (the "Group"); and

WHEREAS, NSP has requested that Transcontinental provide financing for NSP business activities and general consulting services in connection therewith; and

WHEREAS, Transcontinental has a degree of expertise in the areas of business engaged in by NSP; and

WHEREAS, Transcontinental would like to provide funding and general consulting services to NSP under the terms and conditions provided herein.

NOW, THEREFORE, the parties hereto hereby agree as follows:

1. <u>Term</u>.

The term of this Agreement (the "Term") will commence on the date hereof and shall continue until terminated by the mutual agreement of both parties.

2. <u>Funding</u>.

(a) <u>Fund Availability</u>. During the Term, Transcontinental will provide funding for NSP subject to the terms and conditions hereinafter provided. Transcontinental shall have the complete discretion to determine the amount of funding that Transcontinental will provide to NSP for each project and for any other capital requirements of NSP. Transcontinental hereby agrees to provide funding to NSP to cover the cost of protecting, in the United States, the name 'N SYNC including, but not limited to, advancing the costs of trademark or other counsel and all filing fees in connection with filings made with the US Patent and Trademark Office; provided, that it shall be solely within Transcontinental's discretion to decide whether to fund costs associated with protecting any trademarks, tradenames or logos used by NSP or the Group in all territories outside the United States. The outstanding funding balance will be repayable by NSP to Transcontinental before distribution of any profits to the stockholder's of NSP. Without limiting the generality of the foregoing, all outstanding amounts of funding shall become due and payable upon the earlier of (i) Transcontinental's demand for repayment and (ii) the end of the Term.

1



(b) Security for Repayment. As security for the repayment of any funding provided by Transcontinental, Transcontinental is hereby granted a first priority security interest in all assets of NSP including, but not limited to, all copyrights, receivables, contract rights, inventory and the proceeds from each of the foregoing. NSP will execute and deliver to Transcontinental such documents (including Forms UCC-1 and mortgages of copyright and trademark) as Transcontinental may reasonably request to evidence and perfect such security interest. NSP hereby appoints Transcontinental as its true and lawful attorney-in-fact with full power of attorney to execute such documents and to take such action as Transcontinental may determine to be necessary or desirable to evidence and/or perfect the security interests herein granted. The foregoing power of attorney, being coupled with an interest, shall be irrevocable at any time when there are amounts owed by NSP to Transcontinental.

3.     Consulting Services.

(a) Services. During the Term, Transcontinental shall provide NSP with its services as a consultant on such matters relating to the music business, particularly touring , as NSP shall reasonably require. Transcontinental may provide its services hereunder in person or by telephone, as it shall deem appropriate and shall be required to devote only so much of its time and personnel as it determines necessary to perform its services hereunder. Transcontinental shall have no authority to bind NSP in any manner unless previously authorized in writing.

(b) Consulting Fee. In consideration for Transcontinental's consulting services hereunder, NSP shall pay Transcontinental an amount (the "Fee") equal to twenty-five percent (25%) of any and all "Net Revenues" earned by NSP during the Term. For the purposes of this Agreement "Net Revenues" shall mean gross revenues earned by NSP from any and all sources during the Term minus only (i) third party royalty obligations resulting from the receipt (or crediting) of such gross revenues, (ii) payments to non-affiliated trade creditors, (iii) certain overhead expenses including rent, postage, telephone, fixed salaries and office supplies and (iv) repayment of funding provided by Transcontinental under Paragraph 1 above, or otherwise. The Fee shall be payable annually, in arrears, within ninety (90) days after the end of each calendar year. Each payment of the Fee shall be accompanied by a detailed accounting statement setting forth the amounts of gross revenues received by NSP during the previous year, the source of those revenues and itemizing each deduction made therefrom in determining the Fee.

(c) Expenses. NSP shall promptly reimburse Transcontinental for all out-of-pocket expenses incurred in the course of providing consulting services hereunder. Reimbursement shall be made against Transcontinental's presentation of appropriate receipts in such form as NSP may reasonably require to comply with its normal accounting policies.

(d) Review of Books and Records. Transcontinental (and its representatives) shall have the right to review the books and records of NSP (including the right to make copies thereof and take extracts therefrom) for the purpose of confirming the amount of the Fee payable under this Agreement. Any such examination shall take place at the main offices of NSP during normal

2



business hours and upon not less than thirty (30) days' advance notice.

   (e) Independent Contractor; Non-Exclusive.  NSP acknowledges that

Transcontinental's position hereunder is that of independent contractor.  Transcontinental's consulting services are not exclusive to NSP and Transcontinental may provide similar or other services to (or have investments in) other persons or entities during the Term, some of whom may be in direct competition with NSP.

4.   Miscellaneous.

   (a) Representations and Warranties.  Each party hereto represents and warrant to the other that it has the full right, power and authority to enter into this Agreement, that the execution, delivery and performance of this Agreement have been duly authorized by all necessary corporate action and that this Agreement constitutes the valid and binding agreement of such party, enforceable against such party in accordance with its terms.  Each party will indemnify and hold the other harmless from and against all losses, claims, damages and expenses (including reasonable attorneys' fees and disbursements) arising out of or relating to any breach or alleged breach of the foregoing representations and warranties.

   (b) Binding Agreement; Assignment.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  NSP may not assign this Agreement without the prior written consent of Transcontinental except to another entity controlling the touring activities of the Group.  Transcontinental may assign this Agreement to any affiliated entity or to any entity acquiring its entire business.

   (c) Amendment and Waiver.  Any amendment to this Agreement must be in writing signed by both parties hereto.  A waiver by either party of any term or condition of this Agreement in any instance shall not be deemed or construed as a waiver of such term or condition for the future, or of any subsequent breach thereof.

   (d) Breach.  Other than in respect of repayment obligations under Paragraph 1 above, no breach of this Agreement by either party shall be deemed material, unless the non-breaching party shall have given the breaching party notice of such breach and the breaching party shall fail to cure such breach within thirty (30) days after its receipt of such notice.

   (e) Captions.  Paragraph headings used in this Agreement are for ease of reference only and shall not be given any effect in the interpretation of the provisions of this Agreement.



(f)  Choice of Law.  This Agreement shall be governed by and construed under the laws of the State of Florida, applicable to contracts made and to be wholly performed in the State of Florida.

(g)  Complete Agreement.  This Agreement constitutes the complete and exclusive agreement of Transcontinental and NSP with respect to the subject matter hereof and supercedes all prior negotiations and understandings, whether written or oral, express or implied.

IN WITNESS WHEREOF, the parties have duly executed this Agreement as of the date first above written.

TRANSCONTINENTAL RECORDS, INC.

By: _____

'N SYNC PRODUCTIONS, INC.

By: _____

4



# EXCLUSIVE MANAGEMENT AGREEMENT

## EXCLUSIVE MANAGEMENT AGREEMENT

AGREEMENT made as of the 28 day of April , 1996, by and between TRANS CONTINENTAL ENTERTAINMENT, INC., with a place of business at 7380 Sand Lake Road, Suite 350, Orlando, Florida 32819 (hereinafter "MANAGER") and CHRISTOPHER ALAN KIRKPATRICK, residing at 1610 Overdale Street, Orlando, Florida 32829, and JUSTIN RANDALL TIMBERLAKE, a minor, residing at 303 Fawn Lake Drive, Millington, Tennessee 38053, and JOSHUA SCOTT CHASEZ, residing at 6511 Lunestake Drive South, Bowie, Maryland 20720, and JOSEPH ANTHONY FATONE, JR., residing at 2746 Woodruff Drive, Orlando, Florida 32037, and JAMES LANCE BASS, a minor, residing at 111 Newport Circle, Clinton, Mississippi 39056, professionally known as 'N SYNC, (each being hereinafter individually and collectively referred to as "'N SYNC").

WHEREAS, 'N SYNC is desirous of engaging the services of Manager to act as 'N SYNC's professional advisor and counselor and to attend to certain business details in connection with 'N SYNC's professional career in the entertainment industry; and

WHEREAS, Manager is willing to become associated with 'N SYNC and act as the manager for 'N SYNC upon the terms and conditions hereinafter set forth;

NOW, THEREFORE, in consideration of the foregoing and the mutual promises and covenants hereinafter contained, it is agreed as follows:

1. 'N SYNC hereby engages Manager as 'N SYNC's sole and exclusive personal manager for 'N SYNC throughout the world during the term of this Agreement, and Manager hereby accepts such engagement subject to the terms and conditions set forth herein. The term of this Agreement shall commence as of the date hereof and shall continue for an Initial Period of two (2) years. 'N SYNC grants Manager four (4) separate and irrevocable options each to extend the term of this Agreement for a period of one (1) year ("Option Periods"), said Option Periods to run consecutively beginning at the expiration of the Initial Period hereof upon the same terms and conditions as set forth herein. Each option shall be deemed to be automatically exercised unless Manager shall give 'N SYNC written notice to the contrary at least ten (10) days prior to the commencement of the immediately following Option Period. The Initial Period and each Option Period for which Manager has exercised its option are sometimes referred to together herein as the "Term".

2. Manager agrees, subject to 'N SYNC's availability and cooperation, to perform the following personal management services, at the request of 'N SYNC, in connection with 'N SYNC's activities in the entertainment industry;

(a) advise and counsel in the selection of any literary, artistic and musical material;

(b) advise and counsel in any and all matters pertaining to any public relations and advertising for 'N SYNC;

(c) advise and counsel with relation to the adoption of the proper format for presentation of 'N SYNC's talents and in the determination of proper style, mood and setting therefor;

(d) advise, counsel and direct in the selection of any artistic talent to work with 'N SYNC;

(e) advise and counsel with regard to general practices in the entertainment and amusement industries, and with respect to compensation and terms and contract in such industries;

(f) advise and counsel concerning the selection of theatrical agencies and persons, firms and corporations to procure employment and engagements for 'N SYNC;

(g) negotiate any and all agreement(s) pertaining to 'N SYNC's services, but only to the extent permitted by law ('N SYNC agreeing in any event to obtain Manager's prior written approval of each of same); and

(h) use Manager's reasonable efforts to endeavor to advance promising aspects of 'N SYNC's career, in good faith and in accordance with the business policies and practices of Manager in the entertainment industry generally.

3. 'N SYNC agrees that Manager is not expected to, nor shall Manager procure or secure employment for 'N SYNC. Manager is not to perform any services which, standing alone, shall constitute Manager a talent agent, and Manager has not agreed or promised to perform such services except to the extent permitted by any applicable laws. 'N SYNC agrees to utilize proper talent or other employment agencies mutually approved by Manager and 'N SYNC to obtain engagements and employment for 'N SYNC. 'N SYNC further agrees to submit all offers of employment (and all leads or other communications related thereto) and all contracts of any kind to Manager for Manager's advice and counsel and, if and to the extent permitted by applicable laws, approval.

4. (a) If 'N SYNC or 'N SYNC's representative is, in the sole discretion of Manager, not reasonably available to execute any employment agreement (or related or similar written instrument) nor requiring 'N SYNC's exclusive services for in excess of seven (7) full days, Manager may, at Manager's sole election, execute such agreement (or instruments) as 'N SYNC's attorney-in-fact pursuant to the provisions of subparagraph 4(c) hereof. Manager shall also be authorized in Manager's discretion and on 'N SYNC's behalf, to

approve and permit any and all publicity and advertising for 'N SYNC and to approve and permit the use of 'N SYNC's name, photograph, likeness caricatures, voice and/or sound effects for the purposes of advertising and publicity and/or in the promotion of any and all products and services, provided that manager shall obtain 'N SYNC's approval (which 'N SYNC shall not have the right to unreasonably withhold) as to the photographs, likenesses and caricatures to be utilized by Manager for such advertising, publicity and promotional purposes, it being agreed, however, that any inadvertent failure by Manager to utilize such elements so approved by 'N SYNC shall not constitute a breach of this Agreement.   'N SYNC shall not approve or permit any of the foregoing without Manager's approval thereof.

(b)  (i)  'N SYNC shall have the right, subject to written notice to Manager, to engage a business manager, who shall be authorized to receive and make payments on behalf of 'N SYNC, - and to collect and receive all gross compensation earned by 'N SYNC with respect to 'N SYNC's activities hereunder (a "Business Manager"). In the event 'N SYNC does engage a Business Manager, 'N SYNC shall authorize and direct that, except as otherwise provided herein, all gross compensation earned by 'N SYNC as to which Manager's right to compensation shall attach hereunder, shall be paid to and shall be collected by Business Manager.  Manager shall use reasonable efforts to provide that third party payors compensate 'N SYNC individually when possible. 'N SYNC hereby agrees that all such gross compensation received by Business Manager on 'N SYNC's behalf, which is subject to the terms hereof, shall be segregated into two (2) shares (i.e. Manager's "Commission", as hereinafter defined, and "'N SYNC's Share"). Manager's Commissions shall be received by Business Manager on Manager's behalf pending only the monthly payment thereof to Manager as hereinafter provided, and Manager's Commissions shall not at any time be commingled with any other monies being held by 'N SYNC or Business Manager.

(ii) It is agreed that Business Manager shall render written accounting statements to Manager setting forth the amount of gross compensation received directly or indirectly by 'N SYNC or on 'N SYNC's behalf, if any, or Business Manager, and at the same time remit to Manager its Commissions hereunder as reflected by such statement, as well as repay Manager for any and all monies owing to Manager. Said statements shall be rendered and said Commissions shall be remitted within a reasonable time after receipt thereof by Business Manager in connection with gross compensation subject to the terms hereof. If Business Manager is unable for any reason to comply with the above provisions of this subparagraph 4(b)(iii), Business Manager will immediately give Manager written notice by pre-paid certified mail, return receipt requested, of such inability. Business Manager shall simultaneously furnish Manager with copies of all statements rendered by third parties to 'N SYNC and/or Business Manager with respect to 'N SYNC

3

activities hereunder.   Notwithstanding the foregoing, if at any time during such monthly period, the amount of Manager's Commissions in such monthly period equals or exceeds One Thousand Five Hundred Dollars ($1,500.00), 'N SYNC or Business Manager shall promptly notify Manager to such effect, and remit such monies due to Manager simultaneously with the furnishing to Manager of the above described accounting statement. In the event that 'N SYNC recovers any gross compensation pursuant to an audit conducted by or on behalf of 'N SYNC of a third party pursuant to any agreement entered into by 'N SYNC or substantially negotiated on 'N SYNC's behalf during the Term hereof, and upon any extensions, renewals and substitutions thereof entered into or substantially negotiated on 'N SYNC's behalf during the term hereof, such gross compensation shall be commissionable by Manager at the applicable rate as if said gross compensation were received at the time it was properly due.

(c) 'N SYNC hereby retains the right to sign, on 'N SYNC's own behalf, any recording, publishing, film, television or endorsement contracts or any other agreements whose terms exceeds one (1) year. Notwithstanding the foregoing sentence, Manager and 'N SYNC mutually acknowledge the need for a limited Power of Attorney from 'N SYNC to Manager so that Manager can reasonably attend to 'N SYNC's affairs in 'N SYNC's absence, such as in those instances where Manager has insufficient time to reach 'N SYNC or 'N SYNC's representatives to secure the requisite authority to enter into such an agreement. Accordingly, in such instances (i.e., for the acceptance of engagements being offered by promoters and/or booking agents), or if a good faith, unsuccessful effort has been made by Manager, during the term of this Agreement, as 'N SYNC appoints Manager, during the term of this Agreement, as 'N SYNC's true and lawful attorney-in-fact to sign all necessary documents including, but not limited to, bills of exchange, checks, notes or other negotiable instruments. For this provision to apply, Manager must obtain the prior written consent from 'N SYNC, or in the case 'N SYNC is a minor from 'N SYNC's guardian, prior to exercising this power of attorney. The foregoing appointment is to be deemed a power coupled with an interest, and is, therefore, irrevocable. Manager's exercise of this limited Power of Attorney shall be limited to matters reasonably related to 'N SYNC's career in the entertainment field. Manager hereby agrees to indemnify 'N SYNC for all losses and other damages, including court costs and reasonable attorney's fees, occasioned by Manager's exercise of the limited Power of Attorney in a manner that is inconsistent with the terms contained herein.

(d) In the event any gross compensation (as hereinafter defined) which should have been paid to Manager pursuant to the terms of this Agreement is nonetheless received at any time by 'N SYNC or by any other person, firm or corporation or other entity(ies) of any kind or nature on 'N SYNC's behalf, including, without limitation, any agent and/or business manager, same shall

4

be deemed to be held in trust for Manager, and 'N SYNC shall immediately require the source of such gross compensation. to thereafter conform to the provisions of this Paragraph 4 and shall, within forty-eight (48) hours of receipt of such gross compensation, remit or cause the remittance of all such gross compensation to Manager from the first monies so received and prior to the payment of any other monies, and a photocopy of this Agreement shall (and hereby does) serve as an irrevocable letter of direction, authorizing and directing any and all other persons, firms and corporations or other entity(ies) to at all times so remit such gross compensation as provided above.

(e) (i) 'N SYNC hereby warrants and agrees that any and all agreements entered into by, for or concerning 'N SYNC during the Term hereof (including any extensions and renewals thereof) shall provide for payment in accordance with the provisions of this Paragraph 4, and that 'N SYNC shall promptly execute and deliver to each other party to any such agreements already entered into an irrevocable letter of direction (in form acceptable to such party) effectuating the provisions of this Paragraph 4, and 'N SYNC further warrants and agrees that in the event any existing agreement is hereinafter amended, 'N SYNC shall cause such amendment, to include a provision for payment in the manner hereinabove set forth.

(ii) Until such time as 'N SYNC engages a Business Manager as provided for in subparagraph 4(b)(ii) hereof, Manager agrees to use its good faith endeavors to render accounting statements to 'N SYNC at 'N SYNC's written request within a reasonable time after the end of each calendar month during the Term of this Agreement, setting forth gross income and costs for the prior month and the year to date. Each statement shall be accompanied by Manager's check payable to 'N SYNC for the amount of proceeds (if any) due to 'N SYNC. In addition, Manager shall simultaneously furnish 'N SYNC at 'N SYNC's written request with copies of all statements rendered by third parties to 'N SYNC and/or Manager with respect to 'N SYNC's activities hereunder. Manager agrees to keep a comprehensive set of books and records of accounting for all transactions relative to Manager's causing monies to be paid to or on behalf of 'N SYNC, and such accounts shall be open to inspection by 'N SYNC or 'N SYNC's nominee at all reasonable times provided 'N SYNC sends Manager ten (10) days prior written notice. In addition 'N SYNC or 'N SYNC's representatives shall have the right, at 'N SYNC's expense, to conduct an audit of Manager's records to determine the accuracy of such payments.

(f) 'N SYNC acknowledges that Manager is not required to make any loans or advances to 'N SYNC, but in the event Manager is hereby irrevocably authorized to deduct the amount of such loans or advances from any sums which Manager may receive for 'N SYNC's account.



5

5.    'N SYNC understands that Manager may also represent other persons and performers and that Manager's services hereunder are not exclusive. 'N SYNC agrees that Manager shall not be required to devote Manager's entire time and attention to fulfilling Manager's obligation under this Agreement, and that Manager shall have the right to render services to other persons, firms and corporations either in the capacity which Manager is employed hereunder or otherwise. 'N SYNC warrants that 'N SYNC will actively pursue 'N SYNC's career in the entertainment industry and will give due consideration to all advice and counsel preferred by Manager hereunder. 'N SYNC agrees at all times to be devoted to 'N SYNC's career and to do all things reasonably necessary to promote same.

6.    (a)   In full compensation for Manager's services hereunder, 'N SYNC shall pay to Manager, as and when received by 'N SYNC, or by Manager as provided herein, and prior to payment of any other party, twenty-five (25%) percent of the "gross compensation" received in connection with recordings generated under the Exclusive Artist Recording Agreement dated _____, 1996, and thirty (30%) percent of the "gross compensation" received in connection with merchandise and/or performances ("Commission") of 'N SYNC, as hereinafter defined, received at any time on account of any and all activities in the entertainment and publishing industries except as specifically excluded from this Agreement. "Gross compensation", as used herein, shall mean the gross sums of money or other consideration (including, but not limited, to, fees, salaries, earnings, royalties, residuals, advances, report and/or union fees, bonuses, proceeds of sales, leases or licenses, gifts, shares of stock, partnership interests and amounts paid for packaged television, motion pictures and radio programs) directly or indirectly earned or received by 'N SYNC or 'N SYNC's heirs, successors and assigns, or earned, received or expended by anyone on 'N SYNC's behalf, from any professional activities of 'N SYNC (and/or derived from the use of 'N SYNC's experiences or talents and/or the results or proceeds thereof), whether as an actor, writer, composer, author, lyricist, singer, musician, performer, artist, designer, cameraman, technician, director, producer, supervisor, executive, consultant or as owner in whole or in part of any properties, or as proprietary interest in a production, publishing or other firm or entity of any kind, and whether for the rendition of the 'N SYNC's services or from the sale or other disposition of literary, dramatic or musical property or package radio or television program, or any rights therein or thereto, or any use of 'N SYNC's name(s), likeness or talents for advertising purposes or otherwise, without any exclusion or deduction whatsoever, including all sums earned by 'N SYNC during the Term of this Agreement, and thereafter, under (i) any employment or contract now in existence or entered into or negotiated for during the Term hereof, (ii) any extension, modification, addition of renewal of such contract or employment, regardless of when entered into, (iii) any substitutes, directly or indirectly, for such contract or employment, including, without limiting the foregoing,

6

* ie. Commission is based on net to 'N Sync and not sales price of any goods or records sold. (If price to public is sales p then Manager's Commission refers only to amount paid to 'N Sync from record distributor or merchandizer/manufacturer.

a contract or employment with an employer or contracting party entered into within six (6) months of the termination of a previous contract or employment if such previous contract or employment is commissionable hereunder, and (iv) any and all judgments, awards, settlements, payments, damages and proceeds (whenever received) relating to any suits, claims, actions, proceedings or arbitration proceedings arising out of any alleged breach or non-performance by others of any portion of any contracts, engagements, commitments or other agreements refereed to in this Paragraph 6, all of which regardless of when entered into, when performed and when effective. Any Commissions or other sums due Manager resulting from any and all such judgments, awards, settlements, payments, damages and/or proceeds relating to any such suits, claims, actions, proceedings or arbitration proceedings shall be computed after first deducting counsel fees and disbursements, and any counsel fees and disbursements therefrom shall be paid by 'N SYNC. Notwithstanding anything to the contrary contained in this Agreement, as to any motion picture, phonograph record, film, tape, wire, transcription, recording or other reproduction of any of 'N SYNC's activities in the entertainment industries or resulting therefrom which is created in whole or in part during the Term hereof (or thereafter pursuant to an engagement, contract or agreement subject to Commission hereunder), expiration of the Term hereof (or thereafter pursuant to an engagement, contract or agreement subject to Commission hereunder), expiration of the Term of this Agreement shall not affect Manager's right to receive Manager's Commission as provided herein and Manager shall continue to be entitled to such Commission in perpetuity with respect to any gross compensation accruing to or received by 'N SYNC after the expiration or termination of the Term of this Agreement on account of any activities and interests connected to the entertainment industry created by 'N SYNC and initially exploited during Term hereof. Manager's commissions shall, at Manager's option hereunder, apply to any monies paid to 'N SYNC by any employer of 'N SYNC as travel or living expenses in connection with any engagements, employment or agreement performed, secured or entered into by 'N SYNC. Notwithstanding any other provisions of this subparagraph 6(a), Manager's Commission shall not apply to any monies paid to 'N SYNC for (A) recording costs (excluding advances paid directly to 'N SYNC, (B) video production costs, (C) recoupable tour support or (D) tour production (i.e., "sound and lights") costs. Notwithstanding the foregoing, Commissions hereunder shall not apply to union "scale" income received by 'N SYNC in connection with services as a non-featured side musician appearing on recordings or personal appearances of other (featured) artists unless 'N SYNC served in royalty-earning and/or proprietary, controlling, ownership or partnership capacity in connection with such services, appearance of recording.

7.   All expenses, other than normal minimum office overhead expenses, incurred by Manager on behalf of 'N SYNC (including, without limitation, long distance telephone calls, messenger fees,

transportation and expenses while travelling, and promotion and publicity expenses) shall be promptly paid or reimbursed to Manager by 'N SYNC. Unless made reasonably necessary due to circumstances substantially outside of Manager's control, Manager shall not incur (a) any single such expense in excess of Two Thousand Five Hundred (U.S. $2,500) United States Dollars or (b) cumulative expenses in any one (1) calendar month totalling Twenty-Five Thousand (U.S. $25,000) United States Dollars, without 'N SYNC's prior approval. Neither Manager nor any individual affiliated with Manager shall be required to travel to meet with 'N SYNC at any particular time or places, provided, however, that if Manager or any such individual employee of Manager does travel on behalf of 'N SYNC, then the cost of such travel and any and all expenses relating thereto shall be promptly paid or reimbursed by 'N SYNC. Notwithstanding anything to the contrary contained in this Paragraph 7, if the presence of Manager or any such individual is required outside METROPOLITAN ORLANDO, FLORIDA, 'N SYNC agrees that 'N SYNC will pay for the expenses incurred, such expenses to consist of first class living accommodations and requirements (including any and all tips and incidentals) and travelling expenses. All such expenses incurred on 'N SYNC's behalf are to be paid in advance from 'N SYNC's accounts and expense statements are to be turned in by Manager after each trip. In the event Manager has to entertain any individual or group of individuals anywhere in the world on 'N SYNC's behalf, and provided that such expense is related to the furtherance of 'N SYNC's career, Manager shall have the right to deduct such expenses as manager incurs from 'N SYNC's accounts. In the event the accounts Manager holds for 'N SYNC are not sufficient to repay or advance the needed money to Manager, 'N SYNC shall promptly reimburse Manager or advance such money to Manager from the accounts of 'N SYNC that Manager holds upon Manager's request to 'N SYNC for such monies. In no event, without prior written approval, shall expenses exceed five (5%) percent of "gross compensation" of 'N SYNC as defined in paragraph 6(a).

    8.    This Agreement shall not constitute a joint venture by or partnership between Manager and 'N SYNC, it being understood that Manager is acting hereunder as an independent contractor and that, subject to the prior written consent of 'N SYNC, manager may appoint or engage other persons or entities to perform any of the administrative services required hereunder, and any of the non-administrative services required hereunder pursuant to Manager's direction.

    9.    It is understood and agreed that Manager shall not be held in any way liable or responsible for any breach of contract or act or omission on the part of any person, firm or corporation not owned or controlled by Manager with whom any engagement or contract of any kind is entered into by or for 'N SYNC for any reason.

8



10. 'N SYNC acknowledges that it is difficult to determine the amount and exact nature of services Manager must render hereunder at 'N SYNC's request; and correspondingly, Manager acknowledges that it is difficult for 'N SYNC to determine the exact scope and timing of the services Manager will render to 'N SYNC hereunder, and in some cases the rate at which such services rendered will be so commissionable. Accordingly, but without limitation of the foregoing, it is agreed that a party hereto (the "First Party") shall not be deemed in breach of any of its obligations hereunder unless and until the other party (the "Second Party") shall give the First Party written notice, by pre-paid certified mail, return receipt requested, of the precise breach alleged and the First Party fails, within thirty (30) days after receipt of such notice, to cure the breach specified by the Second Party.

