UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

TRANS CONTINENTAL RECORDS, INC.,
BMG ENTERTAINMENT, BMG ARIOLA
MUENCHEN GmbH, TRANS
CONTINENTAL ENTERTAINMENT, INC.
AND LOUIS J. PEARLMAN,

          Plaintiffs,

vs.                                  CIV. ACTION NO. 99-1282-Civ-Orl-22C

ZOMBA RECORDING CORPORATION,
CLIVE CALDER, JAMES LANCE BASS,
JOSHUA SCOTT CHASEZ, JOSEPH
ANTHONY FATONE, JR., CHRISTOPHER
ALAN KIRKPATRICK, and JUSTIN
RANDALL TIMBERLAKE,

          Defendants.

_____/

## ANSWER AND COUNTERCLAIMS OF DEFENDANTS, JAMES LANCE BASS, JOSHUA SCOTT CHASEZ, JOSEPH ANTHONY FATONE, JR., CHRISTOPHER ALAN KIRKPATRICK, AND JUSTIN RANDALL TIMBERLAKE

        Defendants James Lance Bass, Joshua Scott Chasez, Joseph Anthony Fatone, Jr., Christopher Alan Kirkpatrick and Justin Randall Timberlake (collectively, "'N SYNC" or the "Group"), by their attorneys, Dorsey & Whitney LLP for their answer and counterclaims to plaintiffs' Complaint allege as follows:

        1.     'N SYNC denies each and every allegation contained in Paragraph 1 of the Complaint.

        2.     'N SYNC denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 2 of the Complaint, except denies that Pearlman and Transcontinental formed, developed and groomed 'N SYNC and denies that BMG had creative input into the group's recordings.

38

3.      'N SYNC denies each and every allegation contained in Paragraph 3 of the Complaint.

4.      'N SYNC denies each and every allegation contained in Paragraph 4 of the Complaint, except admits that Plaintiffs seek the relief specified.  N' SYNC specifically denies that Plaintiffs are entitled to any relief.

5.      'N SYNC denies the allegations contained in Paragraph 5 of the Complaint, except admit that they have entered into a recording agreement with Zomba Recording Corporation ("Zomba") and respectfully refer the Court to the recording agreement for its terms.

6.      'N SYNC denies each and every allegation contained in Paragraphs 6 and 7 the Complaint.

7.      'N SYNC denies the allegations contained in Paragraph 8 of the Complaint, except admits that Plaintiffs seek the relief specified.  N' SYNC specifically denies that Plaintiffs are entitled to any relief.

8.      'N SYNC denies the allegations contained in Paragraph 9 of the Complaint, except admits that Louis J. Pearlman resides in Orlando, Florida.

9.      'N SYNC denies the allegations contained in Paragraph 10 of the Complaint, except admits upon information and belief that Trans Continental Records, Inc. ("TCR") and Transcontinental Entertainment, Inc. ("TCE") have their principal places of business in Orlando, Florida, that TCR and TCE are owned or controlled by Pearlman and that prior to their termination by 'N SYNC for conflict of interest and breach, TCE and Pearlman managed 'N SYNC pursuant to an Exclusive Management Agreement.  'N SYNC respectfully refers the Court to the Exclusive Artist Recording Agreement (the "Recording Agreement") for its terms.

2

10.     'N SYNC denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 11, except admits that BMG Ariola is a German corporation with its principal place of business in Munich, Germany.

11.     'N SYNC denies the allegations in Paragraph 12 of the Complaint, except admits that TCR is a party to an Agreement dated August 1, 1996 with BMG Ariola pursuant to which 'N SYNC recordings have been released and distributed and that to date more than 10 million 'N SYNC albums have been sold.

12.     'N SYNC denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in Paragraph 13 of the Complaint, except admits upon information and belief that Zomba is a New York corporation with its principal place of business in New York, New York and specifically denies that Zomba or Calder have engaged in any unlawful activity with respect to the matters alleged in the Complaint.

13.     'N SYNC admits the allegations in Paragraph 14 of the Complaint, except denies that James Lance Bass resides in Orlando, Florida.

14.     'N SYNC denies each and every allegation contained in Paragraph 15 of the Complaint, except admits that plaintiffs purport to base this court's jurisdiction on the grounds set forth and seek the relief requested.

15.     'N SYNC denies each and every allegation contained in Paragraph 17 of the Complaint.

16.     'N SYNC states that the allegations contained in Paragraph 18 of the Complaint set forth legal conclusions as to which no response is required; to the extent that these allegations may be construed to state allegations of fact, they are denied.

17.     'N SYNC denies the allegations contained in Paragraph 19 of the Complaint insofar as they pertain to 'N SYNC, except admits that Pearlman or entities controlled by him advanced funds for certain expenses of 'N SYNC and alleges that all sums advanced have been recouped. 'N SYNC denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 19 to the extent that they pertain to anyone other than 'N SYNC.

18.     'N SYNC denies the allegations in Paragraph 20 of the Complaint, except admits that Kirkpatrick and Fatone performed in musical revues at Universal Studios Theme Park, that Timberlake and Chasez had appeared on the television show, the Mickey Mouse Club that none of the members of 'N SYNC had a recording contract and that Timberlake, Chasez and Bass did not have and were not seeking a regular source of income derived from the music business.

19.     'N SYNC denies the allegations in Paragraph 21 of the Complaint, except admits that, in 1995, Pearlman began acting as the manager and business manager for 'N SYNC, that he actively encouraged 'N SYNC to trust him and rely on his expertise in the music business, and that Pearlman or entities he controlled have advanced money for certain expenses of 'N SYNC, and affirmatively state that Pearlman or entities he controlled have sought and obtained reimbursement from 'N SYNC of all sums expended.

20.     'N SYNC denies the allegations in Paragraph 22 of the Complaint, except admits that, in reliance on Pearlman's advice, and his assurances that he was safeguarding the interests of the members of 'N SYNC, and based on Pearlman's fraudulent and deceitful actions, statements, and failures to disclose, Pearlman purportedly signed the members of 'N SYNC to a series of self-dealing agreements with Pearlman, TCR, and TCE, that were inimical to their interests, unconscionable, and were in breach of Pearlman's fiduciary duties to 'N SYNC.

4

21.     'N SYNC denies the allegations in Paragraph 23 of the Complaint, and respectfully refers the Court to the Recording Agreement for the terms thereof except admits that Pearlman or entities he controlled advanced funds to pay certain expenses of 'N SYNC in the period August 1995 to July 31, 1996.

22.     'N SYNC denies the allegations in Paragraphs 24 through 27 and 31 through 33 of the Complaint and specifically denies that the Exclusive Recording Agreement remains in effect and respectfully refers the Court to the Recording Agreement for the terms thereof.

23.     'N SYNC denies the allegations in Paragraph 28 of the Complaint and respectfully refers the Court to the Recording Agreement for the full terms thereof.

24.     'N SYNC denies the allegations in Paragraph 29 of the Complaint and respectfully refers the Court to the Recording Agreement for the full terms thereof.

25.     'N SYNC denies the allegations in Paragraph 30 of the Complaint and respectfully refers the Court to the Recording Agreement for the terms thereof.

26.     'N SYNC denies the allegations in Paragraph 32 of the Complaint, respectfully refers the Court to the Recording Agreement for the full terms thereof and affirmatively state that TCR never exercised any rights pursuant to paragraphs 2, 3, 4 and 21 of the Recording Agreement.

