UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA, ORLANDO DIVISION

TRANS CONTINENTAL RECORDS, INC.,
BMG ENTERTAINMENT, BMG ARIOLA
MUENCHEN GmbH, TRANS CONTINENTAL
ENTERTAINMENT, INC. and LOUIS J.
PEARLMAN,

        Plaintiffs,

                        Civil Action No.:
                        99-1282-CIV-ORL-22C

vs.

ZOMBA RECORDING CORPORATION,
CLIVE CALDER, JAMES LANCE BASS,
JOSHUA SCOTT CHASEZ, JOSEPH
ANTHONY FATONE, JR., CHRISTOPHER
ALAN KIRKPATRICK, and JUSTIN
RANDALL TIMBERLAKE,

        Defendants.
_____/

## 'N SYNC'S RESPONSE TO MOTIONS FOR PRELIMINARY INJUNCTION

Defendants, JAMES LANCE BASS, JOSHUA SCOTT CHASEZ, JOSEPH ANTHONY FATONE, JR., CHRISTOPHER ALAN KIRKPATRICK and JUSTIN RANDALL TIMBERLAKE (collectively "'N Sync" or "the members of 'N Sync") respectfully request this Court to deny Plaintiffs' Motions for Preliminary Injunction and as grounds therefor state:

## PRELIMINARY STATEMENT

For years, the members of 'N Sync have been the victims of a con man, Plaintiff Louis J. Pearlman, who has become wealthy at their expense. They have been cheated at every turn by Pearlman's fraud, manipulation and breach of fiduciary duty. As a final affront, Pearlman now seeks the aid of a federal court to ratify his theft and leave 'N Sync unable to pursue its career.

39

Plaintiffs' motions are wholly meritless and should be denied for these reasons: (a) Plaintiffs cannot succeed on the merits because they have no rights to the name 'N Sync and no standing to enforce any such rights because whatever rights Pearlman obtained he received only through blatant breach of his fiduciary duties to the members of 'N Sync, whom he encouraged to trust him like a parent, and because the Recording Agreement between Transcontinental Records, Inc. ("TCR") and 'N Sync terminated; (b) Plaintiffs cannot show any irreparable harm because they have never controlled the artistic aspects of 'N Sync and if they are entitled to any relief at all, they can be fully compensated by money damages; (c) Because the practical impact of granting the relief Plaintiffs request would be to prevent 'N Sync from recording and performing and would likely destroy their career, the damage to 'N Sync from the proposed injunction would far outweigh the damage to Plaintiffs and thus granting the injunction would be contrary to public policy; and (d) Plaintiffs' unclean hands bar the relief they seek.

## FACTS

The facts, set forth in the accompanying declarations, are briefly summarized below.

### The Origin of 'N Sync

'N Sync was formed in the Summer of 1995 through the efforts of Chris Kirkpatrick. Kirkpatrick contacted former Mickey Mouse Club ("MMC") performer Justin Timberlake, who then enlisted fellow MMC alumnus J.C. Chasez. Chasez and Kirkpatrick recruited their acquaintance Joey Fatone, Jr. Timberlake's mother, Lynn Harless, came up with the name 'N Sync, which the group adopted in August 1995. When 'N Sync needed a bass singer, Harless found Lance Bass, who joined 'N Sync in October 1995.

Drawing on the MMC contacts of Timberlake and Chasez, Harless obtained a vocal arranger and choreographer for 'N Sync, and over the following months they rehearsed, developing their distinct vocal style and image. In April 1996, 'N Sync hired Johnny Wright to act as its manager. Wright obtained a recording contract with the German recording

2

company, BMG Ariola Muenchen GmbH, shortly thereafter.  *'N Sync* has achieved great success as performers and recording artists, first in Europe, and then in the United States.

<u>Pearlman's Role As Manager and Financial Backer</u>

Other than Kirkpatrick, who was in his early twenties, all of the members of *'N Sync* were teenagers, and two were still minors and in high school when *'N Sync* was formed.  None except Kirkpatrick had any education beyond high school or any music business experience.

From the formation of *'N Sync* in August 1995, Pearlman acted as *'N Sync*'s manager and business manager, financing the group's expenses.  Pearlman's role was limited to the business affairs of the group and he had no role at all in its artistic side.  In addition, because of his involvement with the Backstreet Boys, whom Pearlman portrayed as *'N Sync*'s rivals, Pearlman took pains to distance himself from *'N Sync* and to conceal publicly even his limited financial and managerial role.

Pearlman encouraged *'N Sync* to rely on him as if he were a member of their family. Pearlman assured them that all he wanted as compensation for his efforts was to share equally in earnings as the "sixth member" of the group, and that because he stood in the same financial position, they could trust him completely to safeguard their interests.  Pearlman also told *'N Sync* that they were saving a great deal of money in having him act as their manager and business manager for only one-sixth of their earnings, because musical groups usually paid a 35% fee for these services.

