UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA - ORLANDO DIVISION

TRANS CONTINENTAL RECORDS, INC., BMG
ENTERTAINMENT, BMG ARIOLA MUENCHEN
GmbH, TRANS CONTINENTAL ENTERTAINMENT,
INC. and LOUIS J. PEARLMAN,

     Plaintiffs,       CASE NO.  99-1282-CIV-ORL-22C

   v.

ZOMBA RECORDING CORPORATION, CLIVE
CALDER, JAMES LANCE BASS, JOSHUA SCOTT
CHASEZ, JOSEPH ANTHONY FATONE, JR.,
CHRISTOPHER ALAN KIRKPATRICK and
JUSTIN RANDALL TIMBERLAKE,

     Defendants.

## MEMORANDUM OF LAW IN SUPPORT OF THE MOTION OF TRANS CONTINENTAL RECORDS, INC. AND LOUIS J. PEARLMAN FOR A PRELIMINARY INJUNCTION

Plaintiffs, Trans Continental Records, Inc. ("Trans Continental") and Louis J. Pearlman ("Pearlman") (collectively, "plaintiffs") submit this memorandum of law in support of their motion pursuant to Rule 65 of the Federal Rules of Civil Procedure for an Order preliminarily enjoining the defendants from: (i) using the trademark 'N SYNC (the "Mark" or 'N SYNC Mark") in violation of plaintiffs' rights under sections 32 and 43(a) of the Lanham Act; or (ii) using any master recordings of the group professionally known as 'N SYNC (the "Group"); and further enjoining defendant Zomba and all those acting in concert with it, from (a) manufacturing, releasing, distributing or promoting any audio or visual recordings of the Group, or (b) otherwise causing or participating any conduct which causes the members of the Group ("Group Members") to further breach their contracts with plaintiffs.

CLERK'S U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

1999 NOV 15  AM 8: 10

## PRELIMINARY STATEMENT

Upon achieving worldwide acclaim, the Group Member Defendants, led by their New York attorneys, threatened to withhold their services under various long term contracts with Trans Continental and BMG[1] unless their terms were immediately and substantially modified. After the negotiations which followed reached impasse, the Group Members asserted, without basis or justification, that all of their contractual obligations to plaintiffs were terminated. They then engaged in unauthorized recording activities, refused to deliver their work product to plaintiffs as required by their agreements, and began soliciting other record companies to sign a new, long term record deal. No responsible record company would enter into such an agreement because it was so well known that 'N SYNC was under exclusive contract with Trans Continental and that BMG was the Group's exclusive worldwide distributor. Defendant Zomba, however, with the lure of a multi-million dollar payoff, signed the Group to a new record deal and brazenly announced itself to the industry as the Group's new record label.

At no time did any of the defendants come to this court, or any other court, for a determination of their rights under the operative agreements. Rather, they secretly signed a conflicting long term agreement and embarked on a carefully designed plan to misappropriate plaintiffs' property rights, including the 'N SYNC Mark. Defendant Zomba, which already functions as the exclusive record label for another Trans Continental superstar act -- the Backstreet Boys -- is a sophisticated participant in the pop music business and certainly knew that the purported basis for the Group Members' termination and abdication of existing contracts was a sham. The unconscionable activities of the defendants in circumventing valuable, long-term agreements, as more particularly described hereinbelow and in the supporting affidavits, cannot be allowed to stand and must give rise to immediate injunctive relief. Any

---

[1]References herein to "BMG" shall mean BMG Entertainment, including its RCA record label, and BMG Ariola Muenchen GmbH, collectively.

other result will set a dangerous precedent with respect to the sanctity and enforceability of commercial agreements in the music business and will reward unscrupulous interference, as here present.

## STATEMENT OF FACTS[2]

Since 1992, Pearlman has been engaged as an entrepreneur in the music business acting in his individual capacity and through Trans Continental, a recording company which he formed and leads. Trans Continental has created, developed and marketed some of the decade's most successful popular music groups, such as the Backstreet Boys.  (Pearlman Dec. ¶4).

Plaintiffs' success is based on Pearlman's ability to identify talent and trends in popular music, and his willingness to expend substantial effort and to risk great sums of money to finance previously unknown and untrained young performers.  Once a group concept is conceived and talent is selected, plaintiffs advance the expenses of the group and pursue all available opportunities in order to create a success.  In this regard, they provide housing and advance expenses for artists, and sometimes their families, while they are trained by vocal coaches, choreographers, stylists, and other professionals.  If a group or artist does not achieve commercial success, plaintiffs' entire investment will be lost.  Plaintiffs' business is dependent upon Pearlman's skill in identifying and commercializing the right musical concepts and upon plaintiffs' maintenance of their credibility, high artistic standards and important relationships with producers, managers and record companies.  (Pearlman Dec. ¶¶5-6).

In or about 1995, "pop" music was very popular in Europe, but was not as popular in the United States.  'N SYNC was a "concept" group born out of Pearlman's recognition, contrary to the conventional wisdom at the time, that enormous opportunities existed in the teen and pre-teen markets with

---

[2]This statement of facts is taken from the Declaration of Louis Pearlman ("Pearlman Dec."), the President of Trans Continental and from the declarations submitted by co-plaintiffs in support of their companion motion ("the BMG declarations").  Plaintiffs incorporate herein the facts alleged in the BMG declarations, as they also support the relief requested here.  Capitalized terms have the meanings ascribed to them in the Pearlman Declaration, the Complaint, and in the BMG declarations.

3

"up-tempo" groups comprised of young, talented artists with a clean-cut, all-American image. Following plaintiffs' successful formation of the Backstreet Boys, Pearlman decided to assemble another similar group which, like the Backstreet Boys, was to be made up of five (5) talented male performers. He auditioned and evaluated talent and, ultimately selected defendants Bass, Chasez, Fatone, Jr., Kirkpatrick and Timberlake to comprise the group that later became known as 'N SYNC.  (Pearlman Dec. ¶¶7-8).

Pearlman and Trans Continental commenced using the 'N SYNC Mark in 1995 and have continuously used the Mark at all times thereafter.  Pearlman and Trans Continental also hold rights under the exclusive license for U. S. Trademark Registration No.1,843,498.   Pearlman and Trans Continental have continually exercised control over the use of the 'N Sync Mark. (Pearlman Dec. ¶¶20-22).

In April 1996, the Group Members entered into an Exclusive Recording Agreement with Trans Continental in which the Group Members agreed to provide their services exclusively to Trans Continental and acknowledged Trans Continental's ownership of rights to the 'N SYNC Mark. (Pearlman Dec. ¶¶ 5-12). Three months later, Trans Continental entered into an agreement with BMG, one of the largest and most influential record and media companies in the world, to develop, promote and distribute 'N SYNC's first recording on worldwide basis (the "BMG License Agreement").  This agreement was a "breakthrough" opportunity for the Group, and the Group Members enthusiastically accepted the contract.   The Group Members executed a Letter of Acknowledgment in which they expressly acknowledged that Trans Continental had entered into the BMG License Agreement and willingly performed under the agreement for almost 3 years. (Pearlman Dec. ¶ 14).

After substantial preparation, 'N SYNC's first recording was released, first in Europe, under the BMG Ariola label, and later an enhanced version was released in the United States, under the RCA

label.  That recording, as well as the Group's subsequent Christmas album, became enormously successful and combined have sold over 10,000,000 units worldwide.  As a result of the collective efforts of plaintiffs and BMG, 'N SYNC  has become among the world's most popular recording and live performance groups. (Pearlman Dec. ¶¶ 14-19).

Once they became successful, defendants aggressively demanded to renegotiate their contracts. When plaintiffs refused to accede to all of the Group Members' aggressive demands, they unilaterally declared all operative agreements to be terminated and "shopped" themselves to other prominent record companies.  Only defendant Zomba refused to honor and acknowledge the bona fides of the Group's existing agreements with Trans Continental.  Despite its knowledge of the existence of these valid and binding agreements, and to capitalize on plaintiffs' and BMG's efforts, Zomba signed the Group Members to a competing exclusive recording agreement. Defendants apparently plan to release a series of recordings, using plaintiffs' Mark under Zomba's label. (Pearlman Dec. ¶¶ 45-48).   Plaintiffs face immediate and irreparable harm if defendants are allowed to proceed with their unconscionable plans. Thus, plaintiffs have no adequate remedy at law, and are entitled to the preliminary injunction sought here.

## ARGUMENT

### POINT I

### PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION ENJOINING DEFENDANTS' USE OF THE MARK

Plaintiffs are entitled to a preliminary injunction enjoining defendants from infringing the 'N SYNC Mark upon a showing that they own rights to the Mark, that the Mark is valid trademark, that defendants used (or intend to use) the Mark without authorization, and that such use will create a likelihood of confusion.  See, Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 112 S.Ct. 2753

(1992); <u>McDonald's Corp.</u> v. <u>Robertson</u>, 147 F.3d 1301 (11th Cir. 1998).[3]    As demonstrated in the accompanying affidavits and herein, plaintiffs can satisfy each element.    It does not matter whether plaintiffs proceed under § 32 of the Lanham Act, relating to infringement of registered marks, or § 43(a), relating to infringement of unregistered marks.    The standards for receiving protection, the protection thereafter afforded, and the remedies available for infringement are identical.    <u>Two Pesos, Inc.</u> v. <u>Taco Cabana, Inc.</u>, <u>supra</u>.

### A.    <u>Trans Continental Owns All of the Rights to the Mark</u>

It is well-settled law that the creator or manager of a musical group, as opposed to the members of the group, under circumstances such as those here present, own all of the rights to the group's name. <u>Robi</u> v. <u>Reed</u>, 173 F.3d 736 (9th Cir. 1999);    <u>In re Polar Music International AB</u>, 714 F.2d 1567 (Fed. Cir. 1983); <u>Three Degrees Enterprises, Inc.</u> v. <u>Three Degrees Worldwide, Inc.</u>, 1992 U.S. Dist LEXIS 344 (E.D. Pa. Jan. 13, 1992); <u>Rick</u> v. <u>Buchansky</u>, 609 F.Supp. 1522 (S.D.N.Y. 1985), <u>app</u>. <u>dismissed</u>, 770 F.2d 157 (2d Cir. 1985).    This is particularly true where, as here, the group is a "concept" group which did not exist prior to its formation, development and nurturing by plaintiffs and its members were selected and assembled by plaintiffs. In recognizing the paramount ownership interest in a mark (whether as a matter of common law or flowing from registration) held by the creator or manager, the courts generally consider three factors:  (1) the creator's role in developing the group, directing its performances and recordings, and controlling the use of the mark; (ii) the group members' acknowledgments or

---

[3]The standards for granting a preliminary injunction are well settled.  A plaintiff is entitled to a preliminary injunction when it shows:  (1) a likelihood that plaintiff will prevail on the merits; (2) a substantial threat that plaintiff will suffer irreparable injury; (3) that the threatened injury to plaintiff outweighs any threatened harm that the injunction may cause the defendants; and (4) the grant of a preliminary injunction will not disserve the public interest.  <u>See</u>  <u>McDonald's Corp</u>. v. <u>Robertson</u>, <u>supra</u>.  Plaintiffs easily satisfy each of these elements.

agreements recognizing the promotor's prior rights in the mark, and (iii) registration and the rights that flow from registration. Here, all three factors clearly demonstrate plaintiffs' superior rights in the Mark.

### 1. Plaintiffs Own the Rights Flowing from the Federal Trademark Registration for the Mark

Pearlman is the exclusive licensee of the Registration, and as such, has the sole right to control the use of the Mark. Not even the owner of the Registration has retained the right to use the Mark in the industry and channels of distribution within which the Group conducts its business (Pearlman Dec. Exh. C). Further, Pearlman's rights relate back to the time of the first use as reflected in the Registration, in 1992. See generally, 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 16:5, at 16-7 & n. 3.[4] Thus, by virtue of the Registration, Pearlman's rights are prior and paramount.

Plaintiffs themselves began to use the Mark in 1995, when the Group was being formed, financed and commercially developed. They have continuously used, monitored and controlled the Mark at all times thereafter (Pearlman Dec. ¶¶ 21-22). Indeed, the Group Members have conceded that they have no claim of rights to the Mark based upon any prior use by them since their Unauthorized Trademark Application, filed in May 1999, is an "intent to use" application which is predicated upon their sworn representations (subject to fine or imprisonment) that they have not used the Mark, in their own right,

---

[4] Federal registration of the mark is prima facie evidence that the registrant is the owner of the mark. Lanham Act §7(b), 15 U.S.C. § 1057 (b); Lanham Act § 33(a), 15 U.S.C. § 1115. Therefore, the registrant is granted a presumption of ownership, dating to the filing date of the application for federal registration, and the challenger must overcome this presumption by a preponderance of the evidence. E.g., Vuitton et Fils S.A. v. J. Young Enterprises, Inc., 644 F.2d 769, 775-76 (9th Cir. 1981). The benefits of this presumption flow to the exclusive licensee.

prior to May 1999.[5] (Pearlman ¶47, Ex. J).   Thus, defendants cannot, under any circumstances, demonstrate any rights to the Mark based on prior use.

### 2.        The Group Member Defendants Have Also Expressly Acknowledged Plaintiffs' Ownership of All of the Rights to the Mark

In Paragraph 21.04 of the Exclusive Recording Agreement, the Group Member Defendants clearly and expressly acknowledged Trans Continental's ownership and control of all of the rights in and to the 'N SYNC Mark and further agreed that they would not use or authorize any other person to use the Mark in connection with records or personal appearances, unless approved by Trans Continental. (Pearlman Dec., Exh. D).   The courts have given great weight to comparable contractual provisions in determining that a creator or manager owns and controls the name of a group.   Thus, in Stetson v. Howard D. Wolf & Assoc., 1991 WL 149753 (S.D.N.Y. July 16, 1991), aff'd, 955 F.2d 847 (2d Cir. 1992), for example, the performing group, "The Diamonds" agreed that they "[would] not without the written consent of [their manager] first obtained, use, nor cause to be used, nor in any way exploit the trade or professional name The Diamonds...."[6]   The court held that the manager, not the performing group, owned the rights to the name, stating:   "[I]t thus appears from this early documentation that the members of the group recognized that Goodman, as the manager, was the one who would have the right to control the use of the name 'The Diamonds.'"  1991 WL 149753, *2.

