UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA -- ORLANDO DIVISION

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

TRANS CONTINENTAL RECORDS, INC., BMG
ENTERTAINMENT, BMG ARIOLA MUENCHEN
GmbH, TRANS CONTINENTAL ENTERTAINMENT,
INC., and LOUIS J. PEARLMAN,

                             Plaintiffs,

                          v.

ZOMBA RECORDING CORPORATION, CLIVE
CALDER, JAMES LANCE BASS, JOSHUA SCOTT
CHASEZ, JOSEPH ANTHONY FATONE, JR.,
CHRISTOPHER ALAN KIRKPATRICK, and JUSTIN
RANDALL TIMBERLAKE,

                         Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

Civil Action No.
99-1282-Civ-Orl-22C

## ZOMBA DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

        Plaintiffs are not entitled to a preliminary injunction seeking to restrain the five

young stars known as 'N SYNC from pursuing their career.  Plaintiffs' motion is part of their

self-proclaimed "scorched earth policy" to see that 'N SYNC "ceases to exist."  While asking this

Court for equity, plaintiffs are seeking to enforce unreasonable contracts imposed on young

artists, negate their exercise of an explicit termination right, strip them of the name they created

and personify, eliminate any competitive option for the artists to work, and restrain them from

pursuing their career at its peak.  Such a result would be egregiously unfair, send a terrible

message to the music industry, and seriously damage the viability of 'N SYNC's career

        No basis for such relief exists.  We join in 'N SYNC's submission exposing the

unconscionable contracts that plaintiffs extracted from teenagers in breach of fiduciary duty and

all standards of decency in the industry. Even absent this showing of fraud, self-dealing and

overreaching, plaintiffs' near-hysterical portrayal of 'N SYNC's termination of the contracts as

52

a "sham" cannot mask the simple truth that plaintiffs failed to comply with their own contracts or with everyday practices in the music industry. Their claim that Zomba tortiously interfered with these contracts -- despite admissions that Zomba had nothing to do with 'N SYNC's termination -- does not even state a claim for relief.

That is not all. Plaintiffs' effort to cloak their contract dispute in the Lanham Act offends the very purpose of that statute: to protect the public from false and deceptive designations of origin. The public knows 'N SYNC only as its five young stars, who are largely responsible for and solely associated with the name and image and quality and goodwill that 'N SYNC represents to its fans. Plaintiffs' claim to ownership of that name -- in misplaced reliance on inapposite contracts and disregard of the public's identification with 'N SYNC -- is without basis in fact or law.

So, too, are plaintiffs' claims of irreparable injury. This case is about nothing but profits. That plaintiffs are embarrassed at "losing" 'N SYNC cannot justify the serious and demonstrable injury that an injunction would cause 'N SYNC by depriving the group of the opportunity to pursue the potentially ephemeral fame of pop music artists. No court has ever issued an injunction restraining young artists in such circumstances. This is no case to begin.

### Statement of the Case

The facts are set forth in the accompanying declarations.[1] Here, we summarize

---

[1] These are declarations by Diane Bass, mother of 'N SYNC member Lance Bass; Clive Calder, chairman and CEO of the Zomba Group; 'N SYNC member J.C. Chasez; Howard Comart, 'N SYNC's accountant; Lynn Harless, mother of 'N SYNC member Justin Timberlake; Gerri Karr, manager of the official 'N SYNC International Fan Club; Adam Ritholz, 'N SYNC's entertainment counsel; Johnny Wright, 'N SYNC's longtime manager, and three experts: entertainment lawyer Jill Berliner; former BMG Music president and longtime music industry executive Elliot Goldman; and Cynthia Barr, an experienced buyer for music retail stores. In addition, the declaration of Ari Berman attaches materials concerning the public's association of 'N SYNC with its five stars.

**The Parties**

Defendants Lance Bass, J.C. Chasez, Joey Fatone, Chris Kirkpatrick and Justin Timberlake are the young musical stars known around the world as 'N SYNC.

On September 4, 1999, through a company they control, 'N SYNC entered into an exclusive recording contract with defendant Zomba Recording Corporation, an independent record company featuring some of the country's leading pop music artists. In late July 1999, defendant Clive Calder, chairman and CEO of the Zomba Group, had learned that 'N SYNC was seeking a new recording contract, and joined other record companies that were already bidding for 'N SYNC's services. Two months earlier, in May 1999, and without Zomba's knowledge or participation, 'N SYNC had given notice to plaintiff Trans Continental Records, Inc. ("Transcon") of 'N SYNC's termination of a recording contract with Transcon ("the Transcon Recording Agreement").

