FILED

Date \_\_11-16-99\_\_ Time \_\_\_\_\_
CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO, FLORIDA

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF FLORIDA
ORLANDO DIVISION
-------------------------------------------------------------X

TRANS CONTINENTAL RECORDS, INC.,   :
BMG ENTERTAINMENT, BMG ARIOLA      :
MUENCHEN GmbH, TRANS CONTINENTAL   :   99-1282-Civ-Orl-22C
ENTERTAINMENT, INC. and LOUIS J.   :
PEARLMAN,                          :
                                   :
           Plaintiffs,          :   **DECLARATION OF**
                                   :   **ADAM RITHOLZ**
  -against-                       :   **RE: BOND**
                                   :
ZOMBA RECORDING CORPORATION,       :
CLIVE CALDER, JAMES LANCE BASS,    :
JOSHUA SCOTT CHASEZ, JOSEPH        :
ANTHONY FATONE, JR., CHRISTOPHER   :
ALAN KIRKPATRICK, and JUSTIN       :
RANDALL TIMBERLAKE,                :
                                   :
           Defendants.          :
-------------------------------------------------------------X

       I, ADAM RITHOLZ, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury, as follows:

       1.    I am a member of the bar of the State of New York. Since January, 1999, I have been entertainment counsel to the five individual named defendants professionally known as 'N SYNC. Pursuant to local rule 4.06(b)(1) and the order dated November 5, 1999, I submit this declaration in response to plaintiffs' memorandum of law setting forth 'N SYNC's position on an appropriate bond in this matter.

55

2. First, let me note at the outset that what is at stake for this group of five very young men is their entire future career prospects, something upon which no one can place a value. I say this not only as the group's principal business affairs adviser, but also based upon my eighteen years experience in the music industry, including but not limited to more than a decade as an executive in record companies including senior positions in major multinational record companies.

3. Pop groups, such as 'N SYNC, typically release albums of newly recorded material in cycles of approximately eighteen months. The typical album cycle entails writing and recording new material, the release of one or more single records and music videos to secure air play on radio and television and to create public anticipation for the release of a new album. A new album will be released behind the "buzz" created by the single release and its video, usually within one to three months. The album release is accompanied by intensive promotional efforts, such as artist appearances on popular radio programs, MTV and even on occasion in record stores. The initial promotional period after the album release will be followed by an extensive national performance tour of at least three months and frequently five or more months. After the completion of the album "cycle," a new album cycle starts again so that a new album can be released within approximately eighteen months following the prior album.

4. If an artist misses an album cycle — i.e., fails to release a new record for more than eighteen months, the artist runs the risk of losing the attention of a substantial portion of its audience, who in the interim have become interested in other

artists with more current product. This is a particularly acute problem with a group such as 'N SYNC, who appeal to a young market. The history of popular music is littered with "one hit wonders" who enjoyed enormous popularity for a time, but who failed to follow through on their initial success.

5. 'N SYNC is now approaching the outer limit of what historically has been the acceptable interval between album releases. It has been twenty months since the release of its first album in the United States. It is critical that the group release an album of new material as soon as possible or the group is in imminent risk of losing its audience. RCA Records itself recognized this fact as it planned to release a new album by the group this fall until 'N SYNC terminated the Trans Continental recording agreement.

6. Although plaintiffs point to the release of the group's Christmas album a year ago, such specialty albums are *not* considered albums of new pop material with wide audience appeal. Indeed, plaintiffs did not consider it such, as none of them counted the album as the "second" album delivered pursuant to the group's recording commitment and, on delivery of the Christmas album, did not pay the album advance required upon recording and delivery of the "second" album.

7. Second, it should be noted that plaintiffs' contention that the group can avoid harm by merely permitting plaintiffs to release the group's new album is completely contrary to the arguments they advance in support of their motion for a preliminary injunction. 'N SYNC has recorded the material for their new album on their own, working with Johnny Wright, following their termination of the Trans Continental

Records agreement. No one from Trans Continental or RCA Records has been involved in the recording of the works. Thus, it is plain that plaintiffs' professed concern for the "quality" of the group's recorded performance and need for quality control is a sham. Since BMG Music manufactures and distributes recordings released by Zomba, the only thing plaintiffs are interested in is controlling all of the revenue the sale of the new 'N SYNC album will generate, a figure likely to exceed $80 million.

