FILED

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

------------------------------------------------

TRANS CONTINENTAL RECORDS, INC.,          :
BMG ENTERTAINMENT, BMG ARIOLA
MUENCHEN GmbH, TRANS CONTINENTAL          :
ENTERTAINMENT, INC. and LOUIS J. PEARLMAN,     **99-1282-Civ-Orl-22C**
                                          :
                      Plaintiffs,
                                          :  **REPLY MEMORANDUM OF**
                                             **LAW ON BEHALF OF**
        -against-                         :  **PLAINTIFFS LOUIS J.**
                                             **PEARLMAN, TRANS**
ZOMBA RECORDING CORPORATION, CLIVE        :  **CONTINENTAL RECORDS,**
CALDER, JAMES LANCE BASS, JOSHUA SCOTT       **INC. AND TRANS**
CHASEZ, JOSEPH ANTHONY FATONE, JR.,       :  **CONTINENTAL**
CHRISTOPHER ALAN KIRKPATRICK, and            **ENTERTAINMENT INC. IN**
JUSTIN RANDALL TIMBERLAKE,                :  **SUPPORT OF THEIR**
                                             **MOTION FOR A**
                      Defendants.         :  **PRELIMINARY INJUNCTION**

------------------------------------------------

        Plaintiffs, Louis J. Pearlman ("Pearlman"), Trans Continental Records, Inc., and Trans

Continental Entertainment, Inc. (collectively, "Trans Continental") submit this memorandum in

further support of their motion for a preliminary injunction and in reply to the November 2, 1999

submissions of the defendants in opposition to that motion.

## PRELIMINARY STATEMENT

        Plaintiffs have moved for an Order enjoining the defendants Bass, Chasez, Fatone,

Kirkpatrick and Timberlake (the "Group"), Zomba Recording Corporation ("Zomba") and Clive

Calder from releasing a record album on Zomba's "Jive" record label under the name 'N Sync.

Pearlman is the exclusive licensee of Federal Trademark Registration No. 1,883,498, covering the

use of the name 'N Sync (the "Mark") in all aspects of the music business.  The planned album

constitutes both an act of infringement and an unequivocal breach of existing contracts.  The

58

various arguments and voluminous submissions by the defendants do not refute the facts or legal presumptions which flow therefrom (including irreparable injury from a trademark violation) but present a series of unsupportable assertions which, inter alia:  (i) conceal the Group's receipt of $7,000,000 and earnings to date of over $13,000,000, as well as other critical matters (infra pp. 3, 4, 6); (ii) do not bar injunctive relief; and (iii) should be adjudicated only at trial.

Plaintiffs seek a preliminary injunction to preserve the status quo, expedited discovery, and a trial of all claims and counterclaims at the earliest date after February 15, 2000 as the Court can accommodate.  The injunction sought at this time is limited to prohibiting the implementation of the recording agreement with Zomba but would not preclude ongoing merchandising or touring activities, which may proceed under existing arrangements made by Trans Continental or with its consent.  Plaintiffs are seeking an Order that protects the rights of the Group by providing for the escrow of future proceeds received by Trans Continental while the preliminary injunction is in place.  Such an Order will prevent irreparable harm to any party, allow the Group to continue to perform and generate revenues, and permit the Court to address all claims, on a full record with the benefit of testimony and cross-examination subject to the Federal Rules of Evidence.  Defendants concede that they are not prejudiced before the end of the first quarter of 2000, their stated release date of the planned album (Zomba Br. p. 8).[1]

The 500 plus pages of material submitted by the defendants in opposition to Plaintiffs' Motion for a Preliminary Injunction are a shrill, scurrilous, false and outrageous effort to obfuscate the issues involved on this motion and to attempt to overwhelm the Court with bulk.  The submissions flout Rule 11 F.R.Civ.P and Rule 4.06 (b)(4) of this Court and do not approach

---

[1] References to the November 2, 1999 Response Brief and Memorandum of Zomba Recording Corporation and Clive Calder are here described as "Zomba Br."; references to the 'N Sync Response Brief are described as "Group Br."

minimal evidentiary standards.  When the rhetoric of defendants' submissions are put in perspective, it becomes apparent that defendants have neither raised any material factual issue which militates against the relief here sought, nor submitted competent or credible proof of their claims of "involuntary servitude" of five young men who have become millionaires.

A trial of this case will confirm that the defendants' submissions far transcend hyperbole or legitimate argument.  Rather, these unfortunate documents reflect the efforts and views of those who make "show me the money" a mantra of the entertainment world, and who believe that it is proper to convince young men in the public spotlight to ignore contracts and obligations in order to characterize themselves as "indentured servants" unless paid megabucks immediately as free agents unencumbered by commitments made to those responsible for their success.  We urge that such behavior and the defendants' resort to self-help not be countenanced by this Court, that the unlawful scheme be enjoined and the status quo be maintained until an early trial.

