UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA -- ORLANDO DIVISION
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

TRANS CONTINENTAL RECORDS, INC., BMG
ENTERTAINMENT, BMG ARIOLA MUENCHEN
GmbH, TRANS CONTINENTAL ENTERTAINMENT,
INC., and LOUIS J. PEARLMAN,

                                 **Plaintiffs,**

                    v.

ZOMBA RECORDING CORPORATION, CLIVE
CALDER, JAMES LANCE BASS, JOSHUA SCOTT
CHASEZ, JOSEPH ANTHONY FATONE, JR.,
CHRISTOPHER ALAN KIRKPATRICK, and JUSTIN
RANDALL TIMBERLAKE,

                                **Defendants.**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Civil Action No.
99-1282-Civ-Orl-22C

**SECOND
SUPPLEMENTAL
DECLARATION OF
ADAM E. RITHOLZ IN
OPPOSITION TO
PLAINTIFFS' MOTION
FOR A PRELIMINARY
INJUNCTION**

       ADAM E. RITHOLZ, pursuant to 28 U.S.C. § 1746, declares under penalty of perjury:

       1.      I am an attorney admitted to the practice of law in the State of New York and a member of the law firm of Leibowitz Roberts & Ritholz LLP. Since in or about January 1999, I have acted as counsel for defendants James Lance Bass, Joshua Scott Chasez, Joseph Anthony Fatone, Jr., Christopher Alan Kirkpatrick and Justin Randall Timberlake, who are known professionally as 'N SYNC. I make this further supplemental declaration of my own personal knowledge in opposition to plaintiffs' motion for a preliminary injunction.

       2.      In their reply papers, plaintiffs continue to depict my clients as erstwhile street urchins who were enriched by Pearlman but who are now the ungrateful



captives of "avaricious advisors."  Curiously, while headlining the aggregate amounts allegedly received to date by my clients, *plaintiffs nowhere tell this Court the full amount that Pearlman and his companies have received from his various self-dealing agreements out of four years of arduous work by my clients*.  That plaintiffs are silent on the amount of money that Pearlman and his companies have made speaks volumes about the nature of the contracts he procured from my young clients.   Plaintiffs do not dispute that Pearlman and Transcon have made many millions of dollars more than any one of my clients.  Nor do they dispute that the *most* Pearlman and Transcon ever "advanced" 'N SYNC -- to misappropriate my clients' rights and intellectual property for themselves -- was $206,000.

    3.    Plaintiffs have decided not to submit any reply affirmations on their motion for a preliminary injunction until Monday, November 22, when we will be unable to address any of the statements made in them.  Nevertheless, based on their memoranda of law, it is possible to anticipate and address certain of those statements.  In my prior declarations, I noted that plaintiffs had not disclosed various facts to this Court, including all the overreaching contracts that Pearlman procured from my clients.  Apparently on the theory that the best defense is to go on the offense, plaintiffs now accuse 'N SYNC of a lack of disclosure.  As I explain below, however, plaintiffs should re-read our prior submissions, because all of the facts they cite as nondisclosures are in fact set forth in our prior submissions.

**Payments Received by 'N SYNC**

4.      For instance, plaintiffs allege that we have attempted to hide that 'N SYNC in the aggregate has been paid over $7 million in royalties and salary to date. In fact, although hampered by the absence of proper accountings from Pearlman and Transcon, my two prior declarations and the declaration of 'N SYNC's accountant, Howard Comart, accurately refer to and account for the entire $7 million.  Notably, all but a portion of those funds were paid to my clients *in 1999*, largely for touring work *in 1999, after* they retained counsel and examined the contracts at issue.

5.      Equally important, plaintiffs' reliance on the $7 million figure only confirms what we previously established, because it shows how little my clients received during the very time in 1997 and 1998 that plaintiffs here, including BMG Music, boast of having made them superstars.   Before late 1998 -- in other words, for three years of exhausting work performing, touring and recording -- *my clients each made less than $100,000, while Pearlman and his companies made millions.*

6.      To be specific, more than $5 million of the $7 million received by 'N SYNC is the direct result of negotiations earlier this year in relation to N SYNC's most recent tour.  After 'N SYNC terminated its recording agreement with Transcon in May, 'N SYNC was able to negotiate new arrangements with Pearlman and Transcon on 'N SYNC's behalf for the summer 1999 tour, which had already been booked; for the first time, 'N SYNC began receiving an amount approaching what they should have been receiving.  'N SYNC also received a small portion of the merchandising income due

them in or about May 1999, although Pearlman refused to distribute to them any portion of a $1 million advance he had received from the merchandiser.

7.     Plaintiffs complain that, in our submission, we selected an "arbitrary" date for identifying the sums paid to 'N SYNC. In fact, in the declaration of Howard Comart, we reported *all* the money paid to 'N SYNC under the Transcon Recording Agreement from the inception of the parties' relationship through March 20, 1999. These are the only dates for which 'N SYNC had accounting records supplied by plaintiffs and for which payments were made. In my supplemental declaration addressed to the amount of security that this Court should require if a preliminary injunction issues, I also noted the sums received by my clients as wages during their tour which concluded on September 4, 1999. Thus, there is nothing that my clients received which my clients have not disclosed to this Court. Obviously, we are not able to report on alleged "earnings" for which neither a payment nor an accounting has been received.

8.     Again, while plaintiffs would like it to be otherwise, I respectfully submit that the issue here is not what my clients have received as wages or royalties for their own hard labor, but what they should have fairly and reasonably received had Pearlman satisfied his fiduciary obligations and promises to my clients. One measure of the fairness and reasonableness of those contracts is to know the amounts that Pearlman and his companies have received, for their $200,000 investment, and to compare those sums to that received by any member of 'N SYNC. Pearlman and his companies stress the amounts received by my clients, most of it after I arrived on the scene, and never disclose what Pearlman and his companies have received.

### Recording Agreements with U.S. Record Companies

9.      Plaintiffs' insistence that Transcon's contract with BMG Ariola constitutes a contract with a U.S. record company is demonstrably incorrect -- and plaintiffs know it.   As mentioned in my initial declaration, I insisted from the very beginning of my negotiations with plaintiffs that 'N SYNC was entitled to a contract with a U.S. record company.   During those negotiations, Transcon provided me with a copy of a memorandum dated March 4, 1999 on the letterhead of Rudolph & Beer, Transcon's transactional counsel in New York.   This memo appears to concern negotiations between Transcon and BMG Music for a recording agreement with a U.S. record company -- precisely what Transcon was under an obligation to obtain (and which Transcon failed to achieve).   In this memo, Pearlman's own lawyer notes that   "[r]equiring that the entire deal be converted to a U.S. deal may not be the correct move politically, but because sales are primarily in the U.S. in vast numbers, the deal needs to be re-structured so that U.S. sales are not deemed 'foreign' sales and subject to reductions and time delays (in accounting for foreign sales) by BMG."    (See Ex. A)   Thus, before my clients terminated the Transcon Recording Agreement, Pearlman was well aware that the BMG Ariola License Agreement was not a contract with a U.S. record company, and that there were deleterious consequences for 'N SYNC in the differences between the BMG Ariola License and a recording contract with a U.S. record company.

10.      Plaintiffs are also just wrong that recording contracts with U.S. record companies do not contain commitments by the record company to release albums in the U.S.   Any U.S. recording contract, negotiated by competent counsel, contains a

U.S. release commitment.  This is the most routine of the obligations of a U.S. record company.

11.     Plaintiffs' contrary argument -- that typically U.S. record companies merely have an "option" to release albums in the U.S. -- confuses two very different contractual provisions.   One provision concerns the *term* of a recording contract; the other, which is relevant here (and which plaintiffs try to confuse) concerns the record company's *release* obligation.

12.     Specifically, the *term* of a multi-album record contract typically turns on the number of albums that a U.S. record company has the right to ask of the artist.  A standard recording contract with a U.S. record company provides that, after the first album, the U.S. record company has irrevocable options to call for a second album, a third album, and so on.  If the U.S. record company *does not* exercise that option, then the artist is free of any further contractual obligations to the record company for future albums.  If the U.S. record company *does* exercise that option, then the artist is obligated to deliver an album to the U.S. record company.  This provision is different from the provision dealing with the U.S. record company's *release* obligation.

13.     The *release* obligation is an obligation undertaken by the U.S. record company, upon delivery of an album, to release the album in the U.S.  Under a standard recording contract with a U.S. record company, if a U.S. record company fails to release an album in the U.S., then the artist may terminate the agreement.  This is a critical obligation of any U.S. record company's recording agreement with an artist, and a critical protection for the artist.  In this instance, however, the BMG Ariola License

purported to allow BMG Ariola to bind Transcon to the terms of the BMG Ariola License as long as BMG Ariola released an album *in Germany*. There was no obligation to release in the U.S., and no rights if BMG Ariola failed to do so.

14.     In its reply memorandum, BMG Music quotes from a story in *The New York Post* alleging that my clients and I have stated that the "distribution argument [sic] is not the real issue." I have never said anything of the kind. Unlike plaintiffs, my clients and I have struggled, to the extent possible in a case of public interest, to avoid litigating this matter through the media. In response to a *Post* reporter's inquiry, and with another 'N SYNC witness on the call who is prepared to corroborate me, I told the reporter that the distribution agreement is not the *only* issue in this action. Indeed it is not. But Pearlman's failure to obtain a recording agreement with a U.S. record company is a central issue in this action.[1]

15.     In short, plaintiffs cannot deny that plaintiffs failed to obtain a contract for my clients with a U.S. record company. From plaintiffs' standpoint, the absence of a contract with a U.S. record company was of great value -- they owed no obligation to my clients to release albums in the U.S. or to pay my clients royalties consistent with U.S. record contracts. This explains why plaintiffs try to cast the issue as a "sham" technicality. But from my clients' standpoint, the difference is highly

---

[1]     The *Post* article also misquotes me concerning Pearlman's failure to obtain a contract with a U.S. record company. The article claims that I said that Pearlman failed to obtain any distribution of 'N SYNC records in the U.S. I did not say that. Rather, I explained that Pearlman failed to obtain an agreement with a U.S. record company.

material, because they had no U.S. release commitment and no right to receive payments and accountings consistent with agreements with U.S. record companies.

### BMG Ariola Inducement Letters

16.     In their reply memorandum, plaintiffs argue that the so-called Letter of Acknowledgment signed by 'N SYNC serves the purpose of  a letter of inducement and has the effect of binding my clients to the BMG Ariola License. Previous declarants have already refuted this argument.  As Jill Berliner explains in her expert declaration in this matter, the Letter of Acknowledgment has none of the characteristics of or undertakings found in a standard industry inducement letter, a form of which she attaches to her declaration.  Mr. Calder's declaration likewise attaches a form of inducement letter used by BMG Music's RCA label in 1998.  The standard inducement letter not only binds an artist to the recording contract but states that the artist has read and understands the recording contract.  As their declarations attest, none of my clients ever saw the BMG Ariola License until after I was retained.

17.     I add only this new point.  The BMG Ariola License Agreement itself required Pearlman to obtain a Letter of Inducement from 'N SYNC.  I attach hereto as Exhibit B an example of an inducement letter used by BMG Ariola to bind an artist to a recording contact.   As the Court will observe, Pearlman's "Letter of Acknowledgment" has none of the language set forth in this attachment.  This attachment shows that BMG Ariola uses inducement letters in keeping with the industry standard. It further demonstrates that my clients had no contractual relationship with BMG Ariola -- and certainly not with RCA or BMG Music.

### The Zomba Recording Agreement

18.      Plaintiffs do not claim -- and cannot claim -- that Zomba had anything to do with my clients' decision to terminate the Transcon Recording Agreement. They do claim that 'N SYNC negotiated its recording agreement with Zomba "in secret" and that Zomba somehow took my clients "from the table" with plaintiffs.  In fact, however, before my clients had any contact with Zomba, my clients repeatedly, unambiguously and unconditionally told *both* Transcon *and* BMG Ariola (with copies to BMG Music's Mr. Zelnick and to RCA's Mr. Jamieson) that the Transcon Recording Agreement was terminated and that my clients "fully intend to pursue their career on that basis."  (*See, e.g.,* Ex. 18 of my November 1, 1999 declaration)

19.      Zomba did not take my clients "from the table" with plaintiffs, because we were not "at the table" with Transcon during my negotiations with Zomba. Indeed, after I met with Zomba's Mr. Calder in late July 1999, I had only brief contact with anyone representing Transcon, which is described in my November 1, 1999 declaration and in which my clients received Pearlman's "final" offer to resolve the dispute, which they rejected.  Thus, Zomba did not take my clients "from the table" with plaintiffs; my clients did.

### Parental and Court Ratification of the Contracts

20.      In their reply briefs, plaintiffs cite the parental petitions signed by Diane Bass and Lynn Harless as support for the fairness and reasonableness of the contracts Pearlman induced the members of 'N SYNC to sign.  The declaration previously submitted by Ms. Harless (in paragraph 31) and my earlier declaration of

November 1 (at paragraph 13) previously noted these petitions.  I note the following concerning them:

- First, the petitions were prepared by counsel selected by Pearlman.

- Second, the petitions did not disclose all the contracts that Pearlman had procured from my clients, nor disclose the relationship of confidence and trust that existed between Pearlman and my clients at that time.  Indeed, to the best of my knowledge, until I was retained by 'N SYNC earlier this year, no lawyer acting on behalf of 'N SYNC had ever reviewed the entire web of contracts by which Pearlman purported to bind 'N SYNC.

- Third, the omissions from these petitions were highly material. Neither the Exclusive Management Agreement nor the Consulting Agreement were disclosed (see pp. 7-8 and Ex. 7 & 8 of my November 1, 1999 declaration). In addition, the petitions state that 'N SYNC Productions, Inc. was intended for "merchandising" and nowhere disclose Pearlman's subsequent use of that company to siphon off millions of dollars in 'N SYNC's touring income.

- Fourth, though not acknowledged by plaintiffs, the court never approved even the contracts that Pearlman submitted for approval, because the guardian appointed to review the contracts for Justin Timberlake objected.  In his report, and based only on the limited information available, this guardian sharply criticized the terms of the contracts Pearlman got my clients to sign and recommended substantial modifications designed to provide additional protections to Justin.  Tellingly, after this

report was filed, Pearlman did not modify the contracts or seek judicial approval of them.

21.     As others have noted, the Backstreet Boys filed a complaint against Pearlman and Transcon for breach of fiduciary duty and fraud.  That complaint attached copies of the contracts that Pearlman procured from those young men.  A comparison of those contracts with the contracts at issue here shows that they are nearly identical, which confirms that the contracts here were not the product of arms'-length negotiations.

### Plaintiffs' Admissions That 'N SYNC Is Not a Concept Group

22.     Plaintiffs argue that they are entitled to own and control the name 'N SYNC because 'N SYNC is a "concept" group conceived and controlled by Pearlman.  Other declarants, including 'N SYNC itself, have attested to the error of this argument.  I supplement that showing only to submit to the Court the following statements which may be fairly attributed to plaintiffs and which refute plaintiffs' afterthought argument that 'N SYNC is a "concept" group separate from the individual identities of my clients.  These are statements made *before* plaintiffs had to develop the legal theory that they argue to this Court.  The statements show how plaintiffs marketed and promoted 'N SYNC as the *opposite* of a "concept" group:

•     The "official" biography of 'N SYNC, made while 'N SYNC was allegedly under Pearlman's "control" and with Transcon's approval, states at page 7 (the emphasis is mine):

> There are a ton of boy bands on the charts today, all competing for the top spots.  What makes 'N Sync so special?
>
> 'N Sync stands out because the young men in it are genuine; *they're*

*not a prepackaged rent-a-band put together by big-time music promoters.*
Justin Timberlake explains: "We put the group together ourselves.  I think
that's something that's paid off in the long run because we were friends
before we got a management team and before we got a record deal.

