UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

---

TRANS CONTINENTAL RECORDS, INC.,
BMG ENTERTAINMENT, BMG ARIOLA
MUENCHEN GmbH, TRANS CONTINENTAL
ENTERTAINMENT, INC. and LOUIS J.
PEARLMAN,

              Plaintiffs,

v.

ZOMBA RECORDING CORPORATION,
CLIVE CALDER, JAMES LANCE BASS,
JOSHUA SCOTT CHASEZ, JOSEPH
ANTHONY FATONE, JR., CHRISTOPHER
ALAN KIRKPATRICK, and JUSTIN
RANDALL TIMBERLAKE,

              Defendants.

99-1282-Civ.-Orl-22C

REPLY DECLARATION OF LOUIS J.
PEARLMAN IN FURTHER SUPPORT
OF A MOTION
FOR A PRELIMINARY
INJUNCTION

---

      LOUIS J. PEARLMAN, pursuant to 28 U.S.C. §1746, declares under the pains and penalties of perjury, as follows:

      1.     I am a named plaintiff in this action and the Chairman and Chief Executive Officer of the corporate plaintiffs Trans Continental Records, Inc. ("Trans Continental") and Trans Continental Entertainment, Inc. ("TCE"). I submit this declaration in further support of the plaintiffs' motion for a preliminary injunction and in reply to the November 2, 1999 submissions of the defendants in opposition to that motion.

      2.     Trans Continental and I have made our name and reputation in the music and entertainment industries by nurturing, developing and commercializing young talent like defendants Bass, Chasez, Fatone, Kirkpatrick and Timberlake (the "Group Members") who are the members of

555999_1, 11/20/99

the hugely successful musical group 'N SYNC (the "Group"). Given the opportunities that I gave to these five young men, who have become rich and famous as a result of this relationship, I was greatly distressed and saddened when I read the mountain of court papers filed by the attorneys for the Group Members and for Zomba Recording Corporation ("Zomba"). Those papers unfairly assail and demean me on a professional and personal level. The unflattering portrait of the business structure and my role as painted in those papers simply bears no resemblance to the actual events that transpired over the past three years in connection with the conception, artistic growth and commercial development of the Group. I look forward to the opportunity to refute the content and tone of defendants' papers, but I do not wish to inundate the Court with more paper than it already has received on this application and to further the effort to divert attention from the critical issues. However, the aspersions cast against me are unwarranted and I cannot allow the record to stand in the distorted manner presented by the defendants. Therefore, I briefly address below certain of the issues that defendants have raised in their unseemly submissions.

### I Have Always Dealt in a Forthright Manner with the Group Members

3. My dealings with the Group Members have always been open and honest. The defendants' papers fail to disclose that defendant Justin Timberlake's father, Paul Harless, an Executive Vice President of First Tennessee Bank and a sophisticated businessman, along with other advisors, was very involved in the early stages of the Group and with the relevant agreements. He repeatedly told me that the Group Members and their parents had consulted with counsel. I never advised any of the Group Members not to retain independent counsel to review the operative contracts. In fact, the Group Members themselves admit in their papers that the contracts were reviewed and evaluated by independent counsel of their choice.

4.     Furthermore, all of my activities in connection with the Group, including the acquisition of the rights and the license to use the name 'N Sync from the entity that owns the federal trademark registration, were fully disclosed to the Group Members. (Pearlman Decl. pp. 5-13). In the operative agreements the Group Members have acknowledged and confirmed that I own the trademark rights. Indeed, I ultimately obtained exclusive trademark rights for the 'N Sync Mark in more than twenty (20) countries. I used the trademark solely in connection with the commercial activities of the Group for the mutual benefit of the parties, and the Group was never disadvantaged by the terms of the license.

### I Played The Pivotal Role In Connection With the Group's Development and Its Record Contracts

5.     For the past three years, I have also been the driving force behind the Group and all of its varied artistic and commercial activities, including but not limited to merchandising, recording, performing, touring and related activities. The maturation and development of a musical group is a difficult process, one with which I am uniquely familiar, having developed and brought to success other immensely popular groups such as the Backstreet Boys. It is also a risky venture as I have to expend substantial effort and to risk great sums of money to finance previously unknown and untrained young performers. While some of the groups that I have put together have been successful, others have not been financially successful.

