
UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

---

TRANS CONTINENTAL RECORDS, INC., BMG
ENTERTAINMENT, BMG ARIOLA MUENCHEN GmbH,
TRANSCONTINENTAL ENTERTAINMENT, INC.
and LOUIS J. PEARLMAN,

               Plaintiffs,

v.

ZOMBA RECORDING CORPORATION,
CLIVE CALDER, JAMES LANCE BASS,
JOSHUA SCOTT CHASEZ, JOSEPH
ANTHONY FATONE, JR.,
CHRISTOPHER ALAN KIRKPATRICK, and
JUSTIN RANDALL TIMBERLAKE,

               Defendants.

CIVIL ACTION NO.
99-1282-Civ-Orl-22C

REPLY DECLARATION
OF ROBERT JAMIESON

---

      ROBERT JAMIESON, pursuant to 28 U.S.C. §1746, declares under penalty of perjury that the following is true and correct:

      1.     I am President of The RCA Records Label ("RCA"), a unit of BMG Music, d/b/a BMG Entertainment and an affiliate of BMG Ariola Muenchen, Germany (collectively "BMG"). I submit this reply declaration in further support of plaintiffs' motion for a preliminary injunction.

      2.     I have been President of RCA since 1995 and have been employed in the record industry for more than thirty years. From 1991 to 1995, I was President of BMG Canada and before that held various executive positions in the record business for nearly two decades.

      3.     The purpose of this declaration is to explain to the Court how my company will be severely injured – in ways money cannot measure – if the injunction is not issued. I also wish to respond to defendants' argument that they will be injured by an injunction. Finally, I will

SCANNED

describe RCA's close working relationship with and affection for the Group Members and show that their effort to "terminate" their contracts based on the advice of their advisors was wrong and ineffective.

## BMG AND RCA WILL BE IRREPARABLY HARMED WITHOUT AN INJUNCTION

### RCA's Recent History

4. In order to understand why RCA will be irreparably harmed without an injunction, it is important to reemphasize the recent history of my company. Although RCA is one of the oldest record companies in the United States, it experienced a long period of decline from the 1980's until the early 1990's. During this prolonged slump, RCA could not attract the new and vibrant recording artists that are the lifeblood of a record company. While other record companies were signing artists such as Mariah Carey, Gloria Estefan, Celine Dion, Whitney Houston, Sheryl Crow, Kenny G and Madonna, RCA languished.

5. This period of stagnation hurt RCA because it was perceived as a second-rate record company to which recording artists, radio stations, record retailers and the trade press did not pay real attention. Like any slump, this negative momentum fed on itself, and RCA had become demoralized and was seen as the "Record Cemetery of America." In contrast, other record companies with "hot" acts had credibility when they introduced new acts. When a record company with credibility for "breaking" hot acts approaches a radio station or record retailer with a new act, the act is more likely to be played on the radio and given prominent placement in record stores. The effect is to create a wave of momentum and excitement that gives the record company even more credibility when it comes around with its next new act.

-2-

6. When I arrived at RCA, the company enjoyed none of this. I recognized that for RCA to thrive, things had to change dramatically. The key was finding new acts and reversing the overwhelming negative aura surrounding RCA. It was a huge challenge and the situation did not change overnight.

7. But change did come – and RCA began its climb upward. We concentrated on a few artists we thought could help make RCA a "player" in the music business. When I arrived at RCA, the lawyers and managers who represented up-and-coming recording artists would not even return our phone calls. By 1996, as the result of the success of a handful of new artists, including the highly-talented The Dave Matthews Band, La Bouche, The Verve Pipe, and the enormous success of the "Macarena" record, RCA had come a long way back. But it still was not in the elite circle of companies that were magnets for the best new artists.

### RCA's Association With The Group

8. RCA's relationship with the Group known as 'N SYNC changed this, putting RCA over the top and placing it among the top ranking record companies. The Group's self-titled debut album, released by RCA in early 1998, was the biggest selling album in RCA's history and one of the biggest selling debut albums ever.