11. From time to time during the Term of this Agreement, Manager or other persons or entities owned and/or controlled directly or indirectly by Manager, or Manager's partners, shareholders, officers, directors and employees, whether acting alone or in association with others, may package an entertainment program in which 'N SYNC is employed as an artist, or may act as the entrepreneur or promoter of an entertainment program in which 'N SYNC is employed as an artist, or may employ 'N SYNC in connection with the production of phonograph records, or as a songwriter, composer, arranger or otherwise in connection with the creation of literary or musical works. Such activity on Manager's or of Manager's fiduciary obligations and duties to 'N SYNC, and such activity shall not in any way affect Manager's rights to Commissions hereunder in all instances except as hereinafter specifically provided. Manager shall not be entitled to Commissions from 'N SYNC in connection with any gross monies or other considerations derived by 'N SYNC from (i) any employment or agreement hereunder where 'N SYNC is employed or engaged by Manager or by any person, firm or corporation owned or controlled by Manager or by any of Manager's partners, shareholders, officers, directors or employees, in any capacity (including, without limitation, as the package agent for the entertainment program in which 'N SYNC is so employed or engaged, as 'N SYNC's music or literary publisher, or as 'N SYNC's record or promotion company) (ii) the sale, license or grant of any literary or musical rights to Manager or any person, firm or corporation owned or controlled by Manager.

12. This Agreement shall be deemed to have been made in FLORIDA and its validity, construction, performance and breach shall be governed by the laws of the State of FLORIDA applicable to agreements made and to be wholly performed therein.

13. (a) 'N SYNC hereby represents and warrants that 'N SYNC has not entered into any agreements or contracts which shall or do in any way interfere or conflict with 'N SYNC's obligations,



promises and/or warranties hereunder and that 'N SYNC is free to enter into this Agreement, and 'N SYNC agrees to indemnify and hold Manager harmless from any loss, cost or liability (including reasonable attorneys' fees) as a result of any breach by 'N SYNC of any of 'N SYNC's representations, warranties or covenants contained herein, including, without limitation, the provisions of Paragraph 9 hereof.

(b) Manager hereby represents and warrants that Manager has not entered into any agreements or contracts which shall or do in any way interfere or conflict with Manager's obligations, promises and/or warranties hereunder and that Manager is free to enter into this Agreement, and Manager agrees to indemnify and hold 'N SYNC harmless from any loss, cost or liability (including reasonable attorney's fees) as a result of any breach by Manager of any of Manager's representations, warranties or covenants contained herein.

14. The services rendered by 'N SYNC are special, unique and irreplaceable, and any breach or threatened breach by 'N SYNC of any of 'N SYNC's obligations hereunder may be enjoined temporarily or permanently without regard to and without limiting any other remedy that may be available to Manager.

15. In the event Manager (or Manager's successors and/or assigns, if any) shall assign or otherwise transfer this Agreement or any of Manager's (or their) rights hereunder or delegate any of Manager's (or their) obligations hereunder, in whole or in part, to any part(ies) at any time comprising Manager or any corporation or partnership owned by Manager (or them) or any of such parties in whole or in part, such assignment shall be (and hereby is) approved and accepted and deemed to be a novation of this Agreement, subject to PEARLMAN's and 'N SYNC'S prior written consent. 'N SYNC shall not have the right to assign any of 'N SYNC's rights or delegate any of 'N SYNC's obligations hereunder. Without in any way derogating from the preceding sentence, this Agreement shall inure to the benefit of and be binding upon each of the parties hereto and their respective successors, assigns, heirs, executors, administrators and legal and personal representatives.

16. Any notice given hereunder shall be sufficient only if mailed via certified mail, return receipt requested, postage prepaid, and if to Manager, addressed to Manager at the address hereinabove specified with a copy to WILLIAM B. PRINGLE, III, ESQUIRE, Post Office Box 691222, Orlando, Florida 32869-1222; and other address(es) of which 'N SYNC has been given notice as provided herein, and if to 'N SYNC, at 'N SYNC's above address. Any notice shall be effective as of the date three (3) days after mailing aforesaid in the continental United States except for notices of changes in address (which shall only be effective on receipt.)

17. Nothing in this Agreement shall be construed so as to require the commission of any act contrary to law. Wherever there is any conflict between the provisions of this Agreement and any present or future statute, law, ordinance or regulation the latter shall prevail, but in such event the provision(s) of this Agreement affected shall be curtailed or limited only to the minimum extent necessary to bring it within the requirements of the latter. (The parties hereto do not intend by the foregoing sentence to imply the illegality, voidness or unenforceability of any term, provision or paragraph of this Agreement).

18. This Agreement sets forth the entire agreement between the parties hereto, and replaces and supersedes all other agreements relating to the subject matter hereof. This Agreement cannot be modified, altered, terminated or otherwise changed except by an agreement in writing signed by the parties hereto. In the event that any party hereto initiates litigation to enforce this Agreement, the party prevailing to the greater extent shall be entitled to recover reasonable attorneys' fees and costs reasonably incurred in connection with such litigation. No waiver of any provision of this contract or of any default hereunder shall effect Manager's rights thereafter to enforce such provision or to exercise any right or remedy in the event of any other default, whether or not similar.

19. If necessary in Manager's good faith opinion to ensure Manager of payments for Manager's services as provided herein, 'N SYNC agrees to deliver to Manager a written assignment of so much of 'N SYNC's compensation earned as a result of 'N SYNC's professional career in the entertainment industry from any source therein, as hereinabove agreed upon to be Manager's compensation, and if not so delivered to Manager, Manager is authorized to draw an assignment to Manager for such salary, execute the same in the name of 'N SYNC and collect therefrom with the same force and effect as though signed by 'N SYNC in person, or to require any party paying such compensation directly or indirectly to 'N SYNC to pay the same over to Manager, in which event this instrument or a copy thereof shall be authority for such employer to make such deductions and payment. All the terms and conditions of this Agreement shall be irrevocable, this Agreement constituting a contract and a power of attorney and creating an agency coupled with an interest.

20. 'N SYNC hereby expressly agrees that 'N SYNC will not at any time, without Manager's express written consent, exert or permit any third party to exert any of the powers herein granted to Manager so as to create any confusion or conflict of authority in the mind of any third person. 'N SYNC understands and agrees that Manager's interest and compensation under this Agreement shall be a continuing interest and shall not be revocable in any event or for any reason whatsoever for the term of this Agreement and any

11



extension(s), renewals(s), replacement(s), or substitution(s), thereof, except only as specified in this Agreement.

21. Manager shall have the right to advertise and publicize Manager as 'N SYNC's exclusive personal manager and representative and 'N SYNC shall cooperate and assist Manager in securing written (and, if applicable, logo) credit as such wherever reasonably possible.

22. 'N SYNC acknowledges that no promises, representations or inducements have been made by Manager or on Manager's behalf, except as specifically set forth herein, and 'N SYNC further acknowledges that Manager's acceptance and execution hereof is in reliance on this fact.

23. 'N SYNC hereby represents, warrants and agrees that 'N SYNC shall cooperate fully with Manager in any and all of Manager's efforts to comply with any laws as same may apply to the manner in which Manager conducts Manager's management business generally and/or as it specifically pertains to 'N SYNC and/or the rendition of Manager's services hereunder. Manager has advised 'N SYNC and 'N SYNC hereby agrees that they have the right to obtain independent legal counsel to negotiate with WILLIAM B. PRINGLE, III, Esq. and to represent 'N SYNC regarding 'N SYNC's activities with Manager.

24. Manager shall be entitled (but in no event shall be obligated) to secure, in Managers own name or otherwise and at Manager's expense, life, accident, health and/or other insurance covering 'N SYNC, in an amount which does not exceed the sum of One Million Dollars ($1,000,000.00) per member, either independently or together with Manager or any party Manager designates being the sole beneficiary thereof and neither 'N SYNC nor 'N SYNC's estate shall have any right, title or interest in and to such insurance or any proceeds therefrom. 'N SYNC shall cooperate fully with Manager in connection with the obtaining of such insurance, if any, including, without limitation, by timely submitting to medical examinations and by completing any and all documents necessary or desirable in respect thereof.

25. 'N SYNC specifically acknowledges that this Agreement is executed as an arm's length transaction, separate and apart from any fiduciary or other duty or obligation of any kind or nature which may be owed by Manager or any affiliate of Manager to 'N SYNC, and that Manager is under no such duty or obligation to 'N SYNC in connection with this Agreement, whether or not Manager or any affiliate or Manager now has or at any time had any fiduciary or other relationship of any kind or nature with 'N SYNC. It is specifically understood and agreed that 'N SYNC is free to utilize separate, independent legal counsel to advise 'N SYNC with respect to the respective rights and obligations of each party under this Agreement, any failure by 'N SYNC to seek or obtain such legal

12

counsel to be 'N SYNC's sole choice (and contrary to Manager's wishes).

In the event TRANS CONTINENTAL ENTERTAINMENT, INC. does not obtain a record contract for 'N SYNC or, at the very least, a written bona fide offer to enter into a record contract from a major record distributor within 180 days immediately following the effective date of this Agreement, then this Agreement shall be null and void and all parties shall be absolved of and from all liability hereunder.  Manager shall also keep 'N SYNC apprised of all facts concerning the status of negotiations with prospective record distributor(s). ✶ --

IN WITNESS WHEREOF, the parties hereunder set their hands and seals on the day and year first above written.

COMPANY:

By: _____
JOHNNY WRIGHT          President

ACCEPTED TO AND AGREED:

"'N SYNC"
CHRISTOPHER ALAN KIRKPATRICK
Soc. Sec. #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

"'N SYNC"
Joseph Anthony Fatone Jr.
Soc. Sec. # 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

"'N SYNC"
JUSTIN RANDALL TIMBERLAKE
Soc. Sec. #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

"'N SYNC"
JOSHUA SCOTT CHASEZ
Soc. Sec. #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

✶ Upon ninety days (90) after signing this agreement,
'N Sync shall have the right to terminate this
agreement if 'N Sync hasn't recorded new products
and has engaged in four (4) promotional performances
arranged by Manager.

13

"'N SYNC"
JAMES LANCE BASS
Soc. Sec. #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

(doc\tc\nsync\manage.agr)

14

## PARENTAL/GUARDIAN CONSENT

_JAMES I._

    I, __DIANE T. BASS__ , hereby represent and acknowledge that I am the natural parent and/or legal guardian of the minor __JAMES LANCE BASS__ and that I have read and am familiar with the Exclusive Management Agreement attached hereto. I hereby guarantee my child's performance of his obligations under said Management Agreement and agree to be secondarily liable in the event he should breach or improperly terminate same.

 

                              Parent/Guardian Signature
                              Dated: _4/28/96_

16



## EXCLUSIVE ARTIST RECORDING AGREEMENT

AGREEMENT made this 29ᵗʰ day of _April_____, 1996, by and between TRANS CONTINENTAL RECORDS, INC. with a principal place of business at 7380 Sand Lake Road, Suite 350, Orlando, Florida 32819 (hereinafter "COMPANY") and CHRISTOPHER ALAN KIRKPATRICK, residing at 1610 Overdale Street, Orlando, Florida 32825, and JUSTIN RANDALL TIMBERLAKE, a minor, residing at 303 Fawn Lake Drive, Millington, Tennessee 38053, and JOSHUA SCOTT CHASEZ, residing at 6511 Homestake Drive South, Bowie, Maryland 20720, and JOSEPH ANTHONY FATONE, JR., residing at 2746 Woodruff Drive, Orlando, Florida 32837, and JAMES LANCE BASS, a minor, residing at 111 Newport Circle, Clinton, Mississippi 39056, (hereinafter individually and collectively referred to as "you" or "Artist."

1.  **TERM**

    1.01.  The term of this Agreement will commence on the date hereof and shall continue pursuant to the conditions herein until the later of (1) the date nine (9) months after the date of the delivery to COMPANY of all Masters required in fulfillment of your Recording Commitment herein or (2) six (6) months after COMPANY's initial U.S. retail street date for the record delivered by you in fulfillment of your Recording Commitment herein.

    1.02.  Additionally, you hereby grant COMPANY seven (7) separate options to extend the term of this Agreement for additional Contract Periods ("Option Periods") on the same terms and conditions applicable to the initial Contract Period except as otherwise provided herein.  Each option shall be exercised automatically unless written notice is sent by COMPANY prior to the expiration date of the Contract Period which is then in effect (the "current Contract Period").  If COMPANY so advises you in its exercise notice, such Period will begin on the date of such exercise notice.  Each of the Option Periods will end the later of (1) nine (9) months after the date of the Delivery to COMPANY of all Masters required in fulfillment of your Recording Commitment for each such Option Period or (2) six (6) months after Company's initial U.S. retail street date for the last record delivered by you in fulfillment of your Recording Commitment for such Period. Notwithstanding the foregoing, in no event will any Option Period end earlier than twelve (12) months after the date of the commencement of such Period.

2.  **SERVICES**

    2.01.  During the term of this Agreement you will render your services as a performing artist for the purpose of making Master Recordings for COMPANY.  (You are sometimes called "the Artist" below; all references in this Agreement to "you and the Artist" and the like, will be understood to refer to you alone).

2.02.   Artist will render services at recording sessions scheduled at times and places designated by COMPANY. COMPANY shall select in consultation with the Artist, the musical compositions, arrangements and works to be performed by Artist, Company shall also determine the number and identity of the musicians, vocalists and other performers (if any) to be recorded at such sessions.

2.03.   Upon COMPANY'S request you shall re-record any performance recorded hereunder for the purpose of obtaining a commercially satisfactory master recording.

3.   RECORDING COMMITMENT

3.01.   During the Contract Period you will perform for the recording of Master Recordings, commercially satisfactory in COMPANY'S reasonable business judgment. Such Masters shall embody the featured vocal performances of Artist. (Any Masters accepted hereunder by COMPANY that were partially or completely recorded prior to the term of this agreement shall be deemed to have been recorded during the Contract Period). Neither Multiple Record LPs nor Joint Recordings shall not be recorded as part of your Recording Commitment hereunder without your and COMPANY's prior written consent (your delivery of a Multiple LP or a Joint Recording shall be deemed your consent). Without limiting the foregoing, COMPANY shall have the right to reject any master which, in the reasonable opinion of COMPANY's legal counsel, is offensive to reasonable standards of public taste or which infringes on the rights of others.

3.02.   During each Contract Period Artist shall perform for the recording of Masters for Delivery to COMPANY those Masters (the "Recording Commitment") necessary to satisfy the following schedule:

| CONTRACT PERIOD | RECORDING COMMITMENT |
| --- | --- |
| Initial Contract Period | 1 LP |
| First Option Period | 1 LP |
| Second Option Period | 1 LP |
| Third Option Period | 1 LP |
| Fourth Option Period | 1 LP |
| Fifth Option Period | 1 LP |
| Sixth Option Period | 1 LP |
| Seventh Option Period | 1 LP |

3.03.   You shall not deviate from the performance and Delivery schedule specified in Paragraph "3.02" above without COMPANY's written consent; timely Delivery as provided therein shall be deemed a material obligation hereunder. You further agree not to commence the recording of any Master hereunder without COMPANY's prior approval. The LP's will consist entirely of Masters made in the course of the then current single or LP recording project unless agreed to by COMPANY.

2



4.   RECORDING PROCEDURE

    4.01.   You will follow the procedure set forth below in connection with Master Records made hereunder:

        (a)  Except as expressly noted otherwise in this Agreement, prior to the commencement of recording in each instance the following, in order, shall apply:

        (1)  Selection of producer.  You shall have mutual approval with respect to any producer other than a producer signed exclusively to COMPANY, provided in the event of a dispute, COMPANY's decision shall be final.

        (2)  Selection of material, including the number of compositions to be recorded shall be made by COMPANY.  COMPANY shall not be deemed to be unreasonable in rejecting any request to record an Album consisting of more than ten masters. Notwithstanding the foregoing, COMPANY shall consult with you with respect to the selection of material to be recorded hereunder.

        (3)  Specification of accompaniment, arrangement and copying services shall be made by COMPANY.

        (4)  Selection of dates of recording and studios where recording is to take place, including the cost of recording there and scheduling and booking of all studio time will be done by COMPANY.

        (b)  COMPANY shall notify the appropriate Local of the American Federation of Musicians in advance of each recording session.

        (c)  To the extent that any of the information described below is within your control, you shall timely supply COMPANY with all of the information it needs in order:  (1) to make payments due in connection with such Recordings; (2) to comply with any other obligations COMPANY may have in connection with the making of such Master Recordings; and (3) to prepare to release Phonograph Records derived from such Master Recordings.   Without limiting the generality of clause (2) of the preceding sentence, to the extent that such information is within your knowledge or control, you shall furnish COMPANY with all information it requires to comply with its obligations under its union agreements including, without limitation, the following:

        (1)  If a session is held to record new tracks intended to be mixed with existing tracks (and if such information is requested by the American Federation of Musicians), the dates and places of the prior sessions at which such existing tracks were

3

made, and the AFM Phonograph Recording Contract (Form "B") numbers covering such sessions.

(2)  Each change of title of any composition listed in an AFM Phonograph Recording Contract (Form "B").

(3)  A listing of all the musical selections contained in Recordings Delivered to COMPANY hereunder.

4.02.  No "live" Recording or Recordings not made in full compliance with the provisions of this Agreement will apply in fulfillment of your Recording Commitment, nor will COMPANY be required to make any payment in connection with any such Recording, unless COMPANY so agrees in writing or releases the recording.  No Joint Recording will apply in fulfillment of your Recording Commitment, nor will COMPANY be required to make any payments in connection with any such Joint Recording other than royalties due you hereunder, even if such Joint Recording is released by COMPANY. Notwithstanding the foregoing, COMPANY will not require you to jointly record any masters without your prior written approval. No Recordings shall be made by unauthorized dubbing of another party's masters, excluding sampled or computerized dubbing without COMPANY's express written consent.

4.03.  Nothing in this Agreement shall obligate COMPANY to continue or permit the continuation of any recording session or project, even if previously approved hereunder, if COMPANY reasonably anticipates that the Recording Costs will exceed those specified in the approved budget or that the Recordings being produced will not be commercially satisfactory.

4.04.  The Artist will not be required to perform together with any other royalty artist without the Artist's consent. COMPANY shall not be deemed to be unreasonable in rejecting any request for the Artist to record with another royalty artist.

5.   RECORDING COSTS; SPECIAL PACKAGING

5.01.  COMPANY will pay all minimum union scale payments required to be made to Artist in connection with Recordings made hereunder, all costs of instrumental, vocal and other personnel specifically approved by COMPANY for the recording of such Master Recordings, and all other amounts required to be paid by COMPANY pursuant to any applicable law or any collective bargaining agreement with any union representing persons who render services in connection with such Master Recordings.  Notwithstanding the foregoing, Artist agrees that the Advances hereunder include the prepayment of session union scale to Artist as provided in the applicable union codes, and Artist agrees to complete any documentation required by the applicable union to implement this sentence.  (Union contracts will be paid on Artist's behalf by COMPANY, which payments shall be an Advance).  In the event COMPANY

4

should be required to make any such payments directly to a union with which Artist is affiliated, COMPANY may – in its sole discretion – reduce the Advances otherwise payable directly to Artist by the exact amount of any such payment made to such union. If, after the Delivery of Masters constituting the Singles or LP in fulfillment of your Recording Commitment, there are monies remaining in the applicable Recording Budget, then COMPANY will at your prompt written request pay you minimum union scale payment otherwise waived hereunder up to an amount which, when added to all other amounts paid by COMPANY in connection with such Masters, does not exceed the applicable Recording Fund.

5.02.   Except as otherwise provided for pursuant to Sub-Paragraph "15.01(c)" below all amounts described in Paragraph "5.01" above plus all other amounts representing direct expenses paid by COMPANY, or incurred in connection with the recording of Master Recordings hereunder (including, without limitation, travel, rehearsal, and equipment rental expenses, advances to producers, mastering, re-mixing, per diems, hotel, transportation, lodging and all studio and engineering charges, in connection with COMPANY's facilities and personnel or otherwise) are herein sometimes called "Recording Costs" and shall constitute non-returnable advances. All Special Packaging Costs will constitute Advances also.   All costs incurred by COMPANY in connection with the production or exploitation of Videos made for use in promoting sales of Records made under this Agreement will constitute non-returnable Advances. Notwithstanding the foregoing, only fifty (50%) percent of such costs incurred by COMPANY in connection with the production of Videos shall be recoupable from Record royalties due you.   The costs of copper and other masters equivalent to lacquer masters will be chargeable as Recording Costs, but the costs of other metal parts, and payments to the AFM Special Payments Fund and the Music Performance Trust Fund based upon record sales (so-called "pre-record royalties"), shall not constitute Advances.   Any Recording Costs in excess of the budget initially established, and all Special Packaging Costs, will be your sole responsibility and will be paid by you promptly (or reimbursed by you if paid by COMPANY.)

5.03.   In determining the portion of the Recording Costs (other than payments to the Artist) applicable to any Joint Recording which shall be charged against your royalties, such portion shall be computed by multiplying the aggregate amount of such Recording Costs by the same fraction used in determining the royalties payable to you in respect of such Joint Recording.

6.   ADDITIONAL ADVANCES

6.01.   All monies paid to on behalf of Artist (including but not limited to advances and expenditures for tour support and promotion) during the term of this Agreement, other than royalties paid pursuant to Paragraphs "9" and "12" below, shall constitute

non-returnable Advances unless otherwise expressly agreed in writing by an authorized officer of COMPANY.

6.02.   Subject to your full and timely performance of your material obligations hereunder, COMPANY shall pay to you the following advances which shall be deemed to be non-returnable but recoupable from royalties payable to you hereunder:

A.   For Albums recorded during the Initial Option Contract Periods:

| | |
|---|---|
| Initial Period: | $10,000 |
| 1st Option: | 15,000 |
| 2nd Option: | 20,000 |
| 3rd Option: | 25,000 |
| 4th Option: | 30,000 |
| 5th Option: | 35,000 |
| 6th Option: | 40,000 |
| 7th Option: | 45,000 |

B.   Each advance above shall be paid to you one-half (1/2) upon the commencement of your recording services for the applicable Master Recording and the balance within fifteen (15) days after the completion of recording and the acceptance of the Masters by COMPANY and its distributor.

C.   Each advance designated above shall be an aggregate advance for the entire group and shall be distributed equally amongst the members of the group.

7.   RIGHTS IN RECORDING

7.01.   Each Master Recording made under this Agreement or during its term, from the Inception of Recording, will be considered a "work made for hire" for COMPANY; if any such Master Recording is determined not to be a "work made for hire" it will be deemed transferred to COMPANY by this Agreement, together with all rights in it.  All Master Recordings made under this Agreement or during its term, from the Inception of Recording, and all Matrices and Phonograph Records manufactured from them, together with the performances embodied on them, shall be the sole property of COMPANY, free from any claims by you or any other person; and COMPANY shall have the exclusive right to copyright those Master Recordings in its name as the author and owner of them and to secure any and all renewals and extensions of such copyright throughout the world.  You will execute and deliver to COMPANY such instruments of transfer and other documents regarding the rights of COMPANY in the Master Recordings subject to this Agreement as COMPANY may reasonably request to carry out the purposes of this Agreement, and COMPANY may sign such documents in your name and make appropriate disposition of them.

6

7.02.   Without limiting the generality of the foregoing, COMPANY and any person authorized by COMPANY shall have the unlimited and exclusive rights to manufacture Phonograph Records by any method nor or hereafter known, derived from the Master Recordings made under this Agreement or during its term, and to sell, transfer or otherwise deal in the same under any trademarks, tradenames and labels, or to refrain from such manufacture, sale and dealing, throughout the world.

## 8.   NAMES AND LIKENESSES; PUBLICITY

8.01.   COMPANY and any Licensee of COMPANY each shall have the right and may grant to others the right to reproduce, print, publish, or disseminate in any medium your name, the names, portraits, pictures and likenesses of the Artist in connection with Master Recordings made under this Agreement (including, without limitation, all professional, group, and other assumed or fictitious names used by them), and biographical material concerning them, as news or information, or the purposes of trade, or for advertising purposes in connection with the Masters made hereunder.  The uses authorized by the preceding sentence include, without limitation, the use of those names, portraits, pictures, and likenesses in the marketing of Phonograph Records.  During the term of this Agreement neither you nor Artist shall authorize any Party other than COMPANY to use the name or likeness of Artist (or any professional, group, or other assumed or fictitious name used by Artist), in connection with the advertising or sale of:

        (a)   Phonograph Records; or
        (b)   Blank Audio Tape

8.02.   You will cooperate with COMPANY, as it reasonably requests, in making photographs and preparing other materials for use in promoting and publicizing the Artist and the Recordings made under this Agreement.  You shall also have the right to approve any publicity and album cover photographs of you, and any biographies provided, should you fail to notify us of any disapproval within five (5) business days after your receipt of such material, your approval shall be deemed automatic.  You agree not to unreasonably withhold your approval herein.

## 9.   ROYALTIES

9.01.   In consideration of (i) the copyright ownership provided below; (ii) COMPANY's rights to use Artist's name and likeness as provided herein; and (iii) the representations and warranties contained herein, COMPANY agrees to pay you in connection with the Net Sale of Phonograph Records (other than audio-visual records) consisting entirely of Masters hereunder the following net royalty receipts computed at the applicable percentage indicated below, of the applicable Royalty Base Price with respect to the Record concerned, it being agreed that such

7

royalties will be computed and paid in accordance with Paragraph "9" & "11" and Paragraph "10" & "11" below and the other provisions set forth herein.

9.02.   COMPANY shall pay to you a royalty equivalent to fifty percent (50%) of all net royalties received by company in connection with the sales of recordings derived from the Masters hereunder.   Said royalties shall be calculated and determined in the same manner in which COMPANY's licensees and distributor account to company.

9.03.   (a)   If COMPANY licenses Videos (i.e., sight and sound records designed to reproduce the audio performances of recording artists together with a visual image) or make commercial use of such Videos embodying Artist's performances (other than as provided below), the royalty payable by COMPANY to you shall be one-half (1/2) of COMPANY's net receipts derived therefrom after deducting (i) any and all direct costs and/or third party payments in connection with the creation, manufacture, exploitation or use of said videos; (ii) any royalty paid to the producer(s) of the Masters recorded hereunder which are embodied in any such Videos; and (iii) any distribution fees that COMPANY may be required to pay.   It is specifically agreed that COMPANY shall have the right to license Videos to third parties (e.g., club services) without any payment to you as long as COMPANY does not receive any such payment.   To the extent COMPANY receives any payment for such promotional uses, COMPANY will credit your account with one-half (1/2) of the net receipts paid to COMPANY as provided in this Paragraph "9.04".

9.04.   The terms "net receipts", "net sums", or "net amount received" and similar terms in this Paragraph "9" shall mean amount received by COMPANY in connection with the subject matter thereof which are solely attributable to the Masters hereunder less any costs or expenses which COMPANY is required to pay or credit to third parties.

10.   MISCELLANEOUS ROYALTY PROVISIONS

Notwithstanding  anything  to  the  contrary  contained  in Paragraph "9" above:

10.01.    In respect of Joint Recordings, the royalty rate to be used in determining the royalties payable to you shall be computed by multiplying the royalty rate otherwise applicable thereto by a fraction, the numerator of which shall be one and the denominator of which shall be the total number of royalty artists whose performances are embodied on a Joint Recording.