27.     'N SYNC admits the allegations in Paragraph 34 of the Complaint.

28.     'N SYNC denies the allegations in Paragraph 35 of the Complaint and respectfully refers the Court to the Recording Agreement for the full terms thereof.

29.     'N SYNC denies the allegations in Paragraph 36 of the Complaint, except admits that they have recorded and delivered Masters to TCR and admit that two 'N SYNC albums released in the United States on the RCA label and two 'N SYNC albums released outside the United States have collectively achieved sales in excess of 10 million copies.

30.     'N SYNC denies the allegations in Paragraph 37 of the Complaint.

31.     'N SYNC denies the allegations contained in Paragraph 38 of the Complaint, except admits that on or about April 28, 1996, Pearlman caused the group to enter into an Exclusive Management Agreement with TCE and respectfully refers the Court to the Management Agreement attached as Exhibit B for the full terms thereof.

32.     'N SYNC denies the allegations in Paragraph 39 of the Complaint and respectfully refers the Court to the Management Agreement and the Recording Agreement for the full terms thereof.

33.     'N SYNC denies each and every allegation contained in in Paragraph 40 of the Complaint.

34.     'N SYNC denies each and every allegation contained in Paragraph 41 of the Complaint, and affirmatively alleges that Pearlman reported he and TCR were unable to procure a recording agreement for 'N SYNC, but that Johnny Wright could secure a recording agreement for the group.

35.     'N SYNC denies the allegations in Paragraph 42 of the Complaint, except admits upon information and belief that TCR entered into an agreement with BMG Ariola Muenchen GmbH and respectfully refers the Court to Exhibit C for the terms thereof.

36.     'N SYNC denies the allegations in Paragraph 43 of the Complaint, except admits that what appear to be the signatures of the members of 'N SYNC appear on a document titled "Letter of Acknowledgment." 'N SYNC respectfully refers the Court to the Letter of Acknowledgment for the terms thereof.

37.     'N SYNC denies the allegations of Paragraph 44 of the Complaint, except admits that in or about April 1997, 'N SYNC's self-titled first record was released by BMG Ariola Muenchen

6

in Europe, and elsewhere, and that such record has achieved great success outside of the United States including various gold, platinum, and multi-platinum awards. 'N SYNC further admits that, in or about April 1998, RCA released an 'N SYNC recording in the United States, and admits, upon information and belief, that such record has sold approximately 7,000,000 copies in the United States. 'N SYNC further admits that, in or about November 1998, RCA released an 'N SYNC album entitled "Home for Christmas" which, on information and belief, has sold in excess of 1,700,000 copies.

38.     'N SYNC denies the allegations of Paragraph 45 of the Complaint, except admits that they have a huge pre-teen and teen following in several parts of the world, and that their name is widely-recognized and associated with the five individual members of the group.

39.     'N SYNC denies the allegations of Paragraph 46 of the Complaint, except admits that it recently completely a United States tour, that it has engaged in tours abroad, and that it has made numerous television appearances, including its own pay-per-view program and a featured performance in the 1999 MTV video award show. 'N SYNC further admits that it has been the subject of numerous news and magazine features. ''N SYNC affirmatively states that TCR and its affiliated companies have retained and enjoyed the benefits of lucrative Sponsorship and merchandising agreements to the exclusion of the members of the group.

40.     'N SYNC denies the allegations of Paragraph 47 of the Complaint, except admits upon information and belief that Pearlman, in breach of his fiduciary duties to 'N SYNC, acquired a license to U.S. Trademark Registration Number 1,843,498, which license has terminated.

41.     'N SYNC denies the allegations of Paragraph 48 of the Complaint, and respectfully refers the court to Exhibit C to the Complaint for its terms.

42.    'N SYNC denies the allegations in Paragraph 49 of the Complaint, except admits that, in breach of his fiduciary duties to 'N SYNC, Pearlman has obtained trademark rights to the 'N SYNC name in a number of countries throughout the world.

43.    'N SYNC denies each and every allegation contained in Paragraphs 50, 51 and 52 of the Complaint.

44.    'N SYNC denies the allegations in Paragraph 53 of the Complaint, except admits that commencing in or about January 1999, 'N SYNC has been represented by counsel experienced in the music industry located in New York, and that such counsel sought to negotiate with plaintiffs to relieve 'N SYNC from a web of unconscionable contracts, including but not limited to the Exclusive Recording Agreement.

45.    'N SYNC denies the allegations in Paragraph 54 of the Complaint except admits 'N SYNC terminated the Recording Agreement by letter dated May 26, 1999, pursuant to paragraph 19.12 of Exhibit A to the Complaint.

46.    'N SYNC denies each and every allegation contained in Paragraph 55 of the Complaint.

47.    'N SYNC denies the allegations in Paragraph 56 of the Complaint, except admits, upon information and belief, that as of May 26, 1999, 'N SYNC's United States debut album had sold in excess of 6,000,000 copies, and that 'N SYNC's Christmas album had sold in  excess of 1,700,000 copies.

48.    'N SYNC denies each and every allegation contained in Paragraph 57 of the Complaint.

49.    'N SYNC denies the allegations in Paragraph 58 of the Complaint, except admits that it has terminated the  Management Agreement.

8

50.     'N SYNC denies each and every allegation contained in Paragraph 59 of the Complaint.

51.     'N SYNC denies the allegations in Paragraph 60 of the Complaint, except admits that, on or about September 7, 1999, Zomba announced that Zomba had entered into a recording agreement with 'N SYNC.

52.     'N SYNC denies each and every allegation contained in Paragraph 61 of the Complaint.

53.     'N SYNC denies the allegations in Paragraph 62 of the Complaint, except admits that 'N SYNC intends to continue to use its name.

54.     'N SYNC denies the allegations in Paragraph 63 of the Complaint, except admits that the names and likeness of the members of the group will be used in connection with the promotion and marketing of 'N SYNC recordings.

55.     'N SYNC denies each and every allegation contained in Paragraph 64 of the Complaint.

56.     'N SYNC denies each and every allegation contained in Paragraph 65 and 66 of the Complaint.

57.     'N SYNC denies the allegations in Paragraph 67 of the Complaint, except admits that at all times the group has refused to withdraw its termination of the agreement with TCR and that attempts to resolve the dispute failed.

58.     'N SYNC denies the allegations in Paragraph 68 of the Complaint, except admits that after the termination of its agreement with TCR the group recorded on its own for its benefit and that prior to the termination it performed at recording sessions arranged by plaintiffs.

59.     'N SYNC denies the allegations in Paragraph 69 of the Complaint.

60.     'N SYNC denies each and every allegation contained in Paragraphs 70, 71 and 72 of the Complaint.

61.     'N SYNC denies the allegations in Paragraph 73 of the Complaint, except admits that its members filed an "intent to use" trademark application No. TM 75/712737 in the United States Patent and Trademark Office on or about May 24, 1999.

62.     'N SYNC denies each and every allegation contained in Paragraph 73 of the Complaint.

63.     'N SYNC denies each and every allegation contained in Paragraph 75 of the Complaint.

64.     'N SYNC denies the allegations contained in Paragraph 76 of the Complaint and respectfully refers the court to the Winterland Agreements for the full terms thereof.