Having fostered *'N Sync*'s complete reliance upon him, and thereby having assumed a fiduciary obligation to act solely in their best interests, Pearlman used his control over the group's affairs to take every possible opportunity to line his own pockets at their expense. Pearlman proceeded to sign the group to a web of agreements with entities he controlled which were utterly inimical to their interests.  This blatant self-dealing ultimately gave Pearlman or entities he controlled the ability to take as fees the vast majority of the group's income from

all possible sources, and the ability to control or substantially delay the sums that were ultimately to be paid to the members of *'N Sync*.

The Pearlman Agreements Made <u>*'N Sync* Indentured Servants</u>

In October 1995, Pearlman formed *'N Sync* Productions, Inc. ("NPI") to receive all income *'N Sync* earned through live performances. Pearlman or entities that he controlled received 3/8 of NPI's shares. Although the group owned the remaining shares, Pearlman totally controlled the corporation through a shareholder's agreement granting him an "irrevocable proxy" to vote the group's shares and appointing him and one of his employees the sole and perpetual corporate officers. (Ritholz Decl.) Nothing in the agreement obligated NPI to pay anything to the group for its services.

Pearlman operated NPI in a manner reflective of his complete domination of its affairs; he has never held a meeting to elect directors. When *'N Sync* attempted to play some role in the corporation, Pearlman, through his attorney, responded that the members of the group were neither officers nor directors and without power to call a meeting of the Board. (Ritholz Decl.) Pearlman used NPI to unilaterally set *'N Sync*'s salaries while they were on tour, and to pay himself an equal salary. In 1999, Pearlman has received over $ 1 million from NPI alone.[1]

Without the group member's knowledge, on January 15, 1996, Pearlman executed an agreement between NPI and TCR pursuant to which NPI agreed to pay TCR a "consulting fee" of 25% of the net revenues of NPI.[2]

---

[1]   Pearlman created another corporation in October 1995 called *'N Sync* Inc., in which he and each of the group members held a one-sixth interest. It is unclear for what purpose, if any, Pearlman used *'N Sync* Inc., other than to make it appear to the members of *'N Sync* and their families that he would be receiving only one-sixth of the group's income for management services.

[2]   The January 15, 1996 Agreement is also notable because it provided that TCR agreed "to provide funding to NPI to cover the cost of protecting, in the United States, the name *'N Sync* including, but not limited to, advancing the costs of trademark or other counsel and all filing fees in connection with filings made in the U.S. Patent and Trademark Office . . . ." ¶ 2. As discussed below, the trademark was never acquired for NPI; Pearlman instead appropriated it for himself. TCR has, nevertheless, charged to *'N Sync* expenses relating to acquiring trademark rights.   (Comart Decl.)

4

In April 1996, Pearlman told *'N Sync* he was unable to get them a recording contract, and they needed to hire Johnny Wright as their manager. On April 28, 1996, Pearlman advised *'N Sync* to sign an Exclusive Management Agreement with Trans Continental Entertainment, Inc. ("TCE"), which Pearlman falsely said was Wright's company. Under ¶ 6(a) of the Management Agreement, TCE would receive a commission of 25% on the group's recording income, and 30% of the group's touring and merchandising income, an amount far in excess of customary fees. Although the Management Agreement further provides, at ¶ 11, that TCE shall not be entitled to any compensation where it, or an entity controlled by a TCE shareholder, is otherwise entitled to a portion of the same income, Pearlman has not complied with this "no-double-dipping" provision, and has taken the position that it does not apply to his activities. Pearlman is estimated to have taken approximately $5 million under the Management Agreement solely on account of touring.

After signing *'N Sync* to the Management Agreement, Pearlman had *'N Sync* enter into an Exclusive Artist Recording Agreement (the "Recording Agreement") with TCR. The Recording Agreement was in fact a duplicate of the Exclusive Artist Recording Agreement which Pearlman had required the group to sign in October 1995. The term of the October 1995 Agreement was about to expire, and Pearlman had neither paid the group the advance nor recorded the long playing album required.

The result of Pearlman's overreaching and self-dealing, led to Pearlman's assertion of the following rights to *'N Sync*'s earnings:

> **touring:** Pearlman or Pearlman entity entitled to: 30% under Management Agreement; plus 25% under "Consulting Agreement"; plus 37.5% of remainder through ownership of shares of *'N Sync* Productions; plus salary, equal to salary paid to each group member for touring, Pearlman has complete control over all monies through irrevocable proxy to vote all shares of NPI.

> **recording:** Pearlman or Pearlman entity entitled to: 25% Management Agreement; plus 50% Recording Agreement; TCR entitled to all advances, and *'N Sync* entitled only to share of royalties, which are not available until after they are received.

**merchandising:**  Pearlman or Pearlman entity entitled to: 30% under Management Agreement; plus 50% under Recording Agreement.