_____

[5]The Group Members, having made this admission, cannot change their position in this litigation.   "The reason for such an increased evidentiary burden, supported by common sense, is that a change of position from one 'considered to have been made against interest at the time of filing of the application' ... requires enhanced substantiation."  Hydro-Dynamics Inc. v. George Putnam & Company Inc., 811 F.2d 1470, 1473  (Fed. Cir. 1987) (internal citations omitted).

[6]Another agreement similarly provided "the name 'The Diamonds' shall be the exclusive property right of Nathan D. Goodman [the manager]... ."

Similarly, in In re Polar Music Intern. AB, supra, the Federal Circuit Court of Appeals relied upon an agreement between the manager, Polar Music and the individual members of ABBA, making Polar Music responsible for all aspects of the production of "master recordings" including the content and all production costs, in concluding that the manager owned and could register the name as a trademark.  Accord, Three Degrees Enterprises, Inc. v. Three Degrees Worldwide, Inc., supra (the manager, not the group members, owned the rights to the name of a performing group where performers had agreed that all rights, title and interests of every kind in connection with the group inured to the benefit of the manager). Cf. Costandi v. AAMCO Automatic Transmissions, Inc., 456 F.2d 941 (9th Cir. 1972) (former franchisee cannot terminate or claim breach of a franchise agreement and continue to use the franchisor's mark).  The Group Member Defendants are precluded by their acknowledgment from now challenging plaintiffs' ownership of all rights to the Mark.

**3.    Trans Continental Is the Owner of the Rights to the**
**Mark Because It Has Controlled the Use of the Mark**

Even absent the federal registration, the exclusive license, and the contractual acknowledgment, each of which is compelling and conclusive, plaintiffs own the rights in and to the Mark because ownership of such rights flows from control of the mark.  As the Federal Circuit explained in Polar Music, supra, 714 F.2d at 1571:

> Since [the record company] controls the quality of the goods, it is the source of the goods.  Any trademark for the sound recordings can therefore only indicate source in [the record company] since no other entity is the source.  The source of the goods does not depend on the public's perception; the public need not know [the record company's] role.  Thus the [trademark trial and appeal] board's holding that "ABBA" cannot function as a trademark for recordings because the public would not know that [the record company] owns the rights in "ABBA" and that it exercise quality control over the records must be rejected.

In <u>Rick</u> v. <u>Buchansky</u>, <u>supra</u>, on strikingly similar facts, the court held the manager's ownership rights in the group's (trademarked) name were superior to any rights claimed by the members of the musical group "VITO AND THE SALUTATIONS":

> [F]rom the beginning, Rick was not merely an agent or bookkeeper for the musical group he managed. **The group was formed at Rick's instigation... Rick not only booked live appearances for the group and handled the group's financial affairs, but also paid many of the group's expenses, arranged for the group to produce recordings, and made key personnel decisions.** In general, Rick provided continuity to the group ... by overseeing both the structure and style of the group's "act."
>
> * * *
>
> When the group was formed in 1961 under Rick's management, all four singing members were in their teens, and none had any experience in organizing or promoting a musical entertainment group. Rick, on the other hand, was an established manager and promoter of musical groups, and therefore was in a position to provide leadership and direction to the newly formed "doo-wop" ensemble.
>
> As the evidence demonstrates, plaintiff exercised almost complete discretion in matters involving the group's financing and promotion, made important personnel decisions, and exerted influence over the style and content of the group's "act."

<u>Id</u>., 609 F. Supp. at 1532 (emphasis added). This description of the promotor's role in developing, managing and supervising the group and the mark could as well describe plaintiffs' role in the formation and growth of 'N SYNC. <u>Accord</u>, <u>Robi</u> v. <u>Reed</u>, <u>supra</u> (manager's rights to trademarked group's name superior to any rights derived from performer; "a person who remains continuously involved with the group and is in a position to control the quality of its services retains the right to use of the mark even when that person is a manager rather than a performer"); <u>Three Degrees Enterprises, Inc</u>. v. <u>Three Degrees Worldwide, Inc</u>., <u>supra</u>, (1989 WL 119697 at *2 (E. D. Pa. Oct. 12, 1989) (injunctive relief

granted to group's manager as against performers when manager had exercised control over the mark and over the "musical, clothing, choreography, hairstyle, venue and recording decisions of the group").

Here (i) plaintiffs founded the Group and have continuously exercised financial and artistic control over the development of the Group and its recordings and over the use of the Mark; (ii) the Group Members expressly acknowledged plaintiffs' paramount rights to the Mark in the Exclusive Recording Agreement; (iii) they also granted plaintiffs control over the content and quality of the Group's performances and recordings and assigned all copyright interests relating thereto, and (iv) Pearlman's rights, as exclusive licensee, flow from and relate back to the 1992 Registration date of first use. Consequently, it cannot be credibly disputed that plaintiffs own all of the rights to the Mark.

### 4.    The Likelihood of Confusion Is Obvious

One of the hallmark rights of a trademark owner is to "control his product's reputation." Burger King v. Hall, 770 F.Supp. 633, 640 (S.D. Fla. 1991). This is the case even where the public does not know the source of the product or service. However, when the buyer sees any related product or service with a certain mark, he is entitled to assume that it comes from the same anonymous source as every other related product or service so marked. 15 U.S.C. §1127 (defining trademark); J.T. McCarthy, McCarthy on Trademarks, §18:18 (1999); In re Polar Music Intern. AB, supra, 714 F.2d at 1571; AmBrit, Inc. v. Kraft, Inc., 805 F.2d 974, n.14 (11th Cir. 1986), reported at 812 F.2d 1531 (11th Cir. 1986); Council of Better Business Bureaus, Inc. v. Better Business Bureau of South Florida, Inc., 1978 WL 21729, 200 U.S.P.Q. 282, 292 (S.D. Fla. 1978). Therefore, where, as here, as a result of the defendants' conduct, the plaintiff will lose control over the quality of the goods and services associated with the mark and the mark's reputation, confusion will inevitably follow. See Burger King Corp. v. Mason, 710 F.2d 1480, 1493 (11 Cir. 1983), cert. denied, 465 U.S. 1102, 104 S.Ct. 1599 (1984) (franchiser/franchisee dispute; court held: "continued trademark use by one whose trademark license has

11

been canceled satisfies the likelihood of confusion test and constitutes trademark infringement"); <u>Firma Melodiya</u> v. <u>ZYX Music GmbH</u>, 882 F.Supp. 1306 (S.D.N.Y. 1995) (defendant's sale of recordings using plaintiffs' trademarks likely to cause confusion where defendant's licensor lacked the authority to grant the license).

Here, the likelihood of confusion is indisputable since the Mark, the nature of the goods and services, channels of use and distribution, and the consumers are identical. <u>Rick</u> v. <u>Buchansky</u>, <u>supra</u>, 609 F. Supp. at 1530 (use of the identical mark to identify plaintiff's group and defendants' group "must inevitably cause confusion"); <u>HEC Enterprises, Limited</u> v. <u>Deep Purple, Inc.</u>, 1980 U.S. Dist. LEXIS 17054 (C.D. Ca. 1980) (confusion resulting from two performing groups use of the name "Deep Purple"). Since only plaintiffs have the right to control the use of the Mark, any unauthorized use of the Mark by defendants will inherently cause confusion.

**B.**    **Defendants' Infringement of the Mark Irreparably Harms Plaintiffs**

In this Circuit, irreparable harm is presumed to follow from the inherent loss of control over a trademark. <u>E.g.,</u> <u>McDonald's Corp.</u> v. <u>Robertson</u>, <u>supra</u>; <u>E. Remy Martin & Co.</u> v. <u>Shaw-Ross Int'l Imports, Inc.</u>, 756 F.2d 1525, 1530 (11th Cir. 1985), <u>Callaway Gold Co.</u> v. <u>Golf Clean, Inc.</u>, 915 F.Supp. 1206 (M.D. Fla 1995).

Even absent the legal presumption, it is indisputable that plaintiffs will be irreparably harmed if a preliminary injunction is not issued. A critical concern here is the lack of control over a trademark which  might result in a damaged reputation. In <u>Ambassador East, Inc.</u> v. <u>Orsatti, Inc.</u>, 257 F.2d 79, 82 (3d Cir. 1958), the Third Circuit held that a plaintiff's "'mark is his authentic seal; by it he vouches for the goods which bear it; it carries his name for good or ill.  If another uses it, he borrows the owner's reputation, whose quality no longer lies within his own control.  This is an injury, even though the borrower does not tarnish it, or divert any sales by its use. ..." The courts in the 11th Circuit are in

12

accord.  See Nailtiques Cosmetic Corp. v. Salon Sciences Corp., 1997 U.S. Dist. LEXIS 4662, *13 (S.D. Fla S.D. Fla 1997), citing, National Car Rental System, Inc. v. National Car Sales, Inc., 17 U.S.P.Q.2d (BNA) 1959 (MD. Fla. 1990) ("The most corrosive and irreparable harm ... is the inability of the victim to control the nature and quality of the defendants' goods.").

Plaintiffs have expended enormous amounts of time, money and resources to develop and promote the Group and the Mark.  As a result of those efforts, 'N SYNC is one of the most popular and successful musical acts, the Mark is one of the most recognizable in the world, and the public has come to expect and associate a certain quality, image and content with the 'N SYNC Mark -- all developed by plaintiffs.  If the Group Member Defendants are permitted to record or perform outside of their contractual arrangements with Trans Continental, plaintiffs will lose control over the reputation of their Mark as well as suffer immeasurable injury to their goodwill, reputation and prestige, as described in detail in the accompanying affidavits.

Should an injunction not issue, Plaintiffs may also be perceived in the industry as having lost their exclusive rights in connection with one of the world's most popular and widely-recognized musical groups.  This recognition is vital to Plaintiffs' ability to attract and sign new talent and could immeasurably and negatively impact critically important relationships with record companies, merchandisers and other key players in media and entertainment industries and their future success in these industries.

Under the circumstances it is beyond peradventure that Plaintiffs would suffer irreparable injury absent the sought-after injunctive relief.

C.    **The Threatened Injury to Plaintiffs Outweighs Any Claimed Damage to Defendants**

13

In contrast to the severe and immeasurable injury facing plaintiffs, the defendants will not face significant injury if a preliminary injunction is issued. The defendants acted knowingly and at their own peril, particularly in light of their failure to seek an orderly declaration of their rights, if any, by this Court. Defendant Zomba only recently signed its recording agreement with the Group Member Defendants, and cannot possibly have spent much time or money in marketing the Group. See e.g. Popular Bank of Florida v. Banco Popular de Puerto Rico, 9 F.Supp.2d 1347 (S.D. Fla. 1998). None of the defendants have any colorable right to use the Mark. Defendants would suffer no legitimate injury because they would only be prohibited from engaging in unlawful activities. See e.g. Nailtiques Cosmetic Corp. v. Salon Sciences Corp. supra, at *5 ("Defendants should not be heard to complain about hardship when their actions, undertaken with prior knowledge of Plaintiffs' trademarks and trade dress imply bad faith"); Callaway, supra, 915 F.Supp. at 1215 ("a preliminary injunction will not cause Defendants to suffer any legitimate harm, because they are simply being prevented from selling a product that they are not legally entitled to sell.").[7]

## POINT II

### PLAINTIFFS WILL SUFFER IMMEDIATE IRREPARABLE INJURY IF DEFENDANTS' INTERFERENCE WITH THE EXCLUSIVE RECORDING AGREEMENT ARE NOT ENJOINED

**A.    The Group Member Defendants Have Clearly Breached the Exclusive Recording Agreement**

Baldly stated, the Group Member Defendants have sought to abandon their contracts with Trans Continental because they think that they can "cut" a better deal with defendant Zomba. They have

_____

[7]A preliminary injunction would not contravene public policy because "[t]he purpose of the Lanham Act is to protect the public and encourage business activity by preventing confusion as to the origin of goods and services." Caterpillar, Inc. v. Nationwide Equipment, 877 F. Supp. 611, 617 (M.D. Fla. 1994).

breached their agreements by, inter alia, entering into an exclusive recording agreement with Zomba, refusing to deliver the New Master Recordings to plaintiffs, threatening to release a series of new albums on a rival record label using plaintiffs' Mark without authorization. Recognizing however, that they must assert some excuse for their breach of their obligations to Trans Continental, they belatedly assert that the BMG License Agreement, which was entered into over three years ago with their knowledge and approval, does not comply with paragraph 19.12. This contention is patently frivolous.

Paragraph 19.12 states in its entirety:

> Notwithstanding anything to the contrary contained herein, you shall have the right to terminate this agreement in the event COMPANY has not secured a distribution agreement with a U.S. record company within eighteen months from the date hereof, pursuant to which recordings of your performances shall be released.

Obviously, BMG, a multi-national conglomerate which owns RCA and other U.S. labels with an enormous distribution capability and substantial market share in the United States, is such a company (see BMG affidavits). Indeed, the Group Members acknowledged as much in writing in the August 1996 Letter of Acknowledgment.

Defendants' hollow reliance on ¶19.12 was a poorly conceived stratagem to break contractual obligations without any justification. Even if the Group Members' position were not frivolous, it is untimely and barred by the Group Members' unequivocal and unqualified acceptance of the benefits of both the Exclusive Recording Agreement and the BMG License Agreement.

> "One of the most familiar applications of the rule relating to the acceptance of benefits arises in the case of contracts. It has been repeatedly held that a person by the acceptance of benefits may be estopped from questioning the validity and effect of a contract; and, where one has an election to ratify or disaffirm a conveyance, he can either claim under or against it, but he cannot do both, and having adopted one course with knowledge of the facts, he cannot afterwards pursue the other." (citation omitted).

15

Rood Co., Inc. v. The Board of Public Instruction, 102 So.2d 139, 142 (Fla. 1958); accord, Hendricks

v. Stark, 99 Fla. 277, 126 So. 293 (1930); Plaza Builders, Inc. v. Regis, 502 So.2d 918 (Fla. Dist. Ct.

App.2d Dist.1986).