Transcon is controlled by plaintiff Louis Pearlman. Pearlman is a self-styled "entrepreneur in the music business" -- and a notorious throwback to the industry's dark ages. Pearlman is best known for claiming to have discovered the Backstreet Boys, young singers who later sued Pearlman over the contracts he had gotten them to sign. In those contracts, like the ones here, Pearlman purported to obtain irrevocable proxies to control the group's business; to tie the group to self-dealing contracts entitling Pearlman to huge royalties and commissions; and to seize control of the group's name. Such practices, which plagued the music business four decades ago, have long since been discredited in the industry.

Pearlman allegedly obtained 'N SYNC's signatures on the Transcon Recording Agreement in April 1996. At the time, despite its name, Transcon was not a record company: it did not produce, market, promote, manufacture or distribute records. Rather, for months prior

to April 1996, Pearlman had tried but failed to interest a U.S. record company in 'N SYNC. In April 1996, a well-known artist manager named Johnny Wright contacted Pearlman about 'N SYNC. After agreeing to act as 'N SYNC's manager (he still is), Wright contacted plaintiff BMG Ariola Muenchen GmbH ("BMG Ariola") on 'N SYNC's behalf.

BMG Ariola is a German record company that produces and distributes records in Germany. In August 1996, BMG Ariola signed a license agreement with Transcon for 'N SYNC's recordings. Pearlman then separately procured 'N SYNC's signature on a two-sentence document in which they "acknowledged" that Transcon had entered into a license agreement with BMG Ariola but which also expressly provided that "nothing herein shall change the terms of" the Transcon Recording Agreement. Neither Pearlman nor BMG Ariola obtained from 'N SYNC what is universally known and required in the music industry: an explicit written agreement by 'N SYNC, called an inducement letter, stating that its members had read, and personally and directly agreed to be bound by, the BMG Ariola License. In fact, 'N SYNC never saw this BMG Ariola License.

BMG Ariola is an affiliate of plaintiff BMG Entertainment ("BMG Music"), one of the world's five major record companies and itself a division of Bertelsmann, A.G., the world's third largest media conglomerate. BMG Music, which releases records in the U.S under its wholly-owned Arista and RCA labels, enjoys the second highest market share in the industry and boasts a repertory featuring hundreds of successful artists. BMG Music, and RCA in particular, regularly use inducement letters to bind artists to the terms of recording contracts.

In early 1997, BMG Ariola released an 'N SYNC record in Germany under the BMG Ariola License. Apparently around the same time, 'N SYNC was allegedly "pitched" to BMG Music's RCA label for consideration as a U.S. release under an alleged "intercompany

licensing agreement" with BMG Ariola. In 1998, having apparently exercised the option to do so under this intercompany arrangement, BMG Music's RCA label released two 'N SYNC albums in the U.S.

**The Formation of 'N SYNC**

'N SYNC was born of the ambition of 'N SYNC member Chris Kirkpatrick to form a singing group. In the summer of 1995, Kirkpatrick contacted Justin Timberlake, a 14-year-old singer who had been featured on Disney's *The Mickey Mouse Club*. Timberlake, in turn, recommended a fellow *Mickey Mouse Club* performer named J.C. Chasez. Chasez, as well as Kirkpatrick, then recruited a friend, Joey Fatone. In September 1995, Timberlake's mother, Lynn Harless, located a bass singer named Lance Bass to join the group. Harless conceived the name 'N SYNC and recommended the name to the five singers, who adopted it as their own. The letters of the name 'N SYNC correspond to the last letters of names of its members.

'N SYNC's first public performance occurred in October 1995 in Orlando In the preceding weeks, Harless, along with a vocal coach and choreographer she had enlisted, worked day and night with the five singers. Harless arranged for the performance space, used her mailing list to invite guests, designed the promotional materials, and hired the persons who recorded the performance. The promotional materials advertised that "'N SYNC *is* Lance Bass, J.C. Chasez, Joey Fatone, Chris Kirkpatrick and Justin Timberlake." No mention was made of Pearlman or Transcon.

There is a reason: Owing to his ties to the Backstreet Boys, Pearlman wanted no public association with 'N SYNC. Instead, in the background, and from the very beginning of Kirkpatrick's efforts, Pearlman agreed to advance certain expenses that 'N SYNC incurred, including leasing a home for Harless and her son and paying the costs for the vocal coach and

choreographer whom Harless enlisted to work with the group.  Every penny he advanced he charged to 'N SYNC for recoupment.  Pearlman played no role in rehearsing the group, and neither Harless nor any member of 'N SYNC was paid a salary.