8. Plaintiffs' proposal also belies their claim of vindicating the "sanctity" of contracts. The fact is that 'N SYNC has and, for the past two months has had, an exclusive recording agreement with Zomba Recording Corp. Thus, plaintiffs' proposal is nothing more than a suggestion that the group breach their existing agreement with Zomba, an agreement that I negotiated on the group's behalf, which, unlike the contracts at issue here, assures the group of the release in the United States of <u>multiple</u> albums and further assures them that the agreement will terminate unless each album optioned is released in the United States.

9. The relationship between an artist and a record company is not merely economic. It is a partnership based on trust, respect, and commitment which forms the foundation for artistic growth and self-expression. That partnership does not and cannot exist between plaintiffs and the group. One cannot put a value on personal autonomy, growth, free expression and trust. For the group, that is what is at stake here, as well as their future career.

10. Although plaintiffs' claim that the group continues to make personal appearances and to keep themselves in the public eye, they ignore the fact that they have sought to prevent the group from continuing to appear publicly as 'N SYNC. Annexed hereto as Exhibit A is a letter from plaintiffs' counsel, Steven Hayes of Parcher Hayes & Snyder, dated November 2, 1999 objecting to the group's using the name 'N SYNC in connection with personal appearances, including television, or other activities. The injunction which plaintiffs seek, as Mr. Hayes noted in his letter, would prevent the group from engaging in any activity except that undertaken for plaintiffs.

11. Mr. Hayes letter reiterates in substance the widely reported remarks made by another of plaintiffs' counsel upon the filing of this action. J. Cheney Mason is quoted in the October 13, 1999 edition of the Orlando Sentinel, as well as other publications, as stating "This is a scorched-earth policy. We're going to shut them down. We believe there will be no tours, no performances or recordings.... If this means 'N SYNC will cease to exist, there's another group right behind them." (A copy is attached as Exhibit B)

12. There is nothing limited about the injunction plaintiffs seek and Mr. Cheney Mason's remarks accurately reflect the terms of the order sought.

13. Notwithstanding that the future value of the careers of these artists and their future growth and development cannot be compensated monetarily, it is my belief the group faces an immediate short term financial loss from any injunction this

Court might issue of approximately $50 million, based on the group's past performance, current popularity, and negotiations in which I am involved.

14. As noted, the group presently anticipates releasing a single imminently and an album within the next two to three months. Based on past sales history and the groups' current royalty rate under the Zomba agreement, the group may reasonably anticipate receiving no less than approximately $20 million in record and music publishing royalties just from the release and sale of records and albums over the next six to eight months. This revenue will be irretrievably lost to the group if an injunction issues. The group will have only one album over the next 18 months when they otherwise would have released two.

15. In addition, the group planned to commence a major live performance tour this spring. The preparations for that tour have commenced and I have been in the process of negotiating tour sponsorship and endorsement agreements for the past month. The dollars offered by potential tour sponsors far exceed the amount previously paid for 'N SYNC's tour this year and the group has already lost one offer valued at $3.5 million because of the potential that this Court might enjoin the tour. The group will not be able to engage in the large scale arena tour that is being planned unless they have a new album in the market. The last tour by the group generated revenues of $28 million for Pearlman and the companies he controls, of which approximately $4.6 million went to Trans Continental Entertainment for management commissions and $1 million went to Louis Pearlman. Approximately $6.5 million in profit has been retained

by 'N SYNC Productions, Inc., the company Pearlman controls, after payment of salaries to the group of approximately $1 million each. Since the group's tour will include larger venues and more lucrative sponsorship and endorsement contracts, I estimate the group will lose $20 million in touring revenue from an injunction.

16. During its last tour, Pearlman and his companies realized gross revenues in excess of $9 million from the sale of merchandise such as t-shirts, both at concert venues and retail outlets. I estimate the group could realize approximately $10 million in merchandise sales during the tour planned for this spring.

17. Thus, I calculate that the group will lose in the next eight months the following:

| | |
|---|---|
| recording and publishing royalties | $20 million |
| tour revenue and endorsements | $20 million |
| merchandise royalties | <u>$10 million</u> |
| Total | $50 million |

18. It takes three to six months to set up a record release and arena tour. The spring-summer period is the most lucrative for touring. In my view, the potential for the group to tour during the spring-summer of the year 2000 will be entirely lost if any injunction issues, even for a few months.