## THE RECORD BEFORE THE COURT ON THIS MOTION

Without resolving the factual inaccuracies and misleading matter which permeate defendants' submissions, we note that they are more significant for what they do not say, rather than for the irrelevant issues presented to obfuscate the issues before the Court.  In particular, despite their bulk, defendants' papers fail to disclose:

- The $7,000,000 received from recording, merchandising and touring activities and the additional amounts (at least $6,000,000) earned by the Group during periods of "involuntary servitude";

- The assertion in defendants' submission that each member of the Group received "only" $95,391 as of October 1998 -- an otherwise arbitrary date -- (Group's Br. p. 6) is a deliberate attempt to mislead the Court since only weeks later payments to the Group exceeded $1,800,000;

- The October 27, 1999 decision of Chief Judge Thompson granting Pearlman's request for a preliminary injunction in the United States District Court for the District of New Jersey and maintaining his exclusive license in full force and effect;

- A statement of what defendants plan to do with the Mark and when, beyond the claim that they plan to release an album sometime by the first quarter of 2000;

- Copies of the relevant contracts among the defendants ostensibly made in September 1999, which would reveal Zomba's multi-million dollar payments to the Group who are alleged to be in dire financial need; and

- The Group's efforts in two proceedings in the Patent and Trademark Office ("PTO") to avoid the trademark they now ask the Court to ignore.

We have not escalated or responded to the name-calling or hysteria employed by defendants and will await the appropriate time and place to dispute those diversionary attacks. The responsive materials to be submitted on this application will instead be limited to adding the following objective matters to the record:

- An accounting showing that the Group Members, whose lawyers describe them as "indentured servants", have earned over $13,000,000 in the last two years of "captivity" and are likely to receive millions more in the next few years;

- Proof that the activities of Johnny Wright, to which the defendants attribute their success, were performed as an employee of Trans Continental and for the benefit of Trans Continental;

- Defendants' recently filed petition to the PTO (nowhere mentioned in their papers) seeking to attack the federally-registered trademark licensed to Pearlman, which they ask this Court to allow them to use for their exclusive benefit, prior to the resolution by the PTO of their challenges to the mark;

- A copy of the October 29 Order of Chief Judge Thompson of the United States District Court for the District of New Jersey;

- A copy of the "Intent to Use" trademark application filed by the Group Members with the PTO seeking to secure the name 'N Sync for themselves; and

- A copy of the petitions signed by the parents of two of the group members who were minors at the time the contracts were signed, and who had various lawyers acting on their behalf when they represented to the Florida court that the

agreements now challenged as unconscionable were reasonable and in their best interests.

We also join in and incorporate the submission of BMG Entertainment and BMG Ariola Muenchen GmbH (collectively, "BMG") which, inter alia, responds to defendants' unsupportable contentions regarding the Group's sham termination of the recording agreement when their renegotiation efforts failed.

1.   **The Defendants' Inflammatory Claims Regarding The Creation Of 'N Sync And Their Relationship With Mr. Pearlman Lack Credibility Or Probative Value And Are Not A Bar To A Limited Injunction To Preserve The Status Quo**

To justify a preliminary injunction, it is not necessary that the plaintiff's right to a final decision be certain. Hamilton Watch Co. v. Benrus, 206 F.2d 738, 740 (2d Cir. 1953). The object of a preliminary injunction is to preserve the status quo pending the litigation on the merits. Cate v. Oldham, 707 F.2d 1176 (11th Cir. Fla. 1983); Collum v. Edwards, 578 F.2d 110 (5th Cir.1978). Factual claims which are not material should not prevent an injunction from issuing to preserve the status quo so that the disputed facts can be resolved at trial. Hamilton Watch Co. v. Benrus Watch Co., supra; Productos Carnic, S.A. v. Central American Beef & Seafood Trading Co., 621 F.2d 683, 685 (5th Cir. 1980); Platt & Munk Co. v. Republic Graphics, Inc., 315 F.2d 847 (2d Cir. 1963); Held v. Missouri P. R. Co., 373 F. Supp. 996 (S.D.Tex. 1974).

The matters raised by defendants are not legal impediments to the injunction sought on either the trademark or the contract issues (infra, pp. 7-19). It is also apparent that they do not meet thresholds of credibility or probity and should not be considered at all.

The moving declarations show that Lou Pearlman created the Backstreet Boys, 'N Sync, LFO and Take Five and is singularly responsible for making Orlando a center of pop music. His unique vision and entrepreneurial zeal have been described in a variety of publications, which have

marveled at his ability to identify, mold and promote the groups in which he has invested millions of dollars. In September, the members of 'N Sync were on Sixty Minutes II on the CBS network in a program about Pearlman in which they admitted that Pearlman "gave [them] the opportunities that ... a lot of people don't have." Without Lou Pearlman there would be no 'N Sync and these five young men, with one high school degree and no professional success among them before they met Pearlman, might well still be among the thousands of talented young performers who took a shot at the highly competitive music business and remain in obscurity. The claim (Zomba Br. pp. 4-5) that the mother of one of the teenagers with no prior experience in the business had the expertise, judgment and resources to make the Group successful and that Pearlman did nothing is facially ludicrous. To credit Johnny Wright with making critical decisions and contacts without revealing that he was an employee of Trans Continental in carrying out his responsibilities for 'N Sync, as he had been when Pearlman earlier recruited him to work with the Backstreet Boys, is dishonest. It is not a mere coincidence that these five young men followed the same pattern as the other groups whom Pearlman brought to Orlando and molded into successive icons of popular music.