•    Pages 10 and 14 of the same book likewise contradicts plaintiffs'

claim that 'N SYNC is a "concept" group conceived by Pearlman.  These pages confirm

the statements made by other declarants here that Chris Kirkpatrick formed 'N SYNC

and that Pearlman was in the background until later:

> Chris was itching to put a group together -- a group who could take
> five-part harmonies and translate them into pop music.  He contacted
> Justin, who, he knew, could sing.  Justin enlisted JC, and soon old pal
> Joey fell into the fold. . . .
>
> Justin immediately called his vocal coach back home in Memphis,
> hoping the coach would be able to recommend the perfect "low guy."
> Enter James "Lansten" Lance Bass, a good-natured country boy from
> Clinton, Mississippi.  Lance jumped on the next flight to Orlando and,
> upon arrival, instantly hit it off with the guys. Chris, Justin, Joey and
> JC knew that they had found their final number.
>
> . . . .
>
>  In 1996, a year after 'N Sync was formed, the demo [made by the
> five in 1995] captured the eye and ear of Lou Pearlman, the band's current
> business manager.  Lou immediately got in touch with Johnny Wright .
> . . .[2/]

•    BMG Ariola's Web site features a story on 'N SYNC, a copy

of which is attached as Exhibit D, which likewise makes clear that the members of

'N SYNC found each other and were not some pre-packaged "concept" group with

changeable parts.  Thus, the Web site says:

---

[2/]    A complete copy of the "official" 'N SYNC book was previously submitted to
this Court as an exhibit to the declaration of Ari Berman.  I attach the pages
quoted above as Exhibit C.

The group's roots are based in the Orlando meeting of Washington DC born "JC" Chasez, and Memphis TN native Justin Timberlake on the set of the Disney Channel show, "Mickey Mouse Club."  After the show ended, JC and Justin found themselves in Nashville at the same time working with the same vocal coach and writers, but on separate solo projects.  Justin was then called back to Orlando, where he hooked up with Pittsburgh, PA expatriate Chris Kirkpatrick.  The trio then met New Yorker Joey Fatone in a local Orlando club.  The four would go out clubbing where their slick dance-floor moves had everyone wanting to know what group they were in.

Thus inspired, *the quartet decided to form a band* and started looking for a bass voice.  Through Justin's vocal coach in Tennessee, the group hooked up with blonde-haired, green-eyed, 18-year-old Clinton, Mississippi crooner James Lance Bass AKA Lance, who fit right in with his characteristic basso profundo.  The bandmates may have come from all over, but JustiN, ChriS, JoeY, LansteN (Lance's occasional nickname) and JC discovered immediately they were 'N Sync.

- •    BMG Music's RCA label also has a biography of 'N SYNC on its Web site, a copy of which I attach as Exhibit E.   The text of this biography is substantially the same as the BMG Ariola biography quoted above, with the addition of the following statement: "Although their handsome mugs have been plastered all over music magazines on the Continent, 'N Sync are not just your flash-in-the-pan teen idol act."

- •    Finally, I note that the "official" biography of 'N SYNC distributed by its "official" fan club, which is licensed by Transcon, a copy of which I attach as Exhibit F, states:

> 'N SYNC was not a pre-packaged band.  These five young men came together as friends and knew each other long before 'N SYNC was born.
> . . .
> Chris was the instigator in terms of getting the group together.

23.     I respectfully submit that these statements are significant primarily in light of plaintiffs' argument that they own the name 'N SYNC.   On plaintiffs' theory, they own the name because my clients merely embody Pearlman's "concept."  Yet plaintiffs themselves market and promote 'N SYNC as anything but a "concept" group.

### The New Jersey Litigation

24.     Plaintiffs make much of an alleged "preliminary injunction" entered by Chief Judge Thomas of the District of New Jersey in Pearlman's suit to prevent -N Sync, Inc. from terminating Pearlman's purported license of the 'N SYNC mark.   In fact, however, I am advised that the New Jersey federal court did not enter a preliminary injunction based on findings that Pearlman met the standards applicable to such injunctions.  Rather, the court extended a temporary restraining order, which the court acknowledged had the effect of a preliminary injunction.   The transcript of the hearing before Judge Thomas, which is attached as Exhibit G, indicates that the court did so because the court could not hear evidence prior to termination of the temporary restraining order and because -N-Sync, Inc. identified no injury from a restraint on its termination of the license between -N-Sync, Inc. and Pearlman.   The court did not conduct an evidentiary hearing.   Instead, the court said that "there is no way that I can resolve this carousel without having the parties before me taking testimony, making findings of fact and conclusions of law."

25.      I note that my clients did not appear in the federal court in New Jersey.  Nor is there any indication in the transcript that the court was advised that my clients had formally terminated all contractual relationships with Pearlman.

26.      Finally, my clients have never conceded the validity of -N-Sync, Inc.'s interest in any enforceable trademark, and have also never conceded that my clients' use of 'N SYNC infringes either that company's registered mark or the N.J. license that Pearlman wrongfully procured for himself.  On this point, I note that plaintiffs nowhere submit to the Court the trademark registration on which the alleged N.J. license is based.  I attach a copy of that registration as Exhibit H.  As the Court will see, the mark registered by -N-Sync, Inc. for limited purposes is materially different from the mark my clients use and own.

Executed in _Neu York_, New York this 2_/_ day of November, 1999.

_____
Adam E. Ritholz



# RUDOLPH & BEER, LLP
## MEMORANDUM

March 4, 1999

To:     Mr. Louis Pearlman
        Mr. Alan Siegel
        Mr. Dave Pierfy
        Mr. Frank Sicoli
        Mr. Bob Fischetti

From:  Laurence H. Rudolph, Esq./ Vivien Rachles, Esq.

Re:    TransContinental Records, Inc. ("TCR") w/ BMG ("BMG") 'N Sync Renegotiation

1.  Provide for U.S. royalties to be paid directly to TCR from the applicable BMG subsidiary (RCA) based upon standard U.S. terms and royalty calculations (i.e., retail royalty) except as set forth below. Requesting that the entire deal be converted to a U.S. deal may not be the correct move politically, but because sales are primarily in the U.S. in vast numbers, the deal needs to be re-structured so that U.S. sales are not deemed "foreign" sales and subject to reductions and time delays (in accounting for foreign sales) by BMG.

2.  As per paragraph 5(b)(1) of the agreement, TCR submits "samples" (demos) for each Option Record prior to BMG exercising the applicable option. BMG has thirty (30) days to determine whether or not it will exercise such option based upon the "samples" submitted. I suggest moving to standard "term" provisions, whereby within thirty (30) days prior to the end of the current contract period BMG must exercise its option for the next Record, or choose not to do so. I suggest a contract period of seven (7) months from the date of initial release (in the U.S.) Of the applicable Option Record, but in no event longer than twelve (12) months from the date of delivery of such Record.

3.  TCR and 'N Sync must have creative control and be subject to a "technically" satisfactory standard for delivery of each Option Record.

4.  On a prospective basis, all "specialty" albums (i.e., an album consisting substantially of only "live" or "theme" recordings, such as a Christmas album) requested by BMG shall be subject to TCR's approval, which may be withheld for any reason, and, further, shall count (as a Commitment Album) towards fulfillment of TCR's Minimum Delivery Commitment.

5.  Three (3) year post-term reversion of the Accepted Master Recordings, provided that BMG shall have a minimum exploitation period of five (5) years for each Commitment Album.

6.  Marketing restrictions (i.e., TCR must have approvals over motion picture, television, radio, commercial licensing, premiums, coupling, etc. ...).

7.  Paragraph 5(e) provides that BMG can reject any Album due to late delivery and have no subsequent financial obligation with respect thereto. This language must be deleted. In addition,

we should add a pay-or-play for each album, which should be the full amount of the fund required to be paid by BMG for such album, less any recording costs and advances previously paid to TCR solely with respect to such album.

8. Need release commitments for the U.S., Canada, Germany, U.K., France, Japan and Benelux. In the U.S., four (4) months from the date of delivery, and elsewhere, six (6) months from the date of release in the U.S. In the event of BMG's failure to release an album in any particular territory, the rights in such territory shall revert to TCR. BMG's failure to release any album in the U.S. shall give rise to termination rights.

9. With regard to advances:

(a) Increase the formula calculation percentage to eighty (80%) percent and base the calculation upon the average of royalties earned on the previous two (2) albums as of the date of delivery of the subject option album, but in no event less than twelve (12) months following the initial U.S. release of the prior record (such figure should include an adjustment for pipeline income);

(b) monies should be paid fifty (50%) percent upon commencement of recording, twenty-five (25%) percent upon completion of vocal tracks and the balance upon delivery;

(c) minimums and maximums as follows:

| Commitment Album | Minimum | Maximum |
|---|---|---|
| Second | no min/max – $7,500,000 flat payment | |
| Third, Fourth & Fifth | $4,000,000 | $9,000,000 |

(all of the above based on U.S. dollars, with no reductions for prior advances paid)

10. "Live" or "Greatest Hits" albums subject to TCR's approval, which may be withheld for any reason. If approved, BMG must negotiate in good faith with regard to an advance. Advances for each such record subject to a minimum of two million dollars ($2,000,000).

11. BMG should be paying all video costs and expenses. Video costs should be non-recoupable (retroactively). BMG should agree not to disapprove any video budget for less than four hundred fifty thousand dollars ($450,000.00) by virtue of its amount.

12. Royalties: (changes retroactive)

| Commitment Album | Royalty |
|---|---|
| First (& Christmas album) | 20% |
| Second, Third | 21% |
| Fourth and Fifth | 22% |

*the above royalties based upon SRLP, for the GAS territories royalties should be the PPD equivalents to that set forth above – *1 pt. escalations in the U.S. and GAS territories at sales levels (combined U.S. and GAS sales) of 1 million and 2 million

13. Twenty-four (24) month holdback on "budget" records, eighteen (18) month holdback on "mid-priced" records and twelve (12) month holdback on record club sales. BMG must pay seventy-five (75%) percent of applicable royalty on mid-priced records and sixty-six (66%) percent of applicable royalty on budget records.

14. Delete paragraph 6(d)(ii), which relates to "Media-promoted Records", in its entirety.

15. With respect to paragraph 6(d)(iv)(bb), as TCR is granted approval over BMG's release or sale of "benefit" albums embodying solely Accepted Master Recordings, TCR should also have approval over the coupling of any Accepted Master Recordings with other recordings for sale as a "benefit" album.

16. Delete paragraph 6(d)(v)(bb) and redefine the "Selling Price" in subparagraph (cc) as the suggested retail list price of the record concerned.

17. With respect to paragraph 6(d)(v)(cc)(i), TCR must have approval over premium records (as set forth above) and the "Selling Price" must be redefined as the per unit purchase price times 130%.

18. No Container Deduction for electronic sales (i.e., MP3)

19. Limit normal "free goods" to fifteen (15%) percent of goods shipped and "special sales plan free goods" to ten (10%) percent more, and, in addition, make sure mechanicals are paid on fifty (50%) percent of free goods. Also, pay royalties on fifty (50%) percent of record club free goods.

20. Limit reserves to twenty (20%) percent for LPs and thirty (30%) percent for singles.

21. Delete language in paragraph 6(h) which allows BMG to deduct "Excess Earnings" (defined in the agreement sums earned by TCR in excess of total advances or other recoupable sums) from future advances, and clarify that advances may not be used to pay down unrecouped monies.

22. Delete merchandising rights in their entirety (paragraph 7), and grant all rights back to TCR on a retroactive basis.

23. BMG must warrant to pay full rate on mechanicals in the U.S. and Canada with a 13x cap.

24. Need to include audit rights for TCR. BMG to pay for audit if more than ten (10%) percent discrepancy found in TCR's favor.

25. The publishing language in paragraph 8(c) should be deleted in its entirety, and any rights previously granted should revert to TCR.

26. The governing law of the agreement should be changed to the U.S. (New York County).



From: ▇▇▇▇▇▇▇▇
Full Address: ▇▇▇▇▇▇▇

Full Address: ▇▇▇▇▇▇▇

Full Address: ▇▇▇▇▇▇▇

Full Address: ▇▇▇▇▇▇▇

Full Address: ▇▇▇▇▇▇▇

To:
BMG Ariola München GmbH
Steinhauser Strasse 3
81677 Munich
Federal Republic of Germany

Ladies and Gentlemen:

Reference is made to that certain License Agreement by and between ▇▇▇▇▇▇▇▇ ("Licensor") and BMG Ariola München GmbH ("Licensee") made as of June 27, 1997 (such License Agreement, as supplemented, amended, varied, extended and/or renewed pursuant to applicable supplements, amendments, modifications, extensions and/or renewals as heretofore have been and/or as may be made at any time hereafter being herein collectively referred to as "the Agreement") which concerns, among other things, the production

continued

INITIALS ▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇ / BMG Ariola München GmbH

2. Letter of Inducement fr█████████████████████████████████████

to BMG Ariola München GmbH █████████

---

and delivery by and/or on behalf of Licensor, and the exploitation by and/or on behalf of Licensee (and its affiliates, subsidiaries, sub-licensees, and assigns), of master recordings embodying the recorded performances of various individual artists and/or artist groups, it being hereby acknowledged and agreed that (i) the master recordings to be delivered by Licensor within the parameters of the Agreement include, without limitation, Master Recordings featuring the recorded performances of the act professionally known as ████████ ("Artists", which immediately aforesaid expression shall be deemed to include, without limitation, said act as currently comprised and any reconstituted act (with or without replacement of any current or former member(s) of the said act) performing from time to time under the aforesaid professional name and/or any other professional name(s) (if any) as may be adopted for use by Artists within the parameters of the Agreement; and (ii) said act █████████████ is currently comprised of the Undersigned █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

In order to induce Licensee to accept Master Recordings featuring the recorded performances of Artists for exploitation within the parameters of the Agreement as in force immediately prior to the date hereof and to pay good and valuable consideration therefor, each of the Undersigned voluntarily, unconditionally and with full power, authority and capacity warrants, represents and agrees all of the following:

1.     Each of the Undersigned warrants and represents that

       (a)     the Undersigned has had the opportunity to consult independent counsel of his own choice before signing this document and has either so consulted such independent legal counsel or has voluntarily waived the Undersigned's right to do so;

       (b)     the Undersigned has made himself fully informed of (and has consulted with or has had the opportunity to consult with independent legal counsel of his own choice for the purpose of having the legal effect of each of the provisions contained in the Agreement explained to him), and with full power and capacity agrees to, all the terms and conditions of the Agreement;

       (c)     on the basis of one or more valid and binding agreement(s) between the Undersigned and the Licensor (such agreement(s), as amended and as in force as of the signing hereof by the Undersigned being referred to as "the Artist Contract"), Licensor is entitled, inter alia, to the Undersigned's exclusive recording services and has, throughout the "Term" of the Agreement (as the same may be extended and/or renewed) and throughout the "Commitment

                              continued

INITIALS
███████████████████████████
██████████████████

██████████ / BMG Ariola München GmbH █████



1. Letter of Inducement

to BMG Ariola München GmbH

Period" applicable in relation to Artists (as such expressions are contractually defined and as further specified in the Agreement) the sole and exclusive right throughout the universe (i) to call upon the Undersigned to render recording services and perform in connection with the making of audio-only and/or audio-visual recordings of all descriptions and by any methods now or hereafter known ("Master Recordings") and (ii) to use, publish and otherwise exploit and to permit others to use, publish and/or otherwise exploit the professional name(s)/trademark/logo of Artists and the name(s), likeness(es) and biographical material of the Undersigned in connection with the exploitation of promotional and/or commercial merchandising rights;

(d)   there are no agreements which would prevent or restrict the Undersigned from fully rendering (or from having rendered) his services and performances for the purpose of and according to the terms and conditions of the Agreement or which would impair, restrict or invalidate the validity of the Agreement or any provisions thereof and/or any exploitation of rights in accordance with the terms and conditions of the Agreement;

(e)   Licensor is authorized to legally bind the Undersigned (and that it is the Undersigned's wish that Licensor binds the Undersigned) on an exclusive basis for purposes of performing the Agreement and the express wish of the Undersigned to render his services and performances for the purpose of and pursuant to the terms and conditions of the Agreement, and that the Undersigned has the full power, authority and capacity to do so;

2.   Each of the Undersigned hereby irrevocably

(a)   assents to the Agreement and agrees to be bound by all of the terms and conditions thereof, whether or not such provisions relate to the Undersigned;