6.     I was integrally involved with 'N SYNC in its formative stages. Illustratively, in 1996 I accompanied the Group to Munich, Germany on its first trip to Europe and to Stockholm, Sweden for its first recording sessions after signing with BMG. During the Group's first tour in early 1997, called the "I Want You Back" tour, which was coordinated with the release of the Group's first single of that name and the subsequent release of its debut album, I traveled to several

European cities with the Group. In mid-late 1997, I traveled with the Group to Southeast Asia in connection with their multi-country Southeast Asia tour. I was the person who represented the interests of the Group at important developmental meetings with BMG executives in 1997 when the Group's first album went Gold and No. 1 in Germany and I traveled with the Group to South Africa, Greece, Mexico, Canada and other locations when their professional careers were at a critical stage in development. On behalf of Trans Continental, I represented the interests of the Group at critical meeting with RCA when plans were first being developed to launch the Group in the United States. I have continued to remain actively involved in all of the Group's activities. I am not just a bank or bill payer as the Group's advisor would have this Court believe.

7.     I also undertook efforts on behalf of the Group to enter into a relationship with a "major" record company with a worldwide presence and strong distribution capabilities. To this end, Trans Continental and its representatives acting on its behalf solicited the interest of prominent record companies and delivered the "demo" tapes that we had made. Most declined to enter into a recording commitment with the Group. Defendant Zomba was among the many record companies that were unwilling to sign the Group or to make a financial commitment.

8.     The Group Members contend that Johnny Wright was instrumental in obtaining the Group's recording contract with BMG Ariola. However, I directed Mr. Wright, as an employee of Trans Continental and TCE, to negotiate with BMG Ariola, with whom we both had contacts. Mr. Wright did so acting as an employee of my companies, under my auspices and at my direction.

9.     The Group Members' papers paint the picture that their success is attributable to Johnny Wright and that he acted independently of me. This is absolutely false. My relationship with Johnny Wright dates back to 1993 when I hired him to work with the Backstreet Boys. I

4

concluded that he would be a valuable asset to the Group. In or about April 1996, I introduced the Group Members to Mr. Wright and he began acting as TCE's management representative for the Group shortly thereafter. At all times, he was an employee of TCE, the management company for 'N Sync, until he resigned on September 24, 1999 after the Group made its deal with Zomba.

### Plaintiffs Did Not Delay In Bringing This Action or In Seeking Injunctive Relief

10. Defendants assert that Plaintiffs delayed in commencing this action and in seeking injunctive relief. The fact is that we moved quickly after we became convinced by rumors and press reports that the Group Members had entered into an unauthorized record deal with Zomba in September. Prior to that point, we had been negotiating on an ongoing basis with the Group Members in response to their requests to renegotiate their contracts to obtain more money, and we were hopeful that the parties' disputes would be resolved amicably. Indeed, we still do not know the terms of the agreement among the Group Members and Zomba, including the amounts of money Zomba has paid or has agreed to pay the Group, or what their plans are. All we know is that the Group and Zomba are planning to release an album under the name 'N Sync during the first quarter of 2000. We have not been given any information as to the content of the proposed new release.

### The Group Members Continue to Tour and Earn Revenues From Touring and Merchandising Activities

11. The Group Members are continuing to tour under agreements made by Trans Continental and merchandising activities are continuing under existing agreements, notwithstanding this litigation. According to information that is posted on the official 'N Sync website, the Group is currently scheduled to tour in the following cities on the following dates during November and December: November 26 and 27, 1999 at the MGM Grand, Las Vegas, NV; November 28, 1999 at the MGM Grand, Reno, NV; November 29, 1999 at the Oakland Arena in Oakland CA; November

30, 1999 at the ARCO Arena in Sacramento, CA; December 3, 1999 at the Fargodome in Fargo, ND; on December 4, 1999 at the Arena in Winnepeg, Canada; on December 7 at Canadian Airlines in Calgary, Canada; on December 8 at the Skyreach Center in Edmonton, Canada, on December 30 and December 31, 1999 and January 1, 2000 at the Blaisdell Center, in Honolulu, Hawaii. As in the past, they will receive weekly salaries and other revenues from these concerts. Merchandising activities arranged by Trans Continental also remain in place under existing contracts with Winterland and the Group Members will continue to earn substantial revenue from these activities as well.

I declare under penalty of perjury under the laws of the United States that the foregoing is true. Executed this 22nd day of November, 1999 at Orlando, Florida.

_____
LOUIS J. PEARLMAN