9. My prior declaration, and that of my A&R Director Vince Degiorgio, describe in some detail the events leading up to RCA's release of the Group's debut record, including the close and intense creative relationship between RCA and the Group Members. RCA invested its heart and soul in the Group – picking songs for the record, devoting countless hours marketing the Group and promoting the Group's records to literally thousands of radio stations across the country.

10. Additional details concerning RCA's intimate involvement with the Group and the Group's embrace of RCA as its U.S. record company are set forth in the accompanying declaration of Kaja Gula, RCA's Senior Director of Marketing and Artist Development.

11. As the Court knows, the Group known as 'N SYNC became one of the most successful and prominent new groups in America. RCA has been identified with and credited for contributing to this success every step of the way.

12. My original declaration describes how the 'N SYNC name and RCA have become inextricably linked in the minds of the public and the music industry. As I explained before, this connection is expressed and reinforced on every single record sold, every single music video broadcast, every single record chart and in nearly every article written about the Group.

### Zomba's Theft of the Group Already has Caused Irreparable Harm

13. It is no surprise that RCA's strong association with the Group made us more attractive to other new artists. After RCA released the Group's first record in the United States to great fanfare, RCA found itself in the newfound position of vying for, and signing, a number of the hottest new acts in America. For example, in 1998, we signed Christina Aguilera, whose debut album is the second most successful in RCA's history, having sold millions of albums, and is currently ranked #11 on the all-important *Billboard Magazine* record charts. In addition, RCA is now in the running for nearly all new important acts, whereas before the success of the Group, this was not the case. In short, RCA is back on the map – in large part due to our association with the group known as 'N SYNC.

14. Christina Aguilera is a good example of the enormous benefits RCA has realized as a result of its association with the Group and the 'N SYNC Mark. It also illustrates the

-4-

irreparable harm we will suffer if this association is allowed to be severed as a result of Zomba's theft of the Group.

15. After Zomba announced that it had signed a recording agreement with the Group, I was informed that Christina Aguilera had questioned whether she should continue her relationship with RCA if it could not hold on to its leading act. The threat of the loss of one of RCA's most important artists was devastating. If "irreparable injury" means an injury that cannot be measured by money, then this kind of threat to our business is as irreparable as any harm can be. If one of our most significant recording stars already has raised a question about her relationship with RCA as a result of defendants' actions, then surely others must be considering the same. And if our current artists are losing faith in our company as a result of defendants' actions, then surely we will lose the opportunity to compete for future artists as well.

16. The loss of 'N SYNC, therefore, is about much more than money. If an injunction is not issued, RCA's prestige, reputation and status will be eroded dramatically. The momentum we have spent nearly eight years creating will be arrested, and people in the music business – including our current roster of artists – will conclude that RCA has lost a step.

### Defendants' Arguments Miss the Mark

17. I cannot emphasize enough how important RCA's association with the 'N SYNC name is to our success. This is why so many of the arguments made by defendants and their "experts" are wide of the mark. We could have paid for any number of "experts" to tell the Court why BMG and RCA will be irreparably harmed without the injunction. But I believe that testimony from those actually involved in the day-to-day operations of our company, such as

Kaja Gula, are in the best position to describe the nature and extent of the harm we will suffer (and already have suffered) from defendants' actions.

18. I am tempted simply to ignore the arguments advanced by defendants, their lawyers and their "experts" because the facts establishing our irreparable harm are so plain. Nevertheless, I will briefly address defendants' main arguments.

19. First, defendants ignore the most obvious harm: If Zomba releases a record using the 'N SYNC Mark, it will lead everyone to believe that Zomba – and not BMG/RCA – has the right to release 'N SYNC recordings. For the reasons I discussed above regarding the importance of RCA's association with the 'N SYNC Mark, the damage BMG/RCA will suffer as a result of such a false impression cannot be quantified in monetary damages.