10.02.    With respect to Phonograph Records embodying Master Recordings made hereunder together with other Master Recordings, the royalty rate payable to you shall be computed by multiplying

8



the royalty rate otherwise applicable by a fraction, the numerator of which is the number of sides contained thereon embodying Master Recordings made hereunder and the denominator of which is the total number of sides contained on such Record. Further, Company shall not embody more than two Masters recorded hereunder on any LP that includes masters not recorded hereunder without Artist's consent which consent shall not be unreasonably withheld.

10.03.   No royalties shall be payable to you in respect of Phonograph Records sold or distributed by COMPANY or its Licensees for promotional purposes, as cutouts after the listing of such Records has been deleted from the catalog of COMPANY or the particular Licensee, as "free", "no charge" or "bonus" Records (whether or not intended for resale), or to radio stations.   No royalties will be payable to you on "sampler" Records in tape form intended for free distribution to automobile purchasers and containing not more than two Recordings made under this Agreement.

10.04.   With respect to so-called home video devices embodying Artist's performances (e.g., video cassettes or discs intended primarily for home use), you will be entitled to a royalty computed as provided in Paragraph "9" above.

11.  ROYALTY ACCOUNTINGS

11.01.   COMPANY will compute your royalties as of each June 30th and December 31st for the prior six months, in respect of each such six-month period in which there are sales or returns of Records covered by this Agreement.   On the next September 30th or March 31st, respectively, COMPANY will send you a statement covering those royalties which are due after deducting unrecouped Advances.   COMPANY shall maintain royalty reserves against anticipated returns exchanges, refunds and credits.   Reserves will be maintained in accordance with Company's standard policy and such reserves shall be fully liquidated over four (4) consecutive semi-annual accounting periods commencing upon the rendition of the third accounting statement rendered following the statement with respect to which such reserve was originally maintained.   If COMPANY makes any overpayment to you, you will reimburse COMPANY for it; COMPANY may also deduct it from any payments due or becoming due to you. If COMPANY pays you any royalties on Records which are returned later, those royalties will be considered overpayments.

11.02.   Sale of Records for distribution outside the United States are called "foreign sales" below.   COMPANY will compute your royalties for any foreign sale in the same national currency in which COMPANY's Licensee pays COMPANY for that sale, and COMPANY will credit those royalties to your account at the same rate of exchange at which the Licensee pays COMPANY for that purpose of accounting to you, COMPANY will treat any foreign sale as a sale made during the same six (6) month period in which COMPANY receives

9

its Licensee's accounting and payment for that sale.   If any COMPANY Licensee deducts any taxes from its payments to COMPANY, COMPANY may deduct a proportionate amount of those taxes from your royalties.   If any law, any government ruling, or any other restriction affects the amount of the payments which a COMPANY Licensee can remit to COMPANY, COMPANY may deduct from your royalties an amount proportionate to the reduction in the Licensee's remittances to COMPANY.   If COMPANY cannot collect payment for a foreign sale in the United States in U.S. Dollars it will not be required to account to you for that sale.

11.03.   COMPANY will maintain books and records which report the sales of the Phonograph Records for which royalties are payable to you.   You may, at your own expense, examine those books and records, as provided in this paragraph only.   You may make those examinations only for the purpose of verifying the accuracy of the statements sent to you under Paragraph "11.01" above.   You may make such an examination for a particular statement only once, and only within one (1) year from the date said statement is rendered by COMPANY under Paragraph "11.01" above.   You may make those examinations only during COMPANY's usual business hours, and at the place where it keeps the books and records to be examined.   If you wish to make an examination you will be required to notify COMPANY at least thirty (30) days before the date when you plan to begin it.   If your examination has not been completed within one (1) month from the time you begin it, COMPANY may require you to terminate it on seven days' notice to you at any time; COMPANY will not be required or permit you to continue the examination after the end of that seven (7) day period.   You will not be entitled to examine any manufacturing records or any other records that do not specifically report sales of Phonograph Records, or gratis distributions of Phonograph Records, on which royalties are payable to you.   You may appoint a certified public accountant to make such an examination of you, but not if he or his firm has begun an examination of COMPANY's books and records for any Person except you unless the examination has been concluded.

11.04.   If a certified public accountant performs the examination for you, he will review his tentative findings with those members of the COMPANY Finance staff who COMPANY designates before he renders a report to you in order to remedy any factual errors and clarify any issues which may have resulted from misunderstanding.   Your accountant's report will be completed and a copy of it will be delivered to COMPANY within sixty (60) days from date his examination ends.

11.05.   If you have any objections to a royalty statement, you will give COMPANY specific notice of that objection and your reasons for it within one (1) year after the date when COMPANY sends you that statement under Paragraph "11.01" above.   Each royalty statement will become conclusively binding on you at the end of that twelve (12) month period, and you will no longer have

10

any right to make any other objections to it. You will not have
the right to sue COMPANY in connection with any royalty accounting,
or to sue COMPANY for royalties on Records sold during the period
a royalty accounting covers, unless you commence the suit within
that one (1) year period after a statement is rendered which is the
subject of your claim. If you commence suit on any controversy or
claim concerning royalty accountings rendered to you under this
Agreement, the scope of the proceeding will be limited to
determination of the amount of the royalties due for the accounting
periods concerned, and the court will have no authority to consider
any other issues or award any relief except recovery of any
royalties found owing. Your recovery of any such royalties will
be the sole remedy available to you or the Artist by reason of any
claim related to COMPANY's royalty accountings. Without limiting
the generality of the preceding sentence, neither you nor the
Artist will have any right to seek termination of this Agreement
or avoid the performance of your obligations under it by reason of
any such claim except if such claim is based upon fraud.

    11.06. Neither party hereto shall be deemed to be in material
breach of any of our respective obligations hereunder unless and
until the aggrieved party shall have given the defaulting party
specific written notice of the nature of such breach and the
defaulting party shall have failed to cure such breach within sixty
(60) days after receipt of such written notice. Nothing herein
contained shall constitute or be deemed or construed to constitute
a partnership or other fiduciary relationship between, or a joint
venture by, you and me.

12. <u>LICENSES FOR MUSICAL COMPOSITIONS</u>

    12.01.    (a)  (1)  You grant to us an irrevocable license,
under copyright, to reproduce each controlled composition on
Phonograph Records and distribute them in the United States and
Canada.

              (2)  For that License, COMPANY will pay
Mechanical Royalties at three-fourths (3/4) of the minimum
compulsory license rate per Composition at the time of the
commencement of the recording of the Master concerned but in no
event later than the last date for timely Delivery of such Master
for Records manufactured for distribution in the United States and
at three-fourths (3/4) of the minimum compulsory rate per
Composition for Records manufactured for distribution in Canada,
on the basis of Net Sales. The Mechanical Royalty on any Record
described in Paragraph "9.02" above or sold through a Club
Operation will be three-fourths (3/4) of the amount fixed in the
preceding sentence. If the Composition is an arranged version of
a public domain work, the Mechanical Royalty on it will be half of
the amount fixed in the first sentence. No Mechanical Royalties
will be payable for any Records described in Paragraph "10.03"
above or for any other records for which COMPANY does not receive

11

payment for sale as a full price, mid line, budget or premium record.

(b)   The total Mechanical Royalty for all Controlled Compositions, will be limited to ten (10) times the amount which would be payable on it under Paragraph "12.01 (a)(2)" if it contained only one Controlled Composition.   The total Mechanical Royalty on any Single will be limited to twice that amount.

(c)   COMPANY will compute Mechanical Royalties on Controlled Compositions as of the end of each calendar semi-annual period in which there are sales or returns of Records on which Mechanical Royalties are earned hereunder.   On the next September 30th, or March 31st, COMPANY will send a statement covering those royalties and will pay any net royalties which are due.   Mechanical Royalty reserves maintained by COMPANY against anticipated returns and credits will not be held for any unreasonable period in any case.   If COMPANY makes any overpayment of Mechanical Royalties to Artist for Controlled Compositions only, you will reimburse COMPANY for it;   COMPANY may also recoup it from any payments due or becoming due to you.   If COMPANY pays any Mechanical Royalties on Controlled Compositions on Records which are returned later, those royalties be considered overpayments.   If the total amount of the Mechanical Royalties which COMPANY pays on any Record consisting of Master Recording made under this Agreement (including Mechanical Royalties for compositions which are not Controlled Compositions) is higher than the limit fixed for that Record under Subparagraph "12.01(b)" above, that excess amount will be considered an overpayment also.

(d)   Any assignment made of the ownership on copyrights in or the rights to license or administer the use of any Controlled Compositions shall be subject to the terms set forth above and Artist will make any modifications, if necessary to conform these terms to the terms and provision of any such assignment.

12.02.   You also grant to COMPANY, for promotional purposes only, an irrevocable license under copyright to reproduce each Controlled Composition in motion pictures and other audio-visual works ("pictures") and to distribute and to perform those pictures throughout the world, and to authorize others to do so.   COMPANY will not be required to make any payment in connection with those uses unless COMPANY received any payment in connection with those pictures.

12.03.   If the copyright in any Controlled Composition is owned or controlled by anyone else, you will use your good faith efforts to cause that Person to grant COMPANY the same rights described in Paragraphs "12.01" and "12.02", above on the same terms.   If the copyright in any Controlled Composition is transferred, the transfer will be made subject to this Agreement.

12.04.   With respect to each Controlled Composition herein, you will cause the issuance of effective licenses, under copyright and otherwise,to reproduce each Controlled Composition on Phonograph Records and distribute those Records outside the United States and Canada, on terms not less favorable to COMPANY or its Licensees that the terms most favorable to Phonograph Manufacturers prevailing on a general basis in the country concerned.

13.   <u>WARRANTIES; REPRESENTATIONS; RESTRICTIONS; INDEMNITIES</u>

13.01.   You warrant and represent:

(a)   You have the right and power to enter into and fully perform this Agreement.

(b)   COMPANY shall not be required to make any payments of any nature for, or in connection with, the acquisition, exercise or exploitation of rights by COMPANY pursuant to this Agreement except as specifically provided in this Agreement.

(c)   Artist is or will become and will remain to the extent necessary to enable the performance of this Agreement, a member in good standing of all labor unions or guilds, membership in which may be lawfully required from the performance of Artist's services hereunder.

(d)   No materials, as hereinafter defined, or any use thereof, will violate any law or infringe upon or violate the rights (including copyrights and/or right of privacy) of any Person. "Materials" as used in this Paragraph, means:   (1) a Controlled Composition, (2) each name used by the Artist, individually or as a group, in connection with Recordings made hereunder, and (3) all other musical, dramatic, artistic and literary materials, ideas, and other intellectual properties, furnished or selected by you, the Artist and contained in or used in connection with any Recordings made hereunder or the packaging, sale, distribution, advertising, publicizing or other exploitation thereof.

13.02.   During the term of this Agreement, you will not enter into any Agreement which would interfere with the full and prompt performance of your obligations hereunder, and the Artist will not perform, or render any services as a performing artist, for the purpose of making Master Recordings or Phonograph Records for any Person except COMPANY.   The Artist will not perform any "restricted Composition" (defined below) for any person except COMPANY for the purpose of making Master Recordings or Phonograph Records, at any time before the later of the following dates:   (a) the date five (5) years after the Recording of the Composition for COMPANY, or (b) the date two (2) years after the expiration of the term of this Agreement.   A "restricted Composition", for the purposes of this

Paragraph, is a Composition which shall have been recorded by the Artist for a Master Recording made or delivered to COMPANY under this Agreement.   Neither you nor the Artist shall authorize or knowingly permit the Artist's performances to be recorded for any purpose without an express written Agreement prohibiting the use of such recording on Phonograph Records in violation of the foregoing restrictions.

13.03.   If you become aware of any unauthorized recording, manufacture, distribution or sale by any third party contrary to the foregoing re-recording restrictions you will notify COMPANY thereof and shall cooperate with COMPANY in the event that COMPANY commences any action or proceeding against such third party.

13.04.   The services of the Artist are unique and extraordinary, and the loss thereof cannot be adequately compensated in damages, and COMPANY shall be entitled to seek injunctive relief to enforce the provisions of this Agreement.

13.05.   You will at all times indemnify and hold harmless COMPANY and any Licensee of COMPANY from and against any and all claims, damages, liabilities, costs and expenses, including legal expenses and reasonable counsel fees, arising out of any breach by you of any warranty or representation made by you in this Agreement which is reduced to a final judgment r mutually approved settlement.   Pending the resolution of any claim in respect of which COMPANY is entitled to be indemnified, COMPANY may withhold monies which would otherwise be payable to you under this Agreement in an amount not to exceed your potential liability to COMPANY under this paragraph.   You shall have the right to post a bond in form, amount and duration and with a bonding company satisfactory to COMPANY, and the event you shall post such a bond, COMPANY shall no longer withhold monies due hereunder in respect of which such bond shall be posted.   Company agrees to give Artist notice of any claim, demand or action to which the foregoing indemnity applies, and Artist may participate in the defense of same at Artist's expense, through counsel of Artist's choice; provided, that the final control and disposition of same (by settlement, compromise or otherwise) shall remain with Company.

14.   DEFINITIONS

14.01.   "Record" or "Phonograph Record" means all forms of reproductions, now or hereafter known, manufactured or distributed primarily for use, school use, juke box use or use in means of transportation, including records of sound alone and audio-visual recordings.

14.02.   "Master", "Master Recording" or "Recording" means any recording of sound, whether or not coupled with a visual image, by any method and on any substance or material, whether now or

14

hereafter known, which is intended for use in the recording, production and/or manufacture of Phonograph Records.

14.03. "Performance" means singing, speaking, conducting or playing an instrument, along or with others.

14.04. The words "Single Records" or "Single" means a Record containing not more than three (3) sides.

14.05. "Long Play Single" means a 12-inch 33-1/3 rpm disc Phonograph Record embodying not more than three (3) Sides.

14.06. "Mini LP" or "EP" means any Record, other than an LP, containing more than three (3) Sides.

14.07. The term "Multiple Record LP" means an LP containing two or more 12-inch 33-1/3 rpm records packaged as a single unit or equivalent. For purposes of the Recording Commitment hereunder and for computing the applicable Recording Fund or Advance, a Multiple Record LP is accepted by COMPANY shall be deemed only one (1) LP.

14.08. "Person" means any individual, corporation, partnership, association or other organized group of persons or legal successors or representatives of the foregoing.

14.09. "Side" means a Recording of sufficient playing time to constitute one side of a 45 rpm record, but not less than three (3) minutes of continuous sound embodying performances by Artist.

14.10. (a) "Royalty Base Price" means (i) with respect to Records sold for distribution in the United States, the retail selling price of one hundred (100%) percent of net sales through normal retail channels of phonograph records embodying masters computed on such records, except as otherwise provided herein. Notwithstanding the foregoing, in the event any of COMPANY's distributor should account to COMPANY for sales of records hereunder on a basis less than one hundred (100%) percent, or should calculate royalties on the basis of the wholesale selling price, then with respect to those sales only the royalty basis shall be adjusted to equal that computed by such distributor. Royalties as aforesaid shall be calculated for sales during the applicable accounting period for the computation of royalties to be made hereunder, it being understood that a separate calculation of the price shall be made for each price configuration of Phonograph Records manufactured and sold by COMPANY; and (ii) with respect to Records sold hereunder for distribution outside the United States. The Royalty Base Price shall be the dealer price utilized by COMPANY's distributor or its licensee in computing monies to be paid to COMPANY for the Record concerned, unless COMPANY distributes its own records in a particular country, in which event the Royalty Base Price shall be the suggested or

15

applicable retail price in the country of manufacture or sale, as COMPANY is paid, or, in the absence in a particular country of such suggested retail list price, the price as may be established by COMPANY distributors in conformity with the general practice of the recording industry in such country, provided that COMPANY shall not be obligated to utilize the price adopted by the local mechanical copyright collection agency for collection of Mechanical Royalties. The Royalty Base Price shall be less all excise, sales and similar taxes and less the applicable container charge.

(b)   COMPANY may at some time change the method by which it computes royalties in the United States from a basis to some other basis (the "New Basis"), such as, without limitation, a retail basis.  The New Basis will replace the then-current Royalty Base Price and the royalty rate shall be adjusted to the appropriate royalty which would be applied to the New Basis so that the dollars and cents royalty amounts payable with respect to the top-line product would be the same as that which was payable immediately prior to such New Basis; for sales other than top-line product, for which there is a New Basis, the adjusted royalty rate for such sales of top-line product.  If there are other adjustments made by COMPANY that would otherwise make the New Basis more favorable (a particular example of which might be the distribution of smaller quantities of free goods than theretofore distributed) then the benefits of such other adjustments will be taken into consideration in adjusting the royalty rate.

(c)   Notwithstanding anything to the contrary contained herein, the Wholesale Price with respect to so-called home video devices manufactured and distributed by COMPANY shall be COMPANY's published wholesale price as of the commencement of the accounting period concerned.

14.11.   "Container Charge" shall mean ten (10%) percent of the Retail Selling Price for a single-fold disc Record in a standard sleeve with no inserts or for any other Record other than as hereinafter provided; fifteen (15%) percent of the Suggested List Price for an LP in a double-fold or gatefold, or nonstandard sleeve or jacket or with inserts; and twenty (20%) percent of such Price for Records, cassette tape configuration and twenty-five (25%) percent of such price for records in non-disc form, i.e.: audio-visual Records, or compact discs, audiophile records, DAT and New Record Configurations.  There shall be no Container Charge with respect to seven (7) inch Single Records shipped in a plain stock sleeve.

14.12.   "Video Base Price" means with respect to Videos sold for distribution, COMPANY's distributor's Wholesale Price during the applicable accounting period.

14.13.   "LP" or "Album" means a sufficient number of Masters embodying Artist's performances to comprise one (1) or more 12-

inch, 33-1/3 long-playing Phonograph Record album, or the equivalent, of not less than thirty-eight (38) minutes of playing time.  COMPANY may request that up to ten (10) Masters be recorded for the LP delivered hereunder.

14.14.    The words "term of this Agreement" or "period of this Agreement" or "term hereof" or "so long as this Agreement remains in force" or words of similar connotation shall include the initial period of this Agreement.

14.15.    "United States" means the United States of America, its territories, possessions and military exchanges.

14.16.    "Contract Period" means the initial period and/or an option period as the case may be.

14.17.    "Composition"means - a single musical composition, irrespective of length, including all spoken words and bridging passages and including a medley.

14.18.    "Controlled Composition" means a Composition wholly or partly written, owned or controlled by you, the Artist, or any person in which you, the Artist, has a direct or indirect interest.

14.19.    "Budget Record" means a Record bearing a Gross Royalty Base Price less than or equal to sixty-seven (67%) percent for the Retail Selling Price in the country concerned of top-line single disc LPs.

14.20.    "Net Sales" means one-hundred (100%) percent of gross sales of singles, LPs and EPs, and eighty-five (85%) compact discs, DAT and other audiophile recordings paid for returns and credits, after deduction of reserves against anticipated returns and credits.  "Net Sales" for foreign sales pursuant to license agreements shall be calculated and then payable in the same manner as the applicable agreement.  In the event COMPANY should enter into a Distribution Agreement that accounts to COMPANY on a basis of less than one hundred (100%) percent, COMPANY shall conform the definition of "Net Sales" to such definition as provided in the Distribution Agreement.

14.21.    "Advance" means a prepayment of royalties or any other payments or on behalf of Artist and shall be chargeable against and recoupable from any royalties otherwise payable hereunder.

14.22.    "Territory" shall mean the Universe.

14.23.    "Sales Through Normal Retail Channels" means sales other than as described in Paragraph "9.02" and "9.03" above.

17

14.24.    "Mechanical Royalties" means royalties payable to any Person for the right to reproduce and distribute copyrighted musical compositions on Phonograph Records.

14.25.    "Joint Recordings" means Masters embodying the Artist's performance and any performance by another artist with respect to whom COMPANY is obligated to pay royalties.

14.26.    "Mid-line" record means a record bearing a Gross Royalty Base that is less than or equal to eighty (80%) percent of the Gross Royalty Base in the country concerned of top-line records in the configuration concerned.  (See Paragraph "9.02" above).

## 15.  REMEDIES

15.01.    Without limiting any other rights and remedies of COMPANY hereunder, if you fail to Deliver any Masters hereunder within the time prescribed in Paragraph "1" above, COMPANY will have the following options:

(a)  to suspend COMPANY's obligations to make payments to you under this Agreement until you have cured the default;

(b)  to terminate the term of this Agreement at any time, whether or not you have commenced curing the default before such termination occurs; and

(c)  to require you to repay to COMPANY the amount, not then recouped, of any Advance previously paid to you by COMPANY and not specifically attributable under Paragraph "6" above to an Album which has actually been fully Delivered.  COMPANY may exercise each of those options by sending you the appropriate notice.  If COMPANY terminates the term under Paragraph "15.01 (b)" above all parties will be deemed to have fulfilled all of their obligations under this Agreement except those obligations which survive the end of the term (such as indemnification obligations, re-recording restrictions, accounting and your obligations under Paragraph "15.01 (c)".)  No exercise of any option under this paragraph will limit COMPANY's rights to recover damages by reason of your default, its rights to exercise any other option under this paragraph, or any of its other rights.

15.02.    If Artist's voice should be or become materially and permanently impaired or if Artist should otherwise become physically unable to perform recording and/or for a period of six (6) months or more personal appearances and/or if Artist should cease to pursue a career as an entertainer, COMPANY may elect to terminate this Agreement, by notice to you at any time during the period in which such contingency arose or continues and thereby be relieved of any liability for the executory provisions of this Agreement.

18

15.03.    If because of:    act of God; inevitable accident; fire, lockout; strike or other labor dispute; riot or civil commotion; act of public enemy; enactment, rule, order or act of any government or governmental instrumentality (whether federal, state, local or foreign); failure of technical facilities; failure or delay of transportation facilities; illness or incapacity of any performer or producer; or other cause of similar or difference in nature not reasonably within COMPANY's control; COMPANY is materially hampered in the recording, manufacture, distribution or sale of records, then, without limiting COMPANY's rights, COMPANY shall have the option by giving you notice to suspend the running of the then current Contract Period for the duration of any such contingency plus such additional time as is necessary so that COMPANY shall have no less than thirty (30) days after the cessation of such contingency in which to exercise its options, if any, for the next following Option Period.   Notwithstanding the foregoing in the event any such suspension continues for a period in excess of six (6) months, you shall have the right to terminate this Agreement upon written notice to COMPANY following such six (6) month period.

## 16.   AGREEMENTS, APPROVAL & CONSENT

16.01.    As to all matters treated herein to be determined by mutual Agreement, or as to which any approval or consent is required, such Agreement, approval or consent will not be unreasonably withheld.

16.02.    Your Agreement, approval or consent, whenever required, shall be deemed to have been given unless you notify COMPANY otherwise within five (5) business days following the date of COMPANY's written request to you therefor.

## 17.   NOTICES

17.01.    Except as otherwise specifically provided herein, all notices hereunder shall be in writing and shall be given by personal delivery, registered or certified mail or telegraph (prepaid), at the addresses shown above, or such other address or addresses as may be designated by either Party.   Notices shall be deemed given when mailed or when transmitted by telegraph, except that notice of change of address shall be effective only from the date of its receipt.   Each notice sent to COMPANY shall be directed to COMPANY:  Trans Continental Records, Inc., 7380 Sand Lake Road, Suite 350, Orlando, Florida 32819; Attention:  Louis J. Pearlman, President; and a copy of each such notice shall be sent simultaneously to William B. Pringle, III, Esquire, Post Office Box 691222, Orlando, Florida  32869-1222.

19

## 18.  EVENTS OF DEFAULT

18.01.    In the event of your or our dissolution or the liquidation of your or our assets, or the filing by or against you of a petition for liquidation or reorganization under Title 11 of the United States Code as now or hereafter in effect or under any similar statute relating to insolvency, bankruptcy, liquidation or reorganization, or in the event of the appointment of a trustee, receiver or custodian for you or for any of your property, or in the event that you shall make an assignment for the benefit of creditors or commit any act for, or in, bankruptcy or become insolvent, or in the event you shall fail to fulfill any of your material obligations under this Agreement for any other reason, then at any time after the occurrence of any such event and subject to the provisions as set forth in paragraph "11.06" above and "15.01" above, COMPANY shall have the option by notice to terminate this Agreement.  You shall have the right to terminate this Agreement upon written notice to COMPANY in the event COMPANY declares bankruptcy and files a petition for protection from their creditors.

18.02.    COMPLIANCE WITH LAWS/MORALS

During the term of this agreement, you shall observe and comply with all federal, state and local laws, ordinances, rules and regulations, including but not limited to, those laws prohibiting use/sale of controlled substances. Additionally, you agree not to commit any act which shall subject COMPANY, its officers, employees, assigns or yourself to public ridicule, humiliation or disrepute.  Failure by you to comply with the provisions of this paragraph shall give COMPANY the right to immediately terminate this agreement.

## 19.  MISCELLANEOUS

19.01.    The Artist will, prior to the release of the LP hereunder, prepare an act of professional quality and will during the term of this Agreement, actively pursue his career as an entertainer in the live engagement field.

19.02.    (a) This Agreement contains the entire understanding of the Parties relating to its subject matter.  No change or termination of this Agreement will be binding upon COMPANY unless it is made by an instrument signed by an officer of COMPANY.  A waiver by either Party of any provision of this Agreement in any instance shall not be deemed to waive it for the future.  All remedies, rights, undertakings, and obligations contained in this Agreement shall be cumulative and none of them shall be in limitation of any other remedy, right, undertaking, or obligation of either Party.

(b)   No change of a budget prescribed in this Agreement or established under it will be effective unless the change is approved in writing by COMPANY.

19.03.     Those provisions of any applicable collective bargaining Agreement between COMPANY and any labor organization which are required, by the terms of such Agreement, to be included in this Agreement shall be deemed incorporated herein.

19.04.     Each option and election granted to COMPANY in this Agreement, including, without limitation, to suspend the running of one (1) or more period of time, to terminate the term, to acquire the direct and individual services of a leaving member (if a group artist is involved), or otherwise, is separate and distinct, and the exercise of any such option or election shall not operate as a waiver of any other option or election unless specifically so stated by COMPANY in its notice of exercise of such option or election.

19.05.     You shall not be entitled to recover damages or to terminate the term of this Agreement by reason of any breach by COMPANY of its material obligations hereunder, unless COMPANY has failed to remedy such breach within sixty (60) days following receipt of your notice thereof.

19.06.     This Agreement has been entered into in the State of Florida, and the validity, interpretation and legal effect of this Agreement shall be governed by the laws of the State of Florida applicable to contracts entered into and performed entirely within the State of Flora.  The courts (state and federal), only will have jurisdiction of any controversies regarding this Agreement; any action or other proceeding which involves such a controversy will be brought in those courts, in Florida and not elsewhere.  Any process in any such action or proceeding may, among other methods, be served upon you by delivering it or mailing it, by registered or certified mail, directed to the address first above written or such other address as you may designate pursuant to Paragraph "17" above.   Any such process may, among other methods, be served upon the Artist or any other Person who approves, ratifies, or assents to this Agreement to induce COMPANY to enter into it, by delivering the process or mailing it by registered or certified mail, directed to the address first above written or such other address as the Artist or the other Person concerned may designate in the manner prescribed in Paragraph "17" above.   Any such delivery or mail service shall be deemed to have the same force and effect as personal service within the State of Florida.

19.07.     In entering into this Agreement, and in providing services pursuant hereto, you shall have the status of an independent contractor and nothing herein contained shall contemplate or constitute you as COMPANY's agent(s) or employee(s).