65.     'N SYNC denies the allegations in Paragraph 77 of the Complaint, except admits that 'N SYNC informed Winterland of the termination of the Recording Agreement and furnished Winterland with a copy of its May 26, 1999 termination letter and that Justin Timberlake disaffirmed the Winterland Agreements.

<u>AS TO COUNT I OF THE COMPLAINT</u>

66.     Answering paragraph 78 of the Complaint, 'N SYNC repeats and realleges its answers to Paragraphs 1 through 77 of this Answer with the same force and effect as if the same were fully set forth herein.

67.     'N SYNC denies each and every allegation contained in Paragraphs 79 through 84 of the Complaint.

## AS TO COUNT II OF THE COMPLAINT

68.     Answering paragraph 85 of the Complaint, 'N SYNC repeats and realleges its answers to Paragraphs 1 through 84 of the Complaint with the same force and effect as if the same were fully set forth herein.

69.     'N SYNC denies each and every allegation contained in Paragraphs 86 through 89 of the Complaint.

## AS TO COUNT III OF THE COMPLAINT

70.     Answering paragraph 90 of the Complaint, 'N SYNC repeats and realleges its answers to Paragraphs 1 through 89 of the Complaint with the same force and effect as if the same were fully set forth herein.

71.     'N SYNC denies each and every allegation contained in Paragraph 91 of the Complaint.

72.     'N SYNC denies each and every allegation contained in Paragraphs 92 through 95 of the Complaint.

## AS TO COUNT IV OF THE COMPLAINT

73.     Answering paragraph 96 of the Complaint, 'N SYNC repeats and realleges its answer to Paragraphs 1 through 95 of the Complaint with the same force and effect as if the same were fully set forth herein.

74.     'N SYNC denies each and every allegation contained in Paragraphs 97 and 98 of the Complaint.

## AS TO COUNT V OF THE COMPLAINT

75.     Answering paragraph 99 of the Complaint, 'N SYNC repeats and realleges its answers to Paragraphs 1 through 98 of the Complaint with the same force and effect as if the same were fully set forth herein.

76.     'N SYNC denies each and every allegation contained in Paragraphs 100 through 103 of the Complaint.

## AS TO COUNT VI OF THE COMPLAINT

77.     Answering paragraph 104 of the Complaint, 'N SYNC repeats and realleges its answers to Paragraphs 1 through 103 of the Complaint with the same force and effect as if the same were fully set forth herein.

78.     'N SYNC denies each and every allegation contained in Paragraph 105 of the Complaint.

## AS TO COUNT VII OF THE COMPLAINT

79.     Answering paragraph 106 of the Complaint, 'N SYNC repeats and realleges it answers to Paragraphs 1 through 105 of the Complaint with the same force and effect as if the same were fully set forth herein.

80.     'N SYNC denies each and every allegation contained in Paragraph 107 of the Complaint.

81.     'N SYNC denies the allegations in Paragraph 108 of the Complaint and respectfully refers the Court to the Recording Agreement for the terms thereof.

82.     'N SYNC denies each and every allegation contained in Paragraphs 109 through 112 of the Complaint.

12

## AS TO COUNT VIII OF THE COMPLAINT

83.     Answering paragraph 113 of the Complaint, 'N SYNC repeats and realleges its answers to Paragraphs 1 through 112 of the Complaint with the same force and effect as if the same were fully set forth herein.

84.     'N SYNC denies each and every allegation contained in Paragraph 113 of the Complaint.

## AS TO COUNT IX OF THE COMPLAINT

85.     Answering paragraph 115 of the Complaint, 'N SYNC repeats and realleges its answers to Paragraphs 1 through 114 of the Complaint with the same force and effect as if the same were fully set forth herein.

86.     'N SYNC denies the allegations in Paragraph 116 of the Complaint.

87.     'N SYNC denies the allegations in Paragraph 117 of the Complaint.

## AS TO COUNT X OF THE COMPLAINT

88.     Answering paragraph 118 of the Complaint, 'N SYNC repeats and realleges its answers to Paragraphs 1 through 117 of the Complaint with the same force and effect as if the same were fully set forth herein.

89.     'N SYNC lack information sufficient to form a belief as to the truth of the allegations set forth in Paragraph 119 of the Complaint and consequently denies the same.

90.     'N SYNC denies each and every allegation contained in Paragraphs 120 and 121 of the Complaint.

<u>AS TO COUNT XI OF THE COMPLAINT</u>

91.     Answering paragraph 122 of the Complaint, 'N SYNC repeats and realleges its answers to Paragraphs 1 through 121 of the Complaint with the same force and effect as if the same were fully set forth herein.

92.     'N SYNC denies each and every allegation contained in Paragraphs 123 through 128 of the Complaint.

<u>AS TO COUNT XII OF THE COMPLAINT</u>

93.     Answering paragraph 129 of the Complaint, 'N SYNC repeats and realleges its answers to Paragraphs 1 through 128 of the Complaint with the same force and effect as if the same were fully set forth herein.

94.     'N SYNC admits the allegations in Paragraph 130 of the Complaint.

95.     'N SYNC denies each and every allegation contained in Paragraphs 131 through _ _ of the Complaint.

<u>AS TO COUNT XIII OF THE COMPLAINT</u>

96.     Answering paragraph 134 of the Complaint, 'N SYNC repeats and realleges its answers to Paragraphs 1 through 134 of the Complaint as to the same force and effect as if the same were fully set forth herein.

97.     'N SYNC denies each and every allegation contained in Paragraph 135 through 137 of the Complaint.

**<u>FIRST DEFENSE</u>**

98.     The Complaint, and each and every claim thereof, fails to state a claim upon which relief may be granted against 'N SYNC.

14

## SECOND DEFENSE

99.     Plaintiffs claims are barred in whole or in part due to their unclean hands.

## THIRD DEFENSE

100.    Plaintiffs' claims are barred in whole or in part because any and all agreements purportedly entered into by 'N SYNC during the period that Pearlman was purporting to act as their manager or business manager, including but not limited to the Recording Agreement, the Management Agreement and the 'N SYNC Productions, Inc. Shareholders Agreement, are void because such agreements were the result of Pearlman's breach of his fiduciary duties to 'N SYNC.

## FOURTH DEFENSE

101.    Plaintiffs' claims are barred in whole or in part because the Recording Agreement has terminated pursuant to the terms of Paragraph 19.12 of such Agreement.

## FIFTH DEFENSE

102.    Plaintiffs' claims are barred in whole or in part because any and all agreements purportedly entered into by 'N SYNC during the period that Pearlman was purporting to act as their manager or business manager, including but not limited to the Recording Agreement, the Management Agreement and the 'N SYNC Productions, Inc. Shareholders Agreement, are void as unconscionable.

## SIXTH DEFENSE

103.    Plaintiffs' claims are barred in whole or in part because any and all agreements purportedly entered into by 'N SYNC during the period that Pearlman was purporting to act as their manager or business manager, including but not limited to the Recording Agreement, the Management Agreement and the 'N SYNC Productions, Inc. Shareholders Agreement, are void because Pearlman fraudulently induced 'N SYNC to enter into such agreements.

15

## SEVENTH DEFENSE

104.    Plaintiffs' claims are barred in whole or in part because any and all agreements purportedly entered into by 'N SYNC during the period that Pearlman was purporting to act as their manager or business manager, including but not limited to the Recording Agreement, the Management Agreement and the 'N SYNC Productions, Inc. Shareholders Agreement, are void because Pearlman used undue influence to induce 'N SYNC to enter into such agreements.