**music publishing:**  Pearlman entity entitled to: 100% under Recording Agreement

**celebrity endorsements:**  Because entered into through NPI, Pearlman or Pearlman entity entitled to: 30% Management Agreement; plus 25% under "Consulting Agreement"; plus 37.5% of remainder through ownership of shares of NPI; Pearlman has complete control over all remaining monies through irrevocable proxy to vote all shares of NPI.

These agreements and Pearlman's actions under them made the members of *'N Sync* virtual indentured servants, paid, if at all, only in Pearlman's sole discretion.  As set forth in the Comart Declaration, as of October 1998, despite their phenomenal success and three years of work, the members of *'N Sync* had each received only $37,000 under the Recording Agreement  plus wages of $ 58,391 from NPI.

<u>The Recording Agreement with BMG Ariola Muenchen GmbH</u>

Pearlman's one significant duty under the Recording Agreement was to obtain a contract with a <u>U.S.</u> recording company within eighteen months.  ¶ 19.12.  In the summer of 1996, Pearlman told *'N Sync* that they had been signed directly to "BMG."  In fact, the only agreement that existed was an August 1, 1996 agreement between TCR and the <u>German</u> record company, Defendant BMG Ariola Muenchen GmbH.  The first *'N Sync* album was released in Germany in April 1997.

In late 1997, after *'N Sync* was courted by both Arista and RCA, Pearlman announced that the group was signed to RCA.  However, according to RCA, the German *'N Sync* album was "too" European for the U. S. market.  *'N Sync* was required to return to the recording studio to record new material.  The first *'N Sync* album was released in the U. S. in March 1998, one year after the group's first German album.

In 1999, *'N Sync* retained counsel.  The group learned, for the first time, that they were not signed to RCA or any other U.S. record company, and they also learned of Pearlman's self-dealing.  On May 26, 1999, *'N Sync* gave notice of termination of the Recording

Agreement for failure to obtain an agreement with a U.S. record company. *'N Sync* also gave notice of termination of the Management Agreement and the Recording Agreement due to various breaches of those agreements, including Pearlman's violation of the "no-double-dipping" provision by commissioning *'N Sync* income earned through NPI and TCR.

## ARGUMENT

A "preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant 'clearly carries the burden of persuasion' as to the four prerequisites" for issuance of a preliminary injunction. *United States v. Jefferson County*, 720 F.2d 1511, 1519 (11th Cir. 1983)(citations omitted). A movant must show: (1) a substantial likelihood of ultimate success on the merits; (2) irreparable injury; (3) that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) that the injunction, if issued, would not be adverse to the public interest. *Id.* The burden of persuasion in all four elements is "at all times upon the plaintiff.'" *Id.*

## I.   PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.

### A.   Plaintiffs Have No Claim for Trademark Infringement and Unfair Competition.

Defendants Zomba and Calder's Memorandum of Law addresses why Plaintiffs have no standing to sue for trademark infringement under Section 32 of the Lanham Act, and why Plaintiffs have no claim for unfair competition under Section 43(a) of the Lanham Act. *'N Sync* hereby joins in and incorporates by reference those arguments.

We emphasize here just one point. To the extent Plaintiffs obtained any rights to the *'N Sync* name through the Recording Agreement, those rights do not survive its termination. Paragraph 21.04(b) of the Recording Agreement states that TCR's ownership of the name subsists only "during the term hereof," and the license for the registered Mark pertains solely to use in connection with "the musical group currently known as *"'N Sync*" — i.e., Lance, J.C., Joey, Chris and Justin.

TCR currently has no contract right to the group's services.  Not only has the Recording Agreement been terminated for failure to obtain a distribution agreement with a U.S. record company and because of TCR's breach, but also the Agreement is void due to Pearlman's breach of fiduciary duty and unconscionable overreaching.

      B.     <u>The Recording Agreement Was the Result of Breach of Fiduciary Duty, Fraud and Self-Dealing.</u>

Under Florida law, the concept of a fiduciary relationship "is a very broad one." *Dale v. Jennings*, 107 So. 175, 178 (Fla. 1926):

> It is settled by an overwhelming weight of authority that the principle extends to every possible case in which a fiduciary relation in fact exists, in which confidence is reposed on one side and there is a resulting superiority and influence on the other, and the relation and duties involved in it need not be legal, but may be moral, social, domestic or merely personal.

*Id.*  One of the quintessential fiduciary relationships is that between a manager or business manager and a performing artist or athlete.  *See ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988, 993 (2d. Cir. 1982); *The Detroit Lions, Inc. v. Argovitz*, 580 F. Supp. 542, 547-48 (E.D. Mich. 1984); *Jones v. Childers*, 1992 WL 300845 (M.D. Fla. 1992), *aff'd in pertinent part*, 18 F.3d 899 (11th Cir. 1994).

The facts described above, and more fully set forth in the Chasez, Bass and Harless Declarations, fully demonstrate that Pearlman had a fiduciary relationship with 'N Sync as of the group's formation in August 1995.  These declarations fully describe how Pearlman gained the trust of the group and their families, encouraged them to rely on his superior experience, and took complete control over their business affairs.