From as early as August 1996, the Group Members knew that their recordings were to be

distributed "worldwide" by BMG.  From that time forward, they eagerly accepted the benefits of both

the Exclusive Recording Agreement and the BMG License Agreement, which included, in addition to

their share of royalties and other remuneration, the enormous financial commitments made by BMG and

Trans Continental, the intensive day-to-day efforts of plaintiffs' and BMG and Trans Continental

personnel to produce and distribute the Group's albums, and the exhaustive effort made to promote the

Group and sell its records, all as described in detail in the Pearlman and BMG affidavits.  Largely as a

result of these efforts, 'N SYNC has become the sensation that it is today.  Their belated "concern" that

BMG is not a "U.S. record company," and their purported termination of the Exclusive Recording

Agreement on that ground, neither explains nor justifies their conduct.[8]   The Exclusive Recording

Agreement remains a valid, binding contract.

### B.  Zomba Has Tortiously Interfered with Plaintiffs' Contract, Causing Irreparable Harm to Plaintiffs

A defendant is guilty of tortious interference with another's contract or business relations when,

knowing of the existence of a business relationship under which plaintiff has legal rights; the defendant

intentionally and unjustifiably interferes with the contract or relationship, causing injury to the plaintiff

─────────────────

[8]Even if the Group Members raise any other purported breaches of the Exclusive
Recording Agreement, such as the alleged failure to pay additional royalties claimed to be due,
their unilateral termination of the agreement remains unjustified as a matter of law. See Nolan v.
Sam Fox Publishing Co., 499 F 2d 1394 (2d Cir. 1974); Cafferty v. Scotti Bros. Records, 969
F.Supp. 193 (S.D.N.Y. 1997).  Moreover, plaintiffs have repeatedly affirmed their commitments
to act in accordance with their obligations under the operative agreements.

as a result of the breach of the business relationship. Tamiami Trail Tours, Inc. v. J. C. Cotton, 463 So.2d 1126 (Fl. 1985); ABC-Paramount Records, Inc. v. Topps Record Distributing Co., 374 F.2d 455 (5th Cir. 1967). Recognizing the threat of immediate irreparable harm, the Courts do not hesitate to enjoin a rival from interfering in another's contracts or business relations. Id. Accord, King Records, Inc. v. Brown, 21 A.D.2d 593, 252 N.Y.S.2d 988 (N.Y.A.D. 1st Dep't 1964) (performer and competing record company enjoined from using or distributing recordings made in violation of exclusive recording agreement with plaintiff's manager); Winnipeg Rugby Football Club v. Freeman, 140 F. Supp. 365, 366 (D. Ohio 1955) (injunction granted prohibiting rival football league from signing college players, in violation of contract with plaintiff: "Otherwise, such a contract with a college football player seldom would stand up to the professional club that first signed him."). See Zink Communications v. Elliot, 1990 U.S. Dist. LEXIS 14784 (S.D.N.Y. 1990) (a copy of this decision is annexed hereto as Exhibit "A"); Madison Square Garden Boxing v. Shavers, 434 F.Supp. 449 (S.D.N.Y. 1977); Harry Rogers Theatrical Enterprises, Inc. v. Comstock, 225 A.D. 34, 35, 232 N.Y.S. 1, 3 (N.Y.A.D. 1st Dep't. 1928).

In ABC-Paramount Records, Inc., supra, the Fifth Circuit, faced with similar conduct in the music industry, awarded both injunctive relief and money damages to the plaintiff recording company, describing one without the other as "the bottle without the milk." 374 F.2d at 461 n.7. There, one plaintiff, the promoter and agent for the recording artist, Jimmy Velvit, had an agreement with the other plaintiff, Topps, to promote and sell Velvit's recordings, through another record company with which Topps had a contract. Topps and that company intensively promoted Velvit's record. In the meantime, Velvit entered into another contract with the defendant, ABC-Paramount, to distribute the same recording. Like Zomba here, ABC-Paramount knew about the Topps contract. Finding that ABC-Paramount had tortiously interfered with the Topps recording contract, the Court enjoined ABC-

17

Paramount from using the Velvit recordings, required it to return the recordings to Topps, and awarded money damages.

In Zink Communications, supra, the court discussed at length the immeasurable harm facing the plaintiff television producer when a performer signed to its show moved to a competitor's show, in breach of its contract with the plaintiff. As do plaintiffs here, that plaintiff faced not only monetary loss, but incalculable damage to its reputation and credibility in its industry, and to its future business prospects, because it would be perceived as unable to "deliver" the shows, with the performers, that it had agreed to provide to the networks. 1990 U.S. Dist LEXIS 14784 at * 79-83. In Madison Square Garden, supra, 434 F.Supp. at 452, in a similar situation, the court also found irreparable harm:

> The Garden [Madison Square Garden] is, to a measurable extent, irreparably injured as a viable promoter of major boxing matches were Shavers with impunity able to simply disavow a prior agreement with the Garden to take advantage of a later-made more attractive offer. The Garden's credibility could be destroyed in the eyes of boxing managers as well as various media representatives, such as television producers or others, who, in reliance, enter into further contracts that in fact may well represent the major source of income from the event being promoted, possibly being the difference between profit and loss for the promoter.

Indeed, the Florida Supreme Court has recognized that a prohibitive injunction[9], is appropriate where, as here, the defendants, through breach of or tortious interference with contractual obligations, seek to divert the benefits of unique chattel or services from the plaintiff. Wilson v. Sandstrom, 317 So. 2d 732, 738 (Fl. 1975), cert. denied, 423 U.S. 1053, 96 S. Ct. 782 (1976) (citation omitted) (emphasis added):

> Injunctive relief ... is often invoked to prevent violation of contracts calling for personal services or acts of a special character, or for such services by persons of eminence in their calling, possessing special

---

[9]See McDonald's Corp. v. Robertson, supra, 147 F.3d at 1307 n.2 (discussing the difference between a mandatory and prohibitory injunction).

18

qualifications.   [In granting such relief, the courts recognize] **the difficulty of replacing such service, and the inadequacy of damages as compensation for such loss**.

Defendant Zomba's recent entry into its own exclusive recording agreement with the Group Members, and planned use of plaintiffs' New Master Recordings and plaintiffs' Mark to issue recordings under Zomba's own label, with full knowledge of the plaintiffs' contracts, constitutes an egregious act of tortious interference.   Zomba knew that BMG had produced and distributed 'N SYNC's recordings in the United States under the RCA label and that Trans Continental had exclusive rights to the Group. If Zomba made any inquiry into the <u>bona fides</u> of the Group Members' purported termination of the Exclusive Record Agreement, it could not possibly have believed, in good faith, that the operative agreements were terminable under paragraph 19.12.   Not only is BMG's persuasive presence felt in every record store in the United States, but Zomba's own recordings are distributed exclusively by BMG throughout the United States.

Plaintiffs are in an intolerable situation and face immeasurable harm.   Their reputation and ability to do future business in this industry will be irreparably damaged if it is perceived that their rivals, such as Zomba, can sit back while they devote substantial resources to locate, train, promote and market the recordings of new performers, only to step in and sign the performers to agreements once they become successful.   No recording company, such as BMG, will enter into distribution agreements with Trans Continental to distribute the recordings of an unknown group if operative agreements with the artist can be unilaterally abandoned.

The Group Members acknowledged in the Exclusive Recording Agreement that their recordings and services are unique and extraordinary, entitling plaintiffs to injunctive relief to prevent their loss (Exclusive Recording Agreement ¶13.04).   The New Master Recordings are also unique and, as expressly provided in the Exclusive Recording Agreement, are the exclusive property of Trans

19

Continental and its licensees. Thus, defendants should be enjoined from using the 'N Sync Mark or the New Master Recordings for any purposes, and Zomba should be further enjoined from taking any actions causing any further breach of the Exclusive Recording Agreement, including, but not limited to manufacturing, releasing, distributing or promoting any audio or visual recordings of the Group.

## CONCLUSION

For all of the reasons stated herein, in the accompanying Pearlman Declaration, and in the BMG affidavits, plaintiffs respectfully request that their motion for a preliminary injunction be granted, together with such other relief as to this Court seems just and proper.

Dated: Orlando, Florida   November 12, 1999

Respectfully submitted,

J. CHENEY MASON, P.A.

WILLIAM B. PRINGLE, III, P.A.
390 N. Orange Ave., Suite 2100
Orlando, FL 32801
Florida Bar No 0131982/077986
(407) 843-5785
(407)422-6858

cc: All counsel of record

20

8TH CASE of Level 1 printed in FULL format.

**ZINK COMMUNICATIONS** and ZINK ENTERTAINMENT, a division of M.J. ZINK PRODUCTIONS, INC., Plaintiffs, v. GORDON ELLIOTT and ELLIOTT INTERNATIONAL PROPRIETARY, LTD., Defendants

No. 90 Civ. 4297 (CSH)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

1990 U.S. Dist. LEXIS 14784

November 2, 1990, Decided

November 2, 1990, Filed

COUNSEL: [*1]

MILGRIM THOMAJAN & LEE, P.C., Attorneys for Plaintiffs, New York, New York, Samuel D. Rosen, Esq., David R. Toraya, Esq., Of Counsel.

KAYE, SCHOLER, FIERMAN, HAYS & HANDLER, Attorneys for Defendants, New York, New York, Jay G. Strum, Esq., Sally J. Forman, Esq., Jonathan L. Hochman, Esq., Of Counsel.

JUDGES: Charles S. Haight, Jr., United States District Judge. (orally). *

* This decision was delivered orally on September 24, 1990, except for the footnotes, which were added subsequently.

OPINIONBY: HAIGHT

OPINION: MEMORANDUM OPINION AND ORDER

The plaintiffs in this case, **Zink Communications** and Zink Entertainment, a division of M.J. Zink Productions, Inc., who I will collectively refer to as Zink, are, respectively a New York partnership and a New York corporation whose activities include the production of television programs.

Defendant Gordon Elliott is a British citizen, formerly resident in Australia and currently resident in New York, who appears on television programs in the United States. Defendant Elliott International Proprietary Limited is an Australian corporation controlled by Mr. Elliott.

Subject matter jurisdiction in this case is founded upon diversity of citizenship.

Zink's action alleges [*2] that Elliott breached his contract to appear as host in a television game show, called Get The Picture, to be produced by Zink. Zink seeks money damages and an injunction preventing Elliott from continuing as the host of another television game show, called To Tell The Truth, produced by the Goodson Corporation. That show is now being shown on weekdays on the NBC network.

Elliott denies that he breached any contract with Zink. He further contends that even if a breach occurred, the circumstances of the case do not entitle Zink to equitable relief.

The case came before the court on Zink's application for a preliminary injunction. The court consolidated the hearing on that application with trial on the merits pursuant to Rule 65(a)(2) of the Federal Rules of Civil Procedure. Both parties waived jury trial on the issue of breach of contract. Zink reserves its right to a jury on the issue of damages and as to issues arising out of a proposed amended complaint. Elliott resists that amendment. I do not reach that question today.

Plenary trial on the issues before the court has been completed. What follows constitutes the court's findings of fact and conclusions of law under Rule 52(a). [*3]

Zink developed a format for a television game show called Get The Picture. Zink and Elliott entered into a memoranda of agreement dated as of August 15, 1989. I will read the parts of the agreement pertinent to the court's decision. "ZE" as used in the contract refers to Zink, and "GE" refers to Elliott.

The memorandum of agreement dated as of August 15, 1989 provides in paragraph 1 "ZE has engaged GE



EXHIBIT A

to perform as a host and MC for a pilot program for a contemplated television series now known as Get The Picture (the series)."

Paragraph 2 provides "ZE will have the sole, exclusive and irrevocable option for GE's services as a host and MC of the series exercisable on or before November 16, 1989."

Paragraph 4(a) provides "If such series option is exercised the significant series terms are as follows: (a) First year initial minimum commitment 13 weeks of new shows (five per week)."

Paragraph 4(i) provided that while the series was being shown Elliott could make "no appearance as a host, MC or regular of any kind in any other cable television programs of any kind or nature and no other appearances of any kind on any game contest or quiz programs in any form of television (including but [*4] not limited to network, local, syndicated and cable)."

The agreement provided in paragraph 12 that it was "deemed to contain such other terms and conditions as are customary in this type of agreement," including, among others, "pay or play."

The record does not contain the language of such a condition but it is common ground that the effect of the "pay or play" term was to require Zink, if it exercised its option on Elliott, to pay him his stipulated fee for the normal initial broadcast run of 13 weeks even if the series was never broadcast anywhere.

The evidence shows that this form of contracting is customary in the industry. It reflects the pragmatic necessity for a producer to have the host or MC of a proposed game show under option before the program can be marketed to television networks, cable companies or independent syndicators.

The pilot program contemplated by the August 1989 agreement was completed during that month. However, it became apparent that by November 16, 1989, the date by which Zink had to exercise its option on Elliott, Zink would not have assembled that package of contracts with other parties necessary to get a television show on the air.

In these circumstances, [*5] Zink and Elliott entered into a second memorandum of agreement as of November 8, 1989, whose pertinent provisions read: "This memorandum of agreement is supplementary to the prior memorandum of agreement dated as of August 15, 1989 between the parties pertaining to the contemplated television series now known as Get The Picture (the series). In the event of any conflict between this memorandum of agreement and such prior memoran-

dum of agreement, this memorandum of agreement shall govern."

Paragraph 1 provides in part "ZE heretofore engaged GE to perform as a host and MC for a pilot program for the series."

Paragraph 2 provides in part "ZE will have the sole, exclusive and irrevocable option for GE's services as a host and MC of the series exercisable on or before February 2, 1990."

Paragraph 4(e) provides in its entirety "Exclusivity on GE from now until series option expires and if series option exercised continuing until expiration of the buyer's usage rights in series shows in which GE appears - no appearances as a host, MC, regular or guest of any kind in any other game, contest or quiz programs in any form of television (including but not limited to network, local, syndicated [*6] and cable)."

The November agreement also incorporated by reference the "pay or play" condition.

The time within which Zink must exercise its option over Elliott was now extended to February 2, 1990. Circumstances required Zink to request additional extensions from Elliott, to which Elliott agreed. Specifically, on January 24, 1990 the parties signed a letter extending the outside option date to on or before March 15, 1990. Thereafter the parties signed a letter dated March 12, 1990 extending the option date to on or before April 16, 1990. Zink paid Elliott $ 2000 for that extension on condition that if Zink exercised the option Zink would recoup the payment out of Elliott's initial series fees. Thereafter the parties signed a letter dated April 12, 1990 which provided in part as follows:

"A. The outside series option date under paragraph 2 of such memorandum is further extended until on or before April 23, 1990."