Following 'N SYNC's initial public performance, Harless designed a "demo" to send to record companies.  The materials for this "demo" again identified 'N SYNC solely with the names and photographs of the five individuals.  No reference was made to Pearlman or Transcon.  In the next months, Harless continued to devote herself to the five singers as they shaped their sound and dance.  By the time Wright agreed to act as their manager and then contacted BMG Ariola on their behalf, the five members had rehearsed and performed together as 'N SYNC for seven months.

'N SYNC went to Europe to record and perform, accompanied by Harless and Wright but not Pearlman.   'N SYNC thereafter achieved success as performing and recording artists first in Europe and then in the U.S.

**The Public Association with 'N SYNC**

The name 'N SYNC is strongly identified in the public's mind with its five stars All promotional materials and merchandise about 'N SYNC prominently display their names and likenesses.  In videos, records, merchandise, posters, fan circulars, books, countless magazine and news stories, and thousands of Web pages, 'N SYNC is personified only by its five members -- their names, their faces, their voices, their biographies, their families, their likes and dislikes Each of the five has his own fan clubs -- over 1300 on the Web devoted to individual members, and another 2200 for the group as a whole.  Their likeness has even appeared on postage stamps

Central to 'N SYNC's image is that 'N SYNC is not a so-called "concept group" -- that is, a "revolving door" musical group of changing and unconnected members marketed

around a particular sound or idea.  'N SYNC's own materials so state: both its "official" book and its "official" fan biography note that 'N SYNC is not "a pre-packaged" or "concept" group, but a group formed by five friends whose personal names make up the name.  These statements only reinforce that the public, and in particular the young teen fans to whom 'N SYNC primarily appeals, identify 'N SYNC with Chris, J.C., Joey, Justin and Lance -- and only them

**Pearlman's Misappropriation of the Name 'N SYNC**

Although the name 'N SYNC was conceived by and expressly refers to its five stars, and although the contracts Pearlman got them to sign charged the cost of protecting the name to them, Pearlman attempted to seize control of the 'N SYNC name for himself.   Buried in section 21.04(b) of the Transcon Recording Agreement, Pearlman obtained 'N SYNC's purported "acknowledgment" that Transcon is the "sole owner" of the name  'N SYNC   In fact, however, at the time, a New Jersey company called -N-Sync, Inc. held a registered trademark in that name.  In June 1996, while acting as a fiduciary for 'N SYNC, Pearlman entered into a license with this N.J. company in his personal name.   This "N.J. License" purports to give Pearlman a limited-use license, without any general right of assignment without the N.J. company's consent, to use the name solely "in connection with the musical group currently known as 'N SYNC."  -N-Sync, Inc. has since terminated this N.J. License, which is the subject of litigation in a N.J. federal court.   In that action, -N-Sync, Inc. alleges that Pearlman represented himself as acting for 'N SYNC in obtaining the license.

**'N SYNC's Termination of the Transcon Recording Agreement**

Pearlman had an obligation under his contracts with 'N SYNC to obtain a contract with a U.S. record company.  Section 19.12 of the Transcon Recording Agreement entitled 'N SYNC to terminate that contract if Transcon failed to obtain such an agreement within eighteen

months. Although the BMG Ariola License purported to obtain "worldwide distribution" rights for 'N SYNC's records, nothing obligates BMG Ariola, or any affiliate of BMG Ariola, to release 'N SYNC recordings in the U.S.

The BMG Ariola License is not a U.S. record contract, and differs from contracts with U.S. record companies in material respects prejudicial to 'N SYNC. Among other things, under the BMG Ariola License, 'N SYNC has no commitment that any of its albums will ever be released in the U.S., the world's largest market, and instead must rely solely on whether one of BMG Ariola's U.S.-based affiliates (such as RCA) chooses to release one. Even in the absence of a U.S. release, BMG Ariola may continue to bind 'N SYNC, to the exclusion of any other U.S. record company, as long as BMG Ariola releases an album in Germany. In addition, the economics of the BMG Ariola License materially differ from a standard contract with a U S record company.

On May 26, 1999, citing Transcon's failure to obtain a recording contract with a U.S. record company, 'N SYNC gave notice of termination under the Transcon Recording Agreement. Zomba had no knowledge of or participation in 'N SYNC's decision to do so. For over three months thereafter, Transcon did nothing to seek a judicial declaration challenging the termination. Meanwhile, 'N SYNC began negotiating with U.S. record companies for a new recording contract. Upon learning as much, Zomba joined other record companies in bidding for 'N SYNC's services, and signed 'N SYNC in September 1999. This action followed.