19. Finally, I feel compelled to correct misstatements of fact set forth in the memorandum submitted by plaintiffs. Plaintiffs state that the group can continue to tour because "Trans Continental is willing to proceed with the currently scheduled tour

dates under appropriate terms and merchandising activities under existing agreements." The comment is completely disingenuous. In fact, it means nothing more than that the group can continue to enrich Louis Pearlman and his companies and work for whatever he chooses to throw the group's way. Thus, Pearlman has been attempting to get the group to perform live at ten concert dates, he wants them to perform. However, he has insisted on taking for himself 11.25% of the gross revenue to be generated as a management commission even though he is not performing any management services for the group and has not performed any in years. In addition, he has demanded a salary for himself equal to that of the group and he has refused to set any salary for the group commensurate with that to which they are entitled and what they could receive if they engaged to play the dates directly. Indeed, Louis Pearlman has failed to pay the group the salary fixed for the last week of the group's completed concert tour notwithstanding repeated demands, a sum of nearly $100,000 per group member. In short, Pearlman proposes nothing more than the continued exploitation of the group for his financial benefit, something for which he seeks this Court's imprimatur.

20. Next, 'N SYNC's performances on the *Music of My Heart* single and soundtrack with Gloria Estefan and its performance on the soundtrack for the films *Pokemon* and *Light It Up* were recorded long before the institution of this action. The group has received <u>nothing</u> for any of these performances. Indeed, the group was offered $250,000 to record a new song for the *Pokemon* soundtrack, but 'N SYNC lost this

opportunity because plaintiffs licensed an existing 'N SYNC recording and only plaintiffs received payment from the film company.

21. More significantly, <u>none of the above noted soundtracks are on the RCA Records label or distributed by BMG</u>. *The Music of My Heart* recording is on Epic, a Sony Records label. *The Light It Up* record appears on YabYum/Elektra, a Warner-Elektra-Atlantic ("WEA") label and the *Pokemon* soundtrack is distributed on Atlantic, another WEA label. The performances are not "credited" to plaintiffs. To the contrary, there is a discrete, courtesy credit, which states merely "'N SYNC appears by arrangement of BMG-Ariola Muenchen GmbH, RCA Records, Trans Continental Records, Inc., and Zeeks, Inc.," the group's own company.

22. These records demonstrate the false premise on which plaintiffs seek preliminary injunctive relief. None of the plaintiffs had anything to do with recording of the *Music of My Heart* and *Light it Up* records. They exerted no control over 'N SYNC's performance or over the material recorded. They do not distribute the records. Thus, there is ample precedent for 'N SYNC to record on their own and to sell records released on labels other than RCA Records.

23. Further, I note that plaintiffs state that 'N SYNC is "due to receive substantial additional royalties while the injunction is in place." The members of the group have received no royalties from plaintiffs in 1999. In fact, the group was owed a royalty statement and payment by September 30, 1999 for sums received by Pearlman and his companies in the period from January 1, 1999 through June 30, 1999. That

royalty statement has not been received, although we know to a certainty that in excess of $1.6 million was received by Trans Continental Records by May, 1999 and no less than half of that is due to 'N SYNC. Although the plaintiffs have received in excess of $100,000,000 from the sale of 'N SYNC recordings, each member of 'N SYNC has received a grand total of $237,000 on account of their recording activities since the inception of their relationship with Louis Pearlman.

24. Although the sale of 'N SYNC merchandise has generated close to $9 million in royalties, the members of 'N SYNC have received a grand total of $65,000 each on account of merchandise sales. Royalties of less than $135,000 in addition to this sum were received by me prior to the termination of the Trans Continental agreement and deposited under protest because they are less than the 50% of royalties due the group as set forth in the recording agreement.

25. The so-called "millions" which the group has earned consists entirely of wages paid by 'N SYNC Productions, Inc., for five months of back breaking work performing five to six concerts a week on tour this spring and summer — in excess of 100 concerts. These wages totalling approximately $1 million per group member, 75% of which was paid since June 1999, were paid by 'N SYNC Productions, Inc., a company which is not a plaintiff in this action, although controlled by Pearlman. These wages were paid only under threat that the group would not perform the concerts for 'N Sync Productions, Inc. at all. In fact, the group was paid less than half of what they should have received for this tour and less than what Pearlman and his companies received,

although Pearlman never took the stage or spent a night on the tour bus. The individual group members earned less per concert than the average retired politician, author or celebrity speaker receives for a 45 minute lecture.

26. Finally, I wish to comment on the claim that the plaintiffs are good for the money and that no bond is required. No plaintiff has submitted a financial statement demonstrating their ability to respond in damages. While some BMG company may be worth millions, it is not at all clear what any of the particular named plaintiffs are worth and what their free cash assets are. Louis Pearlman has not even paid the group their last week's tour wages which has been due since September 4, 1999. One of the group's counterclaims in this action is for these unpaid wages. The group should not have to chase the plaintiffs to recover for their losses in the event an injunction is wrongfully issued, nor should they bear the risk that when the day of judgment arrives, plaintiffs do not have the cash to satisfy the liability. 'N SYNC should have immediate redress from a secure source.