The Declaration of David Pierfy ("Pierfy Decl.")[2] shows that it is not mere hyperbole but outright falsity to conceal payments to the Group of $7 million in two years, as well as earnings during that period exceeding $13 million and to describe the recipients of those sums as subject to "involuntary servitude". It is here demonstrated by written proof that the contracts defendants describe as "unconscionable" were made with the advice of independent counsel and parental involvement and that the agreements have benefited them financially beyond their wildest dreams (Brett Decl. Exhs. D and E). We are confident that it will be found that the "unconscionable"

---

[2] References in this memorandum to declarations not described by references to the moving documents are to documents to be submitted on the November 22, 1999 date specified by the Court.

behavior is the effort by avaricious advisors who have convinced these five young men that they must demand to be paid as free agents NOW, and that they should say or do anything to achieve that goal without regard for truth or the consequences of their actions.

2.      **The Violation Of Trademark Rights By Defendants Is Not Disputed And None Of Defendants' Multiple Efforts Or Grounds To Preclude Enforcement Of That Mark Present A Cognizable Factual, Or Legal Impediment To An Injunction Against That Infringement**

In our moving memorandum we demonstrated (pp. 6-7), inter alia, that Mr. Pearlman's status as the exclusive licensee of federally registered trademark No.1,843,498 for use of the name 'N Sync in the music industry established his rights which, by operation of law, date back to the 1992 filing by the registrant of the Mark.  We further demonstrated that there was no possible issue as to the defendants' infringement of the Mark (pp. 11-12) and that such use creates a presumption of irreparable injury as a matter of law (pp. 12-13).  Defendants neither dispute that they intend to infringe the Mark and act in a manner inconsistent with the Mark, nor address the cited authorities in this Circuit which establish the impact of the presumption and the showing of irreparable injury which apply in these circumstances.  Illustratively, Defendants do not address the controlling effect of McDonald's Corp. v. Robertson, 147 F.3d 1301 (11th Cir. 1998) (Br. p. 5) requiring that their infringement be enjoined.

By their recent undisclosed collateral attacks on the Mark, the defendants have confirmed their recognition that Mr. Pearlman's license to the Mark is an insurmountable barrier to their scheme.  These efforts have not succeeded and both the Mark and Pearlman's exclusive license remain in full force and effect.  Significantly, nowhere in the 500 pages of filings did defendants choose to mention that (i) on September 30, 1999 they filed with the PTO a petition to cancel the Trademark and (ii) on May 24, 1999, they filed an "Intent to Use" application seeking to secure a

Mark of their own and establishing, as a matter of law, that they can derive no rights from any alleged prior use of the Mark.  (infra pp. 8-14).  Moreover, defendants refer to the effort to attack Mr. Pearlman's license and assert that the licensor "has since terminated this NJ license" (Zomba Br. p. 7), but fail to disclose the Order of Chief Judge Thompson of the United States District Court of the District of New Jersey entering a Preliminary Injunction against that effort to terminate.  (Brett Decl. Exh.  A).

    a.    **Defendants Have Not Shown Any Bar To Plaintiffs' Ability To Assert Rights Under The Lanham Act**

Defendants claim Pearlman lacks standing to assert the claims under §32 of the Lanham and that he does not have a claim under §43(a).  (Zomba Br. pp. 12-13).  It appears implicit that defendants do not dispute "standing" to assert the §43(a) claim.

Since there is no issue as to defendants' intent to bring out an album which will infringe the Mark, the §32 claim alone is thus a bar to the infringement since, contrary to defendants' conclusory assertion (Zomba Br. p 12), as an exclusive licensee with unfettered rights to use and enforce the Mark, Mr. Pearlman has standing under §32 of the Lanham Act.  Wynn Oil Co. v. Thomas, 839 F.2d 1183 (6th Cir. 1988); Ultrapure Sys. v. Ham-Let Group, 921 F. Supp. 659, 665-666 (N.D. Ca. 1996)  See also Great Southern Co. v. Irvin, 1995 U.S. Dist. LEXIS 528 (N.D. Ill. Jan. 19, 1995); Shoney's, Inc. v. Schoenbaum, 686 F. Supp. 554 (E.D. Va. 1988), aff'd 894 F.2d 92 (4th Cir. 1990).[3]

---

[3]  Zomba does not support a contrary conclusion by its citation (Zomba Br. p. 12) to Gruen Mktg. Corp v. Benrus Watch Co., Inc., 955 F. Supp 979, 982 (N.D. Ill. 1998) in which the §32(a) claim was brought by a licensee against a licensor.  Since the rights of the licensee are based upon the rights of the owner or licensor, infringement actions against the owner or licensor are generally prohibited and the result in Gruen does not impact on a claim by a licensee against a confessed infringer.  See, e.g., Seven-Up Bottling Co. v. Seven-Up Co., 420 F. Supp. 1246 (E. D. Mo. 1976), aff'd, Seven-Up Bottling Co. v. Seven-Up Co., 561 F.2d 1275 (8th Cir. 1977); Westowne Shoes v. Brown Group, 104 F.3d 994 (7th Cir. 1997).