(b)   agrees that, even if, at any time or for any reason, the Undersigned's relationship with Licensor should cease, terminate or be modified (as the case may be), the Undersigned shall continue to be bound by the Agreement, holding it at all times as true and valid and not subject to any claims against Licensee by virtue of any termination, cessation or modification of the Undersigned's relationship with Licensor or for any other reason;

(c)   agrees that if, during the Term of the Agreement and/or during the applicable Commitment Period respecting Artists (as such Term and/or Commitment Period may be extended or renewed), Licensor, for any reason, shall fail or refuse to fully and timely comply with Licensor's delivery and/or minimum delivery commitment pursuant to the Agreement in respect of Master Recordings featuring Artists or cease to be entitled to the Undersigned's recording services (including, without limitation, if Licensor fails to exercise an option under the Artist Contract), the Undersigned shall, at Licensee's request, forthwith do all such acts and things as shall give to Licensee the same rights, privileges and benefits as Licensee would have

continued

INITIALS



_____ / BMG Ariola München GmbH____

had under the Agreement if Licensor had continued to be entitled to the Undersigned's services and if Licensor had continued to comply with Licensor's delivery and minimum delivery commitment pursuant to the Agreement in respect of Master Recordings featuring Artists, and such rights, privileges and benefits shall be enforceable on Licensee's behalf against the Undersigned and all the terms and conditions contained in the Agreement shall be effective;

(d)     agrees that no termination or modification of the Artist Contract shall operate to diminish the Undersigned's liability or obligations to Licensee hereunder, and no breach by Licensor of the Artist Contract or any other agreement(s) which the Undersigned may from time to time have with Licensor shall be sufficient cause for the Undersigned's failure or refusal to fully perform for Licensee pursuant to the Agreement and in accordance with the warranties and agreements hereunder;

(e)     agrees that if Licensor shall breach the Artist Contract the Undersigned shall immediately advise Licensee in writing of the details of such breach;

(f)     agrees that the Undersigned's execution hereof shall include, but not be limited to, execution by the Undersigned as officer(s) or authorized signatory(ies) agreeing to the issuance of the licenses referred to therein on behalf of any music publishing company which is the publisher of Controlled Compositions and which is owned or controlled by (any of) the Undersigned or by any person/party which is owned or controlled by (any of) the Undersigned;

(g)     agrees and acknowledges that (except as set forth in the Agreement) Licensee shall have no obligation to make any (additional) payment whatsoever to (any of) the Undersigned and (each of) the Undersigned shall look solely to Licensor for any and all sums which arise by virtue of and/or in connection with the Agreement and/or as a result of any exploitation of any rights granted pursuant to the Agreement and/or which may become due to (any of) the Undersigned on the basis of any other agreement(s), and (each of) the Undersigned shall hold Licensee free and harmless from any and all claims with respect thereto now and forevermore;

(h)     and unconditionally waives any and all moral and like rights that the Undersigned has in the Master Recordings subject to the Agreement and in the performances embodied therein and hereby agrees not to make any claim against Licensee or any party authorized by Licensee to exploit any of such Master Recordings based on such moral or like rights;

(i)     agrees to and does hereby indemnify, save and hold Licensee harmless from any loss and/or damage and/or liability and/or expense (including but not limited to legal expenses and reasonable attorneys' fees and disbursements) paid or incurred by Licensee by reason of any act, omission, negligence, breach or alleged breach by Artists or (any of) the Undersigned or failure of the covenants, representations or warranties contained herein or in the Agreement;

continued

INITIALS

/ BMG Ariola München GmbH

to BMG Ariola München GmbH

(j)      agrees and acknowledges that Licensor owns in perpetuity and on a universe-wide basis all right, title and interest in and to Artists' professional group name(s);

(k)      agrees that the Undersigned's liability under the aforesaid representations, warranties, assents, agreements, guarantees and indemnifications is direct and immediate and not conditioned or contingent upon the pursuit by Licensee of any remedy Licensee may have against Licensee, and that such liability of the Undersigned is joint and several and shall not be subject to revocation at any time or for any reason, including without limitation any amendment to, or modification, extension, waiver, termination or discharge of, the Agreement, with or without notice to the Undersigned;

(l)      agrees that (i) any failure or delay on the part of Licensee in exercising any right or remedy in connection with the Agreement and/or any of the aforesaid representations, warranties, assents, agreements, guarantees and indemnifications shall not be deemed to constitute a waiver of the rights of Licensee against the Undersigned or of the obligation of the Undersigned or of the right of Licensee to take further action without notice to or demand upon the Undersigned; and (ii) in no event shall any modification or waiver of any of the aforesaid representations, warranties, assents, agreements, guarantees and indemnifications be effective unless in writing signed by a duly authorized signatory of Licensee, nor shall any such waiver be applicable except in the specific instance for which given;

(m)     agrees that Licensee shall have the right (but no obligation) to secure, at Licensee's expense, insurance with respect to (any of) the Undersigned for Licensee's own benefit, and the Undersigned agrees to be available for physical examinations by a physician as and when reasonably requested to do so (but no more than one time per year) and to complete such questionnaires and other documents which Licensee or any insurance carrier(s) may from time to time require in connection with securing and maintaining such insurance, provided that (i) Licensee shall keep such information confidential, except that Licensee may disclose such information to the applicable insurance carrier(s); (ii) at the Undersigned's request, Licensee shall allow the Undersigned to select any physician approved the applicable insurance carrier(s); and (iii) the foregoing shall not constitute a warranty that the Undersigned is insurable, and (iv) the Undersigned's failure to qualify for such insurance shall not constitute a breach of the Agreement or this letter of inducement;

(n)     agrees that (i) the validity, construction, effect, performance and breach of the Agreement and this document shall be governed by the laws of the Federal Republic of Germany applicable to agreements made and to be wholly performed therein; (ii) in the event that any provision of the Agreement or of this document shall be legally declared invalid or unenforceable ("Invalid Provision"), then all other provisions of the Agreement and hereof shall remain in full

continued

INITIALS

/ BMG Ariola München GmbH

force and effect; (iii) in the event that any provision of this document is legally declared invalid or unenforceable, the Undersigned shall enter into good faith negotiations with Licensee to reform such Invalid Provision in such manner which comes nearest to the part hereof thus invalidated or declared unenforceable and the intended operation of the Agreement and hereof; and (iv) the Undersigned shall submit to the courts in Munich, Germany, in any action which may arise out of the Agreement and/or this document and that said courts shall have exclusive jurisdiction over any and all disputes pertaining to the Agreement and/or this document and all matters related thereto.

Very truly yours,

_____                          _____
Social Security #                                  Date of signature:

_____                          _____
Social Security #                                  Date of signature:

_____                          _____
Social Security #                                  Date of signature:

_____                          _____
Social Security #                                  Date of signature:

_____                          _____
Social Security #                                  Date of signature:

Execution by Artists Witnessed by:

ACCEPTED AND AGREED TO                             ACKNOWLEDGED AND AGREED TO
BMG Ariola München GmbH

By: _____                        By: _____
Date: _____                        Date: _____

continued

INITIALS

_____ / BMG Ariola München GmbH _____

From:
(Name & full address of Artist)

Date:

cc:
BMG Ariola Muenchen GmbH
Steinhauser Strasse 3
81677 Munch
Germany

To:

Gentlemen:

I am one of the current members of the artist group p/k/a ███████ ("Said Group") and hereby refer to the Exclusive Artist Recording Agreement dated as of ███████ (the "Artist Contract") with ███████ which is in full force and effect as of the date hereof and pursuant to which ███████ has and shall continue to have the sole and exclusive right, on a universewide basis and throughout the entire term of the Artist Contract (as defined in the Artist Contract and including, without limitation, any extensions and/or renewals thereof) to call upon me to render my personal services and performances as a recording artist in connection with the making of recordings of all descriptions and by any methods now or hereafter known, whether as a member of Said Group and/or any other group and/or as a solo artist and/or otherwise. I hereby agree as follows (it being to my benefit as a recording artist to do so):

1.      I hereby warrant and represent that my date of birth is ................ and that I was born in ....................... (city/state/country).

2.      I hereby ratify the Artist Contract and all provisions thereof for the full term thereof, including, without limitation, any extensions and/or renewals thereof, and thereafter with respect to the provisions thereof that survive the expiration or termination of the full term thereof, and I hereby acknowledge that the Artist Contract is and at all times has been valid and in full force and effect.

3.      I hereby ratify all of your right, title, and interest in and to the results and proceeds of my services rendered during the Term (as defined in the Artist Contract and including, without limitation, any extensions and/or renewals) of the Artist Contract during the period of time prior to the date on which I attained the age of eighteen (18) years.

4.      I hereby warrant, represent and acknowledge that I have not heretofore disaffirmed the Artist Contract nor shall I at any time hereafter disaffirm or purport to disaffirm the Artist Contract.

STATE OF _____

                              ss.:

COUNTY OF _____

On _____, 1998, before me personally came _____ to
me known, and known to me to be _____described herein, and who executed
the foregoing agreement, and duly acknowledged to me that she/he executed the
same on her/his behalf.


_____
Notary Public





# ★*NSYNC*

## THE OFFICIAL BOOK



by ★*NSYNC* with K. M. Squires

# 'N the Beginning

**THERE ARE A TON OF BOY BANDS** on the charts today, all competing for the top spots. What makes 'N Sync so special?

'N Sync stands out because the young men in it are genuine; they're not a prepackaged rent-a-band put together by big-time music promoters. Justin Timberlake explains: "We put the group together ourselves. I think that's something that's paid off in the long run because we were friends before we got a management team and before we got a record deal."

Lance Bass agrees. "Everything that we do is always together, and I think that's what makes the group unique."

The web of their friendship is dizzying. Flashback to 1995: Pennsylvania native Chris Kirkpatrick was living in Orlando, Florida, and working at Universal Studios as a doo-wop singer. It was there that he met and became friendly with Brooklyn-born Joey Fatone. Meanwhile, Washington, D.C., native JC Chasez and Memphis boy Justin Timberlake had just wrapped a stint together on *The Mickey Mouse Club,*



Copyright © 1998 by Joy E. Scheller/London Features

7



The group in Warsaw, Poland, on its 1996 European Tour. (Photograph courtesy of the Bass family)

The group visits the James Dean memorial. (Photographs courtesy of the Fatone family)

also in Orlando. Justin knew Chris from auditions, and JC was friendly with Joey, whose high-school buddies had also been on *The Mickey Mouse Club*.

Chris was itching to put a group together—a group who could take five-part harmonies and translate them into pop music. He contacted Justin, who, he knew, could sing. Justin enlisted JC, and soon old pal Joey fell into the fold.

The foursome was ready to make a go of it, but they lacked something important. Though Chris, JC, Justin, and Joey had wide vocal ranges, not one of them felt he had a solid enough bass.

Justin immediately called his vocal coach back home in Memphis, hoping the coach would be able to recommend the perfect "low guy." Enter James "Lansten" Lance Bass, a good-natured country boy from Clinton, Mississippi. Lance jumped on the next flight to Orlando and, upon arrival, instantly hit it off with the guys. Chris, Justin, Joey, and JC knew they had found their final member.

Now all they needed was a name. They brainstormed for weeks, but nothing seemed right; nothing seemed to fit these five fab fellows and their unique sound. Until, one day, Justin's mom remarked how "in sync" their harmonies and dancing were. The phrase stuck with the guys. "In Sync" had a nice ring to it.

But Justin's mom wasn't sure that the guys were convinced. Going back to the drawing board, she started playing around with their initials. She got nothing but gobbledygook out of the initials of their first and last names, so she started to toy with the last letters of their first names. After some shifting and scrambling, she came up with JoeyN, ChriS, JoeY, LansteN, and JC. It was too good a coincidence. These guys were completely N Sync. The name 'N Sync perfectly summed up everything about the band. Five guys with five diverse backgrounds, from five different parts of the United States, with various musical influences, somehow managed to make a sound that worked.

Though all the guys cite current hot musicians like Boyz II Men and Brian McKnight as vocal influences, each of them brings his personal taste to the mix. Joey claims fifties and sixties groups such as Frankie Lymon and the Teenagers and the Temptations as a huge influence. Lance offers a country twang and a love of Garth Brooks. Chris patterns his moves and high soprano after Michael Jackson. JC contributes a love of jazz and brings smoky vocal style, and Justin throws in a little bit of Stevie Wonder's soul with hip hop energy.

Chris describes 'N Sync's combined sound as "purely original. It's pop with an R&B twist. We take a lot of up tempo songs and put harmonies behind them." Once they had their sound down, the guys were pumped up and ready to board the initial train to success. They read every mag they could get, from coffeehouses to discuss to theme parks.

Shortly after forming as a group in 1995, they cut a video demo. Justin remembers, "We did our demo package as fast as we could, and that's when we got in touch with our management." Chris recalls the demo with a tinge of embarrassment. "It was very, very rough. We did it last minute, but it was all done by us. The printing of the posters, the

13

choosing of the outfits, the song orders, the choreography—everything. It was a lot of work." The demo included a few originals and one cover: a funky version of the Beatles' classic "We Can Work It Out."

In 1996, a year after 'N Sync formed, the demo captured the eye and ear of Lou Pearlman, the band's current business manager. Lou immediately got in touch with Johnny Wright, the mastermind manager behind such hit groups as New Kids on the Block, Snap, Color Me Badd, and the Backstreet Boys.

Johnny recollects what made him sit up and take notice of this particular gang of five: "They could really sing. They had a chemistry—an aura about them. When they talked to me they talked to me as a group, as a unit, rather than five individuals trying to pitch themselves to me—they weren't selfish. They had the same kind of aura [as New Kids on the Block]," he says fondly. "They came across my partner, Lou Pearlman. I was in Germany, and Lou called me one night and said, 'Hey, you'll never believe what's in Orlando. Another great bunch of guys. You've got to come check them out!' So I checked them out and agreed. We had the perfect opportunity to land a record deal for them. The stars were lined up for them."

Wright had no problem obtaining a record contract at BMG in Germany for 'N Sync. "He hooked us up with our record company," Justin says, "and Lou Pearlman, our business manager, was also good friends with the record company. The whole team hooked us up with BMG, and they took us to Europe. We were, like, we don't care where you take us—we just want to sing!"

Power producers Denniz Pop and Max Martin, who worked with international superstars Ace of Base and Robyn, were the next to join the team. The first single, and first smash hit, "I Want You Back," came out of the collaboration. In a few months' time, 'N Sync had a gold record on its hands.

Immediately, almost miraculously, the band broke long-standing European records, knocking out Michael Jackson as the king of the quickest-rising single and capturing the



The guys in Switzerland, 1996. (Photograph courtesy of the Bass family.)

title for longest reign for a new act on the charts. "Tearin' Up My Heart" followed quickly on the first single's heels, debuting in the top five. When 'N Sync's album was finally finished, it soared to number one faster than you can say "overnight sensation." Suddenly the guys of 'N Sync were pursued by frenzied fans wherever they went.

A sold-out tour followed, bringing them not only across the European continent but to the United Kingdom, Mexico, South Africa, Asia—everywhere but home, sweet home, the U.S.A. But success in the guys' own country wasn't too far off. After establishing a foothold in the European market, 'N Sync was ready to come home.

Two years later in 1998, when the group returned to the States, there were no swarms of fans waiting on every corner. Chris considered it a "reality check," and he actually relished going to the movies or eating at a restaurant as a face in the crowd.

Case 6:99-cv-01293-ACC   Document 66   Filed 11/22/99   Page 37 of 62 PageID 1289





*N SYNC – The Story   *N SYNC – Videos   *N SYNC – Photos

## *N Sync - The beginning

The five young men who make up 'N Sync came from all over the U.S. to form a band in Orlando, FL that then became an overnight sensation in Germany. Confused? You needn't be. JC, Joey, Justin, Lance and Chris have come together, with a self-titled debut RCA Records album. The record, originally released on BMG Ariola Munich, was produced by several top-name producers, including dancemeister Denniz Pop (Ace of Base, 3T, Robyn), and has already sported two giant smashes. The anthemic pop-soul of "I Want You Back" went Gold in both Europe and the United States. The dance-floor pulse of "Tearin' Up My Heart," their latest release, is one of the most played songs at Top 40 radio this summer. In August, with the help of their first hour long television special, 'N Sync In Concert, on the Disney Channel, 'N Sync's debut album earned Platinum status and entered the Top 10 on Billboard's charts.