20. Defendants also make the sweeping argument that BMG would not be irreparably harmed by the loss of the 'N SYNC Mark because defendants are unaware of any instance in which a record company's loss of an artist affected its ability to "fully exploit its position in the marketplace." As I explained above and in my prior declaration, RCA's "position in the marketplace" is based on its roster of artists, and 'N SYNC is a cornerstone of our roster. That is why the loss of such an extraordinarily popular and successful act and Mark would clearly damage BMG's and RCA's "position in the marketplace."

21. The irreparable harm to BMG and RCA from the loss of the Group and the Mark has been recognized by recent reports in the press. For example, a September 13, 1999 article from the *New York Daily News* states that:[1]

---

[1] Relevant supporting documents are attached as Exhibits to the Accompanying Declaration of Steven Hayes, executed on November 22, 1999.

BMG h uch to lose if the five-man band – whose hit singles
include "Tearing Up My Heart" – flees.

> 'N SYNC now records for BMG label RCA, which has relied on
> the group to help pull it out of a major slump.
>
> While RCA's other leading acts include another sudden teen
> sensation, Christina Aguilera, and popular rock act the Dave Matthews
> Band, the loss of 'N SYNC would be a heavy blow.

22. Defendants' "expert" Elliot Goldman states in his declaration that he does not believe the loss of any artist could have an impact on a label beyond the monetary value of the lost sales of the artist's next release. I am astonished that Mr. Goldman could say this since it defies the realities of the music business. In fact, Mr. Goldman's opinion is contradicted by the October 30, 1999 *Billboard* article he attached as Exhibit D to his declaration. In that article, Erik Bradley, Chicago radio station WBBM's music director is quoted as stating: "Success seems to breed success. So, Jive will surely attract other good artists because of its current roster." That article confirms the statement in my prior declaration that, "In the recording industry, success begets success." If "success begets success," then surely the loss of an essential artist begets the loss of additional artists and stature.

23. Mr. Goldman's opinion also is contradicted by a second article in the *Billboard* excerpt he attached as Exhibit D. In that article, entitled "The Secret of Jive's Int'l Success," Zomba's managing director, Stuart Watson, states:

> "A lot of [Zomba's] expansion has been driven by the U.S. success and
> the success of their acts. . . ."
>
> "These days there are very few labels which have an aura about them and
> which determine buying decisions. . . . Jive is one of them. At radio
> stations people take it and put it on the deck if it's a Jive record."

As this shows, Zomba's own managing director understands that the success of a label's artists affects every aspect of its business, and not just the amount of money a particular artist would earn for that label.

24. Clive Calder – Zomba's chief executive officer – also acknowledges in his declaration that a record label's reputation and ability to promote artists is based on its existing artists. In arguing that the quality and image of 'N SYNC would not suffer if Zomba releases the next 'N SYNC album, Calder states: "Two of the leading artists in the pop music segment – the Backstreet Boys and Britney Spears – release their records with Zomba." The fact that Zomba's top executive believes the identity and success of his company's existing artists is evidence that his company will also be able to successfully produce and promote recordings by a different artist reflects the fundamental understanding in the music industry that a label's roster of artists constitutes the core of its business and reputation – including its attractiveness to other artists. This is why the loss of a popular and successful group and mark is about much more than money – it penetrates the very heart of a record company's business.

25. Mr. Goldman also states that the loss of the Group would not make it more difficult for RCA to compete for other artists because "no artist would refuse the chance to record for BMG Music or RCA." Mr. Goldman's statement is way off base; if it were true, BMG and RCA would have every artist they wanted. Since this (unfortunately) is not true, Mr. Goldman's statement is obviously wrong.