21

19.08.    This Agreement shall not become effective until executed by all proposed Parties hereto.

19.09.    Any and all riders annexed hereto together with this basis document shall be taken together to constitute the Agreement between you and COMPANY.

19.10.    You hereby grant to us, or our affiliate 'N Sync Productions, Inc. or our designee all merchandising rights and the sole and exclusive right to use your name (both legal and professional), likeness, picture and portrait in any manner whatsoever in connection with the exercise of the merchandising rights herein granted. COMPANY or its designee shall have the right to grant to the others (including companies affiliated with us) upon such terms as we shall see fit, the right to exercise or cause to be exercised such merchandising rights. COMPANY shall pay to you, in addition to any and all monies provided for in this Agreement, one-half (1/2) of all net monies received by us in connection with the exercise of said merchandising rights.

19.11.    COMPANY shall retain tutors and a parent or parent-appointed guardian to oversee and supervise the education and maintenance of such members of the group that are under the age of eighteen years during periods of recording and touring.  The costs and expenses related to such personnel shall be paid by COMPANY and shall be deemed to be an additional recoupable advance hereunder.

19.12.    Notwithstanding anything to the contrary contained herein, you shall have the right to terminate this agreement in the event COMPANY has not secured a distribution agreement with a U.S. record company within eighteen months from the date hereof, pursuant to which recordings of your performances shall be released.

20.   PUBLISHING AGREEMENT

You hereby assign to COMPANY, or a publishing company designated by COMPANY, One Hundred (100%) percent of all the right, title and interest in and to the Controlled Compositions, including without limitation, the rights in and to the copyrights therein and the renewal rights thereto.  You shall simultaneously herewith enter into the attached Exhibit A copyright transfer and assignment, pursuant to which COMPANY or such publishing company shall acquire said rights, title and interest, together with the exclusive right to Administer the copyrights for the term of the copyright in each such Controlled Composition.  Artist shall receive their public performance royalties for the United States directly from the performing rights society to which they are affiliated.  "IT IS SPECIFICALLY UNDERSTOOD AND AGREED THAT THIS PARAGRAPH (AND PROVISIONS CONTAINED IN THIS AGREEMENT RELATED THERETO) APPLIES ONLY TO THOSE CONTROLLED COMPOSITIONS RECORDED BY

22

ARTIST HEREUNDER AND COMPANY SHALL HAVE NO CLAIM TO, OR ANY RIGHT, TITLE OR INTEREST IN, ANY COMPOSITIONS WHOLLY OR PARTLY WRITTEN, OWNED, OR CONTROLLED BY YOU AND/OR ARTIST WHICH ARE NOT RECORDED HEREUNDER."

21.  **VIDEO AND SIDEPERSON PROVISIONS**

21.01.   If COMPANY shall decide to produce one (1) or more Videos during the term hereof (which COMPANY is under no obligation whatsoever to do), the following shall be applicable:

(a)  The selection(s) to be embodied in each Video shall be designated by COMPANY and Artist.

(b)  Each Video shall be shot on a date or dates and at a location or locations to be designated by COMPANY and subject to your reasonable availability.

(c)  The producer and director of each Video, and the concept or script for each Video, shall be mutually approved by COMPANY and Artist.  COMPANY shall engage the producer, director and other production personnel for each Video, and shall be responsible for and shall pay the production costs of each Video in an amount not in excess of a budget to be established in advance by COMPANY in consultation with you (the "Production Budget").  You shall be responsible for and shall pay the production costs for each Video which are in excess of the production costs caused by your delay and/or circumstances that are within your control for which you are responsible pursuant to the foregoing (which COMPANY is in no way obligated to do), you shall promptly reimburse COMPANY for such excess costs upon demand and, without limiting COMPANY's other rights and remedies, if you fail to so reimburse COMPANY, then COMPANY may deduct an amount equal to such excess from any monies otherwise payable to you hereunder.  Your compensation for performing in such Videos shall be limited to any minimum amounts required to be paid for such performances pursuant to any collective bargaining Agreement pertaining thereto, provided, however, that you hereby waive any right to receive such compensation to the extent such right may be waived.

(d)  COMPANY shall be the sole owner of all worldwide rights in and to each Video (including the worldwide copyrights therein and thereto.).

(e)  You shall issue (or shall cause the music publishing companies having the right to do so to issue) (i) worldwide, perpetual synchronization licenses, and (ii) perpetual licenses for public performance in the United States (to the extent that ASCAP or BMI are unable to issue same), to COMPANY at no costs for the use of all Controlled Compositions in any such Videos effective as of the commencement of production of the applicable Video (and your execution of this Agreement shall constitute the issuance of such

23

licenses by any music publishing company which is owned or controlled by you, or by any Person owned or Controlled by you). In the event that you shall fail to cause any such music publishing company to issue any such license to COMPANY, and if COMPANY shall be required to pay any fee to such music publishing company in order to obtain any such license, then COMPANY shall have the right to deduct the amount of such license fee from any and all sums otherwise payable to you hereunder.

(f) COMPANY shall have the right to use and allow others to use each Video for advertising and promotional purposes with no payment to you except as otherwise provided herein. As used herein, "advertising and promotional purposes" shall mean all uses for which COMPANY receives no monetary consideration from licensees in excess of its costs and expenses in connection with the creation or exploitation of the Video, an incidental fee and a reasonable reimbursement for its administrative costs. Compensation derived from such promotional uses due you hereunder shall be credited to your account as provided in Paragraph "9.05" above.

(g) COMPANY shall also have the right to use and allow others to use the Videos for commercial purposes. As used in this subparagraph, "commercial purposes" shall mean any use which is not for "advertising and promotional" purposes (as defined above) for which COMPANY received monetary consideration in excess of its Compensation derived from such commercial exploitation and due you hereunder shall be credited to your account as provided in Paragraph "9.05" above.

(h) Each Video shall be deemed a Material as provided herein and COMPANY shall have the rights otherwise applicable hereto with respect to Masters hereunder including, without limitation, the right to use and publish, and permit others to use and publish, your name and likeness in each Video and for advertising and purposes of trade in connecting therewith.

21.02. Notwithstanding anything to the contrary contained herein, Artist shall have the right, during the term hereof, to perform as a background vocalist or background instrumentalist for the purpose of making audio Phonograph Records for other subject to the following:

(a) You have then fulfilled all of your then current obligations hereunder, and the engagement does not interfere with the continuing prompt performances of your obligations to COMPANY or with any professional engagements to which you are committed and which are intended to aid in the promotion of Records hereunder;

(b) Artist will not after the commencement of this Agreement, render a solo or "step-out performance" and the musical style of the recording will not be such as to be confused with

24

Recordings made by Artist for COMPANY, without the consent of COMPANY, such consent shall not be unreasonably withheld;

(c)   Artist will not record any material embodied on a Master theretofore or thereafter delivered by you hereunder, and you shall be restricted from recording the same material for COMPANY (which you shall not do without COMPANY's written consent);

(d)   Artist's name may be used in a courtesy credit to COMPANY or its designee on the LP liners used for such Records, in the same position as the credits accorded to other sidepersons and in type identical in size, prominence and all other respects. Except as provided in this subparagraph (d), neither the Artist's name, nor likeness nor biographical material may be used in any manner in connection with such Recordings. Without limiting the foregoing, Artist's name and/or likeness shall not be used on the front cover of LPs, on sleeves or labels used for single records, or advertising, publicity or other forms of exploitation, without COMPANY's express written consent which COMPANY may withhold in its absolute discretion.

21.03.   Within sixty (60) days following the execution hereof, you may supply COMPANY with six (6) approved pictures of Artist to be used by COMPANY. Such submission shall be made to COMPANY. In the event that COMPANY disapproves of the pictures supplied by you, COMPANY will make available to you for your approval pictures to be used by COMPANY. Your approval will not be unreasonably withheld, and will be deemed given unless your notice of disapproval (including the reason) has been received by COMPANY within five (5) days after the material has been made available to you. In the event that you timely disapprove of any pictures, you will, within seven (7) days of the date of your disapproval notice, supply to COMPANY approved pictures. In the event that the pictures supplied by you, pursuant to the preceding sentence, are not satisfactory to COMPANY pursuant to this paragraph, COMPANY shall thereafter have the right to select and use such pictures as it shall determine, in its sole discretion, and you shall have no approval rights in respect thereof. No inadvertent failure to COMPANY to comply with this paragraph will constitute a breach of this Agreement.

21.04.   (a)   As used herein, the term "You" includes all members of the group presently professionally known as 'N SYNC. The obligations, liabilities, prohibitions and restrictions imposed upon you hereunder shall be deemed to apply individually and collectively to each of the members of 'N SYNC, whether performing alone, with others or as a member of 'N SYNC, regardless of the name by which you or any of your members may then be identified. A failure by any member of 'N SYNC to satisfy any of your obligations hereunder shall, as COMPANY's election, be deemed a breach of this Agreement by you. In the event of any such breach, COMPANY may, by notice to you, and without limiting any of

25

COMPANY's other rights or remedies hereunder, terminate the term of this Agreement or, alternatively, may terminate the term of this Agreement only as it applies to the member or members who have failed to satisfy their individual obligations.

(b)  You hereby acknowledge that TRANS CONTINENTAL RECORDS, INC. is the sole owner of the name 'N SYNC and will be the sole owner of such name during the term hereof; that you will not use or authorize any other person to use such name or other name adopted by you in connection with the recording, production, manufacture, sale or advertising of records in the territory, or in connection with personal appearances by any person other than you unless approved by TRANS CONTINENTAL RECORDS, INC.   If any member becomes a "leaving member" of the group, or if COMPANY terminates the term of this Agreement as to some but not all members then the leaving member as to whom the term of this Agreement is terminated shall not thereafter use or authorize or permit any other person to use in any manner or for any purpose whatsoever the name 'N SYNC or such other name as you may hereafter adopt.   As used herein, a "leaving member" means any member of Artist who during the term hereof ceases to be an actively performing member of the group for any reason whatsoever, and in the event you disband or COMPANY decides to terminate this Agreement because there being a leaving member, each member of the group.

(c)  No additional member may be added without COMPANY's prior written consent.  If any member of Artist becomes a leaving member, then you shall promptly give COMPANY written notice thereof and COMPANY shall thereafter have the right to terminate this Agreement as to such leaving member or to require such leaving member to render his services directly to COMPANY as a solo artist or as a member of any new group comprised of the leaving members under the same terms and conditions as set forth in this Agreement with respect to you.

21.05.   At COMPANY's request, you shall submit to a drug test with a physician designated by COMPANY at COMPANY's expense.

TRANS CONTINENTAL RECORDS, INC.

By: _____
    LOUIS J. PEARLMAN    President

ACCEPTED TO AND AGREED:

_____
"Artist"
CHRISTOPHER ALAN KIRKPATRICK
Soc. Sec. #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

26

"Artist"
JUSTIN RANDALL TIMERBLAKE
Soc. Sec. #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

"Artist"
JOSHUA SCOTT CHASEZ
Soc. Sec. #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

"Artist"
JOSEPH ANTHONY FATONE, JR.
Soc. Sec. #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

"Artist"
JAMES LANCE BASS
Soc. Sec. #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

27

## EXHIBIT "A"

### TRANSFER OF COPYRIGHT

     For good and valuable consideration, receipt whereof is hereby acknowledged, the undersigned hereby transfer to TRANS CONTINENTAL RECORDS, INC., PUBLISHER DESIGNEE, One Hundred (100%) percent of all the right, title and interest in and to the copyright and One Hundred (100%) percent of the rights comprised in the copyright, without limitation, in the controlled musical composition recorded hereunder.   The above pertains only to Publisher's interest.   The writers retain their interest.

CHRISTOPHER ALAN KIRKPATRICK
Artist

JUSTIN RANDALL TIMERBLAKE
Artist

JOSHUA SCOTT CHASEZ
Artist

JOSEPH ANTHONY FATONE, JR.
Artist

JAMES LANCE BASS
Artist

28

10

/O

A 735- 36  74720240

INTENT TO USE

| TRADEMARK/SERVICE MARK APPLICATION, PRINCIPAL REGISTER, WITH DECLARATION | MARK (Word(s) and/or Design) 'N SYNC | CLASS NO. (if known) 9, 25, 41 |

## TO THE ASSISTANT COMMISSIONER FOR TRADEMARKS:

APPLICANT'S NAME: TRANS CONTINENTAL, INC.

APPLICANT'S BUSINESS ADDRESS: 7380 Sand Lake Road, Suite 350
(Display address exactly as it should appear on registration) Orlando, Florida 32019
FL

RECD AUG 2 3 1995

APPLICANT'S ENTITY TYPE: (Check one and supply requested information)

____ Individual - Citizen of (Country)

____ Partnership - State where organized (Country, if appropriate):

____ Names and Citizenship (Country) of General Partners:

X   Corporation - State (Country, if appropriate) of Incorporation: Florida Corporation

____ Other (Specific Nature of Entity and Domicile) FL

## GOODS AND/OR SERVICES:

Applicant requests registration of the trademark/service mark shown in the accompanying drawing in the United States Patent and Trademark Office on the Principal Register established by the Act of July 5, 1946 (15 U.S.C. 1051 et. seq., as amended) for the following goods/services (SPECIFIC GOODS AND/OR SERVICES MUST BE INSERTED HERE): A series of audio and/or video recordings featuring music performances in CLASS 9; Entertainment in the nature of live performances by a musical group in CLASS 41; and the manufacture and sale of clothing, footwear and/or handgear in CLASS 25.

## BASIS FOR APPLICATION. (Check boxes which apply, but never both the first AND second bases, and supply requested information related to each box checked.)

[ ] Applicant is using mark in commerce on or in connection with the above identified goods/services (15 U S C 1051(a), as amended ) Three specimens showing the mark as used in commerce are submitted with this application.
- Date of first use of the mark in commerce which the U S Congress may regulate (for example, interstate or between the U S and a foreign country)
- Specify the type of commerce _____ (for example, interstate or between the U S and a specified foreign country)
- Date of first use anywhere (the same as or before use in commerce date).
- Specify intended manner or mode of use of mark on or in connection with the goods/services _____
(for example, trademark is applied to labels, service mark is used in advertisements)

[X] Applicant has a bona fide intention to use the mark in commerce on or in connection with the above identified goods/services (15 U S C 1051(b), as amended )
- Specify manner or mode of use of mark on or in connection with the goods/services Trademark will be applied to labels, packaging &/or advertisements; Service Mark will be used for advertisements.
(for example, trademark will be applied to labels, service mark will be used in advertisements)

[ ] Applicant has a bona fide intention to use the mark in commerce on or in connection with the above identified goods/services and asserts a claim of priority based upon a foreign application in accordance with 15 U.S.C. 1126(d), as amended.
- Country of foreign filing _____      - Date of foreign filing: _____

[ ] Applicant has a bona fide intention to use the mark in commerce or in connection with the above identified goods/services, and, accompanying this application, submits a certification or certified copy of a foreign registration in accordance with 15 U S C 1126(e), as amended
- Country of registration _____      - Registration number: _____

## NOTE: Declaration, on Reverse Side, MUST be Signed

PTO Form 1477 (REV 10/93)

U S DEPARTMENT OF COMMERCE/Patent and Trademark Office

If submitted on one page, side two of the form should be Upside Down" in relation to page 1.

## DECLARATION

The undersigned being hereby warned that willful false statements and the like so made are punishable by fine or imprisonment, or both, under 18 U S C. 1001, and that such willful false statements may jeopardize the validity of the application or any resulting registration, declares that he/she is properly authorized to execute this application this application on behalf of the applicant; he/she believes the applicant to be owner of the trademark/service mark sought to be registered, or if the application is being files under 15 U S C. 1051(b), he/she believes applicant to be entitled to use such mark in commerce, to the best of his/her knowledge and belief no other person, firm, corporation, or association has the right to use the above identified mark in commerce, either in the identical form thereof or in such near resemblance thereto as to be likely, when used on or in connection with the goods/services of such other person, to cause confusion, or to cause mistake, or to deceive, and that all statements made of his/her own knowledge are true and that all statements made on information and belief are believed to be true

DATE     _3/24/71_

(407)   876-0465

TELEPHONE NUMBER

SIGNATURE

LOUIS J. PEARLMAN, PRESIDENT

PRINT OR TYPE NAME

## INSTRUCTIONS AND INFORMATION FOR APPLICANT

**TO RECEIVE A FILING DATE, THE APPLICATION MUST BE COMPLETED AND SIGNED BY THE APPLICANT AND SUBMITTED ALONG WITH:**

1  The prescribed FEE of $245.00* for each class of goods/services listed in the application.

2  A DRAWING PAGE displaying the mark in conformance with 37 CFR 2 52.

3  If the application is based on use of the mark in commerce, THREE (3) SPECIMENS (evidence) of the mark as used in commerce for each class of goods/services listed in the application   All three specimens may be in the nature of  (a) labels showing the mark which are placed on the goods, (b) photographs of the mark as it appears on the goods, (c) brochures or advertisements showing the mark as used in connection with the services

4  An APPLICATION WITH DECLARATION (this form) - The application must be signed in order for the application to receive a filing date   Only the following person may sign the declaration, depending on the applicant's legal entity  (a) the individual applicant, (b) an officer of the corporate applicant, (c) one general partner of a partnership applicant, (d) all joint applicants

**SEND APPLICATION FORM, DRAWING PAGE, FEE AND SPECIMENS (IF APPROPRIATE) TO:**

Assistant Commissioner for Trademarks

Box  New App / Fee

2900 Crystal Drive

Arlington, VA 22202-3513

Additional information concerning the requirements for filing an application is available in a booklet entitled Basic Facts About Registering a Trademark, which may be obtained by writing to the above address or by calling  (703) 308-9000

* Fees are subject to change, changes usually take effect on October 1  If filing on or after October 1, 1995, please call the PTO to confirm the correct fee

... is estimated to take an average of 1 hour to complete, including time required for reading and understanding instructions, gathering necessary information, recordkeeping, and actually preparing the ... Any comments on the form, including the amount of time required to complete this form, should be sent to the Office of Management and Organization, U S Patent and Trademark Office, U S. ... of Commerce, Washington, D C 20231 and Paper Reduction Project 0651-0009, Office of Information and Regulatory Affairs, Office of Management and Budget, Washington, D C 20503  Do ... at other of this address

**CERTIFICATE OF EXPRESS MAIL**

EXPRESS MAIL mailing label number:   GB117346075US

Date of Deposit:_____

I HEREBY CERTIFY THAT THIS PAPER AND FEE IS BEING DEPOSITED WITH
THE UNITED STATES POSTAL SERVICE "EXPRESS MAIL POST OFFICE TO
ADDRESSEE" SERVICE UNDER 37 CFR 1.10 ON THE DATE INDICATED ABOVE
AND IS ADDRESSED TO THE ASSISTANT COMMISSIONER FOR TRADEMARKS, BOX
NEW APP/FEE, 2900 CRYSTAL DRIVE, ARLINGTON, VIRGINIA 22202-3513.

_____
Janet M. Hart

**CERTIFICATE OF MAILING**

U S POSTAL SERVICE
MAY BE USED FOR DOMESTIC AND INTERNATIONAL MAIL. DOES NOT
PROVIDE FOR INSURANCE. POSTMASTER

Received From  Louis J Pearlman
7380 Sand Lake Rd Ste
Orlando FL 32819

One piece of ordinary mail addressed to
Box New App/Fee
Asst Commissioner for Tradema
2900 Crystal Dr
Arlington VA 22202-350

PS Form 3817, Mar 1989        dPO : 1993 O - 191-051



**74720240**
**SAMPLE DRAWING PAGE**

COMBINED

9

INT. CL.
**25**

21,23,26,36,38,39

PHONES CL
22,37

'PLICAM... TRANS CONTINENTAL, INC.

'PLICANT'S ADDRESS:    7380 Sand Lake Road, Suite 350
                      Orlando, Florida  32819

:ODS AND SERVICES: CLASS  9--a  series  of  audio  and/or  video
                   recordings featuring music performances;  41
                   CLASS 41--entertainment in the nature of live
                   performances by a musical group; and
                   CLASS 25--the manufacture and sale of clothing 100,101,107
                   footwear and/or headgear.

:TE OF FIRST USE:   INTENT TO USE application.

:TE OF FIRST USE IN COMMERCE:   INTENT TO USE application.

:SIGN:



TRADEMARK APPLICATION SERIAL NO. 74720240

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE
FEE RECORD SHEET

)8G VH 09/08/95 74720240                    0 361      735.00 CK

PTO-1555
(5/87)

11

## LICENSE AGREEMENT

AGREEMENT made as of the 31st day of July , 1996, by and between ___Richard E. Ford___ as President of -N- Sync Inc., a New Jersey corporation, having an address at Post Office Box 263, Scotch Plains, New Jersey 07076 (hereinafter called "PROPRIETOR") and LOUIS J. PEARLMAN, having an address at 7380 Sand Lake Road, Suite 350, Orlando, Florida 32819 (hereinafter called "LICENSEE").

### W I T N E S S E T H :

WHEREAS, PROPRIETOR is the owner of U.S. Service Mark Registration No. 1,843,498 and the service mark -N- Sync, Inc. registered thereby (hereinafter called "the Licensed Mark"); and

WHEREAS, LICENSEE desires to use the Licensed Mark in the composite mark 'N SYNC in connection with the musical group currently known as "'N Sync" (the "Group") including all recording, publishing, merchandising, television, video, motion picture, live performance, promotional, advertising and other activities related to the Group's career in the entertainment industry;

NOW, THEREFORE, in consideration of the premises and of the mutual covenants hereinafter set forth, the parties hereto, intending to be legally bound, hereby agree as follows:

1. **GRANT**

PROPRIETOR hereby grants to LICENSEE the exclusive right and license to use the Licensed Mark in the composite mark 'N SYNC in connection with the musical group currently known as "'N Sync" (the "Group") including all recording, publishing, merchandising, television, video, motion picture, live performance, promotional,

advertising and other activities related to the Group's career in the entertainment industry, but not in connection with any other kind of services or merchandise, upon the terms and conditions of this Agreement.

2.   **SUBLICENSES**

PROPRIETOR grants to LICENSEE the non-exclusive right to sublicense others to use the Licensed Mark in conjunction only with the composite mark 'N SYNC for the purposes set forth in paragraph "1" above.  All other licensed uses shall be subject to the written approval of PROPRIETOR.

3.   **TITLE AND VALIDITY**

LICENSEE agrees that it will not, during the term of this Agreement or thereafter, attach the title of PROPRIETOR in and to the Licensed Mark or attack the validity of this license.

4.   **QUALITY OF SERVICES**

The quality of all services performed by LICENSEE hereunder and the quality of all goods made by LICENSEE hereunder and the quality of all related advertising, promotional or other related uses of the Licensed Mark by LICENSEE shall be of a standard equally high as that currently maintained by PROPRIETOR and shall conform to the standards set by and be under the control of PROPRIETOR provided LICENSEE shall be advised in writing of any changes in such standards or practices.  LICENSEE agrees to cooperate with PROPRIETOR in facilitating PROPRIETOR's control of such quality, to permit reasonable inspection of LICENSEE's operation, including live performances, and to supply PROPRIETOR

2

with specimens of all uses of the Licensed Mark upon request. LICENSEE shall comply with all applicable laws and regulations and obtain all appropriate government approvals pertaining to the sale, distribution and advertising of goods and services covered by this License.

    5. <u>FORM OF MARK</u>

LICENSEE agrees to use the marks only in the form and manner with appropriate legends as prescribed from time to time by PROPRIETOR, and not to use any other trademark or service mark in combination with the Licensed Mark without prior written approval of PROPRIETOR.

    6. <u>ROYALTY</u>

In full consideration for the rights granted LICENSEE herein, LICENSEE agrees to pay to PROPRIETOR a royalty of $10.00 and other good and valuable consideration.

    7. <u>HOLD HARMLESS</u>

LICENSEE hereby indemnifies and agrees to hold PROPRIETOR harmless from and against any claim or suit arising out of alleged defects in the services and/or products of LICENSEE hereunder. PROPRIETOR shall give to LICENSEE immediate notice of any such claim or suit and afford LICENSEE the opportunity to defend the same, at LICENSEE's own expense, through counsel of LICENSEE's choice. Likewise, PROPRIETOR hereby indemnifies and agrees to hold LICENSEE harmless from and against any claim or suit arising out of alleged defects in the services and/or products of PROPRIETOR hereunder. LICENSEE shall give to PROPRIETOR immediate notice of

3

any such claim or suit and afford PROPRIETOR the opportunity to defend the same, at PROPRIETOR's own expense, through counsel of PROPRIETOR's choice.

8.    USE INURES TO PROPRIETOR

All use of the Licensed Mark by LICENSEE on or in connection with the services performed hereunder and any goods sold hereunder shall inure to the benefit of PROPRIETOR.   LICENSEE agrees to cooperate with PROPRIETOR in the prosecution of any service mark or trademark applications that PROPRIETOR may desire to file and for that purpose LICENSEE shall supply to PROPRIETOR from time to time such articles, brochures, advertising and similar material as may reasonably be required in connection with any such application. The rights of LICENSEE pursuant to paragraph "1" hereof shall include, to the extent necessary, the right to use any registered service marks or trademarks relating to the Licensed Mark secured by PROPRIETOR hereunder at no additional fee.

9.    BREACH

If LICENSEE shall violate or fail to perform any of its obligations hereunder, PROPRIETOR shall have the right to terminate this Agreement upon thirty (30) days written notice, and such notice of termination shall become effective unless LICENSEE shall completely remedy the default within such thirty-day period. Termination of the Agreement under the provisions of this paragraph shall be without prejudice to any other rights which PROPRIETOR may have against LICENSEE.

4

10.   **SEVERABILITY**

If any term, condition, or provision of this License Agreement is or should be found to be void or unenforceable because of a law of the United States or of any state thereof, the validity or enforceability of the remaining provisions of this Agreement shall not be affected thereby but shall remain in full force and effect as though such void or unenforceable term, conditions or provision had never been included in this Agreement.

11.   **ASSIGNMENT**

This Agreement is personal to LICENSEE and may not be assigned without the prior written consent of PROPRIETOR.  With respect to any corporation that is affiliated with the LICENSEE and that is related to the Group, PROPRIETOR agrees not to withhold consent to an assignment of this Agreement.

12.   **PROPRIETOR'S RIGHTS**

All rights in the Licensed Marks other than those specifically granted herein are reserved by PROPRIETOR for its own use and benefit.  Upon the expiration or termination of this Agreement for any reason whatsoever, all rights in the Licensed Mark and any service mark registrations or trademark registrations pertaining thereto shall automatically revert to PROPRIETOR.  LICENSEE shall at any time, whether during or after the term of this Agreement, execute any documents reasonably required by PROPRIETOR to confirm PROPRIETOR's ownership of all such rights.

5

13. **TERM**

This Agreement shall continue in force and effect so long as the Licensed Mark is being used by LICENSEE or the assignee of LICENSEE if this agreement is assigned under the terms and conditions of this agreement, unless sooner terminated as provided for herein.

14. This Agreement and the rights and benefits conveyed hereunder shall inure to the heirs, successors, and assigns of PROPRIETOR and LICENSEE subject to the terms contained herein.

15. **APPLICABLE LAW**

This Agreement shall be construed in accordance with the laws of the State of Florida.

IN WITNESS WHEREOF, the parties have caused this Agreement to be duly executed as of the day and year first above written.