## EIGHTH DEFENSE

105.    Plaintiffs' claims against Justin Randall Timberlake are barred in whole or in part because Timberlake upon reaching the age of majority, disaffirmed the Recording Agreement and the Management Agreement.

## NINTH DEFENSE

106.    Plaintiffs' claims under Section 32 of the Lanham Act are barred because no plaintiff has standing to bring such claim.

## TENTH DEFENSE

107.    Plaintiffs' claims under Section 43(a) of the Lanham Act are barred because no plaintiff owns the name 'N SYNC.

## ELEVENTH DEFENSE

108.    Plaintiffs' claims under Section 43(a) of the Lanham Act are barred because Pearlman's license to use the name 'N SYNC has terminated.

## TWELFTH DEFENSE

109.    Plaintiffs' Lanham Act claims are barred because any rights to the 'N SYNC Mark obtained by Pearlman were obtained as the result of his breaches of fiduciary duty.

16

## THIRTEENTH DEFENSE

110.    Plaintiffs' claims are barred in whole or in part by the doctrine of laches.

### 'N SYNC's COUNTERCLAIMS

#### Facts Common to All Counterclaims

111.    'N SYNC consists of James Lance Bass, Joshua Scott Chasez, Joseph Anthony Fatone, Jr., Christopher Alan Kirkpatrick, and Justin Randall Timberlake (hereinafter, "'N SYNC" or "the Group").

112.    'N SYNC was formed in the summer of 1995 through the efforts of Chris Kirkpatrick. Kirkpatrick contacted former Mickey Mouse Club performer Justin Timberlake, who then enlisted fellow Mickey Mouse Club alumnus J.C. Chasez. Chasez and Kirkpatrick recruited their acquaintance Joey Fatone, Jr. Timberlake's mother, Lynn Harless, came up with the name 'N SYNC, which the Group selected in August 1995. When the Group was in need of a bass singer, Harless found Lance Bass, who joined 'N SYNC in October 1995.

113.    Relying on the Mickey Mouse Club contacts of Timberlake and Chasez, Harless obtained a vocal arranger and choreographer to work with 'N SYNC, and over the following months the Group rehearsed developing their distinct vocal style and image. In April, 1996 'N SYNC hired Johnny Wright, who obtained a recording contract with the German recording company BMG Ariola Muenchen GmbH. 'N SYNC thereafter achieved great success performing and selling records first in Europe, and then in the United States.

#### Pearlman's Role As Manager and Financial Backer

114.    Other than Kirkpatrick, who was in his early twenties, all of the members of 'N SYNC were teenagers, and two were still in high school, when 'N SYNC was formed. None except

Kirkpatrick had any education beyond high school or any business background or experience in the business aspects of the music industry.

115.    As soon as 'N SYNC was formed, in August 1995, Pearlman began acting as 'N SYNC's manager and business manager. Pearlman also provided the financial backing, advancing the Group's expenses and the fees of its vocal coach and choreographer, as well as renting a home that served as 'N SYNC's base.

116.    Pearlman had no role in rehearsing or preparing 'N SYNC to perform; indeed he had no role at all in the artistic side of 'N SYNC. In addition, because of his involvement in the Backstreet Boys, whom Pearlman portrayed as 'N SYNC's rivals, Pearlman took pains to distance himself from 'N SYNC and to conceal publicly even his limited financial and managerial role.

117.    Pearlman told 'N SYNC that his primary interest was to see them become successful, and that he had their best interests at heart, and that they should rely on him as if he were a member of their family. Pearlman assured 'N SYNC that all he wanted as compensation for his efforts was to share equally in earnings as the "sixth member of the group", and that because he stood in the same financial position as 'N SYNC, they could and should trust him completely to safeguard their interests.

118.    Pearlman also told 'N SYNC that they were saving a great deal of money by having him act as their manager and business manager for only one-sixth of their earnings, because musical groups usually paid a 35% fee for these services.

119.    Having made extraordinary efforts to foster N SYNC's complete reliance upon him and his superior experience in the music industry, and thereby having assumed a fiduciary obligation to act solely in their best interests, Pearlman used his control over the Group's affairs to take every possible opportunity to line his own pockets at 'N SYNC's expense. Pearlman signed 'N SYNC to

18

a web of agreements with entities he controlled. These agreements were utterly inimical to their interests. This pattern of blatant self-dealing ultimately gave Pearlman or entities he controlled the right to take as fees the vast majority of the Group's income from all possible sources, and the right to control or substantially delay the sums that were ultimately to be paid to 'N SYNC.

120.    In August 1995, after the Group Members selected the name 'N SYNC, Pearlman, without telling the 'N SYNC, filed an application to obtain for his own corporation, Trans Continental Inc., the trademark rights to the Group's name.

### The Outrageous Web of Agreements By Which Pearlman
### Made the Group Members Virtual Indentured Servants

121.    In October 1995, Pearlman formed 'N SYNC Productions, Inc, and required the members of 'N SYNC to execute a Stockholders' Agreement establishing its ownership and control. 'N SYNC Productions, Inc. received all income 'N SYNC earned through live performances and other non-merchandising sources.   Pearlman or Trans Continental entities that he owned or controlled received 3/8 of the shares of 'N SYNC Productions, and the remaining 5/8 of its shares were owned by the five members of 'N SYNC.

122.    Pearlman totally controlled 'N SYNC Productions through an "irrevocable proxy" to vote Group's shares, and a clause in the Stockholders' Agreement whereby 'N SYNC were required to elect Pearlman the Chairman, President and Treasurer of 'N SYNC Productions for as long as he was a stockholder.  Nothing in the agreements applicable to 'N SYNC Productions obligated 'N SYNC Productions to make any distribution of profits to the shareholders.

123.    Pearlman has operated 'N SYNC Productions in a manner reflective of his complete domination of its affairs. He has never held a meeting to elect directors. When 'N SYNC attempted

to play some role in the corporation, Pearlman, through his attorney, responded that 'N SYNC were neither officers nor directors and that they could not call a meeting of the Board.

124.    Pearlman used 'N SYNC Productions to unilaterally set the salary of 'N SYNC while they were on tour, and to pay himself an equal salary.  In 1999, Pearlman received salary and bonuses from 'N SYNC Productions alone in excess of $1 million.

125.    In October 1995, Pearlman also created another corporation called 'N SYNC Inc., in which he and each of the members of 'N SYNC held a 1/6 interest.  Just as he did with 'N SYNC Productions,  Pearlman had 'N SYNC grant him an "irrevocable proxy" to vote their shares of 'N SYNC Inc., and had 'N SYNC agree to elect him Chairman, President and Treasurer for as long as he was a stockholder.

126.    Completely unbeknownst to 'N SYNC, on January 15, 1996, ostensibly acting on behalf of 'N SYNC Productions, Inc., Pearlman executed an agreement between 'N SYNC Productions and Transcontinental Records Inc., ("TCR") which Pearlman also owned and controlled.