"A fiduciary owes to its beneficiary the duty to refrain from self-dealing, the duty of loyalty, the overall duty not to take unfair advantage and to act in the best interest of the other party, and the duty to disclose material facts." *Capital Bank v. MBC, Inc.*, 644 So. 2d 515, 520 (Fla. 3d DCA 1994).  Further, the "most elemental fiduciary dut[y]" owed by an agent to his principal is "not to deal in his business for the agent's own benefit." *Phillips Chemical Co.*

*v. Morgan*, 440 So.2d 1292, 1294 (Fla. 3d DCA1983). "Unless otherwise agreed, an agent is subject to a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency." Restatement, Second, Agency § 387. When a fiduciary does participate in a transaction with his principal, the fiduciary has the duty to disclose fully his interest, his role and "all other facts material to the transaction." *Dale,* 107 So. at 178. "[T]he fact of invited confidence necessarily carries with it the superlative degree of frankness and fair dealing." *Id.* at 179; *see also Jones,* 1992 WL at *10.

Pearlman's overall scheme to take wildly excessive and duplicative fees from '*N Sync* and to take total control of every source of their revenues for his own benefit was contrary to their best interest and utterly contrary to his fiduciary duties to them as their manager and business manager.[3]

Among Pearlman's most egregious breaches of fiduciary duty was his secret scheme to appropriate to himself permanent trademark rights to the name *'N Sync.* In August 1995, after the group adopted the name *'N Sync*, Pearlman, before any contract was signed, filed an application to obtain for his own corporation, Trans Continental Inc., the trademark rights to the *'N Sync* name. When he learned that the name *'N Sync* was already registered to a New Jersey company, Pearlman obtained a license to use such mark *for himself.* It did not serve *'N Sync's* interest for Pearlman personally to take the rights to the Mark. Pearlman's acts constituted a violation of his fiduciary duties to the group as their business manager, and to NPI as an officer and director of that corporation.[4]

---

[3] The fact that Pearlman reluctantly chose to make some payments when *'N Sync* began to question him does not in any way undermine the group's claim that Pearlman breached his fiduciary duties to them. *See Tinwood v. Sun Banks, Inc.*, 570 So. 2d 955 (Fla. 5th DCA 1990).

[4] *See generally, Cohen v. Hattaway*, 595 So. 2d 105, 109 (Fla. 5th DCA 1992) ('a fiduciary obligor is precluded from appropriating for himself a business opportunity that belongs to the fiduciary beneficiary"); *see also Farber v. Servan Land Company, Inc.*, 662 F.2d 371, 377 (5th Cir. 1981) (under Florida law, fiduciary may not acquire "in opposition to corporation, property in which the corporation has an interest or tangible expectancy or which is essential to its existence").

Pearlman's signing *'N Sync* to the April 29, 1996 Recording Agreement was itself a breach of fiduciary duty. As set forth in the Chasez Declaration, by April 1996, Pearlman had admitted that his efforts to get *'N Sync* signed to a record label had failed. Hiring Johnny Wright to act as their manager was the only means available to obtain a record contract, Pearlman said. There was no need therefore for *'N Sync* to sign the April 29, 1996 Recording Agreement.

Further, Pearlman induced the group to sign the Recording Agreement by stating that it would make them appear to be "signed recording artists" and thus more attractive to major record companies. (Chasez Decl.) Pearlman did not explain to *'N Sync* that the Recording Agreement served merely to further his own adverse interest as the owner of TCR. Pearlman also told the members of the group that they did not need to have an attorney review the Agreement, because he had the same interest they did (as the "sixth member of the group"), and that his lawyer had reviewed it. (Chasez Decl.) Pearlman's acts in advising *'N Sync* to sign the Management Agreement were rife with fraud and breach of fiduciary duty. At no time did Pearlman advise the group of his interest in TCE. (Chasez Decl.; Harless Decl.) Pearlman's telling *'N Sync* to pay a higher-than-usual commission rate, to induce Wright to give *'N Sync* his best efforts, could hardly have been a more egregious example of self-dealing.

In sum, the web of contracts described above and Pearlman's conduct of *'N Sync's* financial affairs under those contracts constituted a pervasive and ongoing breach of his fiduciary duties to *'N Sync*. Far less egregious examples of managers taking financial advantage of unsophisticated performers have been found to constitute a breach of fiduciary duty. *See, e.g., Gershunoff v. Panov*, 430 N.Y.S.2d 299 (N.Y. App. Div. 1980) (manager breached fiduciary duty to artists where manager attempted to obtain both profits as producer and commissions as manager).