I will add parenthetically that the reference to "such memorandum" is to the memorandum of agreement dated as of November 8, 1989.

The April 12, 1990 letter of extension also provides a paragraph B:

"You shall also have the right upon notice to me on or before April 23, 1990 [*7] to further extend such outside series option date until on or before June 1, 1990, and if you so further extend under this paragraph B you shall pay me at the time of your said notice the sum of $ 2000."

It will appear from what I have read that the extension letter takes the form of a letter addressed by Elliott to Zink, signed by him, and in the lower left-hand corner

it is stated that the agreement is accepted and agreed to by Zink Entertainment.

It is common ground that when Zink first presented this letter agreement to Elliott the date specified in paragraph B was a mid-June date, probably June 16. It is also common ground that Elliott refused to sign the letter in that form. The mid-June date was blacked out and June 1, 1990 inserted in its place.

These extension letters, while prepared by Zink, took, as I have said, the form of letters addressed by Elliott to Zink and signed by him. That is true in respect of the entire series of extension letters. They were each endorsed "Accepted And Agreed To By Zink." Jan Morgan Zink endorsed each of the extension letters. She is the executive vice president of **Zink Communications.** She played a central role in Zink's negotiations with Elliott [*8] and in Zink's negotiations with other parties looking toward the appearance of the Get The Picture game show on television. It is also common ground that on April 18, 1990 Zink paid Elliott an additional $ 2000 and triggered the further extension of the outside option date to on or before June 1, 1990.

Thus far I have dealt with undisputed documents in evidence and other uncontested facts, but I now come to events where the facts are hotly contested. The testimony of certain witnesses flatly contradicts that of others. The differences are irreconcilable. Decision turns primarily upon the court's evaluation of the witnesses' credibility. To that evaluation I summon the traditional resources of the fact finder:

Is the witness interested in the outcome or unconcerned and thus above the fray? Is the witness's account inherently plausible or implausible? Has the witness made prior inconsistent statements? Is the recollection of the witness in testifying suspiciously selective? Is the witness's account corroborated by independent evidence or cast into doubt by independent evidence? And what of the witness's demeanor, that largely indefinable but nonetheless very real impact that a witness's [*9] behavior and attitude while testifying has upon the fact finder, a sort of legal body English which indicate whether or not a witness is testifying truthfully?

No witness who appeared before me was disinterested. Ms. Morgan was not. Her company seeks to hold Mr. Elliott in damages and to restrain his activity. The Zink employees who testified are presumably loyal to their employer. Mr. Elliott is not disinterested. He has found more advantageous employment with the Goodson company and wishes to be free of obligation to Zink. Evan Bell, Elliott's agent, is not disinterested. As his principal profits, so does Bell profit. Mr. Chester, a Goodson representative, is not disinterested. His company desires to retain Elliott's services, a desire manifested in part by the Goodson company paying the fees of Mr. Elliott's very able counsel in this litigation. But other indicia of credibility are useful in this case.

I heard a good deal of evident about the difficulties Zink encountered in marketing Get The Picture and the progress toward resolving those difficulties. In the view I take of the case, I need not consider that evidence in detail. It is sufficient to say that by May 30, 1990 Ms. [*10] Morgan and her colleagues at Zink were optimistic that all necessary third parties were orally committed to the project, that implementing contracts would soon be signed, and that Get The Picture would appear on a number of Fox Television stations beginning in September 1990. Morgan has testified to that state of mind. I accept that testimony.

What Morgan did not know, because Elliott had not told her, was that in mid-May Elliott had been approached by the Goodson company with a view toward hiring him as a host for a revival of the game show To Tell The Truth, an early success in the genre which dates back to the 1950s. In April, so far as the record reveals, Elliott had also retained Evan Bell as his agent. Bell had previously acted as Elliott's accountant.

The case for Zink in principal part is that in the late afternoon of June 1st Zink sent to Bell by telefax and Bell received a written exercise of Zink's option to hire Elliott for Get The Picture. The case for Elliott is that Bell did not receive a fax exercise on June 1st, so that the option lapsed and Elliott was free to contract with others.

I may put two issues to rest at once. First, delivery of an option exercise to Bell [*11] constitutes delivery of the exercise to Elliott. Elliott in his dealings with Zink clothed Bell with apparent authority which was in fact actual authority. I do not understand defendants to suggest otherwise.

Second, it is of no moment that the written exercise, if sent by Zink and received by Bell, was not signed by an officer of Zink. Harvey Sindle, Zink's business attorney, had misgivings on that score, but he need not have done.

The manner in which an option must be exercised is in itself a matter of contract. The parties may specify in their agreement if they wish that an option must be exercised not only by a certain time but also in a particular manner. The contract at bar specified the time by which Zink had to exercise, on or before June 1, but said nothing about the manner of exercise. Zink could exercise the option orally, in person, by telephone or in a writing

that was hand-delivered, mailed, faxed, communicated by carrier pigeon or corked in a bottle and thrown into the sea. All that matters is whether Zink communicated the exercise in some manner to Elliott in time.

I find guidance on this point in the Second Circuit's decision in Shubert Theatrical Company v. Rath, [*12] a 1921 case reported at *271 F. 827.* Plaintiff was a producer of stage attractions. Defendants were performers who breached their contract with plaintiff to perform with a rival company. The Court of Appeals affirmed an order of injunction. I am not presently concerned with that holding but with the court's discussion of the manner in which plaintiff exercised an option in its contract with defendant.

The contract entitled plaintiff to give notice of exercise orally or in writing. Plaintiff, in New York, mailed to defendants, in Detroit, a timely exercise. Defendants said they never received it. The Court of Appeals first considered the nature of the option. The Court of Appeals said, at page 833, "An option, when based on a sufficient consideration, is a contract by which one binds himself to sell property or perform services, and leaves it discretionary with the other to take the property or accept the services on the terms specified."

The Court of Appeals reviewed a number of cases from other jurisdictions in which it is said, among other things, "an option is nothing more than a continuing offer to sell" and "an option is a continuing offer which the offeror may not withdraw until [*13] the expiration of the time limited."

The court then said "The law is settled that, if a letter accepting the offer is made in the manner either expressly or impliedly indicated by the party making the offer, it makes no difference whatever that the letter is never received because of some mistake of the post office authorities or through accident in transmission or because in some way it becomes lost."

"It is necessary, therefore," the Court of Appeals continued, "to inquire whether under the circumstances the plaintiff had a right to use the mails for the purpose of communicating its exercise of its option. The plaintiff was expressly authorized by the defendants to exercise the option in writing or orally. We think that this gave it the right to communicate by mail its written acceptance of the offer."

In the case at bar the contract was silent on the manner of exercise. There is thus no express requirement that the exercise be written or, if written, that it be signed by Zink, nor can such a requirement fairly be implied from the circumstances.

I reject Mr. Strum's submissions on these points. He says that case law required a signed exercise, but the cited cases are inapposite [*14] on the facts. He says that the parties' prior dealings implied the requirement of signature, but the document he relies upon are the option extension agreements. The agreements are bilateral in nature to the extent Zink had to pay for them and required the signature of both parties if both were to be bound.

The parties' conduct in respect of executing option extensions is not in the least probative of the manner in which Zink had to exercise the option. Zink's exercise was unilateral, in furtherance of a discretion vested in it by a contract which in no way described or limited the manner, form or style by which the execution must be made.

While Mr. Strum is correct in saying that Zink or its attorney prepared the document exercising the option so as to be signed by Zink, and Zink officers were available to sign it on the afternoon of June 1st, these are irrelevant facts in view of the principles of law to which I have referred.

The main thrust of the case for defendant is not, of course, that the June 1st fax exercise was not signed, but rather that Bell did not receive it on June 1st. That is the heart of the matter. I turn to the relevant evidence.

On May 30, which was a Wednesday, [*15] a meeting took place in the offices of Zink which Ms. Morgan described in her testimony as celebratory in nature. Mr. Elliott was there, Glen Warren of Canada was there, David Fox of Fox-Lorber, who would syndicate the show, was there. He is to be distinguished from the Fox Television channels or stations, which stations under the contemplated project would broadcast Get The Picture.

Morgan testified that her feeling on that occasion was one of celebration and relief because after very considerable effort and considerable time and peaks of elation and valleys of discouragement as one thing or another happened, which I don't think I need recount on this record, it appeared that everything was at last coming in place and the show would be aired in September. I have, as I have said, accepted the truth of that testimony with respect to its description of the witness's state of mind.

On Thursday, May 31 Morgan flew to New Orleans to attend an industry meeting, and on June 1st, she testified, late in the morning or early in the afternoon New Orleans time, she initiated the first of several calls that she had with Betty Selby in Zink's office in New York. Mrs. Selby is the director of program [*16] development at Zink and had a good deal to do with the Get The

Picture project.

In that conversation on June 1st Mrs. Selby recounted to Ms. Morgan that she had been unable to reach Mr. Elliott throughout the entire day on May 31. Mrs. Selby said that she was anxious to reach Mr. Elliott, that she had attempted to reach him at every place she could think of, radio studios where he was engaged, his home, where an answering machine cut in and responded but did no more than that, as machines are unable to do, and that she never succeeded in reaching Mr. Elliott during May 31.

In those circumstances, Ms. Morgan testified she felt a considerable alarm. One of the reasons for that alarm, she testified and I accept and find, is that this represented a significant change in Mr. Elliott's conduct. Up until that time he had been prompt and cooperative in returning efforts by Zink to reach him by telephone, but all of a sudden an iron curtain seemed to have descended, or so it seemed to Ms. Morgan, and she was worried about it.

So she gave instructions to Betty Selby. According to her testimony, she instructed Selby in substance to get a signed extension from Mr. Elliott beyond June 1st, or [*17] if she was not able to do that, to order him, which in the parlance of the industry means to exercise the option. Ms. Morgan testified that to exercise the option on Mr. Elliott would, under the provisions of the "pay or play" term, obligate Zink to pay Mr. Elliott for the first 13 weeks even if the show was never aired. Her testimony is that that obligation amounted to about $ 80,000. But Ms. Morgan testified that in her view she was so close to collecting all of the written contracts making up the package, and she or her company had in her estimate invested about $ 300,000 in the show, that she was quite content to exercise the option before the end of June 1st if she could not get a further extension from Mr. Elliott.

There is no question that Zink would have preferred an extension. This is a point which Mr. Strum made in argument and to which I will return a little later. And the reason for that, of course, is apparent. A further extension of say two weeks would have cost $ 1000, and then in Ms. Morgan's mind there would have been plenty of time for the signed orders and contracts to come in from third parties. But she was not prepared to let the June 1st date expire and the option [*18] lapse if during the course of that day she had not received an extension signed by Mr. Elliott and in Zink's hands clearly binding him to an extension. Hence the instructions to Betty Selby, which I find that Ms. Morgan gave to Mrs. Selby in midday on June 1st New Orleans time and which Mrs. Selby received, as I also find.

Ms. Morgan was thinking in terms of an extension beyond June 1st in part because, according to her testimony, Mr. Elliott had orally agreed at the time of the April 12 extension to extend beyond the June 1st date if Zink asked him to and paid him more money. Elliott denies that such an oral agreement was made.

On June 1st, towards the end of the day, probably before 6 p.m. New Orleans time, Selby and Morgan had another telephone conversation. Selby recounted to Morgan her efforts to obtain a signed extension from Elliott during that day, efforts which did not succeed. Selby described certain conversations that she had with Evan Bell. Lastly, Morgan testified Selby told her how she sent a collection of documents to Mr. Bell, a collection which included a written exercise of option, and Morgan testified that she felt relief when Selby told her that the exercise had [*19] been sent.

Betty Selby testified at trial. She said that on May 31 she made repeated efforts to communicate with Elliott. I have already described the nature and extent of those efforts. They were not responded to. The calls were not returned.

Ms. Selby testified that she again tried during the morning of June 1st New York time to contact Mr. Elliott. She tried to contact Mr. Bell by telephone. Again, the calls were not returned. Mr. Elliott had identified Mr. Bell as his agent to Zink in April, which is why Mrs. Selby was trying to reach Mr. Bell. Mrs. Selby testified that she spoke to Ms. Morgan during the middle of the day on June 1st, that Morgan instructed her that if there was any problem obtaining a further extension from Mr. Elliott, Selby was to exercise the option.

In considering the demeanor of these two witnesses and the plausibility of their account, which I will say something more about a little later, I accept that testimony.

Mrs. Selby attempted to obtain a further written extension of the option from Mr. Elliott during June 1st. What she did was to send a Zink employee, Cecilia Pagkalinawan, to find Mr. Elliott. Mrs. Pagkalinawan was bearing with her a typed extension [*20] and a $ 1000 check. She left the Zink offices on that mission at about 3 p.m. on June 1st New York time. She went to a radio studio where Mr. Elliott was then engaged.

I have heard a good deal of evidence about what happened in furtherance of and eventual frustration of that mission. I do not think I need recount that evidence in full detail. Certain undisputed facts emerge. They are that Mr. Elliott received an extension and a check from Ms. Pagkalinawan, but he did not sign the extension

and return it to Zink on June 1st or thereafter, and he has not cashed the check. Also, it is common ground that Mr. Elliott said that the Zink people would have to talk to Mr. Bell about any extension. He expressed that first, I believe, to Ms. Pagkalinawan, who then informed Mrs. Selby back at the Zink office that this was so.

In any event, a time came when a three-way telephone conversation took place between Mrs. Selby at the Zink office, Mr. Elliott at a radio studio and Mr. Bell at Mr. Bell's office. And we've now reached about 5 p.m. on June 1st New York time. Mr. Bell told Mrs. Selby that he could not advise Mr. Elliott to sign any extension because he had not seen any of the past contracts [*21] between the parties. It is common ground that he said that to Mrs. Selby.