**The Irreparable Injury to 'N SYNC and Zomba**

'N SYNC's appeal today is predominately concentrated in the notoriously fickle pre-teen and teen audience for pop music. No segment of the music business is subject to more rapidly changing trends. Sensations one minute disappear the next. New artists emerge quickly

There is great competition among artists for the ever-changing loyalty of these fans. 'N SYNC's last album of pop music was released in March 1998. To maintain the momentum of 'N SYNC's career, an album ideally should have been released this year, but it is essential that 'N SYNC release its next album no later than the first quarter of next year.

Using many of the same producer/songwriters and the same manager as 'N SYNC has used in the past, Zomba has devoted substantial funds, time and resources in planning for this release. Zomba has a contract with BMG Music whereby BMG Music acts as manufacturer and distributor of Zomba releases in the U.S.; indeed, Zomba is responsible for close to thirty percent of BMG Music's market share, and BMG Music regularly claims credit for sales of Zomba releases. Thus, today, BMG Music itself would sell and ship the new 'N SYNC album for Zomba. Any delay in releasing this album would cost 'N SYNC a critical opportunity to solidify and enhance the group's following. That opportunity cannot be recaptured. There is no reason in this case to delay it, and substantial reasons not to do so.

## Argument

To obtain a preliminary injunction, plaintiffs must demonstrate (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm absent the requested injunctive relief; (3) that the threatened injury to plaintiffs outweighs any damage the requested injunction might cause the defendant and (4) that the requested injunction is not adverse to the public interest. *Tefel v. Reno*, 180 F.3d 1286, 1295 (11th Cir. 1999); *Glen Raven Mills, Inc., v. Ramada Int'l, Inc.*, 852 F. Supp. 1544, 1546 (M.D. Fla. 1994). A preliminary injunction is "an extraordinary and drastic remedy" that may not issue unless the movant clearly carries the burden of persuasion on each of these elements. *Anheuser-Busch, Inc. v. A-B*

*Distribs. Inc.*, 910 F. Supp. 587, 589 (M.D. Fla. 1995). Here, plaintiffs do not meet their burden on any of them.

## PLAINTIFFS HAVE NO SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS OF ANY CLAIM

**A.     Plaintiffs Cannot Prove Claims for Tortious Interference with Contract**

Plaintiffs cannot prevail on their claim that Zomba tortiously interfered with any contract. To state a claim for tortious interference, plaintiffs must allege (1) that plaintiffs had valid contracts with 'N SYNC (2) which were known to Zomba, (3) who then wrongfully procured the breach of those valid contracts (4) resulting in damages to plaintiff. *Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 94 (1993); *Innovative Networks, Inc. v. Young*, 978 F. Supp. 167, 180 (S.D.N.Y. 1997).[2]

**1.     Plaintiffs Cannot Prove Interference with Any Contract with Pearlman**

Plaintiffs allege that, by signing 'N SYNC, Zomba interfered with the Transcon Recording Agreement. We join in (and incorporate) 'N SYNC's showing that this Agreement is the properly terminated and void product of fraudulent overreaching. If plaintiffs had no valid contract, then Zomba cannot be liable for interference. Yet even if the Transcon Recording Agreement were valid, and even if 'N SYNC had no right to terminate, plaintiffs cannot show that Zomba induced the breach of that Agreement.

To show that Zomba wrongfully induced the breach of a contract, plaintiffs must prove that Zomba was the cause of the alleged breach and that, but for Zomba's action, the contract would have been performed. *Mina Inv. Holdings Ltd. v. Lefkowitz*, 184 F.R.D. 245, 255

---

[2]     The actions underlying plaintiffs' tort claim occurred in New York, so the law of that State should apply. *See Bishop v. Florida Specialty Paint Co.*, 389 So. 2d 999 (Fla. 1980). In any case, there is no substantive difference between the law of New York and Florida on the elements of this tort. *See Fla. Tel. Corp. v. Essig*, 468 So. 2d 543 (Fla. Dist. Ct. App. 1985).

(S.D.N.Y. 1999); *"21" Brands, Inc. v. R & J Emmet PLC*, 1990 WL 180136 (S.D.N.Y. 1990)
That Zomba did not even communicate with 'N SYNC until two months after 'N SYNC
terminated the contract -- and that the complaint concedes that 'N SYNC refused to perform
before Zomba even knew of the termination -- negate plaintiffs' claim that Zomba caused 'N
SYNC's alleged breach.