27. In sum, 'N Sync is already incurring substantial harm from the mere pendency of plaintiffs' motions, and will incur at least $50 million in damages in the next six to eight months, if not the complete destruction of their future career. A bond should be set in the amount of $50 million in favor of the five individual members of 'N SYNC, with leave to increase the bond in a like amount if any injunction is issued and remains in effect past April 2000.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 17th day of November, 1999 at New York, New York.

_____
ADAM RITHOLZ

# PARCHER, HAYES & SNYDER

A PROFESSIONAL CORPORATION

ATTORNEYS AT LAW

500 FIFTH AVENUE
NEW YORK, NEW YORK 10110

TELEPHONE
(212) 382-0200

E-MAIL
phs@phs-law.com

FACSIMILE
(212) 302-4371

November 2, 1999

**VIA FAX TRANSMISSION**

Helene Freeman, Esq.
Dorsey & Whitney
350 Park Avenue
New York, NY 10022
(953-7201)

Gerard E. Harper, Esq.
Paul Weiss Rifkind Wharton & Garrison
1285 Avenue of the Americas
New York, NY 10019
(373-2225)

    Re:    <u>Trans Continental Records, Inc., et al. v. Zomba Recording Corporation, et al.</u>
                  Case No. 99-1282-Civ-Orl-22C

Dear Helene and Gerry:

    We have been informed that James Lance Bass, Joshua Scott Chasez, Joseph Anthony Fatone, Jr., Christopher Alan Kirkpatrick and Justin Randall Timberlake (hereinafter collectively the "Group Members") have made a variety of appearances under the name "'N SYNC," including on the WB Radio Music Awards on October 28, 1999. In particular, on that program we are informed that the Group Members sang a composition entitled "Bye Bye Bye" which was referred to as being their new release.

    As you know, BMG has applied for a preliminary injunction enjoining the Group Members from, *inter alia*, using, displaying, or in any manner exploiting the mark 'N SYNC (the "'N SYNC Mark"), or any variation or derivative of such Mark, in connection with a musical group and with all recording, publishing, merchandising, television, video, motion picture, live performance, promotional, advertising and other activities related to the activities of the musical recording group known as 'N SYNC (the "Group").



PARCHER, HAYES & SNYDER, P.C.

Helene Freeman, Esq.
Gerard E. Harper, Esq.
November 2, 1999
Page 2

    Any use of the name 'N SYNC other than in connection with the performance by the Group Members of their contractual obligations to Trans Continental Records and BMG is without authority and inappropriate. In addition, the Group Members may not perform, record, distribute, market or sell any recording other than that provided to Trans Continental and BMG as part of their recording commitment to these companies.

    Under no circumstances may the Group Members be identified with Jive and/or Zomba or as Jive and/or Zomba recording artists, and to the extent that any such activity has taken place it must stop immediately. BMG hereby reserve their rights regarding any further injury they may suffer as a result of any such activities.

    Of course, this letter is not intended to be a complete or exhaustive statement of all of BMG's rights, claims or contentions. Nothing contained herein is intended as, nor should be deemed to constitute, a waiver or relinquishment of any of BMG's rights or remedies, whether legal or equitable, all of which are expressly reserved.

                                              Very truly yours,

                                              Steven M. Hayes

SMH:rsb

cc:    Michael Friedman, Esq.

**The Orlando Sentinel**
WEDNESDAY, OCTOBER 13, 1999

# Business

# Group founders' suit could put 'N Sync out of business

By Leslie Doolittle
OF THE SENTINEL STAFF

War has been declared in Orlando's billion-dollar bubble-gum pop world.

Trans Continental Records, its founder Louis J. Pearlman and worldwide record distributor BMG filed a lawsuit in federal court in Orlando on Tuesday that could bring 'N Sync — the musical money machine they helped create — to a screeching halt.

Trans Con, Pearlman and BMG are seeking $150 million in damages from all five members of the multi-platinum-selling group and Zomba Records, accusing them of breach of contract because 'N Sync recently signed with Zomba subsidiary Jive Records.

The plaintiffs also want to stop the group from any use of the name 'N Sync, claiming it would infringe on Trans Con's exclusive rights to that trademark.

"This is a scorched-earth policy," said J. Cheney Mason, Trans Con's co-lead trial counsel. "We're going to shut them down. We believe there will be no tours, no performances, no rehearsal or recordings" other than those benefitting Trans Con until contract disputes are resolved.