**b.**   **Defendants Unsupported Contention That They Own the Trademark is refuted by (i) Explicit Agreements; (ii) Clear Law; (iii) Documents Signed By Them; and (iv) Public Records of the PTO**

Defendants' acknowledge that "Pearlman's NJ License creates a presumption of ownership subject to rebuttal . . . " (Zomba Br. pp. 13-14). They do not dispute our detailed showing (Pearlman Decl. pp. 5-13) that by agreements and collateral documents the members of 'N Sync have acknowledged and confirmed that plaintiffs own the trademark rights they now claim. Instead, they claim the ability to take all rights in the Mark for themselves based on the proposition that the Court should find that "the agreement is the unconscionable product of fraud and breach or fiduciary duty." (Zomba Br. p.16). Defendants have neither sought nor secured any adjudication of these vigorously disputed claims, and the submission of 500 pages of largely inadmissible argumentative matter does not provide a basis for defendants to ignore contracts and the Mark.

As noted, defendants assert without equivocation or qualification (Zomba Br. pp. 7 and 13) that Pearlman's license to the Mark was terminated. They do not report the decision of Chief Judge Thompson enjoining that termination and finding a likelihood of success for Pearlman in the action seeking to set aside the termination. (Brett Decl., Exh. A).

Defendants claim prior rights to ownership of the Mark based on their role in its creation and use. (Zomba Br. pp. 14-15). They fail to disclose, however, the existence or content of their "Intent to Use" trademark application and their petition to cancel the Mark licensed to Pearlman. The application's recitation of an "intent to use" the Mark after May 24, 1999 cannot be reconciled with a claim of prior use by defendants or a claim they secured rights at an earlier date than the date recited in that sworn instrument. <u>Disney Enterprises, Inc. v. The Short Sport(s) Co.</u>, 1999 T.T.A.B. LEXIS 300 (July 13, 1999); <u>Ramac International Corporation, v. San Miguel Corporation,</u> 1999 T.T.A.B. LEXIS 304 (July 7, 1999); <u>Towle Mfg. Co. v. Godinger Silver Art Co., Ltd.,</u> 1999

T.T.A.B. LEXIS 194 (May 7, 1999).[4]  Similarly, in their petition to cancel the Mark, the Group

members did not assert that they had used the Mark at any time before September 1999.  (Brett

Decl., Exh. B).

      c.    **Defendants Cannot Avoid the Consequences of Their Infringement by Claiming That the Name of the Group is Associated With Its Members Or That The Members Conceived the Name of the Group**

Defendants ignore controlling authorities giving Pearlman paramount rights to the Mark

back to the 1992 date of first use set forth in the Registration, (See Br. pp. 6-7) and, instead, assert

that they can infringe because they allegedly conceived of the name and the public now associates

the Mark with them.  It is, however, is a well-settled principle that trademark owners are permitted

to license their trademarks for use by others without losing these rights.  Dawn Donut Co. v. Hart's

Food Stores, Inc., 267 F.2d 358 (2d Cir. 1959); Kentucky Fried Chicken Corp. v. Diversified

Packaging Corp., 549 F.2d 368 (5th Cir. 1977).  McCarthy on Trademarks, §18:45.  As the

Southern District of New York explained relating to the licensing of the "Stolichnaya" trademark on

vodka:

> It is irrelevant that the consuming public does not know that it is actually PepsiCo who owns the Mark.  It is well-established that the public need not know the name of the trademark owner for there to be goodwill in a Mark, nor does the name of the owner have to appear on the product itself.

Financial Matters, Inc. v. Pepsico, Inc., 806 F.Supp. 480, 482 (S.D.N.Y. 1992).  Equally irrelevant

are defendants' claims to have thought of the Mark.  Again, the law is clear that no such inquiry

---

[4] The significance of this date becomes heightened by the defendants' choice to file their May 24, 1999 application under Section 1(b) of the Lanham Act requiring a statement of "intent to use."  Most applications are filed under Section 1(a) based on actual use. Their application, under oath and penalty of perjury, confirms that they eschew a claim of earlier use and specifically refutes the current effort (Zomba Br. pp 14-16) to support some rights dating back to a date earlier than the filing of the intent to use.  See STANSPEC Co. v. American Chain & Cable Co., 531 F.2d 563 (C.C.P.A. 1976) and Hydro-Dynamics Inc. v. George Putman & Co., Inc., 811 F.2d 1470 at 1473 (Fed. Cir. 1987) establishing that defendants can assert no such claims.

must be made before an existing registration is enforced.  As stated in <u>Rick v. Buchansky</u>, 609 F. Supp. 1522, 1531 (S.D.N.Y. 1985), <u>dismissed without op.</u>, 770 F.2d 157 (2d Cir. 1985):  "It goes without saying that rights in a trademark or service mark are acquired through appropriation and use of the mark in commerce.  Thus, the mere conception of a mark, without its subsequent use in commerce, would be insufficient to confer rights on the conceiver of the mark under federal trademark law."  <u>See also</u>, <u>Blue Bell, Inc. v. Farah Manufacturing Company, Inc</u>., 508 F. 2d 1260 (5th Cir. 1975); <u>Compton v. Fifth Ave. Ass'n, Inc.</u>, 7 F. Supp. 2d 1328 (M.D. Fla. 1998) (conception of a mark is irrelevant to ownership).  <u>See also</u> <u>Reflange, Inc. v. R-Con International</u>, 17 U.S.P.Q. 2d 1125 (T.T.A.B.1990).