## How they met

The group's roots are based in the Orlando meeting of Washington DC born "JC" Chasez, and Memphis, TN native Justin Timberlake on the set of the Disney Channel show, "Mickey Mouse Club." After the show ended, JC and Justin found themselves in Nashville at the same time working with the same vocal coach and writers, but on separate solo projects. Justin was then called back to Orlando, where he hooked up with Pittsburgh, PA expatriate Chris Kirkpatrick. The trio then met New Yorker Joey Fatone in a local Orlando club. The four would go out clubbing where their slick dance-floor moves had everyone wanting to know what group they were in.

Thus inspired, the quartet decided to form a band and started looking for a bass voice. Through Justin's vocal coach in Tennessee, the group hooked up with blonde-haired, green-eyed, 18-year-old Clinton, Mississippi crooner James Lance Bass AKA Lance, who fit right in with his characteristic basso profundo. The bandmates may have come from all over, but JustiN, ChriS, JoeY, LansteN (Lance's occasional nickname) and JC discovered immediately they were 'N Sync.

**So who are these five boys that make up *N Sync:**

**Justin Randall Timberlake** comes from Memphis, Tennessee. He's the youngest *N Sync and his blond curls gave him the nickname "Curly"

**Christopher "Chris" Alan Kirkpatrick** was born in Clarion but grew up in Pittsburgh, Pennsilvania. He's the oldest 'N Sync, but the biggest cut-up.

**Joseph Anthony "Joey" Fatone Jr.** grew up in Brooklyn, New York. His ancestors where Italian. He loves Pasta and everything that has to do with Superman.

**Joshua Scott "JC" Chasez** was born in Washington, D.C. but grew up in Bowier, Maryland. He has two younger sisters and is sometimes called "Big Daddy" by the other *N Syncs.

**James Lance "Lansten" Bass,** from Laurel, Mississippi, is not only calles Bass, he

Case 6:99-cv-01283-ACC   Document 66   Filed 11/22/99   Page 38 of 62 PageID 1290

also sings bass. He graduated from High School when he was 17.





# 'N SYNC

James Lance "Lantsen" Bass (Born- 5/4/79)
Joshua Scott "JC" Chasez (Born- 8/8/76)
Joseph "Joey" Anthony Fatone Jr. (Born- 1/28/77)
Christopher "Chris" Alan Kirkpatrick (Born- 10/17/71)
Justin Randall Timberlake (Born- 1/31/81)

---

The five young men who make up 'N Sync came from all over
the U.S. to form a band in Orlando, FL that then became an
overnight sensation in Germany. Confused? You needn't be. JC,
Joey, Justin, Lance and Chris have come together, with a self-
titled debut RCA Records album. The record, originally
released on BMG Ariola Munich, was produced by several top-
name producers, including dancemeister Denniz Pop (Ace of
Base, 3T, Robyn), and has already sported two giant smashes.
The anthemic pop-soul of "I Want You Back" went Gold in
both Europe and the United States, where the dance-floor pulse
of "Tearing Up My Heart," their latest release, has moved into
the Top 10 on Hits Most Powerful Songs chart, having gone
Gold throughout Europe. In August the album earned Platinum
status and entered the Top 10 on Billboard's charts.

Although their handsome mugs have been plastered all over
music magazines on the Continent, 'N Sync are not just your
flash-in-the-pan teen idol act. Show business veterans all, the
group are accomplished singers and dancers who have studied
under the same choreographer who's worked with Prince and
Michael Jackson. Showing their versatility, 'N Sync's repertoire
includes the simple pop bliss of Christopher Cross' "Sailing."

The group's roots are based in the Orlando meeting of
Washington DC born "JC" Chasez, and Memphis, TN native
Justin Timberlake on the set of the Disney Channel show,
"Mickey Mouse Club." After the show ended, JC and Justin
found themselves in Nashville at the same time working with
the same vocal coach and writers, but on separate solo projects.
Justin was then called back to Orlando, where he hooked up
with Pittsburgh, PA expatriate Chris Kirkpatrick. The trio then
met New Yorker Joey Fatone in a local Orlando club. The four
would go out clubbing where their slick dance-floor moves had
everyone wanting to know what group they were in.

Thus inspired, the quartet decided to form a band and started
looking for a bass voice. Thru Justin's vocal coach in
Tennessee, the group hooked up with blonde-haired, green-
eyed, 18-year-old Clinton, Mississippi crooner James Lance
Bass AKA Lance, who fit right in with his characteristic basso
profundo. The bandmates may have come from all over, but
JustiN, ChriS, JoeY, LansteN (Lance's occasional nickname)
and JC discovered immediately they were 'N Sync.

James Lance "Lantsen" Bass: Describes himself as "rather laid

back and addicted to harmony." He is the shyest member of the band. Listens to everything "from Boyz II Men to Offspring." Likes to play video games. Earned his high school degree through a tutorial program offered by the University of Nebraska. Goals for the future include "learning about music management, starting a family, and driving a Toyota 4-Runner." Lives with his father and mother in Orlando and is a freshman in college.

Joshua Scott "JC" Chasez: Served as one of the hosts of the "Mickey Mouse Club" for four years. Likes to play football and watch his favorite team, the Washington Redskins. Loves listening to "the jazzy and soulful sound between Billie Holiday and Stevie Wonder." Lives in Orlando with bandmates Chris and Justin, and Justin's mom.

Joseph "Joey" Anthony Fatone Jr.: Appeared in small roles in movies "Once Upon A Time In America" and "Matinee" and on TV series, "Sea Quest." Sang in an a cappella group. "I feel most comfortable on stage." he says, "Or in front of the camera. No matter what I do, I go at it full-tilt and can't be stopped." Favorite activity aside from performing: flirting. Lives with his parents and siblings in Orlando.

Christopher "Chris" Alan Kirkpatrick: The oldest member of the group at 26, but the biggest cut-up. Discovered his singing ability when he joined the choir in college. A big football fan whose favorite food is tacos. His musical tastes vary from "Michael Jackson to hard-techno music... The most important thing is you get the groove."

Justin Randall Timberlake: At 17, he's the youngest member of the group and still in high school. His hobbies include playing basketball, watching the Orlando Magic and dancing. "I'm a real party animal," he says. "When the others let me go to parties." His greatest musical influence is singer Brian McKnight. He lives with his mother and fellow 'N Sync members JC and Chris in Orlando, not far from the band's rehearsal studio, an old warehouse. "It really exhausts you when you jump around four times a week for three to five hours in 90-degree heat," he says.

See the web site:
http://www.peeps.com/nsync/





# Then and Now

Who is ★NSYNC? They are James Lansten "Lance" Bass, 19; Joshua Scott "JC" Chasez, 22; Joseph "Joey" Fatone, Jr., 22; Christopher "Chris" Alan Kirkpatrick, 27; and Justin Randall Timberlake, 18. All are firmly committed to ★NSYNC and are working incredibly hard to satisfy the needs and desires of their fans. This includes city to city promotional tours, concerts worldwide and of course working on new songs and upcoming videos.

Their repertoire ranges from infectious dance tunes and smooth ballads to amazing a capella melodies and freshly reworked covers. Their live shows are like nothing I've ever seen before. ★NSYNC's high-energy concerts feature not only these incredible vocals but expertly choreographed dance routines, amazing acrobatics and a lot of fun for fans with audience participation in many songs.

★NSYNC was not a pre-packaged band. These five young men came together as friends and knew each other long before ★NSYNC was born. Justin explains that "we put the group together ourselves. I think that's something that's paid off in the long run because we were friends before we got a management team and before we got a record deal." In 1995, Chris was living in Orlando, Florida working for Universal Studios. It was there that he met and became friends with Joey. Meanwhile, JC and Justin had just finished their time together on *The Mickey Mouse Club*. Justin knew Chris through auditions and JC was friends with Joey, whose high-school buddies had also been on *The Mickey Mouse Club*.

Chris was the instigator in terms of getting the group together. He wanted to form a group that could do intricate five-part harmonies with a full range from bass to soprano and could translate them into pop music. He contacted Justin, who, he knew, could sing. Justin contacted JC, and soon Joey fell into the fold.

The foursome was ready to make it happen but they lacked a solid bass singer. Justin called his vocal coach back home in Memphis, hoping the coach would be able to recommend the perfect "low guy". The coach recommended James "Lance" Bass. Lance jumped on the next flight to Orlando and the rest is history! As JC says, "he was the fifth finger on our hand".

Now, all they needed was a name. After weeks of brainstorming Justin's mom remarked how "in sync" their harmonies and dancing were. The phrase stuck with the guys. "In Sync" had a nice ring to it. Justin's mom wasn't sure that the guys were convinced so she played around with their initials. After some shifting and scrambling she came up with JustiN, ChriS, JoeY, LansteN, and JC. It was an interesting coincidence. These guys were completely ★NSYNC. Their name summed up everything about the band. They were five guys from different backgrounds, from different parts of the US with various musical influences, somehow managing to make a sound that was in sync.

Chris describes *NSYNC's combined sound as "purely original. It's pop with an R&B twist". In the beginning they took every gig they would get, from coffeehouses to discos to theme parks. Justin remembers, "we aid our demo package as fast as we could, and that's when we got in touch with our management."

In 1996, a year after *NSYNC formed, the demo captured the eye and ear of Lou Pearlman. Lou immediately got in touch with Johnny Wright, the mastermind manager behind such groups as New Kids On the Block, Snap, Color Me Bad, and the Backstreet Boys. Johnny recollects what made him take notice of this group: "They could really sing. They had a special chemistry, an aura about them. When they talked to me, they talked to me as a group, not five individuals, they weren't selfish."

Wright had no problem obtaining a record contract at BMG in Germany for *NSYNC. Justin says, "the whole team hooked us up with BMG and they took us to Europe. We were, like, we don't care where you take us: we just want to sing!"

Producers Dennis Pop and Max Martin, who worked with international superstars Ace of Base and Robyn, were the next to get on board. The first single, and first smash hit, "I Want You Back", came out of this collaboration. In only a few months *NSYNC had a gold record on its hands. "Tearin' Up My Heart" followed quickly on the first single's heels, debuting in the top five. When *NSYNC's album was finally finished, it soared to number one in record time! Suddenly the guys of *NSYNC were pursued by frenzied fans wherever they went.

A sold-out tour followed across Europe, the UK, Mexico, South Africa and Asia. After establishing themselves overseas, *NSYNC was ready to come home to the good old USA.

Two years later in 1998, when the group returned to the States, there were no swarms of fans waiting on every corner. Chris considered it a "reality check" and he actually enjoyed going to movies or eating at a restaurant like normal people can do. Little did he know! When *NSYNC hit the stores in April 1998, the singles "I Want You Back" and "Tearin' Up My Heart" were already climbing the charts. The album went platinum within four months of its release. They didn't have their anonymity in the US for very long.

They started their first North American tour. They filmed a Disney concert special, performed at the Miss Teen USA pageant, and made guest appearances on The Tonight Show, Live with Regis and Kathie Lee, MTV, Much Music and the Aloha Bowl. You'd think that they'd get tired of each other with such a grueling schedule but the guys say it isn't so. Justin confirms that "when we get time off, there won't be a day that goes by that I don't talk to one of them and say what are you doing tonight, do you want to go do something?"

*NSYNC certainly exceeded all expectations by pursuing the dream of getting together, working hard at a goal and having a good time.



UNITED STATES DISTRICT COURT
FOR DISTRICT OF NEW JERSEY
CIVIL ACTION NO. 99-4729 (AET)

LOUIS J. PEARLMAN,
    Plaintiff,

v.

-N-SYNC, INCORPORATED, and
RICHARD E. FORD,
    Defendants.

ORDER TO SHOW CAUSE
WITH TEMPORARY
RESTRAINING ORDER

OCTOBER 22, 1999

CLARKSON S. FISHER UNITED STATES COURTHOUSE
402 EAST STATE STREET, TRENTON, NJ 08608

B E F O R E : THE HONORABLE ANNE E. THOMPSON, USDJ

A P P E A R A N C E S :

STERNS & WEINROTH, ESQUIRES
BY: JOEL H. STERNS, ESQUIRE
    KAREN A. CONFOY, ESQUIRE
    -and-
PARKER, CHAPIN, FLATTAU & KLIMPL,
BY: MICHAEL D. FRIEDMAN, ESQUIRE (NY)
    BARRY J. BRETT, ESQUIRE (NY)
On behalf of the Plaintiff

RADAMES VELAZQUEZ, JR., ESQUIRE
On behalf of the Defendants

* * * * *

VINCENT RUSSONIELLO, CSR
OFFICIAL COURT REPORTER
138 PAXSON AVENUE
TRENTON, NEW JERSEY 08690
(609) 588-9516

PURSUANT TO SECTION 753, TITLE 28 USC, THE
FOLLOWING TRANSCRIPT IS CERTIFIED TO BE AN ACCURATE
TRANSCRIPTION OF MY STENOGRAPHIC NOTES IN THE
ABOVE-ENTITLED MATTER.

---------------------------
VINCENT RUSSONIELLO, CSR

FILED
NOV 0 4 1999
AT 8:30
WILLIAM T. WALSH
CLERK

---

**2**

1      THE COURT: The next matter, -N-Sync. Note your
2  appearances, please.
3      MR. STERNS: Your Honor, Joel Sterns, and
4  Mr. Barry Brett of the New York bar, the firm of Parker
5  Chapin, and Mr. Michael Friedman also of Parker Chapin.
6  They are the general counsel for Mr. Pearlman. I will
7  make the appropriate motion now or at your convenience
8  for their admission.
9      THE COURT: All right. Mr. Brett and Mr.
10  Friedman.
11      MR. STERNS: That's correct. Michael
12  Friedman. Your Honor, I've had the opportunity to work
13  with both of them as colleagues in the Federal Courts
14  in New Jersey and can personally vouch for their
15  honesty and integrity.
16      THE COURT: Mr. Sterns, if you bring them
17  here, then we'll approve them because of how well we
18  know you. Now, they have to fulfill high expectations
19  if they come with your sponsorship.
20      MR. STERNS: Thank you, your Honor.
21      THE COURT: Were you hiding, Mr. Friedman,
22  or do you want to come up here?
23      MR. FRIEDMAN: I'll sit here. That's fine.
24      THE COURT: All right. That's for the
25  left-hand side of the courtroom. Thank you very much.
VINCENT RUSSONIELLO, OFFICIAL COURT REPORTER

---

**3**

1  You may be seated.
2      Now, here you are all by yourself.
3      MR. VELAZQUEZ: All by myself. Radames
4  Velazquez, Jr., on behalf of the defendants, -N-Sync,
5  Incorporated, and Richard E. Ford.
6      THE COURT: Now, we had that telephone
7  dispute the other day in the middle of depositions.
8  Everybody was talking. You caught the Judge in her
9  kitchen. Now, let's see in the courtroom what you have
10  to say for yourselves. What's the status? Who wants
11  to speak?
12      MR. STERNS: If I may briefly, your Honor.
13      As you will recall, the motion before the
14  Court was based on a purported letter of termination.
15  It was undated but delivered on September 29th. The
16  basis for the termination was allegedly that
17  Mr. Pearlman had no connection with the group. The
18  license agreement was before your Honor and of course
19  we maintained and continue to maintain the license
20  agreement was specifically with Mr. Pearlman.
21      We now are confronted with a further
22  statement in terms of a counterclaim that Mr. Pearlman
23  owes a fiduciary duty and did not give that fiduciary
24  duty to a company which he wholly owns and is the sole
25  stockholder of. I believe your Honor should dispatch
VINCENT RUSSONIELLO, OFFICIAL COURT REORTER