26. Defendants further argue that BMG and RCA would not be irreparably harmed because BMG is a large and successful company. This is, of course, not the point. Just as IBM or General Motors would suffer irreparable injury from the misappropriation of an important

-8-

trademark from one of the divisions by a competitor, so too would BMG and RCA be harmed by the unauthorized use of the 'N SYNC Mark by Zomba, a competitor of RCA.

27. Defendants also argue that there will be no irreparable harm because BMG Distribution acts as the distributor for Zomba and therefore will perform the distribution function if the Group's next album is released by Zomba. This argument also misses the mark because the record would be released by and associated with Zomba, a major competitor of RCA. The industry and the public would know the record as a "Zomba record," not an "RCA record," and the association between RCA and the Group would be destroyed.

28. For the same reason, defendants' assertion that this case is only about money – because BMG would rather receive 100% of the profits if the Group's next album is released on RCA, instead of 20% of the profits if it is released on Zomba (BMG owns a 20% minority interest in Zomba) – is totally wrong. For RCA, this case is about its standing and credibility in the music industry as the U.S. record company for one of the country's top groups – a status which the Group Members themselves sought and affirmed. The fact that BMG may receive some percentage of the profits if the album is released by Zomba is entirely irrelevant to RCA's irreparable injury.

29. Defendants' next argument – that artists are not associated with their labels – is demonstrably wrong. All record companies – including RCA – take great pains to insure that their names are included on all of the recordings and music videos by any of their artists. They do so for an obvious reason – because it creates an association between the artist and label, generating the goodwill and momentum I have described above.

-9-

30. Similarly, record industry trade press reports on and evaluates record companies based on their roster of artists. For example, RCA's status as the Group's U.S. record company has been noted in articles and record charts published in *Billboard Magazine*, the record industry's "Bible" which is read by virtually every member of the industry, every single week since mid-1998. Similarly, the association between the Group and RCA prominently has been featured in other trade publications, including *Rolling Stone*, *Hits* and *Spin*. In short, RCA's close association with the Group is pervasive.

31. Finally, defendants' assertion that there is nothing "to indicate that BMG Music did anything more for 'N SYNC than any other record label would do for one of its artists" (Goldman Dec. ¶15) is inaccurate. As demonstrated in my prior declaration, and that of Vince Degiorgio, as well as in the accompanying declaration of Kaja Gula, BMG and RCA gave the Group special attention and care as we helped transport them from obscurity to stardom. Before BMG accepted the Group as a BMG artist, 'N SYNC had not released a single record and was completely unknown. As a result in no small part of our efforts, the Group and Mark are now among the most popular and recognizable in America and across the world. RCA has sold many millions of copies of the Group's records and videos, each one bearing the RCA name. The Group had two of the top 100 albums in the United States in 1998, both of which were released on RCA, and (as set forth below) has numerous records on the record charts today. During last year's holiday season, both of the Group's albums were in the top ten, which was the first time that had occurred since the Beatles three decades ago. The accompanying declaration of Kaja Gula describes the extent to which RCA went above and beyond the call of duty to assist the Group Members to become as famous as they are today.

-10-

## THE IRREPARABLE HARM TO BMG AND RCA OUTWEIGHS ANY POTENTIAL HARM TO DEFENDANTS

### The Group Members Can Continue Their Careers and Maintain Their Public Visibility

32.  Defendants' principal business advisor tells this Court that "what is at stake for this group . . . . is their entire future career prospects . . . . " (Declaration of Adam Ritholz Re: Bond, executed on November 17, 1999 ("Ritholz Bond Dec") ¶ 2). He argues that a preliminary injunction prohibiting Zomba from releasing the Group's next album pending a full trial would cause the Group to plummet into obscurity. More specifically, he argues that the absence of a Zomba record "as soon as possible" will create an "imminent risk [that the Group will] lose [ ] its audience." (Id. ¶ 5). This is the essence of defendants' argument as to why an injunction would be unfair. As I now explain, defendants' argument ignores the fact that the injunction sought by plaintiffs does not seek to prevent the Group Members from continuing to give live concert performances and appear on major television programs, generating substantial public attention and income from those ongoing professional activities. It also ignores the fact that the Group currently has eight different recordings on the record charts which continue to generate considerable enthusiasm and sales. In short, defendants' argument ignores the fact that the Group today is more popular than ever with no prospect of losing its current audience.