ATTEST:                                                              "PROPRIETOR"

_____               By: _____
Witness Signature

___Teresa D. Bord, Esq.___
Witness Name Printed


ATTEST:                                                              "LICENSEE"

_____               By: _____
Witness Signature                                              Louis J. Pearlman

_____
Witness Name Printed


(docs\tc\nsync\license.agc)
Rev. July 23, 1996

6

STATE OF *New Jersey*

: SS

COUNTY OF *Union* :

The foregoing License Agreement was acknowledged before me this *31*st day of *July*, 1996, by *Richard E. Fisk* as *President* (title) of 'N SYNC, INC., a *New Jersey* corporation, on behalf of the corporation, who is personally known to me or who produced _____ as identification.

*Teresa D. Ford, Esq.*

Teresa D. Ford, Esq.
An Attorney At Law of New Jersey

Notary Public
Name Printed:
Commission No.:

STATE OF _____ :

: SS

COUNTY OF _____ :

The foregoing License Agreement was acknowledged before me this ____ day of _____, 1996, by LOUIS J. PEARLMAN, an individual, who is personally known to me or who produced _____ as identification.

Notary Public
Name Printed:_____
Commission No.:_____

7

**12**

RADAMES VELAZQUEZ, JR., ESQ.
2955-299 Newark Avenue
Jersey City, New Jersey 07302
(201) 656-4200
Attorney for the Defendants -N-SYNC, Inc. and Richard E. Ford.

**FILED**

OCT 2 · 1999

AT 8:30 _____ M
WILLIAM T. WALSH
CLERK

IN THE UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

----------------------------------------

LOUIS J. PEARLMAN,                      :

          Plaintiff,                    :

     -against-                          :

-N-SYNC, INC. and  RICHARD E. FORD      :

          Defendants                    :

----------------------------------------

Civil Action No.: 99-4729 (AET)

DECLARATION OF RICHARD E.
FORD, IN OPPOSITION OF AN
APPLICATION FOR A PRELIMINARY
RESTRAINING ORDER

RICHARD E. FORD, pursuant to 28 U.S.C. Sec.1746, declares under the pains and

penalties of perjury as follows:

     1. I am one of the named defendants in this action.  I am also the President of -N-SYNC,

Inc., a New Jersey Corporation.  I make this declaration based upon my own personal knowledge

and my review and familiarity with the relevant documents and things.

     2. -N-SYNC, Inc., is a corporation I formed in 1994.  In connection to this corporation, I

obtained and registered the mark -N-SYNC, Inc., under registration number U.S. Registration

No. 1, 843,498.  As a corporation, we were registered to make and sell prerecorded phonographs,

videos, cassette tapes and compact discs featuring music.

3. In the summer of 1996, Louis J. Pearlman's representative, Alan Siegal contacted my corporation with the intent of licensing the mark. Mr. Pearlman, through, his representatives indicated that they were the legal representatives of the musical group currently known as 'N Sync. At all times, we were told that Mr. Pearlman had a contract with the musical group 'N Sync and that he was their legal representative.

4. Mr. Pearlman's representative's drafted the license agreement that is at issue in this lawsuit. We came to an agreement with Mr. Pearlman and the license agreement was signed on July 31, 1996. We had no further contact with Mr. Pearlman until approximately June of 1999.

5. In June of 1999, Mr. Pearlman representatives began to call me. They indicated that they had some problems with merchandising and wanted to purchase the mark. I did not come to them to "extort" money, as is implied in their complaint. They contacted me and asked me if I was willing to sell.

6. I contacted my attorney and asked his advice about the value of the mark. I knew the musical group was successful and did not want to sell the corporation's name for less than the market value. My attorney found out that in the music industry names are a very valuable property right. The industry standard is $1.00 per album the musical group had sold. A prime example is the musical group "Allure", who sold one and a half million records and purchased their name for one million five hundred thousand dollars. 'N Sync has sold approximately ten million records, accordingly the value of their name is approximately ten million dollars. Since Mr. Pearlman claimed to have the international rights to the mark, I made a offer of sale in the amount of five million dollars. Again, I was responding to their request to purchase.

7. Recently, I found out that I was mislead by Mr. Pearlman and his representatives. Attorneys for the musical group 'N Sync notified me, through my attorney, that at no time did

Mr. Pearlman ever have a contract or agreement with the group. When he entered into our license agreement he was acting without any authority to bind the group to the agreement. In fact, he was acting without their knowledge. For that reason, unless Mr. Pearlman can produce a contract between himself and the musical group 'N Sync, I believe the license agreement is void, as a matter of law.

8. The musical group's lawyers further informed me that they are not under any contractual relationship with Trans Continental Records, Inc., Mr. Pearlman's corporation. The group's lawyers informed me that they terminated their relationship with Trans Continental on May 26, 1999.

9. Mr. Pearlman and his representatives have acted against my best interests by lying and attempting to purchase this mark without disclosing to me the fact that they never had a contractual relationship with the group. They want to steal the mark so that they may hold the group hostage to their demands.

I declare under penalty of perjury that the foregoing is true and correct. Executed October 19, 1999.

RICHARD E. FORD

# 13

**WISS - World Identical Screening Search**
Ref: W19990908/58300711

Run Date: 08-SEP-99
Classes: 03 06 09 14 16 18 25 28 41

| Hit # | Trademark | Country/Register | App/Reg Number | Pub Ref Year Page | Classes | Applicant Identifier | Country |
|---|---|---|---|---|---|---|---|
| 1 | N SYNC * | ARGENTINA | 2188957 | 1999 00005 | 09 | PEARLMAN LOUIS J | USA |
| 2 | N SYNC * | AUSTRALIA | 766263 | 1998 06377 | 09 | LOUIS J PEARLMAN ORLANDO | USA |
| 3 | ZINK N SWIM * | AUSTRALIA | A 449472 | 1989 2457 | 03 | BERNHAUT NOMINEES LOWER TEMPLESTOWE | AUST |
| 4 | ZINKWALZWERK MARKTL N OEST * | AUSTRIA | 100328 | 1982 0425 | 06 37 40 | F. V. NEUMAN GESELL. MARKTL IM TRAISENTALE | OSTE |
| 5 | N SYNC * | AUSTRIA | 168903 | 1997 00367 | 09 14 16 18 20 21 25 26 28 41 | PEARLMAN LOUIS J. ORLANDO | USA |
| 6 | N SYNC * | BRAZIL | 1132792 | 1999 00061 | 09 | LOUIS J. PEARLMAN | USA |
| 7 | ISE IN SINK ERATOR * | BRAZIL | 7334696 | 1994 P0116 | 07 08 09 11 | EMERSON ELECTRIC | USA |
| 8 | IN SINK ERATOR | BRAZIL | 8038160 | 1995 U0123 | 07 08 09 11 | EMERSON ELECTRIC CO. | USA |
| 9 | IN SYNC | CANADA | 718161 | 1993 C0046 | 25 | R.S. TROMBETTA NEW YORK | USA |
| 10 | INSYNC * | CANADA | 737460 | 1997 00005 | 09 41 | GERALD B. HESLOP ETOBICOKE | CANA |
| 11 | IN SYNC * | CANADA | 799732 | 1998 00011 | 09 16 36 | TRIMARK INVESTMENT MANAGEMENT INC. TORONTO | CANA |
| 12 | N SYNC * | CANADA | 834465 | 1998 00032 | 06 09 14 16 18 20 21 25 26 28 41 | LOUIS J. PEARLMAN ORLANDO | USA |
| 13 | IN SYNC * | CANADA | 837417 | 1998 00050 | 09 16 36 | TRIMARK INVESTMENT MANAGEMENT INC. TORONTO | CANA |
| 14 | EN SYNC | CANADA | 852659 | 1998 00090 | 09 | PANASONIC CANADA INC. MISSISSAUGA | CANA |
| 15 | ENSYNC | CANADA | 886945 | 1999 00079 | 09 | PANASONIC CANADA INC. MISSISSAUGA | CANA |
| 16 | INSYNC | COMMUNITY TRADEMARKS | 00178897 | 1998 00100 | 09 16 42 | INSYNC SYSTEMS INC. MILPITAS | USA |
| 17 | INC INCREDIBLE | COMMUNITY TRADEMARKS | 00772574 | 1999 00365 | 09 16 41 | SONY MUSIC ENTERTAINMENT UK LIMITED LONDON | GBRI |
| 18 | N SYNC * | FINLAND | 208276 | 1997 00035 | 09 16 25 41 | PEARLMAN LOUIS J. FLORIDA | USA |

* Trademark has a design element.

## WISS - World Identical Screening Search
Ref: W19990908/58300711

Run Date: 08-SEP-99
Classes: 03 06 09 14 16 18 25 28 41

| Hit # | Trademark | Country/ Register | App/Reg Number | Pub Ref Year Page | Classes | Applicant Identifier | Country |
|---|---|---|---|---|---|---|---|
| 19 | LA CINQUIEME ON EN APPREND TOUS LES JOURS | FRANCE | 95579982 | 1995 00095 | 09 16 25 28 35 38 41 | TELEVISION DU SAVOIR DE LA FORMTATION ET DE L EMPLOI ISSY LES MOULINEAUX | FRAN |
| 20 | N SYNC * | FRANCE | 97665595 | 1997 00128 | 09 16 25 41 | PEARLMAN LOUIS J. ORLANDO | USA |
| 21 | INSYNQ | GERMANY FED RE | 39533377 | 1996 04307 | 09 16 42 | QUINTUS CORP. MOUNTAIN VIEW | USA |
| 22 | INSYNC | GERMANY FED RE | 39625025 | 1997 01317 | 09 12 | ONLINE STORE TELECOM SYSTEME GMBH DIETZENBACH | WGER |
| 23 | N SYNC * | GERMANY FED RE | 39705244 | 1997 08028 | 16 09 14 18 20 21 25 26 28 41 | PEARLMAN LOUIS J. ORLANDO | USA |
| 24 | N SYNC | GERMANY FED RE | 39719889 | 1997 11241 | 25 21 26 | ENGELHARDT ROLF ENGELHARDT DOMINIK GELSENKIRCHEN | WGER |
| 25 | N SYNC * | INDONESIA | 012209 | 1998 00251 | 09 | LOUIS J. PEARLMAN ORLANDO | USA |
| 26 | N SYNC * | ITALY | RM000794 | 1997 00662 | 09 16 25 41 | LOUIS J.PEARLMAN ORLANDO | USA |
| 27 | NSIINC | JAPAN | 01080747 | 1991 Y106 | 09 11 | NIPPON SYSTEM INTEGRATION TOKYO | JAPA |
| 28 | NSIINC | JAPAN | 01080748 | 1992 S130 | 09 11 | NIPPON SYSTEM INTEGRATION TOKYO | JAPA |
| 29 | NSIINC | JAPAN | 01080749 | 1991 R116 | 16 | NIPPON SYSTEM INTEGRATION TOKYO | JAPA |
| 30 | NSIINC | JAPAN | 01080750 | 1992 J093 | 16 | NIPPON SYSTEM INTEGRATION TOKYO | JAPA |
| 31 | C IN C | JAPAN | 02030132 | 1994 I0086 | 09 11 | CINC AICHI | JAPA |
| 32 | M S INC | JAPAN | 02132928 | 1992 K117 | 24 25 | MS IN CORP. TOKYO | JAPA |
| 33 | INFORMIX IN SYNC SOFTWARE PARTNERSHIPS UNLIMITED * | JAPAN | 04240996 | 1995 Y0026 | 41 | INFOMIKKUSU SOFUTOUEA INC CALIFORNIE | USA |
| 34 | INSSINC * | JAPAN | 04325169 | 1995 Q0098 | 09 | NEW YORK | USA |
| 35 | IN SINK MATE | JAPAN | 63054163 | 1990 L115 | 09 11 | EMERSON ELECTRIC COMP. MISSOURI | USA |
| 36 | IN SINK MATE | JAPAN | 63054164 | 1990 L115 | 09 11 | EMERSON ELECTRIC COMP. MISSOURI | USA |

* Trademark has a design element.

## WISS - World Identical Screening Search
Ref: W19990908/58300711

Run Date: 08-SEP-99
Classes: 03 06 09 14 16 18 25 28 41

| Hit # | Trademark | Country/ Register | App/Reg Number | Pub Ref Year Page | Classes | Applicant Identifier | Country |
|-------|-----------|-------------------|----------------|-------------------|---------|----------------------|---------|
| 37 | INZINC | JAPAN | 63126053 | 1990 Z102 | 03 | FH HOLDING SOUTH AUSTRALIA | AUST |
| 38 | 88 SINK HWA IN * | KOREA SOUTH | 89004695 | 1989 0062 | 06 19 | YONG MAN LEE | SKOR |
| 39 | INSYNC | KOREA SOUTH | 96017594 | 1997 00041 | 03 05 08 10 18 21 | CHE IL JE DANG J.H. | SKOR |
| 40 | INSYNC | KOREA SOUTH | 96017596 | 1997 00101 | 03 21 | CHE IL JE DANG J.H. | SKOR |
| 41 | N SYNC * | KOREA SOUTH | 98016601 | 1999 08046 | 09 | LOUIS J. PEARLMAN | USA |
| 42 | IN SINK ERATOR | MEXICO | 227529 | 1979 N284 | 09 | EMERSON ELECTRIC RACINE | USA |
| 43 | N SYNC * | NEW ZEALAND | 294528 | 1998 02506 | 09 | LOUIS J PEARLMAN ORLANDO | USA |
| 44 | N SYNC * | NORWAY | 194557 | 1999 00020 | 09 16 25 41 | LOUIS J. PEARLMAN ORLANDO | USA |
| 45 | ISE IN SINK ERATOR * | PARAGUAY | 94016516 | 1995 00465 | 09 | EMERSON ELECTRIC CO. | USA |
| 46 | ISE IN SINK ERATOR ISE INK SINK ERATOR * | PARAGUAY | 94020399 | 1995 00486 | 09 | EMERSON ELECTRIC CO. | PARA |
| 47 | CINCO EN UNO | PERU | 078702 | 1984 0219 | 28 | GRAFICA TECNICA | PERU |
| 48 | INSYNC INTERNATIONAL * | PERU | 168466 | 1990 0432 | 09 | INSYNC | PERU |
| 49 | ISE IN SINK ERATOR * | POLAND | 086399 | 1995 01333 | 07 09 11 | EMERSON ELECTRIC CO. ST. LOUIS | USA |
| 50 | N SYNC * | PORTUGAL | 321811 | 1997 00531 | 09 16 25 41 | LOUIS J. PEARLMAN ORLANDO | USA |
| 51 | N SYNC * | SPAIN | 2073404 | 1997 09545 | 09 | PEARLMAN LOUIS J. ORLANDO | USA |
| 52 | N SYNC * | SPAIN | 2073405 | 1997 09545 | 16 | PEARLMAN LOUIS J. ORLANDO | USA |
| 53 | N SYNC * | SPAIN | 2073406 | 1997 09545 | 25 | PEARLMAN LOUIS J. ORLANDO | USA |
| 54 | N SYNC * | SPAIN | 2073407 | 1997 09546 | 41 | PEARLMAN LOUIS J. ORLANDO | USA |
| 55 | N 64 ZINCO MULTIMEDIA | SPAIN | 2096978 | 1997 22908 | 16 | EDICIONES ZINCO BARCELONA | SPAI |
| 56 | N SYNC * | SWITZERLAND | 447903 | 1998 00474 | 09 16 25 41 | LOUIS J. PEARLMAN ORLANDO | USA |
| 57 | ISE IN SINK ERATOR | TAIWAN | 299397 | 1985 0536 | 07 09 11 | EMERSON ELECTRIC ST. LOUIS | USA |
| 58 | ISE IN SINK ERATOR HAO NEI ZHU * | TAIWAN | 392111 | 1987 0453 | 07 09 11 21 | Name of applicant not available | |

* Trademark has a design element.

## WISS - World Identical Screening Search
### Ref: W19990908/58300711

Run Date: 08-SEP-99
Classes: 03 06 09 14 16 18 25 28 41

| Hit # | Trademark | Country/ Register | App/Reg Number | Pub Ref Year Page | Classes | Applicant Identifier | Country |
|---|---|---|---|---|---|---|---|
| 59 | IN SINK ERATOR | TAIWAN | 83046187 | 1995 O0194 | 07 09 11 21 | EMERSON ELECTRIC COMPANY ST LOUIS MISSOURI | USA |
| 60 | N SYNC N SYNC * | TAIWAN | 87033338 | 1999 00587 | 09 | LOUIS J PEARLMAN ORLANDO | USA |
| 61 | N SYNC * | THAILAND | 363866 | 1999 00080 | 09 | MR. LOUIS J. PEARLMAN | USA |
| 62 | IN SYNC * | UNITED KINGDOM | 1565553 | 1995 01953 | 25 | FATEH INTERNATIONAL LIMITED LONDON | GBRI |
| 63 | N SYNC * | UNITED KINGDOM | 2122875A | 1998 14747 | 09 14 16 18 20 21 26 28 41` | LOUIS J PEARLMAN C O ORLANDO | USA |
| 64 | IN SYNQ | UNITED STATES | 020868 | 1990 U142 | 41 | GJ MARKETING CORP. DETROIT | USA |
| 65 | INSYNC MODEMSHARE | UNITED STATES | 063945 | 1997 00244 | 09 | ARTISOFT INC. TUCSON | USA |
| 66 | TUB N SINK JELLY | UNITED STATES | 064956 | 1993 N047 | 03 | LOCTITE CORP. NEWINGTON | USA |
| 67 | IN SYNC MEDIA SERVICES * | UNITED STATES | 065494 | 1997 00433 | 41 | IN SYNC MEDIA SERVICES VIRGINIA BEACH | USA |
| 68 | INZINC | UNITED STATES | 086715 | 1991 B034 | 03 | F.H. FAULDING PARKSIDE | AUST |
| 69 | INSYNC | UNITED STATES | 105545 | 1997 00188 | 16 | SUNDAY SCHOOL BOARD OF THE SOUTHERN BAPTIST CONVENTION NASHVILLE | USA |
| 70 | CORPORATE CONNECT INSYNC * | UNITED STATES | 119239 | 1991 L062 | 09 | GALLAGHER SYSTEMS RESTON | USA |
| 71 | INSYNC | UNITED STATES | 158940 | 1997 00249 | 09 | INTEGRATED SUPPORT SYSTEMS CLEMSON | USA |
| 72 | SYNECTICS INSYNC | UNITED STATES | 188851 | 1997 00192 | 09 | SYNECTICS CAMBRIDGE | USA |
| 73 | SINK N SAVE | UNITED STATES | 213768 | 1992 I168 | 28 | DAYTRAUN GUYMON | USA |
| 74 | N SYNC INC * | UNITED STATES | 214905 | 1992 S187 | 09 | N SYNC SCOTCH PLAINS | USA |
| 75 | INSYNC | UNITED STATES | 216715 | 1998 00019 | 35 39 41 42 | ADVANTA INFORMATION SERVICES SPRING HOUSE | USA |

* Trademark has a design element.

## WISS - World Identical Screening Search
Ref: W19990908/58300711

Run Date: 08-SEP-99
Classes: 03 06 09 14 16 18 25 28 41

| Hit # | Trademark | Country/ Register | App/Reg Number | Pub Ref Year Page | Classes | Applicant Identifier | Country |
|-------|-----------|-------------------|----------------|-------------------|---------|----------------------|---------|
| 76 | IN SYNC * | UNITED STATES | 242436 | 1997 00146 | 09 | GIGATRON SOFTWARE CORP. IRVINE | USA |
| 77 | IN SYNC | UNITED STATES | 324855 | 1994 A0147 | 25 | TROMBETTA NEW YORK | USA |
| 78 | IN SYNC MEDIA SERVICES INC * | UNITED STATES | 327777 | 1993 R232 | 41 | KONDAS VIRGINIA BEACH | USA |
| 79 | INSYNC | UNITED STATES | 358800 | 1993 Y080 | 09 | SYNERGY SOLUTIONS MESA | USA |
| 80 | IN SYNC | UNITED STATES | 358872 | 1993 X081 | 09 | IN SYNC SPORT INT. CAPE PORPOISE | USA |
| 81 | IN SYNC * | UNITED STATES | 367416 | 1993 A0052 | 09 | GOLF SCIENTIFIC DEL MAR | USA |
| 82 | IN SYNC * | UNITED STATES | 380886 | 1994 I0086 | 09 | IN SYNC CORP. BETHESDA | USA |
| 83 | IN SYNC | UNITED STATES | 385063 | 1993 R0104 | 16 | ERIE INSURANCE EXCHANGE ERIE | USA |
| 84 | IN SYNC * | UNITED STATES | 403397 | 1984 Q233 | 25 | GARAN NEW YORK | USA |
| 85 | INSYNC | UNITED STATES | 408749 | 1998 00218 | 16 | IN SYNC KINGWOOD | USA |
| 86 | INSYNC | UNITED STATES | 428395 | 1995 00006 | 09 37 | MANTECH SYSTEMS CORP. JAMESBURG | USA |
| 87 | INSYNC | UNITED STATES | 450525 | 1998 00223 | 09 | ADAC LAB. MILPITAS | USA |
| 88 | IN SYNC | UNITED STATES | 469493 | 1999 00001 | 25 42 | FEDERATED DEPARTMENT STORES CINCINNATI | USA |
| 89 | INSYNC | UNITED STATES | 540548 | 1996 00133 | 16 | RICHMOND NEWSPAPERS RICHMOND | USA |
| 90 | INSYNC * | UNITED STATES | 540681 | 1996 00134 | 16 | RICHMOND NEWSPAPERS RICHMOND | USA |
| 91 | INSYNQ | UNITED STATES | 543706 | 1995 U0120 | 09 | QUINTUS CORP. MOUNTAIN VIEW | USA |
| 92 | INSYNC * | UNITED STATES | 552384 | 1995 00162 | 09 | INSYNC SYSTEMS SANTA CLARA | USA |
| 93 | IN SYNC * | UNITED STATES | 583658 | 1995 00195 | 16 | PILGRIM SMYRNA | USA |
| 94 | IN SYNCH | UNITED STATES | 586692 | 1986 R048 | 09 | AMERICAN VIDEO TELECONFERENCING FARMINGDALE | USA |
| 95 | INSYNC * | UNITED STATES | 666765 | 1996 00127 | 09 | DI BIASIO EDGINGTON ANNANDALE | USA |

* Trademark has a design element.

**N SYNC**

**WISS - World Identical Screening Search**
Ref: W19990908/58300711

Run Date: 08-SEP-99
Classes: 03 06 09 14 16 18 25 28 41

| Hit # | Trademark | Country/ Register | App/Reg Number | Pub Ref Year Page | Classes | Applicant Identifier | Country |
|-------|-----------|-------------------|----------------|-------------------|---------|----------------------|---------|
| 96 | IN SYNC PRODUCTIONS ISP * | UNITED STATES | 700969 | 1988 F101 | 41 | IN SYNC PRODUCTIONS NEW YORK | USA |
| 97 | IN SYNC | UNITED STATES | 721793 | 1996 00328 | 41 | REALITY MINISTRIES DUNCANVILLE | USA |
| 98 | IN SYNC WITH YOUR VALUES | UNITED STATES | 731492 | 1996 00167 | 09 | WHEELOCK LONG BRANCH | USA |
| 99 | IN SYNC MANAGEMENT * | UNITED STATES | 815924 | 1990 B025 | 16 41 | PERFORMANCE SYSTEMS DALLAS | USA |
| | End of Search | | | | | | |

* Trademark has a design element.

**Page:   7**

14

NOTICE OF SPECIAL MEETING
OF
BOARD OF DIRECTORS OF
'N SYNC PRODUCTIONS INC.

A special meeting of the board of directors of 'N Sync Productions, Inc. a Delaware corporation, will be held at 2:30 p.m. on June 17, 1999 at the Sheraton Orlando North Hotel, 600 North Lake Destiny Drive, Maitland, Florida, to consider the appointment of an Independent Auditor; the distribution of the corporation's assets and the winding up of its affairs and the transaction of such other business as may lawfully come before the meeting.

Dated:      London, England
            June 9, 1999


James Lance Bass
Director


Joseph Anthony Fatone, Jr.
Director


Justin Randall Timberlake
Director


Joshua Scott Chasez
Director


Christopher Alan Kirkpatrick
Director

**15**

PARKER CHAPIN FLATTAU & KLIMPL, LLP

COUNSELLORS AT LAW

1211 AVENUE OF THE AMERICAS
NEW YORK, NY 10036-8735
(212) 704-6000

CABLE LAWPARK

FAX (212) 704-6288

TELEX 640347

MICHAEL D. FRIEDMAN
(212) 704-6300

475 GREAT NECK ROAD
GREAT NECK, NY 11021
(516) 482-4422
FAX (516) 482-4489

June 14, 1999

BY FACSIMILE AND
FEDERAL EXPRESS

Adam E. Ritholz, Esq.
Liebowitz Roberts & Ritholz, LLP
183 Madison Avenue
Penthouse
New York, New York 10016

Re:    'N Sync Productions, Inc.

Dear Mr. Ritholz:

Louis J. Pearlman, Chairman and President of 'N Sync Productions, Inc. (the "Corporation"), Trans Continental, Inc., and Trans Continental Records, Inc. has referred to us your letter of June 10, 1999 directed to Mr. Pearlman and Laurence H. Rudolph, Esq., together with its attached document purporting to be a Notice of Special Meeting of the Board of Directors of the Corporation (the "Notice").

We understand that the individuals who are signatories to the Notice are neither officers nor directors of the Corporation and the steps necessary to convene a special meeting of the Board of Directors of the Corporation have not been appropriately taken. Without limitation, you are hereby advised that the meeting has been improperly called, and the Notice otherwise fails to satisfy the requirements of the by-laws of the Corporation or the Delaware General Corporation Law. Accordingly, the Notice is a nullity and any action purportedly taken on June 17, 1999 or on any adjourned or postponed date is of no legal force or effect. We would nevertheless address with you any basis you may claim to have for the authority or action contemplated by the Notice. In the absence of a response, we will assume you cannot refute the facts here described and the conclusions which derive from these facts.

459633-1



PARKER CHAPIN FLATTAU & KLIMPL, LLP

Adam E. Ritholz, Esq.                    - 2 -                    June 14, 1999

It is also apparent from the terms of the Notice and surrounding circumstances that the matters proposed to be considered at the special meeting would violate the contractual and other rights of the Corporation, Mr. Pearlman, Trans Continental, Inc. and Trans Continental Records, Inc. In particular, any actions which would, directly or indirectly, impair assets or divert business opportunities of the Corporation, constitute self-dealing, purport to seek an improper dissolution of the Corporation, or otherwise interfere with the proprietary the rights of those mentioned, would be unlawful and subject your clients to substantial liabilities. In this regard, be advised that we will take such action as may be necessary to vigorously enforce all of our clients' rights and to pursue all available remedies.

All of our clients' rights, claims, remedies and legal positions are expressly reserved.

Very truly yours,

PARKER CHAPIN FLATTAU & KLIMPL, LLP

By: _____
    Michael D. Friedman

cc:   Mr. Louis J. Pearlman
      Laurence H. Rudolph, Esq.
      Steven C. Beer, Esq.
      Barry J. Brett, Esq.