127.    Pursuant to this agreement, 'N SYNC Productions agreed to pay TCR a "consulting fee" of 25% of the net revenues of 'N SYNC Productions.  In addition to secretly granting a Pearlman entity the right to such a large proportion of the Group's income, the January 15, 1996 Agreement provided that Transcon Records agreed:

> to provide funding to ['N SYNC Productions] to cover the
> cost of protecting, in the United States, the name 'N SYNC
> including, but not limited to, advancing the costs of trademark
> or other counsel and all filing fees in connection with filings
> made in the U.S. Patent and Trademark Office...

January 15, 1996 Agreement, ¶ 2.  The trademark was never acquired for 'N SYNC Productions; Pearlman instead appropriated it for himself.  Transcon Records has, nevertheless, charged to 'N SYNC expenses relating to acquiring Trademark rights.

20

128.    Pearlman's created another corporation in October 1995 called 'N SYNC Inc., in which he and each of the members of 'N SYNC held a 1/6 interest.

129.    In April 1996, Pearlman told 'N SYNC that TCE was Johnny Wright's company. Pearlman failed to disclose to 'N SYNC that, in fact, he was the owner of TCE.

130.    On April 28, 1996, Pearlman advised 'N SYNC to sign a Management Agreement with Trans Continental Entertainment, Inc. ("TCE"), which Pearlman told 'N SYNC was Johnny Wright's company.

131.    Pearlman affirmatively misled 'N SYNC about the ownership of TCE, never disclosed to them that he, in fact, was the owner of Transcon Entertainment.

132.    Pearlman further advised 'N SYNC to pay a higher-than-customary commission rate of 25% of recording revenues and 30% of merchandising and production revenues under the Management Agreement, in order to induce Wright to give the Group his best efforts.  In fact, unbeknownst to 'N SYNC, Pearlman was advising 'N SYNC to pay such higher commission to himself.

133.    In reliance upon Pearlman's advice, his false and fraudulent statements and his fraudulent failures to disclose, 'N SYNC signed the Management Agreement with Transcon Entertainment.

134.    Although the Management Agreement further provides, at ¶ 11, that the shall not be entitled to any compensation under the Management Agreement where it or an entity controlled by a TCE shareholder is otherwise entitled to a portion of the same income generated by 'N SYNC through another agreement, Pearlman has not complied with this "no-double-dipping" provision, and he has taken the position that it does not apply to his activities.

21

135.    Pearlman or Companies controlled by him have approximately $6.5 million under the Management Agreement.

136.    On or about April 29, 1996, Pearlman had 'N SYNC enter into an Exclusive Artist Recording Agreement (the "Recording Agreement").

137.    The Recording Agreement provided that TCR, which Pearlman owns controls, would be entitled to, among other things, 50% of the net royalties generated by the sale of the Group's recordings. The Recording Agreement provides:

> COMPANY shall pay to ['N SYNC] a royalty equivalent to fifty percent (50%) of all net royalties received by company in connection with the sales of recordings derived from the Masters hereunder. Said royalties shall be calculated and determined in the same manner in which COMPANY's licensees and distributor account to company.

138.    The Recording Agreement further provides that TCR is entitled to 50% of their merchandising earnings. Paragraph 19.10 of the Recording Agreement provides:

> You hereby grant to us, or our affiliate 'N Sync Productions, Inc. Or our designee all merchandising rights and the sole and exclusive right to use your name (both legal and professional), likeness, picture and portrait in any manner whatsoever in connection with the exercise of the merchandising rights herein granted. COMPANY or its designee shall have the right to grant to the others (including companies affiliated with us) upon such terms as we shall see fit, the right to exercise or cause to be exercised such merchandising rights. COMPANY shall pay to you, in addition to any and all monies provided for in this Agreement, one-half [1/2] of all net monies received by us in connection with the exercise of said merchandising rights.

139.    The Recording Agreement further grants TCR 100% of the publishing income from any compositions written by the Group in fulfilling their obligations under the Recording Agreement. Paragraph 20 of the Recording Agreement provides.

> You hereby assign to COMPANY, or a publishing company designated by COMPANY, One Hundred (100%) percent of all the right, title and interest in and to the Controlled Compositions, including without limitation, the rights in and to the copyrights therein and the renewal rights thereto. You shall simultaneously herewith

22

enter into the attached Exhibit A copyright transfer and assignment, pursuant to which COMPANY or such publishing company shall acquire said rights, title and interest, together with the exclusive right to Administer the copyrights for the term of the copyrights for the term of the copyright in each such Controlled Composition. Artist shall receive their public performance royalties for the United States directly from the performing rights society to which they are affiliated. "IT IS SPECIFICALLY UNDERSTOOD AND AGREED THAT THIS PARAGRAPH (AND PROVISIONS CONTAINED IN THIS AGREEMENT RELATED THERETO) APPLIES ONLY TO THOSE CONTROLLED COMPOSITIONS RECORDED BY ARTIST HEREUNDER AND COMPANY SHALL HAVE NO CLAIM TO, OR ANY RIGHT, TITLE OR INTEREST IN, ANY COMPOSITIONS WHOLLY OR PARTLY WRITTEN, OWNED OR CONTROLLED BY YOU AND/OR ARTIST WHICH ARE NOT RECORDED HEREUNDER."

140.    It was not in the 'N SYNC's interest to sign the April 29, 1996 Recording Agreement. The only ones who benefitted from the Recording Agreement were Pearlman and TCR.

141.    To induce 'N SYNC to enter into the Recording Agreement, Pearlman falsely told 'N SYNC that they should sign the agreement was to make them appear to be "signed recording artists" and thus more attractive to major record companies.

142.    Pearlman at no time explained to 'N SYNC how the Recording Agreement served to further his own adverse interest as the owner of TCR.

143.    Pearlman also told 'N SYNC that they did not need to have their own attorneys review this Agreement, because he had the same interest they did (as the "sixth member of the Group"), and his lawyers had reviewed it.

144.    The Recording Agreement was in fact a duplicate of the Exclusive Artist Recording Agreement which Pearlman had required the Group to sign in October 1995. The term of October 1995 Agreement was about to expire, and Pearlman had neither paid the Group the advance nor recorded the long playing album required under that Agreement.

145.    In or about the summer of 1996, Pearlman learned that trademark rights to the name 'N SYNC were already registered to a New Jersey company called "-N-Sync, Inc." On or about

23

July 31, 1996, without making any disclosure whatsoever to 'N SYNC, Pearlman personally entered into a license agreement with "-N-Sync, Inc." to use the Registered Trademark

146.  The result of all of Pearlman's overreaching, secret self-dealing, and misrepresentations was according to Pearlman to give Pearlman or entities he controlled the following rights to 'N SYNC's earnings from all of their income-generating activities:

| | |
|---|---|
| production (touring): | Pearlman or Pearlman entity entitled to: 30% through Management Agreement plus 25% through "Consulting Agreement" plus 37.5% of remainder through stockholders agreement and ownership of shares of 'N SYNC Productions; plus salary, equal to salary paid to each Group Member for touring, to which Pearlman claimed entitlement; Pearlman has complete control over all remaining monies through irrevocable proxy to vote all shares of 'N SYNC Productions. |
| recording: | Pearlman or Pearlman entity entitled to: 25% through Management Agreement; 50% through Recording Agreement; according to Pearlman's interpretation of Recording Agreement, Pearlman entity entitled to all advances, and Group Members entitled only to share of royalties, which are not available until after they are received. |
| merchandising: | Pearlman or Pearlman entity entitled to: 30% through Management Agreement; 50% through Recording Agreement. |
| music publishing: | Pearlman entity entitled to: 100% through Recording Agreement |
| celebrity endorsements: | Because entered into through 'N SYNC Productions, Pearlman or Pearlman entity entitled to: 30% through Management Agreement; 25% through "Consulting Agreement"; 37.5% of remainder through stockholders agreement and ownership of shares of 'N SYNC Productions; Pearlman has complete control over all remaining monies through irrevocable proxy to vote all shares of 'N SYNC Productions. |

24

147.    These agreements and Pearlman's actions under them put 'N SYNC into the position of virtual indentured servants.   Pearlman and his front companies extracted duplicative and ridiculously high fees, and then Pearlman paid 'N SYNC, if at all, in his sole discretion.