C.      The Agreements Are Unconscionable

The web of contracts pursuant to which Plaintiffs claim rights to 'N Sync are also unconscionable and should not be enforced by a court of equity. *See, e.g., Steinhardt v. Rudolph*, 422 So. 2d 884, 889 (Fla. 3d DCA 1982) (equity will interfere where one party has overreached and gained unjust and undeserved advantage which it would be inequitable to enforce); *Peacock Hotel, Inc. v. Shipman*, 138 So. 44, 46 (Fla. 1931).

Under Florida law, unconscionability is determined by reference both to the substance of the agreements and the procedure by which they were obtained. *Kohl v. Bay Colony Club Condominium, Inc.*, 398 So. 2d 865, 867 (Fla. 4th DCA 1981). Here, all of the relevant factors militate strongly toward a finding of procedural unconscionability. The members of 'N Sync were all quite young, and indeed two were minors at the time they signed the Recording Agreement. Only one group member had more than a high school education, and two had not even completed high school. None of the group members had any significant experience in the music business. At Pearlman's urging, 'N Sync relied completely on Pearlman to advise them in all business matters, based on what he represented to be his substantial skill and experience. More importantly, Pearlman induced the group's uncritical reliance on his business counsel by his false representation that he had an interest equal to that of the members of 'N Sync as the "sixth member of the group." He actively discouraged them from obtaining independent counsel.

As explained in the Declaration of Jill Berliner, the agreements by which Pearlman conducted 'N Sync's affairs are also substantively unconscionable, viewed both separately and together. These agreements granted Pearlman and his companies radically excessive fees four to five times above industry norms, and reduced the group's income to 25% to 30% of industry norms. Berliner Decl. ¶ 9. These agreements also granted Pearlman complete control over every potential source of 'N Sync's income, without assuring the members a living wage, leaving the members of 'N Sync indentured servants of Pearlman and his companies.

D.    The Recording Agreement Terminated.

Even if all the operative agreements by which Pearlman controlled 'N Sync's affairs are not void due to Pearlman's breach of fiduciary duty and their unconscionability, Plaintiffs would still have no right to 'N Sync's services and to the name 'N Sync. The reason is simple — the Recording Agreement has terminated pursuant to its terms.

1.    The Recording Agreement Terminated Due to TCR's Failure to Secure a Distribution Agreement with a U.S. Record Company.

Throughout their moving papers, Plaintiffs try to obscure the crucial and fundamental fact that TCR has no distribution agreement with a U.S. record company. TCR has an agreement with Defendant BMG Ariola Muenchen GmbH, a German record company that is separate and distinct, legally and in fact, from BMG Entertainment or any other BMG entity incorporated in the United States. Try as Plaintiffs might by their consistent references in their papers to both BMG Ariola Muenchen GmbH and BMG Entertainment collectively as "BMG," they cannot change this fact, nor can they change the fact that TCR's failure to obtain any agreement with a U.S. record company within 18 months of the signing of the Recording Agreement allowed 'N Sync to terminate that agreement.

Paragraph 19.12 of the Recording Agreement provides:

19.12.    Notwithstanding anything to the contrary contained herein, you shall have the right to terminate this agreement in the event COMPANY has not secured a distribution agreement with a U.S. record company within eighteen months from the date hereof, pursuant to which recordings of your performances shall be released.

Thus, according to the plain terms of the Recording Agreement, 'N Sync had the right to terminate the Agreement.[5] The group exercised that right on May 26, 1999.

---

[5]    In construing a contract, "[w]hen faced with an unambiguous provision, the trial court cannot give it any meaning beyond that expressed by the language utilized and must construe the provision in accord with the ordinary meaning of the language." *Paoli v. Natherson & Co., P.A.*, 24 Fla. L. Weekly D1622, 1999 WL 540308 (Fla. 2d DCA 1999); *accord, Interfirst Federal Savings Bank v. Burke*, 672 So.2d 90, 92 (Fla. 2d DCA 1996).

The fact that the only agreement secured by TCR was with a German record company had, and continues to have, a significant adverse impact on *'N Sync*, as set forth in detail at Paragraphs 69-76 of the Berliner Declaration. First, RCA has <u>no obligation</u> to distribute *'N Sync* records in the United States. If RCA decides in the future that it does not wish to release another *'N Sync* album, *'N Sync* could remain bound to BMG Ariola with no opportunity to sell records in the United States. Further, royalty payments earned by the group on U.S. record sales are substantially delayed as RCA accounts only to the German company. The royalty rate at which *'N Sync* is paid for U.S. record sales is lower. In addition, the term of the Recording Agreement is substantially extended because it is pegged to the date of U.S. release. There was in fact a one year delay in the U.S. release of the first *'N Sync* album, transforming what should have been a nine to twelve month initial term of the Recording Agreement into a two-year term. Moreover, the burden and expense of obtaining a U.S. release is substantially increased since "European" and American musical tastes differ, requiring the group to record different songs. Finally, the German contract contains onerous provisions no longer typically found in U.S. record contracts.