Mrs. Selby testified, and I accept, that she was surprised at that because her recollection was that in April Mr. Bell had replaced a lawyer named Carmody as Mr. Elliott's representative and at that time Zink had sent to Mr. Bell copies of all the documents, doing so at the rest of Mr. Carmody. As it happens, Mrs. Selby's surprise was well-founded, because Mr. Bell testified at trial that he had all the documents in his file at the time of his June 1st request to Selby.

Mr. Bell testified -- and I am referring to page 169 of the transcript -- question by Mr. Rosen:

"Q. I to did your attention to the afternoon of June 1st. You had a three-way telephone conversation with Betty and with Gordon that day, right?

"A. That's right.

"Q. And during that conversation you told Betty in words or substance 'I cannot allow Mr. Elliott to sign an extension agreement because I haven't seen any of the Zink contracts,' right?

"A. That's right.

"Q. And at the time you said that, sir, and represented to Betty you had not seen the Zink contracts was that statement true or false?

"A. That statement was false.

"Q. You intentionally [*22] lied to Betty?

"A. That's right.

"Q. Would you explain to this court why you did that, Mr. Bell?

"A. I have no obligation to be truthful to Betty."

I will pause and reflect that that is something of an understatement on Mr. Bell's part. It is not just that he felt he had no obligation to be truthful to Mrs. Selby. He regarded himself as being at liberty to lie to Mrs. Selby on a crucial point at a crucial time in the context of an important commercial transaction.

The testimony resumes at page 170:

"Q. What was your intention or plan in lying to Betty on June 1?

"A. I was buying some time.

"Q. You have to explain that, sir.

"A. I was trying to get some more time before I had to commit to either accepting the Zink contract or not accepting the Zink contract."

On page 171:

"Q. As of June 1, when you spoke with Betty, the situation was that Zink's option was to expire if not exercised, right?

"A. That's right.

"Q. And as of June 1 you knew your client was getting on a plane on June 3 to audition for Goodson in California on June 4?

"A. That's right.

"Q. And the reason you lied to Betty is because if you were fortunate enough to get a good offer from Goodson you wanted to be free to take [*23] it?

"A. That's right."

I will add parenthetically that the discussions between Mr. Elliott on the one hand and Goodson on the other were at this time entirely unknown to Zink.

Mrs. Selby throttled her surprise at the request and, given the exigencies of the moment and her specific instructions from Ms. Morgan, put together a package of documents for faxing to Mr. Bell. The testimony for the plaintiff, the case for the plaintiff, is that the telefaxed package consisted of two main ingredients, the first being copies of all the prior agreements, as Mr. Bell had requested, the August and November agreements, the series of extensions, and a copy of the extension notice of June 1st which Zink had unsuccessfully attempted to get Mr. Elliott to sign on the afternoon of that day. The second ingredient of the package was, according to the testimony of the plaintiffs' witnesses, a written exercise of option. It is dated June 1, 1990. It is addressed to Mr. Elliott in care of Mr. Bell at the latter's office, and it reads as follows:

"Dear Gordon:

"We are pleased to hereby advise you that we exercise

our option for your services as a host and MC of the series now known as Get The Picture pursuant [*24] to paragraph 2 of our agreement dated as of November 8, 1989, as subsequently amended. In general, the initial series commitment involves 13 weeks of new programs. We look forward to a great success for everyone. Your many favors and cooperation are appreciated.

"Cordially yours,

"Zink Entertainment."

Mrs. Selby is positive in her testimony that such a document was included in the package which she put together to send to Evan Bell. Her testimony is that that package consisted of 14 pages, of which the fax cover sheet was the first and the exercise was the last. The exercise was the last because Mrs. Selby decided to arrange the package of documents in a chronological order.

Mrs. Selby then went to the station where the fax machine lives at the Zink office. Ms. Pagkalinawan usually does the faxing, but she was not there. She was not there because she was working her way back to the office from the ABC Studios. But Lenore Cramer, another Zink employee, was there, and Mrs. Selby, who had to get to a meeting which had begun at 5 o'clock, asked Ms. Cramer to send the package of documents at once to Mr. Bell's office. She gave Ms. Cramer a telephone number for the faxing and a number that [*25] could be called to confirm receipt in good order of the package. It was now about 5:15 on June 1st New York time. Ms. Selby said to Ms. Cramer that the package should go out at once and that its safe receipt should be confirmed promptly by telephone.

Ms. Cramer testified that she did just that, and that she placed into the fax and transmitted by fax each of the 14 pages. She does not testify that she read them all, nor did she pretend to be in a position to say what they were. She simply said that she did what Betty Selby asked her to do, take these documents and send them to Mr. Bell. She said that the faxing process went smoothly, there seemed to be no hitches, the fax machine did not act up or shred anything or refuse anything, as they sometimes do, it seemed to go smoothly, and when it was over she telephoned the number that Mrs. Selby had given her and found herself talking to a woman who said that everything had been received in good order. According to Ms. Cramer's evidence, she then took the documents and gave them to Ms. Pagkalinawan, who had come back by this time.

At that point the testimony of Ms. Pagkalinawan picks up the narrative. She testified that Mrs. Selby was still [*26] in a meeting and so she could not give the doc-

uments directly to her until the meeting was over. She testified that she looked through the documents because she had time to do so, and had a familiarity with the matter, in any event. Her testimony is that the last page of the package was in fact the exercise of the option.

Ms. Selby received the package from Ms. Pagkalinawan and instructed her to make three copies of it. There is a point of inconsistency in the evidence on this point. In an affidavit given in the case in aid of the motion for a preliminary injunction, Mrs. Selby said that the bundle of documents she received back was stapled together. At trial she said that they were either loose or clipped together and that her account on that point in the affidavit had been mistaken.

Mrs. Selby also testified that later that afternoon she called Mr. Bell. Mrs. Selby said that she was anxious and that Zink was anxious to resolve any uncertainties. She suggested discussions, if they would be useful, during the weekend involving counsel or Mr. Bell or anyone from Zink, but she testified that Mr. Bell was short and cold in his responses, that he said he had not yet had time to review [*27] the documents. It was in reaction to that statement that Mrs. Selby suggested expedited discussions during the weekend or first thing Monday, which was June 4th. But Mr. Bell's response I think can fairly be summed up, according to Mrs. Selby's testimony, as that vernacular cliche: Don't call me, I'll call you. Mrs. Selby testified that she then telephoned Ms. Morgan in New Orleans and told her that the written exercise of option had been sent.

Well, that is the case for the plaintiffs on whether or not a written exercise was sent. The case for the defendants on that point relies entirely upon the testimony of Evan Bell. Mr. Bell testified that, yes, in fact he received a package of documents from Zink in the late afternoon or June 1st. He is quite certain in his recollection, and said so repeatedly on the stand, that a written exercise of the option was not included in those documents. He was quite clear in his recollection on that.

And that testimony is really the rock upon which the defendant rests its case insofar as plaintiffs seek to recover upon the basis of a written exercise of option.

There is a second theory which Mr. Rosen argues to me, and that has to do with an oral [*28] agreement by Mr. Elliott to extend the option beyond June 1st, an oral agreement which Mr. Elliott denies. I will come to that aspect of the case in a little while. But for the present I am focusing upon whether or not Zink sent a written exercise of option on June 1st and whether or not Mr. Elliott received it. And the evidence, of course, is irreconcilable.

Which brings me to some of the considerations which one considers in determining the credibility of witnesses. At least, it almost brings me to that. But before I come to that I must deal with events during the week of June 4th. One of the factors, as I have said, is the presence in the record of evidence which tends to corroborate or contradict the account of a witness.

Each party finds in documents which were generated by this case evidence which it says contradicts the testimony of the other. As far as Mr. Strum is concerned, he points to two letters which were written by Zink and sent by Zink or on behalf of Zink on June 6th. The first is a letter and I should be more precise in my language -- sent to Mr. Bell by Harvey Sindle.

Harvey Sindle is an attorney who at the pertinent time was advising Zink in respect of negotiations [*29] with third parties looking towards the program, including Mr. Elliott and others. I find from the evidence that Mr. Sindle had some conversations with Mr. Bell on June 4th and June 5th and in consequence of those conversations Mr. Sindle sent a letter to Mr. Bell suggesting certain improvements in the contract in respect of Mr. Elliott. Mr. Sindle testified, and Mr. Bell really does not contradict him on the point, and I find that these improvements were 1suggested by Mr. Bell on behalf of Mr. Elliott.

Another letter was sent on June 6th, and that was sent from Zink's offices itself and signed by Ms. Morgan. And that letter reads as follows:

"Dear Mr. Elliott.

"Pursuant to our agreement dated as of November 8, 1989, as extended, this will notify you that we exercise our initial option for your services as a host and MC of the above-named series for initial telecast primarily via syndication. We will be in touch with you shortly concerning schedules and other pertinent detail. We look forward to a successful venture for all concerned."

Now, in the light of these two communications, Mr. Strum argues very ably that they are both inconsistent with the exercise of the option on June 1st. [*30] If the option had been exercised on June 1st, why was Mr. Sindle saying anything at all to Mr. Elliott about improving the terms of the contract for Mr. Elliott? And if in fact a written exercise had been sent and delivered on June 1st, what is the need for Ms. Morgan to send a second written exercise on June 6th, and is it not striking that neither counsel's letter nor client's letter make any reference to a written exercise on June 1st? It is these writings that Mr. Strum finds inconsistent with the testimony of the Zink witnesses.

As far as the case for the plaintiff is concerned, Mr. Rosen finds in Mr. Bell's files and the manner in which they were produced and what some of them show and what some of them do not show corroboration that on the crucial point of receiving a written exercise on June 1st Mr. Bell did not tell the truth.

What the record makes clear is that the telefax machine in Mr. Bell's office had the capacity and in fact did indicate on the bottom of each page of a fax being received by that machine certain information, the date the communication was received, the time, the page number of each page, and at the end of the message the total number of pages that the [*31] communication comprised.

We know that Mr. Bell's fax machine was capable of that exercise, at least when the machine was in communication with the Zink fax, because files eventually produced under circumstances which I will describe in a moment from Mr. Bell's office include two fax communications from Zink to Mr. Bell's office. One of them is dated June 11, and the second is dated June 13; one is two pages long, one is six pages long and on the last page it says "Total 2 Pages" in the case of one and "Total 6 Pages" in the case of the other.

Mr. Bell's testimony is that he entirely destroyed the fax communication, whatever it was, that he received from Zink on June 1st. He said that he threw it all away. He undertook to explain why he had done that. There were documents of which he already had copies . Well, we already know how that came about. There were other documents that were not signed, such as the extension. He felt that unsigned documents were not worth keeping.

He was then required under subpoena to furnish to Mr. Strum at the Kaye Scholer firm his file on the Elliott-Zink matter. That was done. Counsel examined it during the course of discovery. Mr. Rosen noted that he [*32] had been furnished by opposing counsel with xerox copies or what appeared to be xerox copies of Mr. Bell's file on the matter. He asked that the originals of the file be produced and they were. They were produced promptly by Mr. Strum.

And I think it only right on this record to make it quite clear that if there was tampering with documents or withholding of documents or anything of that nature, neither Mr. Strum nor any member of his law firm had anything whatsoever to do with it.

But it occurred to Mr. Rosen that he would like to see the originals instead of the copies. It's not quite clear, I don't think Mr. Rosen is clear, what inspired him to do that.

In any event, the originals were produced, and then it appeared for the first time that it was within the capability of Mr. Bell's fax machine to record at the bottom of an incoming communication the date, the time, the page number and the total number of pages. And those circumstances, Mr. Rosen argues, constitute independent evidence tending to contradict the account of Mr. Bell on the point at issue.

Now, back to credibility. Is the plaintiffs' account plausible? And related to that question, is the account, the scenario which [*33] Mr. Strum suggested to me in summation, plausible? The account for the plaintiff is that there was concern that June 1st not come and go without the option being exercised and that Ms. Morgan was determined that that would not happen and gave appropriate instructions to Mrs. Selby which Mrs. Selby acted upon. How did she act upon them? She included, according to the plaintiffs' case, a written exercise in the package.

I find that to be an entirely plausible account. I accept the plaintiffs' testimony that in their view, at least, they were very close indeed to putting together a package which for the first time would have Zink producing a game show on the air. It would be in those circumstances remarkable if Ms. Morgan did anything other than what she did, and it would be remarkable if Mrs. Selby, having received such instructions, disregarded them.

Mr. Strum suggested that the Zink interests were giving primary attention to obtaining an extension to save the $ 80,000 which an exercise would involve and sent an unsigned exercise on June 1st, if they sent one at all, which of course Mr. strum does not accept, in order to play it both ways, to hold Mr. Elliott to his contract if the [*34] formal written orders from Fox-Lorber came in but to have a deniable document if they did not.

I reject that reconstruction for two reasons. The first is that I find credible and accept the testimony of plaintiffs' witnesses. But I need not rely on that entirely in rejecting the imaginative argument that Mr. Strum made. If that was what was afoot as far as Zink was concerned, there is no explaining Ms. Morgan's June 6 exercise, because the written contract from Fox-Lorber had not yet arrived, and if that was the game, it was cast away by the sending of the June 6th written exercise. So I am not able to identify in any of the plaintiffs' testimony any element which is inherently implausible or causes me to doubt what it is that they say.

The plaintiffs charge Mr. Bell with serious wrongdoing. They charge him with having received a written exercise of option and then having denied its receipt under oath. Is it inherently implausible that he would act

in such a way? I do not think that it is. Mr. Bell had every motive or at least a readily discernible motive to deny what in fact he had received. Indeed, that motive emerges with sufficient clarity from his own testimony, from which I [*35] read a moment ago. Something better was coming down the turnpike for Mr. Elliott, the Goodson job. It was a lot better. It paid more money. It gave Mr. Elliott exposure on a national network. The contemplated exposure for Get The Picture, as I understand it, was Fox Television, which, while aggressive and working away hard these days, isn't quite up there with ABC and CBS and NBC. There was a lot in this other engagement which was a lot better for Mr. Elliott and was a lot better for Mr. Bell as his agent. So while on the one hand the plaintiff had every reason to exercise the option on June 1st, Mr. Bell had every reason to deny that plaintiff had done so.

What of the other indicia of credibility? I found plaintiffs' witnesses to be credible not only in what they said but in the manner in which they said it. I am aware that there are some discrepancies between affidavit and trial testimony. That can be looked at in one of two ways, I suppose. If the story was fabricated, great care would be taken that there be no inconsistencies whatsoever. To the extent that inconsistencies exist, I do not find that they go to the heart of the matter.