      *Saja Music Co. v. Sony Music Entertainment, Inc.*, 622 N.Y.S.2d 241 (1st Dep't
1995), is on point. There, as here, an artist terminated a recording contract. There, as here, the
artist began to negotiate with other record labels to sign a new recording contract. There, as
here, the record label that ultimately signed the artist to a contract (there, Sony Music) did not
begin those negotiations until two months after the artist had terminated. There, as here, neither
the artist nor the prior label sought any declaratory relief in the interim. Upon evidence that the
artist had terminated the contract prior to Sony Music's involvement, the trial court granted, and
the appeals court affirmed, summary judgment in favor of Sony Music. Hence, here, too,
plaintiffs cannot prevail on a tortious interference claim. *Accord Michele Pommier Models, Inc.
v. Men Women NY Model Mgmt., Inc.*, 14 F. Supp. 2d 331 (S.D.N.Y. 1998), *Central Sports Army
Club v. Arena Assocs., Inc.*, 952 F. Supp 181 (S.D.N.Y. 1997).

    2.    **Plaintiffs Cannot Prove Interference with Any Contract with BMG**

      Plaintiffs' claim that Zomba interfered with contracts involving BMG Ariola need
not detain us because BMG Ariola had no contract with 'N SYNC. The so-called "Letter of
Acknowledgment" on which plaintiffs rely -- which contains no agreement with 'N SYNC and
only their "acknowledgment" that Transcon had a license with BMG Ariola (which 'N SYNC
never saw) -- is no substitute for a contract. Not only does this document fail to contain any of
the promissory language of the industry's standard inducement letter, but the document itself is

expressly conditioned upon the terms of the Transcon Recording Agreement.  BMG Ariola's throwaway claim to being a "third-party beneficiary" of the Transcon Recording Agreement is baseless: there is no evidence that the parties secured the Transcon Recording Agreement for BMG Ariola's benefit, which is required for third-party beneficiary status.  *Tartell v. Chera*, 668 So. 2d 1105, 1106 (Fla. Dist. Ct. App. 1996); *Aetna Cas. & Sur. Co. v. Jelac Corp.*, 505 So. 2d 37 (Fla. Dist. Ct. App. 1987).

**B.      Plaintiffs Cannot Prove Claims for Violations of the Lanham Act**

Nor are plaintiffs likely to succeed on the merits of their scattershot claims under sections 32 and 43(a) of the Lanham Act.  'N SYNC, not plaintiffs, own their own name.  Use of that name in connection with anyone other than its five stars would cause exactly the type of public deception the Lanham Act was enacted to prevent.

**1.      Plaintiffs Lack Standing To Sue for Trademark Infringement Under § 32**

Plaintiffs' first claim, under section 32 of the Lanham Act, 15 U.S.C § 1114(1), is subject to summary dismissal because no plaintiff has standing to bring it.  Section 32 is explicitly an action by a "registrant"; a plaintiff must either be a registrant or an assignee of a registered mark.  An alleged license to use a registered mark is not enough unless the license amounts to an assignment.   *See* 15 U.S.C. § 1127 ("registrant" includes assignees but not licensees); *Gruen Mktg. Corp. v. Benrus Watch Co., Inc.*, 955 F. Supp 979, 982 (N.D. Ill. 1997).  Here, no plaintiff claims to be a registrant or assignee of a registered mark.  The sole basis for plaintiffs' section 32 claim is the (now terminated) N.J. License, which is expressly *not* an assignment of the name and expressly limited to use of the name "in connection with the musical group currently known as 'N Sync."   Such a limited-use license is not tantamount to an

assignment.  Consequently, no plaintiff has standing to assert this claim.  5 J. McCarthy, *Trademarks & Unfair Competition* §§ 32.17, 32.18, at 32-25 to -26 (4th ed. 1996).

### 2.   Plaintiffs Have No Claim for Unfair Competition Under § 43(a)

Lacking a registered mark on which to sue, plaintiffs retreat to section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), a statute designed to protect the public from deceptive designations of origin, *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 774 (1992).  To succeed on a section 43(a) claim, plaintiffs must show, among other things, that they *own* the designation at issue.  *See, e.g., Lone Star Steakhouse & Saloon, Inc. v. Longhorn Steaks, Inc.*, 106 F.3d 355, 360-63 (11th Cir. 1997).  Plaintiffs cannot show such ownership here.

Plaintiffs' main argument again relies on the N.J. License that Pearlman wrongfully procured for himself.  But even if that N.J. License were not already terminated, the N.J. License gives Pearlman no rights without 'N SYNC. By its express terms, the N.J. License gives Pearlman the right to use the name 'N SYNC *only* in connection with the musical group "known as 'N SYNC" in June 1996 -- *i.e.*, Chris, J.C., Joey, Justin and Lance -- and then *only* as long as Pearlman continues to use that name in connection with those singers.  'N SYNC has made clear that they no longer wish to associate with Pearlman, and he cannot require them to do so.[3/]  As a result, under the express terms of the N.J. License, Pearlman no longer has any right to use the name 'N SYNC.