"It is not Trans Continental's intent to cut the throats of those boys," said Mason, referring to Justin Timberlake, Joey Fatone, Chris Kirkpatrick, J.C. Chasez and Lance Bass, whom he said have received more than $1 million each from the group's debut album

Please see MUSIC, B-8

## Stocks pl

Tumbling bond prices and a stunning earnings warning from Raytheon deflated stocks Tuesday as traders, already anxious about interest rates, found themselves nervous about corporate profits as well.

The Dow fell 2 Nasdaq shed 43. its record high cl
Story, B-5.



# Hot toys for the holidays

# Fin&#xa;Fan&#xa;to c

☐ The Orlan Colonial Dri\ had disappoi

By Greg Groel
OF THE SENTINEL STAF

# Millions in record sales at stake

**MUSIC** from B-1

sales. "But we're going to decapitate the advisers who have been giving them bad advice."

At stake: about $300 million in initial record sales and merchandise and a contract for several more albums with expected revenue Trans Con says easily exceeds $1 billion.

Johnny Wright, the group's Orlando-based manager, could not be reached for comment Tuesday. But in an earlier interview, Wright said he expects the business-minded folks on both sides of the table to resolve the dispute without disruption to the group, as they did when the Backstreet Boys faced off with Trans Con a year and a half ago.

A spokesperson for Zomba and Jive would not comment except to say neither record company had been served with papers in the case.

Trans Con's lawyers said 'N Sync has justified signing with Jive by saying Trans Con failed in its contractual responsibility to obtain a U.S. record company with national distribution within 18 months.

"That's the most legally incompetent and absolutely stupid position I've ever seen in my career, and I've seen some lulus," Mason said.

William Pringle, co-counsel for Trans Con, said within four months his client had 'N Sync signed with BMG, an international distributor that owns RCA Records.

"We're done having people take advantage of Lou Pearlman," Pringle said, noting the recording executive had invested millions grooming the Orlando-based group for stardom since 1996.

Trans Con attorneys insist the company is willing to put 'N Sync out of business.

"If this means 'N Sync will cease to exist, there's another group right behind them," said Mason, referring to Take 5, the next boy band in the Trans Con pipeline.

In an earlier interview, Wright said even if 'N Sync lost its right to use that name, the group would go on.

'N Sync isn't the first band to end up in a battle over rights to a famous name. Others include Creedence Clearwater Revival, Jefferson Airplane/Starship, Toto and the Buffalo Springfield.

Both sides in the current dispute said they hope problems are resolved before brakes are applied to 'N Sync's business, which could come in the form of a preliminary injunction in about 30 days.

How quickly could this be resolved?

"That depends on how smart they get and how quick they get smart," Mason said.

# Planet filing 'buys them some time'

**PLANET** from B-1

tracks the company for CJS Securities Inc. in White Plains, N.Y., said Tuesday the court filing is a good first step in the company's effort to turn around its finances.

"It buys them some time and some flexibility ... but it's premature to say how all this will turn out. ... We're taking a wait-and-see approach right now."

Ursaner said the company is focusing its more limited resources on locations that have performed well, such as in Orlando, and appears to be shifting its strategy to appeal more to an older crowd.

"They are trying to produce a more adult-oriented product — offering lighter menu items such as pastas and salads and moving away from the kids-oriented burger menu," Ursaner said. "They may even turn down the decibels a bit" on the sound systems.

Earl, a former Hard Rock Cafe International

Moore.

But the company's finances plunged as the chain spread to smaller cities, losing much of its luster while competition increased from other theme restaurants. In 1998, the company lost $244 million. Barish resigned in March as a director, setting the stage for the bankruptcy reorganization.

A Chapter 11 filing allows a company to continue operating with protection from creditors while it reorganizes.

In its filing, Planet Hollywood listed Barish as a holder of at least 5 percent of the company's stock. Others were Earl; Kingdom Planet Hollywood Ltd., which is indirectly controlled by Saudi Prince Alwaleed Bin Talal; and Leisure Ventures PLC Ltd., which is indirectly controlled by Singapore billionaire Ong Beng Seng.

In a recent Securities and Exchange Commission filing, Earl, Alwaleed and Ong indicated they would each invest $10 million to help recapitalize the company.

On Tuesday, Planet Hollywood's stock fell 2 cents a share to close at 17 cents.

Atte  
Engin  
Empl  
and  
See  

On Oct  
Spec  

EM  
As part of the Sunda  
914,000 Central Flor  
every ten read the Se  
For information  
representative o  

JOB  
No more random job  
a one-stop job bonan.  
Compare opportuniti  
your qualifications.  
Take advantage  
You can bet you