Far more likely to be upheld than the defendants' exculpatory claims is the plaintiffs' showing that as one of a series of pop music group created by Pearlman, 'N Sync is a concept group and all rights therein belong to Pearlman.  Defendants concede that if it is a concept group they can have no rights in the name.  (Zomba Br. pp. 15-16).  Defendants do not respond persuasively to the authorities so holding (Moving Br. pp. 6-11), particularly, <u>Rick v. Buchansky</u>, <u>supra</u>, which is strikingly similar to the case at bar.[5]  <u>See also</u> <u>O & L Associates v. Del Conte</u>, No. 83-7939, slip op. (S.D.N.Y. Dec. 3, 1984).[6]  There, the court determined that the manager of a musical group, the "Flirts", a group consisting of three girls (one blond, one brunette and one redhead), owned the rights to the name based upon a filed trademark and granted a preliminary injunction barring the group members from using the mark without the manager's consent.  Notably, the court granted

---

[5] Zomba's reliance on <u>Bell v. Streetwise Records, Ltd.</u>, 640 F. Supp. 575 (D. Mass 1986) (Zomba Br. p. 16) is misplaced.  That case did not involve a filed trademark and it was clear that the group had long functioned under the disputed name before the defendants' involvement.  Indeed the defendant did not seek a trademark until 1983 (640 F.Supp at 578) although the group began in 1981 under the name (<u>id.</u> at 577).  The finding after a full trial that the group was not a concept group does not aid these defendants.  Perhaps more significant for this case is the finding that "ownership of a Mark is established by priority of appropriation" (<u>id.</u> at 579) and that public association was earlier found to be irrelevant by the First Circuit Court of Appeals in that case (<u>id.</u> at 581).

such relief in spite of the defendants' defenses that the manager had wrongfully or fraudulently obtained the registration for the mark for his own behalf rather than on behalf of the group.

> d.     The Contract "Issues" Raised By Defendants Do Not Impact On Plaintiffs' Wholly Independent Rights To Enforce The Trademark

Defendants' improperly attempt to excuse their trademark infringement by asserting issues applicable only to their discrete and independent claims for relief based on alleged breaches of contract. Thus, they argue that plaintiffs' trademark rights do not survive the purported termination of the Recording Agreement (Group Br. p. 7). This is incorrect.

Pearlman's rights in the Mark derive from his usage of the Mark and from the license he acquired -- a Mark that has always been used for the benefit of Trans Continental and the Group. Contrary to defendants' claim (Group Br. p.7), Section 21.04(b) of the Recording Agreement (Pearlman Decl. Exh. E) acknowledges Plaintiffs' ownership of the Mark but does not confer such rights. Accordingly, the alleged termination of that agreement does not deprive Pearlman of any rights.

Furthermore, defendants' claims of unconscionability, breach of contract and breach of fiduciary duty are not impediments to enforcement of the plaintiffs' trademark rights. (Zomba Br. p.16). These claims are advanced in an effort to obfuscate the existence of the two independent bases for relief and are otherwise flawed. The courts have routinely held that issues and defenses that are collateral to the infringement claim, such as alleged breaches of contract, do not pose a bar to injunctive relief. Qidatex, S.r.l., v. Campaniello Imports, Ltd., 1999 U.S. Dist. LEXIS 15589 (S.D.N.Y. Oct. 4, 1999) (rejecting defenses to trademark infringement based upon Plaintiffs' asserted right to terminate the underlying agreement); Liz Claiborne, v. Mademoiselle Knitwear, 13

---

(...continued)
[*] A copy of this opinion will be annexed to the Brett Declaration to be submitted to the Court on November 22, 1999

F. Supp. 2d 430, 1998 U.S. Dist. LEXIS 9135 S.D.N.Y. 1998); Burger King Corp. v. Majeed, 805

F. Supp. 994 (S.D. Fla. 1992) (the court stated that "defendants' status as a 'holdover' franchisee

alone was dispositive of the infringement issue" and, as such, it was not necessary to evaluate

defenses on collateral issues); Burger King Corp. v. Lee, 766 F. Supp. 1149 (S.D. Fla. 1991) (post-

termination use of trademark enjoined despite franchisee claims of breach).  The unauthorized use

of a trademark is an infringement, and the infringement of a trademark is not a proper self-help

remedy for an alleged breach of contract.  McDonald's Corp. v. Robertson, 147 F.3d 1301, 1310

(11th Cir. 1998).