---

**4**

1  of that respectfully quite quickly. How can he have
2  breach of duty to himself which is what that amounts
3  to?
4      Since we were before you on the telephone,
5  depositions have taken place with regard to Mr. Richard
6  Ford and with regard to Mr. Pearlman. The depositions
7  are before you, further supplemental briefs are before
8  you, and we believe all of it further emphasizes the
9  fact that the preliminary injunction should continue.
10      Mr. Ford, I think -- and I won't belabor the
11  point. Mr. Brett or myself will be happy to direct
12  ourselves to the questions you may wish to raise. But
13  Mr. Ford in his deposition made plain the following
14  things: He entered into an agreement in 1996 with
15  Mr. Pearlman, with our client. That agreement gave the
16  license for the name 'N Sync. At that point in time
17  Mr. Pearlman was attempting to start a group. Attempts
18  to start musical groups of this kind I am informed
19  occur daily with a success rate of about 1 percent and
20  I may be exaggerating optimistically the amount of the
21  success rate. At the time they entered into an
22  agreement and that agreement called for I believe
23  $14,000.
24      Now, it happens that this group, 'N Sync,
25  was successful and it was extremely successful. And
VINCENT RUSSONIELLO, OFFICIAL COURT REORTER

1 Mr. Pearlman appeared on the program, 60 Minutes,
2 earlier in September and during the course of that
3 program, Mr. Ford, the person who granted the license
4 saw it and based on that the letter of termination
5 apparently came. And based on that the only conclusion
6 I think one can make, and I don't want to be overly
7 argumentative, but the only conclusion one can make is:
8 Hey, these guys are successful and what I got and
9 bargained for, $14,000, that is hardly enough.
10      What it doesn't recognize is, first of all,
11 the legality of the agreement and respectfully I
12 suggest the Courts of the United States or any Court
13 should not be used to better a business bargain. What
14 it also doesn't realize and just the plain human factor
15 is that millions of dollars went into this investment.
16 There are recordings in stores throughout the country.
17 There are license agreements for concert tours and for
18 merchandising and because they say, they, being Mr.
19 Ford says, that he has no longer an interest which he
20 gleans from a 60 Minutes program and which is refuted
21 by the contracts that are before your Honor, because he
22 no longer has this interest, they have some reason to
23 take back a license which is just now after three years
24 beginning to bear some fruit.
25      Respectfully, your Honor, we believe the
    VINCENT RUSSONIELLO, OFFICIAL COURT REORTER

---

1 be happy to collect answers or further statements to
2 anything that may be of concern to you. We
3 respectfully think the restraining order should be
4 granted. I want to add one thing. If conditions were
5 ever to change, we can't tell tomorrow, next week, two
6 weeks from tomorrow, there may be another reason, there
7 may be another case, that's not the case that's before
8 you now. The case before you is: Can they terminate
9 the agreement? I think all of the evidence including
10 the depositions that have been granted say, no, they
11 cannot.
12      THE COURT: Mr. Brett, is there anything you
13 wanted to add?
14      MR. BRETT: Just one point, your Honor, and
15 that is the facts are known to anyone who would wander
16 into a record store and confirmed by specific
17 deposition testimony show that the mark is being very
18 actively used as we speak. There are concerts in the
19 planning, millions of dollars are being spent in
20 connection with those concerts. There are millions of
21 records out for sale at the moment. There are
22 merchandising agreements and arrangements that are
23 actively in place.
24      Mr. Pearlman invested millions of dollars in
25 those activities. They are proceeding and we urge they
    VINCENT RUSSONIELLO, OFFICIAL COURT REORTER

---

1 materials submitted summarize the issues and arguments
2 and make clear the injunction sought should be issued.
3 We don't believe anything in Mr. Ford's deposition --
4 Mr. Ford was extremely honest and direct in the
5 deposition. He made the points: He knew he was
6 dealing with Mr. Pearlman, that he didn't know anything
7 about 'N Sync, who they were, what they did, and he
8 further made the point he knew the agreement would be
9 for licensing, et cetera.
10      He seeks now to terminate that agreement and
11 the only thing he puts forward is he thought he heard
12 on 60 Minutes Mr. Pearlman had no relationship with the
13 group and now we are confronted. Mr. Pearlman and his
14 wholly owned company are two separate entities which
15 shouldn't matter under any circumstance because the
16 license is with Mr. Pearlman. And if there are issues
17 that involve the group, 'N Sync, and Mr. Pearlman and
18 other record companies, as there are and as are noted
19 in the brief, they will be handled in the appropriate
20 jurisdiction. But that doesn't give credibility,
21 respectfully, your Honor, to the ability for a person
22 to watch a television program and say: Hey, maybe I
23 should get some more money and send a notice of
24 termination.
25      With, that your Honor, Mr. Brett and I will
    VINCENT RUSSONIELLO, OFFICIAL COURT REORTER

---

1 both confirm the actual use of the mark now being made
2 by Mr. Pearlman as anticipated by the license
3 agreement, and they also confirm the need for urgency
4 to allow us to go forward without a cloud on the
5 license granted to Mr. Pearlman. So we would ask the
6 injunction be issued so all of those uses can continue
7 without any question or impediment.
8      Other than that, your Honor, the papers
9 state the case and we would welcome the opportunity to
10 address any questions your Honor may have.
11      THE COURT: Upon what events may this
12 contract be terminated?
13      MR. BRETT: Your Honor, I think there are
14 two answers to that and I would like to, if I may,
15 answer your question directly, but first state,
16 whatever events they are, they are, they are clearly not
17 the events that have occurred now. That is,
18 Mr. Pearlman's use of the mark continues actively with
19 the original group and it is very active as we speak
20 and is exactly as intended by the agreement. I believe
21 the event intended, to respond most directly to your
22 Honor's question, the event intended by the agreement
23 that might permit a termination would be as described
24 by Mr. Sterns.
25      In the event that this group found the fate
    VINCENT RUSSONIELLO, OFFICIAL COURT REORTER

11

1  of so many other groups that did not succeed, it
2  went the way of most groups including a group
3  represented by the defendants who tried to get started,
4  tried it for a year, failed and gave up, if the name
5  were abandoned, if the group were not to succeed and
6  stop functioning and this effort would be changed over
7  to the next group or the next group of young men or
8  under another name, as again is the case with many
9  groups, not here because of Mr. Pearlman's investment,
10 if that were to occur and abandon the development of 'N
11 Sync and there were no records or other commercial
12 activities going on, in that event I believe the
13 license can be terminated and revert to the defendants.
14 and would not be used or exploited by Mr. Pearlman.
15 THE COURT: All right. Thank you very much.
16 Mr. Velazquez.
17 MR. VELAZQUEZ: Yes, your Honor.
18 First of all, I take issue with the
19 characterization of the facts as presented by
20 Mr. Sterns. The fact of the matter is, your Honor,
21 -N-Sync, Incorporated, entered into this agreement in
22 1996, didn't have any problem with this agreement
23 at all, didn't know 'N Sync was successful --
24 THE COURT: Who did you say entered into the
25 agreement?
VINCENT RUSSONIELLO, OFFICIAL COURT REORTER

1  termination from the group, it made him even more
2  suspicious.
3  And we found out that Mr. Pearlman entered
4  into this license agreement without the knowledge of
5  the group, without discussing it with the group, and in
6  this license agreement there is a paragraph for Quality
7  of Services, Paragraph No. 4, where the licensee is
8  supposed to be able to be in a position where he can
9  give Mr. Ford and Mr. Ford's representatives access to
10 inspection of licensee's operations, their
11 performances, and supply Mr. Ford and his
12 representatives with specimens of all uses of the mark,
13 and ensure the licensee and the group is using the mark
14 in a lawful way.
15 It was the position of Mr. Ford and the
16 corporation that Mr. Pearlman was no longer in a
17 position to do that. In fact, your Honor, Mr. Pearlman
18 filed a lawsuit in Florida on October 12th which
19 alleges just that. He doesn't know what they are doing
20 with the mark. He doesn't know what contracts they
21 have entered into. He doesn't know what merchandising
22 has been entered into with his mark, and for that
23 reason initially the termination notice was forwarded.
24 Subsequent to that, it was found out that
25 Mr. Pearlman had put this license in his own name, not
VINCENT RUSSONIELLO, OFFICIAL COURT REORTER

10

1  MR. VELAZQUEZ: -N-Sync, Incorporated. That
2  would be Mr. Ford's corporation.
3  THE COURT: All right.
4  MR. VELAZQUEZ: Plaintiff's counsel would
5  make you believe, your Honor, that somehow Mr. Ford
6  initiated these discussions, made these contacts with
7  Mr. Pearlman. The fact of the matter is, on or about
8  the end of June, beginning of July, Mr. Pearlman's
9  representatives reached out to Mr. Ford with the intent
10 to purchase the mark fully from Mr. Ford. They made
11 numerous phone calls to him with regard to that. Mr.
12 Ford began to inquire and look into what the value of
13 this mark would be. That's when he saw the 'N Sync
14 program. That's when it came to hits attention
15 Mr. Pearlman no longer had according to the program a
16 relationship with this group.
17 Phone calls were made the very next day to
18 the business manager of the group, Adam Ritzholz, who
19 indicated on May 26, 1999, and a letter was forwarded
20 to Mr. Pearlman, that would have been a few weeks
21 before he started calling Mr. Ford, terminating
22 'N Sync's relationship with him. When Mr. Ford found
23 out that Mr. Pearlman was attempting to purchase this
24 name knowing that his relationship had terminated with
25 the group or had been placed on notice there was
VINCENT RUSSONIELLO, OFFICIAL COURT REORTER

12

1  in his company's name, and without the group's
2  knowledge and that was not the representations made to
3  Mr. Ford in July of 1996. Mr. Ford was presented by
4  Mr. Pearlman's representatives with the impression, the
5  representation, that this was going to be used with the
6  group, the group currently known as 'N Sync, and at
7  that time the group existed and that the group had full
8  knowledge of this. And it's for that reason we say
9  that this contract never even took effect because
10 Mr. Pearlman, in essence, tried to place an obligation
11 on a third-party who was not privy to this agreement,
12 who never consented to this agreement.
13 So that's our first position, that it
14 doesn't even exist. Our second position is, even if it
15 does exist, certainly the May 26th, 1999 termination
16 notice, the lawsuit filed in Florida give ample
17 evidence that Mr. Pearlman is not in a position to
18 fulfill his obligations under this agreement and
19 therefore terminate.
20 Additionally, I know Mr. Sterns made
21 reference to the fiduciary argument presented in my
22 papers, but that has not so much to do with
23 transcontinental but the obligations they had to this
24 group. The contract itself to this group indicates:
25 We are not going to do anything without you guys
VINCENT RUSSONIELLO, OFFICIAL COURT REORTER

1 knowing and if we do have ___ something in an
2 emergency basis we are going to get it in writing.
3     What Mr. Pearlman has done and what
4 Mr. Pearlman is asking this Court to put a stamp on
5 which is against public policy, he's gone and signed up
6 a group and behind their back went and tried to
7 purchase their name and license their name so he can do
8 exactly what he is doing now. This group doesn't want
9 to be with him. They don't want to do business with
10 him and he is holding that name and fighting for that
11 name and he wants this license held up so he can hold
12 that group hostage to his demands.
13     THE COURT: Now, tell me where the harm is
14 to you. I see this intramural battle, conflict between
15 the Florida court and all of this going on. Now, you
16 tell me where you are being hurt, your client.
17     MR. VELAZQUEZ: This is my client's asset.
18 He licensed it, but it's his.
19     THE COURT: Where is he losing out?
20     MR. VELAZQUEZ: First of all, he had an
21 agreement that allows him to have a certain amount of
22 control on the product because the licensee was
23 supposed to provide under the Quality of Services
24 clause certain checks and balances.
25     THE COURT: Wait a minute. Didn't he enter

1 anything to ___ with that. That's between them. Just
2 leave me alone and let me get the benefits I contracted
3 for.
4     MR. STERNS: Your Honor, my answer would be
5 that we are here because of what Mr. Ford did.
6 There is an agreement. The agreement is between
7 Mr. Pearlman and Mr. Ford. I'm leaving out the company
8 names, *N-Sync, et cetera. Under that agreement
9 Mr. Pearlman, not any record company, not any group of
10 teenage guys named 'N Sync or whatever they might be.
11 Mr. Pearlman undertook to license and promote this. It
12 gave Mr. Ford certain guarantees. Among those
13 guarantees was the right of quality, and it said in
14 particular, and I will quote:
15     "Licensee agrees to cooperate with
16 proprietor in facilitating proprietor's control of such
17 quality, to permit reasonable inspection of licensee's
18 operation, including live performances, and to supply
19 proprietor with specimens of all uses of the licensed
20 mark upon request." Page 3 of the agreement.
21     There was never a request. There was never
22 any issue for three years until a notice of termination
23 came. We are in this courtroom respectfully, your
24 Honor, because of the notice of termination. We didn't
25 want to raise this issue with him. The issue between

---

14

1 into an agreement and turn over to this party all those
2 responsibilities, rights, responsibilities, burdens,
3 benefits? Has he been denied? What is the harm to
4 your client? That's what I want to know.
5     MR. VELAZQUEZ: The potential harm is
6 obvious. Here we are involved in litigation over this
7 name. Who knows what's going to happen now in Florida,
8 if my client is going to be dragged into that court in
9 Florida over this license? It was never his intent to
10 be involved in such a situation. He never was advised.
11 He never was told. It was never communicated to him
12 that Mr. Pearlman was not doing this without the
13 consent, without the knowledge of this group, and
14 because of that now he stands in the position to be
15 dragged into this. He is incurring legal fees right
16 now, your Honor. He never meant to do that. He never
17 meant to do that. It's his asset and it should return
18 to him upon the natural termination of this agreement.
19     THE COURT: Just a minute. Mr. Sterns, what
20 would be your answer to Mr. Velazquez when he says:
21 Look, I just don't want any trouble. I want the
22 benefits I contracted for with Mr. Pearlman when I
23 contracted with him and all I want is the benefits I
24 contracted for and let me alone. And if Pearlman wants
25 to fight the group down in Florida, I don't have

16

1 one record company and another record company that's
2 being fought out in Florida is not a question that has
3 anything to do with the agreement that Mr. Pearlman and
4 Mr. Ford entered into three years ago. We're not
5 asking him to get involved. We had to get involved to
6 protect our interests in this.
7     THE COURT: You do agree Mr. Ford has a
8 right to terminate you, don't you?
9     MR. STERNS: He has a right to terminate for
10 reasons that are in the agreement and if he states a
11 reason that's in the agreement and he sends a notice
12 there is a flaw, that there is something that's not
13 being done, he has to send a 30-day notice and within
14 that 30 days we either cure or he has a right if indeed
15 there is something wrong. In his 30-day letter which
16 is before the Court he never said one reason. He says,
17 "Since you no longer have a business connection to this
18 musical group, the license is now terminated."
19     That's not a relevant consideration of the
20 agreement and it also happens to be not true. He does
21 have a business relationship. If another record
22 company says, we want to record things, and the two
23 record companies are fighting, that doesn't have
24 anything to do with the merchandise, with the records
25 that are already in the stores, with the T-shirts, with

1 the concert tours. That can't have anything to do
2 with that. Basically, the only information that led
3 to this letter which is before you was a statement
4 which was misinterpreted on 60 Minutes and Mr. Ford
5 says that.
6          THE COURT: Is this the world of
7 entertainment law, Mr. Sterns? The wonderful thing
8 about this Court is we go from product liability to
9 tax, drugs, to interstate shipment of stolen goods, and
10 then there is this wonderful world of Kaufman and Hart
11 and Hammerstein entertainment law. This is what this
12 is?
13          MR. STERNS: Basically, that's what this is
14 in Florida. Here it's a simple agreement.
15          THE COURT: Here it's just contract law.
16          MR. STERNS: You were right on the mark to
17 ask about what the harm is, and I don't believe Mr.
18 Velazquez can give you an answer in all good faith, and
19 I know he is very competent and will try because there
20 is no harm. Mr. Ford got what he bargained for.
21          Now, a couple of giants are fighting about
22 who is going to bring out the next record. That
23 doesn't affect this agreement. If something comes out
24 of those giants fighting he feels does affect this
25 agreement, then he can come back before this Court.