33.  The injunction sought by the plaintiffs is limited. We seek only to prohibit Zomba from releasing a record using the 'N SYNC Mark pending trial. The injunction would not prevent the Group Members from continuing the full range of their other professional activities which have kept them in the public eye. The injunction also would not prevent their hit

-11-

albums "'N SYNC" and "Home for Christmas" from continuing to enjoy substantial sales around the world, or their other records from similarly thriving.

34. Defendants' argument that the Group risks losing its audience is extraordinary given the massive exposure the Group has received and will receive over the coming months. These activities include:

- A continuation of their wildly successful Summer 1999 tour. The scheduled tour, which starts the day after Thanksgiving and continues into January 2000, will attract hundreds of thousands of additional fans, on top of the more than 1 million people who have attended the Group's concerts this year alone. Obviously, the absence of a new album is not hurting the Group's ability to give live concerts with great success.

- A current hit single ("*Music of My Heart*") on the record charts, which reached #2 on the "Hot 100 Single Sales," with credit on the record to RCA.

- A #1 album on the *Billboard* "Pop Catalog" record chart. *Home for Christmas*.

- A current recording on the hit soundtrack album released several weeks ago for the smash hit movie "*Pokémon*," which was released on November 9, 1999 and currently is #8 on the "Billboard 200" chart for top-selling albums, with credit on the record to RCA.

- A current recording on the hit soundtrack album for the film "*Light It Up*," which was released on November 9 and currently is #19 on the "Billboard 200" chart for top-selling albums, also with credit to RCA as the Group's record company.

- A current recording entitled *Love's In Our Hearts on Christmas Day* performed by the Group and Rosie O'Donnell, contained on the album entitled *A Rosie Christmas*, which is currently is #34 on the "Billboard 200" chart for top-selling albums.

- A #49 album, "'N Sync" on the *Billboard* "200 Top Selling Albums" record chart.

- Alabama's rendition of the song "(God Must Have Spent) a Little More Time on You" featuring the Group was #19 on *Billboard*'s "Top Country Singles Sales" last week.

-12-

- Blaque's single *Bring It All to Me* featuring the Group was #5 on *Billboard*'s "Top 40 Rhythm-Crossover" chart three weeks ago.

- Numerous high-profile national television appearances, including *The Rosie O'Donnell Show*, CBS's Thanksgiving Special *Celine Dion: All the Way* on November 24, 1999; CBS's Holiday Special entitled *A Home for the Holidays* on December 23, 1999 and ABC's Millennium celebration on December 31, 1999. These television shows will be seen by tens of millions of viewers.

- A featured half-time performance at the Super Bowl on network television on January 30, 2000 which will be seen by over 100 million viewers in the United States alone and more than 800 million viewers around the world. This is the most coveted appearance for any entertainer in the world.

35. Plaintiffs are not seeking to prevent the Group from participating in or profiting from any of these substantial activities. To the contrary, the touring, television appearances, Super Bowl performance and other activities are all being done with plaintiffs' consent and cooperation. This is why defendants' statement that "[t]here is nothing limited about the injunction plaintiffs seek" is wrong. We seek only to prohibit Zomba from releasing the next record and also have demanded that the Group Members not identify themselves as Zomba artists. (See Ritholz Bond Dec. Ex. A) Obviously, plaintiffs' actions demonstrate that we have no intention of "shutting them down." Because we want the Group Members to continue as RCA recording artists, it would be foolish for us to do anything to interfere with their other ongoing professional activities and success.