459638-1

16

(ak 010896)

SUBJECT TO CONTRACT

An / To:          Louis J. Pearlman
                  TRANS CONTINENTAL RECORDS, INC

Fax -Nr:

Von / From:       BMG Ariola Muenchen GmbH

                  Proposed License Agreement
                  Trans Continental Records Inc. ("Licensor") -w-
                  BMG Ariola Muenchen GmbH ("Licensee" or "BMG")
                  for the services of N-Sync ("Artist Group" or "Artists")

```
EINGEGANGEN
    6. AUG. 1996
Erled. ..........................
```

| If you did not receive all pages please call the telephone number above. |
| --- |

Datum /Date: August 1,      Zeit /Time:   16:12      Seiten / Pages:
             1996

Dear Mr. Pearlman:

We hereby should like to summarize our mutual understanding and agreement as follows:

Within no later than four (4) weeks from the date hereof, Transcontinental Records Inc. shall deliver to BMG demo recordings ("the Specified Demos") of such sufficient master recordings featuring the recorded performances of the Artists as shall be required to make two (2) singles, and BMG shall have thirty (30) days from BMG's receipt of the Specified Demos ("BMG's Decision Period") to determine (at BMG's sole discretion) whether or not BMG wishes to enter into the exclusive licensing arrangement with Transcontinental Records, Inc. for the services of the Artists on the basis of the terms and conditions set forth below, PROVIDED THAT BMG's decision on the immediately aforesaid shall be notified to Transcontinental Records in writing within BMG's Decision Period and other subject to the following: (A) If BMG decides not to enter into such licensing arrangement with Trans Continental Records, then BMG shall have no rights in and to the master recordings comprised in the Specified Demos and Trans Continental Records shall be free to contract with any other party for the services of the Artists, it being hereby expressly clarified and agreed that Trans Continental Records shall have no claims against BMG as a result of BMG's decision as immediately aforesaid or (B) If BMG decides to enter into such licensing arrangement with Trans Continental Records, then the master recordings comprised in the Specified Demos shall be deemed to fall within the terms and conditions of such licensing arrangement between BMG and Trans Continental Records (and shall thus fall within the definition of "Additional Master Recordings" (as defined for purposes thereof), in which case the licensing arrangement shall automatically come into effect on the basis of the following terms and conditions:

1.     Licensor:
Trans Continental Records Inc.

2.     Licensee:
BMG Ariola Muenchen GmbH

3.     Exclusive Licensed Territory ("Territory"):
The world and the universe;

#### 4.    Type of Contract:

Exclusive License Agreement ("the Agreement") for the services of the artist group ("Artists" or "Artist Group" which is currently p/k/a "N-Sync" ("Group Name", subject as further specified in 4.b. below). For the purpose of the Agreement,

   a.    Licensor warrants, represents and agrees all of the following:

   (i)    On the basis of one or more binding agreement(s) Licensor has at present and shall continue to have at least during the entire "Term" of the Agreement the sole and exclusive right throughout the Territory to call upon the Artist Group to render services in connection with the making of recordings (whether audio-only and/or audio-visual) of all descriptions and by any and all methods now or hereafter known.

   (ii)    Licensor is authorized to legally bind the Artists on an exclusive basis for purposes of performing the Agreement and it is the Artists' wish that Licensor does so, it being hereby agreed that, in verification of the immediately aforesaid, Licensor shall cause each of the Artists to sign a so-called "Letter of Inducement", such signed Letters of Inducement to be returned to Licensee no later than concurrently with the execution by Licensor of the Agreement.

   (iii)    Licensor and/or Artists shall not cause or procure any changes and will use their best endeavours to prevent any changes during the Term of the Agreement in the Artist Group as now comprised, provided always that (aa) the Artist Group featured in any and all master recordings to be delivered pursuant to the Agreement shall consist of at least the key members specified below which currently comprise the Artist Group ("Key Members") and such additional artist(s), if any, as may be required from time to time to maintain or improve the artistic quality of the Artist Group; (bb) during the Term of the Agreement, the Key Members may not be replaced unless Licensor and Licensee shall mutually agree that any artist(s) of similar calibre are acceptable in replacement of any of the following Key Members:

.................................................................................................................

.................................................................................................................

   (iv)    If, during the Term, any "Leaving Member" (which immediately aforesaid expression means any Key Member or any person accepted in replacement of a Key Member) becomes permanently incapacitated by illness or separates from or otherwise ceases to perform with the remaining Key Members ("Remaining Members") of the Artist Group, then Licensor shall promptly give Licensee written notice of such occurrence and Licensee, in its sole discretion, by written notice to Licensor, may elect to (aa) terminate the Term of the Agreement or (bb) require Licensor and the Remaining Members to continue to be bound by the Agreement and either promptly furnish an acceptable substitute for the Leaving Member or perform as a reconstituted Artist Group without the replacement of the Leaving Member;

   (v)    If during the Term of the Agreement a Key Member (or any person accepted in replacement of a Key Member) decides to record individually whilst still a member of the Artist Group ("Solo Member"), then Licensor shall promptly notify the Licensee in writing to that effect, provided that Licensor shall procure that (unless Licensee specifically agrees to the contrary in writing) no Key Member shall become a Solo Member

-3- (a:jk010896) Basic Terms: Proposed License Agreement re. N-Sy.

during the Term until such time as Licensee shall have released under the Agreement the so-called "First Commitment Album", the "Second Commitment Album" and (if applicable) any further "Commitment Album" (as such expressions are defined) in respect of which Licensee shall have exercised its first option under the Agreement prior to Licensee's receipt of Licensor's written notification as immediately aforesaid.

(vi)    Licensee shall have irrevocable options (subject as shall be specified in more detail in the Agreement) to acquire exclusively the individual recording services of each Leaving Member and/or Solo Member.

(vii)    During the entire Term of the Agreement, Licensor and/or Artists will neither without Licensee's prior written consent change the "Group Name" nor will any Leaving Member or Solo Member have the right to use the Group Name at any time during the Term of the Agreement without Licensee's prior written consent;

(viii)    Licensor is authorized to grant and shall grant to Licensee (for as long as Licensee shall have the exploitation rights pursuant to the Agreement) the right to use and/or to authorize any of Licensee's affiliates, subsidiaries, licensees and their respective parents, sub-licensees and assigns to use (without liability to any party) the Group Name as well as the individual name and/or professional name, facsimile signature, voice, biographical material, photographs and/or other likenesses of each person comprising the Artist Group in connection with the exploition of rights granted to Licensee pursuant to the Agreement.

(ix)    All Master Recordings to be produced under the Agreement shall be so produced solely by such established top producer(s) as has/have proven to be successful in the past (such as but not limited to Denniz Pop) and as shall be mutually agreed from time to time between Licensor and Licensee, and all material to be recorded under the Agreement shall be selected in prior consultation with the Licensee.

(x)    At least DM 350.000,-- (three hundred and fifty thousand Deutsche Mark) shall be expended by way of recording costs in respect of each "Commitment Album" to be delivered by Licensor to Licensee under the Agreement.

(xi)    During the "Re-recording Restriction Period" (as hereinafter defined), each of the Artists and applicable Producer(s) shall be subject to a re-recording restriction in respect of the material included in each applicable "Accepted Master Recording" (as defined), which Re-recording Restriciton Period shall in each instance mean a period of five (5) years from Licensee's initial release of the respective Accepted Master Recording.

b.    "Group Name" means "N-Synch" and any new Group Name as may be adopted for use in connection with the exploitation of the Artist Group's recorded performances, subject to the following:

(i)    Prior to the initial Record release under the Agreement, the parties hereto and Artists shall liaise in good faith and decide by mutual agreement as to whether or not the Artist Group shall adopt another professional Group Name for use in the Territory or any part(s) thereof; and

(ii)    if at any time any third party challenges the Artists' right to use the Group Name and/or new Group Name (as applicable), the parties hereto and Artists shall liaise




4- (a-ik010896) Basic Terms: Proposed License Agreement re. N-Sy,

in good faith and decide by mutual agreement as to whether or not Artists shall adopt another professional name selected by mutual agreement without awaiting the determination of the validity of any such challenge.

## 5.    Licensor's Delivery Commitment, Term of Agreement and Duration of Licensee's Exploitation Rights:

a.    The Agreement shall contain a firm commitment for the production by or on behalf of Licensor and the delivery to Licensee of the "First Commitment Album" (as hereinafter defined) and (subject to Licensor's compliance with Licensor's applicable contractual obligations in respect of the production and delivery of same), Licensee shall be deemed to have been accepted the First Commitment Album for release under the Agreement. For purposes of the Agreement, "First Commitment Album" means the Artist Group's newly produced studio album (whether or not same is a multiple album) to be next released after the Commencement Date of the Term of the Agreement, such completed First Commitment Album to be delivered to Licensee prior to December 31st, 1996.

b.    In addition to Licensee's rights in and to the First Commitment Album, Licensor grants to Licensee separate and consecutive first options to secure for release in the Territory under the terms and conditions of the Agreement all new master recordings embodying the performances of the Artist which shall be produced at any time during the "Term" of the Agreement ("Option Masters"). Licensor shall offer all Option Masters in the form of the respective record formats envisaged by Licensor for initial release of same ("Option Records") and otherwise subject to the following:

(i)    Licensor shall deliver two samples ("Samples") containing either demo or completed recordings (as Licensor may elect at its sole discretion) of at least 50% of the Option Masters to be included in each Option Record, and Licensee shall in each instance have a period of 30 (thirty) calendar days from Licensee's receipt of Samples of the respective Option Record ("Option Period") to exercise Licensee's first option in relation to same by written notice to Licensor. The exercise from time to time by Licensee of Licensee's first option right in accordance with the immediately aforesaid shall be deemed to constitute Licensee's acceptance of the applicable Option Record, provided that Licensee's failure from time to time to validly exercise its first option right in respect of the applicable Option Record shall be deemed to constitute non-acceptance (rejection) of same.

(ii)    Subject to the provisions contained in sub-clauses 5.c. and 5.d. hereof, the Option Records available to Licensee under the Agreement shall include at least the "Second Commitment Album", "Third Commitment Album", the "Fourth Commitment Album" and the "Fifth Commitment Album" (as such expressions are defined and subject as hereinafter specified in more detail), PROVIDED THAT

(aa)    "Second Commitment Album" means the Artist Group's newly produced studio album (whether or not same is a multiple album) to be next released after the release of the First Commitment Album (whereby Licensor shall procure that Samples of the Second Commitment Album shall be supplied to Licensee no later than nine (9) months after the release of the First Commitment Album and, if Licensee shall have validly exercised its first option in relation to the Second Commitment Album, then the completed Second Commitment Album shall be delivered to Licensee not earlier than twelve (12) months but in

-5- (a:ik010896) Basic Terms: Proposed License Agreement re. N-S\

any event no later than eighteen (18) months after Licensee's initial release of the First Commitment Album;

(bb) "Third Commitment Album" means the Artist Group's newly produced studio album (whether or not same is a multiple album) to be next released after the release of the Second Commitment Album (whereby Licensor shall procure that Samples of the Third Commitment Album shall be supplied to Licensee no later than nine (9) months after the release of the Second Commitment Album) and, if Licensee shall have validly exercised its first option in relation to the Third Commitment Album, then the completed Third Commitment Album shall be delivered to Licensee not earlier than twelve (12) months but in any event no later than eighteen (18) months after Licensee's initial release of the Second Commitment Album;

(cc) "Fourth Commitment Album" means the Artist Group's newly produced studio album (whether or not same is a multiple album) to be next released after the release of the Third Commitment Album (whereby Licensor shall procure that Samples of the Fourth Commitment Album shall be supplied to Licensee no later than nine (9) months after the release of the Third Commitment Album and, if Licensee shall have validly exercised its first option in relation to the Fourth Commitment Album, then the completed Fourth Commitment Album shall be delivered to Licensee not earlier than twelve (12) months but in any event no later than eighteen (18) months after Licensee's initial release of the Third Commitment Album;

(dd) "Fifth Commitment Album" means the Artist Group's newly produced studio album (whether or not same is a multiple album) to be next released after the release of the Fourth Commitment Album (whereby Licensor shall procure that samples of the Fifth Commitment Album shall be supplied to Licensee no later than nine (9) months after the release of the Fourth Commitment Album and, if Licensee shall have validly exercised its first option in relation to the Fifth Commitment Album, then the completed Fifth Commitment Album shall be delivered to Licensee not earlier than twelve (12) months but in any event no later than eighteen (18) months after Licensee's initial release of the Fourth Commitment Album.

c. The "Term" of the Agreement shall commence as of August 1, 1996 ("Commencement Date") and shall thereafter continue up to the expiration of ten (10) months after the initial release in the Territory of the Fifth Commitment Album , PROVIDED THAT, notwithstanding anything to the contrary herein contained,

(i) if Licensee rejects or fails to validly exercise its first option in relation to the Second Commitment Album, then the Term shall expire prematurely as of the latest of (aa) the expiration of the Option Period relating thereto or (bb) the date of the actual rejection by Licensee of the Second Commitment Album or (cc) the expiration of ten (10) months after the initial release in the Territory of the First Commitment Album (as the case may be, whichever shall be the latest), provided further that, upon the premature expiration of the Term of the Agreement pursuant to the foregoing provisions of this sub-paragraph (i), Licensor shall have the right to license the Second Commitment Album to any other party and Licensee's first options in relation to the Third Commitment Album, the Fourth Commitment Album and the Fifth Commitment Album shall be deemed to be null and void; or

Case 6:99-cv-01282-ACC   Document 36   Filed 11/02/99   Page 193 of 226 PageID 740

-6- (a:jk010896) Basic Terms: Proposed License Agreement re. N-Syn...

(ii)    if Licensee shall have accepted the Second Commitment Album for release under the Agreement but if Licensee rejects or fails to validly exercise its first option in relation to the Third Commitment Album, then the Term shall expire prematurely as of the latest of (aa) the expiration of the Option Period relating thereto or (bb) the date of the actual rejection by Licensee of the Third Commitment Album or (cc) the expiration of ten (10) months after the initial release in the Territory of the Second Commitment Album (as the case may be, whichever shall be the latest), provided further that, upon the premature expiration of the Term of the Agreement pursuant to the foregoing provisions of this sub-paragraph (i), Licensor shall have the right to license the Third Commitment Album to any other party and Licensee's first options in relation to the Fourth Commitment Album and the Fifth Commitment Album shall be deemed to be null and void; or

(iii)    if Licensee shall have accepted the Third Commitment Album for release under the Agreement but if Licensee rejects or fails to validly exercise its first option in relation to the Fourth Commitment Album, then the Term shall expire prematurely as of the latest of (aa) the expiration of the Option Period relating thereto or (bb) the date of the actual rejection by Licensee of the Fourth Commitment Album or (cc) the expiration of ten (10) months after the initial release in the Territory of the Third Commitment Album (as the case may be, whichever shall be the latest), provided further that, upon the premature expiration of the Term of the Agreement pursuant to the foregoing provisions of this sub-paragraph (ii), Licensor shall have the right to license the Fourth Commitment Album to any other party and Licensee's first option in relation to the Fifth Commitment Album shall be deemed to be null and void; or

(iv)    if Licensee shall have accepted the Fourth Commitment Album for release under the Agreement but if Licensee rejects or fails to validly exercise its first option in relation to the Fifth Commitment Album, then the Term shall expire as of the latest of (aa) the expiration of the Option Period relating thereto or (bb) the date of the actual rejection by Licensee of the Fifth Commitment Album or (cc) the expiration of ten (10) months after the initial release in the Territory of the Fourth Commitment Album (as the case may be, whichever shall be the latest), provided further that, upon the expiration of the Term of the Agreement pursuant to the foregoing provisions of this sub-paragraph (iii), Licensor shall have the right to license the Fifth Commitment Album to any other party.

d.    The First Commitment Album to be delivered by Licensor to Licensee pursuant to sub-paragraph 5.a. and (to the extent applicable) any subsequent Commitment Album(s) to be delivered by Licensor to Licensee pursuant to sub-paragraph 5.b. above are sometimes collectively referred to as "Licensor's Minimum Deliver Commitment", it being expressly clarified and agreed that each Multiple Album which otherwise qualifies as a "Commitment Album" shall count as only one (1) Commitment Album delivered by Licensor towards the fulfilment of Licensor's Minimum Delivery Commitment. It is hereby further agreed that neither any master recordings from the Artist Group's back catalogue nor any Master Recordings embodying the performances of the Artist Group recorded at any time during the Term hereof which consist substantially of only spoken word or which are so-called "live" or specialized "theme" recordings (such as but not limited to any Christmas songs) or "Soundtrack Recordings" or "Videos" (as the case may be) nor any recordings or records by any Solo Member or Leaving Member (as the case may be) shall be applicable towards the fulfilment of Licensor's Minimum Delivery Commitment nor shall any Option Records which are Singles or EPs or Mini Albums or "Greatest Hits" Albums or "Live" Albums or "Limited Edition" Albums (as the case may be) be applied towards the fulfilment

of Licensor's Minimum Delivery Commitment, provided, however, that if at any time during the Term hereof any Master Recordings or Records embodying the performances of the Artist Group shall be recorded or compiled by or on behalf of Licensor (as the case may be) which are in excess of Licensor's Minimum Delivery Commitment ("Excess Master Recordings") and/or which shall not qualify as Master Recordings or Records applicable towards the fulfilment of Licensor's Minimum Delivery Commitment ("Non-Qualifying Master Recordings"), as the case may be (any and all such Non-Qualifying Master Recordings and/or Excess Master Recordings being for the purposes of the Agreement collectively referred to as "Additional Master Recordings", which immediately aforesaid expression shall be deemed to exclude, however, any recordings or records subject to any separate agreement(s)(if any) respecting the services of any Leaving Member or Solo Member), then such Additional Master Recordings (if any) shall equally be deemed to be Option Masters available to Licensor for release in the Territory under the terms and conditions hereof, PROVIDED THAT the non-acceptance or rejection of any Additional Master Recording(s) shall not result in any premature expiration of the Term hereof. Upon the expiration or premature expiration or other termination of the Term of the Agreement, all rights for the Territory in and to any Additional Master Recording(s) rejected or not accepted by Licensee hereunder (collectively "Rejected Additional Master Recordings") shall revert to Licensor and Licensor shall thereafter have the right to exploit and/or authorize any third party to exploit all or any of such Rejected Additional Master Recordings in the Territory or any parts thereof, provided always that any Records, Videograms and/or Multimedia configurations which Licensor and/or any third party may be entitled to release, distribute, sell and/or otherwise exploit at any time after the expiration or premature expiration or other termination of the Agreement shall neither contain any "Accepted Master Recordings" nor any "Specified Videos" (as defined and subject as hereinafter specified in more detail).

e.    Under the Agreement, Licensee shall acquire and retain perpetual exclusive and unrestricted exploitation rights for the Territory in and to all Master Recordings accepted by Licensee for release under the Agreement ("Accepted Master Recordings", which immediately aforesaid expressions shall be deemed to include any and all mixes and/or remixes of same) as well as in and to all "Specified Videos" (which immediately aforesaid expression shall be deemed to mean any and all videos and/or video-clips which embody or are made of or based upon any of the Accepted Master Recordings). Licensee's exclusive exploitation rights as aforesaid include all rights for the promotional and/or commercial exploitation (including exclusive compilation rights) of each Accepted Master Recording and each Specified Video, including without limitation the right to manufacture, release, transmit, market, distribute, sell, use, exhibit and/or otherwise exploit for promotional, commercial and/or any other purposes, publicly perform, broadcast, advertise, publicise and promote the Accepted Master Recordings and/or Specified Videos or any parts thereof separately or in combination with any other material or recordings, in any manner, through any trade channels (including without limitation regular trade channels, club, mail order and direct mail operation) under any label(s), trademark(s) or other identification, in any form and/or by any means and/or media and/or methods now or hereafter known, used or invented, including without limitation in the form and any formats of audio-only "Records" and/or "Videograms" and/or so-called "Multimedia" configurations and/or systems (as such terms shall be defined in the Agreement or as same are commonly understood in the entertainment industry) as same may be so released, re-released, transmitted, marketed, distributed, sold, exhibited and/or otherwise exploited, packaged and/or repackaged hereunder at the discretion from time to time of Licensee and/or any of Licensee's affiliates, subsidiaries, licensees and their respective parents, sub-licensees and assigns, . Without limiting the generality of the foregoing, "Accepted Master Recordings" includes all Master Recordings included or to be included in

-8- (a:jk010896) Basic Terms: Proposed License Agreement re. N-S;

the First Commitment Album, the Second Commitment Album and/or in any Option Record in respect of which Licensee shall have validly exercised its first option right pursuant hereto, provided that if as of the "Latest Delivery Date" (which immediately aforesaid expression means the applicable latest delivery date pursuant to the Agreement for each applicable completed Commitment Album or completed Option Record or completed Specified Video to be delivered by Licensor under the Agreement) Licensor shall have failed to deliver all completed Master Recordings or completed video(s) (as applicable) to be included in same, then (notwithstanding anything to the contrary herein contained) Licensee shall have the right to reject (such rejection right being exerciseable at Licensee's absolute discretion at any time after the Latest Delivery Date and up to the expiration of thirty calendar days after the actual delivery) of any such completed Commitment Album or Option Record or Specified Video (as applicable) which was so delivered after the Latest Delivery Date, provided that Licensee shall have no financial obligations in respect of any Rejected Commitment Album or Rejected Option Record or Rejected Specified Video. Without limiting the generality of the immediately aforesaid proviso or other applicable provisions herein contained, if any part of the applicable Advance or "Licensee's Video Contribution" (as defined and subject as hereinafter specified) shall have been paid to Licensor prior to the delivery of any Commitment Album or Option Record or Specified Video (as applicable) which Licensee shall have validly rejected in accordance with the immediately aforesaid, then Licensee shall have the "Offset Right" (i.e. Licensee's right to request reimbursement from Licensor and/or Licensee's right to charge monies against and/or deduct same from Licensor's account).

## 6.    Advances, Recoupment Provisions, Royalties and Royalty-related Provisions

a.    In full and final consideration of Licensor's services and the rights licensed to Licensee pursuant to the Agreement, Licensee shall pay to Licensor (subject to other applicable terms and conditions relating to the payment and/or recoupment of ) the sums therein specified by way of applicable advances ("Advances), royalties and royalty-like sums such as flat fees, if any (collectively "Royalties"), provided always that the applicable Advances, Royalties and other sums due Licensor pursuant to the Agreement  shall be deemed to be "all-in", meaning that the applicable amounts fully cover and include (and Licensor shall be solely responsible and liable for the payment of) any and all sums which may be due to the Artists and/or any other parties as may have participated in or contributed to the making of the Master Recordings, Videos and/or Video Clips by virtue of their services and/or performances and/or as a result of the exploitation of any rights granted pursuant to the Agreement (it being expressly clarified and agreed that, without limiting the generality of the immediately aforesaid proviso, the sums payable to Licensor further include without limitation all studio and other recording costs as well as fees, royalties and/or other sums due to any musician(s) and/or union(s) such as the AFofM), excepting only that Licensee and Licensee's affiliates, subsidiaries, licensees and their respective sub-licensees shall be solely responsible for the payment of "Mechanical Copyright Royalties" (which immediately aforesaid expression means any "per unit" mechanical copyright royalties payable pursuant to applicable laws in respect of any Accepted Master Recordings, Specified Videos, Records and/or Videograms distributed, sold and/or otherwise exploited under the Agreement which embody copyrighted musical or other material.

b.    Subject always to the provisions contained in sub-clause 6.h., Licensee shall pay to Licensor the following sum(s) by way of Advances hereunder:

(i)    In respect of the First Commitment Album:





Case 6:99-cv-01282-ACC   Document 36   Filed 11/02/99   Page 196 of 226 PageID 743

-9- (a:lk010896) Basic Terms: Proposed License Agreement re. N-St

DM 350,000,-- (three hundred and fifty thousand Deutsche Mark, payable by two equal instalments (the first instalment being due upon the execution of the formal long-form version of the Agreement, and the second instalment being due upon the delivery to Licensee and Licensee's acceptance (or deemed acceptance) of all of the completed Master Recordings to be included in the First Commitment Album).

(ii)    If (but only if) the **Second Commitment Album** shall be accepted by Licensee for release under the Agreement and subject to the minimum and maximum provisions set forth in sub-paragraph 6.b.(ii)(cc) hereof, the Advance payable by Licensee to Licensor in connection therewith shall amount to a sum equal to seventy-five per cent (75%) of aggregate Royalties which have been earned by Licensor under the Agreement up to the "Specified Date" and which resulted solely from net sales in the Territory of the First Commitment Album through the BMG Companies' regular trade channels, PROVIDED THAT (aa) for the purpose of the immediately aforesaid, "Specified Date" means the date of the expiration of twelve (12) months after the initial release in Germany of the First Commitment Album; (bb) for purposes of the Agreement, "BMG Company" means any wholly owned company of BMG Entertainment; (cc) notwithstanding the foregoing provisions of sub-paragraph 6.b.(ii) hereof, the advance in respect of the Second Commitment Album shall be not less than DM 200,000,-- (two hundred thousand Deutsche Mark) and not in excess of DM 500,000,-- (five hundred thousand Deutsche Mark) and (dd) the applicable Advance in respect of the Second Commitment Album shall be payable by two instalments (first instalment in the amount of DM 100,000,-- (one hundred thousand) being due upon the commencement of the recording of the Second Commitment Album and second instalment in the amount of the applicable balance being due upon the delivery to Licensee and Licensee's acceptance (or deemed acceptance) of all of the completed Master Recordings to be included in the Second Commitment Album).

(iii)    If (but only if) the **Third Commitment Album** shall be accepted by Licensee for release under the Agreement and subject to the minimum and maximum provisions set forth in sub-paragraph 6.b.(iii)(bb) hereof, the Advance payable by Licensee to Licensor in connection therewith shall amount to a sum equal to seventy-five per cent (75%) of aggregate Royalties which have been earned by Licensor under the Agreement up to the "Specified Date" and which resulted solely from net sales in the Territory of the Second Commitment Album through the BMG Companies' regular trade channels, PROVIDED THAT (aa) for the purpose of the immediately aforesaid, "Specified Date" means the date of the expiration of twelve (12) months after the initial release in Germany of the Second Commitment Album; (bb) notwithstanding the foregoing provisions of sub-paragraph 6.b.(iii) hereof, the advance in respect of the Third Commitment Album (if accepted by Licensee for release under the Agreement) shall be not less than DM 200,000,-- (two hundred thousand Deutsche Mark) and not in excess of DM 500,000,-- (five hundred thousand Deutsche Mark) and (cc) the applicable Advance in respect of the Third Commitment Album shall be payable by two instalments (first instalment in the amount of DM 100,000,-- (one hundred thousand) being due upon the exercise of Licensee's first option in relation to the Third Commitment Album and second instalment in the amount of the applicable balance being due upon the delivery to Licensee and Licensee's acceptance (or deemed acceptance) of all of the completed Master Recordings to be included in the Third Commitment Album).

(iv)    If (but only if) the **Fourth Commitment Album** shall be accepted by Licensee for release under the Agreement and subject to the minimum and maximum provisions set forth in sub-paragraph 6.b.(iv)(bb) hereof, the Advance payable by Licensee to Licensor in connection therewith shall amount to a sum equal to seventy-five per cent (75%)

of aggregate Royalties which have been earned by Licensor under the Agreement up to the "Specified Date" and which resulted solely from net sales in the Territory of the Third Commitment Album through the BMG Companies' regular trade channels, PROVIDED THAT (aa) for the purpose of the immediately aforesaid, "Specified Date" means the date of the expiration of twelve (12) months after the initial release in Germany of the Third Commitment Album; (bb) notwithstanding the foregoing provisions of sub-paragraph 6.b.(iv) hereof, the advance in respect of the Fourth Commitment Album (if accepted by Licensee for release under the Agreement) shall be not less than DM 200.000,-- (two hundred thousand Deutsche Mark) and not in excess of DM 500.000,-- (five hundred thousand Deutsche Mark) and (cc) the applicable Advance in respect of the Fourth Commitment Album shall be payable by two instalments (first instalment in the amount of DM 100.000,-- (one hundred thousand) being due upon the exercise of Licensee's first option in relation to the Fourth Commitment Album and second instalment in the amount of the applicable balance being due upon the delivery to Licensee and Licensee's acceptance (or deemed acceptance) of all of the completed Master Recordings to be included in the Fourth Commitment Album).