148.    As of October 1998, despite their phenomenal success, the members of 'N SYNC had each received only $37,000 from TCR plus a salary of $58,391 from 'N SYNC Productions three years of work.

<u>The Recording Agreement with BMG Ariola Muenchen GmbH</u>

149.    Pearlman's one significant duty under the Recording Agreement was to obtain a contract with a U.S. recording company with eighteen months of the date of the agreement.

150.    In the summer of 1996, Pearlman told 'N SYNC that they had landed a recording contract with "BMG." In fact, the only agreement that existed was an August 1, 1996 agreement between Transcon Records and the German record company BMG Ariola Muenchen GmbH.

151.    The Group left for Europe and recorded their first album, which was released in Germany in October 1996.   The Group spent the next year touring in Europe.   Pearlman did not accompany them.

152.    'N SYNC periodically questioned Pearlman about what efforts were being made to enter the U.S. market, but it was not until late 1997 that Pearlman told 'N SYNC that the U.S. record labels Arista and RCA were competing for 'N SYNC.

153.    In late 1997, Pearlman announced to 'N SYNC that they were signed to RCA.  'N SYNC were then required to return to the recording studio to record new material for a U.S. album.

154.   Notwithstanding the great success of that album, which was released in March 1998, over the ensuing months, while the money poured in to Pearlman and his companies, Pearlman ensured that 'N SYNC had very little to show for all of their efforts.

155.   After Jan Bolz, the head of BMG Ariola, mentioned to 'N SYNC in late 1998 that he had to give Pearlman "millions" in order for 'N SYNC to get anything, and advised 'N SYNC to get a lawyer, 'N SYNC did so.   The members of 'N SYNC learned, for the first time, that they were not signed to RCA or any other U.S. recording company, and they also began to learn something about the scale of Pearlman's self-dealing and overall exploitation of them.

156.   On May 26, 1999, 'N SYNC gave notice of termination of the Recording Agreement for failure to obtain an agreement with a U.S. record company.

157.   'N SYNC thereafter also gave notice of termination of the Management Agreement and the Recording Agreement due to various breaches of those agreements, including Pearlman's violation of an "anti-double-dipping" provision by taking fees under both the Management Agreement and the Recording Agreement.

## FIRST COUNTERCLAIM

### BREACH OF FIDUCIARY DUTY AGAINST LOUIS J. PEARLMAN, TCR AND TCE

158.   'N SYNC asserts this claim against Louis J. Pearlman, TCR and TCE.

159.   'N SYNC repeats and realleges the allegations contained in Paragraphs 151 through 191 hereof.

160.   During the period that he purported to act as 'N SYNC' manager and/or business manager, Pearlman owed duties to 'N SYNC as a fiduciary, including but not limited to the duty to act solely in 'N SYNC' best interest in all matters related to the activities of the Group, the duty of

loyalty, the duty to refrain from self-dealing, the duty to disclose all material facts, and the duty to meet the highest standards of fairness in matters relating to his dealings with 'N SYNC.

161.    By the actions set forth above at Paragraphs 151 through 191, including but not limited to his inducing 'N SYNC to enter into the 'N SYNC Productions, Inc. Shareholder Agreement, the 'N SYNC Inc. Shareholders Agreement, his causing the execution of, and concealing from 'N SYNC, the January 15, 1996 Agreement between 'N SYNC Productions, Inc. and TCR, his inducing 'N SYNC to enter into the Recording Agreement, his securing rights to the 'N SYNC name and service and trademark in his own name and without making full disclosure to 'N SYNC, his falsely telling 'N SYNC that they had been signed to RCA Records, his concealment from 'N SYNC that TCR had no agreement with a U.S. record company, his taking a salary equal to the that earned by 'N SYNC for touring, his taking and causing entities he controlled to take commissions from 'N SYNC's earnings pursuant to both the Management Agreement and other agreements, his failure to pay 'N SYNC monies due them and his withholding of 'N SYNC's salary for the last week of their 1999 U.S. tour, Pearlman breached his fiduciary duties to 'N SYNC.

162.    As a direct and proximate result of Pearlman's breaches of the fiduciary duties he owed to 'N SYNC, 'N SYNC have been damaged in an amount to be determined at trial, but in any event not less than $25 million.

163.    When he breached his fiduciary duties to 'N SYNC, Pearlman was acting as the agent of TCR and TCE.

WHEREFORE, 'N SYNC demands judgment against Pearlman, TCR and TCE, costs, interest, and any other relief this Court deems appropriate.

## SECOND COUNTERCLAIM

### CONSTRUCTIVE TRUST AGAINST LOUIS J. PEARLMAN.

164.    'N SYNC asserts this claim against Louis J. Pearlman.

165.    'N SYNC repeats and realleges the allegations contained in Paragraphs 151 through 197 hereof.

166.    By virtue of Pearlman's breaches of fiduciary duty alleged above, trademark and service mark registrations applied for or obtained by Pearlman and all corporate entities controlled by him throughout the world since August 1995 for 'N SYNC are held in trust for the benefit of 'N SYNC.

167.    'N SYNC has no adequate remedy at law, and will suffer irreparable harm unless a trust is impressed upon all trademark and service mark applications to register and registrations secured by Pearlman and the entities for 'N SYNC.

WHEREFORE, 'N SYNC demands that the Court issue judgment imposing a constructive trust for the benefit of 'N SYNC on all worldwide trademark and service mark registrations or applications to register in the name of 'N SYNC by Pearlman or the entities which he controls for 'N SYNC's activities, and such other relief as the Court deems just and proper.

## THIRD COUNTERCLAIM

### ACCOUNTING AGAINST LOUIS J. PEARLMAN, TCR AND TCE

168.    'N SYNC repeats and realleges the allegations contained in Paragraphs 151 through 197 hereof.

169.    Pearlman and entities controlled by him have obtained complete control of 'N SYNC's finances through the numerous breaches of fiduciary duty and fraud alleged herein.

170.    Upon information and belief, Pearlman and entities controlled by him have collected in excess of $10 million through their conduct of the affairs of 'N SYNC.

171.    'N SYNC has repeatedly demanded that Pearlman and the entities controlled by him account to 'N SYNC for all sums received by them relating to 'N SYNC's activities and that Pearlman and the entities controlled by him pay to 'N SYNC all sums due from such receipts, but Pearlman and such entities have failed to do so.

172.    'N SYNC does not know and cannot ascertain what sums of money have been collected by Pearlman and the entities he controls, and what sums are due 'N SYNC.

173.    'N SYNC has no adequate remedy at law.