2.    <u>*'N Sync* Did Not Waive Its Rights To Terminate Under Paragraph 19.12.</u>

*'N Sync* did not waive its right to terminate under Paragraph 19.12 because the group was not aware that they were not signed to a U.S. record company. Under Florida law, "waiver is the intentional or voluntary relinquishment of a known right, or conduct which infers the relinquishment of a known right." *Taylor v. Kenco Chemical Corp.*, 465 So. 2d 581, 587 (Fla 1st DCA 1985). To find a waiver, a court must find: (1) the existence <u>at the time of the waiver</u> of a right, privilege, advantage or benefit which may be waived; (2) the actual or constructive knowledge of the right; and (3) the intention to relinquish the right. *Gulf Life Ins. Co. v. Green*, 80 So. 2d 321, 322 (Fla. 1955) (emphasis added). "There can be no waiver

unless the party against whom the waiver is invoked was in possession of all the material facts." *Fireman's Fund Ins. Co. v. Vogel*,195 So. 2d 20, 24 (Fla.2d DCA1967).

As set forth in the Chasez Declaration, in late 1997, Pearlman told *'N Sync* that the group had been signed to the U.S. record company RCA. This followed a period during which both Arista and RCA Records courted the group, and during which Pearlman discussed the relative advantages of signing with each company. *'N Sync* had not been given the original contract with BMG Ariola Muenchen and Pearlman affirmatively misled them as to the true facts. When 'N *Sync* learned the true facts, the Recording Agreement was terminated. Accordingly, no waiver can be found.[6]

The August 1, 1996 Letter of Acknowledgment does not advance Plaintiffs' argument. Nothing in the Letter of Acknowledgment purports to waive any of *'N Sync's* rights under the Recording Agreement. It is irrelevant, as *'N Sync's* right to terminate did not mature until December 29, 1997. By late 1997, Pearlman had told *'N Sync* that they were signed to RCA, and the members of the group had no reason to doubt his word.

> 3.    The Recording Agreement Terminated Due to Breach.

Under Florida law, a party has no standing in equity if he is in default of the agreement at issue. *Seaboard Oil Co. v. Donovan*, 128 So. 821, 824-25 (Fla. 1930); *accord, Bradley*, 687 So. 2d at 333; *see also Troup v. Heacock*, 367 So. 2d 691 (Fla. 1st DCA 1979) (contract not enforceable in equity where enforcing party breached agreement, which breach has legal effect of releasing obligee). As detailed in the Ritholz and Comart Declarations, TCR materially breached the Recording Agreement in an important respect. Contrary to the terms of the Recording Agreement (and the Management Agreement), TCR failed to pay *'N Sync* the royalties to which they were entitled. Instead, Pearlman converted the money due *'N Sync*, paying TCE "management commissions" of at least $ 625,717.53 from the group's TCR

---

[6]    The decisions upon which Pearlman and his companies rely (see Brief at 15) are not to the contrary because they all recognize that the party against whom a waiver is claimed must have knowledge of the material facts.

royalties. By separate letter dated June 29, 1999, *'N Sync* informed TCR that it had breached the Recording Agreement by making payments to TCE which were prohibited by paragraph 11 of the Management Agreement and, gave TCR 60 days to cure the breach. (Ritholz Decl.) TCR ignored this breach notice. Neither TCR nor TCE returned to *'N Sync* any of the converted funds. Wholly apart from all the other fatal defects in Plaintiffs' claims, this breach alone would defeat Plaintiffs' equitable claims for injunctive relief. *See Troup,* 367 So. 2d at 692 (plaintiff employer's failure to pay defendant rendered plaintiff's injunction "contrary to equity").

## II.   PLAINTIFFS WILL NOT SUFFER ANY IRREPARABLE DAMAGE.

Plaintiffs cannot sustain their burden of establishing irreparable injury. As the Eleventh Circuit has stated:

> Mere injuries, however substantial, in terms of money, time and energy expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

*Jefferson County,* 720 F.2d at 1520 (*quoting Sampson v. Murray*, 415 U.S. 61 (1974)). Notwithstanding their protestations about matters of principle, for Plaintiffs, this dispute is solely about money and money damages will fully compensate them, in the highly unlikely event that they are ultimately entitled to any relief.

Pearlman and Transcontinental's claims that they will be irreparably injured by losing "control of the quality and image" of *'N Sync* are fanciful. As set forth in detail in the Chasez and Wright Declarations, in fact, Pearlman never had substantial input into, or exercised substantial control over, the quality *'N Sync's* musical performance. The group's performances are the product of the members' talents, efforts and creativity, along with the efforts of their producers, choreographers and other members of their artistic team. Pearlman has no significant experience in these areas and has not played a significant role in this aspect of *'N Sync's* work. Indeed, the persons who do have significant roles in shaping *'N Sync's*

musical quality — 'N Sync, Johnny Wright, their producers, songwriters and choreographers — will remain unchanged. In short, Pearlman's claims of a degradation in 'N Sync's quality, however convenient they may be to his current claims, cannot be substantiated and simply fly in the face of reality.