I was impressed by Ms. Morgan's testimony, I [*36] was impressed by the testimony of the other Zink witnesses, and in one particular respect. It seemed to me as I listened to them and watched them that they were making an effort to answer the questions truthfully whether they were posed by Mr. Rosen or posed by Mr. Strum.

There were occasions, for example, when Ms. Morgan, an intelligent witness, could have made up some recollections or some thought processes which would have assisted the case. She had a number of opportunities to do that, and the sense I got was that she let those opportunities go by. There were times when she could have improved the plaintiffs' case by gilding a lily here, adding a detail there, throwing in a thought someplace else. My sense was that she listened carefully to the questions of counsel and then did the best she could to answer them truthfully. And I formed the same impression of the other Zink witnesses. These are not people, these witnesses, who are streetwise in the ways of the courtroom. They took an oath to tell the truth and as far as I can tell did the best they could to do so.

When I come to Mr. Bell and, to a certain extent, to Mr. Elliott I find that I cannot repose in their testimony the [*37] same degree of confidence. Indeed, in over 14 years as a trial judge I am not sure I have ever seen a

1990 U.S. Dist. LEXIS 14784, *37

witness in whom I can repose less confidence than Mr. Bell. It is not so much that he acknowledged in his own words that he had no compunction about lying when he perceived his interests to be forwarded by that. It was the extraordinarily selective nature of recollection. In deposition and again at trial Mr. Bell could remember practically nothing of events which were both recent and significant.

Mr. Bell has recently come to the profession of agent for performers. Before that time, at least up until May, he was an accountant. I stress this because this contract had to have been one of Mr. Bell's more significant transactions in his new profession. And yet the record is replete with failures of recollection with respect to events, times, places, what was said, documents, who gave what to whom, when, under what circumstances. There is no point in trying to recount them all. It would take far too long I don't think I remember them all. But there was one thing he did remember, and that is on June 1st that package did not contain a written exercise of option.

His demeanor on the stand [*38] was hostile and evasive, and to the extent that one can describe in words what we mean by demeanor, which I cannot really do, I found Mr. Bell to be an unreliable witness. And my misgivings about him are compounded by the condition of the files that I referred to. I cannot think -- and I have tried -- of any rational reason why the originals show the numbers of pages but the copies made from them do not, except that Mr. Bell undertook deliberately to keep those notations on the originals from coming to the attention of plaintiff and plaintiffs' counsel and, eventually, this court as the trier of fact.

Mr. Bell had to know that he could not deny receiving any fax communication from Zink on June 1st. I may judicially notice that there are telephone records that would have reflected that he did. Therefore, something had to be done about that package if it contained an exercise of option. And the difficulty about simply taking off page 14 and throwing it away is that there were the telltale signs including total pages. It would have been a red flag that something was not there. So the entire communication had to be shredded, made to disappear.

And the reasons given by Mr. Bell for disposing [*39] of some of these documents cause me further concern with respect to his credibility. The file is replete with the sort of documents -- duplicates, unsigned papers -- that Mr. Bell said he destroyed as far as the June 1st package is concerned. The reasons that he gave on the stand for getting rid of the entire June 1st communication is belied by the contents of his own file.

What about the point that Mr. Strum makes with respect to the June 6th communications from Zink? I have considered that aspect of the case carefully but I do not perceive in those documents and what they say and do not say areas of rising anywhere near the level of the concern generated by Mr. Bell's files.

Mr. Sindle testified before me. He is an experienced commercial lawyer. He is well grounded in the sort of negotiation which goes on in putting together a program like this. It is what he has been doing with his professional life for some 30 years, I think he told me. He testified with that self-confident booming, assertive tone which I imagine does him in good stead during this sort of negotiation.

Mr. Sindle was concerned about what seemed to be happening on the other side, a drying up of communication, reticence [*40] where free and easy communication had existed only a few days before, silence where there was collegiality, frigidity where there was warmth. He was concerned that this deal was going down the tube. He had concerns, we know, about the fact that the June 1st exercise was not signed. I do not think that those concerns were well founded for the reasons I have tried to indicate, but he had them at the time. With Mr. Sindle feeling those concerns and encountering unexpected and worrying intransigence, communicated primarily by Mr. Bell, I accept as plausible his testimony that, in substance -- these are not his exact words but I think they fairly summarize his testimony -- he was confronted suddenly and unexpectedly with Mr. Bell, who was acting like a donkey.

There are two things you can do with a donkey. You offer the donkey a carrot or you beat on it with a stick. Your objective is the same: to get the donkey to move from here to there. Mr. Sindle was uncertain of the strength of the stick and it came naturally to him to attempt a carrot.

It was a doomed venture, as we now know, because while Mr. Bell was permitting Mr. Sindle to think that a carrot might work, Mr. Elliott was on his [*41] way to audition for the Goodson people, To Tell The Truth, an audition which went very well. But Mr. Sindle did not know that at the time.

He also did not -- and here I accept Ms. Morgan's evidence on the point as credible -- advise Ms. Morgan of that letter, and she was not happy about it when she heard about it, and her reaction was to send the June 6 written exercise. Should she have referred to the prior exercise? Well, of course. But as these events develop, as a party in the situation in which Zink found itself comes under increasing pressure, a pressure which re-

1990 U.S. Dist. LEXIS 14784, *41

sults from the fact that they are being lied to and misled by the opposite party, I do not think that they should be held to too high a standard of conduct.

There is a case called Winter Garden Company v. Smith in the Second Circuit, decided in 1922 and recorded at *282 F. 166, n1* and I will come to that case a little later on in the context of another aspect of the case. It was between a theatrical producer and a performer. The Court of Appeals said at page 169 "There has rarely come to our attention a more flagrant instance of a deliberate and inexcusable breach of contract," and then went on to quote the trial judge, [*42] who was District Judge Augustus N. Hand, as he then was. Judge Hand said "The law is not a mere game, the rules of which are made to surprise or confound the participants, but its rules are aimed at working out the justice in a world where perfection and ideal adjustment are rarely possible."

n1 *282 F.2d 66 (2d Cir. 1922).*

In my view, the actions on the part of Zink during the week of June 6th and the communications which were sent during that week as I have described them are not fatally inconsistent with the factual premise upon which they base their initial theory of breach of contract on the part of Mr. Elliott. I think that they are plausibly explained by the circumstances which I have tried to describe.

I find, therefore, that Zink sent in its telefax to Mr. Bell at about 5:30 on June 1, 1990 a written exercise of option. I find that Mr. Bell received that written exercise of option. I find that in consequence of that Mr. Elliott became bound by contract to Zink.

I do not feel it necessary in these circumstances [*43] to discuss the alternative theory of oral promises made at a prior time to give an extension. It is not necessary to reach that point. And in any event, Zink did not rely on those oral representations because they sent on June 1st a written exercise of option, as I have found.

What remains in the case is the question of remedy. That Zink in these circumstances is entitled to money damages is apparent. What is not so readily apparent is whether or not Zink is entitled to equitable relief, and I will come to that subject after we take a ten-minute recess.

(Recess)

THE COURT: Having resolved the issue of breach of contract in Zink's favor, the issue of remedy arises. Zink seeks money damages and a permanent injunction

preventing Mr. Elliott from appearing on another game show. Zink has reserved its right to submit the damages claim to a jury. The propriety of injunctive relief is now before me. The trial on that equitable claim having been completed, the precise questions are whether a permanent injunction should issue, and if so, in what form.

I begin by setting the context. Elliott breached his contract with Zink by ceasing meaningful communication with Zink during the week of June [*44] 4th, abandoning his responsibilities to Get The Picture, and thereafter signing a contract with the Goodson company to host To Tell The Truth. In short, Mr. Elliott refused to perform for Zink during the term of his contracted-for employment by Zink, which began on June 1st, when the exercise of option was communicated.

The case thus falls within the analysis of the New York Court of Appeals in American Broadcasting Companies v. Wolf, which is reported, among other places, at *438 N.Y.S.2d 482.* n2 This is a decision of the New York Court of Appeals in 1981. New York law governs the rights and obligations of the parties in this case in which jurisdiction is founded on diversity and the relevant conduct took place in New York.

n2 *52 N.Y.2d 405, 438 N.Y.S.2d 482 (1981).*

The Wolf case is a scholarly review of the law involving enforcement of negative covenants in contracts for personal services, and at page 487 of 438 N.Y.S.2d the Court of Appeals gave a general analysis of two different kinds of cases, a case where the [*45] term of employment has not yet expired at the time a restraint is sought and a case where the contract has expired, which was the fact in the Wolf case but is not the fact here. Therefore, this case falls under that analysis which the Court of Appeals articulated in respect of cases where the contract of employment has not expired. And the Court of Appeals said "If the employee refuses to perform during the period of employment, was furnishing unique services, has expressly or by clear implication agreed not to compete for the duration of the contract and the employer is exposed to irreparable injury, it may be appropriate to restrain the employee from competing until the agreement expires."

Two of the four elements described in Wolf are established by what I have said so far. Elliott refused to perform during his period of employment with Zink. He expressly agreed in his contract with Zink not to appear on another game show.

There remain the elements of unique services and ir-

reparable injury. I will deal with them in that order, after first observing that plaintiffs acknowledge the court cannot order Elliott to perform for them. The question is whether the court can and should enjoin [*46] Elliott from performing for someone else.

The contract at bar is for Mr. Elliott's personal services as the host of a television game show. There is a considerable body of state and federal cases in New York, the Second Circuit, this court and elsewhere, on the point of whether a defendant was furnishing unique services. They must be so characterized to justify the intervention of equity. The most instructive cases involve performers of one kind or another, actors, singers, athletes, radio and television personalities. The inquiry is intensely fact oriented. The Second Circuit said in Winter Garden Company v. Smith, "Each case necessarily stands on its own facts and whether a particular actor falls within the class of cases where an injunction will lie against him for breach of his negative covenant is in last analysis a question of fact."

Nevertheless, from a review of the cases certain themes emerge. I will refer to a group of cases where an injunction issued and then to a group where the injunction was denied. I have not found in the cases cited by counsel in very able briefs or during the course of the court's own research any case which is squarely on all fours with this one. [*47] I did not expect to find one. But when one considers the two general categories of cases to which I am about to refer I find some assistance.

I will begin with cases where an injunction issued. Some of them involve preliminary injunctions, others permanent injunctions. I will come to the difference between those two sorts of equitable orders a little later on. For the purpose of the present analysis, that of uniqueness, whatever the courts mean by that concept in this kind of case, I do not think that the distinction between the forms of orders is particularly important.

In Edwards v. Cissy Fitzgerald n3 an injunction issued. The court said of the performer in question "She has a charm peculiar to herself. By her grace, beauty and artistic methods she has become a special attraction. The plaintiff would undoubtedly find it difficult to procure a substitute who would be likely to produce a similar impression upon the public."

n3 Cited as appearing in the Law Journal, January 16, 1985, in Hammerstein v. Mann, 122 N.Y.S. 276, 278 (1st Dept. 1910).

[*48]

In Ziegfeld v. Norworth, an opinion which is paraphrased in another case, n4 the holding was this: "The defendant was the real star around whom the whole production of the plaintiff's play centered and she had been heavily featured in announcements and advertisements so as to give her chief prominence."

n4 134 App. Div. 951, 118 N.Y.S. 1151 (1st Dept. 1909), paraphrased in Hammerstein v. Mann, supra, at 278.

The case of Comstock v. Lopokowa n5 was decided by Circuit Judge Ward of this circuit back in the days when there were circuit courts of a different sort than we have now. Judge Ward was a circuit judge at the time although he considered this bill in equity as a trial judge. The complainants were theatrical managers engaged in putting on three Russian ballets. The defendants were, quoting from Judge Ward, "Russian dancers of a very high order and possessing unusual personal attractions." And as happens in all these cases, the dancers walked away from their contract with the plaintiffs and accepted employment [*49] elsewhere. I will read from Judge Ward's opinion:

n5 190 Fed. 599 (2d Cir. 1911).

"The first objection to the motion is that the complainants have an adequate remedy at law because the services of the defendants are not unique and can be replaced. But I am satisfied that the defendants are of such unusual attainments and personal characteristics and of such especial value to the complainants as to fall within the class of employees whose negative covenants not to enter into the employment of others may be and should be enforced in equity. It is not a necessary condition of granting such relief that the employees should be the stars or the only stars of the complainant's performances or that the performances should be brought to a standstill because of their withdrawal."

In Shubert v. Angeles, n6 the New York court said "The defendant was an actress under contract with the plaintiffs for the season of a certain play. She was employed because of her special talent as a mimic or imitator of other actresses and of actors." [*50] An injunction issued and the court noted, "The injunction, as granted, does not prevent the defendant from performing as an actress, but only from making certain imitations or mimicking other actresses and actors."

n6 *80 App. Div. 625, 80 N.Y.S. 146 (1st Dept. 1903).*

In Shubert Theatrical Company v. Rath n7 the Second Circuit dealt with a plaintiff organization which was a theatrical manager and producer of plays. The defendants -- there were two of them -- were acrobats. The court observed "The testimony shows that their feats are unique and extraordinary." The court went on to describe it. "One of the feats of the defendants' performances is that one of the defendants with one hand raises the other defendant, a full-grown man, from the floor, his body being stretched at full length upon the floor. The witness in describing it said that this was done without apparent effort, just as easy as you would lift a straw. In reply to a question by the court, he declared 'It is a fact that it is the most marvelous thing that [*51] has ever been before.'"

n7 *271 Fed. 827 (2d Cir. 1921).*

"Ever." An impressive show if, in light of this witness's recollection and judgment, it was more marvelous than every miraculous event since the beginning of the world. And independent witnesses in the theater world came to testify that this was a remarkable performance.

The injunction issued. The court referred to the seminal English case of Lumley v. Wagner, involving a famous singer. The court cites a case involving Lillian Russell, another famous singer, among other things, and there are references to cases involving baseball players.