Even if the N.J. License continued in force, a trademark license "by itself does not enlarge a [licensee's] substantive rights in a mark," but merely confers "procedural advantages which affect the burden of proof."  *American Heritage Life Ins. Co. v. Heritage Life*

---

[3/]   It is basic that the law will not compel specific performance of personal services contracts.  *See, e.g., Burger King Corp. v. Agad*, 911 F. Supp. 1499, 1506 (S.D. Fla. 1995).

*Ins. Co.*, 494 F.2d 3, 10 (5th Cir. 1974). Thus, at most, the N.J. License creates a presumption of ownership subject to rebuttal with evidence that rights in the name belong elsewhere *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 14 (2d Cir. 1976) It goes without saying that "[o]wnership of a trademark is established by *use* of the mark, not by federal registration thereof." *Great Basin Brewing Co. v. Healdsburg Brewing Co.*, 44 U.S.P.Q.2d 1751, 1753 (D. Nev. 1997). And, here, as we now show, using every indicia of ownership known to law, the evidence is overwhelming that 'N SYNC owns its name.

It is basic that the circumstances surrounding the development and use of a mark determine its ownership. 2 J. McCarthy, *Trademarks & Unfair Competition* § 16:1, at 16-3. When more than one person is involved in that development, ownership belongs to the person who controls or determines the nature and quality of the goods that have been marketed under the mark in question. *In re Polar Music Int'l AB*, 714 F.2d 1567, 1571 (Fed. Cir. 1983) This turns on the relative contribution of each party to the goodwill associated with the mark *See Durango Herald, Inc. v. Riddle*, 719 F. Supp. 941 (D. Colo. 1988). In the case of a name referring to a group of performers, this goodwill refers to "that quality or characteristic for which the group is known by the public," because public associations to the mark are "crucial in establishing just what the mark has come to identify." *Bell v. Streetwise Records, Ltd.*, 640 F Supp 575, 580-81 (D. Mass. 1986).

Plaintiffs cannot prove that they own the 'N SYNC name based on these factors The indelible public association of 'N SYNC with Chris, J C., Joey, Justin and Lance establishes those five performers as the primary source and rightful owners of the goodwill in the 'N SYNC name. To the public, from the start, the face and sound and identity of 'N SYNC consisted of the faces, sounds and identities of those five young men, and only those five young men. Such

is apparent from all the promotional and media attention personifying 'N SYNC as five individual performers with individual names and faces; from the individual following that each enjoys; from the innumerable books and magazines and Web stories featuring their faces and biographies; and from the personal identification of the consuming public with their lives and stories and habits.  There is no 'N SYNC without Chris, J.C., Joey, Justin and Lance.

This has always been so, and plaintiffs cannot prove otherwise.  That the five members of 'N SYNC were responsible for finding each other; that they conceived and selected the name 'N SYNC; that they worked for months without pay practicing their music and dance; that they selected their own vocal coach and choreographer and arranger; that they organized their own first public performance; that they first appeared in public as 'N SYNC identified solely as five individuals; that Pearlman distanced himself from public association with 'N SYNC; and that the members of 'N SYNC have remained constant since that first public performance to date, all attest to 'N SYNC's initial use of the name in commerce and their superior role in controlling the nature and quality of their own performances.  That Pearlman paid the bills -- more precisely, that he advanced certain expenses that he then charged to 'N SYNC -- does not mean that plaintiffs are entitled to claim ownership in the name 'N SYNC

These facts defeat the main thesis of plaintiffs' section 43(a) claim.   It is critical to plaintiffs' claim to depict 'N SYNC as a "concept" group of faceless and nameless singers whose image consists merely of a Pearlman-controlled idea with changeable parts.  This explains plaintiffs' heavy dependence on cases -- *Rick v. Buchansky*, 609 F. Supp. 1522 (S.D.N.Y 1985), and *Three Degrees Enterprise, Inc. v. Three Degrees Worldwide, Inc.*, 1989 WL 119697, at *5 (E.D. Pa. Oct. 12, 1989), *clarified*, 1990 WL 121506, *vacated in unrelated part*, 944 F.2d 898 (3d Cir. 1991) -- in which courts held that managers were entitled to ownership of marks used

to describe musical groups whose membership constantly changed over the years.  But these cases have no application when, as here, the musical group 'N SYNC is, and has always been, inextricably intertwined with five young performers.