3.   **Defendants' Assertions Of Breach Of Fiduciary Duty Regarding The Trademark Are not a Bar to a Preliminary Injunction Where Pearlman Has Never Sought to Use The Mark Without The Group While The Group Members Are Here Planning To Use The Mark For Themselves And For Defendant Zomba Without Regard To The Rights Of Plaintiffs**

In an attempt to manufacture a defense to Plaintiffs' right to an injunction, the Defendants'

protest that "Pearlman's most egregious breach[] of fiduciary duty was his secret scheme to

appropriate to himself permanent trademark rights to the name 'N Sync."  (Group's Br., p. 9).

Pearlman purchased the License in his own name.  He paid for the License with his own money.

It is not disputed, however, that Pearlman always used the 'N Sync Mark solely in connection

with the commercial activities of the Group for the mutual benefit of the parties and the Group

was never disadvantaged by the terms of the license.  Thus, there was neither a breach of duty nor

an act regarding the Mark that disadvantaged the Group in any way.

In sharp contrast to Pearlman's activities that have well served the interests of the Group, the

members of the Group do not seek to use the Mark for the mutual benefit of Plaintiffs and

themselves.  Rather, they seek to misappropriate the Mark for their own benefit and for defendant

Zomba to the complete exclusion of the rights and interests of Plaintiffs.  (See, e.g. Zomba Br. pp.

12, 14). If any fiduciary duties exist with respect to the activities of the Group, they are violated only by the actions of the Group who are taking Pearlman's property for their use. See Deauville Corp. v. Federated Dep't Stores, Inc, 756 F.2d 1183 (5th Cir. 1985); In re Cramer, 93 B.R. 764 (Bankr. M.D. Fla. 1988); Reaves v. Hembree, 330 So.2d 747, 749 (Fla. 1st D.C.A. 1976), cert. den., 345 So.2d 423 (Fla. 1977).

As set forth in the moving brief, Pearlman is the owner of the exclusive license and the rights in and to the name 'N Sync in all aspects of the music business. However, in light of the fact that the use of the Mark has been sublicensed for the common benefit of the parties, the Group cannot misappropriate the Mark for its exclusive benefit. Apposite is Durango Herald, Inc. v. Riddle, 719 F. Supp. 941, 945 (D. Col. 1988), where a joint venture held the rights to a trademark and one of the joint venturers proceeded to use the mark to the exclusion of the other joint venturer. The Court determined that neither of the joint venturers could independently use the trademark and enjoined such use.

Defendants improperly refer the Court (Group Br. pp. 8-9) to cases involving breach of fiduciary duty claims by performers against managers such as ABKCO Music, Inc. v. Harrisongs Music, Ltd., 722 F.2d 988 (2d Cir. 1983) and Jones v. Childers, 1992 WL 300845 (M.D.Fla. 1992), aff'd in pertinent part, 18 F.3d 899 (11th Cir. 1994) which do not involve or address an effort by the performers to appropriate for his own use an asset of the manager that has been used with the performer.[7]

---

[7] ABKCO Music, Inc. v. Harrisongs Music, Ltd., supra, involved an effort of the former business manager of the Beatles, to profit from his purchase of the stock of a company to whom George Harrison lost a copyright infringement case. The Second Circuit labeled the case as "novel" and "unique" (Id. at 995) and the district court that originally heard the matter likewise called it "novel in the extreme." (Id. at 995). In like measure, Jones v. Childers, supra, which involved a manager's recommendations and sales of unregistered securities to the plaintiff is not relevant.

4.   **Defendants' Various Assertions Regarding The Contracts Are Neither An Impediment To Injunctive Relief Nor A Basis For Unilateral Breach; Rather, These Vigorously Disputed Claims Should Be Reserved For A Trial**

As noted, we incorporate herein the demonstration in the BMG reply brief that the Exclusive Recording Agreement was not properly terminated.   We continue to assert that defendants' abandonment and breach of the existing and operative agreements provide an independent ground for injunctive relief.   We here demonstrate that there is no basis for defendants' other grounds urging that the contracts should not be enforced.

a.   **None of The Defenses Urged By Defendants Justify Their Unilateral Termination Of The Contracts Or Their Contract With Zomba**

Defendants who now so vocally denounce the contracts that made them rich never at any time over the last three years sought a declaration of their rights, sued for breach of contract or brought an action to rescind the contract.   They accepted and enjoyed the millions of dollars and other benefits of their role as a popular music group.   Clearly, they could have sought such relief in May of 1999 if they believed their claims were meritorious.   Instead, they sought to advance their self-interest through negotiations until they made their secret deal with Zomba that compelled this application as soon as the arrangement was known.   They now seek to walk away with the 'N Sync Mark and enjoy, to the exclusion of Pearlman, the big payday used by Zomba to lure the Group into a conflicting record contract.   Defendants' delay, their lack of candor and credibility preclude their reliance on such claims.

b.   **The Unconscionability Claim Is Not An Impediment to Injunctive Relief**

The threshold for judicial intervention to find a contract unenforceable because it is "unconscionable" is very high.   Hume v. United States, 132 U.S. 406, 411, 10 S.Ct. 134, 136, 33 L.Ed. 393); accord   Golden v. Mobil Oil Corp., 822 F.2d 490 (11th Cir. 1989).   The fact that

enforcement of an agreement results in a heavier burden than would be imposed on a party if the court had a free hand does not make it unconscionable. <u>Singer Island Civic Asso. v Casetta, Ltd.</u>, 527 So.2d 861 (Fla, 4th DCA 1988).