VINCENT RUSSONIELLO, OFFICIAL COURT REORTER

1 still haven't heard one note that they sing. So I
2 can't tell you that or anything about it. But it's not
3 fair for him to ask you to remake the agreement at this
4 time.
5          THE COURT: Thank you, Mr. Sterns.
6          Mr. Velazquez, you just feel as if they've
7 misrepresented. Void ab initio I think is some of the
8 language.
9          MR. VELAZQUEZ: Your Honor, we definitely
10 believe they made a misrepresentation while negotiating
11 this agreement. But beyond that, your Honor, we find
12 that in terms of dealing that we haven't made any
13 requests that's not true. On September 27th a letter
14 was forwarded to counsel, Harold Aronson, requesting
15 copies of all the uses of the mark, admissions to the
16 concerts, opportunity to look at and inspect the
17 facilities. So that's not true.
18          THE COURT: What do they say?
19          MR. VELAZQUEZ: We are still waiting, Judge.
20 They have a couple of days, then we can send a letter
21 for breach. The law doesn't say I have to wait for a
22 breach. The doctrine of anticipatory breach speaks
23 to this exact situation. You have it before you send a
24 letter from the group saying: We are not going to do
25 business with you anymore, Mr. Pearlman. We are on our

VINCENT RUSSONIELLO, OFFICIAL COURT REORTER

1 But in the meantime he has, I respectfully submit, no
2 right because he is not harmed in any way.
3          By the way, Mr. Ford admitted that in his
4 deposition. He said he wasn't harmed in any way.
5 That's before you as a fact. It's not a controverted
6 fact even by him.
7          THE COURT: But he thinks he's been
8 defrauded.
9          MR. STERNS: He thinks he's defrauded
10 because he thinks when he sold it to Mr. Pearlman that
11 Mr. Pearlman was really getting it for a group of kids
12 called 'N Sync, but I have to call your attention to
13 the agreement. The agreement is between Mr. Pearlman.
14 The agreement doesn't say anything about X record
15 company. The agreement doesn't say anything but
16 Mr. Pearlman and that's the person who is before you.
17 If something were to come out of the Florida case, your
18 Honor, I am sure that Mr. Ford would be back in this
19 court or the appropriate jurisdiction saying: Look
20 what they decided in Florida.
21          What he is asking you to do now is
22 predetermine that and he is asking you to involve the
23 Court in remaking a bargain that was made three years
24 ago and upon which our clients spent millions of
25 dollars to get a group to this level. What they do, I

VINCENT RUSSONIELLO, OFFICIAL COURT REORTER

1 own.
2          Mr. Pearlman may be living in a situation
3 where he believes he still controls this group. But
4 his actions by filing a lawsuit in Florida shows he may
5 believe that but somebody is telling him otherwise.
6 His relationship has definitely been terminated here.
7 If he can fix his relationship within the 30 days after
8 the notice, then, hey, we are fine. But I don't
9 believe he is going to be able to resolve his situation in the
10 30-day period, and this is if your Honor is not
11 inclined to find this misrepresentation did not create
12 a license. I believe the fact he is not going to be
13 able to cure the fact he is not in charge of this group
14 within 30 days will certainly terminate this agreement.
15          THE COURT: Well, I like your vigor, Mr.
16 Velazquez. But I find this dispute to be really
17 endemic to the entertainment world, and there is no way
18 I can resolve this carousel without having the parties
19 before me taking testimony, making findings of fact and
20 conclusions of law, and that's what -- I could just
21 pick a number, but I'm not going to do that.
22          The parties entered into this agreement.
23 They now have, as you say, anticipatory breach and when
24 a lawyer gets up and says to me anticipatory breach I
25 must say my eyes go up to the ceiling because there are

VINCENT RUSSONIELLO, OFFICIAL COURT REORTER

21

```
 1   so many headaches in this ___ when you start
 2   terminating contracts over anticipatory breach and
 3   unless we are talking about a truckload of potatoes I
 4   don't know where we are going.
 5            So it seems to me that we've got to set this
 6   down for a hearing, get the parties before us, take
 7   some testimony. At the present time I don't see any
 8   harm to you, Mr. Velazquez, other than the fact you
 9   don't like having -- you think you have been somehow
10   spooked or maybe some misrepresentations have gone on.
11   I don't know whether it has or not. But I don't see
12   where your harm is.
13            I think we should continue the restraints.
14   I think we should set this down for a hearing. I think
15   we should prepare for it. I think we should collapse
16   the preliminary into the final. No point in going
17   through something like this twice and that's the best
18   we could do to resolve a dispute of this sort. It's
19   the only way.
20            So you want to set a schedule, counsel, or
21   do you want me to set one?
22            MR. BRETT: Your Honor, I guess I would
23   first propose we might try to resolve the issues a bit
24   further that are concerning your Honor without a
25   further hearing in that I believe that the deposition
```

VINCENT RUSSONIELLO, OFFICIAL COURT REORTER

23

```
 1   which I know ___ r Honor has not had an opportunity to
 2   review with the care we have because we have lived
 3   through it.
 4            THE COURT: Nor have I seen these credible
 5   faces.
 6            MR. BRETT: Nor have you seen the faces,
 7   that's correct, your Honor. I don't know if there are
 8   any issues of fact that require a hearing and are
 9   disputable at this point. Clearly, the issues as to
10   whether or not Mr. Ford was misled, if you deem it to
11   be relevant, which we would urge is not, are not issues
12   of fact which require a trial. We believe they may be
13   subject to disposition under Rule 12 or Rule 56
14   applications and we would like that opportunity to do
15   it after we would hope your Honor would grant the
16   preliminary injunction.
17            Similarly, your Honor, I don't know that
18   there are any issues of fact as to what went on in the
19   60 Minutes program. We have put the transcript of that
20   before you and it is clear no such statements as were
21   attributed to Mr. Pearlman were made on that program.
22            In addition, your Honor, there is before you
23   in the record the only request made by Mr. Ford for
24   information in three years. It was made on September
25   27th, two days before the notice of termination went
```

VINCENT RUSSONIELLO, OFFICIAL COURT REORTER

22

```
 1   testimony of Mr. Ford does resolve against Mr. Ford and
 2   his company the issues raised by Mr. Velazquez. We
 3   have deposition testimony which has established all of
 4   the matters which he now asserts to be
 5   misrepresentations were not misrepresentations and
 6   moreover were not material. We also have deposition
 7   testimony --
 8            THE COURT: You don't want a hearing. You
 9   would like for me to put my imprimatur on this and say
10   you have no reason to terminate and that's the end of
11   it.
12            MR. BRETT: We would certainly like to get
13   the injunction and if your Honor thought it was
14   necessary to have a trial on the matter we would
15   proceed to that. But I do think we have made out the
16   requirements for a preliminary injunction and I would
17   hope your Honor would enter that preliminary
18   injunction.
19            Now, if you think there is a trial necessary
20   on the issues including the issues on the counterclaim
21   we would like to brief that. I think your Honor might
22   be persuaded in a motion to dismiss those, that they
23   ought not be heard. They are neither credible or
24   tenable. I don't believe they state a claim
25   particularly in the light of the deposition testimony
```

VINCENT RUSSONIELLO, OFFICIAL COURT REORTER

24

```
 1   out, and that notice, there is clearly no breach for
 2   failure to honor that notice.
 3            THE COURT: Thank you, Mr. Brett.
 4            Mr. Velazquez, let me hear from you.
 5            MR. VELAZQUEZ: Your Honor, we are dealing
 6   with a misrepresentation here. I think it's very
 7   important for your Honor to hear the testimony, see
 8   these people, weigh their credibility and give their
 9   testimony whatever credibility you find it's worthy.
10            THE COURT: Well, I told you I'm going to
11   continue the temporary restraints. I guess it's a
12   matter of nomenclature because I certainly don't intend
13   to have this hearing within 10 days. So I think, in
14   effect, that would be a preliminary injunction but it's
15   not the final injunction. I think the parties have to
16   come in and we have to have a final resolution and that
17   would be within 60 days.
18            MR. BRETT: Your Honor, may we within that
19   period make a Rule 56 motion to try to obviate the
20   necessity of that?
21            THE COURT: If you think you can get it.
22            MR. BRETT: We believe the testimony and the
23   proof will establish that.
24            THE COURT: It better be very, very clear
25   because otherwise I'm not reading deposition testimony
```

VINCENT RUSSONIELLO, OFFICIAL COURT REORTER

```
 1  unless it knocks your sock  if it's so clear.
 2          MR. BRETT:  Thank you, your Honor.
 3          THE COURT:  I would rather look at the
 4  faces.  I'll do my own order as a result of this
 5  proceeding and meantime I think the lawyers ought to
 6  talk about this and see if you can work out some
 7  resolution.
 8          . All right.  60 days.
 9          MR. STERNS:  Thank you, your Honor.
10          MR. BRETT:  Thank you, your Honor.
11          MR. VELAZQUEZ:  Thank you, your Honor.
12          THE COURT:  Thank you very much.  We'll send
13  out a date.
14              (Proceedings concluded.)
15                  * * * * *
16
17
18
19
20
21
22
23
24
25
```

VINCENT RUSSONIELLO, OFFICIAL COURT REORTER

---

26

```
 1
 2          C E R T I F I C A T E
 3
 4
 5
 6          I, Vincent Russoniello, C.S.R., Official United
 7  States Court Reporter and Certified Shorthand Reporter
 8  of the State of New Jersey, do hereby certify that the
 9  foregoing is a true and accurate transcript of the
10  proceedings as taken stenographically by and before me
11  at the time, place and on the date hereinbefore set
12  forth.
13          I do further certify that I am neither a
14  relative nor employee nor attorney nor counsel of any
15  of the parties to this action, and that I am neither a
16  relative nor employee of such attorney or counsel and
17  that I am not financially interested in this action.
18
19
20
21
22          _____
            Vincent Russoniello, C.S.R.
23          Official Court Reporter
            Certificate No. 675
24          Date:
25
```

VINCENT RUSSONIELLO, OFFICIAL COURT REORTER

**$14,000**
[2] 4:23 5:9

**0**

**08608**
[1] 1:9
**08690**
[1] 1:20

**1**

**1**
[1] 4:19
**10**
[1] 24:13
**12**
[1] 23:13
**12th**
[1] 11:18
**138**
[1] 1:20
**1996**
[3] 4:14 9:22 12:3
**1999**
[3] 1:6 10:19 12:15

**2**

**22**
[1] 1:6
**26**
[1] 10:19
**26th**
[1] 12:15
**27th**
[2] 19:13 23:25
**28**
[1] 1:22
**29th**
[1] 3:15

**3**

**3**
[1] 15:20
**30**
[3] 16:14 20:7 20:14
**30-day**
[3] 16:13 16:15 20:10

**4**

**4**
[1] 11:7
**402**
[1] 1:9

**5**

**56**
[2] 23:13 24:19
**588-9516**
[1] 1:21

**6**

**60**
[7] 5:1 5:20 6:12 17:4 23:
19 24:17 25:8
**609**
[1] 1:21
**675**
[1] 26:23

**7**

**753**
[1] 1:22

**9**

**99-4729**
[1] 1:2

[2] 1:3 1:7

[1] 26:22

**Ab**
[1] 19:7
**Abandon**
[1] 9:10
**Abandoned**
[1] 9:5
**Ability**
[1] 6:21
**ABOVE-ENTITLED**
[1] 1:23
**Access**
[1] 11:9
**According**
[1] 10:15
**Accurate**
[2] 1:22 26:9
**Action**
[3] 1:2 26:15 26:17
**Actions**
[1] 20:4
**Active**
[1] 8:19
**Actively**
[3] 7:18 7:23 8:18
**Activities**
[2] 7:25 9:12
**Actual**
[1] 8:1
**Adam**
[1] 10:18
**Add**
[2] 7:4 7:13
**Addition**
[1] 23:22
**Additionally**
[1] 12:20
**Address**
[1] 8:10
**Admission**
[1] 2:8
**Admissions**
[1] 19:15
**Admitted**
[1] 18:3
**Advised**
[1] 14:10
**AET**
[1] 1:2
**Affect**
[2] 17:23 17:24
**Ago**
[2] 16:4 18:24
**Agree**
[1] 16:7
**Agreement**
[43] 3:18 3:20 4:14 4:15 4:
22 4:22 5:11 6:8 6:10 7:9 8:
3 8:20 8:22 9:21 9:22 9:25
11:4 11:6 12:11 12:12 12:18
13:21 14:1 14:18 15:6 15:6
15:8 15:20 16:3 16:10 16:11
16:20 17:14 17:23 17:25 18:
13 18:13 18:14 18:15 19:3
19:11 20:14 20:22
**Agreements**
[2] 5:17 7:22
**Agrees**
[1] 15:15
**Allegedly**
[1] 3:16
**Alleges**
[1] 11:19
**Allow**
[1] 8:4

[1] 13:21
**Alone**
[2] 14:24 15:2
**Amount**
[2] 4:20 13:21
**Amounts**
[1] 4:2
**Ample**
[1] 12:16
**ANNE**
[1] 1:10
**Answer**
[4] 8:15 14:20 15:4 17:18
**Answers**
[2] 7:1 8:14
**Anticipated**
[1] 8:2
**Anticipatory**
[4] 19:22 20:23 20:24 21:2
**Appearances**
[1] 2:2
**Appeared**
[1] 5:1
**Applications**
[1] 23:14
**Appropriate**
[3] 2:7 6:19 18:19
**Approve**
[1] 2:17
**Argument**
[1] 12:21
**Argumentative**
[1] 5:7
**Arguments**
[1] 6:1
**Aronson**
[1] 19:14
**Arrangements**
[1] 7:22
**Asserts**
[1] 22:4
**Asset**
[2] 13:17 14:17
**Attempting**
[2] 4:17 10:23
**Attempts**
[1] 4:17
**Attention**
[2] 10:14 18:12
**Attorney**
[2] 26:14 26:16
**Attributed**
[1] 23:21
**AVENUE**
[1] 1:20

**B**

**Balances**
[1] 13:24
**Bar**
[1] 2:4
**Bargain**
[2] 5:13 18:23
**Bargained**
[2] 5:9 17:20
**Barry**
[2] 1:15 2:4
**Based**
[3] 3:14 5:4 5:5
**Basis**
[2] 3:16 13:2
**Battle**
[1] 13:14
**Bear**
[1] 5:24

**Began**
[1] 10:12
**Beginning**
[2] 5:24 10:8
**Behalf**
[3] 1:15 1:17 3:4
**Behind**
[1] 13:6
**Belabor**
[1] 4:10
**Believes**
[1] 20:3
**Benefits**
[4] 14:3 14:22 14:23 15:2
**Best**
[1] 21:17
**Better**
[2] 5:13 24:24
**Between**
[5] 13:14 15:1 15:6 15:25 18:13
**Beyond**
[1] 19:11
**Bit**
[1] 21:23
**Breach**
[8] 4:2 19:21 19:22 19:22 20:23 20:24 21:2 24:1
**Brett**
[16] 1:15 2:4 2:9 4:11 6:25 7:12 7:14 8:13 21:22 22:12 23:6 24:3 24:18 24:22 25:2 25:10
**Brief**
[2] 6:19 22:21
**Briefly**
[1] 3:12
**Briefs**
[1] 4:7
**Bring**
[2] 2:16 17:22
**Burdens**
[1] 14:2
**Business**
[6] 5:13 10:18 13:9 16:17 16:21 19:25

**C**

**C.S.R.**
[1] 26:22
**Cannot**
[1] 7:11
**Care**
[1] 23:2
**Carousel**
[1] 20:18
**Case**
[6] 7:7 7:7 7:8 8:9 9:8 18:17
**Caught**
[1] 3:8
**Ceiling**
[1] 20:25
**Certain**
[3] 13:21 13:24 15:12
**Certainly**
[4] 12:15 20:14 22:12 24:12
**Certificate**
[1] 26:23
**Certified**
[2] 1:22 26:7
**Certify**
[2] 26:8 26:13
**Cetera**
[2] 6:9 15:8
**Change**