36. As noted above, the Group's album entitled "'N SYNC," which was released by RCA in March 1998, continues to experience healthy sales and currently enjoys a position of #62 on the *Billboard* "200 Top Selling Albums" chart. In addition, as noted, the Christmas Album released by RCA in late 1998, which defendants dismiss as insignificant, currently sits at #1 on the *Billboard* "Pop Catalog" record chart. The continued success of these albums belies any

-13-

claim that the absence of a new record "as soon as possible [will create an] imminent risk of [the Group's] losing its audience." (Ritholz Bond Dec. ¶ 5)

37.     These facts demonstrate that all of defendants' doomsday predictions of harm if a new album is not released in early 2000 are false alarms. The Group's position in the public eye is more prominent than ever and will remain so whether or not a new album is released in early 2000. The Group's massive public exposure in the coming months – in concerts, on national television and on the current record charts – demonstrates that a later release of the new record will cause no harm. In fact, a good argument can be made that, given the Group's amazing exposure over the next several months, and its collection of current hit records on so many different record charts, the best strategy would be to release the next album in the summer of 2000 to create anticipation and pent-up demand for the new record, while at the same time allowing the Group's records which are currently on the charts to enjoy the full benefit of their spectacular runs.

38.     For all of these reasons, defendants' claim that the Group must release a new record every 18 months is untrue. While RCA was and is prepared to release a new album as soon as it is ready, our desire to release a record in late 1999 does not mean that the failure to do so would harm the Group. Indeed, the release date of records, like that of movies, often moves depending on changed circumstances. Given the facts described above, including the number of the Group's records currently on the charts, the next record could be an even bigger event and enjoy more significant sales if it is released in mid-2000.

### BMG Will Consent to an Expedited Trial

39. Although there is no urgent need to release a new album by the arbitrary date of early 2000, the injunction sought would not preclude the Group Members from releasing their next album by the Spring of 2000 because BMG is prepared to conduct expedited discovery and proceed to an early trial, if that would be consistent with the Court's calendar. Defendants then could release the Group's album by their self-imposed deadline, if the Court determines they may do so at that time.

### The Group Can Release Its Next Album on RCA

40. The Group Members would not be harmed by an injunction because, if the Group truly believes it needs to release its next album prior to the Spring of 2000, it can do so immediately through BMG/RCA. BMG and RCA are fully prepared to release the Group's next album promptly upon completion. The Group cannot claim that a BMG/RCA release would not be as successful as a Zomba release because BMG/RCA: (i) is one of the largest, most respected and successful record companies in this country and throughout the world; (ii) is ready and willing to release the next 'N SYNC album with the same creative and distribution team that helped the Group achieve its spectacular success in the past; (iii) was expressly acknowledged in writing and embraced by the Group Members for more than two years as their "worldwide" record company; (iv) sold more than 10 million copies of 'N SYNC albums in the United States alone; (v) currently distributes all 'N SYNC records and Zomba records; and (vi) worked closely and cooperatively with the Group Members in the recording and preparation of the next 'N SYNC album until their team of legal and business advisors issued the purported "termination" in May 1999.

41. Significantly, defendants do not once question BMG/RCA's ability or effectiveness to distribute, promote or sell 'N SYNC records. Nor do defendants allege that the Group ever was harmed in any fashion as a result of its relationship with BMG/RCA. Thus, releasing the next record on RCA cannot conceivably harm the Group. Indeed, the label on which the Group wishes to release its next record (Zomba) lacks its own distribution network and itself distributes its records through BMG. Under these circumstances, an RCA release would greatly benefit the Group, both commercially and artistically.

### Any Delay in the Release of the Group's Next Album is Defendants' Own Fault

42. It is worth noting here that any delay in the release of the Group's next album is due entirely to defendants' own actions. RCA had been working closely with the Group Members earlier this year on the Group's next album, and wished to continue doing so. The only reason that did not occur is because the Group Members refused to honor their contractual obligations.