(v)     If (but only if) the Fifth Commitment Album shall be accepted by Licensee for release under the Agreement and subject to the minimum and maximum provisions set forth in sub-paragraph 6.b.(v)(bb) hereof, the Advance payable by Licensee to Licensor in connection therewith shall amount to a sum equal to seventy-five per cent (75%) of aggregate Royalties which have been earned by Licensor under the Agreement up to the "Specified Date" and which resulted solely from net sales in the Territory of the Fourth Commitment Album through the BMG Companies' regular trade channels, PROVIDED THAT (aa) for the purpose of the immediately aforesaid, "Specified Date" means the date of the expiration of twelve (12) months after the initial release in Germany of the Fourth Commitment Album; (bb) notwithstanding the foregoing provisions of sub-paragraph 6.b.(v) hereof, the advance in respect of the Fifth Commitment Album (if accepted by Licensee for release under the Agreement) shall be not less than DM 200.000,-- (two hundred thousand Deutsche Mark) and not in excess of DM 500.000,-- (five hundred thousand Deutsche Mark) and (cc) the applicable Advance in respect of the Fifth Commitment Album shall be payable by two instalments (first instalment in the amount of DM 100.000,-- (one hundred thousand) being due upon the exercise of Licensee's first option in relation to the Fifth Commitment Album and second instalment in the amount of the applicable balance being due upon the delivery to Licensee and Licensee's acceptance (or deemed acceptance) of all of the completed Master Recordings to be included in the Fifth Commitment Album).

c.     No advance payments other than those expressly required to be made in accordance with applicable provisions herein contained shall be due to Licensor hereunder. Without limiting the generality of the immediately aforesaid and notwithstanding anything to the contrary herein contained, Licensee shall in any event not be required to make any advance payment(s) in respect of any of the following:

(i)     Any Commitment Album in respect of which Licensee fails to exercise its first option right or which Licensee shall have actually rejected (as the case may be);

(ii)     any Accepted Option Record (whether Single or Album or Multiple Album or other) which falls within the definition of "Additional Master Recordings" (including without limitation any Option Record which comprises master recordings from the Artist' back catalogue or which consists substantially of only spoken word or so-called



Case 6:99-cv-01282-ACC   Document 36   Filed 11/02/99   Page 198 of 226 PageID 745

-11- (arik010896) Basic Terms: Proposed License Agreement re. N-\__e

"soundtrack recordings" or "Live" recordings or which is a "Greatest Hits" or "Limited Edition" (as the case may be);

(iii)   any "Specified Videos" or Videograms to be used and/or distributed, sold and/or otherwise exploited hereunder, PROVIDED THAT the parties shall by good faith negotiations and mutual agreement from time to time determine Licensee's financial contribution towards the video recording costs ("Video Production Costs") of each Specified Video available to Licensee hereunder, it being agreed, however, that (subject to the provisions contained in sub-paragraph 6.c.(iii)(aa) hereof) Licensee shall not be required to make any financial contribution as immediately aforesaid if the respective Specified Video cannot or will not be used and/or exploited by or on behalf of Licensee in the Licensed Territory. With further respect to the foregoing provisions of this sub-paragraph (iii), the parties hereby agree that (aa) each mutually agreed financial contribution payable by or on behalf of Licensee towards the video recording budget of any Specified Video shall be confirmed by Licensee in writing from time to time (and if so confirmed shall be deemed to constitute "Licensee's Video Contribution" respecting same), provided in any event that (notwithstanding anything to the contrary herein contained) the parties hereby agree that at least two (2) Specified Videos shall be produced in connection with each Commitment Album which Licensee has accepted for release under the Agreement (regardless whether same has been so accepted under the provisions of sub-clause 5.a. or 5.b. hereof) and Licensee shall contribute at least DM 80.000,– (eighty thousand Deutsche Mark) by way of Licensee's Video Contribution in respect of each of such two (2) Specified Videos to be so produced in connection with each Commitment Album which Licensee has so accepted for release under the Agreement; (bb) 100% (one hundred per cent) of any and all sums actually paid by or on behalf of Licensee under the Agreement by way of Licensee's Video Contributions shall be deemed to be "Other Recoupable Sums" and shall thus be fully recoupable from any and all Royalties due to Licensor under the Agreement; (cc) except for sums payable by Licensee to Licensor by way of Licensee's Video Contributions (as same may from time to time be agreed and subject to the provisions of sub-paragraph 6.c.(iii)(aa) above, Licensee shall not be responsible and liable for the payment of (but Licensor shall in each instance bear ) all Video Production Costs for any Specified Video; (dd) without limiting the generality of the immediately aforesaid, the definition of "Video Production Costs" shall include without limitation all studio and recording costs, all sums due to the producer and director of each Specified Video as well as all required "first time" synchronization licenses and fees (if any) for the Territory (as distinct from per unit "Mechanical Copyright Royalties" which shall be payable by Licensee and/or any of Licensee's affiliates, subsidiaries, licensees and their respective parents, sub-licensees and assigns in accordance with applicable provisions herein contained) and (ee) the applicable sum payable by way of Licensee's Video Contribution shall in each instance be payable to Licensor within eight (8) German business days from the delivery to Licensee of the complete and final Specified Video in relation to which Licensee's Confirmed Video Contribution applies.

d.   Subject to applicable recoupment provisions and other applicable provisions relating to the computation of Royalties due to Licensor pursuant to the Agreement, the following Royalties shall be due to Licensor in respect of all "net sales" (as herein defined) of Records (whether audio-only Records or Videograms, unless expressly otherwise specified) which contain one or more Master Recording(s) subject to the Agreement:

(i)   Subject always to the provisions of sub-paragraphs 6.d.(ii), 6.d.(iii), 6.d.(iv), 6.d.(v) and 6.d.(vi) hereof,




Case 6:99-cv-01282-ACC   Document 36   Filed 11/02/99   Page 199 of 226 PageID 746

-12- (arik010896) Basic Ter...: Proposed License Agreement re. N-S...

(aa)    in respect of any audio-only Records or Videograms (as the case may be, including without limitation any Multiple Albums) sold by any of the BMG companies through their regular trade channels in full price category, the Royalty due to Licensor shall equal 18% (eighteen per cent) of the applicable "Royalty Base Selling Price" or "RBSP" (as such expressions are herein defined), SAVE THAT

*20%*

(1)    the Royalty in respect of Singles shall be 13,5% (thirteen and one half per cent) of applicable RBSP;

(2)    if any particular audio-only Record which is an Album comprised solely of Master Recordings subject to the Agreement ("Specified 100% Album") shall have sold in "GSA" (= Germany, Austria and Switzerland) in excess of 250.000 (two hundred and fifty thousand) full-priced units through the BMG companies' regular trade channels, then the Royalty due to Licensor in respect of further full-price category sales in GSA through the BMG companies' regular trade channels of such same particular Specified 100% Album shall be 19% (nineteen *21.6* per cent) of the applicable RBSP, it being expressly clarified and agreed that the immediately aforesaid royalty increase shall not apply retroactively but only in respect of such further sales as immediately aforesaid which are over and above the escalation point specified in this sub-paragraph (2).;

(3)    if any particular audio-only Record which is an Album comprised solely of Master Recordings subject to the Agreement ("Specified 100% Album") shall have sold in "GSA" (= Germany, Austria and Switzerland) in excess of 500.000 (five hundred thousand) full-priced units through the BMG companies' regular trade channels, then the Royalty due to Licensor in respect of further full-price category sales in GSA through the BMG companies' regular trade channels of such *22%* same particular Specified 100% Album shall be 20% (twenty per cent) of the applicable RBSP, it being expressly clarified and agreed that the immediately aforesaid royalty increase shall not apply retroactively but only in respect of such further sales as immediately aforesaid which are over and above the escalation point specified in this sub-paragraph (3).;

(bb)    in respect of any audio-only Records or Videograms (as the case may be, including without limitation any Multiple Albums) sold by any of the BMG companies through their regular trade channels in medium (or mid) price category, the Royalty due to Licensor shall equal 13,5% (thirteen and one half per cent) of the applicable RBSP;

(cc)    in respect of any audio-only Records or Videograms (as the case may be, including without limitation any Multiple Albums) sold by any of the BMG companies through their regular trade channels in low (or budget) price category, the Royalty due to Licensor shall equal 9% (nine per cent) of the applicable RBSP, SAVE THAT 7% (seven per cent) of the applicable RBSP if so sold at a so-called "super-budget price"

Case 6:99-cv-01282-ACC   Document 36   Filed 11/02/99   Page 200 of 226 PageID 747

-13- (a:ik010896) Basic Terms: Proposed License Agreement re. N-\ ..c

(which immediately aforesaid expression means the price line of the Ariola Express label or a price line or list category which is below the applicable regular low or budget price category and similar to the price line of the Ariola Express label);

(dd)   in respect of any audio-only Records or Videograms (as the case may be, including without limitation any Multiple Albums) sold by any of the BMG companies in any price category to or through any "non-regular trade channels" (which immediately aforesaid expression includes without limitation club or mail order or direct mail or similar type operations or direct-to-consumer outlets or door-to-door sales or sales to or through any government or educational institutions or libraries or by way of so-called "Premiums" or to any commercial purchaser for re-sale through army sales channels such as but not limited to PXes or European Exchange System or for use or re-sale as "Premiums" (as the case may be), the Royalty due to Licensor shall in each instance equal the lesser of (1) two thirds (2/3) of Licensee's net royalty receipts (exclusive of taxes, duties and Mechanical Copyright Royalties, if any) which are attributable to any Accepted Master Recordings and/or Specified Videos hereunder contained in audio-only Records or Videograms so sold under the provisions of this sub-paragraph 6.d.(i)(dd) or (2) the applicable Royalty amount arrived at by computing Licensor's Royalty on the basis of 9% (nine per cent) of the applicable RBSP (or 7% (seven per cent) of the applicable RBSP where so sold at a so-called "super-budget price")

(ii)   Notwithstanding anything to the contrary herein contained, in the event that any audio-only Records or Videograms sold by any of the BMG companies under any of the provisions contained in sub-paragraph 6.d.(i) hereof are so-called "Media-promoted Records" (as herein defined), then the following shall apply:

(aa)   If such "Media-promoted Records" are promoted by any "Substantial TV- and/or Radio-Advertising Campaign(s)" (which immediately aforesaid expression shall for the purposes hereof be deemed to mean any "Media Campaign(s)" the aggregate costs of which total at least DM 100.000,— (one hundred thousand Deutsche Mark) or the equivalent thereof in any other currency) or more, then a reduced Royalty shall be due to Licensor in respect only of such Media-promoted Records which are so promoted by any Substantial TV- and/or Radio-Advertising Campaign(s), such reduced Royalty to be computed in each instance on the basis of 75% (seventy-five per cent) of the Royalty rates otherwise applicable pursuant to sub-paragraphs 6.d.(i)(aa) or 6.d.(i)(bb) or 6.d.(i)(cc) or 6.d.(i)(dd) (as applicable) of this sub-clause V.D. and otherwise subject to the provisions contained in sub-paragraph 6.d.(ii)(cc) hereof.

(bb)   Licensor hereby expressly agrees to give good faith consideration to any requests from time to time for reasonable reduced Royalty rates in respect of any Media-promoted Records hereunder which will be promoted by any Media Campaign(s) other than "Substantial TV- and/or Radio-Advertising Campaign(s)" (such as but not limited to any Media-promoted Records hereunder which will be promoted by any TV- and/or radio-advertising campaign(s) the total costs of which are below the minimum sum specified in sub-paragraph 6.d.(ii)(aa) above or which will be promoted by any magazine-and/or cinema-advertising campaign(s), as the case may be), PROVIDED THAT any reduced reduced Royalty rate(s) so requested from time to time under the provisions of this sub-paragraph 6.d.(ii)(bb) shall in each instance be subject to Licensor's final discretion and written approval, provided further that any reduced Royalty rate(s) so approved by Licensor from time to time shall in each instance be computed on the applicable Royalty Base Selling Price and otherwise subject to the provisions contained in sub-paragraph 6.d.(ii)(cc) hereof.



-14- (stk010896) Basic Terms: Proposed License Agreement re. N-S..e

(cc)    Where reduced Royalty rates apply in respect of any Media-promoted Records hereunder (whether pursuant to sub-paragraph 6.d.(ii)(aa) or as may from time to time be approved by Licensor under the provisions of sub-paragraph 6.d.(ii)(bb), as the case may be), the applicable reduced Royalty rate(s) shall so apply only in respect of sales of the respective Media-promoted Records which are sold in the country or countries where the respective Media Campaign(s) is/are effective and (subject to the immediately aforesaid) which are sold during the period commencing as of the first day of the month which immediately precedes the month during which the respective Media Campaign(s) begin(s) up to and including the date of the expiration of nine (9) months after the end of the month during which the respective Media Campaign(s) has/have ended.

(dd)    Subject to differential provisions expressly provided for in the Agreement, "Media-promoted Records" means any audio-only Records and/or Videograms (including any Multimedia configurations) subject to the Agreement which shall be promoted, whether alone or together with any other record(s), videograms and/or multimedia configuration(s), by one or more Media Campaigns.

(iii)    Notwithstanding anything to the contrary herein contained,

(aa)    in the event that any audio-only Records or Videograms hereunder are sold under the terms and conditions of any licensing arrangement(s) made between any BMG Company and any sub-licensee which is not a BMG Company (collectively "Third Party Licensing Arrangements"), whether so sold in any part(s) of the Territory through regular trade channels and/or non-regular trade channels (including without limitation club, mail order, direct mail operations, and direct-to-consumer outlets), Licensee shall procure that the applicable royalty terms (including without limitation royalty rates, container deductions, royalty base prices, royalty-bearing units and reserves provisions) respecting any such Third Party Licensing Arrangements shall be negotiated and agreed in good faith between the applicable BMG Company and the respective sub-licensee from time to time, PROVIDED THAT, subject to the foregoing provisions of this sub-paragraph 6.d.(iii)(aa), the Royalty due to Licensor in respect of any audio-only Records and/or Videograms hereunder which are sold pursuant to any Third Party Licensing Arrangements shall in each instance equal two thirds (2/3) of Licensee's net royalty receipts (exclusive of taxes, duties and Mechanical Copyrights Royalties, if any) which are attributable to any Accepted Master Recording(s) and/or Specified Video(s) hereunder and arising out of audio-only Records and/or Videograms so sold under the provisions of any such Third Party Licensing Arrangements; or

(bb)    in the event that any Accepted Master Recording(s) and/or Specified Video(s) hereunder is/are proposed to be licensed or used hereunder in whole or in part for commercial exploitation on a flat fee basis (as opposed to any percentage rate royalty computed on the applicable royalty base price), whether for film synchronisation or for use in any commercial advertising or Premiums or for any other commercial exploitation (as the case may be), then any such license or use on a flat fee basis and the amount of the applicable flat fee due to Licensee in respect of any such license or use shall be subject to Licensor's approval from time to time, PROVIDED THAT

(1)    Licensor's share of any flat fee which shall be paid or credited to Licensee in respect of any such license or use on a flat fee basis and which is attributable to any Master Recording(s) and/or Specified Video(s) hereunder shall in any





event not exceed two thirds (2/3) of the applicable "net amount" so paid or credited to Licensee from time to time (whereby, for the purposes of the immediately aforesaid, "net amount" shall mean the (pro rated) gross amount paid or credited to Licensee (exclusive of taxes, duties and Mechanical Copyright Royalties) which is attributable to any Accepted Master Recording(s) and/or Specified Video(s) so licensed or used on a flat fee basis; or

           (2)      if Licensee itself wishes to use or exploit any Accepted Master Recording(s) or Specified Video(s) in whole or in part on a flat fee basis, then the applicable amount due to Licensor in respect thereof shall be subject to good faith negotiation and mutual agreement from time to time between Licensor and Licensee.

           (cc)      any monies due to Licensor under the provisions of sub-paragraphs 6.d.(iii)(aa) and/or 6.d.(iii)(bb) shall be deemed to be additional Royalties earned hereunder which are equally subject to recoupment provisions otherwise applicable pursuant hereto.

           (iv)      For the purpose of royalty computation hereunder, it is further agreed as follows:

           (aa)      If any Multiple Album or other Record hereunder (including without limitation any Audiophile Record or Videogram) contains any Accepted Master Recording(s) and/or Specified Video(s) subject to this Agreement together with any other recording(s) and/or material which is/are not subject to this Agreement, then the applicable Royalty due to Licensor pursuant hereto shall be computed on a pro rata numeris basis, excepting only if and when royalties received by Licensee in relation to any Master Recording(s) and/or Specified Video(s) hereunder were computed on a pro rata temporis basis, corresponding Royalties due to Licensor hereunder may also be computed on a pro rata temporis basis.

           (bb)      If and when, in respect of any so-called "Benefit Record" (being a Record or Multiple Album sold at any price which includes any donation(s) payable to any charity or welfare or other relief organization(s) herein defined) containing any Master Recording(s) and/or Specified Video(s) hereunder, provided that Licensee shall not without Licensor's prior approval release or sell any Benefit Record which is solely comprised of Accepted Master Recordings and/or Specified Videos) Licensor shall have approved from time to time a royalty reduction or shall have waived Licensor's entitlement to receive payment or credit of the otherwise applicable Royalty due to Licensor pursuant hereto, then and in any of such events such royalty reduction or waiver as immediately aforesaid shall apply only in respect of sales in such country or countries where the respective Record or Multiple Album is so sold as a "Benefit Record".

           (cc)      If, as of any date(s), the recorded performances comprised in any Accepted Master Recording(s) and/or Specified Video(s) hereunder become(s) property of the public domaine in any part(s) of the Territory so that any party may reproduce and/or otherwise exploit the respective Accepted Master Recording(s) and/or Specified Video(s) in such part(s) of the Territory without license from Licensee, then, notwithstanding anything to the contrary herein contained, no Royalties or other monies whatsoever shall accrue hereunder in connection with record sales and/or other exploitation hereunder of such respective Accepted Master Recording(s) and/or Specified Video(s) which are/is made in such respective part(s) of the Territory from and after the applicable date(s) as of which same has/have become property of the public domaine.

Case 6:99-cv-01282-ACC   Document 36   Filed 11/02/99   Page 203 of 226 PageID 759

-16- (aiik010896) Basie Terms: Proposed License Agreement re. N-Sync

(v)     For the purpose of computing Royalties due to Licensor in respect of any audio-only Records and/or Videograms and/or Multimedia configurations sold by any BMG Company hereunder,

(aa)     the "Royalty Base Selling Price" or "RBSP" means the applicable "Net Selling Price" (as herein defined) less the applicable "Container Deduction" permitted to be made hereunder for the purpose of constructing the applicable RBSP;

(bb)     the "Net Selling Price" means the applicable "Selling Price" (as herein defined and subject as hereinafter specified in more detail) after deduction (if and to the extent applicable) of (1) any taxes actually included in the applicable Selling Price, (2) any packing and/or shipping expenses actually included in the applicable Selling Price and (3) in the case only of any so-called "Benefit Records" (as herein defined), any donation(s) payable to any charity or welfare or other relief organization(s);

(cc)     the "Selling Price" means the the applicable "PPD" (which immediately aforesaid expression means the published price to dealers in respect of the applicable Record configuration in the respective price category as so published from time to time by the respective distributor in the country of sale), PROVIDED THAT, notwithstanding the immediately aforesaid,

(1)     where any Records hereunder have been sold by any BMG Company in the form of finished product to any dealer or other purchaser for use or (re)sale as "Premiums" or to any governmental or educational institution or library or other commercial purchaser for distribution and/or (re)sale through army sales channels (such as European Exchange System or PXes) or to or through club or direct mail or mail order or similar type operation or direct-to-consumer outlets or other non-regular trade channels or non-regular distribution methods and/or for exportation to any other part(s) of the Territory (as the case may be), then and in any of such events the "Selling Price" means the per unit purchase price or the per unit export price (as applicable) paid by the applicable purchaser in respect of the applicable Record configuration so sold, or

(2)     where any Accepted Master Recording(s) and/or Specified Video(s) hereunder have been licensed (as opposed to the sale of Records in the form of finished product) to any other BMG Company for use on Records to be sold through club channels or direct mail or mail order or similar type operation or direct-to-consumer outlets or other non-regular trade channels (as the case may be) or for use on Records to be distributed and/or sold by way of Premiums, the "Selling Price" means the same price as has been used for the purpose of constructing the royalty base price on which royalties are paid or credited to Licensee in respect of such sales.

(dd)     the Container Deduction permitted to be made for the purpose of constructing the applicable "Royalty Base Selling Price" shall be 25% (twenty-five per cent) of the applicable Net Selling Price for any Records hereunder which fall within the definitions of "Videograms" or "Multimedia" configurations or "New Technology Configurations" or "Audiophile Records" (as the case may be), PROVIDED THAT in respect only of audio-only Records which are not included in the definition of any of the aforesaid expressions ("conventional-type Records", which immediately aforesaid expression includes without limitation vinyl records and conventional-type MCs) the container deduction permitted to be made hereunder shall equal 15% (fifteen per cent) of the applicable Net



Case 6:99-cv-01282-ACC   Document 36   Filed 11/02/99   Page 204 of 226 PageID 751

-17- (a:ik010896) Basic Terms: Proposed License Agreement re. N-Sy...   29

Selling Price, except that (i) the Container Deduction in respect of vinyl 7" singles shall be 10% (ten per cent) of the applicable Net Selling Price and (ii) the Container Deduction in respect of conventional-type Multiple Albums shall be 20% (twenty per cent) of the applicable Net Selling Price and (iii) there shall be no Container Deduction in respect of Records sold in so-called "white bags".

　　　　(ee)　　Where any "Multiple Album" (which immediately aforesaid expression means two or more Record configurations (whether any audio-only Record(s) and/or Videogram(s) and/or Multimedia configurations, as the case may be) which are sold in a package as one unit) have been sold by any BMG Company through regular trade channels, the proportionate selling price of each configuration contained in the applicable Multiple Album shall be the criterion to determine the applicable price category in which such particular Multiple Album shall be deemed to have been sold.

　　　　(vi)　　In respect of any Records (including without limitation Audiophile Records, Videograms and Multimedia configurations) hereunder, "sales" or "net sales" or "sold" means 100% (one hundred per cent) of all configurations of Records hereunder which have been sold and paid for, less returns and credits for any reason and otherwise subject to the following, notwithstanding anything to the contrary herein contained:

　　　　(aa)　　If Records hereunder are sold subject to a discount or merchandising plan, the number of Records hereunder deemed to have been sold shall be determined by reducing the number of Records sold by the percentage of discount granted, and if a discount is granted in the form of "free" records (including without limitation free goods to dealers and other customers, free club records or so-called "dividend" or "bonus" records), then such "free" records which are Records subject to this Agreement shall be excluded from the number of sales hereunder, PROVIDED THAT in respect of any and all Records (including without limitation "Audiophile Records", "Videograms" and Multimedia configurations) subject to this Agreement, Licensee shall procure that the quantities of "free" records thereof and other discounts relating to same shall be in accordance with industry practice in the various parts of the Territory and the respective discount policies generally applied or approved from time to time by the BMG Companies.

　　　　(bb)　　In computing the quantities of Records (including without limitation "Audiophile Records", "Videograms" and Multimedia configurations) sold hereunder, reasonable portions of Licensor's Royalties may be withheld from time to time as reserves for subsequent returns and/or credits, PROVIDED THAT such reserves shall be established from time to time in accordance with industry practice and accepted royalty accounting practices in the various parts of the Territory and otherwise in accordance with the applicable reserves policies generally applied or approved from time to time by the BMG Companies, provided further that each reserve shall be liquidated on the basis of actual credits, returns and exchanges but in any event within a maximum of the two accounting periods which immediately succeed the accounting period when the applicable reserve was first established.



　　　　(cc)　　It is hereby expressly clarified and agreed that Licensor shall not be entitled to receive any Royalty or other payment in respect of (1) any promotional uses of any Accepted Master Recording(s) and/or Specified Video(s) subject to this Agreement; (2) Records subject to the Agreement (including without limitation Audiophile Records, Videograms and Multimedia configurations) which are distributed, used or otherwise exploited by way of so-called "Exhibition Copies" (as defined) and/or "free" records



-18- (a:jk010896) Basic Terms: Proposed License Agreement re. N-S.,..:

(including without limitation free goods to dealers and/or other customers, free club records, so-called "dividend" and/or "bonus" records); (3) Records subject to the Agreement sold as "scrap" or "overstock" or "surplus", which terms mean excess inventory of a particular Record hereunder which may still be listed in the respective catalogue(s) and which is sold at one third or less of the otherwise applicable selling price; (4) Records hereunder deleted from the respective catalogue(s) and sold off as discontinued merchandise at so-called "cut-out prices"; (6) Records hereunder destroyed for any reason.

h.      There shall be cross-collateralisation overall between any and all Advances and other recoupable sums due to Licensor pursuant to the Agreement and any and all Royalties due to Licensor pursuant to the Agreement, i.e. any and all Advances and other recoupable sums paid under the Agreement shall be fully recoupable from any and all Royalties due to Licensor hereunder, PROVIDED THAT (i) Mechanical Copyright Royalties shall never be used in recoupment of Advances and/or other recoupable sums paid hereunder, (ii) if as of the end of any accounting period Royalties due to Licensor hereunder shall have been earned which are in excess of the total of Advances and/or other recoupable sums theretofore paid hereunder ("Excess Earnings"), then such Excess Earnings shall be payable to Licensor as and when so earned and due pursuant hereto, it being hereby expressly agreed that Licensee shall have the right to deduct Excess Earnings so paid to Licensor from time to time from any subsequent Advance(s), if any, as may thereafter be payable to Licensor pursuant to the Agreement; (iii) if as of the end of any accounting Advances and/or other recoupable sums theretofore paid hereunder shall not have been fully recouped ("Unrecouped Balances"), then such Unrecouped Balances shall thereafter continue to be fully recoupable from any further Royalties due to Licensor under the Agreement (iv) Advances and other recoupable sums shall be deemed to be non-returnable save as expressly specified to the contrary pursuant to applicable provisions contained in the Agreement.