WHEREFORE, 'N SYNC demands judgment directing that Pearlman and the entities he controls, including TCR and TCE, render to 'N SYNC a full account of all moneys received by them in connection with the activities of 'N SYNC, and requiring that Pearlman and the entities he controls, including TCR and TCE, pay 'N SYNC all monies received by them in connection with 'N SYNC's activities, including but not limited to all moneys received in connection with touring or live performances, recording, merchandising, music publishing, book publishing and celebrity endorsements, and such other relief as the court deems just and proper.

## FOURTH COUNTERCLAIM

### FRAUD IN THE INDUCEMENT — MANAGEMENT AGREEMENT
### AGAINST LOUIS J. PEARLMAN AND TCE

174.    'N SYNC repeats and realleges the allegations contained in Paragraphs 151 through 191 hereof.

175.    In April 1996, Pearlman told 'N SYNC that TCE was Johnny Wright's company. Pearlman failed to disclose to 'N SYNC that, in fact, he was the owner of TCE.

29

176.    In April 1996, Pearlman further advised 'N SYNC to pay the higher-than-customary commission rate of 25% of recording revenues and 30% of merchandising and production revenues set forth in the Management Agreement, without disclosing his ownership interest in TCE and interest in such commissions.

177.    Pearlman's made such false statements and omissions wilfully, knowingly and intentionally, with the intent that 'N SYNC rely on them.

178.    In reliance upon Pearlman's advice, his false and fraudulent statements and his fraudulent failures to disclose, 'N SYNC signed the Management Agreement with TCE.

179.    As a direct and proximate result thereof, 'N SYNC has been damaged by, among other things, paying commissions pursuant to the Management Agreement, in an amount to be determined at trial.

180.    When he committed the fraudulent acts alleged herein, Pearlman was acting as the agent of TCE.

WHEREFORE, 'N SYNC demands judgment against Pearlman and TCE, costs, interest and any other relief this Court deems appropriate.

### FIFTH COUNTERCLAIM

#### FRAUD IN THE INDUCEMENT — RECORDING AGREEMENT
#### AGAINST LOUIS J. PEARLMAN AND TCR.

181.    'N SYNC repeats and realleges the allegations contained in Paragraphs 151 through 191 hereof.

182.    In April 1996, to induce 'N SYNC to enter into the Recording Agreement, Pearlman falsely told 'N SYNC that the reason they should sign the agreement was to make them appear to be "signed recording artists" and thus more attractive to major record companies.

183.    In fact, it was not in 'N SYNC's interest to sign the Recording Agreement. The only ones who benefitted from the Recording Agreement were Pearlman and his company, TCR.

184.    Pearlman concealed, and at no time disclosed to 'N SYNC how the Recording Agreement served to further his own adverse interest as an owner of TCR.

185.    Pearlman also told 'N SYNC that they did not need to have their own attorneys review this Agreement, because he had the same interest they did (as the "sixth member of the Group"), and his lawyers had reviewed it. Said statement was also false and fraudulent and on truth and in fact Pearlman did not have the same interest as the group.

186.    Pearlman's made such false statements and omissions wilfully, knowingly and intentionally, with the intent that 'N SYNC rely on them.

187.    In reliance upon Pearlman's advice, his false and fraudulent statements and his fraudulent failures to disclose, 'N SYNC signed the Recording Agreement with TCR.

188.    As a direct and proximate result thereof, 'N SYNC has been damaged in a total sum to be determined at trial, consisting of, among other things, the TCR's ownership and control of the proceeds of the Recording Agreement, including but not limited to copyrights in 'N SYNC recordings and musical compositions written by the members of 'N SYNC, the merchandising of the group's name and licenses and any service marks or trademarks relating thereto and the results and proceeds thereof.

189.    When he committed the fraudulent acts alleged herein, Pearlman was acting as the agent of TCR.

WHEREFORE, 'N SYNC demands judgment against Pearlman and TCR, costs, interest and any other relief this Court deems appropriate.

## SIXTH COUNTERCLAIM

### BREACH OF CONTRACT — MANAGEMENT AGREEMENT
### AGAINST LOUIS J. PEARLMAN AND TRANSCON ENTERTAINMENT.

190.    'N SYNC repeats and realleges the allegations contained in Paragraphs 151 through 191 hereof.

191.    As of July 14, 1999, 'N SYNC fully complied with the terms and conditions of the Management Agreement.

192.    Paragraph 11 of the Management Agreement provides:

From time to time during the Term of this Agreement, Manager or other persons or entities owned and/or controlled directly or indirectly by Manager, or Manager's partners, shareholders, officers, directors and employees, whether acting aloe or in association with others, may package an entertainment program in which 'N SYNC is employed as an artist, or may act as the entrepreneur or promoter of an entertainment program in which 'N SYNC is employed as an artist, or may employ 'N SYNC in connection with the production of phonograph records, or as a songwriter, composer, arranger or otherwise in connection with the creation of literary or musical works. Such activity on Manager's or of Manager's fiduciary obligations and duties to 'N SYNC, and such activity shall not in any way affect Manager's rights to Commissioners hereunder in all instances except as hereinafter specifically provided. Manager shall not be entitled to Commissions from 'N SYNC in connection with any gross monies or other considerations derived by 'N SYNC from (i) any employment or agreement hereunder where 'N SYNC is employed or engaged by Manager or by any person, firm or corporation owned or controlled by Manager or by any of Manager's partners, shareholders, officers, directors or employees, in any capacity (including, without limitation, as the package agent for the entertainment program in which 'N SYNC is so employed or engaged, as 'N SYNC's music or literary publisher, or as 'N SYNC's record or promotion company); (ii) the sale, license or grant of any literary or musical rights to Manger or any person, firm or corporation owned or controlled by Manager.

193.    Pearlman and TCE have breached the Management Agreement by taking commissions under the Management Agreement in an amount to be determined at trial, but not less that $635,0000, on 'N SYNC's earnings derived from the Recording Agreement.

194.    Pearlman and Transcon Entertainment have breached the Management Agreement by taking commissions under the Management Agreement in an amount to be determined at trial, but not less that $5 million from the receipts of 'N SYNC Productions, Inc.

195.    On or about July 14, 1999, 'N SYNC informed TCE and Pearlman of the aforesaid breach of the Management Agreement.

196.    TCE and Pearlman have failed to cure such breach of the Management Agreement.

WHEREFORE, 'N SYNC demands judgment against Pearlman and TCR, costs, interest and any other relief this Court deems appropriate.

## SEVENTH COUNTERCLAIM

### BREACH OF CONTRACT — RECORDING AGREEMENT
### AGAINST LOUIS J. PEARLMAN AND TRANSCON RECORDS.

197.    'N SYNC repeats and realleges the allegations contained in Paragraphs 151 through 191 hereof.

198.    As of June 29, 1999, 'N SYNC fully complied with the terms and conditions of the Recording  Agreement.

199.    Paragraphs 9.02 and 11.01 of the Recording Agreement require TCR to pay 'N SYNC 50% of all net royalties received by TCR in connection with the sale of recordings derived from Masters recorded by 'N SYNC pursuant to the Recording Agreement.  Paragraph 19.10 of the Recording Agreement requires TCR to pay 'N SYNC 50% of all net monies received by Transcon Records in connection with the exercise of merchandising rights pursuant to the Recording Agreement.

200.   TCR has failed and refused to make the payments required under Paragraphs 9.02, 11.01 and 19.10 of the Recording Agreement in that TCR improperly deducted management commissions therefrom, in an amount to be determined at trial, but not less that $635,0000.