BMG's claim that it will suffer irreparable harm through its loss of name recognition is ridiculous — as explained in the Calder, Goldman and Karr Declarations, no one associates the name of a record label with a musical group. One would be hard-pressed to find any of the group's millions of fans who have even heard of BMG, much less know that it is somehow connected to 'N Sync.

**III.   THE HARM TO 'N SYNC FROM AN INJUNCTION FAR OUTWEIGHS ANY POSSIBLE DAMAGE TO PLAINTIFFS.**

The balance of equities weighs very strongly against granting Plaintiffs the injunctive relief they seek, because an injunction would jeopardize, if not destroy, 'N Sync's career. Indeed Plaintiffs' counsel has publicly stated that Plaintiffs' goal is to make 'N Sync "extinct."

As detailed in the Calder and Goldman Declarations, because 'N Sync's main appeal is to the volatile pre-teen and teen pop music audience, it is vital for them to actively perform and record now, while they are at the height of their popularity. There are many examples of pop acts who reached dazzling heights of popularity, only to disappear in two years or less. Because 'N Sync's first and only full album was released in the United States in March 1998, it is vital to their career to release an album promptly. If they do not, their audience will move on to other artists.

**IV.   AN INJUNCTION IS AGAINST THE PUBLIC INTEREST AND CONTRARY TO PUBLIC POLICY.**

Although Plaintiffs style their case mainly as a trademark claim to prevent 'N Sync's use of its name, it is clear that their true goal is to compel 'N Sync to perform the TCR Agreement. The relief Plaintiffs seek is contrary to the public interest.

16

Florida has a strong public policy against granting injunctive relief to enforce, or to prevent the alleged breach of, a contract to perform personal services. A party claiming breach of a personal services contract is ordinarily restricted to a claim for money damages. The courts are generally reluctant, with good reason, to grant equitable relief in this context:

> based in part on the undesirability of compelling the continuance of personal association after disputes have arisen and confidence and loyalty are gone, and, in some instances, of imposing what might seem like involuntary servitude.

Restatement, Second, Contracts, § 367, Comment a. Here, there is no question that the April 29, 1996 Recording Agreement is a contract to render personal services. See Restatement, Second, Contracts § 367, Comment b; *see also Wilson v. Sandstrom*, 317 So. 2d 732, 738 (Fla. 1975).

The decision of the Third District Court of Appeal in *Montaner v. Big Show Prod.*, 620 So. 2d 246 (Fla 3d DCA 1993), is directly on point. In *Montaner*, a manager and record company sought to enforce an order enjoining a singer's breach of management and recording contracts. The Third District reversed the lower court's granting of an injunction, stating:

> Contracts for employment or personal services should not be enforced by injunction or specific performance. The appropriate remedy is an action for damages for breach of contract. An injunction to prevent the breach of a personal services contract is not available.

*Id.* at 248 (citations omitted). The Florida appellate court accordingly refused to enforce the injunction because it would violate public policy *Id.* at 248, n.2.[2/]

---

[2/]   The fact that the Management Agreement recites that the services of the group members are "special, unique and irreplaceable," and recites that any "breach or threatened breach" may be enjoined is not determinative of the Court's decision whether to exercise its equitable powers. *See generally, Dockstader v. Reed*, 106 N.Y.S. 795, 797 (N.Y. App. Div. 1906)(reversing preliminary injunction prohibiting singer from performing for others notwithstanding identical language in contract; "Parties to an agreement cannot contract that courts will exercise their functions against or in favor of themselves. Whether or not a court will so exercise its powers is for the court itself to determine"); *Wilhemina Models, Inc. v. Iman Abdulmajid*, 413 N.Y.S.2d 21 (N.Y. App. Div. 1979) (reversing grant of preliminary injunction; contract language reciting that model's services were unique and extraordinary and manager would be entitled to injunctive relief in event of breach or threatened breach did not compel court to grant injunction);*Dallas Cowboys Football Club, Inc. v. Harris*, 348 S.W.2d 37 (Tex Civ. App. 1961) (upholding finding that defendant did not have "exceptional and unique knowledge, skill and ability as a football player" notwithstanding express representations to the

(continued...)

The *Montaner* decision is consistent with a long line of Florida cases holding that equitable relief, including injunction against breach, is simply not available on a claim based on a personal services contract. In Florida, "[t]he law is well-settled that personal contracts for service will not, because they cannot, be enforced by courts of equity." *Bowling v. National Convoy & Trucking Co.*, 135 So. 541, 544 (Fla. 1931); *see also Mosely v. De Moya*, 497 So.2d 696, 697 (Fla.3d DCA 1986) ("[t]here is no cause of action for either specific performance or for an injunction against breach of a contract for personal services," and appropriate remedy is action for breach of contract); *Robinson v. Sax*, 115 So. 438 (Fla.3d DCA1959); *SeaEscape, Ltd. v. Maximum Mktg. Exposure, Inc.*, 568 So. 2d 952 (Fla. 3d DCA1990).[8]

Under the circumstances, granting the injunctive relief sought by Plaintiffs would be contrary to the public interest and to Florida's policy against granting injunctive relief requiring artists to continue to provide personal services against their will.