In Winter Garden v. Smith n8 an injunction issued. The plaintiff was a theatrical producer, the defendants were engaged in vaudeville, and the court concluded that in the circumstances the injunction should issue. In arriving at that conclusion the court relied upon testimony from witnesses competent to give it that the defendants "are very talented because they could do all kinds of entertainment; outside of being comedians, [*52] they had the ability of doing grotesque gymnastics, which very few comedians could do; besides, they were capable dancers and singers." The evidence was that the "reputation of defendants was 'very, very big,' and that the compensation paid was the highest salary of which he knew for a quartet of this kind."

n8 *282 Fed.Ed. 166 (2d Cir. 1922).*

A certain emphasis was laid upon the personality of the defendants in that case, and the Court of Appeals said,

"We hardly need expert testimony to inform us that what one of the witnesses called 'personality' is what counts. One performer can speak or act a line of a play, which to a layman would be dull or meaningless in cold print, in such manner as to provoke laughter or tears, while another would call forth no emotion. Gesture, expression, method of speech rendition, keen understanding of what provokes amusement, are all part of those accomplishments which make one man a successful comedian and another a failure."

In Harry Rogers Theatrical Enterprises v. Comstock n9 the plaintiff [*53] was a producer of plays. The defendant was a theatrical performer. An injunction issued, and the court said, "Comstock has that personality which denotes the unusual and unique artist and enables him to pick up the attention of an audience and hold it interested, amused or in pathos until released. Where, therefore, the services of the actor are shown to be unusual, unique or extraordinary, and that the damage to the plaintiff will be irreparable and unascertainable, the latter may enjoin the performer from appearing elsewhere during the period of his contract."

n9 *225 App.Div. 34, 232 N.Y.S. 1 (1st Dept. 1928).*

In Clooney v. WCPO Television Division, a case which comes to us from the state courts of Ohio, n10 the plaintiff was a broadcasting and television personality. In the context of the case, although he was plaintiff, the issue was the uniqueness of his services. The issue was resolved in favor of the broadcasting company because the court found, "In the case at bar, it is uncontroverted that the services of the [*54] plaintiff were special, unique, unusual and of an extraordinary artistic character. Consequently, the employer is entitled to protection." Of course, to the extent that it was uncontroverted, it does not squarely assist me in this case, because here the controversy is very real.

n10 *35 Ohio App.2d 124, 300 N.E.2d 256 (1973).*

In Skyline Broadcasting Corporation v. Hamby, another Ohio case, n11 a permanent injunction was granted for eight months in accordance with the negative covenant given in the contract. The court said that "the defendant, William H. Hamby, as a result of his experience as announcer-disk jockey, and more especially because of his two and one-half years on WONE in this capacity as a specialist in the 'hillbilly' type entertainment is known in the trade as a unique or 'personality'

type entertainer and of a great value in the radio broadcasting field."

n11 *141 N.E.2d 783 (1957).*

[*55]

The court went on to say, "The court recognizes the unusual nature of radio broadcasting, its relationship with the listening public, and the unusual and unique nature of its services and the service of its performers and employees who are active in this medium of entertainment."

Mr. Rosen cited to me Houston Oilers, Inc. v. Ralph Neely, a Tenth Circuit case. n12 This case involved a football player. But I am not certain the extent to which the case assists me on this point, because at page 40 the Court of Appeals said "Neely was over the age of 21 years, and it is stipulated that he had special, exceptional, unique knowledge, skill and ability as a football player." Well, that is not a stipulation which Mr. Strum holds out in this case.

n12 *361 F.2d 36* (10th Cir.), cert. denied, *385 U.S. 840 (1966).*

In Madison Square Garden Boxing v. Ernie Shavers n13 Judge Owen issued an injunction in the context of a prizefighter who had agreed to participate in a bout at the Garden and then walked away from his contract because [*56] something better came along. Judge Owen said in a footnote "It is beyond question that Ernie Shavers' talents are unusual, unique and extraordinary, and, accordingly, a negative covenant not to fight except as provided in the agreement with plaintiff will be implied in the event it is not explicitly so provided."

n13 *434 F. Supp. 449 (S.D.N.Y. 1977).*

There are a number of cases in which an injunction was prayed for and denied. In Hammerstein v. Mann, a New York case, n14 the plaintiff was an operatic impresario and the defendant was a singer. The court said "the services of the defendant are not shown to be of that unique and extraordinary quality which alone justifies an injunction pendente lite."

n14 See fn. 3 supra.

And in explaining that ruling the court said, "The defendant has not been featured. She is not the central figure, upon whom the [*57] whole action of the play depends, of any one production, prepared at great expense. She is but a singer of stock parts, at a moderate salary, which parts many other members of the company have sung."

Russell-Stewart, Inc. v. Birkett is a New York state court case. n15 The plaintiff operated an agency for fashion models. The defendant was one of the fashion models used by that agency. An injunction did not lie. The court said, "Defendant is one of many models who render similar services in the fashion industry. Her abilities are not of such a nature as to permit the granting of an injunction."

n15 *201 N.Y.S.2d 687 (Sup. Ct. N.Y. Cty. 1960).*

In Donnybrook Hairdressers v. Schachter n16 the New York court reached the same conclusion with respect to a hairdresser who, having contracted for employment at one hairdressing salon, moved to another.

n16 *223 N.Y.S.2d 424 (Sup. Ct. West. Cty. 1961).*

[*58]

Chapin v. Powers is a New York case n17 where the plaintiff was a producer of performances of opera and the defendant was an opera singer who had walked away from her contract with the plaintiff. The defendant had agreed to perform the role of Brangaene in plaintiff's production of the opera Tristan and Isolde. The court declined to issue an injunction. It pointed out that "the press releases for the Tristan and Isolde performances merely mention defendant's name as a member of the cast, along with others." And the court concluded "From all that appears, it would seem that the plaintiff could have hired another singer to perform the role of Brangaene."

n17 *73 N.Y.S.2d 854 (Sup. Ct. N.Y. Cty. 1947).*

In a case reported at *106 N.Y.S. 796* -- it's a case in the appellate courts of New York n18 -- the plaintiff was the proprietor of a minstrel troupe and the defendant was cast in plaintiff's troupe as a base singer in a quartet, rendering several songs during the performance. The court denied the injunction and said, "It [*59] is quite improbable that a base singer in a minstrel quartet cannot be found to take the defendant's place." The court went on to say, "The salary agreed to be paid defendant

was quite moderate and indicates that his part was quite ordinary and manifestly could be easily filled."

   n18 *Dockstader v. Reed, 106 N.Y.S. 795 (1st Dept. 1907)*

   In Shubert Theatrical Company v. Gallagher and Shean n19 the plaintiff was a theatrical company, the defendants a vaudeville team. The injunction did not issue because the court said that the defendants "were not employed primarily as vaudeville stars of the first magnitude. At the time the contract was made, as a vaudeville team they were practically unknown."

   n19 *200 App. Div. 596 (193 N.Y.S. 401) (1st Dept. 1922)*.

   And the appellate court quoted with approval the trial justice, who said, "The most that can be said of [*60] them is that they were pleasing and successful artists who commanded fair salaries, but I am not satisfied that they possessed any such special merit or reputation or that their talents were unusual in any such degree as to make their loss a matter of serious consequence to the company."

   Now, I could go on, I suppose, there are other cases, but I think it is now time, in the light of those cases and what they teach us, to focus a little more precisely upon this particular show and this particular performer. That is necessary to place these legal principles into the real world context in which they arise and determine the rights and obligations of the parties.

   A case like the one involving the opera singer retained to sing the role of Brangaene is an illustration of that. Brangaene is the handmaid to Isolde in the opera. It is that sort of role which is sung by opera singers who are usually known as comprimarios. They sing with the principal singers. It is not possible to give a wholly satisfactory performance of Tristan and Isolde with no one singing the role of Brangaene, but it cannot be said that the singer who is singing the role of Brangaene is the singer who sells the tickets. [*61] The public comes to hear the singers who are singing the roles of Tristan and Isolde, and the public is not going to be nearly as troubled by the substitution of a singer for the role of Brangaene as they would be if it was announced two days before the performance that Madame flagstad was not going to sing the role of Isolde.

   This analysis focuses upon both the production and the role in that production of the individual with whom the case is concerned. We are dealing here with a television game show. That is true of both the show that the plaintiffs had in mind and the show in which Mr. Elliott is now appearing. They run or were scheduled to run in the daytime. They are primarily marketed towards and focus upon an audience, one supposes, of women who are at home. I do not mean anything chauvinistic by that. I am simply expressing my understanding of what sort of show this was and to whom it was directed. These shows last half an hour, but what with commercials and so forth, it's about 20 minutes of show.

   I know what To Tell The Truth is about because I have seen examples of it in the evidence. I don't have that clear a picture of what Get The Picture is, but there is no reason to [*62] doubt that it follows the essential game show format of contestants and panelists and a host, a master of ceremonies.

   What is the closer analogy to the host or master of ceremonies of a half hour televised game show? Is it the singer who contracted to sing the role of Brangaene? Is it one base singer in a minstrel quartet? Is it a singer who played stock parts in a repertory company which other members of the company had played? Or is it, this host, this MC of a game show, the sort of performer with special attributes whose disappearance would place the producer into difficulty in replacing?

   In considering these matters, which lie at the heart of what the law has come to refer to in a sort of shorthand as uniqueness but really means something a little different from that, in my judgment, I derive considerable assistance from the testimony of Mr. Chester.

   Mr. Chester, as I have said, was not a disinterested witness, but I found him to be an formidable witness. If you want to talk about demeanor, my sense of Mr. Chester was that he was here to call the shots the way he saw them. He was not inappropriately receptive to the questions of Mr. Strum. He was not belligerently resistant of [*63] the questions of Mr. Rosen. He didn't waste words. He just called the shots the way he saw them.

   He said this at page 415 of the transcript. He was asked if he had an opinion on the importance of the host on the success of the various incarnations of To Tell The Truth.

   "A. Yes.

   "Q. What is that opinion or belief?

   "A. We have had emcees like Gary Moore, who were superb and contributed to the success of the program and the fact that it ran about seven years with him.

"Upon his discovery that he had cancer and he had to withdraw we switched to Joe Garagiola, who in my opinion was not equally as effective, and the show expired after another year and a half."

Continuing his answer a little further down:

"A successful host will not make a success out of a bad show. He will increase the possibility of success of a good show."

At the top of page 416 Mr. Chester said:

"Other than the basic format of the show, I would say Gary was the main contributor to the success."

And I will add parenthetically, a formidable success To Tell The Truth was when the late Gary Moore was its MC.

Mr. Chester's testimony then turned to a discussion of the contract between his company, Goodson, and NBC. At page [*64] 419:

"Q. Now, this is part of a contract between Goodson and NBC?

"A. Yes.

"Q. And does this contract cover just To Tell The Truth?

"A. Yes.

"Q. You will notice at paragraph 11, A, NBC reserves the right and essentially a veto power over the host of the show?

"A. Yes.

"Q. And in your experience, sir, is this common, for a network to reserve veto power over who appears as host of the show, of a game show?

"A. Yes."

And lastly, on page 422:

"Q. Is there anywhere in the NBC-Goodson contract which gives NBC the right to veto a contestant, either the real person or any of the impostors, other than on a morals clause of some sort, you know, seeing that we're on daytime television?

"A. The answer is no.

"Q. Entirely up to you?

"A. Yes.

"Q. So the only person who appears on to which the network reserves veto power is the host?

"A. Yes."

We also know from the evidence that in the arrangement between Fox-Lorber and the plaintiff the presence of Mr. Elliott as host on Get The Picture was a material term, in default of which Fox-Lorber was at liberty to not go through with the contract, which is precisely what happened. A time came in late July 1990 when it became apparent to either Fox TV or [*65] Fox-Lorber that Mr. Elliott was not going to perform. It doesn't make any difference. One of the underlying contracts leading towards the package was canceled out because it was apparent that Mr. Elliott was not going to be made available on time.

Now, I think that these indicia of how the industry feels about the importance of the host of a game show, how they manifest that perception in their contracting practices, is probative evidence of considerable weight with respect to the central position that the host holds in the show. And I can understand better at the end of this case why that is so than I could at the beginning.

The reason for that is that I have been given to look at examples of the To Tell The Truth show, one of them one of four auditioning examples, but with a full runthrough, as far as I can tell. There was an audience and there were four panelists of differing degrees of celebrity and contestants. The host was a performer who I will not name. Mr. Chester told me that this was one of four auditions, full-dress presentations, that this performer had engaged in to see if he measured up to Goodson's very high standards. He did not. He was not hired. Goodson hired Mr. [*66] Elliott. And I saw a performance of To Tell The Truth with Mr. Elliott, and the difference is, as far as I am concerned, night and day.

The other performer, who was not retained, tended to simply fade into the background in what can almost be described as a disappearing act. And when the camera did focus upon him, as it does in this sort of program from time to time, the expressions were not particularly stimulating. The verbal contributions that this individual made were informed neither by particular wit nor sensitivity that I could discern.

The performance given by Mr. Elliott was entirely different. Mr. Elliott is a formidable game show host. He would, I suppose, prefer to have this praise come from lips other than mine, and yet I must be honest in my appraisal of him. He is a formidable host, in my judgment, for a number of reasons. He has a very impressive voice. It is deep and musical. It is projected from the diaphragm, from the chest. The voice of the other performer seemed to me shrill and nasal.

Mr. Elliott speaks with an intriguing and pleasing accent. He is a British subject but has lived for many

1990 U.S. Dist. LEXIS 14784, *66

years in Australia and has performed in television there with great success. [*67] To my ear, the accents of the United Kingdom are now overlayed somewhat by an Australian accent. Americans like Australians. They relate in the entertainment world to Australians. I think that Crocodile Dundee was something of a sleeper, but it just took off, and the Australian actor who played the principal role in that picture and who before then had simply appeared on tourist commercials seeking to lure people to Australia became a very big person in the American movie market, and I think he did so because American audiences are pleased by and respond to that manner of speaking. It is a working out of what has been referred to as that special relationship between the English-speaking peoples.

Mr. Elliott has an impressive size. He has a very quick mind. As I watched his exchanges both with the people whose occupations the panel was trying to guess and the panelists themselves, he demonstrated a lively wit, an ability to respond to others, a very quick ability to play off what someone else has said and turn it down a witty and entertaining bypath.