Bell v. Streetwise Records, Ltd., 640 F. Supp. 575, 580 (D. Mass. 1986), is on point.  In Bell, five young musicians who comprised a band called "New Edition" sued to establish their exclusive right to perform and record under that name.  Defendant record company claimed, much as plaintiffs claim here, that the band members were employed to serve as a public front for a marketing concept developed by the record company, and that the New Edition mark identified this concept.  In granting summary judgment that the members owned the name, the court held, in words equally applicable here:

> They were individual persons that the public came to know as such.  While defendants would have us believe this was only the result of their successful promoting, I find that it was personality, not marketing, that led to the public's intimacy with plaintiffs.  The "magic" that sold New Edition, and which 'New Edition" has come to signify, is these five young men.

This same reasoning dooms plaintiffs' shameful reliance on section 21.04(b) of the Transcon Recording Agreement for their claim of ownership.  To begin with, the termination of that Agreement, and the evidence that the Agreement is the unconscionable product of fraud and breach of fiduciary duty, are alone ample to defeat this argument.  In any case, the Agreement itself does not *create* ownership in the name or otherwise purport to confer rights in that name; it only purports to "acknowledge" a fact that was untrue at the time, because at the time Transcon had *no* ownership rights in the name 'N SYNC.  Indeed, if (as plaintiffs argue) the Agreement were construed to confer any such rights, then section 21.04 would constitute an impermissible assignment of a trademark "in gross" -- that is, without the accompanying goodwill.  *See, e.g., Haymaker Sports, Inc. v. Turian*, 581 F.2d 257 (C.C P.A. 1978).

Plaintiffs' argument offends the purpose of the Lanham Act, which is intended to protect the public from deception. *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189, 198 (1985). Assignments in gross are void because "[u]se of the mark by the assignee in connection with a different goodwill and different product would result in a fraud on the purchasing public who reasonably assume that the mark signifies the same thing." *Marshak v. Green*, 746 F.2d 927, 929 (2d Cir. 1984) (involving a music band). For millions of fans, the goodwill associated with 'N SYNC is reposed in its five stars. Any effort to associate that name with any others would amount to a fraud on the public wholly at odds with the Lanham Act. *Cf. Fuqua v. Watson*, 107 U.S.P.Q. 251, 252 (N.Y. Sup. Ct. 1955) (use of the mark by anyone other than the band's original members would work a deception on the public).

### PLAINTIFFS HAVE NO IRREPARABLE INJURY

Plaintiffs' assertions of irreparable injury -- that they will lose prestige in the music industry and control "over the image and quality" of the 'N SYNC name -- are in plaintiffs' eyes only. This case is about money. A preliminary injunction cannot issue "upon a plaintiff's imaginative, worst case scenario of the consequences flowing from the defendant's alleged wrong." *USA Network v. Jones Intercable, Inc.*, 704 F. Supp. 488, 491 (S.D.N.Y 1989)

Plaintiffs' arguments that their "loss" of 'N SYNC will have "potentially devastating" consequences for their ability to compete in the market is preposterous. This is especially true of BMG Music, one of the world's largest record companies, with a huge roster of artists, an extensive catalog and extraordinary market power. Some of the biggest recording stars of the past thirty years -- from Paul Simon to the Rolling Stones to Aerosmith -- have been "lost" to labels without any discernible effect on those labels' ability to compete for other artists or to have access to outlets. Pearlman proves it: he boasts of Transcon's continued success

despite its widely publicized "loss" of his first and biggest group, the Backstreet Boys.  Indeed, Transcon is on record that, if 'N SYNC "ceases to exist," it will simply replace 'N SYNC with another group called Take Five.

Nor can plaintiffs show irreparable injury from alleged "loss of control" over 'N SYNC.  It is a complete answer to plaintiffs' speculative claims of injury that 'N SYNC continues to be comprised of the same stars, using many of the same record producers and overseen by the same manager as 'N SYNC has in the past.  The only difference is that 'N SYNC's record label is now Zomba, one of the leading pop music record labels in the world, whose records are manufactured and distributed in the U.S by BMG Music, the same company that manufactured and distributed 'N SYNC's prior albums.  Plaintiffs nowhere argue, nor could they, that Zomba is any less their equal as a record label for pop music artists.

This demonstrates that this case is only about profits.  Thus, Pearlman speaks of the money he advanced for the persons who in turn helped to shape 'N SYNC, but he never identifies a single creative contribution he made to the "quality and image" of 'N SYNC beyond money.  Likewise, while noting 'N SYNC's album sales, BMG Music never claims to have done anything more for 'N SYNC than to serve as 'N SYNC's record label, and to do the various things that record labels do everyday for their artists.  The release of a new 'N SYNC album could not possibly injure them in any way not measurable by money damages.  Indeed, by their motion, they seek to eliminate the most obvious way for such damages to be computed.