As stated in <u>Steinhardt v. Rudolph</u>, 422 So.2d 884, 890 (Fla. 3d DCA 1982), relied upon by Defendants:

> ... a court will [not] relieve a party of his obligations under a contract because he has made a bad bargain containing contractual terms which are unreasonable or impose an onerous hardship on him. Indeed, the entire law of contracts, as well as the commercial value of contractual arrangements, would be substantially undermined if parties could back out of their contractual undertakings on that basis. 'People should be entitled to contract on their own terms without the indulgence of paternalism by courts in the alleviation of one side or another from the effects of a bad bargain. In addition, they should be permitted to enter into contracts that actually may be unreasonable or which may lead to hardship on one side.' Williston, A Treatise On The Law Of Contracts §1632 at 51-52 (3d Ed. Jaeger 1972).[8]

A party which accepted the benefits of the contract claimed to be unconscionable, should be "estopped from questioning the validity and effect of a contract." <u>Rood Co., Inc. v. The Board of Public Instruction</u>, 102 So.2d 139, 142 (Fla. 1958); <u>accord</u>, <u>Hendricks v. Stark</u>, 99 Fla. 277, 126 So. 293 (1930); <u>Plaza Builders, Inc. v. Regis</u>, 502 So.2d 918 (Fla. 2d DCA 1986).

The facts and exhibits set forth in the accompanying Pierfy Declaration demonstrates that defendants' claims of economic servitude and the description of the Group Members as "indentured servants" do not reflect candor with the Court. The concealment of cash payments of over $7,000,000 and the imminent receipt of additional millions from Trans Continental, is not defensible.

---

[8] Although the legal principles espoused in Steinhardt are apt, the facts of that case do not avail defendants. There, the Florida Third District Court of Appeals affirmed a trial court's finding that a double escalation clause in a ground lease underlying condominiums was unconscionable. The court concluded that the land had virtually no economic value on the open market because it was subject to the condominiums above and therefore could not be developed. The double escalation clause at issue also allowed only a rise in rents. The facts of this case are hardly comparable to the case at bar.

(continued...)

-16-

Defendants further fail to disclose to the Court that Lynn Harless, the mother of Defendant Timberlake, and Diane Bass, the mother of defendant Bass, respectively filed petitions for approval of the contracts that Defendants Timberlake and Bass entered into with Pearlman, which they now claim are unconscionable and represented to the Florida court that the contracts were "reasonable" and in their sons' "best interests." (Brett Decl. Exhs. D and E) and that:

> "The Petitioner believes <u>the above-referenced contracts are reasonable and in the minor's best interests</u> because the above-referenced Record Company, Trans Continental Records, Inc. and said corporation's president, Louis J. Pearlman, have extensive experience in the entertainment and communications industries, as well as in other businesses. Furthermore, the Record Company and its president have invested substantial sums of money and services in the career of the minor and the other members of the musical group. Additionally, <u>the petitioners engaged the services of independent legal counsel in Memphis, Tennessee, and Los Angeles, California, to review and negotiate the above-referenced contracts</u>."[9]

c.   **The Defense of a Purported Underpayment of Royalties Cannot Provide a Basis To Deny Injunctive Relief**

Defendants' argue (Group's Br. pp. 14-15) that the Group was not properly paid royalties that were converted by Pearlman. As demonstrated in the Pierfy Decl., those claims have not been properly asserted. In any event, they do not provide grounds for rescission or unilateral breach.

Rescission has been described by the Florida Supreme Court as an "extraordinary" and "unfavored remedy." <u>Lang v. Horne</u>, 156 Fla. 605, 23 So. 2d 848 (1945). <u>Accord</u>, 503 So. 2d 1351 (Fla. 5th DCA 1987). As an extraordinary remedy, rescission is appropriate only when a

---

(...continued)

[9] Paul Harless, the husband of Lynn Harless, is Executive Vice President of First Tennessee Bank, who was also directly involved in these events, but is noticeably absent from defendants' presentation. The language of the Petition of Diane Bass is almost identical to the petition of Lynn Harless except that, among other things, it refers to her retention of independent legal counsel "to review and negotiate" the contracts in Mississippi, the place of residence of the Bass family. The Group Members reluctantly admit in their opposition papers that the contracts were made on the advice of counsel, but proffer in support of their unconscionability theory that they could not "understand a word in the contracts" (Bass Decl., ¶7), and that their counsel only looked briefly at the recording agreement (to which he had little comment) and did not, for unstated reasons, review all of the agreements. (Harless Decl ¶20). These recent contentions stand in contrast to the representations that they earlier made to the Florida court.

(continued...)

breach is material and goes to the root of the agreement between the parties.  See  Tabatchnick's II, Inc. v. Davis, 386 So. 2d 37 (Fla. 3d DCA 1980).  Accord Canfield v. Reynolds, 631 F.2d 169, 178 (2d Cir. 1980).