**Changed**
[1] 9:6
**Chapin**
[3] 1:14 2:5 2:5
**Characterization**
[1] 9:19
**Charge**
[1] 20:13
**Checks**
[1] 13:24
**Circumstance**
[1] 6:15
**CIVIL**
[1] 1:2
**Claim**
[1] 22:24
**CLARKSON**
[1] 1:8
**Clause**
[1] 13:24
**Clear**
[4] 6:2 23:20 24:24 25:1
**Clearly**
[3] 8:16 23:9 24:1
**Client**
[4] 4:15 13:16 14:4 14:8
**Client's**
[1] 13:17
**Clients**
[1] 18:24
**Cloud**
[1] 8:4
**Collapse**
[1] 21:15
**Colleagues**
[1] 2:13
**Commercial**
[1] 9:11
**Communicated**
[1] 14:11
**Companies**
[2] 6:18 16:23
**Company**
[9] 3:24 6:14 15:7 15:9 16:1 16:1 16:22 18:15 22:2
**Company's**
[1] 12:1
**Competent**
[1] 17:19
**Concern**
[1] 7:2
**Concerning**
[1] 21:24
**Concert**
[2] 5:17 17:1
**Concerts**
[3] 7:18 7:20 19:16
**Concluded**
[1] 25:14
**Conclusion**
[2] 5:5 5:7
**Conclusions**
[1] 20:20
**Conditions**
[1] 7:4
**Confirm**
[2] 8:1 8:3
**Confirmed**
[1] 7:16
**Conflict**
[1] 13:14
**CONFOY**
[1] 1:13
**Confronted**

**Connection**
[3] 3:17 7:20 16:17
**Consent**
[1] 14:13
**Consented**
[1] 12:12
**Consideration**
[1] 16:19
**Contacts**
[1] 10:6
**Continue**
[5] 3:19 4:9 8:6 21:13 24:11
**Continues**
[1] 8:18
**Contract**
[4] 8:12 12:9 12:24 17:15
**Contracted**
[4] 14:22 14:23 14:24 15:2
**Contracts**
[3] 5:21 11:20 21:2
**Control**
[2] 13:22 15:16
**Controls**
[1] 20:3
**Controverted**
[1] 18:5
**Convenience**
[1] 2:7
**Cooperate**
[1] 15:15
**Copies**
[1] 19:15
**Corporation**
[2] 10:2 11:16
**Correct**
[2] 2:11 23:7
**Counsel**
[6] 2:6 10:4 19:14 21:20 26:14 26:16
**Counterclaim**
[2] 3:22 22:20
**Country**
[1] 5:16
**Couple**
[2] 17:21 19:20
**Course**
[2] 3:18 5:2
**Court**
[44] 1:1 1:19 2:1 2:9 2:16 2:21 2:24 3:6 3:14 5:12 7:12 8:11 9:15 9:24 10:3 13:4 13:13 13:15 13:19 13:25 14:8 14:19 16:7 16:16 17:6 17:8 17:15 17:25 18:7 18:19 18:23 19:5 19:18 20:15 22:8 23:4 24:3 24:10 24:21 24:24 25:3 25:12 26:7 26:23
**COURTHOUSE**
[1] 1:8
**Courtroom**
[3] 2:25 3:9 15:23
**Courts**
[2] 2:13 5:12
**Create**
[1] 20:11
**Credibility**
[3] 6:20 24:8 24:9
**Credible**
[2] 22:23 23:4
**CSR**
[3] 1:19 1:25 26:6
**Cure**
[2] 16:14 20:13

**Daily**
[1] 4:19
**Date**
[3] 25:13 26:11 26:24
**Days**
[8] 16:14 19:20 20:7 20:14
23:25 24:13 24:17 25:8
**Dealing**
[3] 6:6 19:12 24:5
**Decided**
[1] 18:20
**Deem**
[1] 23:10
**Defendants**
[5] 1:7 1:17 3:4 9:3 9:13
**Definitely**
[2] 19:9 20:6
**Defrauded**
[2] 18:8 18:9
**Delivered**
[1] 3:15
**Demands**
[1] 13:12
**Denied**
[1] 14:3
**Deposition**
[10] 4:13 6:3 6:5 7:17 18:4
21:25 22:3 22:6 22:25 24:25
**Depositions**
[4] 3:7 4:5 4:6 7:10
**Described**
[1] 8:23
**Development**
[1] 9:10
**Direct**
[3] 4:11 6:4 7:1
**Directly**
[2] 8:15 8:21
**Discussing**
[1] 11:5
**Discussions**
[1] 10:6
**Dismiss**
[1] 22:22
**Dispatch**
[1] 3:25
**Disposition**
[1] 23:13
**Disputable**
[1] 23:9
**Dispute**
[3] 3:7 20:16 21:18
**DISTRICT**
[2] 1:1 1:1
**Doctrine**
[1] 19:22
**Dollars**
[4] 5:15 7:19 7:24 18:25
**Done**
[2] 13:3 16:13
**Down**
[3] 14:25 21:6 21:14
**Dragged**
[2] 14:8 14:15
**Drugs**
[1] 17:9
**During**
[1] 5:2
**Duty**
[3] 3:23 3:24 4:2

**E**

**EAST**
[1] 1:9
**Effect**

**Effort**
[1] 9:6
**Either**
[1] 16:14
**Emergency**
[1] 13:2
**Emphasizes**
[1] 4:8
**Employee**
[2] 26:14 26:16
**End**
[2] 10:8 22:10
**Endemic**
[1] 20:17
**Ensure**
[1] 11:13
**Enter**
[2] 13:25 22:17
**Entered**
[9] 4:14 4:21 9:21 9:24 11:
3 11:21 11:22 16:4 20:22
**Entertainment**
[3] 17:7 17:11 20:17
**Entities**
[1] 6:14
**ESQUIRE**
[5] 1:12 1:13 1:14 1:15 1:16
**ESQUIRES**
[1] 1:12 1:14
**Essence**
[1] 12:10
**Establish**
[1] 24:23
**Established**
[1] 22:3
**Et**
[2] 6:9 15:8
**Event**
[4] 8:21 8:22 8:25 9:12
**Events**
[3] 8:11 8:16 8:17
**Evidence**
[2] 7:9 12:17
**Exact**
[1] 19:23
**Exactly**
[2] 8:20 13:8
**Exaggerating**
[1] 4:20
**Exist**
[2] 12:14 12:15
**Existed**
[1] 12:7
**Expectations**
[1] 2:18
**Exploited**
[1] 9:14
**Extremely**
[2] 4:25 6:4
**Eyes**
[1] 20:25

**F**

**Faces**
[3] 23:5 23:6 25:4
**Facilitating**
[1] 15:16
**Facilities**
[1] 19:17
**Fact**
[13] 4:9 9:20 10:7 11:17 18:
5 18:6 20:12 20:13 20:19 21:
8 23:8 23:12 23:18
**Factor**
[1] 5:14

**[2] 7:15 9:19
Failed**
[1] 9:4
**Failure**
[1] 24:2
**Fair**
[1] 19:3
**Faith**
[1] 17:18
**Fate**
[1] 8:25
**Federal**
[1] 2:13
**Fees**
[1] 14:15
**Few**
[1] 10:20
**Fiduciary**
[3] 3:23 3:23 12:21
**Fight**
[1] 14:25
**Fighting**
[4] 13:10 16:23 17:21 17:24
**Filed**
[2] 11:18 12:16
**Filing**
[1] 20:4
**Final**
[3] 21:16 24:15 24:16
**Financially**
[1] 26:17
**Findings**
[1] 20:19
**Fine**
[2] 2:23 20:8
**Firm**
[1] 2:4
**First**
[6] 5:10 8:15 9:18 12:13 13:
20 21:23
**FISHER**
[1] 1:8
**Fix**
[1] 20:7
**FLATTAU**
[1] 1:14
**Flaw**
[1] 16:12
**Florida**
[11] 11:18 12:16 13:15 14:7
14:9 14:25 16:2 17:14 18:17
18:20 20:4
**Following**
[2] 1:22 4:13
**Ford**
[32] 1:6 3:5 4:6 4:10 4:13
5:3 5:19 6:4 10:5 10:9 10:
10 10:12 10:21 10:22 11:9
11:11 11:15 12:3 12:3 15:5
15:7 15:12 16:4 16:7 17:4
17:20 18:3 18:18 22:1 22:1
23:10 23:23
**Ford's**
[3] 6:3 10:2 11:9
**Foregoing**
[1] 26:9
**Forth**
[1] 26:12
**Forward**
[2] 6:11 8:4
**Forwarded**
[3] 10:19 11:23 19:14
**Fought**
[1] 16:2

**Freedom**
[6] 1:14 2:5 2:10 2:1 :21
2:23
**Fruit**
[1] 5:24
**Fulfill**
[2] 2:18 12:18
**Full**
[1] 12:7
**Fully**
[1] 10:10
**Functioning**
[1] 9:6

**G**

**General**
[1] 2:6
**Giants**
[2] 17:21 17:24
**Gleans**
[1] 5:20
**Goods**
[1] 17:9
**Grant**
[1] 23:15
**Granted**
[4] 5:3 7:4 7:10 8:5
**Group**
[36] 3:17 4:17 4:24 6:13 6:
17 8:19 8:25 9:2 9:5 9:7 9:
7 10:16 10:18 10:25 11:1 11:
5 11:5 11:13 12:6 12:6 12:7
12:7 12:24 12:24 13:6 13:8
13:12 14:13 14:25 15:9 16:
18 18:11 18:25 19:24 20:3
20:13
**Group's**
[1] 12:1
**Groups**
[4] 4:18 9:1 9:2 9:9
**Guarantees**
[2] 15:12 15:13
**Guess**
[2] 21:22 24:11
**Guys**
[3] 5:8 12:25 15:10

**H**

**Hammerstein**
[1] 17:11
**Hand**
[1] 2:25
**Handled**
[1] 6:19
**Happy**
[2] 4:11 7:1
**Hardly**
[1] 5:9
**Harm**
[7] 13:13 14:3 14:5 17:17
17:20 21:8 21:12
**Harmed**
[2] 18:2 18:4
**Harold**
[1] 19:14
**Hart**
[1] 17:10
**Headaches**
[1] 21:1
**Hear**
[2] 24:4 24:7
**Heard**
[3] 6:11 19:1 22:23
**Hearing**
[6] 21:6 21:14 21:25 22:8
23:8 24:13
**Held**

**Hereby**
[1] 26:8
**Hereinbefore**
[1] 26:11
**Hiding**
[1] 2:21
**High**
[1] 2:18
**Hits**
[1] 10:14
**Hold**
[1] 13:11
**Holding**
[1] 13:10
**Honest**
[1] 6:4
**Honesty**
[1] 2:15
**Honor**
[43] 2:3 2:12 2:20 3:12 3:
18 3:25 5:21 5:25 6:21 6:25
7:14 8:8 8:10 8:13 9:17 9:
20 10:5 11:17 14:16 15:4 15:
24 18:18 19:9 19:11 20:10
21:22 21:24 22:13 22:17 22:
21 23:1 23:7 23:15 23:17 23:
22 24:2 24:5 24:7 24:18 25:
2 25:9 25:10 25:11
**Honor's**
[1] 8:22
**HONORABLE**
[1] 1:10
**Hope**
[2] 22:17 23:15
**Hostage**
[1] 13:12
**Human**
[1] 5:14
**Hurt**
[1] 13:16

**I**

**Impediment**
[1] 8:7
**Important**
[1] 24:7
**Impression**
[1] 12:4
**Imprimatur**
[1] 22:9
**Inclined**
[1] 20:11
**Including**
[4] 7:9 9:2 15:18 22:20
**Incorporated**
[4] 1:6 3:5 9:21 10:1
**Incurring**
[1] 14:15
**Indeed**
[1] 16:14
**Indicated**
[1] 10:19
**Indicates**
[1] 12:24
**Information**
[2] 17:2 23:24
**Informed**
[1] 4:18
**Initiated**
[1] 10:6
**Initio**
[1] 19:7
**Injunction**
[9] 4:9 6:2 8:6 22:13 22:16
22:18 23:16 24:14 24:15

[1] 10:12
**Inspect**
[1] 19:16
**Inspection**
[2] 11:10 15:17
**Integrity**
[1] 2:15
**Intend**
[1] 24:12
**Intended**
[3] 8:20 8:21 8:22
**Intent**
[2] 10:9 14:9
**Interest**
[2] 5:19 5:22
**Interested**
[1] 26:17
**Interests**
[1] 16:6
**Interstate**
[1] 17:9
**Intramural**
[1] 13:14
**Invested**
[1] 7:24
**Investment**
[2] 5:15 9:9
**Involve**
[2] 6:17 18:22
**Involved**
[4] 14:6 14:10 16:5 16:5
**Issue**
[4] 9:18 15:22 15:25 15:25
**Issued**
[2] 6:2 8:6
**Issues**
[10] 6:1 6:16 21:23 22:2 22:
20 22:20 23:8 23:9 23:11 23:
18

**J**

**Jersey**
[4] 1:1 1:20 2:14 26:8
**Joel**
[2] 1:12 2:3
**Jr**
[2] 1:16 3:4
**Judge**
[2] 3:8 19:19
**July**
[2] 10:8 12:3
**June**
[1] 10:8
**Jurisdiction**
[2] 6:20 18:19

**K**

**KAREN**
[1] 1:13
**Kaufman**
[1] 17:10
**Kids**
[1] 18:11
**Kind**
[1] 4:18
**Kitchen**
[1] 3:9
**KLIMPL**
[1] 1:14
**Knocks**
[1] 25:1
**Knowing**
[2] 10:24 13:1
**Knowledge**
[4] 11:4 12:2 12:8 14:13
**Knows**

## L

**Language**
[1] 19:8
**Law**
[5] 17:7 17:11 17:15 19:21 20:20
**Lawful**
[1] 11:14
**Lawsuit**
[3] 11:18 12:16 20:4
**Lawyer**
[1] 20:24
**Lawyers**
[1] 25:5
**Leave**
[1] 15:2
**Leaving**
[1] 15:7
**Led**
[1] 17:2
**Left**
[1] 2:25
**Left-hand**
[1] 2:25
**Legal**
[1] 14:15
**Legality**
[1] 5:11
**Letter**
[8] 3:14 5:4 10:19 16:15 17:3 19:13 19:20 19:24
**Level**
[1] 18:25
**Liability**
[1] 17:8
**License**
[19] 3:18 3:19 4:16 5:3 5:17 5:23 6:16 8:2 8:5 9:13 11:4 11:6 11:25 13:7 13:11 14:9 15:11 16:18 20:12
**Licensed**
[2] 13:18 15:19
**Licensee**
[4] 11:7 11:13 13:22 15:15
**Licensee's**
[2] 11:10 15:17
**Licensing**
[1] 6:9
**Light**
[1] 22:25
**Litigation**
[1] 14:6
**Live**
[1] 15:18
**Lived**
[1] 23:2
**Living**
[1] 20:2
**Look**
[5] 10:12 14:21 18:19 19:16 25:3
**Losing**
[1] 13:19
**LOUIS**
[1] 1:3

## M

**Maintain**
[1] 3:19
**Maintained**
[1] 3:19
**Manager**
[1] 10:18
**Mark**
[12] 7:17 8:1 8:18 10:10 10:15:20 17:16 19:15

**Material**
[1] 22:6
**Materials**
[1] 6:1
**Matter**
[7] 1:23 2:1 6:15 9:20 10:7 22:14 24:12
**Matters**
[1] 22:4
**May**
[16] 3:1 3:12 4:12 4:20 7:2 7:6 7:7 8:10 8:11 8:14 10:19 12:15 20:2 20:4 23:12 24:18
**Meant**
[2] 14:16 14:17
**Meantime**
[2] 18:1 25:5
**Men**
[1] 9:7
**Merchandise**
[1] 16:24
**Merchandising**
[3] 5:18 7:22 11:21
**Michael**
[3] 1:14 2:5 2:11
**Middle**
[1] 3:7
**Might**
[4] 8:23 15:10 21:23 22:21
**Millions**
[5] 5:15 7:19 7:20 7:24 18:24
**Minute**
[2] 13:25 14:19
**Minutes**
[5] 5:1 5:20 6:12 17:4 23:19
**Misinterpreted**
[1] 17:4
**Misled**
[1] 23:10
**Misrepresentation**
[3] 19:10 20:11 24:6
**Misrepresentations**
[3] 21:10 22:5 22:5
**Misrepresented**
[1] 19:7
**Moment**
[1] 7:21
**Money**
[1] 6:23
**Moreover**
[1] 22:6
**Most**
[2] 8:21 9:2
**Motion**
[4] 2:7 3:13 22:22 24:19
**Musical**
[2] 4:18 16:18
**Must**
[1] 20:25