43. In addition, defendants could have sought a declaratory judgment in May of this year when they purported to "terminate" their contracts. Instead, after failing to obtain an acceptable renegotiation of their contracts, the Group Members elected to breach them and entered into a purported contract with Zomba.

### Defendants' $100 Million Claims Are Absurd

44. Defendants' argument that they will each lose $50 million if an injunction is issued demonstrates that, for defendants, this case is only about money. While defendants suggest that BMG may not be good for defendants' claimed damages (Ritholz Bond Dec. ¶ 26),

-16-

nobody seriously disputes BMG is a multi-billion company with more than adequate assets to cover any potential damage award.

45. As for defendants' damages claims, they make no sense. Ivan Gavin, Zomba's Senior Vice President for Finance and Commercial Operations, has submitted a declaration stating that Zomba's damages calculation is based on its estimate that it would sell 11 million copies of the Group's next album and earn a net profit of $50 million, and that an injunction would cause Zomba to lose that entire amount. Mr. Gavin is wrong. As stated above, BMG is willing to agree to an expedited trial which would allow the Group to release its next album by defendants' self-imposed deadline of the first quarter of 2000. In addition, even if the Group's next album is not released until later in 2000, it is ridiculous to say that such a delay would cause the album's sales to plummet from 11 million to zero. If anything, such a delay could lead to even higher sales for the reasons I have described above.

46. The Group Members also argue that they would suffer $50 million in damages if the preliminary injunction is issued. Their attorney Adam Ritholz states that an injunction would prevent the Group from releasing its next album in a timely manner and conducting a tour in the spring and summer of 2000, supposedly causing the Group Members to lose $20 million in recording and publishing royalties, $20 million in tour revenue and endorsements, and $10 million in merchandise royalties. Mr. Ritholz's calculations are pure fiction because, as stated above, BMG is willing to agree to an expedited trial which will permit a resolution of this dispute before the album and tour deadlines defendants allege. In addition, the Group will in fact be able to continue to tour and sell merchandise while the preliminary injunction is in effect whether or not a new album is out in early 2000 – on the heels of their Super Bowl appearance and continued popularity due to the massive exposure they will receive in the coming months.

-17-

And even if the album is released in mid-2000, these huge projected revenues – even if they are dependent upon the release of a new record (which they are not) – can be achieved at that time.

## THE PURPORTED TERMINATION IS A SHAM

47. My original declaration explained why the Group Members' purported "termination" of their recording agreement was wrong and obviously done in an effort to obtain an early renegotiation of their contracts.

48. For all of defendants' voluminous submissions, they never once claim that RCA was not the Group's U.S. record company. Such a claim would be preposterous because RCA sold more than 10 million of the Group's records and was warmly embraced by the Group Members for two years as their record company. Indeed, the Group continued to accept RCA as its U.S. record company for more than one and a half years after the 18 month time period for termination set forth in Section 19.12 of their agreement. This is why the belated "termination" based on the purported failure to obtain an agreement with a U.S. record company is so transparent and unfair. The law should not enable the Group Members to acknowledge the existence of a "worldwide distribution" deal with BMG in 1996, accept RCA as its U.S. record company for two years, accept the huge benefits of over 10 million records sold by RCA and then turn around in May 1999 when they want more money and claim, for the very first time, that RCA never agreed to be their U.S. record company.

49. Finally, as for defendants' argument that RCA is not "obligated" to release the Group's records, RCA is committed to the Group and to the release of the recordings of this top-selling group. In short, RCA agreed long ago to be the Group's U.S. record company and now we urge the Court to prevent Zomba from interfering with that agreement by misappropriating the Group and the valuable 'N SYNC Mark.

-18-

## Conclusion

For the reasons set forth above, as well as in Plaintiffs' other papers, I respectfully request that Plaintiffs' motion for a preliminary injunction be granted.

Executed this 22d day of November, 1999 in New York, New York.

ROBERT JAMIESON