7.      **Merchandising Rights:**

For the purposes of the Agreement, "Non-Record Merchandising Rights" means the right (whether as a result of any rights granted pursuant to sub-paragraph 7.a. or as may from time to time apply or be agreed under the provisions of sub-clause 7.b. or 7.c. below, as the case may be) to use and/or authorize the use of any "Biographical Material" (whereby, for the purposes of this Clause 7, "Biographical Material" means and includes the Group Name (including any trademark and/or logo of the Artist Group) and/or name(s), professional name(s), (facsimile) signature(s), voice(s), photograph(s), other likeness(es) and/or other biographical material and/or or of all or any of the individual Artists as same shall have been made known or furnished or approved by or on behalf of Licensor and/or Artists from time to time) in the creation, manufacture, distribution, sale and/or other exploitation of any goods other than Records, such as but not limited to T-shirts, toys, etc. (any goods other than Records being for the purposes of the Agreement sometimes collectively referred to as "Non-Record Products") and the right to use and/or otherwise exploit (or authorize others to use and/or otherwise exploit) any Non-Record Products containing Biographical Material for promotional and/or commercial purposes in the Territory or in any parts of the Territory (as the case may be), subject to the following:

a.      Any Non-Record Merchandising Rights solely for promotional purposes in connection with the exploitation of any Accepted Master Recordings, Specified Videos, audio-only Records and/or Videograms subject to the Agreement shall be exercisable at the



sole discretion from time to time of Licensee and/or any of Licensee's affiliates, subsidiaries, licensees and their respective parents, sub-licensees and assigns (and shall be so exerciseable any time during the continuance of Licensee's exploitation rights pursuant to the Agreement), and no Royalty shall be due to Licensor and/or Artists as a result of such exercise of Non-Record Merchandising Rights for promotional purposes as aforesaid.

      b.    Except in cases where any BMG Company or any merchandiser(s) affiliated with any BMG Company (collectively "BMG Merchandiser") shall match any so-called "Third Party Merchandising Offer" (as defined in and subject as further specified in sub-paragraph 7.c.. hereof), if at any time during the continuance of the Term hereof any BMG Company or BMG Merchandiser (as the case may be) proposes the commercial exploitation (whether worldwide or in any parts of the Territory) of any Non-Record Merchandising Rights in respect of any Non-Record Product (collectively "BMG Merchandising Offer"), Licensee shall furnish to Licensor complete details respecting such BMG Merchandising Offer, PROVIDED THAT (i) no commercial Non-Record Merchandising Rights shall be exercised without Licensor's prior written approval on a case by case basis, (ii) the applicable terms and conditions in respect of the commercial exploitation by any BMG Company and/or BMG Merchandiser (as the case may be) of any Non-Record Merchandising Rights for any Non-Record Product shall be subject to good faith negotiation and separate agreement(s) from time to time and (iii) any monies due to Licensor as a result of the commercial exploitation of any Non-Record Merchandising Rights shall not be subject to recoupment provisions otherwise applicable pursuant to the Agreement but shall be payable in addition to and separate from any monies due to Licensor pursuant to the Agreement.

      c.    If at any time during the continuance of the Term of the Agreement Licensor and/or Artist shall receive any offer(s) from any third party (excluding any BMG Company or BMG Merchandiser) in respect of the commercial exploitation (whether worldwide or in any parts of the Territory) of any Non-Record Merchandising Rights (collectively "Third Party Merchandising Offer"), then and in any of such events the following shall apply:

      (i)    Licensor shall promptly furnish to Licensee complete copies of all documents constituting such Third Party Merchandising Offer, it being hereby agreed that any BMG Company or BMG Merchandiser shall in each instance have the right and preference on a matching offer basis ("Matching Offer Right") to enter into an agreement with Licensor in respect of the commercial exploitation of any Non-Record Merchandising Rights on the same material terms as are contained in the respective Third Party Merchandising Offer, PROVIDED THAT nothing herein contained shall be deemed to (aa) be an obligation on the part of any BMG Company or BMG Merchandiser to exercise its Matching Offer Right hereunder in respect of any Third Party Merchandising Offer so received from time to time, or (bb) require Licensee to waive any of its rights pursuant to the Agreement in respect of the exploitation in the Territory of any Master Recordings, Records and/or Videograms subject to this Agreement or (cc) permit Licensor to accept (and Licensor hereby agrees to procure that Licensor and Artists shall refrain from accepting) any Third Party Merchandising Offer relating to or competing with any particular Non-Record Product already exploited or scheduled for exploitation by any BMG Company or BMG Merchandiser (as the case may be) on the basis of respective arrangements approved by Licensor and/or Artist prior to Licensee's receipt of the documents constituting such Third Party Merchandising Offer or (ee) permit Licensor to accept (and Licensor hereby agrees to procure that Licensor and Artists shall refrain from accepting) any Third Party Merchandising Offer the acceptance of which would adversely affect or be inconsistent with any rights granted to Licensee under the Agreement in

Case 6:99-cv-01282-ACC   Document 36   Filed 11/02/99   Page 207 of 226 PageID 754

-20- (a:ik010896) Basic Terms: Proposed License Agreement re. N___e

respect of the exploitation of any Master Recordings, audio-only Records and/or Videograms subject to this Agreement;

      **(ii)**     if within thirty (30) calendar days from Licensee's receipt of the documents constituting any particular Third Party Merchandising Offer ("Matching Offer Option Period") the Matching Offer Right hereunder shall not have been exercised by corresponding written notification to Licensor and if within said Matching Offer Option Period Licensor and/or Artists have not accepted any Non-Record Product merchandising arrangement (if any) alternatively proposed by any BMG Company or BMG Merchandiser (as the case may be) in substitution for the applicable Third Party Merchandising Offer for any Non-Record Product, then (subject to applicable restrictions pursuant to the provisions contained in sub-paragraph 7.c.(i).hereof) Licensor and/or Artists shall have the right to accept such particular Third Party Merchandising Offer which was not so matched or substituted, provided that the formal binding merchandising agreement respecting such Third Party Merchandising Offer shall be consummated on terms and conditions no less favourable to Licensor and/or Artists than those set forth in the documents which constituted such particular Third Party Merchandising Offer not matched hereunder.

**8.**    **Miscellaneous:**

      **a.**     The Agreement shall provide for semi-annual accounting within ninety (90) days from the end of June 30 and December 31st.

      **b.**     In connection with the release and/or marketing of any Records hereunder comprised solely of Accepted Master Recordings subject to this Agreement, Licensee and/or any of Licensee's affiliates, subsidiaries, licensees and their respective parents, sub-licensees and assigns may (at their sole discretion from time to time) request the personal appearance of Artist in connection with photo sessions, interviews and/or other publicity and/or promotional activities (collectively "Promotional Activities", provided always that for the purposes hereof the definition of the immediately aforesaid expression shall be deemed to exclude any live concerts and tours of the Artist). Without limiting the generality of the immediately aforesaid, if and when so requested from time to time during the Term, Licensor agrees to cause Artists to cooperate with the requesting party/parties in connection with any such Promotional Activities as aforesaid and to appear at such time(s) and place(s) and during such reasonably continuous period(s) as may be reasonably requested and as shall be coordinated and mutually agreed between Licensor and the requesting party from time to time and otherwise subject to other prior professional commitments of the Artist, provided always that the Artists' services and/or performances in connection with Promotional Activities hereunder shall be made available free of charge except for payment or reimbursement of "Travelling Expenses" (as defined and subject as shall be specified in more detail in the Agreement), provided that if and to the extent that the Artists shall be requested to travel in connection with the any Promotional Activities, then and in any of such events (unless expressly otherwise pre-approved by Licensee in writing in each particular instance), "Travelling Expenses" means in each instance business class travelling expenses, reasonable expenses for hotel accommodation and reasonable per diems for the Artists incurred in direct relation to such Promotional Activities if and for as long as the Artists' services and/or performances by way of Promotional Activities shall be requested and actually rendered under the Agreement. Licensor or Artists shall obtain, retain and submit to Licensee receipts of all costs actually incurred by way of Travelling Expenses in connection with Promotional Activities, provided that reimbursement of per diems intended to cover subsistence costs shall in any event not exceed the lower of (i) DM 80,— (eighty Deutsche Mark) per person and per day (or the

Case 6:99-cv-01282-ACC   Document 36   Filed 11/02/99   Page 208 of 226 PageID 752

-21- (a:ik010896) Basic Terms: Proposed License Agreement re. N-Sy...

equivalent of the immediately aforesaid amount in any other currency) or (ii) the total of subsistence costs per person and per day actually incurred at such times as the Artist shall render services and/or performances by way of Promotional Activities.

c.   BMG or any publisher(s) affiliated with any BMG Company ("BMG Publisher") shall have separate options (exerciseable from time to time with respect to each "Controlled Composition" (to be defined) which is included in any Accepted Master Recording) to acquire the publishing rights for such particular Controlled Composition(s) , PROVIDED THAT if BMG or any BMG Publisher shall exercise its option in respect of one or more Controlled Composition(s), then the publishing rights for same shall be assigned to BMG or the respective BMG Publisher under the terms and conditions of separate publishing agreement(s) to be made between BMG or the applicable BMG Publisher(s) of the one part and Licensor and/or respective composer(s)/author(s) of the other part, provided in any event, however, that in respect of each Controlled Composition for which publishing rights shall have been so assigned to BMG or the applicable BMG Publisher, the respective composer/author shall receive an advance of DM 3.000,-- (three thousand Deutsche Mark) which shall be fully recoupable from composer's/author's shares of monies resulting from the applicable publishing agreement.

d.   For the purpose of the Agreement, the noun "record" or "Record" means any mechnical reproduction, in any form now known or hereafter developed from which sounds (whether or not coupled with visual images) can be perceived, reproduced or otherwise communicated, either directly or with the aid of a machine, device or process, and which is manufactured or exploited primarily for home use, provided further that "Records" includes without limitation (but subject to differential provisions expressly contained in the Agreement) conventional-type records and tape configurations as well as so-called "Audiophile Records" (which immediately aforesaid expression means and includes any audio-only Record or Multiple Album now or hereafter known which is made for digital playback and includes without limitation compact discs, digital audio tapes, digital compact cassettes and mini discs), Videograms and Multimedia configurations, regardless of whether or not same are so-called New Technology Configurations ("NTC") .

e.   The validity, construction and effect hereof and of the Agreement shall be governed by the laws of Germany,  provided that (in the event of any dispute or controversy between the parties) the parties shall submit to the court of competent jurisdiction in Munich Germany.

f.   All final contractual language and further particulars to be included in and subject as shall be specified in the formal long-form version of the Agreement.

If the above is acceptable, please return fax a countersigned copy hereof to the undersigned. We are looking forward to a successful cooperation!

Yours sincerely,
For and on behalf of Licensee,
BMG Ariola Muenchen GmbH

ACCEPTED AND AGREED
for and on behalf of Licensor,
Trans Continental Records Inc.

Jan Bolz

1. Aug. 1996

Louis J. Pearlman ·
President

**17**

# LEIBOWITZ ROBERTS & RITHOLZ LLP
## ATTORNEYS AT LAW

ADAM E. RITHOLZ
JAIMISON M. ROBERTS
WILLIAM R. LEIBOWITZ
———
SHARON COLCHAMIRO*
BARRY M. PERLMAN
DANIEL B. GETZ

OF COUNSEL
DIANE F. KRAUSZ

*ALSO ADMITTED IN NJ

183 MADISON AVENUE
PENTHOUSE
NEW YORK, NY 10016

TELEPHONE: (212) 448-1800
FACSIMILE: (212) 448-0020

May 26, 1999

**BY FAX AND CERTIFIED MAIL, Return Receipt Requested**

Trans Continental Records, Inc.
7380 Sand Lake Road
Suite 350
Orlando, FL 32819
Attention: Louis J. Pearlman

Re: Trans Continental Records, Inc. –w- Christopher Kirkpatrick, Justin Timberlake, Joshua
   Chasez, Joseph Fatone, Jr. and James Lance Bass pka 'N SYNC

Gentlemen:

Reference is made to the agreement between you and the members of 'N SYNC, dated April 29,
1996 ("Agreement"). Further reference is made to paragraph 19.12 of the agreement, pursuant
to which 'N SYNC hereby terminates the Agreement, on the basis that Trans Continental
Records, Inc. did not secure a distribution agreement with a U.S. record company within 18
months following the date of the Agreement.

The foregoing is not intended as a complete statement of the facts or law in this matter, and all
of my clients' rights and remedies are hereby expressly reserved.

Sincerely,
LEIBOWITZ ROBERTS & RITHOLZ LLP

By: _____
   Adam E. Ritholz

AER/dh

Cc:   William B. Pringle, III, Lawrence Rudolph, Esq., Helene Freeman, Esq.,
     Philip Bakershenk, Esq., Howard Comart, 'N SYNC

**18**

# DORSEY & WHITNEY LLP

MINNEAPOLIS
WASHINGTON, D.C.
LONDON
BRUSSELS
HONG KONG
DES MOINES
ROCHESTER
COSTA MESA

250 PARK AVENUE
NEW YORK, NEW YORK 10177
TELEPHONE: (212) 415-9200
FAX: (212) 953-7201

NEW YORK
DENVER
SEATTLE
FARGO
BILLINGS
MISSOULA
GREAT FALLS

HELENE M. FREEMAN
freeman.helene@dorseylaw.com
(212) 415-9239

June 7, 1999

<u>VIA FACSIMILE AND MAIL</u>

Steven Beer, Esq.
Rudolph & Beer LLP
432 Park Avenue South, Second Floor
New York, NY 10016

      Re:   <u>Trans Continental Records Inc. -w- 'N Sync</u>

Dear Steve:

      Adam has forwarded your letter dated June 4, 1999 to me for reply.  You appear to have overlooked the terms of paragraph 19.12 of the Agreement dated April 29, 1996 which provides:

> "Notwithstanding anything to the contrary contained herein, you shall have the right to terminate this agreement in the event COMPANY has not secured a <u>distribution agreement with a U.S. record company within 18 months from the date hereof, pursuant to which recordings of your performance shall be released.</u>"  (Emphasis supplied.)

      The only distribution agreement secured by your client is with BMG Ariola Muenchen GmbH, which is a German company located in Munich, Germany.  All recordings of 'N Sync to date have been distributed pursuant to a distribution agreement, dated August 1, 1996, governed by the laws of Germany, with the aforesaid German record company.

## DORSEY & WHITNEY LLP

Steven Beer, Esq.
June 7, 1999
Page 2

That 'N Sync recordings may have been distributed in the United States by
BMG and/or RCA is irrelevant. Under the plain language of paragraph 19.12 'N Sync
recordings must be distributed pursuant to a distribution agreement with a U.S. record
company. BMG Ariola Muenchen, GmbH is plainly not a U.S. record company. It is a
German corporation which operates independently from the BMG and RCA labels in the
United States.

The members of 'N Sync were not provided with a copy of the distribution
agreement between TransContinental Records and BMG Ariola Muenchen, GmbH. They
had no knowledge of the contractual arrangements made by TransContinental nor were
they aware that their recordings first released in the United States in March 1998 were
being distributed pursuant to the recording agreement dated August 1, 1996.

Indeed, no one was aware that 'N Sync recordings were being distributed in
the United States pursuant to the August 1, 1996 agreement with BMG Ariola Muenchen
GmbH until Larry Rudolph provided a copy of the agreement to Adam Ritholz in
February 1999.

Your client drafted the recording agreement and it is hornbook law that a
contract is interpreted strictly against the draftsman. Indeed, the members of 'N Sync did
not have the benefit of legal counsel in connection with the contracts entered into with
the various TransContinental entities. We believe that those contracts are unconscionable
under Florida law and in all of the circumstances, that a court would enforce paragraph
19.12 in accordance with its plain meaning and conclude that 'N Sync was well within its
rights in terminating the April 29, 1996 agreement.

Accordingly, we unequivocably reject your demand that 'N Sync withdraw
its letter of termination dated May 26, 1999. The agreement dated April 29, 1996 has
terminated. Your client has no rights thereunder and its rights including inter alia to the
recording and songwriting services of 'N Sync or merchandising of the group and its
name have terminated.

## DORSEY & WHITNEY LLP

Steven Beer, Esq.
June 7, 1999
Page 3


The foregoing is not intended as an exhaustive statement of the facts or of our client's rights, remedies and legal position in this matter, all of which are expressly reserved.

Very truly yours,

Helene M. Freeman

HMF/JW

cc:   Adam Ritholz, Esq.
      Straus Zelnick
      Bob Jamieson
      Jeff Walker, Esq.

# DORSEY & WHITNEY LLP

MINNEAPOLIS
WASHINGTON, D.C.
LONDON
BRUSSELS
HONG KONG
DES MOINES
ROCHESTER
COSTA MESA

250 PARK AVENUE
NEW YORK, NEW YORK 10177
TELEPHONE: (212) 415-9200
FAX: (212) 953-7201

HELENE M. FREEMAN
(212) 415-9239
FAX (212) 953-7201
freeman.helene@dorseylaw.com

NEW YORK
DENVER
SEATTLE
FARGO
BILLINGS
MISSOULA
GREAT FALLS

June 21, 1999

**VIA FACSIMILE AND MAIL**

Michael D. Friedman, Esq.
Parker Chapin Flattau & Klimpl, LLP
1211 Avenue of the Americas
New York, New York 10036

> Re:   'N Sync -w- Transcontinental Records
> Your Ref: 'N Sync Productions, Inc.

Dear Mr. Friedman:

We are writing in reply to your letter dated June 17, 1999 which indicates it is written in your capacity as "special counsel to Transcontinental Records, Inc.," although captioned with reference to 'N Sync Productions, Inc.

Although your letter purports to address my letter of June 7, 1999 to Steven Beer, Esq., notably absent from it is any mention of either the relevant facts or the applicable law. Indeed, your letter is devoid of any basis which would justify your _ipse dixit_ that the grounds stated for the termination of the April 29, 1996 agreement between the parties are "devoid of merit".

Needless to say, there is nothing in your letter which would cause us to alter our view that our clients were well within their rights, expressly granted under the plain terms of paragraph 19.12, in terminating the April 29, 1996 agreement. It was a step which was not taken lightly and was based on a review of the applicable law as applied to the facts as set forth in my letter of June 7, 1999.

## DORSEY & WHITNEY LLP

Michael D. Friedman, Esq.
June 21, 1999
Page 2

We are at a loss to understand what you mean by "related hostile acts." Our clients have exercised their rights under a contract. While our clients' rights under the interrelated agreements with Mr. Pearlman's affiliated companies are few, they are absolutely entitled to exercise the rights they have. They have done so, and will continue to do so. The agreement dated April 29, 1999 has been terminated, and our clients fully intend to pursue their career on that basis. They are not and will not be intimidated by threats by you or others.

Given the unconscionability of all of the agreements Mr. Pearlman induced these unsophisticated kids, who were unrepresented by counsel, to execute and the manner in which he and the companies he controls acted thereafter, 'N Sync would be justified in taking the position that all of the agreements are void ab initio under Florida law. That the group to date has limited itself to terminating the agreement in accordance with its terms should not be understood as a waiver of any of their rights or remedies in this matter, all of which are expressly preserved.

Very truly yours,

Helene M. Freeman

HMF/rl

cc:   Adam Ritholz, Esq.
      Strauss Zelnick
      Bob Jamieson
      Jeff Walker, Esq.

19

# DORSEY & WHITNEY LLP

<table>
<tr><td>MINNEAPOLIS</td><td rowspan="10" align="center">250 PARK AVENUE<br>NEW YORK, NEW YORK 10177<br>TELEPHONE: (212) 415-9200<br>FAX: (212) 953-7201<br><br>HELENE M. FREEMAN<br>(212) 415-9239<br>FAX (212) 953-7201<br>freeman.helene@dorseylaw.com</td><td>NEW YORK</td></tr>
<tr><td>WASHINGTON, D.C.</td><td>DENVER</td></tr>
<tr><td>LONDON</td><td>SEATTLE</td></tr>
<tr><td>BRUSSELS</td><td>FARGO</td></tr>
<tr><td>HONG KONG</td><td>BILLINGS</td></tr>
<tr><td>DES MOINES</td><td>MISSOULA</td></tr>
<tr><td>ROCHESTER</td><td>GREAT FALLS</td></tr>
<tr><td>COSTA MESA</td><td></td></tr>
</table>

June 29, 1999

**FACSIMILE & CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Trans Continental Records, Inc.
7380 Sand Lake Road
Orlando, FL 32819

      Attn:  Louis J. Pearlman, President

      Re:    'N Sync -w- Trans Continental Records Inc.

Gentlemen:

      As you are aware, we are the attorneys for the performers professionally known as 'N Sync.  Reference is made to the Exclusive Artist Recording Agreement between you and the members of 'N Sync dated as of April 29, 1996 (the "Agreement") and the Exclusive Management Agreement between Trans Continental Entertainment, Inc. ("Manager") and the members of 'N Sync of the same date (the "Management Agreement").

      Pursuant to paragraphs 9.02 and 11.01 of the Agreement, you are obligated to pay to the members of 'N Sync semi-annually on September 30 and March 31 of each year, a royalty equivalent to 50% of all net royalties received by you in connection with the sales of recordings derived from the Masters.  Pursuant to paragraph 19.10, you are required to pay to the members of 'N Sync one half of all net monies received by you in connection with the exercise of merchandising rights pursuant thereto.

      Pursuant to paragraph 11 of the Management Agreement, Manager is not entitled to commissions from 'N Sync in connection with any monies received or derived by 'N Sync from the Agreement.

DORSEY & WHITNEY LLP

Trans Continental Records, Inc.
June 29, 1999
Page 2

      This letter is to notify you that you are in default of your obligation to pay 'N Sync all royalties due from inception in that you have deducted "Management Commissions" from royalty payments made to the members of 'N Sync.  Subject to the conduct of a full audit pursuant to paragraph 11.04 of the Agreement, it presently appears that $625,717.53 in "Management Commissions" has been incorrectly deducted from the royalties due and payable to 'N Sync.

      Accordingly, demand is made that you pay within sixty (60) days all sums heretofore deducted as Management Commissions from 'N Sync's share of record and merchandising royalties received by you.  Unless you cure said breach within sixty (60) days, the Agreement shall be terminated for breach.

      This letter is written without prejudice to 'N Sync's position that the Agreement terminated on May 26, 1999 pursuant to paragraph 19.12 of the Agreement. This letter is, also, written without prejudice to all of 'N Sync's rights and remedies concerning the Agreement or the accountings rendered by you thereunder, including, but not limited to, the right of the members of 'N Sync to pursue all remedies other than and in addition to termination on account of your failure to account for and to pay royalties, including seeking to void the Agreement ab initio as unconscionable.

                    Very truly yours,

                    Helene M. Freeman

HMF/JW
cc:    Trans Continental Entertainment, Inc.
       William B. Pringle, Esq.
       Adam Ritholz, Esq.
       Howard Comart
       Lawrence Rudolph, Esq.
       'N Sync
       Philip Baker-Shenk, Esq.

**20**

# DORSEY & WHITNEY LLP

| | | |
|---|---|---|
| MINNEAPOLIS | 250 PARK AVENUE | NEW YORK |
| WASHINGTON, D.C. | NEW YORK, NEW YORK 10177 | DENVER |
| LONDON | TELEPHONE: (212) 415-9200 | SEATTLE |
| BRUSSELS | FAX: (212) 953-7201 | FARGO |
| HONG KONG | | BILLINGS |
| DES MOINES | HELENE M. FREEMAN | |
| ROCHESTER | (212) 415-9239 | MISSOULA |
| COSTA MESA | FAX (212) 953-7201 | GREAT FALLS |
| | freeman.helene@dorseylaw.com | |

July 14, 1999

**VIA FACSIMILE &**
**CERTIFIED MAIL**

Trans Continental Entertainment, Inc.
7380 Sand Lake Road
Suite 350
Orlando, FL 32819

       Re:    'N Sync-w-Transcontinental Entertainment, Inc.

Gentlemen:

       We are the attorneys for the performers professionally known as 'N Sync. Reference is made to the Exclusive Management Agreement between you and 'N Sync. Reference is also made to the Exclusive Artist Recording Agreement dated as of April 29, 1996 between Trans Continental Records, Inc. and 'N Sync and the undated Stockholders Agreement purportedly between Trans Continental Inc., Trans Continental Records, Inc., Louis J. Pearlman and the individual members of 'N Sync relating to 'N Sync Productions, Inc.

       Notice is hereby given that the Exclusive Management Agreement is hereby terminated on the ground that there is an inherent and incurable conflict of interest which has precluded and continues to preclude you from performing your duties to 'N Sync under the Agreement.

                 Very truly yours,

                 *Helene M. Freeman*

                 Helene M. Freeman

HMF/gd
cc:    William B. Pringle, Esq.
       Adam Ritholz, Esq.
       Howard Comart
       Lawrence Rudolph, Esq.
       'N Sync
       Philip Baker-Shenk, Esq.
       Johnny Wright

**21**

# DORSEY & WHITNEY LLP

MINNEAPOLIS

WASHINGTON, D.C.

LONDON

BRUSSELS

HONG KONG

DES MOINES

ROCHESTER

COSTA MESA

250 PARK AVENUE

NEW YORK, NEW YORK 10177

TELEPHONE: (212) 415-9200

FAX: (212) 953-7201

HELENE M. FREEMAN

(212) 415-9239

FAX (212) 953-7201

freeman.helene@dorseylaw.com

NEW YORK

DENVER

SEATTLE

FARGO

BILLINGS

MISSOULA

GREAT FALLS

August 31, 1999

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Trans Continental Entertainment, Inc.
7380 Sand Lake Road
Suite 350
Orlando, FL  32819

Dear Sir:

This firm represents Justin Randall Timberlake.  Reference is made to the Exclusive Management Agreement between you and Christopher Alan Kirkpatrick, Justin Randall Timberlake, Joshua Scott Chasez, Joseph Anthony Fatone, Jr. and James Lance Bass.

Notice is hereby given that Justin Randall Timberlake, having reached the age of majority, hereby disaffirms the aforesaid Exclusive Management Agreement on the grounds of his infancy.

Very truly yours,

Helene M. Freeman

HF/JW
cc:   Adam Ritholz, Esq.
       Lawrence Rudolph, Esq.
       William B. Pringle, Esq.

## DORSEY & WHITNEY LLP

Trans Continental Entertainment, Inc.
August 31, 1999
Page 2

Justin Timberlake
Paul & Lynn Harless
James Lance Bass
Joshua Chasez
Joseph Fatone, Jr.
Christopher Kirkpatrick

# DORSEY & WHITNEY LLP

MINNEAPOLIS
WASHINGTON, D.C.
LONDON
BRUSSELS
HONG KONG
DES MOINES
ROCHESTER
COSTA MESA

250 PARK AVENUE
NEW YORK, NEW YORK 10177
TELEPHONE: (212) 415-9200
FAX: (212) 953-7201

NEW YORK
DENVER
SEATTLE
FARGO
BILLINGS
MISSOULA
GREAT FALLS

HELENE M. FREEMAN
(212) 415-9239
FAX (212) 953-7201
freeman.helene@dorseylaw.com

August 31, 1999

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Trans Continental Records, Inc.
7380 Sand Lake Road
Suite 350
Orlando, FL 32819

Attention:   Louis J. Pearlman, President

Dear Sir:

This firm represents Justin Randall Timberlake.  Reference is made to the Exclusive Artist Recording Agreement dated April 29, 1996 between you and Christopher Alan Kirkpatrick, Justin Randall Timberlake, Joshua Scott Chasez, Joseph Anthony Fatone, Jr. and James Lance Bass.

Notice is hereby given that Justin Randall Timberlake, having reached the age of majority, hereby disaffirms the aforesaid Exclusive Artist Recording Agreement dated April 29, 1996 on the grounds of his infancy.

Very truly yours,

Helene M. Freeman

HF/JW
cc:   Adam Ritholz, Esq.
      Lawrence Rudolph, Esq.
      William B. Pringle, Esq.

# DORSEY & WHITNEY LLP

Trans Continental Records, Inc.
August 31, 1999
Page 2


Justin Timberlake
Paul & Lynn Harless
James Lance Bass
Joshua Chasez
Joseph Fatone, Jr.
Christopher Kirkpatrick