201.   On or about June 29, 1999, 'N SYNC informed Transcon Records and Pearlman of the aforesaid breach of the Recording Agreement.

202.   Transcon Records and Pearlman have failed to cure such breach of the Management Agreement.

WHEREFORE, 'N SYNC demands judgment against Pearlman and TCR, costs, interest and any other relief this Court deems appropriate

## EIGHTH COUNTERCLAIM

### INDEMNITY— MANAGEMENT AGREEMENT

(against TCE)

203.   'N SYNC repeats and realleges the allegations contained in Paragraphs 151 through 191 hereof.

204.   As of July 14, 1999, 'N SYNC fully complied with the terms and conditions of the Management Agreement.

205.   Paragraph 4(c) of the Management Agreement provides, among other things, that 'N SYNC retains the right to sign, on its own behalf, endorsement contracts whose terms exceed one year.  Paragraph 4(c) further provides that TCE will indemnify 'N SYNC for all losses and other damages, "including court costs and reasonable attorney's fees," caused by TCE's misuse of a limited power of attorney to enter into contracts on 'N SYNC's behalf in violation of the terms of Paragraph 4(c).

206.   Paragraph 4(c) of the Management Agreement states:

'N SYNC hereby retains the right to sign, on 'N SYNC's own behalf, any recording, publishing, film, television or endorsement contracts or any other agreements whose terms exceeds one(1) year. Notwithstanding the foregoing sentence, Manger and 'N SYNC mutually acknowledge the need for a limited Power of Attorney from 'N SYNC to Manager so that Manager can reasonably attend to 'N SYNC's affairs in 'N SYNC's absence, such as in those instances where manager has insufficient time to reach 'N SYNC or 'N SYNC's representatives to secure the requisite authority to enter into an agreement. Accordingly, in such instances (i.e., for the acceptance of engagements being offered by promoters and/or booking agents), or if a good faith, unsuccessful effort has been made by Manager, during the term of this Agreement, as 'N SYNC's true and lawful attorney-in-fact to sign all necessary documents including, but not limited, bills of exchange, checks, notes or other negotiable instruments. For this provision, to apply, Manger must obtain the prior written consent from 'N SYNC, or in the case 'N SYNC is a minor FROM 'N SYNC's guardian, prior to exercising this power of attorney. The foregoing appointment is to be deemed a power coupled with an interest, and is, therefore, irrevocable. Manager's exercise of this limited Power of Attorney shall be limited to matters reasonably related to 'N SYNC's career in the entertainment field. Manager hereby agrees to indemnify 'N SYNC for all losses and other damages, including court costs and reasonable attorney's fees, occasioned by Manager's exercise of the limited Power of Attorney in a manner that is inconsistent with the terms contained herein.

207.    By letter dated January 25, 1999, 'N SYNC's counsel, provided notice to TCE that, pursuant to Paragraph 4(c), he wished to review "all proposals and contracts for the services of 'N SYNC prior to signature."

208.    TCE breached the terms of Paragraph 4(c) of the Management Agreement by entering into endorsement and television contracts on 'N SYNC's behalf with Kellogg, Clairol, Oxy, and Buena Vista Television without first submitting such contracts to 'N SYNC's counsel for review and approval.

209.    As a result of the aforesaid breach of Paragraph 4(c) of the Management Agreement by TCE, sums to be determined at trial, but not less than $1.5 million, were paid to parties other than 'N SYNC.

210.    By letter dated July 14, 1999, 'N SYNC provided notice to TCE of TCE's breach of Paragraph 4(c) by entering into contracts without prior notice to 'N SYNC's counsel.

211.   TCE has not cured such breach of the Management Agreement.

212.   Accordingly, 'N SYNC is entitled to be indemnified by TCE for all losses and damages caused by TCE's failure to comply with Paragraph 4(c), in an amount to be determined at trial, but not less than $1,500,000, plus 'N SYNC's attorneys' fees in this action.

### NINTH COUNTERCLAIM

### RECOVERY OF UNPAID WAGES and ACCOUNTING (against Pearlman)

213.   In June 1999, Pearlman agreed to pay each of the members of 'N SYNC a weekly salary of $50,000 per week plus 10% of the gross revenues earned during the remainder of 'N SYNC's 1999 tour of the United States.

214.   Pearlman failed to pay any of the members of 'N SYNC such salary for the week ending September 4, 1999, which was the last week of the 1999 U.S. tour.

215.   'N SYNC has demanded payment of such salary and Pearlman has failed to pay same.

216.   'N SYNC does not know and cannot ascertain what sums of revenues have been collected by Pearlman and the entities he controls with respect to the 1999 U.S. tour., and what sums are due 'N SYNC.

217.   Accordingly, each of the members of 'N SYNC demands  judgment in the sum of $50,000, plus 10% of gross receipts, plus attorneys' fees pursuant to Florida Statutes Section 448.08.

WHEREFORE, 'N SYNC demands judgment in the sum of $50,000, plus 10% of gross receipts, plus attorneys' fees pursuant to Florida Statutes Section 448.08.

### DEMAND FOR JURY TRIAL

'N SYNC demands a jury trial of all issues so triable.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing was furnished by facsimile and U.S. Mail, postage prepaid, to: **Gerard E. Harper, Esquire,** Paul, Weiss, et al, 1258 Avenue of the Americas, New York, NY 10019-6064 and **Jeffrey D. Keiner, Esquire** and **Frank Hamner, Esquire**, Gray, Harris & Robinson, P.A., P.O. Box 3068, Orlando, Florida 32802-3068, *Attorneys for Defendants Zomba Recording Corporation and Clive Calder*; **Steven M. Hayes, Esquire** and **Orin Snyder, Esquire,** Parcher, Hayes & Snyder, P.C., 500 Fifth Avenue, 38th Floor, New York, New York 10110 and **William B. Wilson, Esquire,** Holland & Knight LLP, 200 S. Orange Avenue, Suite 2600, Post Office Box 1526, Orlando, Florida 32802-1526, *Attorneys for Plaintiffs BMG Entertainment and BMG Ariola Muechen GmbH;* and **Michael D. Friedman, Esquire** and **Sharon H. Stern, Esquire,** Parker Chapin Flattau & Klimpl, LLP, 1211 Avenue of the Americas, New York, New York, 10036 and **J. Cheney Mason, Esquire** and **William B. Pringle, III, Esquire**, 390 N. Orange Avenue, Suite 2100, Orlando, Florida 32801, *Attorneys for Plaintiffs, Trans Continental Records, Inc., Trans Continental Entertainment, Inc., and Louis J. Pearlman*, this <u>2nd</u> day of November, 1999.

David B. King, Trial Counsel
Florida Bar No. 0093426
Mayanne Downs
Florida Bar No. 754900
Thomas A. Zehnder
Florida Bar No. 0063274
KING, BLACKWELL & DOWNS, P.A.
25 East Pine Street
Post Office Box 1631
Orlando, Florida 32802-1631
Facsimile: (407) 648-0161
Telephone: (407) 422-2472

and

37

Helene Freeman
Richard F. Albert
DORSEY & WHITNEY, LLP
250 Park Avenue, 15th Floor
New York, NY 10177
Telephone: (212) 415-9200
Facsimile: (212) 953-7201

Counsel for 'N SYNC