## V.  PLAINTIFFS' CLAIM FOR EQUITABLE RELIEF IS BARRED BY THEIR UNCLEAN HANDS.

Pearlman's exploitation of *'N Sync* through the web of self-dealing agreements he obtained in blatant breach of his fiduciary duty bar Plaintiffs from equitable relief. It is well settled that "one who seeks the aid of equity must do so with clean hands." *Bradley v. Health Coalition, Inc.*, 687 So. 2d 329, 334 (Fla.3d DCA1997) (citations omitted); *Malkus v. Gaines*, 476 So. 2d 220, 222 (Fla. 3d DCA1985).

As the Florida Supreme Court has stated:

---

[7]      (...continued)
contrary in contract).

[8]      Pearlman's and Transcontinental's reliance on *Wilson v. Sandstrom*, 317 So. 2d 732 (Fla. 1975) for the proposition that Florida law permits the granting of injunctions to enforce personal services contracts is misplaced. *Wilson* was a habeas corpus proceeding challenging the incarceration of kennel owners who had violated an injunction enforcing a contract requiring the kennel owners to provide greyhounds to a race track. The Florida Supreme Court held that the injunction was proper, finding that kennel owners' contract was one to supply a unique product, and not a personal services contract. *Id.* at 737-38. The language cited by Pearlman and Transcontinental (Brief at 18) is dicta. Plaintiffs have not cited, and our research has not revealed, any reported decisions in which the Florida courts have granted injunctive relief in the context of an agreement to provide personal services.

In order to establish that complainant is not entitled to equitable relief because he does not come into equity with clean hands, it is not essential that the fraud or deceit be such as would be a defense to an action at law, or as would require a court of equity to cancel the contract; but it is sufficient if it appears that the complainant has been guilty of unscrupulous practices, or overreaching, or has concealed important facts, though not actually fraudulent, or has been guilty of trickery, or taking undue advantage of his position, or unconscientious conduct.

*Dale*, 107 So. at 180 (citations and internal quotation omitted).

In light of Pearlman's overreaching, it would violate the most basic principles of equity to allow Pearlman and the remaining Plaintiffs, whose rights, if any, derive from Pearlman's actions, to obtain equitable relief.

## **CONCLUSION**

For the foregoing reasons and those set forth in the memorandum of law of co-defendants, the motions for a preliminary injunction should be denied in all respects.

Respectfully submitted,

David B. King, Trial Counsel
Florida Bar No. 0093426
Mayanne Downs
Florida Bar No. 754900
Thomas A. Zehnder
Florida Bar No. 0063274
KING, BLACKWELL & DOWNS, P.A.
25 East Pine Street
Post Office Box 1631
Orlando, Florida 32802-1631
Facsimile: (407) 648-0161
Telephone: (407) 422-2472

and

Helene Freeman
Richard Albert
DORSEY & WHITNEY, LLP
250 Park Avenue, 15th Floor
New York, NY 10177

19

Telephone: (212) 415-9200
Facsimile: (212) 953-7201
Counsel for Defendants Bass, Chasez,
Fatone, Kirkpatrick & Timberlake

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing was furnished by facsimile and U.S. Mail, postage prepaid, to: **Gerard E. Harper, Esquire,** Paul, Weiss, et al, 1258 Avenue of the Americas, New York, NY 10019-6064 and **Jeffrey D. Keiner, Esquire** and **Frank Hamner, Esquire,** Gray, Harris & Robinson, P.A., P.O. Box 3068, Orlando, Florida 32802-3068, *Attorneys for Defendants Zomba Recording Corporation and Clive Calder;* **Steven M. Hayes, Esquire** and **Orin Snyder, Esquire,** Parcher, Hayes & Snyder, P.C., 500 Fifth Avenue, 38th Floor, New York, New York 10110 and **William B. Wilson, Esquire,** Holland & Knight LLP, 200 S. Orange Avenue, Suite 2600, Post Office Box 1526, Orlando, Florida 32802-1526, *Attorneys for Plaintiffs BMG Entertainment and BMG Ariola Muechen GmbH;* and **Michael D. Friedman, Esquire** and **Sharon H. Stern, Esquire,** Parker Chapin Flattau & Klimpl, LLP, 1211 Avenue of the Americas, New York, New York, 10036 and **J. Cheney Mason, Esquire** and **William B. Pringle, III, Esquire,** 390 N. Orange Avenue, Suite 2100, Orlando, Florida 32801, *Attorneys for Plaintiffs, Trans Continental Records, Inc., Trans Continental Entertainment, Inc., and Louis J. Pearlman,* this 2nd day of November, 1999.

_____
Attorney

20