I have also watched Mr. Elliott on Good Morning New York on Channel 5. I do not think that any rules of evidence prevented me from doing [*68] that, although it was not made formally a part of the record in this case. But the fact that Mr. Elliott appears on that program was referred to often enough, and I can judicially notice, it seems to me, what is coming out over the public airwaves.

The segment I saw had Mr. Elliott going into a dormitory of sleeping or otherwise moribund undergraduates at Columbia, I think. The undergraduates were not entirely pleased to see him, at least, not all of them. He received a different sort of reception from them. But again, he displayed these very appealing attributes of humor and style and wit.

And I am talking about a particular kind of wit here, not the sort that produces a comedy of manners or satire after the playwright has thought about it for six months; I am talking about that instantaneous wit, which is almost like the reflex of a muscle before the brain has time to think it over.

It is a performance on the game show which is very strong and for all of the reasons I have suggested seems to me well inclined to appeal very strongly to the targeted audience.

Now, we know that to be unique in this sense of the law the performer in question need not be the sole star or even the principal [*69] star of the show. He or she need not be that sort of performer without whose presence the show just folds and can not be performed. We learn that from the case involving the dance impresarios and the Russian dancers. That is what the court said. You did not have to rise to that level to justify the intervention of equity.

I am not going to go over all those cases again, but I am persuaded that in this kind of show this particular performer brings to the game show format a combination of personal skills and attributes, physical and mental, which make him sufficiently unusual, sufficiently distinctive, sufficiently desirable in that role, the centrality of which Mr. Chester identifies in his testimony, to bring Mr. Elliott within that class of performers to whom the law refers in cases of this nature as unique.

He is not, of course, unique in the strict sense of that word, but the cases as I understand them hold that if there are sufficient attributes about the performer within the context of the production, whatever it may be, to visit upon the producer the loss of an important featured person lying at the center of the performance, a loss for which it would be difficult for the producer [*70] to substitute, equity will intervene, and I conclude that equity should intervene in this case if the plaintiff has made a showing of what the Wolf court referred to as irreparable harm but what other courts have referred to as damage which is irremediable.

The first thing to be said on this aspect of the case is that we deal not with a preliminary injunction but with a permanent injunction after full plenary trial. I did not find it all that easy in researching the law, even with the assistance of able briefs, to determine exactly what difference that procedural posture makes. It seemed to me that it did make a difference. It seemed to me that it should make a difference. But the indications I was getting, even from the Court of Appeals for the Second Circuit itself, seemed to me a little puzzling, perhaps even self-contradictory.

Mr. Rosen called my attention to the Second Circuit's opinion in Buckingham Corporation v. Karp. n20 Well, it is true enough the Court of Appeals said there, "First, several of the cases relied on dealt with permanent injunctions, not preliminary injunctions. Though the appropriateness of both permanent and preliminary injunctions depends on equitable considerations [*71] and the adequacy of monetary relief, irreparable injury is not an independent requirement for obtaining a permanent injunction," at which point the Court of Appeals cited Wright & Miller's text. And then the Court of Appeals quoted with approval a case in the Fifth Circuit called Lewis v. The S.S. Baune, reported at 534 F.2d 1115. n21

n20 *762 F.2d 257 (2d Cir. 1985).*

n21 *534 F.2d 1115 (5th Cir. 1976).*

Well, having said that in the Karp case in 1985, the Court of Appeals then decided *New York State National Organization for Women v. Terry* in *886 F.2d 1339,* a 1989 decision, n22 and there the Court of Appeals said, "Generally, to obtain a permanent injunction a party must show the absence of art adequate remedy at law and irreparable harm if the relief is not granted," and then went on to describe how in that case, which involved abortion clinics, the women were irreparably harmed by their inability to receive the services of the clinics.

n22 *886 F.2d 1339 (2d Cir. 1989).*

[*72]

That was a different panel of judges and sometimes it is not that easy sitting as a district judge to read different pronouncements of different panels of appellate judges ostensibly on the same subject and figure out just what it is they are trying to articulate as the rule for the second circuit.

I imagine Judge Ward was a little puzzled by all of this because when you look at Judge Ward's opinion for this court in the Terry case, the judge specifically said that in the context of permanent injunction irreparable injury did not have to be shown. He was then affirmed in the order he made by the Court of Appeals in Terry, but he might have been a little puzzled by the words which the Court of Appeals used to affirm him.

My own thinking is very much assisted by that Fifth Circuit case, the Lewis case, which the Second Circuit in Karp quoted with approval, and I am going to read from page 1123 of the report in that case, because this to me is the most lucid and helpful analysis of the difference between preliminary and permanent injunctions that I have come across in my research. In any event, the court said:

"In not all cases where the petitioner fails to show irreparable injury will [*73] he still be denied a permanent injunction. Whereas the essential finding that must be made to issue a TRO or preliminary injunction is irreparable injury, the essential prerequisite to a permanent injunction is the unavailability of an adequate remedy at law. Irreparable injury is, however, one basis, and probably the major one, for showing the inadequacy of any legal remedy," citing to Wright & Miller.

The court, resuming:

"Oftentimes the concepts of irreparable injury and no adequate remedy at law are indistinguishable. The court in Bannercraft Clothing Company, a D.C. circuit case" -- I am continuing to read from the Fifth Circuit's opinion -- "acknowledged the frequent indistinguishability but went on to say 'The irreparable injury rubric is intended to describe the quality or severity of the harm necessary to trigger equitable intervention. In contrast, the inadequate remedy test looks to the possibilities of alternative modes of relief, however serious the initial injury.'"

I think that that is the correct distinction between a preliminary injunction and a permanent one. And so I come to the question of whether on this record the plaintiff has demonstrated damage which is irremediable [*74] in the sense that the Lewis case refers to the concept.

I have referred to the text in Wright & Miller. Wright & Miller cited only one case for that proposition. It is a case in the Eastern District of New York decided by Judge Bartels. n23 Judge Bartels was dealing with a restrictive covenant placed by the Port Authority upon the use of certain runways on its airport and one airline -- I think it was United, one of the users under the lease -- made it quite clear that it did not intend to abide by that restrictive covenant. After full plenary trial, the judge issued a permanent injunction and said it is important to have restrictive covenants enforced even though the plaintiff may not be able to show damages which could be quantified. You cannot quantify them, but they are irremediable. And so the permanent injunction issued.

n23 *Port of New York Authority v. Eastern Airlines, Inc., 259 F. Supp. 745 (E.D.N.Y. 1966).*

Now, what of this case? On this aspect of the case, Mr. Strum made a very powerful argument which [*75] arose out of a case called DePol v. Sohlke. n24 It is a beautifully written opinion, as Mr. Strum accurately said. Sometimes I think that judges have forgotten how to write as well as they did in the prior century. The defendant was a dancer with whom the plaintiff thought he had a contract, but she contracted to dance for another company in the city. The court refused to issue an injunction and hinged the opinion in significant part upon the question of irreparable harm or irremediable damage. At one point the court said:

n24 Robertson's Practice Reports 280 (Special Term, December 1867).

"These papers show that the plaintiffs have at present

no establishment in the City of New York or its immediate vicinity or elsewhere, in active operation. And that there is no prospect of having one for some length of time to come. It cannot, therefore, be said that the performance of the defendant Sohlke at another theater draws or tends to draw custom from them."

And Mr. Strum argues that because Zink does not presently have a [*76] game show on the air, the rationale of the DePol case argues against the intervention of equity in this case. I put to him the question of whether it made any difference that Zink did not have a game show on the air because Mr. Elliott has breached his contract. Mr. Strum said that makes no difference, and I am inclined to think he is right. Matters of breaches of contract may be dealt with in terms of money damages, and I think that that fact alone is not decisive.

But what I also see from the DePol case is the stress that the court placed upon the fact that the plaintiffs were not in any competitive posture with the rival company and there was no indication when, if ever, they would be, and in an analysis which comes shortly before what I have just read the judge made it clear that a dancer going from one company to another and having an adverse effect upon the former company's competitive situation would give rise to the intervention of equity because in those circumstances -- and I am reading from the opinion -- "It is for the reason that it is utterly impossible to measure the damages that equity interferes to prevent the violation of such a restrictive clause as the one in question, [*77] when it can perceive that such violation will damnify the party seeking its interference." Wonderful old-fashioned word, "damnify." It means damage, of course.

And the question I must now come to is whether there is in this record any indication of damage which is not remediable suffered by Zink as the result of Mr. Elliott's breach. I begin by saying that I do not think that the fact that they presently do not have a game show to compete with To Tell The Truth is decisive. Mr. Strum makes that argument with great force, but I think that has within it too narrow a concept of competition in this area.

If Zink and the Goodson company are not now competing directly with each other with game shows both on the air at the same time, they are nonetheless in competition with each other for that finite amount of air time which exists in the television medium. There are only so many daytime hours. They can be filled only by so many programs. The Goodson company is in the business of selling shows that will fill those hours. Zink is in the business of selling shows that will fill those hours. They are competitors in a very real and direct sense in that particular industry. So within the context [*78] of

that competition, has damage been demonstrated on this record sufficient to justify the intervention of equity?

Ms. Morgan has testified, and I credit that testimony, that when she made a trip to California in an effort to sell a different show, at the outset of virtually every interview what the people she was trying to sell wanted to talk about was the Gordon Elliott situation, what happened with Gordon Elliott and Get The Picture. That is what her prospective purchasers wanted to talk about right up front.

One of the reasons they might have wanted to talk about that right up front was because, I find from the evidence, Mr. Bell undertook to give quotations to a leading trade daily which said that Zink had simply "screwed up on Gordon Elliott." Well, I found that that is not the case, but in the aspect of the case we are talking about now this was the climate out there in the West Coast with which Ms. Morgan found herself confronted. I cannot find that she did not sell a program because of this. Indeed, as Mr. Strum points out, Ms. Morgan herself acknowledges that one prospective purchaser declined to order the show because he said bluntly "The show's terrible." That, by the [*79] way, furnishes an example of where Ms. Morgan could have colored her testimony if she was prepared to do so because that individual wasn't there as a witness at the trial. But it was the honest answer to give and she gave it.

Because I accept her testimony as credible I also accept that there were great distractions and unhappy, from Zink's point of view, excursions into trying to explain to prospective purchasers, to whom Zink was professing and proclaiming its own competence, why what had been reported in the trade prep as an example of the most appalling professional incompetence had not in fact taken place. The people who chose not to buy Zink's new show were uniformly polite in their rejection of the show, with one exception, who apparently was disagreeable and sarcastic.

But it seems to me entirely plausible that Ms. Morgan is right to be worried, as she said she was, about the impression out there on the coast in the industry about Zink's competence, and that concern I do not think is undermined or lessened by the polite phrases which the people with whom she spoke chose not to select the show. Politeness is, I suppose, an institutional practice which costs the rejecter of the [*80] show nothing to give and may make the company rejected feel a little better.

It is the concept, it seems to me, of Zink's credibility in the industry. There is no direct evidence, and I would not expect to find it, that anyone said to either Mrs. Selby or Ms. Morgan, "We would never consider deal-

ing with Zink again because of the way you screwed up with Gordon Elliott." I would not expect many people on the coast to say that to Ms. Morgan even if they felt it. But there is the testimony describing that trip which justifies in my view a reasonably held concern on the part of these plaintiffs that through the happenstance of the trade press or in one case, at least, the affirmative action of Mr. Bell the company has suffered a blow. I find that that blow has been suffered and I find that it is not quantifiable or remediable in damages.

The cases that come the closest in my view to whether or not a permanent injunction should issue in this case are Judge Owen's opinion in Shavers and a state court case to which I will also return in a moment. In the judicial expressions which I am about to read, I detect the unmistakable voice of the chancellor in equity, whose traditional function it [*81] is to bring to a less than perfect world, inhabited by men and women and not by angels, concepts of fair dealing. If the law is to play its proper place in the ordering of human affairs that voice must occasionally be sounded. In the Shavers case Judge Owen, issuing an injunction, said:

"The Garden is, to a measurable extent, irreparably injured as a viable promoter of major boxing matches were Shavers with impunity able to simply disavow a prior agreement with the Garden to take advantage of a later-made more attractive offer. The Garden's credibility could be destroyed in the eyes of boxing managers as well as various media representatives, such as television producers or others, who, in reliance, enter into further contracts that in fact may well represent the major source of income from the event being promoted, possibly being the difference between profit and loss for the promoter."

Note that Judge Owen says "The Garden's credibility could be destroyed." He did not find it necessary to say that it had been proved on the record before him that it had been destroyed. That was enough for the judge sitting in equity. And I think he was right.

The second case is the Comstock case, [*82] in which the judge in issuing the writ of injunction said this:

"It is obvious that a court of equity is governed by principles of law impartially applied to the facts in the particular case, and that the facts when accurately and truthfully ascertained are alike masters of bench and bar. If the time shall ever come when a court of equity must stand helplessly by while unique and unusual theatrical performers may be induced to breach contracts with impunity, except for such damages as a jury may see fit to award at some distant date, theatrical corporations will find their business hampered by intolerable conditions."

I conclude in this case that by his breach of this contract Mr. Elliott placed Zink in that sort of intolerable condition which led to damages not capable of precise ascertainment but sufficient under these sort of policy considerations to entitle Zink to an order of injunction in equity.

The remaining question is what form that order should take. At the end of his summation Mr. Rosen suggested a form. Mr. Strum has not had time to respond to that in any way. The form that an order in equity should take is subject to many concerns, many of which arise in this case.

Equity [*83] must not issue an injunction overbroad or unfair to the defendant, even a defendant found in breach of contract Mr. Strum may well wish to give consideration to applying, under Rule 8 of the Federal Rules of Appellate Practice, that the District Court stay the entry of any order pending appeal. I do not indicate one way or another how I would respond to that application if made, but there are circumstances in the case which might at least justify the application.

What I have said constitutes the court's findings of fact and conclusions of law. Counsel are directed to settle an order of injunction consistent with this opinion on seven days' notice. And in responding to that order the defendant may make such applications as he may be advised in the circumstances.

I have done the best I can to deal with all of the issues. I am grateful to counsel, to both of them, for their effective assistance in this case, and the text of this opinion will be available as soon as I have it and have been able to edit it. And the court is adjourned pending submission of an order.

It is SO ORDERED.