## PLAINTIFFS OTHERWISE DO NOT SATISFY THEIR BURDEN

Plaintiffs' argument that the injury they face outweighs any injury to 'N SYNC ignores the extremely ephemeral nature of fame in the pop music industry -- and the substantial investment that Zomba has already made in preparing for 'N SYNC's next release.  The evidence

is overwhelming that any material delay in seizing the opportunity to release 'N SYNC's next album could cost 'N SYNC its career. The rapidly changing tastes of the pop music audience mean that time is of the essence for these young artists. The potential for injury to their career far surpasses the monetary risks that these entrenched plaintiffs proffer here.[5]

.          The public interest would also suffer. Plaintiffs argue that the "sanctity of contracts" is at stake. But the public will not be harmed -- quite the opposite -- by a holding that equity will not intervene on behalf of self-dealing and onerous contracts extracted from unsophisticated youngsters pursuing a dream  Had plaintiffs thought otherwise, they could and should have acted the instant that 'N SYNC terminated the contracts to seek their full enforcement. Plaintiffs did not do so, and their delay shows their lack of irreparable harm  *See, e.g., Citibank, N.A. v. Cititrust*, 756 F.2d 273, 276-77 (2d Cir. 1985).

          Let there be no mistake: With their $150 million claims against 'N SYNC and Zomba and Calder, plaintiffs want to send a signal to the music industry, and especially to young artists and to the independent labels such as Zomba, not to dare to assert contractual rights or to compete for the talent of artists who decide on their own to do so. Plaintiffs seek to intimidate others from exercising those rights, or from providing artists with a competitive alternative. This outcome would harm the public in general and the music industry in particular.

---

[5]       *See, e.g., Marcy Playground, Inc. v. Capitol Records, Inc.*, 6 F.Supp.2d 277 (S.D.N.Y. 1998) (speculative injury to plaintiff is outweighed by likely injury to the defendants); *Comedy Hall of Fame, Inc. v. George Schlatter Productions, Inc.*, 874 F. Supp. 378 (M.D. Fla. 1994) (same); *Future Tech Int'l, Inc. v. Tae Il Media, Ltd.*, 944 F. Supp. 1538 (S.D. Fla. 1997); *Computer Currents Publ'g Corp. v. Jaye Comms., Inc.*, 968 F. Supp 684 (N.D Ga. 1997).

## Conclusion

For the reasons set forth above, in the memorandum submitted on behalf of 'N SYNC, and in the accompanying declarations, this Court should deny plaintiffs' motion for a preliminary injunction and grant such other relief as the Court deems just and proper

Respectfully Submitted,

Jeffrey D. Keiner (Bar No. 181678)
GRAY, HARRIS & ROBINSON, P.A.                PAUL, WEISS, RIFKIND, WHARTON &
201 East Pine Street, Suite 1200             GARRISON
Post Office Box 3068                         1285 Avenue of the Americas
Orlando, Florida 32802-3068                  New York, New York 10019-6064
(407) 843-8880                               (212) 373-3000

Attorneys for Defendants Zomba Recording Corporation and Clive Calder

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true copy of the foregoing was furnished by facsimile and U.S. Mail, postage prepaid, to: **J. Cheney Mason, Esq. and William B. Pringle, III, Esq.**, 390 North Orange Avenue, Suite 2100, Orlando, FL 32801; **Michael D. Friedman, Esq. and Sharon H. Stern, Esq.**, 1211 Avenue of the Americas, New York, NY 10033, Attorneys for Plaintiffs Louis J. Pearlman and Trans Continental Records, Inc; **William B. Wilson, Esq.**, 200 South Orange Avenue, Suite 2600, Orlando, Florida, 32802; **Stephen M. Hayes, Esq.**, 500 Fifth Avenue, 38th Floor, New York, NY 10110, Attorneys for Plaintiffs BMG Entertainment and BMG Ariola Muenchen Gmbh; **David B. King, Esq., Mayanne Downs, Esq. and Thomas A. Zehnder, Esq.**, P.O. Box 1631, Orlando, FL 32802; **Philip Baker-Shenk, Esq., Helene Freeman, Esq. and Richard Albert, Esq.**, 250 Park Ave., 15th Floor, New York, NY 10177, Counsel for Defendants Bass, Chasez, Fatone, Kirkpatrick and Timberlake, this _15th_ day of November, 1999.

Jeffrey D. Keiner (Bar No. 181678)
GRAY, HARRIS & ROBINSON, P.A.                PAUL, WEISS, RIFKIND, WHARTON &
201 East Pine Street, Suite 1200             GARRISON
Post Office Box 3068                         1285 Avenue of the Americas
Orlando, Florida 32802-3068                  New York, New York 10019-6064
(407) 843-8880                               (212) 373-3000

Attorneys for Defendants Zomba Recording Corporation and Clive Calder