Courts in numerous jurisdictions have followed the principle espoused in the leading case of Nolan v. Sam Fox Publishing Co., 499 F.2d 1394 (2d Cir. 1974) holding that unless there have been a total failure to make required royalty or other monetary payments, the alleged breach is not material and a right of rescission cannot be claimed.  See e.g. Performance Unlimited v. Questar Publishers, 52 F.3d 1373 (6th Cir. 1995); Semptembertide Pub., B.V. v. Stein & Day, Inc., 884 F.2d 675 (2d Cir. 1989); Cabot v. Jamie Record Co., 1999 U.S. Dist. LEXIS 5549 (E.D. Pa. Apr. 22, 1999); Gordy Co. v. Mary Jane Girls, Inc., 1989 U.S. Dist. LEXIS 14581 at *124, 1989 WL 149290 at *41 (S.D.N.Y. Dec. 6, 1989); Cafferty v. Scotti Bros. Records, 969 F. Supp. 193 (S.D.N.Y. 1997).[10]

Moreover, the Recording Agreement itself also defeats the Group Members' position. Specifically, paragraphs 11.03 and 11.04 of the Exclusive Recording Agreement provide that before the commencement of litigation relating to any royalty statement, the Group is required to conduct an audit and deliver an audit report.   The Group did not comply with these requirements. Furthermore, Paragraph 11.05 of the Exclusive Recording Agreement expressly provides that the recovery of royalties is "the sole remedy available" and the Group does not have "any right to seek termination of this Agreement or avoid the performance of [its] obligations under it by reason of any such claim, except if such claim is based upon fraud."

_____

(...continued)

[10] Defendants cite Troup v Hancock, 367 So. 2d 691 (Fla 1st DCA 1979)  for the proposition that a party may not seek to enjoin the breach of a contract by another party if the former party has materially breached its obligations under the contact.  Troup is inapposite since it involved proven breaches going to the essence of the injunction unlike the money issues here raised.

5.    **The Balancing Of The Equities And The Manifest Harm To The Plaintiffs Justifies The Limited Injunction Here Sought**

Defendants could not be clearer. To them "[t]his case as about money." (Zomba Br. pp. 17, 18). The contracts at issue are declared "unworthy of respect." (Id. at 19). Presumably, anything is permissible if it helps defendants get more money now. The destruction of a man's character and violations of trademark and contract rights are irrelevant to their pursuit of money. The plaintiffs have shown irreparable injury. As the Eleventh Circuit has explained, irreparable harm arises from the loss of the ability to exercise control of the nature and quality of the use of the Mark; a right which resides exclusively with the owner of the rights to the Mark. McDonald's Corp. v. Robertson, 147 F.3d 1301, 1310 (11th Cir. 1998). As similarly explained by the Seventh Circuit in an oft-cited passage: "The most corrosive harm attributable to trademark infringement is the inability of the victim to control the nature and quality of the defendants' goods. Even if the infringer's products are of high quality, the plaintiff can properly insist that its reputation should not be imperiled by the actions of another." Processed Plastic Co. v. Warner Communications, Inc., 675 F.2d 852, 858 (7th Cir. 1982) (citation omitted).

In the face of these policies and rules, defendants are not aided by characterizing the relief sought as enforcing contracts for personal services or their citation to Montaner v. Big Show Prod. 620 S.2d 246 (Fla. 3rd DCA 1993) and other cases cited. ('N Sync Br. pp. 17-18). Neither Montaner nor any of the other case cited suggest that there is any judicial reluctance to enforce the misuse of a trademark and there is no case which applies the alleged policy in that circumstance. In any event, unlike Montaner, plaintiffs do not seek to compel any conduct or action or prevent the Group from performing. Indeed, the Group is continuing to tour, sell merchandise and engage in a wide range of other highly visible activities. They can release their next album through RCA while

the proposed injunction is in place but we do not seek to compel such action. It can hardly offend any policy to prevent the Group and Zomba from releasing an 'N Sync album until the respective claims are tried before this Court. Plaintiffs are prepared to proceed with expedition to satisfy defendants' professed urgent timing need while all future proceeds earned by the Group are protected. Plaintiffs' have manifestly demonstrated that they are entitled this result.

### CONCLUSION

Plaintiffs respectfully request that the preliminary injunction here sought be entered and that expedited discovery and an early trial be directed.

J. Cheney Mason, Esq.
Florida Bar No.: 131982
J. CHENEY MASON, P.A.
390 North Orange Avenue, Suite 2100
Orlando, FL 32801
Telephone No.: (407) 843-5785
Facsimile No.: (407) 422-6858


William B. Pringle, Esq.
Florida Bar No.: 077986
WILLIAM B. PRINGLE, P.A.
390 North Orange Avenue, Suite 2100
Orlando, FL 32801
Telephone No.: (407) 843-3701
Facsimile No.: (407) 650-1800

Of Counsel:

PARKER CHAPIN FLATTAU & KLIMPL, LLP
Barry J. Brett, Esq.
Michael D. Friedman, Esq.
Sharon H. Stern, Esq.
1211 Avenue of the Americas
New York, New York 10036
(212) 704-6000