## N

**N-Sync**
[6] 1:6 2:1 3:4 9:21 10:1 15:8
**Name**
[11] 4:16 9:4 9:8 10:24 11:25 12:1 13:7 13:7 13:10 13:11 14:7
**Named**
[1] 15:10
**Names**
[1] 15:8

**Natural**
[1] 14:18
**Necessary**
[2] 22:14 22:19
**Necessity**
[1] 24:20
**Need**
[1] 8:3
**Negotiating**
[1] 19:10
**Never**
[11] 12:9 12:12 14:9 14:10 14:11 14:11 14:16 14:16 15:21 15:21 16:16
**New**
[5] 1:1 1:20 2:4 2:14 26:8
**Next**
[6] 2:1 7:5 9:7 9:7 10:17 17:22
**NJ**
[1] 1:9
**Nomenclature**
[1] 24:12
**Note**
[2] 2:1 19:1
**Noted**
[1] 6:18
**NOTES**
[1] 1:23
**Notice**
[12] 6:23 10:25 11:23 12:16 15:22 15:24 16:11 16:13 20:8 23:25 24:1 24:2
**Number**
[1] 20:21
**Numerous**
[1] 10:11
**NY**
[2] 1:14 1:15

## O

**Obligation**
[1] 12:10
**Obligations**
[2] 12:18 12:23
**Obviate**
[1] 24:19
**Obvious**
[1] 14:6
**Occur**
[2] 4:19 9:10
**Occurred**
[1] 8:17
**October**
[2] 1:6 11:18
**Official**
[3] 1:19 26:6 26:23
**One**
[8] 5:6 5:7 7:4 7:14 16:1 16:16 19:1 21:21
**Operation**
[1] 15:18
**Operations**
[1] 11:10
**Opportunity**
[5] 2:12 8:9 19:16 23:1 23:14
**Optimistically**
[1] 4:20
**Order**
[4] 1:4 1:5 7:3 25:4
**Original**
[1] 8:19
**Otherwise**
[2] 20:5 24:25
**Ought**

**Ourselves**
[1] 4:12
**Overly**
[1] 5:6
**Owes**
[1] 3:23
**Own**
[3] 11:25 20:1 25:4
**Owned**
[1] 6:14
**Owns**
[1] 3:24

**P**

**Page**
[1] 15:20
**Papers**
[2] 8:8 12:22
**Paragraph**
[2] 11:6 11:7
**Parker**
[3] 1:14 2:4 2:5
**Particular**
[1] 15:14
**Particularly**
[1] 22:25
**Parties**
[5] 20:18 20:22 21:6 24:15
26:15
**Party**
[1] 14:1
**PAXSON**
[1] 1:20
**Pearlman**
[44] 1:3 2:6 3:17 3:20 3:22
4:6 4:15 4:17 5:1 6:6 6:12
6:13 6:16 6:17 7:24 8:2 8:5
9:14 10:7 10:15 10:20 10:23
11:3 11:16 11:17 11:25 12:
10 12:17 13:3 13:4 14:12 14:
22 14:24 15:7 15:9 15:11 16:
3 18:10 18:11 18:13 18:16
19:25 20:2 23:21
**Pearlman's**
[4] 8:18 9:9 10:8 12:4
**People**
[1] 24:8
**Percent**
[1] 4:19
**Performances**
[2] 11:11 15:18
**Period**
[2] 20:10 24:19
**Permit**
[2] 8:23 15:17
**Person**
[3] 5:3 6:21 18:16
**Personally**
[1] 2:14
**Persuaded**
[1] 22:22
**Phone**
[2] 10:11 10:17
**Pick**
[1] 20:21
**Place**
[4] 4:5 7:23 12:10 26:11
**Placed**
[1] 10:25
**Plain**
[2] 4:13 5:14
**Plaintiff**
[2] 1:4 1:15
**Plaintiff's**
[1] 10:4

**Penn** 7:19
**Point**
[6] 4:11 4:16 6:8 7:14 21:
16 23:9
**Points**
[1] 6:5
**Policy**
[1] 13:5
**Position**
[7] 11:8 11:15 11:17 12:13
12:14 12:17 14:14
**Potatoes**
[1] 21:3
**Potential**
[1] 14:5
**Predetermine**
[1] 18:22
**Preliminary**
[6] 4:9 21:16 22:16 22:17
23:16 24:14
**Prepare**
[1] 21:15
**Present**
[1] 21:7
**Presented**
[3] 9:19 12:3 12:21
**Privy**
[1] 12:11
**Problem**
[1] 9:22
**Proceed**
[1] 22:15
**Proceeding**
[2] 7:25 25:5
**Proceedings**
[2] 25:14 26:10
**Product**
[2] 13:22 17:8
**Program**
[8] 5:1 5:3 5:20 6:22 10:14
10:15 23:19 23:21
**Promote**
[1] 15:11
**Proof**
[1] 24:23
**Propose**
[1] 21:23
**Proprietor**
[2] 15:16 15:19
**Proprietor's**
[1] 15:16
**Protect**
[1] 16:6
**Provide**
[1] 13:23
**Public**
[1] 13:5
**Purchase**
[3] 10:10 10:23 13:7
**Purported**
[1] 3:14
**PURSUANT**
[1] 1:22
**Put**
[4] 11:25 13:4 22:9 23:19
**Puts**
[1] 6:11

**Q**

**Quality**
[4] 11:6 13:23 15:13 15:17
**Quickly**
[1] 4:1
**Quite**
[1] 4:1

[1] 15:14

**R**

**Radames**
[2] 1:16 3:3
**Raise**
[2] 4:12 15:25
**Raised**
[1] 22:2
**Rate**
[2] 4:19 4:21
**Rather**
[1] 25:3
**Reached**
[1] 10:9
**Reading**
[1] 24:25
**Realize**
[1] 5:14
**Really**
[2] 18:11 20:16
**Reason**
[7] 5:22 7:24 11:23 12:8 16:
11 16:16 22:10
**Reasonable**
[1] 15:17
**Reasons**
[1] 16:10
**Recognize**
[1] 5:10
**Record**
[11] 6:18 7:16 15:9 16:1 16:
1 16:21 16:22 16:23 17:22
18:14 23:23
**Recordings**
[1] 5:16
**Records**
[3] 7:21 9:11 16:24
**Reference**
[1] 12:21
**Refuted**
[1] 5:20
**Regard**
[3] 4:5 4:6 10:11
**Relationship**
[7] 6:12 10:16 10:22 10:24
16:21 20:6 20:7
**Relative**
[2] 26:14 26:16
**Relevant**
[2] 16:19 23:11
**Remake**
[1] 19:3
**Remaking**
[1] 18:23
**Reporter**
[4] 1:19 26:7 26:7 26:23
**Representation**
[1] 12:5
**Representations**
[1] 12:2
**Representatives**
[4] 10:9 11:9 11:12 12:4
**Represented**
[1] 9:3
**Request**
[3] 15:20 15:21 23:23
**Requesting**
[1] 19:14
**Requests**
[1] 19:13
**Require**
[2] 23:8 23:12
**Requirements**
[1] 22:16

[2] 24:16 25:7
**Resolve**
[5] 20:9 20:18 21:18 21:23
22:1
**Respectfully**
[7] 4:1 5:11 5:25 6:21 7:3
15:23 18:1
**Respond**
[1] 8:21
**Responsibilities**
[2] 14:2 14:2
**Restraining**
[2] 1:5 7:3
**Restraints**
[2] 21:13 24:11
**Result**
[1] 25:4
**Return**
[1] 14:17
**Revert**
[1] 9:13
**Review**
[1] 23:2
**Richard**
[3] 1:6 3:5 4:5
**Rights**
[1] 14:2
**Ritzholz**
[1] 10:18
**Rule**
[3] 23:13 23:13 24:19
**Russoniello**
[4] 1:19 1:25 26:6 26:22

**S**

**Sale**
[1] 7:21
**Saw**
[2] 5:4 10:13
**Schedule**
[1] 21:20
**Seated**
[1] 3:1
**Second**
[1] 12:14
**SECTION**
[1] 1:22
**Seeks**
[1] 6:10
**Send**
[5] 6:23 16:13 19:20 19:23
25:12
**Sends**
[1] 16:11
**Separate**
[1] 6:14
**September**
[4] 3:15 5:2 19:13 23:24
**Services**
[2] 11:7 13:23
**Set**
[5] 21:5 21:14 21:20 21:21
26:11
**Shipment**
[1] 17:9
**Shirts**
[1] 16:25
**Shorthand**
[1] 26:7
**Show**
[2] 1:4 7:17
**Shows**
[1] 20:4
**Side**
[1] 2:25

[1] 13:5
**Similarly**
[1] 23:17
**Simple**
[1] 17:14
**Sing**
[1] 19:1
**Sit**
[1] 2:23
**Situation**
[4] 14:10 19:23 20:2 20:9
**Socks**
[1] 25:1
**Sold**
[1] 18:10
**Sole**
[1] 3:24
**Sort**
[1] 21:18
**Sought**
[1] 6:2
**Speaks**
[1] 19:22
**Specific**
[1] 7:16
**Specifically**
[1] 3:20
**Specimens**
[2] 11:12 15:19
**Spent**
[2] 7:19 18:24
**Sponsorship**
[1] 2:19
**Spooked**
[1] 21:10
**Stamp**
[1] 13:4
**Stands**
[1] 14:14
**Start**
[3] 4:17 4:18 21:1
**Started**
[2] 9:3 10:21
**State**
[5] 1:9 8:9 8:15 22:24 26:8
**Statement**
[2] 3:22 17:3
**Statements**
[2] 7:1 23:20
**States**
[5] 1:1 1:8 5:12 16:10 26:7
**Status**
[1] 3:10
**STENOGRAPHIC**
[1] 1:23
**Stenographically**
[1] 26:10
**Sterns**
[20] 1:12 1:12 2:3 2:3 2:11
2:16 2:20 3:12 8:24 9:20 12:
20 14:19 15:4 16:9 17:7 17:
13 17:16 18:9 19:5 25:9
**Still**
[3] 19:1 19:19 20:3
**Stockholder**
[1] 3:25
**Stolen**
[1] 17:9
**Stop**
[1] 9:6
**Store**
[1] 7:16
**Stores**
[2] 5:16 16:25

**Street**
[1] 1:9
**Subject**
[1] 23:13
**Submit**
[1] 18:1
**Submitted**
[1] 6:1
**Subsequent**
[1] 11:24
**Succeed**
[2] 9:1 9:5
**Success**
[2] 4:19 4:21
**Successful**
[4] 4:25 4:25 5:8 9:23
**Suggest**
[1] 5:12
**Summarize**
[1] 6:1
**Supplemental**
[1] 4:7
**Supply**
[2] 11:11 15:18
**Supposed**
[2] 11:8 13:23
**Suspicious**
[1] 11:2
**Sync**
[16] 1:6 2:1 3:4 4:16 4:24
6:7 6:17 9:11 9:21 9:23 10:
1 10:13 12:6 15:8 15:10 18:
12
**Sync's**
[1] 10:22

**T**

**T-shirts**
[1] 16:25
**Tax**
[1] 17:9
**Teenage**
[1] 15:10
**Telephone**
[2] 3:6 4:4
**Television**
[1] 6:22
**Temporary**
[2] 1:4 24:11
**Tenable**
[1] 22:24
**Terminate**
[7] 6:10 7:8 12:19 16:8 16:
9 20:14 22:10
**Terminated**
[5] 8:12 9:13 10:24 16:18
20:6
**Terminating**
[2] 10:21 21:2
**Termination**
[12] 3:14 3:16 5:4 6:24 8:
23 11:1 11:23 12:15 14:18
15:22 15:24 23:25
**Terms**
[2] 3:22 19:12
**Testimony**
[11] 7:17 20:19 21:7 22:1
22:3 22:7 22:25 24:7 24:9
24:22 24:25
**Therefore**
[1] 12:19
**They've**
[1] 19:6
**Thinks**
[3] 18:7 18:9 18:10
**Third-party**

THOMPSON
[1] 1:10
Three
[5] 5:23 15:22 16:4 18:23 23:24
Throughout
[1] 5:16
TITLE
[1] 1:22
Tomorrow
[2] 7:5 7:6
Took
[1] 12:9
Tours
[2] 5:17 17:1
Transcontinental
[1] 12:23
Transcript
[3] 1:22 23:19 26:9
TRANSCRIPTION
[1] 1:23
TRENTON
[2] 1:9 1:20
Trial
[3] 22:14 22:19 23:12
Tried
[4] 9:3 9:4 12:10 13:6
Trouble
[1] 14:21
Truckload
[1] 21:3
True
[4] 16:20 19:13 19:17 26:9
Try
[3] 17:19 21:23 24:19
Turn
[1] 14:1
Twice
[1] 21:17
Two
[5] 6:14 7:5 8:14 16:22 23:25

**U**

Undated
[1] 3:15
Under
[6] 6:15 9:8 12:18 13:23 15:8 23:13
Undertook
[1] 15:11
United
[4] 1:1 1:8 5:12 26:6
Unless
[2] 21:3 25:1
Urge
[2] 7:25 23:11
Urgency
[1] 8:3
USC
[1] 1:22
USDJ
[1] 1:10
Uses
[4] 8:6 11:12 15:19 19:15

**V**

Value
[1] 10:12
Velazquez
[21] 1:16 3:3 3:4 9:16 9:17 10:1 10:4 13:17 13:20 14:5 14:20 17:18 19:6 19:9 19:19 20:16 21:8 22:2 24:4 24:5 25:11
Vigor

Vincent
[4] 1:19 1:25 26:6 26:22
Void
[1] 19:7
Vouch
[1] 2:14

**W**

Wait
[2] 13:25 19:21
Waiting
[1] 19:19
Wander
[1] 7:15
Wants
[3] 3:10 13:11 14:24
Watch
[1] 6:22
Week
[1] 7:5
Weeks
[2] 7:6 10:20
Weigh
[1] 24:8
WEINROTH
[1] 1:12
Welcome
[1] 8:9
Wholly
[2] 3:24 6:14
Wish
[1] 4:12
Wonderful
[2] 17:7 17:10
World
[4] 17:6 17:10 20:17 21:1
Worthy
[1] 24:9
Writing
[1] 13:2

**Y**

Year
[1] 9:4
Years
[5] 5:23 15:22 16:4 18:23 23:24
York
[1] 2:4
Young
[1] 9:7
Yourself
[1] 3:2
Yourselves
[1] 3:10



Int. Cl.: 9

Prior U.S. Cls.: 21 and 36



**United States Patent and Trademark Office**    Reg. No. 1,843,498
                                                  Registered July 5, 1994

### TRADEMARK
### PRINCIPAL REGISTER



-N- SYNC, INC. (NEW JERSEY CORPORATION)
P.O. BOX 263
SCOTCH PLAINS, NJ 07076

FOR: PRERECORDED PHONOGRAPH RE-
CORDINGS, VIDEO CASSETTE TAPES,
AUDIO CASSETTE TAPES AND COMPACT
DISCS FEATURING MUSIC, IN CLASS 9 (U.S.
CLS. 21 AND 36).

FIRST USE 1-2-1992; IN COMMERCE
1-2-1992.

NO CLAIM IS MADE TO THE EXCLUSIVE
RIGHT TO USE "INC.", APART FROM THE
MARK AS SHOWN.

SN 74-214,905, FILED 10-24-1991.

BARBARA G. HERMAN, EXAMINING ATTOR-
NEY